**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

**TIMOTHY SEWELL**

**CIVIL ACTION NO**
**VS**                                                    **2:23-cv-317**

**THE LINCOLN NATIONAL**
**LIFE INSURANCE COMPANY**

<u>**COMPLAINT**</u>

1.

Plaintiff, **TIMOTHY SEWELL**, files this Complaint against Defendant, **THE LINCOLN NATIONAL LIFE INSURANCE COMPANY (hereinafter "LINCOLN").**

**JURISDICTION and VENUE**

2.

Federal question subject matter jurisdiction under 28 U.S.C. 1331 applies to this case, as it is governed by federal law under the Employee Retirement Income Security Act of 1972 (ERISA), 29 U.S.C. 1001, *et. seq.*, because Plaintiff is claiming benefits under an ERISA-governed employee benefits plan, and under ERISA, "a person denied benefits under an employee benefit plan [may] challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1001, *et seq.*, 29 U.S.C. § 1132(a)(1)(B)).

3.

Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claim occurred in this district, and under 28 U.S.C. §1391 (c) and (d), and 29 U.S.C. § 1132(e), ERISA § 502(e), because Defendant resides in this district, and may be found in this district by being subject to personal jurisdiction in this district for the controversy at issue herein.

## PARTIES

### 4.

Plaintiff is a major resident and citizen of the City of Paradise, County of Wise, Texas.

### 5.

Defendant, **LINCOLN**, is a foreign insurance corporation with its principal business establishment in the State of Indiana and is authorized to do and doing business in this Court's district.

## FACTS

### 6.

On August 28, 2021, Plaintiff, then age 56, a proud husband, father, and sole breadwinner, who served in the United States Navy from 1983-1985 before being honorably discharged, was permanently rendered quadriplegic from a diving accident while on a fishing trip with friends and colleagues as described below.

### 7.

**LINCOLN** wrongly denied Accidental Dismemberment insurance benefits to which Plaintiff was entitled as described below.

### 8.

On August 28, 2021, Plaintiff went on a speckled-trout fishing trip as a guest on a boat with three friends, who were colleagues and insurance professionals, all in their mid-50's in age, one of which owned and captained the boat, in Port Aransas, County of Nueces Texas.

9.

Plaintiff and his friends fished at different spots that day out of Port Aransas, Texas, until stopping for lunch at about 2:30 p.m. at a dockside restaurant, after which they boated a short distance at around 4:00 p.m. and anchored in a large bay to take a break, swim, and cool off.

10.

The boat Plaintiff and friends occupied was among several other boats anchored 30 to 50 feet apart, whose occupants were wading and swimming near their boats.

11.

Plaintiff's friends occupying the boat with Plaintiff were avid saltwater fishermen who had fished the area regularly, and the boat owner lived in the coastal town where they launched.

12.

Plaintiff had never been fishing or boating in that area in his life and was unfamiliar with it, and had seldom been saltwater fishing (less than a dozen times over the course of his entire life).

13.

Plaintiff observed the occupants of several other boats, including full-grown men appearing to be up to six feet in height, jumping and diving from their boats into the water near the boat occupied by Plaintiff and his friends without incident, then wading in water between chest deep to neck deep where they had entered the water, indicating to Plaintiff a four-to-five-foot water depth.

14.

From seeing that, Plaintiff assumed the water where his boat was anchored, which was a similar distance from the shore, and just 30 to 50 feet from the other boats, was the same depth.

15.

There were no shallow-water markers or signs warning boaters or swimmers of shallow water or sandbars in the area, no visible evidence of sandbars, and no discussion of sandbars or water depth that day. The bottom was not visible from the boat, as the water was murky.

16.

Plaintiff decided to dive into the water to cool off like he saw the occupants of the other boats do.

17.

The "dive" that Plaintiff made was a shallow dive off the side of the rear deck of the boat, which was about 18 inches above the water surface. The "dive" was more flat or horizontal in orientation with the water, and in more an outward direction from the boat, less than at a 45-degree angle to the water.

18.

Plaintiff did not forcefully spring with his legs for the dive. It was a light push with his legs, very well controlled and deliberate, and with barely any real push of the legs at all.

19.

Plaintiff did not slip, stumble, lose his balance or fall from the boat.

20.

Plaintiff is familiar with making such shallow water dives, having dived into and swum in ponds, lakes, rivers, and other natural bodies of water throughout his life.

21.

From the manner in which Plaintiff dove, he knew there was no way he could have hit the bottom if the water had been chest or neck deep, or four to five feet deep where he entered as he had assumed the depth to be.

22.

Upon diving, Plaintiff recalls his neck being snapped backward from his head impacting bottom, and the water being far shallower than he had anticipated.

23.

The impact did not feel to Plaintiff like a severe blow to the head, and Plaintiff was consciously aware of the inability to feel or move either of his arms or legs, and being unable to stand, lift his head from the water, or roll from a face-down position.

24.

Plaintiff recalls being about to run out of breath and feeling like he was losing consciousness, and then his recollection fades in and out before being in the hospital.

25.

Plaintiff was permanently rendered a quadriplegic from the accident.

26.

