The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578




J. PRICE MCNAMARA
LAW OFFICES OF J. PRICE MCNAMARA
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE LA 70809

EXHIBIT

2

**Lincoln/Sewell 093**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

September 27, 2023

J. Price McNamara
Law Offices of J. Price McNamara
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE, LA 70809

RE:   Insured: Timothy Sewell
      Policyholder: McLarens, LLC
      Policy #: SA3-890-LF0483-01
      Claim #: 12885926

Dear J. Price McNamara:

We have completed the appeal review of the above-referenced claim for Accidental Dismemberment benefits under Group Life Insurance Policy No. SA3-890-LF0483-01 (hereinafter "Policy") issued by The Lincoln National Life Insurance Company (hereinafter "Lincoln") to McLarens, LLC. We have determined that the denial of benefits will be maintained.

## Initial Claim Decision

In investigating this claim, we obtained a Dismemberment Claim Form and also reviewed the medical records contained within Mr. Sewell's Long Term Disability claim file.

During the initial claim evaluation, Mr. Sewell's file was referred for review by Dr. Robert Millstein, an independent physician Board Certified in Internal Medicine.  Dr. Millstein provided the following summary of Mr. Sewell's medical treatment:

*8/28/21 Mr. Sewell sustained a spinal cord injury in a diving accident into 3 feet of water from the back of the boat with loss of consciousness. Diagnostic imaging + locked facet dislocation, C4 – C5 anterior subluxation, cord edema from C2 to mid C6, aspiration pneumonia, and vertebral artery thrombosis versus dissection at C4 – C5. He was intubated at the scene.*

*8/28/21 at 1814 hrs. a blood alcohol level was 222 mg/dL. A list of diagnoses from the acute care hospitalization included alcohol abuse with intoxication.*

*8/29/21 Mr. Sewell underwent C4 – C6 ACDF with plating. While hospitalized he remained in sinus bradycardia with pauses on telemetry. Persistent symptomatic hypotension was treated with midodrine and Florinef. Methicillin sensitive staph aureus pneumonia was treated with*

*antibiotics. 9/2/21 he underwent PEG tube placement. 9/5/21 tracheostomy was placed with ongoing ventilatory support. 9/21/21 he was transferred for inpatient skilled rehab.*

*11/1/21 Dr. Bowman Brock, physical medicine and rehabilitation, observed ongoing tetraplegia.*

Following a review of the available medical evidence, Dr. Millstein noted that on August 28, 2021, Mr. Sewell sustained a spinal cord injury resulting in quadriplegia in a diving accident into 3 feet of water from the back of the boat. His blood alcohol level at the time of the diving accident was 222 mg/dL. Dr. Millstein concluded with a blood alcohol level of 222 mg/dL Mr. Sewell would have experienced signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia. Further the clinical review by Dr. Millstein indicated,

*Manifestations of alcohol intoxication in persons who do not drink alcohol on a regular basis are related to the blood alcohol level. Persons who abuse alcohol chronically may have some degree of tolerance to some of the effects of alcohol. The submitted information does not indicate whether, around the time of her hospitalization, Mr. Sewell was consuming alcohol on a regular basis.*

*Among patients who do not abuse ethanol chronically, clinical signs often associated with particular ranges of the BAC (blood alcohol concentration) [1] are as follows:*

- *With a BAC between 0.01 and 0.10 percent (<100 mg/dL), euphoria and mild deficits in coordination, attention, and cognition may be observed.*
- *With a BAC between 0.10 and 0.20 percent (100—200 mg/dL), an individual experiences*
- *greater deficits in coordination and psychomotor skills, decreased attention, ataxia, impaired judgment, slurred speech, and mood variability.*
- *With a BAC between 0.20 to 0.30 percent (200—300 mg/dL), severe intoxication results in a lack of coordination, incoherent thoughts, confusion, nausea and vomiting.*
- *When the BAC exceeds 0.30 percent, stupor and loss of consciousness can occur. Some patients experience coma and respiratory depression, and death is possible.*

