

Not Reported in F.Supp.2d, 2004 WL 193131 (E.D.La.)
**(Cite as: 2004 WL 193131 (E.D.La.))**

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Susan Van Valkenburgh NEEDHAM
v.
TENET SELECT BENEFIT PLAN, et al

No. Civ.A. 02–3291.
Jan. 30, 2004.

James Frederick Willeford, Attorney at Law, New Orleans, LA, for plaintiff.

Lauren A. Welch, McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, Metairie, LA, Dwayne O. Littauer, Elizabeth Pugh Odom, The Kullman Firm, New Orleans, LA, for defendants.

*ORDER AND REASONS*
ENGELHARDT, J.

**\*1** Before the Court are: (1) Defendant's Motion for Summary Judgment, filed by defendant Tenet Employee Benefit Plan (the "Plan"); (2) a Motion for Summary Judgment, filed by defendant UNUM Life Insurance Company of America; and (3) Plaintiff's Cross Motion for Summary Judgment. For the reasons that follow, plaintiff's motion is GRANTED. The defendants' motions are DENIED.

I. *BACKGROUND*
Plaintiff filed this suit against the Tenet Employee Benefit Plan (the "Plan") and Unum Life Insurance Company of American ("UNUM"), alleging that her long-term disability benefits were wrongfully terminated. Prior to her disability, plaintiff worked as a medical technologist for Northshore Regional Medical Center, an affiliate of Tenet Healthcare Corporation. In November 1999, plaintiff began having numbness in her right hand. (UACL00028). Then, in June or July 2000, she began to have burning pain in her right scapula. (UACL00052). She sought medical treatment for this "right shoulder, right-sided arm pain, and right scapular pain," and was prescribed narcotic pain medication. (UACL00131). A myelogram revealed a defect in her cervical spine, and she underwent a cervical fusion at C5/C6 on August 16, 2000. (UACL00130). Dr. Bert R. Bratton performed the surgery. Plaintiff was then referred to Dr. Robert J. Beck, a chiropractor for post-surgery rehabilitation.

Plaintiff used sick leave beginning in July 2000. (UACL00052). In September 2000, she applied for short-term disability benefits pursuant to the Tenet Employee Benefit Plan, giving a disability date of July 14, 2000. She was approved for these benefits, which were self-insured by Tenet. *See* Tenet Exh. C, p. 29 ("During the first 180 days of a disability, ... payable plan benefits are paid out of the general assets of the Company....Beginning on the 181st day of a disability, income replacement benefits are insured by UNUM."). UNUM began providing long-term disability benefits on January 10, 2001.

Beginning in October 2000, according to Dr. Bratton's notes, plaintiff reported an increase in pain, the "same original pain" – "shoulder pain." (UACL00023). In January 2001, Dr. Beck reported that plaintiff had experienced two episodes of right arm "paralysis." (UACL00101). One of these episodes occurred in his office, and he observed that it involved the bicep, tricep, wrist flexor and extensors, as well as the intrinsic muscles of the right hand. The

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

severity was such that he had difficulty trying to straighten out the affected joints. He had no explanation for what he had observed and was "at a loss" as to why such episodes were occurring, when a January 23, 2001 MRI revealed no problems with plaintiff's cervical spine. At an insured/claimant visit in February 2001, the interviewer similarly recorded that plaintiff reported "seizures" in her right arm. (UACL00114). In February 2001, Dr. Beck reported that "working over a microscope and other daily tasks [we]re contraindicated" for plaintiff, that she was "under full restriction with no work at this time." (UACL00099–00100).

**\*2** In March 2001, plaintiff was referred for an MRI and bone scan. These tests revealed nothing to explain plaintiff's symptoms. (UACL00140–143). An ultrasound of plaintiff's right upper extremity in April 2001 likewise revealed no abnormal physiology. (UACL00165).

On May 10, 2001, UNUM sent a letter to Dr. Bratton, stating that UNUM typically anticipates recovery from a cervical fusion to be complete within six to nine months and asking Dr. Bratton to answer a series of questions relating to plaintiff's condition. (UACL00177). Dr. Rand Metoyer responded to the letter on June 14, 2001, stating that he was "not able to determine" plaintiff's current restrictions and limitations or whether she had any work capacity. In response to the question "What are the current barriers for Ms. Needham to return to work? What would need to change in order for her to get back into the work force?," Dr. Metoyer responded: "Pain. Psychological Support." (UACL00176).

A few days later, on June 21, 2001, UNUM sent a letter to plaintiff notifying her that it had determined she no longer met the policy's definition of disability FN1 and therefore no longer was entitled to long-term disability benefits. (UACL00191–189). According to the letter, UNUM was denying further benefits because information in her file did "not support restrictions and limitations which would preclude [plaintiff] from [her] own occupation." (UACL00187). In particular, the letter focused on the post-surgery MRIs, x-rays, and bone scan, none of which had revealed a physiological explanation for plaintiff's symptoms. The letter noted Dr. Metoyer's statement of pain as a "return to work barrier," although it gave no explanation for rejecting this doctor's opinion that pain precluded plaintiff from returning to work. Moreover, the letter ignored altogether Dr. Beck's conclusion that "working over a microscope and other daily tasks [we]re contraindicated" for plaintiff and that plaintiff was "under full restriction with no work at this time." Indeed, the only concrete evidence cited in the letter was plaintiff's own report to UNUM that she (as part of her prescribed rehabilitation program) had been doing weight-lifting exercises up to 30 pounds. The letter gave plaintiff 90 days in which to appeal UNUM's decision.

> FN1. The policy defines "disability" as follows:
>
> You are disabled when UNUM determines that:
>
> -you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury;
>
> -you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

-during the first 60 days of the elimination period, you are unable to perform the material and substantial duties of your regular occupation.

After 12 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

*Limited* means what you cannot or are unable to do.

*Material and substantial duties* means duties that:

-are normally required for the performance of your regular occupation; and

-cannot be reasonably omitted or modified.

*Regular occupation* means the occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location. (UACL00465).

On June 29, 2001, Dr. Peter R. Galvan wrote a letter stating that plaintiff was under his care "with a chronic neuropathy of her shoulder and upper extremity causing physical disability." (UACL00206). On July 2, 2001, Dr. Beck wrote a letter to UNUM stating that plaintiff "continues to experience moderate to severe cervical pain that radiates into the right upper arm and into the right interscapular region." (UACL00208). In this letter, he explained that the controlled exercises he had prescribed for plaintiff did not evidence an absence of reduced capacity to perform her occupation. To the contrary, "[s]imple activities such as bending her neck downward to look into a microscope should be avoided at all times." *Id.* "Any repetitive cervical motion that alters her posture from the neutral position will cause her to have complications." *Id.*

**\*3** On September 18, 2001, plaintiff wrote a letter to UNUM, informing it that she wished to appeal UNUM's decision to deny her benefits. (UACL00219). In the letter, plaintiff cataloged her continuing attempts to find a medical answer for her condition, including cortisone injections, acupuncture, and possible arthroscopy. She explained that one could now "physically see the unevenness and drop of [her] right shoulder" and that she continued to have spasms, pain, and an inability to use her right arm and shoulder most of the time. *Id.* As a result, she had increased her use of prescribed narcotics. *Id.* She also reported that Dr. Galvan has requested a handicapped parking permit on her behalf, which had been approved. *Id.*

In addition, plaintiff sent UNUM information from her employer, Tenet, including a June 30, 2000 letter informing plaintiff that Tenet had received a fax from plaintiff's treating physician indicating that neither Soma nor Vicodin should be taken during work or immediately prior to work. (UACL00215). The letter further instructed plaintiff that if she needed to take either Soma or Vicodin prior to or during work, she would be relieved of her duties for that shift.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 193131 (E.D.La.)
**(Cite as: 2004 WL 193131 (E.D.La.))**