Two other friend occupants of the boat Plaintiff occupied later told and Plaintiff and his wife that there was a sandbar where he entered the water, and the depth was only about 2.5 feet deep. It was described to Plaintiff and his wife as having an abrupt drop-off, or transition of water depth from about 2.5 feet to four or five feet deep where Plaintiff had seen others diving, swimming and wading minutes before, in chest- and neck-deep water.

27.

No "alcohol-caused" misjudgment had any causal role at all with Plaintiff's accident.

28.

Alcohol had nothing to do with Plaintiff's accident or his decision to dive into the water when he did and in the manner that he did.

29.

With all that Plaintiff saw before he entered the water, such as other people jumping and diving and wading in chest and neck deep water, and all that Plaintiff didn't see, such as sandbars or shallow water signs or markers, Plaintiff would have assumed that he was diving into four- to five-foot-deep water whether or not he had consumed any beer at all that day. He would have entered the water the same way and suffered the same accident, which would not have happened if the water had been at the depth that Plaintiff had assumed.

6

30.

Under that assumption, and unfamiliar with the sandbars of this waterway, or how abruptly water depth can change there because of them, Plaintiff would not have felt the need to check, nor would he have checked the depth before entering the water with or without having consumed any beer that day.

31.

Beginning around 9 a.m. on the morning of Plaintiff's accident, up until the time of his accident, Plaintiff drank 6 12-ounce beers equally spread in timing between 9 a.m. and the time of the accident. He also drank several bottles of water and Gatorade and had breakfast, lunch and snacks throughout the day.

32.

Plaintiff is accustomed to drinking that number of beers over that period of time on all day beach or water recreation type outings and has a high tolerance to the effects of alcohol at that level of consumption.

33.

Plaintiff did not at all feel "drunk" or unsteady at any time that day, nor at the time of the accident, and he recalls everything about the day up to his dive into the water very clearly until some fading in and out after feeling like he was losing consciousness after the accident.

34.

Plaintiff's occupation and employment before and up until becoming disabled from his accident was General Commercial Property Claims Adjuster for McLarens, Inc. (not a

party).

35.

At all relevant times, Plaintiff was a covered employee and member of McLarens's group employee benefit plan (the Plan").

36.

The Plan included certain Accidental Death and Dismemberment coverage and benefits that covered Accidental Dismemberment to McLarens employees caused by accidents as defined by the Plan.

37.

Quadriplegia is a covered Dismemberment under the Plan which pays the full amount of the Plan's Death benefit.

38.

Decedent's quadriplegia Dismemberment was caused by accident occurring within this Court's district in Port Aransas, Texas while he was a McLarens employee and Plan member.

39.

At all relevant times, in full force and effect was an Accidental Death and Dismemberment insurance policy ("the Policy"), written by Defendant, **LINCOLN**, wherein McLarens was policyholder, and which provided insurance coverage for those benefits referenced above, provided under the Plan and the Policy.

40.

At all relevant times, Plaintiff was an insured and lawful beneficiary under the Policy.

41.

Plaintiff is clearly entitled to Dismemberment benefits under the provisions of the Plan and

the Policy under applicable law.

42.

At all relevant times, **LINCOLN** acted as Plan-appointed Claims Administrator of the Plan for the benefits at issue here, and in that capacity, both made the benefits determinations and provided the funding to cover benefits for Plaintiff's claims at issue herein under the Policy and the Plan**,** thus creating a structural conflict of interest.

43.

**LINCOLN** abused its discretion and arbitrarily and capriciously denied Dismemberment benefits to Plaintiff, entitling Plaintiff to the recovery of those benefits and attorney's fees.

44.

**LINCOLN** based its denial of benefits on a Policy exclusion which provides:

"No benefits are payable for any loss that is contributed to or caused by:… 11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred;…"

45.

The evidence in this case cannot reasonably support a finding that the presence of alcohol caused or contributed to Plaintiff's accident as the Policy requires for exclusion.

46.

While **LINCOLN'S** conclusion that the presence of alcohol caused or contributed to Plaintiff's accident was an abuse of discretion, this Court's review of **LINCOLN's** denial of benefits is *de novo*.

47.

The evidence cannot carry **LINCOLN's** burden of proof that the presence of alcohol

caused or contributed to Plaintiff's accident, thus triggering the Policy exclusion.

48.

Plaintiff timely appealed **LINCOLN's** initial denial of benefits.

49.

Plaintiff exhausted all required administrative remedies prior to filing this lawsuit.

## PRAYER

**WHEREFORE**, Plaintiff, **TIMOTHY SEWELL**, prays for judgment against Defendant,

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY** as follows:

1. For all Dismemberment benefits due Plaintiff by law under the Policy and Plan, plus pre- and post-judgment interest;
2. For all reasonable attorney's fees;
3. For costs of suit; and
4. For all other relief as the facts and law may warrant.

Respectfully Submitted,

s/J. Price McNamara

_____

**J. PRICE McNAMARA**
Bar Nos: LA 20291 & TX 24084626
10455 Jefferson Highway, Ste. 2B
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313
price@jpricemcnamara.com
Attorney for Complainant

**SERVICE**
Complaint will be served upon agent for service for defendant(s) by
Certified Mail with request for Waiver of Service of Summons.

10