*The predominant effect of alcohol is in the brain. High alcohol concentrations cause central nervous system depression, judgment disorder, decision inability, and impairment of perception and reaction to events. This impairment develops prior to the onset of more overt symptoms of alcohol intoxication, such as difficulty walking or maintaining balance.[2] With a blood alcohol level of 222 mg/dL Mr. Sewell would likely experience signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.*

*Diving and head-first sliding into the water account for the most serious aquatic injuries because of damage to spinal cords, often as a result of striking the bottom or side of a shallow body of water. The majority of spinal cord injuries resulting from aquatic accidents are sufficiently serious to cause permanent paralysis.[3]*

*Serious accidents due to diving into shallow water are rare but potentially devastating as*

**Lincoln/Sewell 095**

*in this case. The incidence of spinal cord injuries following these accidents has been reported to range from 1.2 and 21%. Misjudgments of the water depth and recklessness behavior have been cited as common factors in these accidents. Alcohol consumption is also important risk factor, thought to be contributory and 38 to 49% of cervical injuries in previously published series.[4]*

*Types of accidents associated with traumatic cervical spinal cord injury include motor vehicle crashes in sport related accidents – in particular, diving accidents. Numerous studies have shown that 50% of spinal cord injuries occur while victims are under the influence of alcohol. A 2004 study of persons who sustained spinal cord injury supported the association between alcohol use and cervical spinal cord injury specifically – the spinal cord injury type with the most severe consequences. The study that demonstrated that participants with cervical injury were more likely to use alcohol when injured compared with participants without cervical injury.[5]*

The McLarens, LLC Group Life Policy includes the following exclusion:

***ACCIDENTAL DEATH AND DISMEMBERMENT EXCLUSIONS***

*No benefits are payable for any loss that is contributed to or caused by:*

*… the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred; or*
*…*

Accidental Dismemberment benefits were denied on the basis that the presence of alcohol in Mr. Sewell's blood contributed to the cause of the accident.

The basis for the decision was outlined in a letter dated January 27, 2023. Mr. Sewell was provided an opportunity to request an appeal review of the denial by submitting a written request stating the reasons why the claim should not have been denied and submitting additional information to support the claim.

## Appeal

We received your request for reconsideration on behalf of Mr. Sewell on May 16, 2023. In your letter, you indicated Mr. Sewell was on a "relaxed business trip among professional friends and gentlemen…" which was "no drunken outing, and the hospital lab results were simply wrong…." You noted it is undisputed that Mr. Sewell did not drink more than 6 beers spread over the course of a long day before his accident, felt no signs of intoxication, exhibited no signs of intoxication, and dove from the boat in a controlled manner into the water which by all appearances was much deeper than the unseen sandbar where he dove. You stated that Mr. Sewell had never been in this area before, was unfamiliar with it and nothing gave him any visual clue that the water where he dove was only about half the depth of what he believed. You asserted that alcohol played no part in his decision to dive from the boat, or the controlled manner in which he dove from the boat. You noted other people from other boats were doing so without incident. You indicated that according to

**Lincoln/Sewell 096**

Toxicologist, Dr. Thomas Arnold, "it is a certainty" that after several minutes of cardiac arrest and CPR being performed on Mr. Sewell that he would have accumulated a large amount of lactic acid in his blood "that explain the inaccurate reading on the hospital serum alcohol assay by simple interference with the measured enzyme." You stated that according to Dr. Thomas Arnold, the hospital serum toxicology results "could not possibly" be accurate and "alcohol played no causal role in Mr. Sewell's tragic accident. You indicated that Mr. Sewell and his fishing mates are late-50's age in professional gentleman, who were on a relaxed all-day fishing trip, "not young drunken fraternity boys." You provided quotes from what you described as an analogous ERISA case.