On October 9, 2001, Dr. Bratton (the neurosurgeon who performed the August 16, 2001 cervical fusion) wrote a letter to UNUM, confirming that plaintiff had continued to have pain following the surgery, for which she took pain medication. (UACL00224). Dr. Bratton admitted that he was "somewhat at a loss to explain the significant complaints based on an uneventful one level fusion with good stability" and that he found it difficult to determine the exact extent of plaintiff's disability. *Id.* Dr. Bratton opined that, although a one-level fusion generally carries with it only a five to ten percent permanent disability, in plaintiff's case, "there is a more significant problem going on." *Id.*

On January 18, 2002, UNUM sent plaintiff a letter stating that the additional information "was not sufficient to reverse" UNUM's previous decision. (UACL00243). The letter stated that plaintiff's claimed disability was inconsistent with her performing the exercises prescribed by Dr. Beck (lateral pull-downs at 20 to 30 pounds, chest press, and rows at 15 pounds). The letter also suggested that plaintiff's claimed limited ability to use her hands for fine dexterity beyond short periods was refuted by her indication that she "would be interested in Rehabilitation taking classes over the computer." In response to plaintiff's complaints that her prescribed narcotic pain medication (Soma and Vicodin) made her groggy, UNUM simply stated that "use of these medications should not cause significant cognitive impairment." *Id.*

Ten days later, on January 28, 2002, UNUM sent a letter informing plaintiff that, based on its review, denial of her claim was appropriate. (UACL00248–246). The letter reiterated UNUM's conclusion that plaintiff's claimed limitations were "inconsistent with [her] activities" (the exercises requiring plaintiff to lift 15 to 30 pounds) and that the "severity of [plaintiff's] pain complaints [was] not supported by the clinical data on file or [plaintiff's] reported activities" (presumably the rehabilitation exercises).

**\*4** One month later, on March 7, 2002, plaintiff called UNUM. According to the UNUM memo documenting this call, plaintiff told the representative that plaintiff had been diagnosed with a progressive condition – would UNUM reconsider her claim? (UACL00249). The representative told plaintiff that since she was not considered disabled on June 21, 2001, her coverage ended at that time, and any worsening of her condition would not be covered. *Id.* "[H]er claim therefore could not be reopened." *Id.*

On October 1, 2002, plaintiff's attorney wrote a letter to UNUM, explaining that he had been retained to represent plaintiff. He informed UNUM that plaintiff had been diagnosed with remote Parsonage–Turner syndrome on November 13, 2001 – a fact that had not been considered in UNUM's determination of plaintiff's claim. (UACL00430). The letter also informed UNUM that the Social Security Administration had found plaintiff to be disabled, based in part on the Parsonage–Turner diagnosis. *Id.* Counsel enclosed with the letter the November 2001 diagnosis and other medical evidence. He concluded the letter with a request that UNUM reconsider plaintiff's claim for benefits based upon the supplemental information.

Among the materials submitted to UNUM by plaintiff's counsel was a September 25, 2001 letter to UNUM from Dr. Galvan. (UACL00278). It is unclear why this letter was not in UNUM's file when it made its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 193131 (E.D.La.)
**(Cite as: 2004 WL 193131 (E.D.La.))**

January 2002 decision. In the letter, Dr. Galvan explained how he had referred plaintiff to other physicians and ordered numerous diagnostic tests to determine the cause of the pain that plaintiff "continues to have, even after the successful [fusion]." *Id.* He stated that he had "documented the spasm, paralysis, the tenderness and pain, as well as loss of function she experiences in her right scapula and arm." *Id.* He explained that "in [his] opinion, this is a physical/neurological problem" the cause of which "has not been able to be identified to date." *Id.* According to Dr. Galvan, plaintiff "is unable to do any type of work what so ever and cannot perform routine daily tasks without assistance or experiencing physical pain." *Id.* In his opinion, plaintiff was "not able to perform" the repetitive procedures required of a medical technologist, including "extensive bending over the microscope." *Id.* In addition, her daily regimen of Valium and Vicodin could interfere with the performance of her job duties such that "she should have no dealings with patient testing and reporting of results." *Id.*

Also among the materials sent to UNUM by plaintiff's counsel were November 2001 medical records from Dr. Felix Savioe and Dr. Art Leis, diagnosing plaintiff's condition as Parsonage–Turner syndrome (also known as neuralgic amyotrophy), based on a nerve conduction study and EMG performed on November 13, 2001. (UACL00284–280, UACL00330). According to other materials submitted by plaintiff's counsel, "[t]his condition presents with severe pain in the shoulder and arm, followed by atrophic paralysis of some muscles." (UACL00279). Counsel also sent to UNUM the March 22, 2002 decision by the administrative law judge for the Social Security Administration, approving plaintiff's claim for disability benefits. (UACL00311–307).

**\*5** UNUM replied to plaintiff's counsel in a letter dated October 18, 2002, stating that "no further review [would] be completed" regarding plaintiff's claim for benefits, but that UNUM would be reviewing plaintiff's file to determine whether, in light of plaintiff's recovery of social security benefits, UNUM might be entitled to a set-off against payments previously made to plaintiff. (UACL00337). Shortly thereafter, on October 31, 2002, plaintiff filed this suit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

## II. *LAW AND ANALYSIS*

All parties agree that this Court's review is limited to the administrative record (although there is some dispute as to what materials should be included, as discussed *infra* ). Accordingly, they have submitted the matter on cross motions for summary judgment.

A. *Summary Judgment Standard:*

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' ' *Kee v. City of Rowlett, Texas,* 247 F.3d 206, 210 (5th Cir.), (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c))), *cert. denied,* 534 U.S. 892 (2001). "The moving party bears the burden of showing ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 210. If the moving party meets this burden, "the nonmovant must go beyond the pleadings and designate specific

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 193131 (E.D.La.)
**(Cite as: 2004 WL 193131 (E.D.La.))**

facts showing that there is a genuine issue for trial." *Id.* "A dispute over a material fact is genuine if the evidence is such that a jury reasonably could return a verdict for the nonmoving party." *Id.* (internal quotations omitted). "The substantive law determines which facts are material." *Id.* at 211.

B. *Standard of Review:*

" '[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." ' *Vega v. National Life Ins. Services, Inc.,* 188 F.3d 287, 295 (5th Cir.1999) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Factual determinations are also reviewed for abuse of discretion. *Lain v. UNUM Life Ins. Co. of America,* 279 F.3d 337, 342 (5th Cir.2002). When applying the abuse of discretion standard, the Court's task is to determine whether the administrator acted arbitrarily or capriciously. *Id.* "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence." ' *Id.* (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan,* 97 F.3d 822, 828 (5th Cir.1996)). Thus, an "administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial." ' *Id.* (quoting *Vega,* 188 F.3d at 299). The Court owes no deference to an administrator's "unsupported suspicions" and will not uphold the denial of a claim "solely because an administrator suspects something may be awry." *Vega,* 188 F.3d at 302. Simply put, there must be "some concrete evidence in the administrative record that supports the denial of the claim." *Id.* If there is none, the Court must find that " 'the administrator abused its discretion." ' *Lain,* 279 F.3d at 342 (quoting *Vega,* 188 F.3d at 302).

**\*6** This standard of review is somewhat less deferential where, as here, the administrator is operating under a conflict of interest. Here, it is undisputed that UNUM is both the party charged with determining whether claims for long-term benefits will be approved and the insurer responsible for paying claims that are approved. Such administrators "ha[ve] a financial incentive to deny the claim and often can find a reason to do so." *Vega,* 188 F.3d at 296. This creates a conflict of interest, as UNUM concedes.FN2 The Fifth Circuit has adopted a "sliding scale" standard of review for such cases. *Vega,* 188 F.3d at 296. Using this sliding scale approach, "the court always applies the abuse of discretion standard, but gives less deference to the administrator in proportion to the administrator's apparent conflict." *Id.* For example, where an administrator is conflicted, the Court will be "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Id.* at 299.