Included with the May 16, 2023 notice of appeal was a copy of a medical review dated April 28, 2023 prepared by Dr. Thomas Arnold, the affidavit of Timothy Sewell, affidavit of Gaye Sewell, affidavit of James Fenn, affidavit of Tiffany Weaver, affidavit of Paul Boswell, affidavit of Chris Boswell, CV for Thomas Clayton Arnold, MD, and Journal of Analytical Toxicology Article.

This appeal review and analysis considered all the medical and claim documentation contained in Mr. Sewell's Group Life and Long Term Disability administrative record, whether or not specifically referenced in this document.

## Appeal Evaluation

To ensure a full and fair review on appeal, we have reviewed the information in the file in its entirety and have considered all information, facts and circumstances pertaining to this claim.

During the appeal evaluation, Mr. Sewell's file was reviewed by Dr. Peggy Geimer, an independent physician Board Certified in Internal Medicine and Preventive Medicine (Occupational Medicine). Based on a review of the evidence submitted in support of Mr. Sewell's claim, Dr. Geimer concluded the presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth. Dr. Geimer noted that blood from Mr. Sewell was tested on the day of admission to Corpus Christi Medical Center and revealed alcohol at a concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. Mr. Sewell's hospital diagnoses included alcohol abuse with intoxication. The clinical review by Dr. Geimer noted that blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing.

Further the clinical review by Dr. Geimer indicated,

> Timothy Sewell is a 58-year-old male who, on 8/28/21, sustained a traumatic spinal cord injury involving his cervical spine when he reportedly dove into shallow water from a boat. Among other findings, diagnostic imaging on admission revealed C4-C5 locked facet

**Lincoln/Sewell 097**

*dislocation, C4- C5 anterior subluxation, cord edema from C2 to mid C6. Blood testing revealed and ethanol concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration (BAC) of 0.222%. He underwent C4-C6 ACDF with plating. His encounter diagnoses as listed in the Continuity of Care Document were: unspecified injury at unspecified level of cervical spinal cord, initial, 3; contact with and (suspected) exposure to COVID 19; sepsis, unspecified organism; severe sepsis with septic shock quadriplegia, unspecified; pneumonia due to methicillin susceptible staph; acute respiratory failure with hypoxia; other shock; acute kidney failure, unspecified; unspecified effects of drowning and nonfatal submersion; hyperlipidemia, unspecified; spondylolisthesis, cervical region; alcohol abuse with intoxication, unspecified; essential (primary) hypertension; hypokalemia; anxiety disorder, unspecified; other specified heart block; unspecified atrial fibrillation; long-term (current) use of systemic steroids; presence of cardiac pacemaker; arthrodesis status; unspecified cause of accidental drowning and submersion, initial; other places as the place of occurrence of the external cause; dislocation of C4-C5 cervical vertebrae, initial encounter. The claimant was transferred to Shepherd Center on 9/21/21 where he remained until 11/1/21. As of 12/14/22, his physician, Dr. Van Beest, noted that the claimant's diagnoses are quadriplegia and cervical translation injury with weakness/paralysis of all four extremities, numbness/altered sensation of body, neurogenic bladder and bowel, and restrictive lung disease. He has no functional use of hand/legs and cannot complete any activities of daily living. His condition is permanent.*

*Diving accidents comprise 1.2 – 22% of all spinal injuries and 2.5% of all cervical spinal trauma is linked to diving accidents. Shallow-water (maximum depth of 1.5 m) injuries due to dive or fall into shallow water have catastrophic neurological sequelae. The severity of the injury is closely related to the weight of the individual, the height of the jumping place as well as the depth of the water. Cervical spinal injuries are associated with significant morbidity and mortality and many individuals with cervical spinal injuries have permanent disabilities such as quadriplegia as seen in the claimant. Misinterpretation of the depth of water, careless behavior and alcohol consumption are risk factors for these accidents. In fact, alcohol use is involved in up to 70% of deaths associated with water recreation, like boating or swimming; nearly 25% of ED visits for drowning and 20% of boating deaths. The owner of the boat stated that he was aware that the depth of the water in the area of the accident was 4.5 to 5 feet deep, but no discussion of sandbars or water depth took place before Mr. Sewell dove into the water. Mr. Sewell acknowledged drinking beer on the boat during the day of his accident, this was confirmed by others. He had lunch at a dockside restaurant at 2:30 but there is no comment regarding what beverages he consumed at lunch. Mr. Sewell's blood alcohol concentration was 0.222% on hospital admission. i, ii*