> FN2. As the Fifth Circuit explained in *Vega,* "there are two ways employee benefit plans may be created: (1) the employer funds the program and either contracts with a third party who administers the plan or provides for administration by a trustee, individual, committee, or the like; or (2) the employer contracts with a third party that both insures and administers the plan." *Vega,* 188 F.3d at 295. "In the latter situation, the administrator of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plan is self-interested, *i.e.,* the administrator potentially benefits from every denied claim." *Id.*

C. *The Administrative Record:*

The parties concur that the Court is limited in its review to the administrative record. They vigorously dispute, however, whether the November 2001 diagnosis regarding the cause of plaintiff's right-arm pain, numbness, and paralysis (*i.e.,* Parsonage–Turner syndrome) should be considered part of that record. Plaintiff's counsel submitted this diagnosis (along with additional medical records supporting plaintiff's disability) to UNUM in October 2002 –before filing suit, but after UNUM had denied plaintiff's *pro se* administrative appeal. UNUM refused to consider the additional material on grounds that plaintiff's appeal had been denied and her file closed.

Citing *Vega, supra,* plaintiff argues that the material constitutes part of the administrative record, and thus properly may be considered by the Court, because it was presented to UNUM before filing suit, thereby affording UNUM a fair opportunity to reconsider its decision prior to litigation. UNUM argues that the Court should not consider this material because it was not before UNUM when it made its final decision on January 28, 2002. Alternatively, UNUM argues that the Court should not consider the material because it relates to a "new" condition, which was not diagnosed until after UNUM's initial decision to terminate plaintiff's benefits and Tenet's consequent decision to terminate plaintiff's employment, thereby disqualifying her as eligible to participate in the plan.

The Court disagrees with UNUM's latter argument. The record contains no evidence to support a determination that the condition diagnosed as Parsonage–Turner syndrome in November 2001 was a new condition. To the contrary, the record evidence is overwhelming that the condition diagnosed (*i.e.,* right scapular pain and right arm/shoulder pain, numbness, and paralysis) was the same as that for which she sought medical treatment in July and August 2000, that she complained of again post-surgery in October 2000, that was painstakingly documented by Dr. Beck in January/February and July 2001, and was described by Dr. Galvan in June 2001. ( *e.g.,* UACL00023, UACL00130, UACL0099–101, UACL00206, UACL00208). The record contains no evidence to support a contrary conclusion.

**\*7** UNUM's primary argument (*i.e.,* that in determining whether UNUM abused its discretion, the Court should limit its review to materials presented to UNUM on or before it made its final decision on January 28, 2002) is more persuasive. The question is not an easy one, however. Dicta in *Vega,* an en banc Fifth Circuit decision, tends to support plaintiff's argument. "Before filing suit," the *Vega* court stated, "the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it." *Vega,* 188 F.3d at 300. If the claimant's lawyer does so, then "that additional information should be treated as part of the administrative record." *Id.*[FN3] Here, plaintiff's counsel did submit additional material to UNUM prior to filing suit and did ask UNUM to reconsider its decision. *See* UACL00430. He did so, however, eight months after UNUM had denied plaintiff's appeal.[FN4]

> FN3. *See also Estate of Bratton v. National Union Fire Ins. Co. of Pittsburgh,* 215 F.3d 516, 521 n. 5

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(5th Cir.2000) ("as a safeguard against possible abuse or mistake, the claimant's lawyer may add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.... If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record.").

FN4. It appears that plaintiff herself attempted to inform UNUM of her November 2001 diagnosis on March 7 2002, only one month after UNUM's final decision. However, this telephone call yielded only a one page internal memo by the UNUM representative who took the call. Thus, even if it were considered part of the record, it adds little that is of substance.

Were this Court seated in a different circuit, the Court would be confident in excluding from its review any materials submitted to UNUM after January 28, 2002, the date on which UNUM issued its decision denying plaintiff's appeal.[FN5] The Fifth Circuit also has made statements that tend to support UNUM on this issue,[FN6] but it has done so (as far as this Court can determine) only in the context of evidence that had been presented for the first time in the district court, not with respect to evidence that had been presented first (albeit late) to the administrator prior to filing suit. In *Vega,* too, the Fifth Circuit was faced with evidence which the claimants had sought to present to the trial court in the first instance, not with evidence such as

that confronting this Court, which was presented first to the administrator prior to filing suit. *Vega,* 188 F.3d at 299–300 ("The testimony that the Vegas sought to introduce is evidence ... which easily could have been presented to the administrator by the Vegas' counsel. The district court therefore correctly held that it could not admit new evidence for the purpose of resolving this dispute...."). Thus, while *Vega* does contain dicta that supports plaintiff on this issue, it does not address specifically the question presented here. Nor does it provide any guidance regarding the limits of post hoc accretion of the administrative record. Does an administrator *ipso facto* abuse its discretion by refusing to reconsider its decision after the administrative appeal process is concluded? At what point, if any, may an administrator close its file and simply refuse to consider new evidence? If an administrator legitimately may take this position eight months after denying a claimant's appeal, is it not inconsistent with the abuse of discretion standard of review for the Court to then judge the reasonableness of the denial in light of evidence submitted post hoc?

FN5. *See, e.g., Marks v. Newcourt Credit Group, Inc.,* 342 F.3d 444, 458 (6th Cir.2003) ("The district court did clearly err, however, in relying on Auletta's affidavit to designate a piece of electronic mail sent from Rob McFarlane to Auletta on August 30, 1999, as part of the administrative record. The benefits committee notified Marks that it had denied his appeal on August 27, 1999. Clearly McFarlane's electronic mail could not have been available to the administrators when they made their final decision to deny Marks's claim. Therefore, this docu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment should not be considered part of the administrative record."); *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir.1999) (" '[I]n reviewing decisions of plan administrators under the arbitrary and capricious standard, the reviewing court may consider only the evidence that the administrators themselves considered on or before the final decision denying benefits.'... Mr. Kimber appealed from the letter denying his benefits on May 20, 1996 and the plan administrator issued a final decision denying reinstatement for physical disability on August 13, 1996.... Thus, our review is limited to evidence presented to Thiokol before August 13, 1996."); *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 824 (10th Cir.1996) (magistrate judge properly limited scope of review to evidence presented to administrator "on or before its final decision"); *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 48 n. 8 (3rd Cir.1993) (holding that evaluations submitted after the committee's final decision cannot be considered in determining whether the decision was arbitrary and capricious); *Alford v. DCH Foundation Group Long–Term Life Ins. Co. of America,* 144 F.Supp.2d 1183 (C.D.Cal.2001) ("Because this Court is primarily concerned with the propriety of the August 5, 1998 affirmance of the decision to grant benefits only through November 1, 1996, documentation 'received' only after that decision was rendered is not properly part of the 'record' against which it must be judged."), *aff'd,* 311 F.3d 955 (9th Cir.2002).

FN6. *See Denton v. First Nat'l Bank of Waco, Texas,* 765 F.2d 1295, 1304 (5th Cir.1985) ("In reviewing a decision under the arbitrary and capricious standard, the trial court must focus on the evidence that was before the Plan committee when the final benefit determination was made.").

**\*8** Fortunately, in this case, resolution of this difficult issue is not outcome determinative. With the November 2001 diagnosis, and the diagnostic tests that supported it, the main rationale offered by UNUM (*i.e.,* that the "objective medical evidence" did not support her claimed limitations) is thoroughly undermined, thus making UNUM's abuse of discretion more plain. However, even without these materials, the Court is compelled to conclude that UNUM abused its discretion, as discussed *infra.* Thus, the Court is comfortable deciding the administrative record issue in UNUM's favor. In determining whether UNUM abused its discretion in terminating plaintiff's benefits, the Court will restrict its review to the evidence that was before UNUM when it made its final benefits determination on January 28, 2002.