*Substances Found:*
*Alcohol: Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed alcohol at a concentration of 222 mg/dL (High). This is equivalent to a blood alcohol concentration of 0.222%. Mr. Sewell's hospital diagnoses included alcohol abuse with intoxication. Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger,*

**Lincoln/Sewell 098**

*judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. iii, iv, v, vi*

*Comments on Affidavits submitted by Attorney McNamara: This were reviewed in their entirety. All agreed that Mr. Sewell was drinking on the boat of the day of his accident. Of interest is the fact that while all of the participants on the boat acknowledged stopping at a "dockside restaurant" around 2:30 PM, the name of the restaurant was not mentioned nor was their any mention of the quantity or type of beverages consumed by Mr. Sewell or others at this restaurant.*

*Comments on Medical Report from Dr. Thomas Arnold: Records including the Port Aransas EMS Run Report and Medical Records from Corpus Christi Medical Center were made available to Dr. Arnold for his review. These documents are not contained within the claim file, therefore the information regarding the clinical status prior to and at the time of admission cannot be confirmed. He comments regarding the validity of the hospital's alcohol testing results are in question as well as they appear to be based primarily on statements from individuals on the boat that Mr. Sewell did exhibit "signs of severe intoxication". As mentioned above, Mr. Sewell's doctors made and documented in the record the diagnosis of alcohol abuse with intoxication casting doubt on the opinion of lay bystanders.*

On July 14, 2023, we sent you a letter which included a copy of the clinical review that was performed in connection with Mr. Sewell's request for appeal. You were given an opportunity to review and respond with any additional information that you would like considered before a final determination was made on the appeal. A deadline for response was given of August 04, 2023.

In support of Mr. Sewell's claim, the following additional information was received:

- Affidavit of Timothy Sewell (dated July 20, 2023)
- Affidavit of Tiffany Weaver (dated July 20, 2023)
- Affidavit of James Fenn (dated July 24, 2023)
- Affidavit of Chris Boswell (dated July 29, 2023)
- Affidavit of Paul Boswell (dated August 16, 2023)
- Copy of appeal exhibits 001-029 (previously on file)
- Appeal exhibits 030-269 not previously on file which include the following documents:
  - Signed Affidavit of Tim Sewell
  - Signed Affidavit of Gaye Sewell
  - Signed Affidavit of James Fenn
  - Signed Affidavit of Tiffany Weaver
  - Signed Affidavit of Paul Boswell
  - Signed Affidavit of Chris Boswell

**Lincoln/Sewell 099**

- Photograph of Tim and Gaye Sewell
- Port Aransas EMS Report
- Corpus Christi Medical Center Medical Records
- Affidavit of John Price McNamara, Esq.

Following receipt of the additional information received in connection with Mr. Sewell's appeal including medical records from Corpus Christi Medical Center – Bay Area, Port Aransas EMS Patient Care Record and additional affidavits, his file was referred for an addendum review by independent Internal Medicine and Preventive Medicine (Occupational Medicine) physician, Dr. Peggy Geimer who concluded review of the newly available records did not alter her prior assessment. The addendum review stated in part,