D. *Analysis of UNUM's Decision:*
UNUM denied plaintiff's claim for benefits based on its finding that she was not "limited from performing the material and substantial duties of [her] regular occupation," as required under the terms of the policy. (UACL00465). The question for the Court is whether this determination was " 'based on evidence, even if disputable, that clearly supports the basis for its denial." ' *Lain,* 279 F.3d at 342 (quoting *Vega,* 188 F.3d at 299). The Court owes no deference to an administrator's "unsupported suspi-

Not Reported in F.Supp.2d, 2004 WL 193131 (E.D.La.)
**(Cite as: 2004 WL 193131 (E.D.La.))**

cions." *Vega,* 188 F.3d at 302. There must be "some concrete evidence in the administrative record that supports the denial of the claim." *Id.*

The Court can find no concrete evidence in the record that supports UNUM's determination that plaintiff was not limited from performing the material and substantial duties of a medical technologist. As specified in the policy, UNUM looked to the occupation of medical technologist as it is normally performed in the national economy, rather than how work tasks might have been performed for plaintiff's specific employer. (UACL00465). According to UNUM, a medical technologist's tasks include cutting, staining, and mounting biological material on microscopic slides, examining slides under a microscope, analyzing test results, entering findings into a computer, cultivating and analyzing microbial organisms, conducting medical research, and setting up, cleaning, and maintaining laboratory equipment. (UACL00183–180). The job requires precision working; frequent reaching, handling, and fingering; frequent lifting up to 10 pounds; and occasional lifting up to 20 pounds. *Id.*

Other than evidence that plaintiff was capable of occasional lifting between 10 and 20 pounds (evidenced by plaintiff's performance of her prescribed rehabilitation exercises), the record contains no evidence to support UNUM's conclusion that plaintiff was capable of performing any of the material and substantial duties of a medical technologist. Indeed, the evidence was to the contrary: *e.g.,* Dr. Beck's opinion that "working over a microscope and other daily tasks [we]re contraindicated" for plaintiff and that plaintiff was "under full restriction with no work at this time"

(UACL00099–00100, UACL00208); Dr. Metoyer's report of pain as a return-to-work barrier (UACL00176); Dr. Bratton's opinion that there was "a more significant problem going on" than the normal five to ten percent disability associated with a stable cervical fusion. (UACL00224). As the record stood on January 28, 2002, not a single treating or examining physician was of the opinion that plaintiff was able to perform the sorts of tasks required of a medical technologist. UNUM is correct that these doctors had not yet uncovered the physiological explanation for plaintiff's disability – and admitted so. However, this fact does not constitute concrete evidence that plaintiff had no such disability, particularly given these doctors' expressed opinions to the contrary. UNUM was not required to accept these physicians' opinions. But for the Court to uphold UNUM's finding of no disability, the record must contain *some* concrete evidence that supports that finding. Here, the record contains none.

**\*9** Other than plaintiff's performance of prescribed exercises and the alleged absence of "objective" medical information in the file, the only other evidence cited by UNUM for its finding was plaintiff's expressed interest "in Rehabilitation taking classes over the computer." (UACL00243). According to UNUM, this interest on plaintiff's part refuted her claimed inability to perform computer work or other fine fingering beyond short periods of time. The Court disagrees. The fact that plaintiff might have *expressed a desire* to take a class via computer does not support a rational inference she was indeed capable of performing the microscope, computer entry, and other fine fingering work required of medical technologists. It does not even demonstrate that she is in fact capable

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of taking a rehabilitation class via computer – only that she was interested in doing so.

Based on UNUM's description of a medical technologist's job responsibilities, the occasional lifting of 10 to 20 pounds constitutes only a minute aspect of the job. The overwhelming majority of tasks described require fingering and handling of microscopic slides, cultures, biological samples, microscopes and other laboratory equipment, as well computer data entry. Thus, the fact that plaintiff was able to perform her prescribed weight-lifting exercises cannot support UNUM's conclusion that she was capable of performing the material and substantial duties of her occupation.

In short, even without applying a "sliding scale" to its standard of review, the Court is able to find no concrete evidence in the record to support UNUM's basis for denying plaintiff's claim for benefits. Thus, it is the conclusion of the Court that UNUM abused its discretion in terminating plaintiff's benefits.

E. *The Plan's Motion for Summary Judgment:*

Under the terms of the Plan, UNUM is both the claims administrator and the insurer responsible for paying long-term disability claims. *See* Tenet Exh.C, p. 29 ("Beginning on the 181st day of a disability, income replacement benefits are insured by UNUM. Plan benefits are paid in accordance with the insurance contract between UNUM and Tenet Healthcare Corporation."). The Plan argues that plaintiff's claims against it should be dismissed because UNUM is the party ultimately responsible for paying any claim for long-term disability benefits, the only kind of benefits at issue in this suit.

It is undisputed that, pursuant to the insurance policy between Tenet and UNUM, UNUM is responsible for paying approved long-term disability benefits. However, plaintiff derives her right to benefits from and through the Plan. The Plan has cited no authority to support its argument that by contracting with a third party to administer and insure claims such as plaintiffs', the Plan is relieved of its responsibility to claimants such as plaintiff. Indeed, as plaintiff points out, there is jurisprudence in this Court holding that the Plan is the only proper defendant in an action to recover benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). *See, e.g., Roig v. Limited Long Term Disability Program,* 2000 WL 1146522 *9 (E.D.La.2000) (Vance, J.). Accordingly, the Court finds that Tenet has failed to carry its burden of demonstrating that is entitled to judgment as a matter of law dismissing plaintiff's claims against it.

F. *Amount of Judgment and UNUM's Argument for Set–Off:*

**\*10** It is uncontested that plaintiff's basic monthly earnings were $3,577.77 and that, if found disabled, her gross disability payment would be fifty percent of her basic monthly earnings, or $1,788.88. It is further uncontested that plaintiff is receiving Social Security disability benefits in the amount of $1,394.10 per month, which reduces her minimum monthly benefit under the policy to $394.78. The parties agree further that, should this Court rule in plaintiff's favor, plaintiff is entitled to receive this minimum monthly benefit retroactively to June 21, 2001. According to the Court's calculation, this yields 31 months of benefits, totaling $12, 238.18. UNUM states that all such amounts are subject to any set-offs under the policy. However, UNUM has presented no evidence or argument regarding the amounts of any such

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

set-off. Thus, the Court does not find that UNUM is entitled to any such set-offs as part of the judgment in this case. The Court agrees with plaintiff that prejudgment interest is appropriate under the facts of this case.

Regarding future benefits, the Court agrees with UNUM that plaintiff is simply to be placed "back on claim." Her right to receive future benefits will be subject to the terms of the policy, including the obligation to provide proof of continued disability, as defined by the policy.

G. *Attorneys' Fees:*

An award of attorneys fees is authorized under 29 U.S.C. § 1132(g)(1). In determining the appropriateness of such an award, the Court is to consider the following factors: 1) the degree of the opposing parties' culpability or bad faith; 2) the ability of the opposing parties to satisfy an award of attorneys' fees; 3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; 4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant question regarding ERISA itself; and 5) the relative merits of the parties' positions. *See Riley v. Administrator of Supersaver 401K Capital Accumulation Plan for Employees of Participating AMR Corp. Subsidiaries,* 209 F.3d 780, (5th Cir.2000) (citing *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980)). Weighing these factors in this case, the Court finds that an award of attorneys' fees to plaintiff is appropriate. Plaintiff shall file an appropriate motion within thirty (30) days.

### III. *CONCLUSION*

Accordingly, for the foregoing reasons,

IT IS ORDERED that: (1) the Motion for Summary Judgment filed by Tenet Employee Benefit Plan is DENIED; (2) the Motion for Summary Judgment filed by defendant UNUM Life Insurance Company of America is DENIED; and (3) Plaintiff's Cross Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment in favor of plaintiff and against defendants in the amount of $12,238.18, with legal interest thereon from date of judicial demand, plus attorneys fees and costs.