> *Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed serum alcohol concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. While blood alcohol concentrations (BAC) most often refer to serum ethanol (alcohol) concentrations; whole blood alcohol concentrations may be used and are somewhat lower because serum and plasma contain more water than whole blood. The ratio of ethanol in serum or plasma to whole blood has been reported to be in the range of 1.09 to 1.18. As noted in the Medical Review by Thomas Arnold, MD submitted by the claimant's attorney, he used the middle of this range (16.5%) to calculate the claimant's whole blood alcohol concentration as 0.185 grams % at the time of his hospitalization. Dr. Arnold also proposed that the claimant's BAC was closer to 0.219 grams% at the time of his injury by using generally accepted population average of alcohol metabolism. I have no disagreement with his calculations. However, I disagree with Dr. Arnold's statement that "serum alcohol level reported at the hospital cannot possibly be accurate." The results were never question by the treating providers and multiple physicians included the "Alcohol intoxication" and "ETOH intoxication" in their impression of the claimant's acute medical problems. There hospital's testing laboratory is required to follow strict guidelines in their testing. There is no evidence that the hospital's testing was flawed. Dr Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay. The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed. Lactic acidosis is not mentioned anywhere in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis.*

> *Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.*

**Lincoln/Sewell 100**

*It should be noted that the claimant swore that he made a shallow dive into the water (less than a 45-degree angle). In affidavits from May 2023, three witnesses swore that the claimant dove "straight out from the boat, not in a downward direction." However, in Port Aransas EMS Patient Care Report dated 8/28/21, it was noted that witness on the boat with the claimant advised them that they watched the claimant perform a headfirst dive into shallow water.*

The additional information received with Mr. Sewell's appeal has been considered, however, the information received on appeal is not sufficient to alter the prior conclusion that the presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury.

## Conclusion

We conducted a thorough and independent review of the entire claim. Based on the facts of the case and the terms of the Policy, we maintain that Mr. Sewell's accident was caused by or, at a minimum, contributed to by the influence of alcohol in his blood. Therefore, the Policy exclusion applies and no accidental dismemberment benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

## The Policy

The McLarens, LLC Group Life Policy states, in part:

*Benefits*

*Accidental Death and Dismemberment benefits are payable when a Covered Person suffers a loss solely as the result of accidental Injury that occurs while covered. The loss must occur within 365 days after the date of the accident. The benefit payable is called the Full Amount. It is shown in the Schedule of Benefits…*

*"Injury" means bodily impairment resulting directly from an accident and independently of all other causes.*

*ACCIDENTAL DEATH AND DISMEMBERMENT EXCLUSIONS*

*No benefits are payable for any loss that is contributed to or caused by:*
*…*
*11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred; or…*

*"Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

*1. a claim form completed and signed (or otherwise formally submitted) by the Covered Employee or his beneficiary claiming benefits;*
*2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
*3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits;*
*4. a certified copy of a death certificate.*

*Proof must be submitted in a form or format satisfactory to Lincoln.*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Sewell was entitled to appeal the decision made by Lincoln, and to submit any additional information he wished to be considered as part of the appeal. Lincoln has conducted a full and fair review of this appeal and we have determined that the denial of benefits will be maintained.

At this time, your administrative right to review has been exhausted and no further review will be conducted by Lincoln. You may request to receive, free of charge, copies of all documents relevant to the claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The McLarens, LLC Group Life Policy contains the below provision:

***Legal Proceedings***

*A claimant or the claimant's authorized representative cannot start any legal action:*

*1. until 60 days after Proof of claim has been given; or*
*2. more than one year after the time Proof of claim is required.*

*Legal actions are contingent upon first having followed the Claims and Appeals procedure outlined in this policy.*

The McLarens, LLC Group Life Policy has a contractual limitations period of one year, which means that a lawsuit must be brought within one year after the date written proof of claim was required. The date on which the contractual limitations period expires for this claim is September 26, 2024.

Nothing in this letter should be construed as a waiver of any Lincoln National Life Insurance Company rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln are based on the provisions outlined in McLarens, LLC Group Life Policy. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact Lincoln to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

**Lincoln/Sewell 102**

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłíí' dóó ná'ookąąh nííní'ąągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtííł nínízingo doo báάh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Tawnya Valliere
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 15894
Secure Fax No.: (603) 334-0401