E.D.La.,2004.
Needham v. Tenet Select Ben. Plan
Not Reported in F.Supp.2d, 2004 WL 193131 (E.D.La.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Cited
As of: Jun 30, 2012

**JOHN D. PROVENCIO, Plaintiff, v. SBC DISABILITY INCOME PLAN, Defendant.**

**Civil Action No. SA-05-CA-0032-WWJ**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION**

**2006 U.S. Dist. LEXIS 94845**

**December 5, 2006, Decided**
**December 6, 2006, Filed**

**CORE TERMS:** administrator, progress notes, medical records, plan administrator, disability, claimant, administrative appeal, administrative record, denial of benefits, medical evidence, medical information, anxiety, disability benefits, specific reasons, attorneys' fees, documentation, short-term, symptoms, mailed, manager, abuse of discretion, accommodation, depression, telephone, abused, inability to perform, identification, technician, contacted, disabled

**COUNSEL:** [*1] For John D. Provencio, Plaintiff, Counter Defendant: Jeffrey E. Dahl, LEAD ATTORNEY, Harkins, Latimer & Dahl, P.C., San Antonio, TX.

For SBC Disability Income Plan, AT&T Disability Income Plan, also known as SBC Disability Income Plan, Defendant, Counter Plaintiff: Madeleine E. Dabney, LEAD ATTORNEY, Attorney at Law, San Antonio, TX.

**JUDGES:** William Wayne Justice, Senior United States District Judge.

**OPINION BY:** William Wayne Justice

**OPINION**

**MEMORANDUM OPINION**

Plaintiff, John D. Provencio, filed the instant civil action under 29 U.S.C. § 1132 of the Employee Retirement Income Security Act of 1974 ("ERISA"), complaining that Defendant SBC Disability Income Plan

wrongly denied his application for short-term disability benefits. The Court has jurisdiction over the instant action under the terms of 29 U.S.C. § 1132(e)(1).

After careful consideration of the relevant evidence presented at the bench trial, the Court hereby adopts the following findings of fact and conclusions of law. For the reasons stated below, the Court will issue final judgment in favor of Defendant.

**I. FINDINGS OF FACT**

1. Provencio worked for SBC Communications, [*2] Inc. ("SBC") or its affiliate as a, systems technician for 22 years. Provencio's duties were physical; they included climbing ladders and telephone poles, and lifting up to 150 pounds.

2. Provencio applied for short-term disability benefits under the SBC Disability Income Plan ("the Plan"), the ERISA disability plan sponsored by his employer. Provencio complained that he was suffering from depression, anxiety, and panic attacks.

3. Provencio qualifies to receive 52 weeks of short-term disability benefits, if he is found to be "totally disabled," as defined by the Plan.

4. According to the Plan's terms, "Total Disability for (short-term disability) benefits means that due to an illness or injury you are unable to perform all of the essential functions of your job or another available job assigned by your company with the same full- or part-time classification for which you are qualified." [1]

1   Neither party addresses Provencio's eligibility for STD benefits based on "partial disability" under the Plan; thus, the Court does not address the issue.

[*3] **A. Initial Benefits Determination**

5. The SBC Medical Absence & Accommodations Resource Team ("SMAART"), a division of Sedgwick Claims Management Services, Inc. ("Sedgwick"), reviewed Provencio's application for benefits. [2]

2   Sedgwick is an independent third parry under contract with SBC Communications, Inc., to administer claims filed under the Plan. The Parties stipulate that Sedgwick is not an affiliate of SBC Communications, Inc., that Sedgwick has no role in the Plan's insurance, and that Sedgwick receives a flat fee for its services, without regard to whether it approves or denies claims under the Plan.

6. In a letter dated May 14, 2004, SMAART advised Provencio that "medical information to substantiate your disability is due" by May 21, 2004. [3] In an effort to obtain such documentation, a SMAART case manager contacted Provencio's primary care physician, Kevin Comfort, M.D., and his therapist, Charles Tatum, Ph.D., by telephone on May 18, 2004, to request copies of Provencio's medical [*4] records. [4]

3   SBC DIP 0102.
4   SBC DIP 0006.

7. Provencio contacted SMAART on May 19, 2004, and May 20, 2004, to check the status of his claim. [5] On both occasions, SMAART informed Provencio that his claim was still pending, given that SMAART had not received his medical records. [6]

5   SBC DIP 0007.
6   *Id.*

8. On May 21, 2004, the day that SMAART imposed as the deadline for the submission of Provencio's medical records, the SMAART case manager again contacted Dr. Tatum's office. [7] The case manager reiterated the request for medical records, explained that such records are "due today," and also noted that, if SMAART did not receive any medical records, Provencio's claim "will be denied for no medical." [8]

7   *Id.*
8   *Id.*

[*5]   9. SMAART denied Provencio's disability claim in a letter dated May 24, 2004, which states:

"The determination to deny benefits is based on the fact that as of the date of this letter, we have not received medical documentation to establish your inability to perform your job as a Systems Technician, with or without reasonable accommodations." [9] In addition, the letter noted that SMAART bad not received any medical records from Dr. Comfort or Dr. Tatum. [10]

9   SBC DIP 0051.
10   SBC DIP 0051-52.

10. SMAART had, however, received some of Provencio's medical records before it mailed the denial letter. Those records consisted of handwritten "progress notes" from Dr. Tatum, which were received by SMAART on the afternoon of May 21, 2004. Dr. Tatum wrote those progress notes during Provencio's office visits, on May 11, 2004, and May 18, 2004, According to the progress notes, Provencio exhibited extremely severe anxiety at that time. [11] The progress notes scored Provencio's job stress level and [*6]  "physical symptoms" level as high. [12] In addition, the progress notes reveal that Provencio suffered from "moderate-severe depression" and that he reported experiencing moderate chest pain. [13] Apart from these concerns, however, the progress notes do not indicate any other major problems with Provencio's health. [14] In fact, using a scale of one to five (with one being not present, and five being "extremely severe"), Dr. Tatum assigned scores of one and two to all other symptoms listed on the progress notes. [15]

11   SBC DIP 0072.
12   SBC DIP 0074.
13   SBC DIP 0073; SBC DIP 0072.
14   SBC DIP 0072; SBC DIP 0074.
15   *Id.*

11. SMAART discovered that Dr. Tatum's progress notes had been submitted in a timely manner, and that they had not been reviewed before the denial letter was mailed. In an effort to correct this error, both the SMAART case manager, and a business unit manager reviewed Dr. Tatum's progress notes on May 25, 2004. [16] A notation in the SMAART claims log states that,  [*7] even after Dr. Tatum's progress notes were reviewed, Provencio's medical records did "not support" a finding of disability. [17]

16   SBC DIP 0013.
17   *Id.*

12. SMAART mailed a letter to Provencio on May 28, 2004, informing him that the review of Dr. Tatum's progress notes did "not alter the previous denial decision." [18]

18   SBC DIP 0050.

**B. Administrative Appeal of the Initial Benefits Determination**

13. SMAART advised Provencio of his right to appeal the denial of his initial claim determination to SMAART's appellate division, the "Quality Review Unit," and outlined in writing the procedures for doing so. [19]

> 19 SBC DIP 0067.

14. [*8] According to the "Appeal Procedures" document provided to Provencio, "medical evidence" is due "at the time that you file your appeal." [20] Among the medical evidence required to be submitted with the appeal were the following: a description of how Provencio's "level of functionality" impacted his ability to work and his daily activities, findings from mental and physical health examinations, diagnostic test results, and a list of Provencio's medications. [21]

> 20 Id.
> 21 SBC DIP 0067-68.

15. On May 26, 2004, Provencio filed an administrative appeal of the denial with SMAART's Quality Review Unit. [22] Provencio did not submit additional medical documentation of his condition at the time he filed the appeal, as required by the Plan.

> 22 SBC DIP 0064.

16. As a courtesy, SMAART extended the deadline for the filing of additional [*9] medical records for consideration in the appeal. Provencio ultimately presented additional medical evidence in support of his disability claim. That evidence consisted of notes from Provencio's visits to his primary care physician, Dr. Comfort, and a letter from his therapist, Dr. Tatum. [23]

> 23 SBC DIP 0056-60. The Court is unable to address the progress notes submitted by Dr. Comfort, as they are largely illegible.

17. Dr. Tatum's letter first explained that Dr. Tatum had treated Provencio "for a number of years" in connection with an "anxiety disorder." [24] Anxiety disorders, Dr. Tatum explained, result from arousal of the sympathetic nervous system, which, in turn, simulates the body's neurons and hormones. [25] Dr. Tatum noted that, in the past, arousal of Provencio's sympathetic nervous system caused Provencio to suffer from fainting spells. [26] Dr. Tatum wrote that, on May 11, 2004, Provencio's electrodermal response score, one measure of his sympathetic nervous system's activity, was "very high. [*10] " [27] After reviewing the electrodermal response score in light of his patient's previous medical history, Dr. Tatum

wrote that, "I felt that Mr. Provencio could not work with his high level of anxiety[,] as it would place him in jeopardy of injury if he had one of his panic attacks while at work." [28]

> 24 SBC DIP 0056A.
> 25 Id.
> 26 Id.
> 27 Id.
> 28 Id.

18. According to the letter, Dr. Tatum saw Provencio again on May 18, 2004. During that office visit, Provencio complained of "dysphoria, anergia, loss of motivation, concentration problems, short-term memory problems, and lower back pain," and registered a "Moderate-Severe" score on the Beck Depression Inventory. [29] "Again," Dr. Tatum explained, "I felt that [Provencio] needed to stay out of work[,] as I felt his symptoms were severe enough that he would not be able to safely perform his duties. Due to the amount of anxiety and depressive symptoms he was displaying, I did not think, that he was capable of performing [*11] any type of job until he could be stabilized." [30]

> 29 Id.
> 30 Id.

19. An independent board certified psychiatrist, Robert N. Polsky, M.D., reviewed Provencio's claim for benefits on behalf of SMAART and the Quality Review Unit. As part of that review, Dr. Polsky considered the following documents: Provencio's claim file, the progress notes submitted by Dr. Comfort and Dr. Tatum, and Provencio's job description. [31] In addition, Dr. Polsky spoke with Dr. Tatum by telephone, about his diagnosis of Provencio's condition. [32]

> 31 SBC DIP 0044.
> 32 SBC DIP 0045.

20. Dr. Polsky reported that "the rationale for the disability as given by Dr. Tatum is that of problems with memory and cognition[,] as well as concentration." [33] Dr. Polsky noted, however, that Dr. Tatum based this diagnosis not "on a formal mental [*12] status examination[, but] rather on self reports and observations in general[,] such as that Mr. Provencio locked his keys and wallet in the car recently." [34] "The objective findings," Dr. Polsky concluded, "indicate that Mr. Provencio is not suicidal, parasuicidal, homicidal, or psychotic, nor is he unable to perform his activities of daily living. There are no formal mental status findings of an objective nature to substantiate significant problems with memory, cognition, or concentration. This lack of findings does not support an inability to perform job duties." [35] Accordingly, Dr. Polsky determined that Provencio was "not dis-

abled." [36] Instead, Dr. Polsky diagnosed Provencio's condition as "major depression and panic disorder." [37]

33  *Id.*
34  *Id.*
35  *Id.*
36  *Id.*
37  *Id.*

21. After reviewing both Provencio's medical records and Dr. Polsky's report, the Quality Review Unit concluded that Provencio was not disabled under the terms of the Plan. As a result [*13] of this determination, the Quality. Review Unit upheld the denial of Provencio's benefits claim. [38] The Quality Review Unit explained the basis for this decision in a letter to Provencio, which states: "although some findings on examination are evident and support the need for continued treatment, your treatment providers did not provide sufficient observational clinical [sic] to support your self-reported symptoms in the medical information they provided." [39] In addition, the Quality Review Unit noted that "the medical information does not show observational evidence of severe cognitive dysfunction documented in the form of mental status examination or functionality related to job duties. Evidence in the medical records does not support that a psychiatric condition has significantly impaired your ability to perform basic activities of daily living. [40]

38  SBC DIP 0040-42.
39  SBC DIP 0041.
40  *Id.*

22. SMAART did not directly notify Provencio of Dr. Polsky's identity at the time it issued [*14] the June 24, 2004 letter upholding the decision to deny disability benefits. [41] Instead, that letter merely informed Provencio that an unnamed, board certified psychiatrist had reviewed his file. [42] Because Dr. Polsky and Dr. Tatum discussed Provencio's condition over the phone, however, Dr. Tatum was aware of Dr. Polsky's identity prior to the conclusion of the administrative appeal.

41  SBC DIP 0041.
42  *Id.*

## C. Medical Records Submitted After the Administrative Appeal

23. SMAART considered its review of Provencio's claim closed on June 24, 2004, when the Quality Review Unit upheld the denial of benefits. Despite this fact, Provencio submitted additional medical information to SMAART on several occasions after his appeal had been adjudicated, and requested that his claim be, reconsidered in light of those new records.

24. Citing its view that Provencio's case had already been closed, SMAART declined to consider the new documents. Among those documents was a letter from Dr. Tatum, [*15] which offered an explanation of the causes of Provencio's panic attacks. SMAART also refused to consider a letter from Dr. Comfort that supported Provencio's claim for disability.

25. In August of 2004, Provencio received notification from his supervisor that his leave time had expired and that he was requited to begin working again. Provencio returned to light duty work on August 23, 2004. He requested a job accommodation for his condition. Provencio's employer initially denied this request, but later granted it, subject to the condition that Provencio not have contact with electric wires or be required to climb telephone poles.

## II. CONCLUSIONS OF LAW

26. The Court reviews a challenge to a denial of benefits in an ERISA case "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the teens of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). "Under *Bruch,* therefore, when an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one [*16] of abuse of discretion." *Vega v. Nat'l Life Ins. Servs., Inc.,* 188 F.3d 287, 295 (5th Cir. 1999) *(en banc).* In the instant case, it is undisputed that the Plan administrator has such discretion; the Plan provides that the "Claims Administrator... shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan." [43] In addition, "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard," even if the Plan does not expressly give the administrator discretionary authority. *Vercher v. Alexander & Alexander, Inc.,* 379 F.3d 222, 226 (5th Cir. 2004). Accordingly, abuse of discretion is the appropriate standard of review in this case.

43  SBC DIP 0194.

27. "In applying the abuse of discretion standard, the Court analyzes whether the plan administrate acted arbitrarily or capriciously." *Meditrust Fin. Servs. Corp.. v. Sterling Chems., Inc.,* 168 F.3d 211, 214 (5th Cir. 1999) [*17] *(quoting Sweatman, v. Commercial Union Ins. Co.,* 39 F.3d 594, 601 (5th Cir. 1994)). When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, the Court affirms an administrator's decision if it is supported by substantial evidence. *Id.* at 215. A decision is arbitrary only if "made without a rational

connection between the known facts and the decision or between the found facts and the evidence." *Id. (quoting Bellaire Gen. Hosp. v. Blue Cross Blue Shield, 97 F.3d 822, 828-29 (5th Cir. 1996)).*

28. The Court must, therefore, determine whether the denial of Provencio's claim for short-term disability benefits is arbitrary and capricious as a matter of law by analyzing the evidence upon which Defendant based its decision. In so doing, the Court's review of the administrator's decision "need not he particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness-even if on the low end." *Vega, 188 F.3d at 297.*

29. In addition, "[c]hallenges to ERISA procedures are evaluated under the substantial Compliance standard." *Robinson v. Aetna Life Ins Co., 443 F.3d 389, 392-93 (5th Cir. 2006)* [*18] *(citing Lacy v. Fulbright & Jaworski, 405 F.3d 254, 257 (5th Cir. 2005)).* Accordingly, the Court will not requite "technical" compliance with ERISA procedures, as long as the purposes of the statute have been fulfilled. *See Robinson, 443 F.3d at 392-93.*

**A. Initial Benefits Determination**

30. ERISA provides, in pertinent part:

> In accordance with regulations of the Secretary, every employee benefit plan shall-
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for full and fair review by the appropriate named fiduciary of the decision denying the claim.

*29 U.S.C. § 1133 (2006).* [44]

> 44    The Plain Text of the SBC Disability Income Plan also states that the denial shall be in writing, and that the writing shall specify the reason for the denial. SBC DIP 0193.

[*19]  31. As a threshold matter, the Court finds that, proper written "notice" of the benefits determination, as required by *29 U.S.C. 1133(1)*, occurred when

SMAART mailed Provencio the May 24, 2004, letter denying his claim.

32. Along with the requirement that the administrator notify the claimant in writing, *29 U.S.C. § 1133(1)* also requires that such notification state the specific reasons for an administrator's decision to deny benefits. As quoted above, SMAART's May 24, 2004, letter provides the following specific reason for denying Provencio's claim: "The determination to deny benefits is based on the fact that as of the date of this letter, we have not received medical documentation to establish your inability to perform your job as a Systems Technician, with or without reasonable accommodations." [45] Provencio contends that this statement is false because SMAART had, in fact, received Dr. Tatum's progress notes before the date of the denial letter. As a result, Provencio claims, SMAART failed to substantially comply with *29 U.S.C. § 1133(1)*.

> 45    SBC DIP 0051.

[*20]  33. As a factual matter, Provencio is correct; SMAART received Dr. Tatum's progress notes before it mailed the denial letter. Nevertheless, the administrative record reflects that on May 25, 2004, and May 26, 2004, SMAART did review Dr. Tatum's progress notes. [46] In fact, both the SMAART case worker and a business manager reviewed the progress notes, and noted in Provencio's file that the medical records did "not support" the established diagnosis, and that they were deficient, in that they "did not contain information from a mental status examination or description of [Provencio's] limitations based on observed" clinical findings. [47]

> 46    SBC DIP 0011-0013.
> 47    SBC DIP 0013.

34. After reviewing Dr. Tatum's progress notes, SMAART mailed a second letter to Provencio, dated May 28, 2004, explaining that Dr. Tatum's progress notes did "not alter the previous denial decision," [48] *i.e.,* that "we have not received medical documentation to establish your inability to perform your job as a Systems [*21] Technician, with or without reasonable accommodations." Thus, even though the May 24, 2004, denial letter was based upon the erroneous assertion that SMAART had not received any medical evidence before denying the claim, SMAART cured this defect by reviewing Dr. Tatum's progress notes. Because SMAART ultimately reviewed Dr. Tatum's progress notes, and then notified Provencio in writing that the progress notes did not change the adverse benefit determination, SMAART substantially complied with its obligation under *29 U.S.C. § 1133(1)* to provide Provencio with a specific, written reason for the adverse benefits determination. Accordingly, the Court does not find that Defendant

abused its discretion in denying Provencio's initial benefits claim.

> 48    SBC DIP 0050.

## B. Administrative Appeal of the Initial Benefits Determination

35. Provencio also contends that his appeal to the Quality Review Unit did not amount to a "full and fair" review of his initial benefits determination, [*22] as required by 29 U.S.C. § 1133(2). In that respect, Provencio raises three arguments, which, he submits, constitute arbitrary and capricious behavior on the part of Defendant. First, Provencio contends that the Quality Review Unit did not review the same specific reasons that SMAART gave as a basis for denying his benefits claim. Second, Provencio claims that there is no rational connection between the evidence that he presented in support of his disability claim and the Quality Review Unit's decision to uphold the denial of benefits. Third, Provencio suggests that SMAART improperly failed to disclose the identity of its expert, Dr. Polsky.

36. The Court first turns to Provencio's argument that the Quality Review Unit upheld the denial of benefits for reasons different from those stated at the time his initial claim was denied. Provencio contends that SMAART denied his initial benefits claim for one reason-that he failed to provide any medical evidence whatsoever to support his claim-and that the Quality Review Unit upheld the denial of benefits for another reason altogether-that Provencio's medical records were insufficient to establish that he was [*23] disabled under the terms of the plan.

37. The most relevant case cited in support of Provencio's argument that the Quality Review Unit did not review the same "specific reasons" upon which SMAART denied his initial benefits claim is *Robinson v. Aetna Life Insurance Company,* 443 F.3d 389 (5th. Cir. 2006). *Robinson* requires that the administrative appeal review the same "specific reasons" for the administrator's initial denial of benefits, and not the denial of benefits generally. *See id* at 393. In *Robinson,* the plan administrator first approved the claimant's initial application for benefits, after finding that the claimant's impaired vision precluded him from performing a material duty of his "field sales rep" job-driving a vehicle. *Id.* at 391. The plan administrator terminated the claimant's benefits, however, after reviewing a physician's statement, which said that the claimant had "no restrictions due to ocular history." *Id.* The claimant appealed the termination of benefits to the plan administrator, and included a letter from his physician, which stated that it was, in fact, hazardous for the claimant to drive. [*24] *Id.* at 392. The plan ad-

ministrator considered this evidence, but upheld the termination of benefits after determining that driving was not a material duty of a sales representative. *Id.* Thus, in *Robinson,* the plan administrator gave the claimant two different reasons for his benefits determination-first, that he was ineligible for benefits in light of the fact that he was able to perform the material duty of his job-driving-and second, that he was ineligible for benefits, in light of the fact that driving was *not* a material duty of the job. This "shifting justification" effectively meant that the plan administrator's specific reason for terminating the claimant's benefits was never reviewed at the administrative level, and therefore violated 29 U.S.C. § 1133(2): *Id.* at 393-94.

38. The facts of this case are unlike those in *Robinson,* however. As stated above, SMAART did not deny Provencio's initial benefits claim because he failed to provide any medical records at all. Rather, it considered the documents that were timely filed, and concluded that they did not support a finding of disability. 49 On appeal, [*25] the Quality Review Unit upheld the denial of benefits for exactly the same reason: Provencio's medical records did not support a finding of disability. 50 Thus, unlike the facts in *Robinson,* the Court finds that the plan administrator in the instant case did not abuse its discretion by giving one reason for the initial benefits determination and a wholly different reason for the benefits determination at the administrative appeal.

> 49    SBC DIP 0050-53.
> 50    SBC DIP 0040-0042.

39. Provencio next argues that there is no rational connection between the Quality Review Unit's reason for upholding the denial of benefits and the medical evidence that supported his claim for disability. Provencio alleges, for example, that Dr. Polsky's conclusion that Provencio was "not suicidal, parasuicidal, homicidal, or psychotic" simply ignores evidence such as Dr. Tatum's progress notes and letter, which indicate that Provencio's depression, anergia, and anxiety prevented him from working. "Nothing" in ERISA, however [*26] "suggests that plan administrators must accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). "Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion. *Id.* Even though Dr. Polsky might well have addressed Provencio's reported symptoms more directly, and thoroughly, the administrative record makes clear that Dr. Polsky nevertheless reviewed all of the relevant information in Provencio's file, including Dr. Tatum's progress notes and letter. Although Dr. Polsky disagreed with Dr. Tatum's analysis of Provencio's condition, the

Count cannot say that Dr. Polsky's report was so cursory as to fall below the "low end" on a "continuum of reasonableness." Similarly, the Court cannot hold that the Quality Review Unit's decision to rely upon Dr. Polsky's report, in making the ultimate decision to uphold the decrial of benefits, falls so far below the same standard, so as to constitute an abuse of discretion.

40. Provencio next contends that the plan administrator abused its discretion by failing to identify Dr. Polsky, the [*27] board certified psychiatrist who reviewed Provencio's medical information in connection with his administrative appeal. An ERISA plan administrator is requite to "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefits determination, without regard to whether the advice was relied upon in making the benefit determination." 29 C.F.R. § 2560.503-1(h)(3)(iv) (2006). Provencio reads this regulation as a requirement that the plan administrator identity the plan's medical expert directly to the claimant, before the conclusion of an administrative appeal. The express language of the regulation, however, merely requires the plan administrator to "provide for" the identification of a medical expert. *Id.*

41. Several reasons support the Court's conclusion that SMAART met its requirement to "provide for" the identification of its medical expert, Dr. Polsky. First, SMAART complied with Provencio's request to provide a copy of his entire file, which included Dr. Polsky's findings. [51]

> 51 SBC DIP 0036.

[*28] 42. Second, although Provencio did not request this information until after the conclusion of his administrative appeal, it is clear that Provencio's own doctor, Dr. Tatum, was aware of Dr. Polsky's identity during the course of the administrative appeal. Indeed, the two doctors spoke by telephone regarding Dr. Polsky's review of Provencio's medical records. Thus, Dr. Polsky's identity was no secret.

43. Third, the facts of this case are dissimilar to those in *Robinson,* to which Provencio again turns for support. In *Robinson,* the plan administrator purported to base its decision to deny benefits on the conclusions of a vocational expert. *Robinson,* 443 F.3d at 392. But in that case, the administrator never even contacted the expert upon whose opinion it purported to rely in malting that decision. *See id.* In Provencio's case, by contrast, it is undisputed that SMAART actually consulted Dr. Polsky.

44. Moreover, in *Robinson,* the nondisclosure of the expert's identity alone did not rise to the level of a failure to substantially comply with ERISA. Rather, it was the

nondisclosure of the expert's identity, coupled with the administrator's [*29] "shifting justification" for denying the claimant's benefits claim, that amounted to a failure on the part of the administrator to substantially comply with 29 U.S.C. § 1133. *See id.* at 394.

45. Thus, after careful review, the Court cannot hold that the plan administrator abused its discretion by failing to "provide for the identification" of Dr. Polsky, in violation of 29 C.F.R. § 2560.503-1(h)(3)(iv).

## C. Medical Records Submitted After the Administrative Appeal

46. Last, Provencio contends that SMAART failed to consider medical records properly submitted after the conclusion of his administrative appeal on June 24, 2004. In particular, Provencio objects to SMAART's refusal to consider a July 1, 2004, letter from Dr. Tatum, [52] a July 15, 2004, letter from Dr. Comfort, [53] an October 12, 2004, letter from Dr. Tatum, [54] and a December 9, 2001, letter from Dr. Comfort. [55]

> 52 Defendant's Objections to Plaintiff's Trial, Exhibits, Exhibit A.
> 53 *Id.,* Exhibit B.
> 54 *Id.,* Exhibit C.
> 55 *Id.,* Exhibit D.

[*30] 47. Assuming that both parties had an opportunity to present facts to the administrator, the Court's review of factual determinations is confined to the record available to the administrator. *Meditrust Fin. Servs. Corp.,* 168 F.3d at 215 (citing *Wildbur v. Arco Chem. Co.,* 974 F.2d 631, 639 (5th Cir. 1992)).

48. "A long line of Fifth Circuit cases stands for the proposition that, when assessing factual questions, the district court is constrained to the evidence before the plan administrator." *Vega,* 188 F.3d at 299. "Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions." *Id.*

49. Provencio alleges that, under *Vega,* the administrative record in this case should include the letters submitted by Dr. Tatum and Dr. Comfort after the conclusion of the administrative appeal. In support of that argument, Provencio points to the following language from *Vega:* "[T]he administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator [*31] a fair opportunity to consider it." *Id.* at 300. *Vega* also provides that:

Before filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it. In *Moore,* we said that "we may consider only the evidence that was available to the plan administrator in evaluating whether he abused his discretion in making the factual determination." If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record. Thus, we have not in the past, nor do we now, set a particularly high bar to a party's seeking to introduce evidence into the administrative record.

*Id.* (internal citations omitted).

50. Defendant argues that if the Court admits the above-mentioned letters into the administrative record, a plan administrator's review process would become perpetual. That is, a plan administrator would be forced to consider medical documentation of a claimant's [*32] purported disability *ad infinitum,* even after, and in spite of, the fact that the claimant's initial adverse benefits determination had been upheld on appeal. [56]

> 56  The Court notes that the Honorable Orlando L. Garcia, United States District Judge, before whom the instant action was originally filed, concurred with Defendant's position. In his Order Denying Defendant's Motion to Dismiss (Docket No. 6), Judge Garcia wrote that *"Vega* does not stand for the proposition that plaintiffs can insert evidence into the record after the administrative process has concluded."

51. The Court notes that there is some tension between the "long line" of cases that limit the district court's review to the evidence that the administrator itself considered, and the ability of the claimant to supplement the administrative record under *Vega.* On this point, *see Needham v. Tenet Select Benefit Plan,* No. Civ. A. 02-3291, 2004 U.S. Dist. LEXIS 1267, 2004 WL 193131, at *6-*9 (E.D. La. Jan. 30, 2004).

52. In this case,  [*33]  however, Defendant's argument is particularly persuasive. Provencio was well aware of the Plan's requirement that he submit all of his additional medical information at the time he filed his appeal. Nev-

ertheless, Provencio failed to present any new medical evidence at that time. Rather than dismiss the appeal outright, Defendant graciously granted Provencio an extension of time in order to file medical records to support his appeal. But even when Provencio had this second chance to make his case on appeal, be submitted only limited set of additional medical records (all Of which the Quality Review Unit considered). Thus, it is clear that Provencio had not one, but two opportunities to present additional medical evidence in such away that would have allowed the administrator a fair opportunity to review that information on appeal. Indeed, he had even more of an opportunity to do so at the administrative level than the express terms of the Plan allowed. To permit Provencio yet a third opportunity to submit medical information-well after the conclusion of his appeal-would be to sanction an abuse of the administrative process, and would thwart the legitimate statutory purpose of allowing [*34]  the claims administrator to decide the matter under fair and reasonable circumstances.

53. Because Provencio did not present the additional medical information in such a manner that would have allowed the administrator, a fair opportunity to consider it, the Court cannot maintain that Defendant abused its discretion in refusing to consider the four letters that Provencio submitted after the conclusion of his administrative appeal.

## III. CONCLUSION

For the reasons stated above, the Court finds that Defendant substantially complied with the requirements of ERISA.

## IV. ATTORNEYS' FEES

When determining whether to award attorneys' fees and costs in an ERISA case, the Court considers the following factors:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself;  [*35]  and (5) the relative merits of the parties' position.

*Lain v. UNUM Life Ins. Co. of America,* 279 F.3d 337, 347-48 (5th Cir. 2002) (quoting *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir. 1980)). After careful consideration of these factors, the Court finds that an award of attorneys' fees is not warranted.

**SIGNED** this 5th day of December, 2006.

William Wayne Justice

Senior United States District Judge

## FINAL JUDGMENT

On the basis of the findings of fact and conclusions of law set forth in the Memorandum Opinion of the Court, which has been issued simultaneously herewith, it is

**ADJUDGED** that the Plaintiff, John D. Provencio, take nothing from the Defendant, SBC Disability Income Plan, on his claims in the above-styled and numbered civil action.

**SIGNED** this 5th day of December, 2006.

William Wayne Justice

Senior United States District Judge