**Life Claim Event Detail**

| Find | Clear | Save | New | Delete | Last Modified | Print | Help | Reopen | Amend Event |

Add Vendor Pmt   Beneficiary Benefit   Beneficiary Payment   Check   Clm Evt Pmt Summary   Correspond   Notes   Tasks   Vendor Pmt

**Employee**

| First Name | TIMOTHY | MI | A |
| Last Name | SEWELL |
| SSN | | DOB | |

**Customer**

| Name | MCLARENS, LLC | ID | 09 | - | LF0483 |
| Sub Name | | Sub Code | 0000 |
| Loc Name | DALLAS PROFESSIONALS | Loc Code | 01602000 |

**Life Claim**

| Life Claim Number | 12885926 | Last Name | SEWELL | First Name | TIMOTHY | EE Relationship | Employee | DOB | |

**Event Information** | AD&D Riders / Dismemberment

| Event Number | 2 | Class Code | 1 | Life Claim Sub | 0000 | Life Claim Loc | 01602000 | Submission | PRTE |

**Event Information**

| Event Type | | Date of Disability | | Date Event Input | 10/24/2022 | Date Claim Received | 10/21/2022 |
| Event Reason | | *Date of Dismemberment | 08/28/2021 | Date Event Reported | 10/21/2022 | Date Complete Information | 01/25/2023 |
| *Determination Date | 01/26/2023 | Date of Accident | 08/28/2021 | Reopen Date | 04/10/2023 | Date Investigation Complete | |
| Closed Date | 01/26/2023 | # Days Acc to Loss | 0 | Date Last Worked | 08/25/2021 | Date Proof of Death Received | |

**Event Status**

| *Event Status | | Reopen Reason | |
| *Status Reason | | Claim Issue | |

**Associated Event Indicators**

| *Waiver | | *Paid Up | | *Wausau | |
| *Continuation | | *PTD | | *ADB | |

**Death Information**

| Date of Death | | Cause of Death | |

**Other Information**

| Employee Annual Earnings $ | 131799.46 |
| Census Validation | |
| *Takeover Indicator | |

**Coverage Amounts**

| Basic Life | $ | 0.00 | | Basic AD&D | $ | 264000.00 | |
| Optional Life $ | 0.00 | | Optional AD&D $ | 500000.00 | |

**Case Management**

| *Assign To: | STRUM | DANIEL | *Need Info To Pay | | *Date Information Requested | 10/24/2022 |
| | | | Date Information Received | 01/25/2023 | Date Acknowledgement Letter Sent | 11/02/2022 |

**Lincoln/Sewell 713**

EXHIBIT

4

**Lincoln/Sewell 714**

---

**Note Report**

| Report | Clear | Print | Help |

AS Accom | AS Event | Add Note | Appeal | Claim | Coord Claim Note | Correspond | Doc List | Employee | Leave | Life Claim | Lve Addtl Info

Lve Correspondence | Lve Program | Lve Work Sched | Medical | Medical History | Note | SPELL Letters | Scheduled Pmt | Task Print | Task Rpt

Tasks

---

**Claim**

\* **Claim/Event/Leave Number** 12885926          **Accommodation Number** [     ]

**Note type:** [                    ]

**Primary Sort Order**
- Note Type
- Note Number
- ● Note Date/Time
- Accm. No.

Sec
●

---

**08/02/2024 8:59 AM - CLAIM Note 16**
Claim/Event/Leave: 12885926
NoteSubject : LTR to Atty
Other Subject : APPEAL UH
Text: [08/02/2024 - MACK, LINDSAY]FAXED AND MAILED APPEAL UPHOLD LETTER TO ATTORNEY.

**08/01/2024 11:39 AM - CLAIM Note 15**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : MGR REVIEW
Text: [08/01/2024 - AVRETT, MARY]MGR REVIEW COMPLETE. ON APPEAL, REVIEW COMPLETED BY OCC MED. AGREE WITH MAINTAINING DENIAL AS THE EVIDENCE ON FILE SUPPORTS THE PRESENCE OF ALCOHOL IN THE COVERED PERSON'S BLOOD WHICH RAISES A PRESUMPTION THAT THE COVEREDPERSON WAS UNDER THE INFLUENCE OF ALCOHOL AND CONTRIBUTED TO THE CAUSE OF THE ACCIDENT.

**08/01/2024 9:56 AM - CLAIM Note 14**
Claim/Event/Leave: 12885926
NoteSubject : Action Plan
Other Subject : CRS DECISION REVIEW
Text: [08/01/2024 - MACK, LINDSAY]**REFERRAL FOR OVERSIGHT REVIEW** CLAIM FOR ACCIDENTAL DISMEMBERMENT BENEFITS DUE TO ACCIDENT OCCURRING 8/28/21 IN WHICH EE DOVE OFF A BOAT INTO SHALLOW WATER AND SUSTAINED INJURY TO HIS CERVICAL SPINE RESULTING IN QUADRIPLEGIA. HOSPITAL RECORDS REVEALED SERUM ALCOHOL CONCENTRATION OF 222 MG/DL (EQUIVALENT TO BAC OF 0.222%). CLAIM WAS DENIED ON THE BASIS OF POLICY EXCLUSION STATING THAT NO BENEFITS ARE PAYABLE FOR ANY LOSS THAT IS CONTRIBUTED TO OR CAUSED BY THE PRESENCE OF ALCOHOL IN THE COVERED PERSON'S BLOOD WHICH RAISES A PRESUMPTION THAT THE COVERED PERSON WAS UNDER THE INFLUENCE OF ALCOHOL AND CONTRIBUTED TO THE CAUSE OF THE ACCIDENT. CP REVIEW WAS COMPLETED PRIOR TO INTIAL DENIAL. INDEPENDENT CP REVIEW COMPLETED ON APPEAL, WITH DENIAL UPHELD 9/26/23. ADDL MEDICAL WAS SUBMITTED AFTER APPEAL UPHOLD, WHICH IS NOW BEING CONSIDERED IN CONNECTION WITH SUBSEQUENT LITIGATION. FURTHER MEDICAL REVIEW COMPLETED WITH 3RD CP. ALL OF THE MEDICAL INFORMATION AND OTHER EVIDENCE HAS BEEN CONSIDERED, INCLUDING THE OPINION OF THE EE/ATTNY'S MEDICAL CONSULTANT, WHO MADE ARGUMENTS REGARDING THE VALIDITY OF THE ALCOHOL TESTING/RESULTS. HOWEVER, THE TOTALITY OF THE EVIDENCE IS NOT PERSUASIVE THAT THE BLOOD ALCOHOL TESTING WAS INVALID AND ALCOHOL-RELATED IMPAIRMENT ID NOT PLAY A PART IN EE'S ACCIDENT. RECOMMEND MAINTAINING DENIAL AS THE EVIDENCE ON FILE SUPPORTS THE PRESENCE OF ALCOHOL IN THE COVERED PERSON'S BLOOD WHICH RAISES A PRESUMPTION THAT THE COVERED PERSON WAS UNDER THE INFLUENCE OF ALCOHOL AND CONTRIBUTED TO THE CAUSE OF THE ACCIDENT. THE SIGNFICANTLY ELEVATED BAC WOULD HAVE RESULTED IN IMPAIRMENTS TO JUDGMENT, PERCEPTION, ETC. WHICH CONTRIBUTED TO OR CAUSED THE ACCIDENT THAT RESULTED IN EE'S QUADRIPLEGIA.

**07/31/2024 5:14 PM - CLAIM Note 13**
Claim/Event/Leave: 12885926
NoteSubject : Peer Review
Other Subject : ADDENDUM
Text: [07/31/2024 - MACK, LINDSAY]LATE ENTRY - RECEIVED CP ADDENDUM REPORT DATED 7/27/24 FROM DR. ROBERT SWOTINSKY.

**07/08/2024 11:56 AM - CLAIM Note 12**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [07/08/2024 - MACK, LINDSAY]RECEIVED 6/24/24 REBUTTAL REPORT BY DR. THOMAS ARNOLD AND ASSOCIATED REFERENCE ARTICLES, SUBMITTED BY CLMT'S ATTORNEY TO OUTSIDE COUNSEL ON 7/5/24. COMPLETED REFERRAL TO ICP DR. SWOTINSKY FOR ADDENDUM TO HIS 6/3/24 REPORTTO DETERMINE IF THE NEW INFORMATION ALTERS HIS PREVIOUS RESPONSES/CONCLUSIONS.

---

**06/05/2024 5:33 PM - CLAIM Note 11**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [06/05/2024 - MACK, LINDSAY]RECEIVED EMAIL DATED 6/4/24 EMAIL FROM CLMT'S ATTORNEY REQUESTING EXTENSION TO RESPOND TO MEDICAL REVIEW. EMAILED RESPONSE LETTER CONFIRMING WE WILL GRANT REQUESTED EXTENSION THRU AND INCLUDING 7/6/24 FOR RESPONSE. LINCOLN WILL ISSUE ITS DECISION WITHIN 30 DAYS AFTER WE RECEIVE THEIR RESPONSE.

**06/03/2024 3:03 PM - CLAIM Note 10**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [06/03/2024 - MACK, LINDSAY]CP REVIEW DATED 6/1/24 RECEIVED FROM DR. ROBERT SWOTINSKY. COPY OF REPORT FAXED TO CLMT'S ATTORNEY FOR REVIEW; PROVIDED UNTIL 6/6/24 FOR ANY RESPONSE.

**05/28/2024 9:38 AM - CLAIM Note 9**
Claim/Event/Leave: 12885926
NoteSubject : Ref to Other
Other Subject : ICP
Text: [05/28/2024 - MACK, LINDSAY]CLAIM REFERRED FOR REVIEW BY INDEPENDENT CONSULTING PHYSICIAN. AD&D DENIAL PREVIOUSLY UPHELD ON APPEAL IN 9/2023. ADDITIONAL APPEAL REVIEW BEING COMPLETED PER LEGAL.

**11/28/2023 8:18 AM - CLAIM Note 8**
Claim/Event/Leave: 12885926
NoteSubject : LTR to EE
Other Subject : ANNUAL
Text: [11/28/2023 - BERARD, LUCILLE]MAILED ANNUAL WOP APPROVAL LETTER.

**11/22/2023 2:47 PM - LIFE Note 62**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : RQST FOR ADDTL RVW
Text: [11/22/2023 - VALLIERE, TAWNYA]RECEIVED ADDTL REQUEST FOR RECONSIDERATION DATED 11/17/23 RELATED TO DENIAL OF AD&D BENEFITS FROM ATTY J. PRICE MCNAMARA***RESPONSE SENT TO ATTY ADVISING ERISA REVIEW HAS BEEN EXHAUSTED. AD&D CLAIM WILL REMAIN CLOSED WITH NO FURTHER ACTION TAKEN BY LFG.

**10/16/2023 11:53 AM - CLAIM Note 7**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : FILE COPY
Text: [10/16/2023 - KEEFER, DAWN]COMPLETE FILE COPY REQUEST HAS BEEN COMPLETED AND SENT VIA ONE DRIVE TO THE EMAIL ADDRESS PROVIDED SUPPORT@JPRICEMCNAMARA.COM

**09/26/2023 1:45 PM - CLAIM Note 6**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : MANAGER REVIEW
Text: [09/26/2023 - SCHAAPVELD, MATHEW]REVIEWED UPHOLD RECOMMENDATION. AGREE WITH UPHOLD. PEER REVIEW FOUND THE CLAIMANT'S ALCOHOL LEVELS DID CONTRIBUTE TO THE CAUSE OF THE CLAIMANT'S INJURY.

**09/25/2023 3:47 PM - LIFE Note 61**
Claim/Event/Leave: 12885926
NoteSubject : Action Plan
Other Subject : CRS DECISION REVIEW
Text: [09/25/2023 - VALLIERE, TAWNYA]RECOMMEND THE DENIAL OF ACCIDENTAL DISMEMBERMENT BENS BE MAINTAINED. CLMT IS A 59 YOM PREVIOUSLY EMPLOYED AS A NATIONAL GENERAL ADJUSTER FOR MCLARENS LLC. ON 08/28/21, CLMT SUSTAINED A TRAUMATIC SPINAL CORD INJURY RESULTING IN QUADRIPLEGIA WHEN HE REPORTEDLY DOVE INTO SHALLOW WATER FROM A BOAT. BLOOD FROM THE CLMT WAS TESTED ON THE DAY OF ADMISSION TO CORPUS CHRISTI MEDICAL CENTER AND REVEALED SERUM ALCOHOL CONCENTRATION OF 222 MG/DL. CP REVIEW ON APPEAL NOTEDTHAT BLOOD ALCOHOL CONCENTRATIONS GREATER THAN 0.05% CAUSE A STATE OF INCREASED EUPHORIA, EXAGGERATED BEHAVIOR; REDUCED COORDINATION, DIFFICULTY STEERING, REDUCED ABILITY TO TRACK MOVING OBJECTS AND REDUCED RESPONSE TO EMERGENCY DRIVING SITUATIONS. BLOOD ALCOHOL CONCENTRATIONS GREATER THAN 0.08% IMPAIR MUSCLE COORDINATION (BALANCE, SPEECH, VISION, REACTION TIME, AND HEARING), DETECTION OF DANGER, JUDGMENT, SELF-CONTROL, REASONING, MEMORY, CONCENTRATION, PERCEPTION, AND REDUCE INFORMATION PROCESSING CAPABILITY. BLOOD ALCOHOL CONCENTRATIONS ABOVE 0.10% IMPAIR REACTION TIME AND CONTROL. BLOOD ALCOHOL CONCENTRATIONS ABOVE 0.16% CAUSE MAJOR LOSS OF BALANCE, COORDINATION, REACTION TIME, ATTENTION TO TASK AND IMPAIRMENT IN VISUAL AND AUDITORY INFORMATION PROCESSING. CLINICAL REVIEW ON APPEAL CONCLUDED THE PRESENCE OF ALCOHOL IN THE CLMT S BLOOD CAUSED OR CONTRIBUTED TO THE ACCIDENT WHICH RESULTED IN HIS CERVICAL SPINE INJURY BECAUSE IT AFFECTED HIS JUDGMENT REGARDING SAFETY AND THE DANGERS OFDIVING INTO WATER OF UNCERTAIN DEPTH. THE POLICY EXCLUDES BENEFITS FOR ANY LOSS THAT IS CONTRIBUTED TO OR CAUSED BY THE PRESENCE OF ALCOHOL IN THE COVERED PERSON'S BLOOD WHICH RAISES A PRESUMPTION THAT THE COVERED PERSON WAS UNDER THE INFLUENCE OFALCOHOL AND CONTRIBUTED TO THE

**Lincoln/Sewell 716**

CAUSE OF THE ACCIDENT. THEREFORE, RECOMMEND OF THE DENIAL OF ACCIDENTAL DISMEMBERMENT BENEFITS BE UPHELD.

**08/30/2023 2:52 PM - LIFE Note 60**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [08/30/2023 - VALLIERE, TAWNYA]REFERRAL MADE FOR CP ADDENDUM REVIEW FOLLOWING RECEIPT OF ADDTL INFO FROM ATTY

**08/30/2023 2:51 PM - LIFE Note 59**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : RECORDS RECD
Text: [08/30/2023 - VALLIERE, TAWNYA]APPEAL ENCLOSURES 001-269 RECEIVED FROM ATTY J. PRICE MCNAMARA AND ADDED TO DOC LIST

**08/23/2023 3:51 PM - PHONE Note 2**
Claim/Event/Leave: 12885926
NoteSubject : Called Other
Other Subject : MISSING INFO
Text: [08/23/2023 - VALLIERE, TAWNYA]T/C TO ATTY OFFICE AT 225-201-8311. S/W SARA AND ADVISED WE WERE NOT ABLE TO ACCESS THE LINK PREVIOUSLY SENT TO THIS OFFICE WHICH INCLUDED ENCLOSURES 001-269 BEFORE THE LINK EXPIRED. WE HAD PREVIOUSLY REQUESTED THE LINK BE RESENT, BUT HAVE NOT RECEIVED IT YET. SARA AGREED TO RESEND LINK TO CRS AT TAWNYA.VALLIERE@LFG.COM

**08/23/2023 3:49 PM - CLAIM Note 5**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : ADDTL INFO RECD
Text: [08/23/2023 - VALLIERE, TAWNYA]REC'D STATEMENT OF CHRIS BOSWELL AND PAUL BOSWELL FROM ATTY J. PRICE MCNAMARA. FAX FROM ATTY DATED 08/21/23 INDICATES THIS CONCLUDES THEIR SUBMISSION FOR THE APPEAL.

**08/04/2023 8:25 AM - LIFE Note 58**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [08/04/2023 - VALLIERE, TAWNYA]RTR EXTENDED THROUGH 08/18/23 PER ATTY REQUEST. ATTY HAS SUBMITTED AFFIDAVIT FROM T. SEWELL, T. WEAVER, AND J. FENN, HOWEVER, ADVISED ADDTL INFO IS FORTHCOMING. CRS ALSO REQUESTED ATTY RESUBMIT LINK THAT WAS SENT TO THIS OFFICE ON 07/21/23 AS LINK EXPIRED.

**07/19/2023 11:17 AM - LIFE Note 57**
Claim/Event/Leave: 12885926
NoteSubject : LTR to Other
Other Subject : MISSING INFO
Text: [07/19/2023 - VALLIERE, TAWNYA]PER REVIEW OF CORRESPONDENCE FROM ATTY DATED 07/17/23, WE ARE MISSING PGS 30-269 OF APPEAL ENCLOSURE. REQUESTED THAT THIS INFORMATION BE RESUBMITTED BY EITHER FAX OR EMAIL TO 603-334-0401 OR LIFECLAIMDOCS@LFG.COM

**07/14/2023 4:04 PM - LIFE Note 56**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [07/14/2023 - VALLIERE, TAWNYA]COPY OF CLINICAL REVIEW SENT TO ATTY FOR REVIEW/RESPONSE WITHIN 21 DAYS, BY 08/04/23.

**05/25/2023 1:08 PM - LIFE Note 55**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : STATUS
Text: [05/25/2023 - VALLIERE, TAWNYA]INITIAL REVIEW OF THE FILE IS COMPLETE. DETERMINATION FOR PHYSICIAN LEVEL REVIEW; REFERRAL IN PROCESS.

**05/22/2023 8:27 AM - LIFE Note 54**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : REFERRAL RECVD
Text: [05/22/2023 - AVERILL, REBECCA]ASSIGNED TO TAWNYA VALLIERE

**05/19/2023 11:29 AM - LIFE Note 53**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : APPEAL
Text: [05/19/2023 - STRUM, DANIEL]THIS APPEAL IS FOR THE DISMEMBERMENT PORTION OF THE CLAIM. THE DENIAL
LETTER THAT WAS SENT REFERENCES THE WOP BUT CORRESPONDENCE PICKED THAT UP AS THERE WAS A WOP CLAIM

LETTER THAT WAS SENT REFERENCES THE WOP BUT CORRESPONDENCE PICKED THAT UP AS THERE WAS A WOP CLAIM CREATED FIRST SO DEFAULTED TO THAT. THIS IS FOR THEDISMEMBERMENT

**05/19/2023 10:14 AM - LIFE Note 52**
Claim/Event/Leave: 12885926
NoteSubject : Appeal
Other Subject : APPEAL
Text: [05/19/2023 - STRUM, DANIEL]SENT APPEAL TO APPEALS DEPT

**05/05/2023 9:04 AM - LIFE Note 51**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : POLICY
Text: [05/05/2023 - STRUM, DANIEL]SENT COPY OF THE POLICY TO THE ATTY

**04/19/2023 7:27 AM - LIFE Note 50**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : FILE COPY
Text: [04/19/2023 - NILES, CATHY]REQUEST TO SEND A COPY OF SEND ALL DOCS WITH DOCUMENT DATE OF 4/18/23 ONLY HAS BEEN COMPLETED. SENT TO EMAIL SUPPORT@JPRICEMCNAMARA.COM THRU ONEDRIVE.

**04/18/2023 8:08 AM - LIFE Note 49**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : REQUEST
Text: [04/18/2023 - PUNSKA, MELISSA]SENT REQUEST TO CLAIMSHOADMIN TO SEND MEDICAL RECORDS TO REPRESENTING ATTNY

**04/18/2023 7:59 AM - LIFE Note 48**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : MED RECORDS
Text: [04/18/2023 - PUNSKA, MELISSA]ATTNY REQUESTED MEDICAL RECORDS - DISCUSSED WITH DISABILITY MANAGER - PULLED RECORDS ADDED TO LIFE FILE AND REQUESTED RECORDS BE SENT TO REPRESENTING ATTNY

**04/10/2023 4:01 PM - LIFE Note 47**
Claim/Event/Leave: 12885926
NoteSubject : Reopen
Other Subject : REOPEN
Text: [04/10/2023 - STRUM, DANIEL]REOPENED CLAIM DUE TO QA HITS WHERE HAD TO UPDATED WOP INDICATOR AND LDW

**04/06/2023 9:29 AM - LIFE Note 46**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : LTR FROM ATTY
Text: [04/06/2023 - WATSON, MATTHEW]DUPLICATE 3/27/23 LTR RCVD FROM ATTY MCNAMARA REQUESTING ADDITIONAL SIXTY DAYS FOR DOCUMENT SUBMISSION. DCM FORWARDED TO ASSIGNED LIFE SPEC FOR DISMEMBERMENT DENIAL.

**03/31/2023 2:59 PM - LIFE Note 45**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : MGR REVIEW
Text: [03/31/2023 - BURNS, KIMBERLY]RETURNED LTD FILE REQUEST TO LIFE UNIT FOR PROCESSING.

**03/31/2023 10:45 AM - LIFE Note 44**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : FILE REQUEST
Text: [03/31/2023 - STRUM, DANIEL]SENT FILE REQUEST TO LTD AS MED RECORDS FROM THAT FILE WERE USED TO MAKE DETERMINATION ON DISMEMBERMENT CLAIM

**03/30/2023 3:13 PM - LIFE Note 43**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : ATTY LETTER
Text: [03/30/2023 - WATSON, MATTHEW]ATTY REQUEST FOR AN ADDITIONAL 60 DAYS FOR MARCH 28, 2023 DEALINE RCVD, DATED 3/27/2023. DCM FORWARDED TO ASSIGNED LIFE ASSOC REP VIA EDM.

**03/30/2023 3:06 PM - LIFE Note 42**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : LTR FROM ATTY
Text: [03/30/2023 - WATSON, MATTHEW]ATTY LETTER RCVD DATED 3/24/2023 REQUESTING COPY OF COMPLETE INSURANCE POLICY AND CERTIFICATE. DCM FORWARDED TO ASSIGNED LIFE REP VIA EDM.

**03/06/2023 12:23 PM - CLAIM Note 4**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : FILE COPY
Text: [03/06/2023 - KEEFER, DAWN]FILE COPY RESENT VIA ONE DRIVE TO THE EMAIL ADDRESS PROVIDED
MAILTO:SUPPORT@JPRICEMCNAMARA.COM

**03/06/2023 11:03 AM - LIFE Note 41**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : CLAIM FILE
Text: [03/06/2023 - STRUM, DANIEL]REQUESTED THE CLAIM FILE BE RESENT AS WOULD NOT OPEN PREVIOUSLY DUE TO
INCORRECT PASSWORD

**02/28/2023 3:41 PM - LIFE Note 40**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : VM
Text: [02/28/2023 - STRUM, DANIEL]CALLED ERIKA BACK AT THE LAW OFFICE AND PROVIDED HER WITH THE PW FOR THE
FILE: TI09211964 - LOWER CASE I

**02/27/2023 4:32 PM - CLAIM Note 3**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : FILE COPY
Text: [02/27/2023 - KEEFER, DAWN]COMPLETE FILE COPY REQUEST HAS BEEN COMPLETED AND SENT VIA ONE DRIVE TO
THE EMAIL ADDRESS PROVIDED SUPPORT@JPRICEMCNAMARA.COM

**02/27/2023 8:05 AM - LIFE Note 39**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : FILE REQUEST
Text: [02/27/2023 - STRUM, DANIEL]REQUESTED CLAIM BE SENT TO ATTY OFFICE VIA EMAIL

**02/17/2023 10:34 AM - LIFE Note 38**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : COPY OF FILE
Text: [02/17/2023 - STRUM, DANIEL]REC'D COPY OF THE FILE NEED A LETTER OF AUTH TO RELEASE THE FILE TO THE
ATTORNEY

**01/26/2023 2:07 PM - LIFE Note 37**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : PCM
Text: [01/26/2023 - STRUM, DANIEL]CALLED GAYE 972-658-8777 ADVISED THAT DUE TO THE EXCLUSIONS WE HAD SENT OUT
A DENIAL LETTER REFERENCING THE ALCOHOL EXCLUSION

**01/26/2023 1:55 PM - LIFE Note 36**
Claim/Event/Leave: 12885926
NoteSubject : Denied
Other Subject : DENIED
Text: [01/26/2023 - STRUM, DANIEL]SENT DENIAL LETTER TO INSURED DUE TO ALCOHOL EXCLUSION - SENT EMAIL TO ER
AS WELL

**01/10/2023 2:21 PM - LIFE Note 35**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : STATUS
Text: [01/10/2023 - STRUM, DANIEL]SENT CLAIM FOR A CP REVIEW FOR DISMEMBERMENT - LTD HAS MEDICAL RECORDS
12021334

**01/04/2023 1:21 PM - LIFE Note 34**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : 60 DY
Text: [01/04/2023 - STRUM, DANIEL]SENT 60 DY FU EM TO GAYE FOR TOX RPT

**12/02/2022 12:04 PM - LIFE Note 33**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : GAYE
Text: [12/02/2022 - STRUM, DANIEL]SPOKE TO GAYE SHE IS GOING TO TRY TO TRACK DOWN TOX RPT OR LAB RESULTS
FROM WHEN HE WAS ADMITTED TO THE HOSPITAL IN CORPUS CHRISTI BEFORE BEING TRANSPORTED TO ATLANTA

**Lincoln/Sewell 719**

FROM WHEN HE WAS ADMITTED TO THE HOSPITAL IN CORPUS CHRISTI BEFORE BEING TRANSPORTED TO ATLANTA SHEPHERDS CENTER ON VENTILATOR W TRACH

**11/18/2022 12:22 PM - LIFE Note 32**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : POA
Text: [11/18/2022 - PUNSKA, MELISSA]REC POA TIMOTHY SEWELL NAMES GAYE SEWELL FOR ALL POWERS INCLUDING BANKING/FINANCES AND INSURANCE

**11/18/2022 12:16 PM - LIFE Note 31**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : NO INCIDENT RPT
Text: [11/18/2022 - PUNSKA, MELISSA]REC EMAIL FROM TEXAS PARKS & WILDLIFE RECORDS DEPARTMENT <TPWDTEXAS@GOVQA.US> EMAIL CONFIRMS NO INCIDENT REPORT

**11/17/2022 10:59 AM - LIFE Note 30**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : GAYE
Text: [11/17/2022 - STRUM, DANIEL]SPOKE TO GAYE SHE IS GOING TO BE SENDING IN EMAIL FROM TEXAS WILDLIFE - THERE IS NO ACC RPT - SENDING OTHER DOCS IN WELL

**11/02/2022 12:30 PM - LIFE Note 29**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : PCM
Text: [11/02/2022 - STRUM, DANIEL]SPOKE TO GAYE 972-658-8777 REV'D THE CLAIM ASKED THAT I SEND HER THE LBSP BY EM SHE IS THE POA: GAYE.SEWELL@ICLOUD.COM

**11/02/2022 12:20 PM - LIFE Note 28**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : PREMS LDW SAL
Text: [11/02/2022 - STRUM, DANIEL]REC'D EM THAT STATES PREMS ARE PAID CURRENT --- LDW WAS 8/25/21 --- AND SAL IS $131,799.46 WHICH IS WHAT WAS REPORTED AND USED IN THE ADJ ---- OK TO PROCEED

**10/26/2022 4:52 PM - LIFE Note 27**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : STATUS
Text: [10/26/2022 - STRUM, DANIEL]SENT EM TO ER FOR PREMS? SAL? LDW?

**10/26/2022 4:46 PM - LIFE Note 26**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : LOA
Text: [10/26/2022 - STRUM, DANIEL]LEAVE OF ABSENCE DUE TO DISABILITY THE SPONSOR MAY CONTINUE THE COVERED EMPLOYEE'S COVERAGE(S) BY PAYING THE REQUIRED PREMIUMS, IF THE COVERED EMPLOYEE IS GRANTED AN APPROVED LEAVE OF ABSENCE DUE TO A DISABILITY. THE COVERED EMPLOYEE'S COVERAGE(S) WILL NOT CONTINUE BEYOND A PERIOD OF 12 MONTHS. IN CONTINUING SUCH COVERAGE(S) UNDER THIS PROVISION, THE SPONSOR AGREES TO TREAT ALL COVERED EMPLOYEES EQUALLY - EE ON AN APPROVED LTD CLAIM WITH LFG 12021334 --- NEED TO CONFIRM PREMS, SALARY, AND LDW

**10/26/2022 4:40 PM - LIFE Note 25**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : AOI
Text: [10/26/2022 - STRUM, DANIEL]QUADRIPLEGIA MEANS THE TOTAL AND PERMANENT PARALYSIS OF BOTH UPPER AND LOWER LIMBS --- QUADRIPLEGIA FULL AMOUNT

**10/26/2022 4:39 PM - LIFE Note 24**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : ACCIDENT
Text: [10/26/2022 - STRUM, DANIEL]THE EMPLOYEE DOVE OFF OF A BOAT IN TO WATER AND HIT HIS HEAD ON A ROCK BREAKING HIS C3 AND C4 - RESULTING IN LOSS OF FEELING FROM HIS UPPER ARMS DOWN.

**10/26/2022 4:38 PM - LIFE Note 23**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : ADJ
Text: [10/26/2022 - STRUM, DANIEL]DISMEMBERMENT ***PROD EFF. DATE: 1/1/21 ***EAP YES ***SITUS STATE: GA ***DOH: 6/17/19 ***LDW: 7/31/21 ***DATE OF ACCIDENT: 8/30/21 ***CLASS 1: ALL FULL-TIME, EXEMPT EMPLOYEES ***ELIGIBILITY MET

6/17/19 - LDW: 7/31/21 - DATE OF ACCIDENT: 5/30/21 - CLASS 1: ALL FULL-TIME, EXEMPT EMPLOYEES - ELIGIBILITY MET
***NONCONTRIB BASIC AD&D / CONTRIB OPTIONAL AD&D ***AOI: EMPLOYEE BASIC ACCIDENTAL DEATH AND
DISMEMBERMENT INSURANCE: AN AMOUNT EQUAL TO 2 TIMES ANNUAL EARNINGS. IF NOT A MULTIPLE OF $1,000.00, THIS
AMOUNT WILL BE ROUNDED TO THE NEXT HIGHER MULTIPLE OF $1,000.00. THIS AMOUNT MAY NOT EXCEED $400,000.00.
THE MINIMUM AMOUNT IS $10,000.00 - $131,799.46 * 2 = $263,598.92 ROUNDED TO $264,000 --- EMPLOYEE OPTIONAL
ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE: AN AMOUNT IN INCREMENTS OF $10,000.00. THIS AMOUNT MAY
NOT EXCEED THE LESSER OF 7 TIMES ANNUAL EARNINGS OR $500,000.0 - $500,000 ***REDUCTIONS: N/A DUE TO AGE
***EOI: REC'D PROOF OF OPT AD&D COV EFF THE DATE OF EFF DATE FOR ER IN THE AMT OF $500K

**10/24/2022 7:59 AM - LIFE Note 22**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : 7 DAY F/U
Text: [10/24/2022 - CONSTANTINO, ASHLEY]LBSP SENT?

**10/24/2022 7:59 AM - LIFE Note 21**
Claim/Event/Leave: 12885926
NoteSubject : Initial Entry
Other Subject :
Text: [10/24/2022 - CONSTANTINO, ASHLEY]RTMUS CHECKED- NO HITS

**10/20/2022 2:43 PM - LIFE Note 20**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : NOTICE TO LCE
Text: [10/20/2022 - BURNS, KIMBERLY]LCE ADVISED INFO SUBMITTED IS FOR PTD AND A NEW CLAIM FOR AD&D IS NEEDED.
LCE IS REACHING OUT TO EMPLOYER FOR THE CORRECT DOCUMENTATION TO BE SUBMITTED. REQUESTED LCE REACH
OUT TO EMPLOYEE HOWEVER THEY ADVISED INFO IS NEEDED FROM EMPLOYER BEFORE THEY CAN FOLLOW UP WITH
EMPLOYEE.

**10/13/2022 2:40 PM - PHONE Note 1**
Claim/Event/Leave: 12885926
NoteSubject : Other Called
Other Subject : SPOUSE (TPA)
Text: [10/13/2022 - ADAMS, MICHELLE]SPOUSE CALLED IN REGARDS TO CK THE STATUS OF CLAIM # 12885926. THE ER SENT
IN A CLAIM FOR AD&D FOR HER HUSBAND WHO IS A QUADRIPLEGIC. I HAVE SET A TASK TO HAVE THE CE GIVE THEM A
CALL, TO GO OVER THE CLAIM.

**10/06/2022 9:43 AM - LIFE Note 19**
Claim/Event/Leave: 12885926
NoteSubject : VOID
Other Subject : PTD
Text: [10/06/2022 - LAPIANA, LORI]ER REQUESTED PTD HOWEVER THIS BENEFIT DOES NOT EXIST IN LIFE WAIVER
CONTRACT.

**10/06/2022 9:22 AM - LIFE Note 18**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : 7 DAY F/U
Text: [10/06/2022 - CONSTANTINO, ASHLEY]CLAIM REVIEWED?

**10/06/2022 9:22 AM - LIFE Note 17**
Claim/Event/Leave: 12885926
NoteSubject : Initial Entry
Other Subject :
Text: [10/06/2022 - CONSTANTINO, ASHLEY]RTMUS CHECKED- NO HITS

**10/06/2022 9:19 AM - LIFE Note 16**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : CHANGED SUB-LOC
Text: ASHLEY CONSTANTINO CHANGED THE SUBSIDIARY AND LOCATION FOR THIS CLAIM ON 10/06/2022, FROM 0000,
01602000, TO 0000, 01602000.

**09/02/2022 4:06 PM - LIFE Note 15**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : TPA CALLED AD&D ?
Text: [09/02/2022 - MCCONNELL, PAUL]SPOUSE TPA CALLED AND HAD QUESTIONS OVER AD&D CLAIM - THEY THOUGHT
THAT WOP WAS FOR THAT AND NOW NEED TO LOOK INTO CLAIM FOR AD&D - TOLD THEM TO GET W/ ER WHO WILL HAVE
FORMS TO FILE ADD&D CLAIM AND ONCE REC A BS FROM LIFE WILL REACH OUT TO THEM - IT IS OVER 12 MONTHS NOW -
TOLD THEM TO DO AS SOON AS POSS AND THE BS WILL BE ABLE TO ANSWER AL THEIR QUESTIONS - THANKED ME FO
RINFO -

**07/07/2022 9:52 AM - CLAIM Note 2**

Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : WOP REF PROCESSED
Text: [07/07/2022 - LUGO, KRISTI]SEE LTD CLAIM 12021334.

**07/01/2022 8:03 AM - CLAIM Note 1**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : REASSIGNMENT
Text: [07/01/2022 - HOFFNER, FAYE]WOP CLAIM REASSIGNED TO KRISTI LUGO. PLEASE REFER TO THE LTD CLAIM12021334 FOR ALL FUTURE CORRESPONDENCE

**06/30/2022 6:17 PM - LIFE Note 14**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : FINAL DECISION
Text: [06/30/2022 - MCCONNELL, PAUL]MADE FINAL DECISION CALL TO CLMT - LEFT VM ON SPOUSE VM LET KNOW APPROVED - LET KNOW SENDING OUT A LTR AND TO CALL ONCE REC IF ANY QUESTIONS -

**06/30/2022 6:15 PM - LIFE Note 13**
Claim/Event/Leave: 12885926
NoteSubject : Action Plan
Other Subject : PDMU REFER HANDLING
Text: [06/30/2022 - MCCONNELL, PAUL]UPDATED PATH: DO APPROVAL TDAO AND REFER TO PDMU FOR HANDLING LIKE LTD DID (ACCEPTED) - OVER DOLLAR REV AS $264K BLI + $100K OLI COVERAGES SUPPORTS DIRECTION - ALL POLICY PROVISIONS REVIEWED, AND KEY INDICATORS MET -LTD APPROVED W/ FU SET FOR 11/28/2022 FOR UPDATE (REFERRED TO PDMU ALREADY) ************** EE IS A 57 YOM, NATIONAL GENERAL ADJUSTER, SEDENTARY OCC, W/ DX: FRACTURE OF NECK, UNSPECIFIED AND QUADRIPLEGIA, UNSPECIFIED DX: QUADRIPLEGIA D/T BROKEN NECK ** WAS FISHING ON 8/28/2021 WHEN HE JUMPED OFF OF A BOAT INTO SHALLOW WATER ** WAS ON A VENTILATOR AND TRANSFERRED TO INPATIENT REHAB CENTER (SHEPERD CENTER) - ERMA FREEMAN IS SOCIAL WORKER AT SHEPERD CENTER ** AP BOWMAN IS PMR PROVIDER AT SHEPHERD CENTER ** TOLERATED VENT WEAN ON 10/21/2021 AND WAS TRANSITIONED TO CUFFLESS TRACH ON 10/27/2021 ** HAD TRACHEOSTOMY, PEG TUBE ** IS WHEELCHAIR DEPENDENT AND REQUIRED INPATIENT CARE THROUGH 12/7/2021 D/C, INCLUDING PT, OT, SLP, AS CONFIRMED BY MEDICAL RECORDS ON FILE *** BASED ON EE'S AGE, OCC, SEVERITY OF DIAGNOSIS WITH LESS THAN SEDENTARY CAPACITY REASONABLE SUPPORTED ONGOING D/T NATURE OF CONDITION, RECOMMEND CLAIM BE REFERRED TO PDMU ***************

**06/30/2022 6:15 PM - LIFE Note 12**
Claim/Event/Leave: 12885926
NoteSubject : Approved
Other Subject : TDAO ELIM PERIOD
Text: [06/30/2022 - MCCONNELL, PAUL]UPDATED PATH: DO APPROVAL TDAO AND REFER TO PDMU FOR HANDLING LIKE LTD DID (ACCEPTED) - OVER DOLLAR REV AS $264K BLI + $100K OLI COVERAGES SUPPORTS DIRECTION - ALL POLICY PROVISIONS REVIEWED, AND KEY INDICATORS MET -LTD APPROVED W/ FU SET FOR 11/28/2022 FOR UPDATE (REFERRED TO PDMU ALREADY) ************** EE IS A 57 YOM, NATIONAL GENERAL ADJUSTER, SEDENTARY OCC, W/ DX: FRACTURE OF NECK, UNSPECIFIED AND QUADRIPLEGIA, UNSPECIFIED DX: QUADRIPLEGIA D/T BROKEN NECK ** WAS FISHING ON 8/28/2021 WHEN HE JUMPED OFF OF A BOAT INTO SHALLOW WATER ** WAS ON A VENTILATOR AND TRANSFERRED TO INPATIENT REHAB CENTER (SHEPERD CENTER) - ERMA FREEMAN IS SOCIAL WORKER AT SHEPERD CENTER ** AP BOWMAN IS PMR PROVIDER AT SHEPHERD CENTER ** TOLERATED VENT WEAN ON 10/21/2021 AND WAS TRANSITIONED TO CUFFLESS TRACH ON 10/27/2021 ** HAD TRACHEOSTOMY, PEG TUBE ** IS WHEELCHAIR DEPENDENT AND REQUIRED INPATIENT CARE THROUGH 12/7/2021 D/C, INCLUDING PT, OT, SLP, AS CONFIRMED BY MEDICAL RECORDS ON FILE *** BASED ON EE'S AGE, OCC, SEVERITY OF DIAGNOSIS WITH LESS THAN SEDENTARY CAPACITY REASONABLE SUPPORTED ONGOING D/T NATURE OF CONDITION, RECOMMEND CLAIM BE REFERRED TO PDMU ***************

**06/30/2022 10:47 AM - LIFE Note 11**
Claim/Event/Leave: 12885926
NoteSubject : Approved
Other Subject : TD ANY OCC WITH PDMU
Text: [06/30/2022 - LAPIANA, LORI]AGREE WITH APPROVAL OF LIFE WAIVER WITH AN IMMEDIATE TRANSFER TO PMDU AS TOTAL DISABILITY FROM ANY OCC IS SUPPORTED INDEFINITELY. ALL POLICY PROVISIONS REVIEWED AND KEY INDICATORS MET.

**06/27/2022 5:51 PM - LIFE Note 10**
Claim/Event/Leave: 12885926
NoteSubject : Ref to Management
Other Subject : OVER DOLLAR REV
Text: [06/27/2022 - MCCONNELL, PAUL]UPDATED PATH: DO APPROVAL TDAO AND REFER TO PDMU FOR HANDLING LIKE LTD DID (ACCEPTED) - SEND FOR OVER DOLLAR REV AS $264K BLI + $100K OLI COVERAGES - ALL POLICY PROVISIONS REVIEWED, AND KEY INDICATORS MET - LTD APPROVED W/ FU SET FOR 11/28/2022 FOR UPDATE (REFERRED TO PDMU ALREADY) ************** EE IS A 57 YOM, NATIONAL GENERAL ADJUSTER, SEDENTARY OCC, W/ DX: FRACTURE OF NECK, UNSPECIFIED AND QUADRIPLEGIA, UNSPECIFIED DX: QUADRIPLEGIA D/T BROKEN NECK ** WASFISHING ON 8/28/2021 WHEN HE JUMPED OFF OF A BOAT INTO SHALLOW WATER ** WAS ON A VENTILATOR AND TRANSFERRED TO INPATIENT REHAB CENTER (SHEPERD CENTER) - ERMA FREEMAN IS SOCIAL WORKER AT SHEPERD CENTER ** AP BOWMAN IS PMR PROVIDER AT SHEPHERD CENTER ** TOLERATED VENT WEAN ON 10/21/2021 AND WAS TRANSITIONED TO CUFFLESS TRACH ON 10/27/2021 ** HAD TRACHEOSTOMY, PEG TUBE ** IS WHEELCHAIR DEPENDENT AND REQUIRED INPATIENT CARE THROUGH 12/7/2021 D/C, INCLUDING PT, OT, SLP, AS CONFIRMED BY MEDICAL RECORDS ON FILE *** BASED ON EE'S AGE

THROUGH 12/7/2021 D/C, INCLUDING PT, OT, SLP, AS CONFIRMED BY MEDICAL RECORDS ON FILE *** BASED ON EE'S AGE, OCC, SEVERITY OF DIAGNOSIS WITH LESS THAN SEDENTARY CAPACITY REASONABLE SUPPORTED ONGOING D/T NATURE OF CONDITION, RECOMMEND CLAIM BE REFERRED TO PDMU ***************

**06/27/2022 5:44 PM - LIFE Note 9**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : WAIVER PROVISION
Text: [06/27/2022 - MCCONNELL, PAUL]**EE WENT OOW PRIOR TO AGE 60 (57) YES - **6-MONTH EP HAS BEEN MET YES - **DOES AD&D AND/OR DEPENDENT COVERAGE CONTINUE? NO - **REDUCTION CODE: 31 TERMS AT AGE 65 OR RETIREMENT - **IS DEFINITION TD ANY OCC: YES**WERE THERE ANY PRIOR PROVISIONS TO REVIEW: YES -

**06/27/2022 5:44 PM - LIFE Note 8**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : ADJUDICATION
Text: [06/27/2022 - MCCONNELL, PAUL]**TYPE OF COVERAGE CONFIRMED ON TEMPLATE: BLI & OLI **IS LW APPLICABLE TO ALL EE COVERAGES: YES - **PRODUCT EFF DATE: JAN 1, 2021 - **ERISA (CONFIRMED IN S1): YES - **SITUS STATE: GA - **LDW: 8/25/2021 - **DOH: 7/20/2015 - **CLASS: CLASS 1: ALL FULL-TIME, EXEMPT EMPLOYEES **ELIGIBILITY MET (MHR & EWP): YES: FT 5 DAYS 8-HOUR DAYS - EWP: YES: NONE - **NON-CONTRIBUTORY BASIC LIFE AOI CALCULATION: AN AMOUNT EQUAL TO 2 TIMES ANNUAL EARNINGS. IF NOTA MULTIPLE OF $1,000.00, THIS AMOUNT WILL BE ROUNDED TO THE NEXT HIGHER MULTIPLE OF $1,000.00. THIS AMOUNT MAY NOT EXCEED $400,000.00. THE MINIMUM AMOUNT IS $10,000.00. SALARY $131799.48 X 2 = $263598.96 ($264K BLI) - **CONTRIBUTORY OPTIONAL LIFE AOI CALCULATION: AN AMOUNT IN INCREMENTS OF $10,000.00. THIS AMOUNT MAY NOT EXCEED THE LESSER OF 7 TIMES ANNUAL EARNINGS OR $500,000.00. FLAT $100K OLI - **REDUCTIONS PRIOR TO WOP TERM AGE? NO - **EOI: (NA) OLI NOT OVER $150K & NO INCREASESABOVE 2 LEVELS IN LAST 2 YEARS - EMPLOYEE OPTIONAL LIFE INSURANCE BENEFITS: $150,000.00 OLI ANY INCREASES OF MORE THAN TWO LEVELS ABOVE THE CURRENT BENEFIT LEVEL WILL BE SUBJECT TO EVIDENCE OF INSURABILITY - **REVIEWED DEFINITION OF ANNUAL EARNINGS: YES -

**06/14/2022 12:14 PM - LIFE Note 7**
Claim/Event/Leave: 12885926
NoteSubject : Acknowledgment Sent
Other Subject : ER FU 2 TEMP INFO
Text: [06/14/2022 - MCCONNELL, PAUL]UPDATED PATH: SEND OUT ER TEMPLATE 2 TO VERIFY CLASS, SALARY & COVERAGES ON DLW - DO APPROVAL ONCE VERIFY INFO AND REFER TO PDMU FOR HANDLING LIKE LTD DID (ACCEPTED) - LTD APPROVED W/ FU SET FOR 11/28/2022 FOR UPDATE (REFERRED TO PDMU ALREADY) **************

**06/09/2022 4:11 PM - LIFE Note 6**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : REC VM FROM SPOUSE
Text: [06/09/2022 - MCCONNELL, PAUL]REC VM FORM CLMT SPOUSE GAYE 3RD PARTY AUTH - CALLED BACK - VERIFIED DX & ONGOING THERAPY - HE IS IN PT/PT STILL TRYING TO REGAIN ANY USE OF EXTREMITIES NOW - HE IS IN WHEELCHAIR ONGOING - THEY ARE SLOWLY STARTING TO GETSOME MOVEMENT ON LEFT SIDE BICEP (VERY LITTLE) - HE IS ALSO DOING ONGOING WOUND CARE FOR BED SORE HAS FORM BEING CONFINED TO BED FOR MOST PART - HE NEEDS ASSISTANCE WITH ALL OF HIS ADL'S STILL ONGOING - I EXPLAINED OO VS AO - EXPLAINED THAT I AM APPROVING CLAIM AND JUST TRYING TO VERIFY INFO FORM ER AND ONCE DO THIS WILL SEND OUT APPROVAL LTR - TOLD HER WOULD NOT CALL ON APPROVAL DATE UNLESS SOMETHING ELSE NEEDED FROM HER - ALSO TOLD HER TO CALL ME AT ANY TIME IF ANY QUESTIONS & SENT OUT INTROLTR THE OTHER DAY - THANKED HER FOR INFO & CALL ENDED CORDIALLY -

**06/07/2022 5:31 PM - LIFE Note 5**
Claim/Event/Leave: 12885926
NoteSubject : Acknowledgment Sent
Other Subject : ER TEMP CLMT INTRO
Text: [06/07/2022 - MCCONNELL, PAUL]PATH: SEND OUT CLMT INTRO LTR - SEND OUT ER TEMPLATE TO VERIFY CLASS, SALARY & COVERAGES ON DLW - DO APPROVAL ONCE VERIFY INFO AND REFER TO PDMU FOR HANDLING LIKE LTD DID (ACCEPTED) - LTD APPROVED W/ FU SET FOR 11/28/2022 FOR UPDATE (REFERRED TO PDMU ALREADY) **************

**06/07/2022 5:30 PM - LIFE Note 4**
Claim/Event/Leave: 12885926
NoteSubject : Phone Call
Other Subject : INITIAL CLMT CALL
Text: [06/07/2022 - MCCONNELL, PAUL]MADE INITIAL CALL TO CLMT - LEFT VM ON SPOUSE VM LET KNOW DOING REV AND LINK FROM LTD 6 MONTHS - LET KNOW JUST NEED UPDATE ON CONDITION & ONGOING THERAPY & STATUS OF POSS RTW DOWN THE ROAD - LET KNOW SEND OUT INTRO LTR AND IF HAS ANY QUESTIONS TO CALL ME - LEFT # FOR UPDATES OR QUESTIONS -

**06/07/2022 5:21 PM - LIFE Note 3**
Claim/Event/Leave: 12885926
NoteSubject : Other
Other Subject : 3RD PARTY AUTH
Text: [06/07/2022 - MCCONNELL, PAUL]***** 3RD PARTY AUTH DATE 9/8/21 GAYE SEWELL BLUE 9/8/21 -

**06/07/2022 5:20 PM - LIFE Note 2**
Claim/Event/Leave: 12885926

NoteSubject : Action Plan
Other Subject : REV LTD INFO - CLMT
Text: [06/07/2022 - MCCONNELL, PAUL]EE IS A 57 YOM, NATIONAL GENERAL ADJUSTER, SEDENTARY OCC, W/ DX: QUADRIPLEGIA D/T BROKEN NECK ** WAS FISHING ON 8/28/2021 WHEN HE JUMPED OFF OF A BOAT INTO SHALLOW WATER ** WAS ON A VENTILATOR AND TRANSFERRED TO INPATIENT REHAB CENTER (SHEPERD CENTER) - ERMA FREEMAN IS SOCIAL WORKER AT SHEPERD CENTER ** AP BOWMAN IS PMR PROVIDER AT SHEPHERD CENTER ** TOLERATED VENT WEAN ON 10/21/2021 AND WAS TRANSITIONED TO CUFFLESS TRACH ON 10/27/2021 ** HAD TRACHEOSTOMY, PEG TUBE** IS WHEELCHAIR DEPENDENT AND REQUIRED INPATIENT CARE THROUGH 12/7/2021 D/C, INCLUDING PT, OT, SLP, AS CONFIRMED BY MEDICAL RECORDS ON FILE *** BASED ON EE'S AGE, OCC, SEVERITY OF DIAGNOSIS WITH LESS THAN SEDENTARY CAPACITY REASONABLE SUPPORTED ONGOING D/T NATURE OF CONDITION, RECOMMEND CLAIM BE REFERRED TO PDMU *************** ***** AUTH DATE 9/10/2021 BLUE 9/10/2021 ***** FORMS IN BLUE 12/2/21 (TEE, CSS, TMP) - ***** 3RD PARTY AUTH DATE 9/8/21 GAYE SEWELL BLUE 9/8/21 -

**06/01/2022 10:57 AM - LIFE Note 1**
Claim/Event/Leave: 12885926
NoteSubject : Initial Entry
Other Subject :
Text: [06/01/2022 - DIRCK, JAIME]RTMUS CHECKED NO HITS.

**Lincoln/Sewell 724**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

| | |
|---|---|
| Date: | August 2, 2024 |
| To: | J. PRICE MCNAMARA<br>LAW OFFICES OF J. PRICE MCNAMARA<br>10455 JEFFERSON HIGHWAY<br>STE 130<br>BATON ROUGE LA 70809 |
| Attn: | |
| Fax: | (225) 201-8313 |
| From: | Lindsay Mack<br>Claim Resolution Specialist<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-0401 |
| Total Pages<br>(Including Cover): | 16 |
| RE:<br><br>Claim #:    12885926<br>Claimant:   Timothy Sewell<br><br>McLarens, LLC | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Sewell 725**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

August 2, 2024

J. Price McNamara
Law Offices of J. Price McNamara
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE, LA 70809

RE:     Employee: Timothy Sewell
        Policyholder: McLarens, LLC
        Policy #: SA3-890-LF0483-01
        Claim #: 12885926

Dear J. Price:

We have completed our review of the above-referenced claim for accidental dismemberment benefits under Group Life Insurance Policy No. SA3-890-LF0483-01 (hereinafter "Policy") issued by The Lincoln National Life Insurance Company (hereinafter "Lincoln") to McLarens, LLC and maintained the decision to deny benefits.

**Initial Claim Decision**

Accidental dismemberment benefits were denied on the basis that Timothy Sewell was under the influence of alcohol, which contributed to the cause of his accident and resulting quadriplegia / tetraplegia.

A Claimant Statement was completed on November 30, 2022 by Gaye Sewell, Timothy Sewell's wife and power of attorney. On this form, she noted that the date of Mr. Sewell's accident was August 28, 2021. She reported that he was hospitalized at Corpus Christi Medical Center Bay Area in Corpus Christi, TX from August 28, 2021 to September 21, 2021 and then at Shepherd Center in Atlanta, GA from September 21, 2021 to December 7, 2021.

The attending physician's portion of the Dismemberment Claim Form was completed by Dominique Van Beest, MD on November 17, 2022. She noted a diagnosis of tetraplegia associated with an accident on August 28, 2021. She noted she was first consulted for this condition on November 15, 2022. She noted, "Veteran suffered a C4-5 translation dislocation resulting in tetraplegia. He has no functional use of his extremities and is dependent for mobility and activities of daily living."

An email dated November 14, 2022 was received from Texas Parks and Wildlife Records

1  of 15

**Lincoln/Sewell 726**

Department which indicated that an accident report was not created for this accident.

In January 2023, the medical information on file was reviewed by a board certified internal medicine physician, Dr. Robert Millstein. In reviewing the available records, Dr. Millstein noted:

> 8/28/21 Mr. Sewell sustained a spinal cord injury in a diving accident into 3 feet of water from the back of the boat with loss of consciousness. Diagnostic imaging + locked facet dislocation, C4 – C5 anterior subluxation, cord edema from C2 to mid C6, aspiration pneumonia, and vertebral artery thrombosis versus dissection at C4 – C5. He was intubated at the scene.

> 8/28/21 at 1814 hrs. a blood alcohol level was 222 mg/dL. A list of diagnoses from the acute care hospitalization included alcohol abuse with intoxication.

> 8/29/21 Mr. Sewell underwent C4 – C6 ACDF with plating. While hospitalized he remained in sinus bradycardia with pauses on telemetry. Persistent symptomatic hypotension was treated with midodrine and Florinef. Methicillin sensitive staph aureus pneumonia was treated with antibiotics. 9/2/21 he underwent PEG tube placement. 9/5/21 tracheostomy was placed with ongoing ventilatory support.

> 9/21/21 he was transferred for inpatient skilled rehab.

> 11/1/21 Dr. Bowman Brock, physical medicine and rehabilitation, observed ongoing tetraplegia.

Based on his review of the available evidence, Dr. Millstein concluded:

- *On 8/28/21 Mr. Sewell sustained a spinal cord injury resulting in quadriplegia in a diving accident into 3 feet of water from the back of the boat. His blood alcohol level at the time of the diving accident was 222 mg/dL.*

- *With a blood alcohol level of 222 mg/dL Mr. Sewell would have experienced signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.*

*Manifestations of alcohol intoxication in persons who do not drink alcohol on a regular basis are related to the blood alcohol level. Persons who abuse alcohol chronically may have some degree of tolerance to some of the effects of alcohol. The submitted information does not indicate whether, around the time of his hospitalization, Mr. Sewell was consuming alcohol on a regular basis.*

*Among patients who do not abuse ethanol chronically, clinical signs often associated with particular ranges of the BAC (blood alcohol concentration) are as follows:*

- *With a BAC between 0.01 and 0.10 percent (<100 mg/dL), euphoria and mild deficits in coordination, attention, and cognition may be observed.*
- *With a BAC between 0.10 and 0.20 percent (100—200 mg/dL), an individual*

2  of 15

**Lincoln/Sewell 727**

*experiences greater deficits in coordination and psychomotor skills, decreased attention, ataxia, impaired judgment, slurred speech, and mood variability.*
- *With a BAC between 0.20 to 0.30 percent (200—300 mg/dL), severe intoxication results in a lack of coordination, incoherent thoughts, confusion, nausea and vomiting.*
- *When the BAC exceeds 0.30 percent, stupor and loss of consciousness can occur. Some patients experience coma and respiratory depression, and death is possible.*

*The predominant effect of alcohol is in the brain. High alcohol concentrations cause central nervous system depression, judgment disorder, decision inability, and impairment of perception and reaction to events. This impairment develops prior to the onset of more overt symptoms of alcohol intoxication, such as difficulty walking or maintaining balance.*

*With a blood alcohol level of 222 mg/dL Mr. Sewell would likely experience signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.*

*Diving and head-first sliding into the water account for the most serious aquatic injuries because of damage to spinal cords, often as a result of striking the bottom or side of a shallow body of water. The majority of spinal cord injuries resulting from aquatic accidents are sufficiently serious to cause permanent paralysis.*

*Serious accidents due to diving into shallow water are rare but potentially devastating as in this case. The incidence of spinal cord injuries following these accidents has been reported to range from 1.2 and 21%. Misjudgments of the water depth and recklessness behavior have been cited as common factors in these accidents. Alcohol consumption is also important risk factor, thought to be contributory in 38 to 49% of cervical injuries in previously published series.*

*Types of accidents associated with traumatic cervical spinal cord injury include motor vehicle crashes in sport related accidents – in particular, diving accidents. Numerous studies have shown that 50% of spinal cord injuries occur while victims are under the influence of alcohol. A 2004 study of persons who sustained spinal cord injury supported the association between alcohol use and cervical spinal cord injury specifically – the spinal cord injury type with the most severe consequences. The study that demonstrated that participants with cervical injury were more likely to use alcohol when injured compared with participants without cervical injury.*

The basis for the denial decision was outlined in a letter dated January 27, 2023. Mr. Sewell was provided an opportunity to request an appeal review of the denial by submitting a written request stating the reasons why he felt that the claim should not have been denied and submitting additional information to support the claim.

### Initial Appeal Decision

We received your appeal request on behalf of Mr. Sewell on May 16, 2023. In your letter, you contended that it was "undisputed" that Mr. Sewell did not drink more than six beers spread over the course of a long day before his accident and exhibited no signs of intoxication. You indicated that

**Lincoln/Sewell 728**

Mr. Sewell had never been in the area before and nothing gave him any visual clue that the water where he dove was only about half the depth of that he believed. You asserted that alcohol played no part in his decision to dive from the boat or the "controlled manner" in which he dove from the boat and stated that other people from other boats were doing so without incident. You noted that the medical records say that the hospital's serum alcohol testing "[r]esults are for medical purposes only, and not for legal or employment evaluative purposes." You advised that, according to Dr. Thomas Arnold, toxicologist, "'it is a certainty' that after the several minutes of cardiac arrest and CPR being performed on Mr. Sewell, he would have accumulated a large amount of lactic acid in his blood that explain the inaccurate reading on the hospital serum alcohol assay by simple interference with the measured enzyme" and that the hospital serum toxicology results "could not possibly" be accurate. You stated that Mr. Sewell and his fishing mates were professional gentlemen in their late 50s who were on a relaxed all-day fishing trip and "not young drunken fraternity boys." A copy of Dr. Arnold's April 28, 2023 medical review was received with your request, as well as affidavits from Mr. Sewell, his wife, his boating companions (James Fenn, Chris Boswell, and Paul Boswell), and another acquaintance/boater (Tiffany Weaver).

In June 2023, the medical information on file was reviewed by Dr. Peggy Geimer, who is board certified in internal medicine and occupational medicine.  Dr. Geimer concluded:

> *Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed alcohol at a concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. Mr. Sewell's hospital diagnoses included alcohol abuse with intoxication. Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.*

In her report, Dr. Geimer made reference to records missing from the claim file, including the Port Aransas EMS Run Report and medical records from Corpus Christi Medical Center. She also questioned Dr. Arnold's comments regarding the validity of the hospital's alcohol testing results, noting that they appeared to be based primarily on statements from individuals on the boat that Mr. Sewell did not exhibit "signs of severe intoxication." However, she noted that Mr. Sewell's doctors made and documented in the record the diagnosis of alcohol abuse with intoxication, thus casting doubt on the opinion of lay bystanders. Dr. Geimer also noted that the affidavits from Dr. Sewell and his friends acknowledged stopping at a "dockside restaurant" around 2:30 PM, but that the name of the restaurant was not mentioned nor was there any mention of the quantity or type of beverages consumed by Mr. Sewell or others at this restaurant.

On July 14, 2023, a copy of Dr. Geimer's report was sent to your office, and you were given the opportunity to provide any response you wished to be considered prior to a final decision being

made on Mr. Sewell's appeal.  It was determined that appeal enclosures pages 030 – 269, which were to have been included with your May 16, 2023 appeal request, were not previously received. These documents were re-submitted.  You also submitted new affidavits from Mr. Sewell, Tiffany Weaver, James Fenn, Chris Boswell, and Paul Boswell. In these affidavits, Mr. Sewell reported that they lunched at Woody's Sports Center in Port Arkansas and that he did not consume any beer or other alcohol there; his friends attested that they did not recall him consuming any alcohol-containing beverages while there.

Included in the newly received records was a report dated August 28, 2021 from Port Arkansas EMS. The report stated, "Dispatched to CPR in progress with pt involved in dive injury. Arrived to marina doc to await boat arrival. Boat arrived to dock, 56 yo male found lying lt lateral recumbent position on rear benchseat of boat. Bystander found to be manually holding finger in pt mouth in attempt to keep airway open. States pt having difficulty breathing. Pt appeared cyanotic to head and pale skin. Pt had faint pulses to carotid. Pt having agonal respirations. Witnesses on boat described pt performed head first dive into shallow water. Described pt immediately went unresponsive in water and pulled into boat by friends. Pt positioned on backboard and carried out of boat with 6 person carry. Pt carried to stretcher, secured. CPR compressions initiated by EMS as pt moved to unit. Pt secured in unit. BVM applied. EKG-sinus rate of sixty. Applied c-collar and secured head to board. Pulses now strong, pt still unresponsive. Compressions stopped…Pt intubated with Kingvision device 3rd attempt after visualization of vocal cords…transported code 3 emergency to Bay Area ER. Pt ventilated with BVM throughout transport…"

Records were also received from Corpus Christi Medical Center, regarding Mr. Sewell's admission on August 28, 2021. It was noted that he presented to the ED after diving from a boat into three feet of water. Lab results documented serum alcohol level of 222 mg/dL. Acute medical problems were noted to include "ETOH intoxication." Diagnostic imaging revealed C4-C5 locked facet dislocation, C4-C5 anterior subluxation, cord edema from C2 to mid C6, aspiration pneumonia, and vertebral artery thrombosis versus dissection at C4-C5. On August 29, 2021, he underwent C4-C6 ACDF with plating. A PEG tube was placed on September 2, 2021 and a tracheostomy on September 5, 2021. He was later transferred to Shepherd Center for comprehensive inpatient spinal cord injury rehabilitation and medical management.

In September 2023, an addendum review was completed by Dr. Geimer, to include the additional records. Dr. Geimer concluded the review of the newly available records did not alter her prior assessment. Dr. Geimer noted:

> Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed serum alcohol concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. While blood alcohol concentrations (BAC) most often refer to serum ethanol (alcohol) concentrations; whole blood alcohol concentrations may be used and are somewhat lower because serum and plasma contain more water than whole blood. The ratio of ethanol in serum or plasma to whole blood has been reported to be in the range of 1.09 to 1.18. As noted in the Medical Review by Thomas Arnold, MD submitted by the claimant's attorney, he used the middle of this range (16.5%) to calculate the claimant's whole blood alcohol concentration as 0.185 grams % at the time of his hospitalization. Dr. Arnold also proposed that the claimant's BAC was closer to 0.219 grams% at the time of his injury by using generally accepted population average of alcohol metabolism. I have no disagreement with his calculations. However, I disagree with

**Lincoln/Sewell 730**

*Dr. Arnold's statement that "serum alcohol level reported at the hospital cannot possibly be accurate." The results were never question by the treating providers and multiple physicians included the "Alcohol intoxication" and "ETOH intoxication" in their impression of the claimant's acute medical problems. There hospital's testing laboratory is required to follow strict guidelines in their testing. There is no evidence that the hospital's testing was flawed. Dr Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay. The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed. Lactic acidosis is not mentioned anywhere in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis.*

*Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.*

*It should be noted that the claimant swore that he made a shallow dive into the water (less than a 45-degree angle). In affidavits from May 2023, three witnesses swore that the claimant dove "straight out from the boat, not in a downward direction." However, in Port Aransas EMS Patient Care Report dated 8/28/21, it was noted that witness on the boat with the claimant advised them that they watched the claimant perform a headfirst dive into shallow water.*

Following a full and fair appeal review, the denial of accidental dismemberment benefits was maintained. The basis for the decision was outlined in a letter dated September 26, 2023.

Pursuant to your request, a complete copy of Mr. Sewell's claim file and Policy were sent to you on October 16, 2023.

**Additional Appeal Evaluation**

On November 17, 2023, you submitted an additional report from Dr. Arnold. In your November 17, 2023 letter, you asserted that there was "no way to logically conclude from the record evidence, either that Mr. Sewell was intoxicated, or that intoxication caused his terrible loss." You claimed that the records is "undisputed" as to precisely how much alcohol Mr. Sewell consumed and that Mr. Sewell exhibited none of the expected effects of alcohol intoxication. You alleged that the hospital serum test result "could not be accurate not only in light of the amount of alcohol consumed, but also as a result of lactic acid buildup from well-documented prolonged cardiac arrest."

**Lincoln/Sewell 731**

In June 2024, an independent review of all of the available evidence was completed by Dr. Robert Swotinsky, who is board certified in occupational medicine. In his report, Dr. Swotinsky noted:

> As the claimant's reviewer Thomas Arnold, MD, noted that serum alcohol level corresponded to a blood alcohol concentration (BAC) of approximately 0.185 at 17:46. The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.

> The claimant weighed 82 kg. An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking. If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking [the nine hours accounts for about two hours between the injury and alcohol test], his BAC would have been essentially undetectable. The calculation is:

$$0.12 - \left( \frac{9\ hrs\ x\ 60\frac{min}{hr}}{40} \times 0.01 \right) = -0.015$$

> Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking. His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.

> It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink. The evidence indicates the recollections underreported actual alcohol consumption. This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters. In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.

In addressing Dr. Arnold's arguments regarding lactic acid rendering the alcohol test result inaccurate, Dr. Swotinsky noted:

> Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test. Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase. Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur. In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured…

> In May 2023, claimant's reviewer Dr. Arnold opined that due to cardiac arrest and cardiopulmonary resuscitation, the claimant "would have accumulated a large amount of lactic acid in his blood" which interfered with the alcohol test and made the result falsely high. Dr. Arnold assumes the result was falsely high because it indicates more alcohol consumption than the claimant reported and because no-one who was with the claimant at the time of his injury reported that the claimant seemed intoxicated…

> On 11/17/23, Dr. Arnold responded to [Dr. Geimer's report] as follows:

**Lincoln/Sewell 732**

> *"Lactic acid is produced any time there is underperfusion of body tissues. The EMS providers on the scene reported that [the claimant] was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation. There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood…It is not uncommon for large lactic acid levels to be present without significant acidosis of the blood…. [The claimant] received IV fluids and the hospital record repeatedly shows [the claimant] being on vasoactive pressor agents to support low blood pressure and increase tissue perfusion. All of these interventions treat lactic acidosis so the claim that [the claimant] did not receive treatment for lactic acidosis cannot be supported."*

*Dr. Arnold also notes that a laboratory test report footnote states the results are "not for legal or employment evaluative purposes." Dr. Arnold says this footnote is additional evidence that the test results are unreliable.*

*Dr. Arnold's reports include no supporting citation(s) from the medical/scientific literature. Dr. Arnold's reports do not quantify the effect he believes lactic acid had on the test result.*

Dr. Swotinsky indicated that the medical/scientific literature lacks support for Dr. Arnold's theory. He stated:

*Dr. Arnold makes assumptions. He assumes that the claimant:*

1. *Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused high lactic acid level to be present.*
2. *Had an inaccurate test result due to the lactic acid in his blood.*

*The first assumption is contradicted by the medical records. The second assumption is unsupported by medical/scientific literature. I explain why:*

1. *Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused a high level of lactic acid in his blood.*

*The Port Arkansas EMS record states that CPR compressions were started at 16:51, an EKG was performed at 16:55 showing a sinus rhythm and heart rate of 60, and thus CPR compressions were discontinued. The record thus indicates that the claimant underwent CPR compressions for up to four minutes. The Port Arkansas EMS record does not indicate that the claimant was in cardiac arrest, and instead indicates that he had faint pulses when first checked at 16:51 and his heart was in normal sinus rhythm and his blood pressure was 135/62 at 16:55 when first checked by EKG, i.e., he was not in cardiac arrest.*

*Most cases of elevated lactic acid are due to marked tissue hypoperfusion resulting from low fluid volume (e.g., "bleeding out"), heart failure, sepsis, or heart attack. Before the claimant's blood was collected for ethanol, the claimant did not have health condition associated with elevated lactic acid. While Dr. Arnold implies that performing CPR causes elevated lactic acid levels, my search of the medical literature did not find evidence of this. (There is an association of lactic acid elevations in patients who have had CPR. That association is because many patients who need CPR have suffered a condition that causes*

8  of 15

*elevated lactic acid levels. The claimant, however, did not.)*

*Dr. Arnold does not mention lactate dehydrogenase. As noted above, the literature about elevated enzymatic ethanol test results involves elevations of both lactic acid and lactate dehydrogenase at the same time.*

*2.  Had an inaccurate ethanol test result due to a high level of lactic acid in his blood.*

*The phenomenon of elevated lactic acid and lactate dehydrogenase causing elevated enzymatic ethanol test results has been described in autopsy blood samples. It has been raised as a possibility when trauma patients with elevated levels of lactate and/or lactate dehydrogenase levels were admitted to the hospital for treatment.*

*However, studies have found little evidence to support this possibility in live patients. For example:*

- *A study of 37 patients hospitalized with elevated lactate and lactate dehydrogenase levels failed to find an elevation in ethanol content. The study concludes, "This data does not support the contention that an elevated LDH2 and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."*

*An article describes two children who were tested around the time they died, and who had elevated levels of both lactic acid and lactic dehydrogenase leading to elevated ethanol concentrations. I can't tell if this article falls in the category of dead patients or living patients. In any event, there is little or no evidence to support Dr. Arnold's contention that high levels of lactic acid (and lactate dehydrogenase?) caused elevation of the claimant's enzymatic ethanol test result. Dr. Arnold does not address elevated lactate dehydrogenase. I don't know if he is assuming lactate dehydrogenase was also elevated. The record presents no measurement of lactate dehydrogenase or indication that it was elevated…*

*In summary, Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:*

- *Unquantified. To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?*
- *Presented without corroborating facts*
- *Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.*
- *Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.*

Dr. Swotinsky concluded:

*Per Dr. Arnold, based on the measured BAC at 17:49, the claimant's BAC at the time of the injury was 0.22. A person's impairment at a given BAC is subject to factors like drinking history (tolerance) and timing (is the BAC going up or going down?). Thus, the medical literature presents overlapping ranges of impairment corresponding with BAC…*

**Lincoln/Sewell 734**

*Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.*

A copy of Dr. Swotinsky's report was sent to you on June 4, 2024, and you were given the opportunity to review it and provide any response you wished to be considered prior to a final decision being rendered on Mr. Sewell's claim. We agreed to your request to allow through July 6, 2024 for your response.

We received your submission of Dr. Arnold's June 24, 2024 report on July 5, 2024. Dr. Arnold's rebuttal report was reviewed by Dr. Swotinsky, who addressed Dr. Arnold's assertions in detail. Dr. Arnold's assertions and Dr. Swotinsky's responses are outlined below:

- *Per Dr. Arnold:  Dr. Swotinsky's 06/01/24 report "completely omits the sworn affidavits" about the claimant's alcohol consumption.*

  - *Dr. Swotinsky's response:  Incorrect. I addressed the sworn affidavits recalling how much the claimant drank on page 1 of my report, bottom paragraph.*

- *Per Dr. Arnold: Dr. Swotinsky incorrectly questioned Dr. Arnold's statements that the claimant was in cardiac arrest and had CPR for 6-8 minutes. Per the EMS records, the claimant was noted to have an initial EKG rhythm of pulseless electrical activity (PEA). He was down 3 minutes before CPR started and had 5 minutes of CPR, which meant 8 minutes in cardiac arrest.*

  - *Dr. Swotinsky's response:  The EMS records state the claimant initially "had faint pulses" and state the initial EKG rhythm was "PEA." In this respect, the records is contradictory, because a heart in PEA does not generate a pulse.*

- *Per Dr. Arnold: Dr. Arnold assumes the claimant had elevated levels of lactic acid and lactate dehydrogenase, and "this is the basis for my contention that [the claimant's] test was erroneous. Even Dr. Swotinsky admits that benchtop studies have demonstrated elevation in alcohol test results due to lactate and/or lactate dehydrogenase.*

  - *Dr. Swotinsky's response: There is no evidence of elevated levels of lactate or lactate dehydrogenase. Even if one presumes elevated levels of lactate and lactate dehydrogenase, case reports of this phenomenon describe it occurring only in a fraction of the alcohol enzymatic test products, and describe the alcohol levels as much lower than the claimant's .222 g/dL. Consider, for example, the three studies that Dr. Arnold referenced in his 06/24/24 report:*

    1. *A report of two live patients with high lactic acid and lactate dehydrogenase levels. Their serum alcohol test results were .069 and .044 g/dL, respectively. These values were less than one-third of he claimant's alcohol test result of .222 g/dL.*

**Lincoln/Sewell 735**

2. *A report of alcohol test results of .039 -.076 g/dL in two children just before and after death. This is actually not a report of high lactate and lactate dehydrogenase levels causing spurious alcohol test results because the study did not have lactate and lactate dehydrogenase test result – instead, the authors assumed lactate and lactate dehydrogenase were high. The alcohol test values were less than one-third of the claimant's alcohol test result of .222 g/dL.*

3. *A report of alcohol test results of .017 and .051 g/dL in two patients with high lactate and lactate dehydrogenase levels. These values were less than one-fourth of the claimant's alcohol test result of .222 g/dL.*

*In my 06/01/24 report, I cited publications describing no effect on alcohol test results from lactate and lactate dehydrogenase levels. For example:*

- *A 2018 study of 37 patients with elevated lactate and lactate dehydrogenase levels concludes, "This data does not support the contention that an elevated LDH and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."*
- *A critique of the case report of two children (the second of Dr. Arnold's references) that notes that studies in general have found little evidence to support this phenomenon in live patients.*

*Dr. Arnold attributes the claimant's alcohol test result to elevation by elevated lactate and lactate dehydrogenase. If one assumes the claimant had elevated lactate and lactate dehydrogenase levels, then recognize that:*

1) *"The association between elevated lactate and ethanol remains controversial and studies show varying results." (This is per an article in the journal Mayo Clinic Proceedings.)*

2) *The medical/scientific literature that Dr. Arnold cites to support his claim describe this phenomenon as contributing at most low levels of alcohol, about ¼ - ¿ of the claimant's level.*

- *Per Dr. Arnold: The disclaimer on the lab report, i.e., "for medical purposes only…", demonstrates that the lab knows the results are unreliable.*

  - *Dr. Swotinsky's response: Dr. Arnold also stated this in his 11/17/23 report. Dr. Arnold restates this opinion, again without medical/scientific support. His opinion differs from the medical/scientific literature, which states that the results of hospital tests for alcohol may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.*

- *Per Dr. Arnold: There are no facts in the record to support the idea that alcohol-related impairment played any part in the claimant's accident. Multiple people who were there when the claimant was injured say he:*
  *- Had 5-6 beers spread out throughout the day before his accident.*
  *- Dove into 4.5 – 5 feet deep water.*
  *- Did not appear intoxicated*

**Lincoln/Sewell 736**

- *Dr. Swotinsky's response: The record indicates the claimant's alcohol level was 0.222 g/dL. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. This is a level that put him at high risk for a diving-related cervical spine injury.*

  *The file includes from May 2023 the claimant's statement and several statements from the claimant's friends who state they were with the claimant when he was injured on 08/28/21. These statements were submitted in response to the insurer questioning the claim based on alcohol intoxication. These statements are redundant, which suggests one person was their primary author.*

  *The May 2023 recollection differs from the 08/28/21 EMS, emergency room, and hospital records which state:*
  *- The claimant's BAC was .222 g/dL. By contrast, had the claimant's alcohol consumption been limited to 5-6 beers spread out throughout the day, his BAC would have been essentially undetectable.*
  *- The claimant dove into 3 feet deep water.*
  *- ER Dr. Truman Milling's opinion on 08/28/21 that the claimant had presented with "alcohol intoxication."*

  *Dr. Arnold accepts the May 2023 recollection as "undisputed evidence," i.e., more reliable than the contemporaneous records from health care providers. By contrast, I view the records from 08/28/21 as a more reliable source of evidence because they:*
  *a. Were contemporaneous,*
  *b. Come from independent sources not subject to biased recall*
  *c. Come from medical professionals who were likely better qualified than the claimant's friends at recognizing and documenting the claimant's intoxication.*

  *The medical/scientific literature consistently finds that alcohol use increases the risk of spinal cord injury from diving. One study reports that alcohol increases the risk 4.31-fold. The claimant's alcohol use either did, or did not, contribute to his accident. A 4.31-fold increase in risk indicates it likely did contribute to the accident because, in any group of people who have diving accidents while using alcohol, 78% of such accidents are attributable to alcohol use.*

Dr. Swotinsky concluded that Dr. Arnold's June 24, 2024 submission provided no basis for altering his conclusions as outlined in his previous report. In particular, he summarized that:

- *Dr. Arnold's reference articles indicate that the claimant's alcohol test result of 0.222 g/dL cannot be attributed to the effect of presumed high levels of lactate and lactate dehydrogenase.*

- *While Dr. Arnold relies on the statements submitted by the claimant and his friends almost two years after the accident, those statements are contradicted by the contemporaneous, medical records.*

12 of 15

**Lincoln/Sewell 737**

- *The claimant's alcohol level corresponded with diminished judgment, increased self-confidence, and decreased inhibition. Misjudgments of water death and reckless behavior have been cited as common factors in diving-related cervical spine injuries. The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water. The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident.*

**Conclusion**

We conducted a thorough and independent review of the entire claim. Based on the facts of the case and the terms of the Policy, we have determined that the accidental dismemberment benefit is not payable. We have thoroughly evaluated all of the information provided in support of Mr. Sewell's claim and do not find persuasive evidence to invalidate the blood alcohol testing performed by Corpus Christi Medical Center, which demonstrated a significantly elevated blood alcohol level, which would have resulted in impairments, including but not limited to judgement and perception, that caused or contributed to the accident that resulted in his quadriplegia.

**The Policy**

McLarens, LLC's Group Life Insurance Policy states, in part:

> *Benefits*
> *Accidental Death and Dismemberment benefits are payable when a Covered Person suffers a loss solely as the result of accidental Injury that occurs while covered. The loss must occur within 365 days after the date of the accident. The benefit payable is called the Full Amount. It is shown in the Schedule of Benefits…*
>
> *ACCIDENTAL DEATH AND DISMEMBERMENT EXCLUSIONS*
> *No benefits are payable for any loss that is contributed to or caused by:*
> *…*
> *11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred…*

This claim decision reflects an evaluation of the claim facts and Policy provisions.

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Sewell was entitled to appeal the decision made by Lincoln, and to submit any additional information he wished to be considered as part of the appeal. Lincoln has conducted a full and fair review of this appeal and we have determined that the denial of benefits will be maintained.

At this time, the appeal process has been exhausted and no further review will be conducted by Lincoln. You may request to receive, free of charge, copies of all documents relevant to the claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The McLarens, LLC Group Life Policy contains the below provision:

Lincoln/Sewell 738

*Legal Proceedings*
*A claimant or the claimant's authorized representative cannot start any legal action:*
*1.  until 60 days after Proof of claim has been given; or*
*2.  more than one year after the time Proof of claim is required.*
*Legal actions are contingent upon first having followed the Claims and Appeals procedure outlined in this policy.*

Lincoln is required by the ERISA appeal guidelines to advise you that The McLarens, LLC  Group Life Policy has a contractual limitations period of one year, which means that a lawsuit must be brought within one year after the date written proof of claim was required. The date on which the contractual limitations period expires for this claim is September 26, 2024.

Nothing in this letter should be construed as a waiver of any Lincoln National Life Insurance Company rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by The Lincoln National Life Insurance Company are based on the provisions outlined in McLaren's LLC's Group Life Policy. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact The Lincoln National Life Insurance Company to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłįį' dóó ná'ookąąh nííní'ą́ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtįįł nínízingo doo bą́ą́h ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lindsay Mack
Claim Resolution Specialist

14 of 15

Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-0401

15 of 15

**Lincoln/Sewell 740**

The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578




J. PRICE MCNAMARA
LAW OFFICES OF J. PRICE MCNAMARA
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE LA 70809

**Lincoln/Sewell 741**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

August 3, 2024

J. Price McNamara
Law Offices of J. Price McNamara
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE, LA 70809

RE:    Employee: Timothy Sewell
       Policyholder: McLarens, LLC
       Policy #: SA3-890-LF0483-01
       Claim #: 12885926

Dear J. Price:

We have completed our review of the above-referenced claim for accidental dismemberment benefits under Group Life Insurance Policy No. SA3-890-LF0483-01 (hereinafter "Policy") issued by The Lincoln National Life Insurance Company (hereinafter "Lincoln") to McLarens, LLC and maintained the decision to deny benefits.

## Initial Claim Decision

Accidental dismemberment benefits were denied on the basis that Timothy Sewell was under the influence of alcohol, which contributed to the cause of his accident and resulting quadriplegia / tetraplegia.

A Claimant Statement was completed on November 30, 2022 by Gaye Sewell, Timothy Sewell's wife and power of attorney. On this form, she noted that the date of Mr. Sewell's accident was August 28, 2021. She reported that he was hospitalized at Corpus Christi Medical Center Bay Area in Corpus Christi, TX from August 28, 2021 to September 21, 2021 and then at Shepherd Center in Atlanta, GA from September 21, 2021 to December 7, 2021.

The attending physician's portion of the Dismemberment Claim Form was completed by Dominique Van Beest, MD on November 17, 2022. She noted a diagnosis of tetraplegia associated with an accident on August 28, 2021. She noted she was first consulted for this condition on November 15, 2022. She noted, "Veteran suffered a C4-5 translation dislocation resulting in tetraplegia. He has no functional use of his extremities and is dependent for mobility and activities of daily living."

An email dated November 14, 2022 was received from Texas Parks and Wildlife Records Department which indicated that an accident report was not created for this accident.

Lincoln/Sewell 742

In January 2023, the medical information on file was reviewed by a board certified internal medicine physician, Dr. Robert Millstein. In reviewing the available records, Dr. Millstein noted:

*8/28/21 Mr. Sewell sustained a spinal cord injury in a diving accident into 3 feet of water from the back of the boat with loss of consciousness. Diagnostic imaging + locked facet dislocation, C4 – C5 anterior subluxation, cord edema from C2 to mid C6, aspiration pneumonia, and vertebral artery thrombosis versus dissection at C4 – C5. He was intubated at the scene.*

*8/28/21 at 1814 hrs. a blood alcohol level was 222 mg/dL. A list of diagnoses from the acute care hospitalization included alcohol abuse with intoxication.*

*8/29/21 Mr. Sewell underwent C4 – C6 ACDF with plating. While hospitalized he remained in sinus bradycardia with pauses on telemetry. Persistent symptomatic hypotension was treated with midodrine and Florinef. Methicillin sensitive staph aureus pneumonia was treated with antibiotics. 9/2/21 he underwent PEG tube placement. 9/5/21 tracheostomy was placed with ongoing ventilatory support.*

*9/21/21 he was transferred for inpatient skilled rehab.*

*11/1/21 Dr. Bowman Brock, physical medicine and rehabilitation, observed ongoing tetraplegia.*

Based on his review of the available evidence, Dr. Millstein concluded:

- *On 8/28/21 Mr. Sewell sustained a spinal cord injury resulting in quadriplegia in a diving accident into 3 feet of water from the back of the boat. His blood alcohol level at the time of the diving accident was 222 mg/dL.*

- *With a blood alcohol level of 222 mg/dL Mr. Sewell would have experienced signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.*

*Manifestations of alcohol intoxication in persons who do not drink alcohol on a regular basis are related to the blood alcohol level. Persons who abuse alcohol chronically may have some degree of tolerance to some of the effects of alcohol. The submitted information does not indicate whether, around the time of his hospitalization, Mr. Sewell was consuming alcohol on a regular basis.*

*Among patients who do not abuse ethanol chronically, clinical signs often associated with particular ranges of the BAC (blood alcohol concentration) are as follows:*

- *With a BAC between 0.01 and 0.10 percent (<100 mg/dL), euphoria and mild deficits in coordination, attention, and cognition may be observed.*
- *With a BAC between 0.10 and 0.20 percent (100—200 mg/dL), an individual experiences greater deficits in coordination and psychomotor skills, decreased attention,*

2  of  14

**Lincoln/Sewell 743**

*ataxia, impaired judgment, slurred speech, and mood variability.*

- *With a BAC between 0.20 to 0.30 percent (200—300 mg/dL), severe intoxication results in a lack of coordination, incoherent thoughts, confusion, nausea and vomiting.*
- *When the BAC exceeds 0.30 percent, stupor and loss of consciousness can occur. Some patients experience coma and respiratory depression, and death is possible.*

*The predominant effect of alcohol is in the brain. High alcohol concentrations cause central nervous system depression, judgment disorder, decision inability, and impairment of perception and reaction to events. This impairment develops prior to the onset of more overt symptoms of alcohol intoxication, such as difficulty walking or maintaining balance.*

*With a blood alcohol level of 222 mg/dL Mr. Sewell would likely experience signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.*

*Diving and head-first sliding into the water account for the most serious aquatic injuries because of damage to spinal cords, often as a result of striking the bottom or side of a shallow body of water. The majority of spinal cord injuries resulting from aquatic accidents are sufficiently serious to cause permanent paralysis.*

*Serious accidents due to diving into shallow water are rare but potentially devastating as in this case. The incidence of spinal cord injuries following these accidents has been reported to range from 1.2 and 21%. Misjudgments of the water depth and recklessness behavior have been cited as common factors in these accidents. Alcohol consumption is also important risk factor, thought to be contributory in 38 to 49% of cervical injuries in previously published series.*

*Types of accidents associated with traumatic cervical spinal cord injury include motor vehicle crashes in sport related accidents – in particular, diving accidents. Numerous studies have shown that 50% of spinal cord injuries occur while victims are under the influence of alcohol. A 2004 study of persons who sustained spinal cord injury supported the association between alcohol use and cervical spinal cord injury specifically – the spinal cord injury type with the most severe consequences. The study that demonstrated that participants with cervical injury were more likely to use alcohol when injured compared with participants without cervical injury.*

The basis for the denial decision was outlined in a letter dated January 27, 2023. Mr. Sewell was provided an opportunity to request an appeal review of the denial by submitting a written request stating the reasons why he felt that the claim should not have been denied and submitting additional information to support the claim.

**Initial Appeal Decision**

We received your appeal request on behalf of Mr. Sewell on May 16, 2023. In your letter, you contended that it was "undisputed" that Mr. Sewell did not drink more than six beers spread over the course of a long day before his accident and exhibited no signs of intoxication. You indicated that Mr. Sewell had never been in the area before and nothing gave him any visual clue that the water

**Lincoln/Sewell 744**

where he dove was only about half the depth of that he believed. You asserted that alcohol played no part in his decision to dive from the boat or the "controlled manner" in which he dove from the boat and stated that other people from other boats were doing so without incident. You noted that the medical records say that the hospital's serum alcohol testing "[r]esults are for medical purposes only, and not for legal or employment evaluative purposes." You advised that, according to Dr. Thomas Arnold, toxicologist, "'it is a certainty' that after the several minutes of cardiac arrest and CPR being performed on Mr. Sewell, he would have accumulated a large amount of lactic acid in his blood that explain the inaccurate reading on the hospital serum alcohol assay by simple interference with the measured enzyme" and that the hospital serum toxicology results "could not possibly" be accurate. You stated that Mr. Sewell and his fishing mates were professional gentlemen in their late 50s who were on a relaxed all-day fishing trip and "not young drunken fraternity boys." A copy of Dr. Arnold's April 28, 2023 medical review was received with your request, as well as affidavits from Mr. Sewell, his wife, his boating companions (James Fenn, Chris Boswell, and Paul Boswell), and another acquaintance/boater (Tiffany Weaver).

In June 2023, the medical information on file was reviewed by Dr. Peggy Geimer, who is board certified in internal medicine and occupational medicine.  Dr. Geimer concluded:

> *Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed alcohol at a concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. Mr. Sewell's hospital diagnoses included alcohol abuse with intoxication. Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.*

In her report, Dr. Geimer made reference to records missing from the claim file, including the Port Aransas EMS Run Report and medical records from Corpus Christi Medical Center. She also questioned Dr. Arnold's comments regarding the validity of the hospital's alcohol testing results, noting that they appeared to be based primarily on statements from individuals on the boat that Mr. Sewell did not exhibit "signs of severe intoxication." However, she noted that Mr. Sewell's doctors made and documented in the record the diagnosis of alcohol abuse with intoxication, thus casting doubt on the opinion of lay bystanders. Dr. Geimer also noted that the affidavits from Dr. Sewell and his friends acknowledged stopping at a "dockside restaurant" around 2:30 PM, but that the name of the restaurant was not mentioned nor was there any mention of the quantity or type of beverages consumed by Mr. Sewell or others at this restaurant.

On July 14, 2023, a copy of Dr. Geimer's report was sent to your office, and you were given the opportunity to provide any response you wished to be considered prior to a final decision being made on Mr. Sewell's appeal.  It was determined that appeal enclosures pages 030 – 269, which

**Lincoln/Sewell 745**

were to have been included with your May 16, 2023 appeal request, were not previously received. These documents were re-submitted.  You also submitted new affidavits from Mr. Sewell, Tiffany Weaver, James Fenn, Chris Boswell, and Paul Boswell. In these affidavits, Mr. Sewell reported that they lunched at Woody's Sports Center in Port Arkansas and that he did not consume any beer or other alcohol there; his friends attested that they did not recall him consuming any alcohol-containing beverages while there.

Included in the newly received records was a report dated August 28, 2021 from Port Arkansas EMS. The report stated, "Dispatched to CPR in progress with pt involved in dive injury. Arrived to marina doc to await boat arrival. Boat arrived to dock, 56 yo male found lying lt lateral recumbent position on rear benchseat of boat. Bystander found to be manually holding finger in pt mouth in attempt to keep airway open. States pt having difficulty breathing. Pt appeared cyanotic to head and pale skin. Pt had faint pulses to carotid. Pt having agonal respirations. Witnesses on boat described pt performed head first dive into shallow water. Described pt immediately went unresponsive in water and pulled into boat by friends. Pt positioned on backboard and carried out of boat with 6 person carry. Pt carried to stretcher, secured. CPR compressions initiated by EMS as pt moved to unit. Pt secured in unit. BVM applied. EKG-sinus rate of sixty. Applied c-collar and secured head to board. Pulses now strong, pt still unresponsive. Compressions stopped…Pt intubated with Kingvision device 3rd attempt after visualization of vocal cords…transported code 3 emergency to Bay Area ER. Pt ventilated with BVM throughout transport…"

Records were also received from Corpus Christi Medical Center, regarding Mr. Sewell's admission on August 28, 2021. It was noted that he presented to the ED after diving from a boat into three feet of water. Lab results documented serum alcohol level of 222 mg/dL. Acute medical problems were noted to include "ETOH intoxication." Diagnostic imaging revealed C4-C5 locked facet dislocation, C4-C5 anterior subluxation, cord edema from C2 to mid C6, aspiration pneumonia, and vertebral artery thrombosis versus dissection at C4-C5. On August 29, 2021, he underwent C4-C6 ACDF with plating. A PEG tube was placed on September 2, 2021 and a tracheostomy on September 5, 2021. He was later transferred to Shepherd Center for comprehensive inpatient spinal cord injury rehabilitation and medical management.

In September 2023, an addendum review was completed by Dr. Geimer, to include the additional records. Dr. Geimer concluded the review of the newly available records did not alter her prior assessment. Dr. Geimer noted:

> *Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed serum alcohol concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. While blood alcohol concentrations (BAC) most often refer to serum ethanol (alcohol) concentrations; whole blood alcohol concentrations may be used and are somewhat lower because serum and plasma contain more water than whole blood. The ratio of ethanol in serum or plasma to whole blood has been reported to be in the range of 1.09 to 1.18. As noted in the Medical Review by Thomas Arnold, MD submitted by the claimant's attorney, he used the middle of this range (16.5%) to calculate the claimant's whole blood alcohol concentration as 0.185 grams % at the time of his hospitalization. Dr. Arnold also proposed that the claimant's BAC was closer to 0.219 grams% at the time of his injury by using generally accepted population average of alcohol metabolism. I have no disagreement with his calculations. However, I disagree with Dr. Arnold's statement that "serum alcohol level reported at the hospital cannot possibly*

**Lincoln/Sewell 746**

*be accurate." The results were never question by the treating providers and multiple physicians included the "Alcohol intoxication" and "ETOH intoxication" in their impression of the claimant's acute medical problems. There hospital's testing laboratory is required to follow strict guidelines in their testing. There is no evidence that the hospital's testing was flawed. Dr Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay. The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed. Lactic acidosis is not mentioned anywhere in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis.*

*Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability. Blood alcohol concentrations above 0.10% impair reaction time and control. Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.*

*It should be noted that the claimant swore that he made a shallow dive into the water (less than a 45-degree angle). In affidavits from May 2023, three witnesses swore that the claimant dove "straight out from the boat, not in a downward direction." However, in Port Aransas EMS Patient Care Report dated 8/28/21, it was noted that witness on the boat with the claimant advised them that they watched the claimant perform a headfirst dive into shallow water.*

Following a full and fair appeal review, the denial of accidental dismemberment benefits was maintained. The basis for the decision was outlined in a letter dated September 26, 2023.

Pursuant to your request, a complete copy of Mr. Sewell's claim file and Policy were sent to you on October 16, 2023.

**Additional Appeal Evaluation**

On November 17, 2023, you submitted an additional report from Dr. Arnold. In your November 17, 2023 letter, you asserted that there was "no way to logically conclude from the record evidence, either that Mr. Sewell was intoxicated, or that intoxication caused his terrible loss." You claimed that the records is "undisputed" as to precisely how much alcohol Mr. Sewell consumed and that Mr. Sewell exhibited none of the expected effects of alcohol intoxication. You alleged that the hospital serum test result "could not be accurate not only in light of the amount of alcohol consumed, but also as a result of lactic acid buildup from well-documented prolonged cardiac arrest."

In June 2024, an independent review of all of the available evidence was completed by Dr. Robert

**Lincoln/Sewell 747**

Swotinsky, who is board certified in occupational medicine.  In his report, Dr. Swotinsky noted:

> *As the claimant's reviewer Thomas Arnold, MD, noted that serum alcohol level corresponded to a blood alcohol concentration (BAC) of approximately 0.185 at 17:46. The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.*
>
> *The claimant weighed 82 kg. An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking. If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking [the nine hours accounts for about two hours between the injury and alcohol test], his BAC would have been essentially undetectable. The calculation is:*

$$0.12 - \left( \frac{9\ hrs \times 60\frac{min}{hr}}{40} \times 0.01 \right) = -0.015$$

> *Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking. His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.*
>
> *It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink. The evidence indicates the recollections underreported actual alcohol consumption. This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters. In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.*

In addressing Dr. Arnold's arguments regarding lactic acid rendering the alcohol test result inaccurate, Dr. Swotinsky noted:

> *Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test. Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase. Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur. In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured…*
>
> *In May 2023, claimant's reviewer Dr. Arnold opined that due to cardiac arrest and cardiopulmonary resuscitation, the claimant "would have accumulated a large amount of lactic acid in his blood" which interfered with the alcohol test and made the result falsely high. Dr. Arnold assumes the result was falsely high because it indicates more alcohol consumption than the claimant reported and because no-one who was with the claimant at the time of his injury reported that the claimant seemed intoxicated…*
>
> *On 11/17/23, Dr. Arnold responded to [Dr. Geimer's report] as follows:*

7  of 14

**Lincoln/Sewell 748**

*"Lactic acid is produced any time there is underperfusion of body tissues. The EMS providers on the scene reported that [the claimant] was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation. There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood…It is not uncommon for large lactic acid levels to be present without significant acidosis of the blood…. [The claimant] received IV fluids and the hospital record repeatedly shows [the claimant] being on vasoactive pressor agents to support low blood pressure and increase tissue perfusion. All of these interventions treat lactic acidosis so the claim that [the claimant] did not receive treatment for lactic acidosis cannot be supported."*

*Dr. Arnold also notes that a laboratory test report footnote states the results are "not for legal or employment evaluative purposes." Dr. Arnold says this footnote is additional evidence that the test results are unreliable.*

*Dr. Arnold's reports include no supporting citation(s) from the medical/scientific literature. Dr. Arnold's reports do not quantify the effect he believes lactic acid had on the test result.*

Dr. Swotinsky indicated that the medical/scientific literature lacks support for Dr. Arnold's theory. He stated:

*Dr. Arnold makes assumptions. He assumes that the claimant:*

1. *Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused high lactic acid level to be present.*
2. *Had an inaccurate test result due to the lactic acid in his blood.*

*The first assumption is contradicted by the medical records. The second assumption is unsupported by medical/scientific literature. I explain why:*

1. *Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused a high level of lactic acid in his blood.*

*The Port Arkansas EMS record states that CPR compressions were started at 16:51, an EKG was performed at 16:55 showing a sinus rhythm and heart rate of 60, and thus CPR compressions were discontinued. The record thus indicates that the claimant underwent CPR compressions for up to four minutes. The Port Arkansas EMS record does not indicate that the claimant was in cardiac arrest, and instead indicates that he had faint pulses when first checked at 16:51 and his heart was in normal sinus rhythm and his blood pressure was 135/62 at 16:55 when first checked by EKG, i.e., he was not in cardiac arrest.*

*Most cases of elevated lactic acid are due to marked tissue hypoperfusion resulting from low fluid volume (e.g., "bleeding out"), heart failure, sepsis, or heart attack. Before the claimant's blood was collected for ethanol, the claimant did not have health condition associated with elevated lactic acid. While Dr. Arnold implies that performing CPR causes elevated lactic acid levels, my search of the medical literature did not find evidence of this. (There is an association of lactic acid elevations in patients who have had CPR. That association is because many patients who need CPR have suffered a condition that causes elevated lactic acid levels. The claimant, however, did not.)*

8  of 14

*Dr. Arnold does not mention lactate dehydrogenase. As noted above, the literature about elevated enzymatic ethanol test results involves elevations of both lactic acid and lactate dehydrogenase at the same time.*

*2.  Had an inaccurate ethanol test result due to a high level of lactic acid in his blood.*

*The phenomenon of elevated lactic acid and lactate dehydrogenase causing elevated enzymatic ethanol test results has been described in autopsy blood samples. It has been raised as a possibility when trauma patients with elevated levels of lactate and/or lactate dehydrogenase levels were admitted to the hospital for treatment.*

*However, studies have found little evidence to support this possibility in live patients. For example:*

- *A study of 37 patients hospitalized with elevated lactate and lactate dehydrogenase levels failed to find an elevation in ethanol content. The study concludes, "This data does not support the contention that an elevated LDH2 and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."*

*An article describes two children who were tested around the time they died, and who had elevated levels of both lactic acid and lactic dehydrogenase leading to elevated ethanol concentrations. I can't tell if this article falls in the category of dead patients or living patients. In any event, there is little or no evidence to support Dr. Arnold's contention that high levels of lactic acid (and lactate dehydrogenase?) caused elevation of the claimant's enzymatic ethanol test result. Dr. Arnold does not address elevated lactate dehydrogenase. I don't know if he is assuming lactate dehydrogenase was also elevated. The record presents no measurement of lactate dehydrogenase or indication that it was elevated…*

*In summary, Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:*

- *Unquantified. To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?*
- *Presented without corroborating facts*
- *Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.*
- *Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.*

Dr. Swotinsky concluded:

*Per Dr. Arnold, based on the measured BAC at 17:49, the claimant's BAC at the time of the injury was 0.22. A person's impairment at a given BAC is subject to factors like drinking history (tolerance) and timing (is the BAC going up or going down?). Thus, the medical literature presents overlapping ranges of impairment corresponding with BAC…*

*Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished*

9  of  14

**Lincoln/Sewell 750**

*judgment, increased self-confidence, and decreased inhibitions. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.*

A copy of Dr. Swotinsky's report was sent to you on June 4, 2024, and you were given the opportunity to review it and provide any response you wished to be considered prior to a final decision being rendered on Mr. Sewell's claim. We agreed to your request to allow through July 6, 2024 for your response.

We received your submission of Dr. Arnold's June 24, 2024 report on July 5, 2024. Dr. Arnold's rebuttal report was reviewed by Dr. Swotinsky, who addressed Dr. Arnold's assertions in detail. Dr. Arnold's assertions and Dr. Swotinsky's responses are outlined below:

- *Per Dr. Arnold:  Dr. Swotinsky's 06/01/24 report "completely omits the sworn affidavits" about the claimant's alcohol consumption.*

  - *Dr. Swotinsky's response:  Incorrect. I addressed the sworn affidavits recalling how much the claimant drank on page 1 of my report, bottom paragraph.*

- *Per Dr. Arnold: Dr. Swotinsky incorrectly questioned Dr. Arnold's statements that the claimant was in cardiac arrest and had CPR for 6-8 minutes. Per the EMS records, the claimant was noted to have an initial EKG rhythm of pulseless electrical activity (PEA). He was down 3 minutes before CPR started and had 5 minutes of CPR, which meant 8 minutes in cardiac arrest.*

  - *Dr. Swotinsky's response:  The EMS records state the claimant initially "had faint pulses" and state the initial EKG rhythm was "PEA." In this respect, the records is contradictory, because a heart in PEA does not generate a pulse.*

- *Per Dr. Arnold: Dr. Arnold assumes the claimant had elevated levels of lactic acid and lactate dehydrogenase, and "this is the basis for my contention that [the claimant's] test was erroneous. Even Dr. Swotinsky admits that benchtop studies have demonstrated elevation in alcohol test results due to lactate and/or lactate dehydrogenase.*

  - *Dr. Swotinsky's response: There is no evidence of elevated levels of lactate or lactate dehydrogenase. Even if one presumes elevated levels of lactate and lactate dehydrogenase, case reports of this phenomenon describe it occurring only in a fraction of the alcohol enzymatic test products, and describe the alcohol levels as much lower than the claimant's .222 g/dL. Consider, for example, the three studies that Dr. Arnold referenced in his 06/24/24 report:*

    1. *A report of two live patients with high lactic acid and lactate dehydrogenase levels. Their serum alcohol test results were .069 and .044 g/dL, respectively. These values were less than one-third of he claimant's alcohol test result of .222 g/dL.*
    2. *A report of alcohol test results of .039 -.076 g/dL in two children just before*

**Lincoln/Sewell 751**

*and after death. This is actually not a report of high lactate and lactate dehydrogenase levels causing spurious alcohol test results because the study did not have lactate and lactate dehydrogenase test result – instead, the authors assumed lactate and lactate dehydrogenase were high. The alcohol test values were less than one-third of the claimant's alcohol test result of .222 g/dL.*

3. *A report of alcohol test results of .017 and .051 g/dL in two patients with high lactate and lactate dehydrogenase levels. These values were less than one-fourth of the claimant's alcohol test result of .222 g/dL.*

*In my 06/01/24 report, I cited publications describing no effect on alcohol test results from lactate and lactate dehydrogenase levels. For example:*

- *A 2018 study of 37 patients with elevated lactate and lactate dehydrogenase levels concludes, "This data does not support the contention that an elevated LDH and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."*
- *A critique of the case report of two children (the second of Dr. Arnold's references) that notes that studies in general have found little evidence to support this phenomenon in live patients.*

*Dr. Arnold attributes the claimant's alcohol test result to elevation by elevated lactate and lactate dehydrogenase. If one assumes the claimant had elevated lactate and lactate dehydrogenase levels, then recognize that:*

1) *"The association between elevated lactate and ethanol remains controversial and studies show varying results." (This is per an article in the journal Mayo Clinic Proceedings.)*
2) *The medical/scientific literature that Dr. Arnold cites to support his claim describe this phenomenon as contributing at most low levels of alcohol, about ¼ - ¿ of the claimant's level.*

- *Per Dr. Arnold: The disclaimer on the lab report, i.e., "for medical purposes only…", demonstrates that the lab knows the results are unreliable.*

  - *Dr. Swotinsky's response: Dr. Arnold also stated this in his 11/17/23 report. Dr. Arnold restates this opinion, again without medical/scientific support. His opinion differs from the medical/scientific literature, which states that the results of hospital tests for alcohol may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.*

- *Per Dr. Arnold: There are no facts in the record to support the idea that alcohol-related impairment played any part in the claimant's accident. Multiple people who were there when the claimant was injured say he:*
  *- Had 5-6 beers spread out throughout the day before his accident.*
  *- Dove into 4.5 – 5 feet deep water.*
  *- Did not appear intoxicated*

**Lincoln/Sewell 752**

- *Dr. Swotinsky's response: The record indicates the claimant's alcohol level was 0.222 g/dL. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. This is a level that put him at high risk for a diving-related cervical spine injury.*

  *The file includes from May 2023 the claimant's statement and several statements from the claimant's friends who state they were with the claimant when he was injured on 08/28/21. These statements were submitted in response to the insurer questioning the claim based on alcohol intoxication. These statements are redundant, which suggests one person was their primary author.*

  *The May 2023 recollection differs from the 08/28/21 EMS, emergency room, and hospital records which state:*
  *- The claimant's BAC was .222 g/dL. By contrast, had the claimant's alcohol consumption been limited to 5-6 beers spread out throughout the day, his BAC would have been essentially undetectable.*
  *- The claimant dove into 3 feet deep water.*
  *- ER Dr. Truman Milling's opinion on 08/28/21 that the claimant had presented with "alcohol intoxication."*

  *Dr. Arnold accepts the May 2023 recollection as "undisputed evidence," i.e., more reliable than the contemporaneous records from health care providers. By contrast, I view the records from 08/28/21 as a more reliable source of evidence because they:*
  *a. Were contemporaneous,*
  *b. Come from independent sources not subject to biased recall*
  *c. Come from medical professionals who were likely better qualified than the claimant's friends at recognizing and documenting the claimant's intoxication.*

  *The medical/scientific literature consistently finds that alcohol use increases the risk of spinal cord injury from diving. One study reports that alcohol increases the risk 4.31-fold. The claimant's alcohol use either did, or did not, contribute to his accident. A 4.31-fold increase in risk indicates it likely did contribute to the accident because, in any group of people who have diving accidents while using alcohol, 78% of such accidents are attributable to alcohol use.*

Dr. Swotinsky concluded that Dr. Arnold's June 24, 2024 submission provided no basis for altering his conclusions as outlined in his previous report. In particular, he summarized that:

- *Dr. Arnold's reference articles indicate that the claimant's alcohol test result of 0.222 g/dL cannot be attributed to the effect of presumed high levels of lactate and lactate dehydrogenase.*

- *While Dr. Arnold relies on the statements submitted by the claimant and his friends almost two years after the accident, those statements are contradicted by the contemporaneous, medical records.*

- *The claimant's alcohol level corresponded with diminished judgment, increased*

12 of 14

*self-confidence, and decreased inhibition. Misjudgments of water death and reckless behavior have been cited as common factors in diving-related cervical spine injuries. The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water. The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident.*

**Conclusion**

We conducted a thorough and independent review of the entire claim. Based on the facts of the case and the terms of the Policy, we have determined that the accidental dismemberment benefit is not payable. We have thoroughly evaluated all of the information provided in support of Mr. Sewell's claim and do not find persuasive evidence to invalidate the blood alcohol testing performed by Corpus Christi Medical Center, which demonstrated a significantly elevated blood alcohol level, which would have resulted in impairments, including but not limited to judgement and perception, that caused or contributed to the accident that resulted in his quadriplegia.

**The Policy**

McLarens, LLC's Group Life Insurance Policy states, in part:

> **Benefits**
> *Accidental Death and Dismemberment benefits are payable when a Covered Person suffers a loss solely as the result of accidental Injury that occurs while covered. The loss must occur within 365 days after the date of the accident. The benefit payable is called the Full Amount. It is shown in the Schedule of Benefits…*
>
> ***ACCIDENTAL DEATH AND DISMEMBERMENT EXCLUSIONS***
> *No benefits are payable for any loss that is contributed to or caused by:*
> *…*
> *11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred…*

This claim decision reflects an evaluation of the claim facts and Policy provisions.

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Sewell was entitled to appeal the decision made by Lincoln, and to submit any additional information he wished to be considered as part of the appeal. Lincoln has conducted a full and fair review of this appeal and we have determined that the denial of benefits will be maintained.

At this time, the appeal process has been exhausted and no further review will be conducted by Lincoln. You may request to receive, free of charge, copies of all documents relevant to the claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The McLarens, LLC Group Life Policy contains the below provision:

13 of 14

**Lincoln/Sewell 754**

*Legal Proceedings*
*A claimant or the claimant's authorized representative cannot start any legal action:*
*1.  until 60 days after Proof of claim has been given; or*
*2.  more than one year after the time Proof of claim is required.*
*Legal actions are contingent upon first having followed the Claims and Appeals procedure outlined in this policy.*

Lincoln is required by the ERISA appeal guidelines to advise you that The McLarens, LLC  Group Life Policy has a contractual limitations period of one year, which means that a lawsuit must be brought within one year after the date written proof of claim was required. The date on which the contractual limitations period expires for this claim is September 26, 2024.

Nothing in this letter should be construed as a waiver of any Lincoln National Life Insurance Company rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by The Lincoln National Life Insurance Company are based on the provisions outlined in McLaren's LLC's Group Life Policy. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact The Lincoln National Life Insurance Company to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį́į' dóó ná'ookąąh nííní'ą́ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį́į́ł nínízingo doo bą́ąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lindsay Mack
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-0401

Lincoln/Sewell 755

## Clinical Review Memo

| Customer Name | Claimant Name | | Claim Number | |
|---|---|---|---|---|
| McLarens, LLC | Timothy Sewell | | 12885926 | |
| Report Date: | 07/22/2024 | | | |
| Referred By: | Lindsay Mack | Claimant DOB: | | |
| Referral Date: | 07/08/2024 | Job Title: | | |
| Due Date: | 07/26/2024 | Med/Surg Condition: | | |
| Referral Type: | AD&D Review | Disability Occ Type: | | |
| Reason for Priority Handling: | | Product Type: | LIFE | |
| Other Considerations | | LDW: | 08/25/2021 | |
| | | DOD: | | |
| Physical Demands: | | BBD: | | |
| Non-Medical Issue: | No | Non-Med Issue Details: | | |

### My 06/01/24 report

By history, six beers were consumed.  Per the blood alcohol test result, he drank about twice that amount.  I explained in my report why the test result was a more reliable indicator of alcohol consumption than the recollections of the claimant and others.

The claimant submitted reports by Thomas Arnold, MD, opining that the blood alcohol test result was falsely high due to lactic acid in the blood.  The insurer's previous reviewer (Peggy Geimer, MD, September 2023) and I (June 2024) disagreed with Dr. Arnold.  In my June 2024 report:

1. I explained why Dr. Arnold's contention that the claimant was in cardiac arrest and had elevated lactic acid was not supported by the medical records or scientific/medical literature.

2. I explained why Dr. Arnold's contention that elevated lactic acid caused an inaccurate blood alcohol concentration was not supported by the scientific/medical literature.

3. I explained why blood alcohol concentrations can be used to inform opinions about intoxication.  The claimant's blood alcohol concentration of 0.22, for example, corresponded with functional impairments and elevated risk of injury.

I also noted that Dr. Arnold's report lacked reference(s) to the medical/scientific literature.

### Dr. Arnold's 06/24/24 rebuttal report (and my response)

| | Per Dr. Arnold | My response |
|---|---|---|
| 1 | Dr. Swotinsky's 06/01/24 report "completely omits the sworn affidavits" about the claimant's alcohol consumption. | Incorrect.  I addressed the sworn affidavits recalling how much the claimant drank on page 1 of my report, bottom paragraph. |

**Lincoln/Sewell 756**

Claimant: Timothy Sewell

Claim # 12885926

July 27, 2024

Report by R Swotinsky MD; pg 2

| | Per Dr. Arnold | My response |
|---|---|---|
| | Dr. Swotinsky incorrectly questioned Dr. Arnold's statements that the claimant was in cardiac arrest and had CPR for 6-8 minutes.  Per the EMS records, the claimant was noted to have an initial EKG rhythm of pulseless electrical activity (PEA).  He was down 3 minutes before CPR started and had 5 minutes of CPR, which meant 8 minutes in cardiac arrest. | The EMS records state the claimant initially "had faint pulses" and state the initial EKG rhythm was "PEA."  In this respect, the record is contradictory, because a heart in PEA does not generate a pulse. |
| 2 | Dr. Arnold assumes the claimant had elevated levels of lactic acid and lactate dehydrogenase, and "this is the basis for my contention that [the claimant's] test was erroneous.  Even Dr. Swotinsky admits that benchtop studies have demonstrated elevation in alcohol test results due to lactate and/or lactate dehydrogenase | There is no evidence of elevated levels of lactate or lactate dehydrogenase.  Even if one presumes elevated levels of lactate and lactate dehydrogenase, case reports of this phenomenon describe it occurring only in a fraction of the alcohol enzymatic test products, and describe the alcohol levels as much lower than the claimant's .222 g/dL.  Consider, for example, the three studies that Dr. Arnold referenced in his 06/24/24 report:<br><br>1.  A report of two live patients with high lactic acid and lactate dehydrogenase levels.  Their serum alcohol test results were .069 and .044 g/dL, respectively.[i] These values were less than one-third of the claimant's alcohol test result of .222 g/dL.<br><br>2. A report of alcohol test results of .039 - .076 g/dL in two children just before and after death. This is actually not a report of high lactate and lactate dehydrogenase levels causing spurious alcohol test results because the study did not have lactate and lactate dehydrogenase test result – instead, the authors assumed lactate and lactate dehydrogenase were high.[ii]  The alcohol test values were less than one-third of the claimant's alcohol test result of .222 g/dL. |

Claimant: Timothy Sewell                                    July 27, 2024
Claim # 12885926                            Report by R Swotinsky MD; pg 3

| | Per Dr. Arnold | My response |
|---|---|---|
| | | 3. A report of alcohol test results of .017 and .051 g/dL in two patients with high lactate and lactate dehydrogenase levels. These values were less than one-fourth of the claimant's alcohol test result of .222 g/dL. [iii]<br><br>In my 06/01/24 report, I cited publications describing <u>no</u> effect on alcohol test results from lactate and lactate dehydrogenase levels. For example:"<br><br>- A 2018 study of 37 patients with elevated lactate and lactate dehydrogenase levels concludes, "This data does not support the contention that an elevated LDH and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department." [iv]<br>- A critique of the case report of two children (the second of Dr. Arnold's references) that notes that studies in general have found little evidence to support this phenomenon in live patients. [v]<br><br>Dr. Arnold attributes the claimant's alcohol test result to elevation by elevated lactate and lactate dehydrogenase. If one assumes the claimant had elevated lactate and lactate dehydrogenase levels, then recognize that:<br><br>(1) "The association between elevated lactate and ethanol remains controversial and studies show varying results." [vi] (This is per an article in the journal *Mayo Clinic Proceedings*.)<br><br>(2) The medical/scientific literature that Dr. Arnold cites to support his claim describe this phenomenon as contributing at most low levels of alcohol, about ¼ - ⅓ of the claimant's level. |
| 3 | The disclaimer on the lab report, e.g., "for medical purposes | Dr. Arnold also stated this in his 11/17/23 report. Dr. Arnold restates this opinion, again without medical/scientific support. His opinion differs |

**Lincoln/Sewell 758**

Claimant: Timothy Sewell                                                                July 27, 2024
Claim # 12885926                                                        Report by R Swotinsky MD; pg 4

|   | Per Dr. Arnold | My response |
|---|---|---|
|   | only...", demonstrates that the lab knows the results are unreliable. | from the medical/scientific literature, which states that the results of hospital tests for alcohol may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.[vii] |
| 4 | There are no facts in the record to support the idea that alcohol-related impairment played any part in the claimant's accident. Multiple people who were there when the claimant was injured say he:<br><br>- Had 5-6 beers spread out throughout the day before his accident.<br>- Dove into 4.5 – 5 feet deep water.<br>- Did not appear intoxicated. | The record indicates the claimant's alcohol level was 0.222 g/dL.  As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. This is a level that put him at high risk for a diving-related cervical spine injury.<br><br>The file includes from May 2023 the claimant's statement and several statements from the claimant's friends who state they were with the claimant when he was injured on 08/28/21. These statements were submitted in response to the insurer questioning the claim based on alcohol intoxication.  These statements are redundant, which suggests one person was their primary author.<br><br>The May 2023 recollection differs from the 08/28/21 EMS, emergency room, and hospital records which state:<br><br>- The claimant's BAC was .222 g/dL.  By contrast, had the claimant's alcohol consumption been limited to 5-6 beers spread out throughout the day, his BAC would have been essentially undetectable.[1]<br>- The claimant dove into 3 feet deep water.<br>- ER Dr. Truman Milling's opinion on 08/28/21 that the claimant had presented with "alcohol intoxication."<br><br>Dr. Arnold accepts the May 2023 recollection as "undisputed evidence," i.e., more reliable than the contemporaneous records from health care providers.  By contrast, I view the records from 08/28/21 as a more reliable source of evidence because they: |

[1] The detailed analysis is on page 1 of my 06/01/24 report.

**Lincoln/Sewell 759**

Claimant: Timothy Sewell                                      July 27, 2024
Claim # 12885926                              Report by R Swotinsky MD; pg 5

| Per Dr. Arnold | My response |
|---|---|
|  | a. Were contemporaneous, <br> b. Come from independent sources not subject to biased recall <br> c. Come from medical professionals who were likely better qualified than the claimant's friends at recognizing and documenting the claimant's intoxication. <br><br> The medical/scientific literature consistently finds that alcohol use increases the risk of spinal cord injury from diving. One study reports that alcohol increases the risk 4.31-fold.[viii] The claimant's alcohol use either did, or did not, contribute to his accident. A 4.31-fold increase in risk indicates it likely did contribute to the accident because, in any group of people who have diving accidents while using alcohol, 78% of such accidents are attributable to alcohol use. |

Risk of Diving-Related Cervical Spinal Cord Injury

(Bar chart: "Without alcohol" = 1; "With alcohol" ≈ 4.31, vertical axis from 0 to 5.)

Attributable risk: $\frac{4.31 - 1}{3.31} = 0.78$

*Q.      Please review the 06/24/24 report by Dr. Thomas Arnold and associated reference articles. Does anything in Dr. Arnold's rebuttal change your responses/conclusions as outlined in your 06/03/24 report? Please explain why or why not.*

A.      Dr. Arnold's 06/24/24 submission provides no basis for altering my responses/conclusion as outlined in my 06/03/24 report. My detailed response is above. In particular:

- Dr. Arnold's reference articles indicate that the claimant's alcohol test result of 0.222 g/dL cannot be attributed to the effect of presumed high levels of lactate and lactate dehydrogenase.

**Lincoln/Sewell 760**

Claimant: Timothy Sewell                                          July 27, 2024
Claim # 12885926                                    Report by R Swotinsky MD; pg 6

- While Dr. Arnold relies on the statements submitted by the claimant and his friends almost two years after the accident, those statements are contradicted by the contemporaneous, medical records.
- The claimant's alcohol level corresponded with diminished judgment, increased self-confidence, and decreased inhibition. Misjudgments of water death and reckless behavior have been cited as common factors in diving-related cervical spine injuries.[ix] The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water. The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident.

_____

- *Electronically signed* -

Robert Swotinsky MD
Bd Cert, Occupational Medicine

_____

[i] Thompson C, Malhotra D, Schammel D, et al. False-positive ethanol in clinical and postmortem sera by enzymatic assay: Elimination of interference by measuring alcohol in protein-free ultrafiltrate. *Clin Chem.* 1994;40:1594-5.

[ii] Bishop-Freeman S, Bertholf R, Powers R, et al. False-positive enzymatic alcohol results in perimortem specimens. *Laboratory Medicine.* 2020;51:391-401.

[iii] Nine J, Moraca M, Virji M, Rao K. Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays. J Anal Toxicol. 1995;19:192-6.

[iv] Nacca N, Hodgman M, Lao K, et al. Can elevated lactate and LDH produce a false-positive enzymatic ethanol result in live patients presenting to the emergency department? *Clin Toxicol (Phila).* 2018;56:189-92.

[v] Winek C, Whaba W. A response to "serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays." *J Anal Toxicol.* 1996;20:211.

[vi] Anderson L, et al. Etiology and therapeutic approach to elevated lactate. *Mayo Clin Proc.* 2013;88:1127-40.

[vii] Goldberger B, Caplan Y, Levine B. Methods for fluid analysis. In: Caplan Y, Goldberger B (eds). *Garriott's Medicolegal Aspects of Alcohol, 6th Ed.* Tucson, AZ: Lawyers & Judges Publishing Company, Inc. 2015. Pgs. 256-7.

[viii] Garrison A, Clifford K, Gleason S, et al. Alcohol use associated with cervical spinal cord injury. *J Spinal Cord Med.* 2004;27:111-5.

[ix] Blanksby B, Wearne F, Elliott B, Blitrich J. Aetiology and occurrence of diving injuries. *Sports Med.* 1997;23:228-46.

**Lincoln/Sewell 761**

June 24, 2024

**MEDICAL REVIEW – Second Rebuttal Report**

**SUBMITTED TO:**  J. Price McNamara

10455 Jefferson Hwy, Ste. 2B

Baton Rouge, LA 70809

**PERTAINING TO:**  Timothy Sewell

**PREPARED BY:**  Thomas C. Arnold, MD, FAAEM, FACMT

Professor and Chairman

Department of Emergency Medicine

LSU Health Science Center – Shreveport

Medical Director, Louisiana Poison Center

**Lincoln/Sewell 762**

**Additional Material Reviewed:**

- Original Report of April 28, 2023
- Rebuttal comments regarding original opinion by Dr. Peggy Geimer
- First rebuttal Report Dated November 17, 2023
- Answers to Questions directed to Dr. Robert Swotinsky regarding opinions of Dr. Arnold

Dear Mr. McNamara,

I have received and reviewed the report of Dr. Robert Swotinsky refuting my assertions that the serum alcohol level of Mr. Timothy Sewell cannot be accurate and cannot be used to determine a legal matter. I will address the questions and responses below:

**Q1 and Answer 1** – Dr. Swotinsky states my exact point that that the consumption of six beers over seven hours prior to the accident cannot explain the serum alcohol level reported by the hospital. He also states that people tend to underestimate their alcohol consumption. But he completely omits the sworn affidavits of five other individuals listed in my original report who corroborate Mr. Sewell's account of his alcohol consumption that day.

**Q2 & Q3 and Answer 2 & 3** – These questions again focus on the possibility of the serum alcohol sample being falsely elevated by the presence of lactic acid in the blood. Dr. Swotinsky would like to change the facts that were documented by the EMS providers on the scene and state that Mr. Sewell never experienced a cardiac arrest. The record very clearly states that he was in cardiac arrest at the time of their arrival, and he was down 3 minutes before CPR was started. Compressions were begun at 16:50 and return of spontaneous circulation (ROSC) was obtained at 16:55. That five minutes plus the three minutes before CPR was started equals 8 minutes in cardiac arrest. They also record the initial ECG rhythm as **Pulseless Electrical Activity** (PEA). This is

Page 2 of 6

verification that Mr. Sewell was pulseless at that time. No reasonable physician or informed layperson who reviews this EMS chart can conclude that Mr. Sewell did not suffer a cardiac arrest. To ignore the clear documentation of this EMS record is intellectually disingenuous.

Dr. Swotinsky tries to refute the notion that the serum alcohol level could be falsely elevated by stating that no lactic acid or lactate dehydrogenase level were ever measured. I simply point out that just because levels were never measured, cannot be relied upon as proof that they were not present.

Dr. Swotinsky states in his own report, **"Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase."** In addition, several of the references he listed discuss the possibility of this phenomenon occurring.

The hospital test does **NOT** directly measure alcohol in the blood. The simple explanation is that the hospital enzymatic test for alcohol in the serum measures a co-factor that is produced when alcohol is metabolized to acetaldehyde. This co-factor is called **NADH**. It is universally accepted that there are other compounds, illnesses and situations that can produce NADH that have nothing to do with alcohol metabolism. One of these compounds is **lactic acid** which is produced in situations of tissue hypoxia as would occur during a cardiac arrest event. When lactate is converted to pyruvate by the enzyme lactate dehydrogenase, **NADH is produced**. The hospital test has no way to differentiate NADH produced from alcohol metabolism or from lactate metabolism. This is the basis for my contention that Mr. Sewell's test was erroneous.

A few references describing this possibility are listed here:

1. Powers et al. Evaluation of potential lactate/lactate dehydrogenase interference with an enzymatic alcohol analysis. *Journal of Analytical Toxicology*. 2009;33:561-563.

2. Bishop-Freeman et al. False-Positive Enzymatic Alcohol Results in Perimortem Specimens. *Laboratory Medicine* 2020;51:394-401

3. Nine et al. Serum-Ethanol Determination: Comparison of Lactate and Lactate Dehydrogenase Interference in Three Enzymatic Assays. *Journal of Analytical Toxicology*, Volume 19, Issue 3, May-June 1995, Pages 192–196.

4. Badcock NR, O'Reilly DA. False-positive EMIT-st ethanol screen with post-mortem infant plasma. Clin Chem. 1992 Mar;38(3):434. PMID: 1547566.

He also criticizes me for not quantifying the amount of alcohol elevation is attributable to the lactic acid. The fact is that there is no linear relationship for this interference so no estimations can be made. The result is spurious and therefore unreliable.

**Q4 and Answer 4 –** again Dr. Swotinsky misinterprets a very clear medical record documented by medical professionals who were at the scene and documenting the events at the time they occurred. The EMS record clearly documents that Mr. Sewell had a "CARDIAC ARREST". This contention otherwise should be viewed as a Hail Mary Pass by Lincoln Financial to attempt to suggest that lactic acid could not have been present because they know and fully understand that there is a problem with this alcohol test when lactic acid is present.

**Q5 and Answer 5 –** The matter of the clear disclaimer in the medical record that **"Results are for medical purposes only and not for legal or employment purposes."** As I have already stated, this disclaimer is present because the labs and hospitals know that this type of testing is subject to error and misapplication. This statement is a clear pronouncement that they are aware of the significant issues related to this type of testing and cannot stand behind the results as being valid or accurate.

**Q6 and Answer 6 –** I have no disagreement regarding this chart of the effects of alcohol and have relied on this myself on multiple occasions. My point is that Mr. Sewell did not have these levels of alcohol in his system at the time of the accident. It was the build-up of lactic acid from 8 minutes of low or no circulation that resulted in a spurious result on the hospital serum alcohol assay.

**Lincoln/Sewell 765**

Finally, I address the issue of whether alcohol was a "contributing cause" of Mr. Sewell's accident. Even if one were to assume that Mr. Sewell had a BAC of 0.22 at the time of the accident, the undisputed facts still could not support a finding that alcohol played any contributing role in causing the accident. Accepted scientific methodology is fact based, not speculation based. The undisputed facts, attested to by multiple witnesses, are that Mr. Sewell exhibited no signs of intoxication, and made a perfectly controlled, outward dive from a boat, which is exactly what others were observed doing in close proximity from other boats, then witnessed wading and swimming in chest-deep water. There were no visual indications that the water was dramatically shallower where Mr. Sewell dove. Thus, there is nothing fact-based in the record to support the idea that any diminished judgment or other alcohol effect played any part in the decision to dive or the tragic accident.

Dr. Swotinsky's leap from generalities regarding impaired judgment to his claimed "contributing factor" conclusion is based upon pure speculation that has no support in the undisputed evidence. His scientific methodology is flawed and not appropriately applied. Likewise, previous statements presented by insurance company experts noting the percent of water-recreation accidents that involve alcohol are inadequate to support an opinion that alcohol was a "contributing cause."  The mere fact that a given percentage of cervical injuries or water-recreation accidents may involve alcohol cannot support the conclusion that alcohol contributed to Mr. Sewell's accident. All available evidence is to the contrary.

**Opinion**

It continues to be my firm opinion that the serum alcohol level reported for Mr. Sewell was not accurate and would be impossible considering the amount of alcohol numerous people reported to have witnessed him consume. The reasons for this opinion have been documented in my two previous reports and should be reviewed carefully.

This opinion is based on my education, training and experience as an emergency physician and medical toxicologist. I reserve the right to modify this opinion if additional information is presented with bearing on this case.

Lincoln/Sewell 766

It should also be noted that I do not advertise my services as an expert witness, nor am I affiliated with any organization that solicits cases for me. I took on this case because I saw a miscarriage of justice being attempted on a helpless individual and family.


Sincerely,

Thomas C. Arnold, MD

**Lincoln/Sewell 767**

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/15154252

# False-positive ethanol in clinical and postmortem sera by enzymatic assay: Elimination of interference by measuring alcohol in protein-free ultrafiltrate

**Article** *in* Clinical Chemistry · September 1994

DOI: 10.1093/clinchem/40.8.1594 · Source: PubMed

CITATIONS
23

READS
749

**6 authors**, including:



Deepak Malhotra
University of Toledo
**190** PUBLICATIONS   **6,214** CITATIONS

SEE PROFILE

David P Schammel
Greenville Health System
**53** PUBLICATIONS   **962** CITATIONS

SEE PROFILE

Amitava Dasgupta
University of Texas Health Science Center at Houston
**437** PUBLICATIONS   **5,946** CITATIONS

SEE PROFILE

All content following this page was uploaded by Amitava Dasgupta on 06 June 2014.

The user has requested enhancement of the downloaded file.

**Lincoln/Sewell 768**

# technical briefs

**False-Positive Ethanol in Clinical and Postmortem Sera by Enzymatic Assay: Elimination of Interference by Measuring Alcohol in Protein-Free Ultrafiltrate**, *William C. Thompson, Deepak Malhotra, David P. Schammel, Walter Blackwell, Michael E. Ward, and Amitava Dasgupta[1]* (Dept. of Pathol., Office of the Med. Investigator, and Dept. of Med., Univ. of New Mexico School of Med., Albuquerque, NM; [1] address correspondence to this author at: Pathology Services, Univ. of New Mexico Hosp., 2211 Lomas Blvd. NE, Albuquerque, NM 87106, fax 505-272-0240)

The Emit® alcohol assay (Syva, San Jose, CA) provides false-positive results in postmortem samples because of increased concentrations of lactate and lactate dehydrogenase (LDH) (1). Recently, we found by Emit assay falsely increased ethanol values in the sera of two living subjects with high lactate and LDH concentrations, indicating that this problem is not limited to postmortem specimens only. We investigated the possibility of eliminating interference from lactate and LDH by measuring alcohol in protein-free ultrafiltrates.

The Emit assay for ethanol was performed on a Monarch (Instrumentation Laboratory, Lexington, MA) analyzer according to the manufacturer's protocol. Alcohol concentrations were also measured by a gas-chromatographic technique with *n*-propanol as the internal standard. The gas chromatograph (Perkin-Elmer, Norwalk, CT; Model 3920) we used was equipped with a 305-cm (10-ft.) Carbowax column, which yielded baseline separation of methanol, ethanol, acetone, and isopropanol.

The protein-free ultrafiltrates of sera were prepared by centrifuging 0.8–1.0 mL of sera in a Centrifree Micropartition System (Amicon, Danvers, MA) for 20 min at 1500*g*. The concentrations of LDH and lactate in sera were measured with an Ektachem 700 analyzer (Eastman Kodak, Rochester, NY).

Patient 1 had end-stage renal disease secondary to type II diabetes mellitus. After receiving a cadaveric kidney transplant, she required surgical intervention for a ureteral leak. The following medications were administered: azathioprine, prednisone, cyclosporin A, nystatin, trimethoprim/sulfamethaxazole, nifedipine, alprazolam, and famotidine. About 1 week later, the patient became obtunded and developed severe metabolic acidosis with an anion gap of 20 mmol/L. The entire colon from the ileum to the sigmoid colon was found to be necrotic. Her serum concentration of LDH was 27 000 U/L and lactate 15 mmol/L before death (reference range in health, 300–600 U/L and 0.5–2.2 mmol/L, respectively). Her apparent serum ethanol concentration by Emit was 690 mg/L (Table 1).

The second patient had had an inferior wall myocardial infarction 1 week after carotid endarterectomy. The patient was not a candidate for thrombolytic therapy because of the recent surgery. LDH was 12 473 U/L and increased to 45 500 U/L the same day. The γ-glutamyltransferase, aspartate aminotransferase, alkaline phosphatase, and alanine aminotransferase activities were also increased into thousands of units per liter. The total and conjugated bilirubin concentrations were normal. The patient was hemo-

## Table 1. Concentrations of ethanol measured in serum and corresponding ultrafiltrate samples.

| | Ethanol, mg/L | | | Serum LDH, U/L | Serum lactate, mmol/L |
|---|---|---|---|---|---|
| | Emit | | Gas chrom. | | |
| Sample | Serum | Ultrafiltrate | | | |
| Patient 1 | 690 | 0 | 0 | 27 000 | 15.0 |
| Patient 2 | 440 | 0 | 0 | 24 623 | 5.6 |
| Patient 3 | | | | | |
| Antemortem | 0 | 0 | 0 | 668 | 2.5 |
| Postmortem (2 h) | 100 | 0 | 0 | 1567 | 15.6 |
| Postmortem (24 h) | 2360 | 0 | 0 | 88 443 | 33.1 |

dynamically stabilized and renal output was increased with a renal dose of dopamine. The concentration of lactate was 5.6 mmol/L. Apparent ethanol concentration measured by Emit at the end of the first day of admission was 440 mg/L (Table 1).

A third patient initially admitted to our hospital had an antemortem ethanol concentration of 0. The apparent concentration of alcohol in postmortem sera was 100 mg/L after 2 h and increased to 2360 mg/L after 24 h. As expected, alcohol was not detected in the protein ultrafiltrate (Table 1).

In serum specimens with normal concentrations of lactate, we observed no falsely increased values in the Emit assay for alcohol. When we added 17.5 mmol/L lactate to several serum specimens (negative for alcohol) with LDH concentrations ranging from 100 to 3838 U/L, we observed no interferences in sera containing LDH <1500 U/L. In one specimen with LDH at 1755 U/L, the Emit-measured ethanol concentration after adding 17.5 mmol/L lactate was 460 mg/L.

When we supplemented with lactate aliquots of a serum specimen with an LDH concentration of 3457 U/L, the apparent alcohol concentration was undetectable at lactate concentration <4.4 mmol/L, but increased to 2500 and 3300 mg/L at 8.8 and 17.5 mmol/L of lactate, respectively. The apparent ethanol concentration ($y$) as a function of added lactate concentration ($x$) gave the following regression equation: $y = 32.2 x + 3.4$ ($r = 0.95$).

Emit-measured ethanol concentrations were unaffected by ultrafiltration in five different clinical specimens that had alcohol concentrations between 2500 and 4400 mg/L (ultrafiltrate values were 97–101% of serum ethanol) and normal concentrations of LDH and lactate.

To further validate that ultrafiltrate, which contains no protein, has no matrix effect on the Emit assay of ethanol, we prepared 600 μL of ultrafiltrate from a serum pool negative for alcohol, then supplemented both serum and ultrafiltrate with ethanol, and assayed in triplicate. The concentration of alcohol in the ultrafiltrate (mean 2050, SD 10 mg/L) was not different from serum concentration (2100, 45 mg/L). Specimens that gave false-positive alcohol concentrations by the Emit assay (no alcohol detected by gas chromatography) showed no alcohol content in protein-free ultrafiltrates of those sera reassayed by the same enzymatic technique.

**Lincoln/Sewell 769**

In the Emit assay of alcohol, the positive interference from high LDH and lactate concentrations is caused by the catalytic conversion of lactate to pyruvate by LDH, during which also $NAD^+$ is converted to NADH. Measurement of the change in absorbance at 340 nm to reflect the conversion of $NAD^+$ to NADH is also the basis for the Emit assay of alcohol, but through the catalysis of ethanol to acetaldehyde by alcohol dehydrogenase. Removing the LDH from the sample by ultrafiltration completely eliminates the interference.

The clinical situation in which a patient has lactic acidosis may be accompanied with increased LDH released by cellular breakdown. Because clinicians will often test patients with confusion and anion gap acidosis for the presence of various alcohols (2), LDH interference in the Emit assay may lead to improper diagnoses. Therefore, we emphasize with this report that interference in the Emit assay of alcohol by high lactate and LDH concentrations does occur in clinical samples, and that these interferences can easily be eliminated by analyzing for ethanol in the protein-free ultrafiltrates.

### References

1. Badcock NR, O'Reilly DA. False-positive Emit®-st™ ethanol screen with post-mortem infant plasma [Tech Brief]. Clin Chem 1992;38:434.
2. Malhotra D, Shapiro JI, Chan L. Nuclear magnetic resonance spectroscopy in patients with anion-gap acidosis. J Am Soc Nephrol 1991;2:1046–9.

### Sensitive Assay for Sodium Pump Inhibition,

*Qing-Feng Tao, Piotr A. Soszynski, Norman K. Hollenberg, and Steven W. Graves*[1] (Depts. of Med. and Radiol., Brigham and Women's Hosp., Harvard Med. School, Boston, MA 02115; [1]address correspondence to this author, at Endocrine-Hypertension Div., Brigham and Women's Hosp., 221 Longwood Ave., Boston, MA 02115, Fax 617-732-5764)

The sodium pump is essential to the function of all eukaryotic cells. The possibility that one or more pump inhibitors or digitalis-like factors (DLFs) contribute to the function of the kidney (1), the heart (2), the brain (3), the eye (4), and other systems is under active investigation. Excess or insufficient physiological amounts of these inhibitors may also contribute to disease (1–4). Attempts to isolate and characterize DLFs have often been limited by the lack of sensitivity of current [Na,K]ATPase assay methods and the small amount of inhibitor typically isolated. For these reasons, we undertook an effort to increase the sensitivity of the [Na,K]ATPase assay.

[Na,K]ATPase was purified from the outer medulla of calf kidney as described by Jorgensen (5), with modifications. The microsomal fraction was incubated at 25°C for 30 min with deoxycholate (1.4 g/mg protein per liter) and centrifuged through a two-layer sucrose gradient of 23% and 38% (110 min at 180 000g). The fraction between 23% and 38% of sucrose was collected, diluted, and centrifuged for 20 h at 150 000g. The pellet was resuspended in buffer (mmol/L: 250 sucrose, 30 histidine, 1 EDTA, pH 7.2) at 1 g of protein per liter and stored at 4°C. Canine renal [Na,K]ATPase (Sigma, St. Louis, MO) was used for comparison.

Ouabain, in graded concentrations, was used as a specific inhibitor of [Na,K]ATPase. DLF, highly purified from the peritoneal dialysate (PD) of renal-failure patients by ultrafiltration and two HPLC steps as described previously (1), was used for comparison. This purification separates PD-DLF completely from common steroids (cortisol, aldosterone, dehydroepiandrosterone, estrogens, progesterones, and testosterone) (1). Because PD-DLF is chemically unstable (1), all the PD-DLF from one purification was divided equally in the two assays and assayed simultaneously on the day of purification.

[Na,K]ATPase activity was determined by measuring the hydrolysis of $[\gamma\text{-}^{32}P]ATP$:

*Routine ATPase assay*: Enzyme (10 $\mu g$) was incubated in 120 $\mu L$ of buffer containing (in mmol/L) 100 $Na^+$, 5 $K^+$, 3 $MgCl_2$, 1 EGTA, and 80 Tris (pH 7.5) for 30 min at 37°C in the presence and absence of inhibitor. The reaction was started by adding 10 $\mu L$ of 40 mmol/L $[\gamma\text{-}^{32}P]ATP$ (Amersham, Arlington Heights, IL; final specific activity, 70 mCi/mol) and ended after 10 min by adding 0.87 mL of 40 g/L charcoal in 0.1 mmol/L HCl solution. After centrifugation, an aliquot of the supernate was removed and its radioactivity counted. Ouabain-insensitive activity was defined as the activity remaining in the presence of 1 mmol/L ouabain. Ouabain-sensitive inhibition was calculated as the percentage reduction of counts in the presence of ouabain or DLF divided by counts in presence of buffer, after subtraction of ouabain-insensitive activity.

*Modified method*: The inhibitors were preincubated with [Na,K]ATPase in a buffer containing (in mmol/L) 10 $MgCl_2$, 10 $NaHPO_4$ and 100 Tris (pH 7.2) at 37°C. Having determined that 85% of maximum [$^3$H]ouabain binding occurred within 15 min, we used a preincubation of 30 min to achieve steady-state binding. After preincubation, 40 $\mu L$ of preincubation mixture was transferred to 100 $\mu L$ of the routine reaction buffer, equilibrated for 5 min, and 10 $\mu L$ of $[\gamma\text{-}^{32}P]ATP$ was added. The reaction was terminated by adding 0.85 mL of the 40 g/L charcoal solution and the routine method followed thereafter. The intraassay and interassay CVs were 5.2% and 8.4%, respectively.

Plots of the ouabain concentration-dependent inhibition of [Na,K]ATPase hydrolysis in the routine and modified assays were parallel (Fig. 1A). The half-maximal inhibitory concentration ($IC_{50}$) of ouabain, measured after preincubation in 10 mmol/L Mg and 10 mmol/L phosphate was $5.3 \times 10^{-9}$ mol/L, whereas the $IC_{50}$ with preincubation in routine buffer was $1.9 \times 10^{-7}$ mol/L, a 35-fold shift in sensitivity. Results were equivalent for canine renal or our purified bovine kidney [Na,K]ATPase. Quantities of PD-DLF were insufficient to obtain full dose–response curves. PD-DLF inhibition of [Na,K]ATPase was significantly enhanced in the modified assay. Comparable increases were seen for ouabain solutions producing 0–15% inhibition in the routine assay, the range observed for DLF (Fig. 1B). Without the addition of ATP to begin the reaction, 50% of the enhancement was lost 20 min after transfer to the reaction solution.

Low $K^+$ and high $Mg^{2+}$ and $PO_4^{3-}$ favor ouabain binding (6), whereas $Na^+$ and $K^+$ are required for [Na,K]ATPase activity. We found that preincubation of ouabain or PD-DLF with enzyme under ion conditions favoring binding resulted in high-affinity binding that was not immediately reversed when the buffer was changed to the conventional assay buffer required for the hydrolysis reaction. While it was reasonable to anticipate that the buffer would enhance binding, we also thought that it would persist only as long as the low $K^+$, high $Mg^{2+}$ and

**Lincoln/Sewell 770**

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

# False-Positive Enzymatic Alcohol Results in Perimortem Specimens

*Sandra C. Bishop-Freeman, PhD,[1,2] Roger L. Bertholf, PhD,[3] Robert H. Powers, PhD,[4] Lisa C. Mayhew, MS,[1] Ruth E. Winecker, PhD[5]*

*Laboratory Medicine* 2020;51:394-401

DOI: 10.1093/labmed/lmz082

## ABSTRACT

Herein, we present 2 cases referred to the North Carolina Office of the Chief Medical Examiner (NC OCME) in which ethanol results reported by different hospital laboratories, using alcohol dehydrogenase (ADH)–based assays, were positive, whereas results of headspace gas chromatography testing performed in the NC OCME laboratory were negative. Literature reports suggest that false-positive ethanol measurements from ADH-based assays can occur when a combination of elevated lactate and lactate dehydrogenase (LD) are present in the specimen. The results were reported in perimortem specimens collected from 2 children with unrelated medical conditions. The cases and associated clinical parameters are considered based on the lactate/LD explanation for the false-positive results, to facilitate the recognition of circumstances that can produce erroneous serum ethanol results.

**Keywords:** alcohol dehydrogenase (ADH)–based assays, forensic toxicology, lactate dehydrogenase (LD), lactic acid, perimortem specimens, serum ethanol

Analysis for serum alcohol is one of the more commonly performed clinical tests, with application to a wide variety of patients. The test is so ubiquitous that it is routinely performed on patients for whom there is no reasonable expectation of a positive result. Although the standard method for forensic analysis of specimens thought to contain ethanol is dual-column gas chromatography with flame ionization detection,[1] the enzymatic technique utilized extensively in clinical settings is highly accurate and reliable. One issue with the enzymatic method is the potential for interference, or a false-positive result, that arises from scenarios that do not include alcohol species.[2–7]

The basis for the enzymatic alcohol assay is the oxidation of ethanol to acetaldehyde by alcohol dehydrogenase (ADH). ADH activity requires the coenzyme nicotinamide adenine dinucleotide ($NAD^+$), which accepts one of the protons that is liberated when ethanol is oxidized to acetaldehyde (**Figure 1**).[3] This reaction can be monitored spectrophotometrically because the reduced form of the coenzyme nicotinamide adenine dinucleotide (NADH) has an absorption maximum at 340 nm, an absorbance that is absent in the oxidized form. To measure ethanol, ADH and its coenzyme $NAD^+$ are added to the serum specimen. Any ethanol present will be converted to acetaldehyde with an accompanying increase in absorption at 340 nm due to the concomitant production of NADH from $NAD^+$. In the typical configuration of the assay, ADH and $NAD^+$ are in relative excess, and the reaction rate is limited only by ethanol; therefore, the rate of change in absorbance is proportional to the

**Abbreviations:**

ADH, alcohol dehydrogenase; NAD+, nicotinamide adenine dinucleotide; NADH, reduced form of the coenzyme nicotinamide adenine dinucleotide; LD, lactate dehydrogenase; SIDS, sudden infant death syndrome; CAP, College of American Pathology; ED, emergency department; NC OCME, North Carolina Office of the Chief Medical Examiner; GC-FID, gas chromatography with flame ionization detection; CPR, cardiopulmonary resuscitation; EMS, Emergency Medical Services; SVU, Special Victims Unit; CPS, Child Protective Services; AST, aspartate transaminase; ALT, alanine aminotransferase; ALP, alkaline phosphatase; DUI, driving under the influence; F, female; B, black; GC, gas chromatography; UF, ultrafiltrated; ND, none detected; NA, nonapplicable; M, male; ID, inner diameter; DSS, Department of Social Services

[1]Office of the Chief Medical Examiner, Raleigh, NC, [2]UNC Department of Pathology and Laboratory Medicine, Chapel Hill, NC, [3]Department of Pathology and Genomic Medicine, Houston Methodist Hospital, Houston, TX, [4]University of New Haven, Henry C. Lee College of Criminal Justice and Forensic Sciences, West Haven, CT, [5]Center for Forensic Sciences, RTI International, Research Triangle Park, NC

*To whom correspondence should be addressed.
sandra.bishop@dhhs.nc.gov

© American Society for Clinical Pathology 2020. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com

**Lincoln/Sewell 771**

Science

$$CH_3CH_2OH + NAD^+ \xrightarrow{\text{Alcohol Dehydrogenase}} CH_3CH = O + NADH + H^+$$

ethanol                                    acetaldehyde

**Figure 1**

The enzymatic oxidation of ethanol to acetaldehyde.

ethanol concentration. Commercially available ADH-based assays are readily adapted to automated chemistry analyzers and are in widespread use in clinical laboratories.[1,2]

Because other endogenous enzymes also use $NAD^+$, the potential exists, at least theoretically, for the $NAD^+$ to NADH conversion to occur in the reaction mix in the absence of ethanol if there is an adequate amount of alternate enzyme and substrate. However, the enzymatic ethanol reagent formulation used in the assay provides an excess of ADH so that other reactions using the coenzyme $NAD^+$ do not routinely contribute significantly to the production of NADH. If other enzymes using this coenzyme are present in unusually high concentration, along with their substrate, the potential for false-positive signals exists.

Persistent in the literature for more than 20 years has been the suggestion that lactic acid, or the combination of lactate and lactate dehydrogenase (LD) can, in some circumstances, result in such a false-positive result. Also persistent has been the suggestion that to the extent that such interference might occur, it would not be of adequate magnitude or frequency to seriously affect assay results. A biochemical basis for the interference has been suggested,[2,8] as have means of evaluating the potential for interference based on consideration of clinical parameters.[8]

Interference with an enzymatic ethanol method was first reported in patients with sudden infant death syndrome (SIDS) and was attributed to elevated lactate and lactate dehydrogenase.[2] Metabolic oxidation of lactate to pyruvate is catalyzed by LD and, in cases of sufficiently high concentrations of the enzyme and the substrate, could theoretically compete with ADH for the coenzyme and produce a false-positive result in an alcohol assay. Concentrations of lactate and LD within normal ranges clearly do not generate a measurable signal in a standard ADH-based ethanol assay. This lactate/LD interference has been reported several times,[3–6] and select cases have been summarized in **Table 1**. Populations at risk for this interference appear to include patients with end-stage renal disease,[3] leukemia,[4] hepatocellular necrosis from acetaminophen

toxicity,[5] patients for whom resuscitative efforts were necessary,[4] and elderly patients with cardiovascular disease.[6] Only when a large excess of lactate and LD are present in a specimen, along with excess $NAD^+$ from the assay reagent, are conditions sufficient to produce falsely elevated or false-positive ethanol results. Conversion of lactate to pyruvate only occurs in the presence of LD because lactate is not a substrate for ADH.[2,4,7,8] Thompson et al. demonstrated this by eliminating the interference through the removal of endogenous LD by ultrafiltration of serum samples.[3]

Although this interference has been reported in the literature, it appears that the concept is misunderstood and underreported. Enzymatic ethanol methods are extensively utilized. A College of American Pathology (CAP) pilot study in 2010 designed to focus on lactate and LD false-positive results,[7] reported that several clinical labs use platforms that demonstrated ethanol interferences. Manufacturer instructions for the ethanol methods contain only minimal references to the possibility of false-positive results (Beckman Coulter Emit II Plus Ethyl Alcohol Assay September 2010 [Beckman Coulter Inc] and Sigma-Aldrich Product Information Alcohol Dehydrogenase Activity Assay Kit [Sigma-Aldrich Co]).

The interference is mainly noted in technical bulletins and is characterized as problematic only when analyzing postmortem specimens, especially in the setting of acetaminophen overdose. However, it appears as if the interference is not limited to postmortem specimens; perimortem or antemortem specimens harvested after severe shock and trauma may also be subject to this interference.

It is clear that, to the extent that this interference occurs, it is relatively rare; several authors[9–11] have suggested that concerns about false positives should not be overstated. Trauma, including elevated serum liver enzyme levels, may not be adequate to produce the combination of significantly elevated LD and lactate that are apparently necessary to elicit an erroneous result. In a 1996 article, Winek et al[9] warned against misleading law enforcement officers and attorneys regarding the specific conditions that may cause erroneous results. In a 2004 study, Winek et al[10] reported ethanol concentrations measured by enzymatic and chromatographic methods in 24 trauma patients and found no significant differences. They did not report corresponding lactate or LD concentrations in their study subjects. Nacca et al[11] also did not confirm that the interference occurs in specimens from living patients.

*Lab Medicine* 2020;51;394–401    395
DOI: 10.1093/labmed/lmz082

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

**Lincoln/Sewell 772**

Science

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library, Shreveport user on 21 June 2024

**Table 1. Select Cases in the Literature with False-Positive Ethanol Results**

| Case/Reference No. | 1[3] | 2[3] | 3[3] | 4[5] | 5[6] |
|---|---|---|---|---|---|
| Age/sex/ethnicity | Unknown | Unknown | Unknown | Unknown | 85/F/Unknown |
| Ethanol Hospital Result(s), mg/dL (mmol/L) (date/time of specimen collection) | 69 (14.9) (antemortem) | 44 (9.5) (antemortem) | None detected (antemortem) 10 (2.1) (2 hrs postmortem) 236 (51.2) (24 hrs postmortem) | 152 (32.9) (time of collection not reported) | 200 (43.4) (12/25) 100 (21.7) (12/26) None detected (12/31) |
| Assay type | Emit alcohol assay[a] | Emit alcohol assay | Emit alcohol assay | Siemens ADVIA 1650[b] | DRI Ethyl Alcohol Assay[c] |
| Abnormal laboratory results (date/time of collection, when provided) | LD: 27,000 U/L Lactate: 15 mmol/L Anion gap: 20 mmol/L | LD: 24,623 U/L Lactate: 5.6 mmol/L | LD: 668 U/L Lactate: 2.5 mmol/L (antemortem) LD: 1567 U/L Lactate: 15.6 mmol/L (2 hrs postmortem) LD: 88,443 U/L Lactate: 33.1 mmol/L (24 hrs postmortem) | AST: 8330 U/L ALT: 3540 U/L LD: 8075 U/L Lactate: 22 mmol/L Acetaminophen: 1218 μmol/L | LD: 294 U/L Anion gap: 22 mmol/L (12/25) Anion gap: 18 mmol/L LD: 188 U/L (12/26) Anion gap: 12 mmol/L; LD: 221 U/L (12/31) |
| Patient details | End-stage renal disease secondary to type II diabetes mellitus, cadaveric kidney transplant | Inferior wall myocardial infarction post carotid endarterectomy | Information unavailable | Acetaminophen-induced hepatocellular necrosis | Altered consciousness with a medical history of aortic stenosis, ischemic heart disease, and heart failure |
| Ethanol Result derived via GC and/or UF | ND (GC and UF) | ND (GC and UF) | ND (GC and UF) | <9.2 mg/dL (<2 mmol/L) (GC) | ND (GC) |
| Cause of death | Unknown outcome | Unknown outcome | Unknown outcome | Unknown outcome | NA |

F, female; LD, lactate dehydrogenase; AST, aspartate aminotransferase; ALT, alanine transaminase; GC, gas chromatography; UF, ultrafiltrated; ND, none detected; NA, nonapplicable.
[a]Manufactured by Beckman-Coulter, Inc.
[b]Manufactured by Siemens AG.
[c]Manufactured by Thermo Fisher Scientific Inc.

However, their study included measurement of lactate and LD in 37 patients; the authors concluded that elevations of lactate and LD sufficient to cause a false-positive ethanol result were extremely unlikely to be encountered in an emergency department (ED) setting.

In an attempt to clarify this issue, we compared perimortem case studies with the available biochemistry results. The hospital ethanol results in 2 cases involving children were positive with enzymatic assays, whereas the subsequent headspace gas chromatographic analyses performed at the North Carolina Office of the Chief Medical Examiner (NC OCME) toxicology laboratory yielded results that were clearly negative. In this article, we review the medical conditions and corresponding laboratory results that potentially can lead to erroneous ethanol results and suggest

approaches to avoid misinterpretation of laboratory data. We consider it significant to note that, in pediatric cases, the positive ethanol results prompted law enforcement and social services officials to accuse family members and/or friends of administering alcohol to minors.

## Results

The postmortem toxicology testing for the 2 pediatric patients with positive ADH ethanol results did not detect ethanol using dual-column headspace gas chromatography with flame ionization detection (GC-FID).[8] **Table 2** is a summary of the case information, including the clinical

**Lincoln/Sewell 773**

Science

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

### Table 2. Perimortem Cases at NC OCME with Confirmed False-Positive Ethanol Results

| Case | 1 | 2 |
|---|---|---|
| Age, y/sex/ethnicity | 6/M/B | 2/F/B |
| Ethanol Hospital Result(s), mg/dL (mmol/L) (time when specimen collected) | 76 (16.5) (admit day 1: 3:57 PM) | |
| | 52 (11.29) (antemortem day 1: 5:04 PM) | 53 (11.5) (admission: ~6:15 PM) |
| | 39 (8.47) (antemortem day 2: 3:59 AM) | |
| Assay type | SYNCHRON Systems ETOH Alcohol[a] | SYNCHRON Systems ETOH Alcohol, UniCel DxC 600/800[a] |
| Abnormal laboratory result | pH: <6.80 | Anion gap: 23 mmol/L |
| | Lactate: >20.0 mmol/L | |
| | ALP: 244 U/L | ALT: 1404 U/L |
| | AST: 18,798 U/L | AST: 2322 U/L |
| | ALT: 9170 U/L | |
| | Methemoglobin: 1.9% | Glucose: 146 (8.103) mg/dL (mmol/L) |
| | Glucose: 96 (5.328) mg/dL (mmol/L) | Sodium: 169 mmol/L |
| | Sodium: 146 mmol/L | Potassium: 13.2 mmol/L |
| | Potassium: 7.0 mmol/L | |
| Patient timeline | Died ~15 hours after hospital admission | Died in ED at 5:57 PM: ~1 h after EMS was called |
| NC OCME–determined ethanol result | Antemortem blood (day 1) and urine (catheter): ND | Postmortem blood and vitreous: ND |
| Cause of death | Hypoxic-ischemic encephalopathy due to resuscitative drowning | Natural death due to septicemia, streptococcus bacteremia/sepsis |

*NC OCME, North Carolina Office of the Chief Medical Examiner; M, male; F, female; B, black; ALP, alkaline phosphatase; ALT, alanine transaminase; AST, aspartate aminotransferase; ED, emergency department; EMS, Emergency Medical Services; ND, none detected;*
*[a]Manufactured by Beckman Coulter, Inc.*

equipment utilized. The forensic technique identifies volatile analytes based on chromatographic retention time on 2 analytical columns with unique and complimentary stationary phases that produce specific shifts in analyte retention on the column based on the chemical structure of the analyte, rather than relying on an indirect enzymatic method. Volatile analysis at NC OCME was performed on an Agilent 7890A Gas Chromatograph with an Agilent Flame Ionization Detector (FID) fitted with an Agilent 7697A Headspace Sampler. The dual chromatographic columns were as follows: Restek Rtx™-BAC1: 30 m length, 0.32 mm inner diameter (ID), 1.8 µm film thickness; and Rtx™-BAC2: 30 m, 0.32 mm ID, 1.2 µm.

Clinical reference ranges for **Table 2** are provided in the text when biochemical values are indicated.[12] Although these medical examiner-reported cases may not have the entire clinical picture represented, all available test results for the patients were reported as they appeared in the medical records.

### Case 1

A 6-year-old black male was attending a birthday party at a community swimming pool with family members when he was discovered motionless at the bottom of the pool. The victim was pulled from the pool, and bystanders immediately administered cardiopulmonary resuscitation (CPR), which was continued by the Emergency Medical Services (EMS) team on their arrival. Police arrived concurrently with EMS to investigate. The hospital to which the victim was transported contacted local law enforcement when the hospital laboratory reported a serum alcohol result of 76 mg per dL (16.5 mmol/L) for the child. The child died approximately 15 hours after hospital admission.

The hospital child-protection team and the police Special Victims Unit (SVU) were involved in the case, to ensure the ethanol result was well documented. Video surveillance of the pool and surroundings were viewed by a forensics officer, and several pool party attendees were interviewed to investigate the possibility of accidental ingestion or other exposure to alcohol. Investigators visited the home of the child to interrogate family members about alcohol purchases and any opportunities for accidental ingestion before or during the pool party. Child Protective Services (CPS) decided not to remove

**Lincoln/Sewell 774**

Science

any siblings from the home during the investigation. Detectives met with the investigator from the NC OCME after laboratory GC-FID analysis and were advised of the possibility of a false-positive ethanol result.

Of particular note in the clinical findings (Table 2) was the markedly elevated lactate level of greater than 20.0 mmol per L (normal: 0.9–1.7 mmol/L) and significantly elevated levels of the hepatic enzymes aspartate transaminase (AST) and alanine aminotransferase (ALT): 18,798 and 9170 U per L, respectively (normal ranges are 10–36 and 10–32 U/L, respectively). Although not measured in this case, LD is well-recognized as a marker of hepatic ischemic injury, and the theory that it would be released in magnitude similar to the hepatic enzymes AST and ALT is a reasonable clinical expectation.[13] We note that, over the course of approximately 12 hours, the false ethanol concentration decreased from 76 mg per dL (16.5 mmol/L) to 52 mg per dL (11.29 mmol/L) to 39 mg per dL (8.47 mmol/L), in contrast to the normal rate of elimination of approximately 15 to 20 mg per dL per h (3.26–4.34 mmol/L/h) after cessation of true ethanol consumption.[14,15]

Other significant biochemical findings for this child were low pH, less than 6.80 (normal: 7.35–7.45), and elevated methemoglobin, 1.9% (normal: less than 1.0%). These findings are consistent with hypoxia due to drowning. Hypoxic liver damage has been demonstrated to produce 20-fold elevations in liver enzymes, potentially creating the environment for the false-positive ethanol results.[16]

### Case 2

A 2-year-old black female without a significant previous medical history was at home with her mother and grandmother when she was found unresponsive 2 hours after being laid down for a nap. The family reported no accidental or intentional trauma. In the 2 days before hospitalization, the patient had diarrhea 4 to 5 times per day and a low-grade fever on the last day before hospital admission. Laboratory results included a positive serum alcohol level of 53 mg per dL (11.51 mmol/L), as well as possible dehydration. The child was pronounced dead, with a diagnosis of acute respiratory failure and cardiac arrest, at the local ED, 1 hour after EMS workers arrived at the scene.

The mother and grandmother of the girl reported no use of alcohol-containing cough or cold medicines, as well as no possibility of incidental alcohol exposure. The treating physician was unsure what had caused the elevated ethanol level in this 2-year-old child with cardiac arrest and intended to

wait for medical examiner findings, which might offer an explanation. However, the ethanol levels were communicated to CPS and law-enforcement officials as being the equivalent to 1.5 servings of beer. On that basis, and a previous history of interventions by the local Department of Social Services (DSS), a sibling was removed from the home. When the pathologist was informed that there was no ethanol present in the postmortem specimens after the GC-FID results at NC OCME, he placed a call to DSS, and the sibling was returned to the family.

As shown in Table 2, the available laboratory results included an elevated anion gap of 23 mmol per L (normal: 7–16 mmol/L), elevated ALT level of 1404 U per L (normal: 10–32 U/L), and elevated AST level of 2322 U per L (normal: 18–36 U/L). The potassium level was 13.2 mmol per L (normal: 3.5–5.1 mmol/L), and the sodium level was 169 mmol per L (normal: 134–143 mmol/L).

The postmortem toxicology specimens were taken by the medical examiner the day after the patient died, and no antemortem specimens were available for further testing. The ED blood draw for the serum ethanol analysis was taken within an hour of the time of death. If the result of 53 mg per dL (11.51 mmol/L) ethanol concentration in the blood was accurate, under a normal elimination rate, the child would be expected to still have had a quantifiable ethanol result 1 hour later in the postmortem specimens. The chromatograms for the postmortem blood and vitreous tests were inspected for any peaks below the reporting limit of 20 mg per dL but above the limit of detection. Both results were negative for any trace of ethanol.

Postmortem blood culture results were positive for 2 strains of *Streptococcus constellatus* (anginosus group). These bacteria are part of the normal gastrointestinal flora but can develop abscesses and cause significant systemic infections. Hyperlactatemia and liver dysfunction are symptoms of severe sepsis; this combination appears to be responsible for the false-positive ethanol results obtained using the enzymatic assay. The cause of death was certified as acute bacteremia/sepsis due to gastrointestinal infection/illness.

## Discussion

Consistent with the findings of previous studies, our cases illustrate the potential for a combination of elevated lactate

DOI: 10.1093/labmed/lmz082

**Lincoln/Sewell 775**

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

Science

and LD to cause falsely elevated, or false-positive, ethanol results in some enzymatic assays. Evaluation of clinical parameters—the key species lactate and LD—or indirect indicators of their presence (eg, anion gap, AST, and ALT) may also provide an indication of the potential for the interference or, conversely, suggest that in a particular case, an interference is unlikely to have occurred, and the ethanol result is probably valid.

## Elevated Clinical Results

Most organisms are capable of *glycolysis*, the metabolic conversion of glucose to pyruvate, and use it as a secondary, anaerobic source of ATP (adenosine triphosphate) when the oxygen supply is insufficient or energy demand is high. In the last step of the glycolytic pathway, pyruvate is converted to lactate, and the lactate concentration in blood depends on its rate of production in the tissues and its rate of metabolism in the liver and kidneys.[17] Elevated lactate is associated with critical illness and hypoxia[18]; a normal lactate concentration in the blood is 0.6 to 1.8 mmol per L.[12] Overproduction of lactate most often occurs in periods of hypoxia and results in acidosis.

Causes of hypoxia include shock (distributive, cardiogenic, hypovolemic, obstructive), cardiac arrest, regional tissue ischemia, diabetic ketoacidosis, pharmacological agents, toxins, anaerobic muscle activity (seizures, heavy exercise, excessive work of breathing), thiamine deficiency, malignant neoplasms, liver failure, mitochondrial disease, and asphyxiation.[8,17–19] Of particular relevance to this discussion, is the rapidity with which lactate levels return to normal after the return to normal oxygenation status. As such, a transitory elevation of lactate, even in the face of elevated hepatic enzymes (suggesting a concomitant appearance of LD in the blood) would not provide a reasonable expectation of ADH-assay interference. An elevated concentration of LD in the bloodstream is necessary for the interfering reaction to occur at a rate sufficient to be detected. LD is present in most tissues, but is particularly concentrated in muscle and the liver. After tissue breakdown, LD levels are increased due to its release from the cytoplasm. Because tissue concentrations are approximately 500 times greater than serum concentrations of LD, a relatively small amount of tissue damage can significantly increase the serum LD concentration.[20] Clinically important elevations in serum LD have been defined as 800 U per L or greater.[12,21] Hemolysis, cancer, severe infections and sepsis, brain infarctions, meningitis,

pulmonary infections, liver diseases, pancreatitis, and muscle injury cause elevations in LD.[21]

Liver damage or liver disease is associated with elevations in several enzymes that are found in relatively high concentration in hepatocytes, including ALT, AST, and alkaline phosphatase (ALP), in addition to LD. Elevation of ALP/AST are most often associated with viral hepatitis and excessive alcohol intake but also can occur in the absence of these factors.[22] Other causes include cardiovascular diseases, heat stroke, connective tissue diseases, hematological diseases, renal diseases, systemic infection-bacteremia/sepsis, and acetaminophen-induced hepatocellular necrosis.[22]

## Specimen Type

ADH ethanol assay interference has been used as a defense in some driving under the influence (DUI) cases[23] and is suggested in online resources by authors such as Thiessen.[24] However, the possibility of false-positive ethanol measurements in these cases is remote because the necessary conditions of lactate and LD elevations would rarely, if ever, be met.[9–11] The interference is most likely encountered in perimortem situations in which lactate and LD are elevated as a result of severe disease or trauma. In the setting of perimortem patients, resuscitative efforts may create a higher risk for developing increased LD. Prolonged failed resuscitative efforts in the field will not correct the oxygen demand/delivery mismatch.[25] Lactate levels will continue to increase, a situation that is associated with a high risk of death, and extensive resuscitation may cause potential muscle damage, increasing the serum concentration of LD. Administration of epinephrine results in a dose-dependent increase in lactate levels[18]; yet, without corresponding LD elevation, there is no potential for interference.

These pediatric cases highlight interference in enzymatic ethanol assays that can lead to false-positive ethanol results. This phenomenon may be more recognizable in young patients who would not ordinarily be exposed to ethanol. In an adult, a false-positive ethanol result may often be dismissed as an expected finding in cases, such as acetaminophen toxicity, in which an ethanol result is inconsequential to other emergent medical concerns. Because the interference does not usually produce significantly elevated ethanol measurements that would alert clinicians to potential ethanol toxicity as a clinical finding, modest blood ethanol concentrations in adults are likely to be accepted without question, particularly

*Lab Medicine* 2020;51;394–401    399
DOI: 10.1093/labmed/lmz082

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

**Lincoln/Sewell 776**

Science

if the patient is unresponsive and therefore unable to report having not consumed ethanol.

The cases presented demonstrate the danger in reporting an ethanol result in minors based solely on the results of an enzymatic assay. In cases involving children, or in adults when the consequences of a positive ethanol result are serious, we advise caution in the interpretation of enzymatic ethanol results, as well as confirmation of the ethanol result by a more specific method, such as dual-column GC-FID. Alternatively, an ADH-based ethanol assay that includes an ultrafiltration pretreatment step should be considered as a confirmatory assay. If neither of these alternatives are available, performing a second enzymatic alcohol measurement on a specimen collected 1 hour or more later, thus allowing for the metabolism of any true ethanol, may demonstrate a false result if the ethanol concentration does not decrease by an expected amount. As the results in **Table 2** for case 1 show, the lack of appropriate ethanol metabolism after a period of approximately 12 hours could have alerted clinicians that something was amiss with the ethanol measurements. Further, measurement of lactate and LD levels in the patient specimens would provide supporting evidence of assay interference.

## Conclusions

The 2 cases reported, in which enzymatic testing indicated the presence of significant concentrations of ethanol in pediatric patients and yet those results were clearly demonstrated by GC-FID to be false-positive results, shows that laboratory and medical professionals need to better understand enzymatic assays. Clinical laboratory workers using enzymatic ethanol assays should be aware of potential causes of false-positive or falsely elevated ethanol results, including elevated lactate and LD levels. Also, they should question results that do not fit the clinical picture. Laboratory policies or result flags may be instituted to alert clinicians to order a second ethanol analysis by a different technique, using the same or future serum specimens if possible, to allow for ethanol metabolism. Ultimately, it may be necessary to contact the laboratory directly and speak to a toxicologist regarding the reliability of a specific ethanol

measurement. Definitive analytical methods, such as dual-column headspace gas chromatography, should be considered for confirmation of ethanol results that may have legal consequences. These perimortem pediatric cases showed that the potential exists for interferences to complicate an ED diagnosis and to negatively impact families already trying to cope with a tragedy. **LM**

## References

1. Barnhill MT Jr, Herbert D, Wells DJ Jr. Comparison of hospital laboratory serum alcohol levels obtained by an enzymatic method with whole blood levels forensically determined by gas chromatography. *J Anal Toxicol.* 2007;31(1):23–30.

2. Badcock NR, O'Reilly DA. False-positive EMIT-st ethanol screen with post-mortem infant plasma. *Clin Chem.* 1992;38(3):434.

3. Thompson WC, Malhotra D, Schammel DP, Blackwell W, Ward ME, Dasgupta A. False-positive ethanol in clinical and postmortem sera by enzymatic assay: elimination of interference by measuring alcohol in protein-free ultrafiltrate. *Clin Chem.* 1994;40(8):1594–1595.

4. Nine JS, Moraca M, Virji MA, Rao KN. Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays. *J Anal Toxicol.* 1995;19(3):192–196.

5. Gharapetian A, Holmes DT, Urquhart N, Rosenberg F. Dehydrogenase interference with enzymatic ethanol assays: forgotten but not gone. *Clin Chem.* 2008;54(7):1251–1252.

6. Jones TE. False-positive ethanol blood concentrations leading to clinical confusion on Christmas Day. *Clin Biochem.* 2011;44(16):1355–1357.

7. Frederick DL, King GS. Lactate dehydrogenase can cause false-positive ethanols. *Clinical & Forensic Toxicology News.* 2012;June:4–5.

8. Powers RH, Dean DE. Evaluation of potential lactate/lactate dehydrogenase interference with an enzymatic alcohol analysis. *J Anal Toxicol.* 2009;33(8):561–563.

9. Winek CL, Wahba WW. A response to "Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays". *J Anal Toxicol.* 1996;20(3):211–212.

10. Winek CL, Wahba WW, Windisch RM, Winek CL Jr. Serum alcohol concentrations in trauma patients determined by immunoassay versus gas chromatography. *Forensic Sci Int.* 2004;139(1):1–3.

11. Nacca N, Hodgman MJ, Lao K, Elkins M, Holland MG. Can elevated lactate and LDH produce a false positive enzymatic ethanol result in live patients presenting to the emergency department? *Clin Toxicol (Phila).* 2018;56(3):189–192.

12. Painter PC, Cope JY, Smith JL. Reference information for the clinical laboratory. In: Burtis CA, Ashwood ER, eds. *Tietz Textbook of Clinical Chemistry.* 3rd edn. Philadelphia (PA): W.B. Saunders;1999:1788–1846.

13. Giannini EG, Testa R, Savarino V. Liver enzyme alteration: a guide for clinicians. *CMAJ.* 2005;172(3):367–379.

14. Jones AW. Evidence-based survey of the elimination rates of ethanol from blood with applications in forensic casework. *Forensic Sci Int.* 2010;200(1-3):1–20.

15. Donovan JE. Estimated blood alcohol concentrations for child and adolescent drinking and their implications for screening instruments. *Pediatrics.* 2009;123(6):e975–e981.

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

**Lincoln/Sewell 777**

Science

16. Ebert EC. Hypoxic liver injury. *Mayo Clin Proc.* 2006;81(9):1232–1236.

17. Sacks DB. Carbohydrates. In: Burtis CA, Ashwood ER, eds. *Tietz Textbook of Clinical Chemistry*. 3rd ed. Philadelphia (PA): W.B. Saunders;1999:750–808.

18. Bakker J, Nijsten MWN, Jansen TC. Clinical use of lactate monitoring in critically ill patients. *Ann Intensive Care.* 2013;3(1):12.

19. Andersen LW, Mackenhauer J, Roberts JC, Berg KM, Cocchi MN, Donnino MW. Etiology and therapeutic approach to elevated lactate levels. *Mayo Clin Proc.* 2013;88(10):1127–1140.

20. Moss DW, Henderson AR. Clinical enzymology. In: Burtis CA, Ashwood ER, eds. *Tietz Textbook of Clinical Chemistry*. 3rd ed. Philadelphia (PA): W.B. Saunders;1999:617–721.

21. Erez A, Shental O, Tchebiner JZ, et al. Diagnostic and prognostic value of very high serum lactate dehydrogenase in admitted medical patients. *Isr Med Assoc J.* 2014;16(7):439–443.

22. Shimizu Y. Liver in systemic disease. *World J Gastroenterol.* 2008;14(26):4111–4119.

23. Citron J. DUI/DWI: hospital laboratory testing lacks forensic reliability. *JLegal Nurse Consult.* 2009;20(1):3–6.

24. Thiessen MR; Voice for the Defense Online. Falsely Elevated Ethanol Results Using Hospital Enzymatic Assay Blood Testing. http://www.voiceforthedefenseonline.com/story/falsely-elevated-ethanol-results-using-hospital-enzymatic-assay-blood-testing. Accessed October 22, 2019.

25. Bloos F, Zhang Z, Boulain T. Lactate-guided resuscitation saves lives: yes. *Intensive Care Med.* 2016;42(3):466–469.

Downloaded from https://academic.oup.com/labmed/article/51/4/394/5718005 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

*Lab Medicine* 2020;51;394–401  401
DOI: 10.1093/labmed/lmz082

**Lincoln/Sewell 778**



Journal of Analytical Toxicology, Vol. 33, October 2009

Downloaded from https://academic.oup.com/jat/article/33/8/561/777014 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

*Case Report*

# Evaluation of Potential Lactate/Lactate Dehydrogenase Interference with an Enzymatic Alcohol Analysis

**Robert H. Powers[1],\*** and **Dorothy E. Dean[2]**

[1]*Connecticut Department of Public Safety, Controlled Substances/Toxicology Laboratory, 10 Clinton Street, Hartford, Connecticut 06424 and* [2]*Office of the Summit County Medical Examiner, 85 N. Summit Street, Akron, Ohio 44308*

### Abstract

**The Connecticut Department of Public Safety laboratory recently addressed a legal challenge to a hospital alcohol dehydrogenase (ADH)-based serum ethanol determination based on the suggestion of interference by lactate dehydrogenase (LDH)-catalyzed oxidation of lactate. Both ADH- and LDH-oxidations require NAD+ (present in excess in the assay). NADH produced by LDH-catalyzed lactate oxidation in the assay is interpreted as derived from ethanol. Hepatic trauma was suggested as the basis for elevated levels of lactate and LDH. Clinical laboratory results were evaluated, specifically serum hepatic enzymes, ions, and anion gap. Aspartate aminotransferase (ASAT) and alanine aminotransferase (ALAT) were 229 and 144 U/L, respectively (~ 8× and 4× reference range midpoint values). Na+, K+, Cl–, and $CO_2$ levels were 143, 3.0, 112, and 20 meq/L, respectively, yielding an anion gap of 8 meq/L (ref. range 8–15). Serum lactate contributes to "unmeasured anions"; hence, the anion gap was inconsistent with a significant lactate elevation. Based on the slight elevation of ASAT and ALAT, LDH levels were estimated to be elevated to no more than 10-fold. Calculation of the amount of LDH and ADH present in the ethanol assay suggest an ADH/LDH ratio of 200:1. Hence, contribution by lactate oxidation to the serum ethanol concentration in this case would have been negligible.**

### Introduction

This laboratory was recently asked to provide an opinion regarding the validity of a hospital laboratory alcohol level in a criminal case. The test was an alcohol dehydrogenase (ADH)-based serum ethanol determination. A question was raised regarding the validity of the ethanol value due to the possibility of the assay reflecting a "false positive" result as a consequence of lactate dehydrogenase (LDH)-catalyzed oxidation of lactate present in the sample. In this case, neither lactate nor LDH levels were measured in the patient sample, which forced an evaluation and response based on other clinically measured

parameters and information regarding the specific assay utilized for the ethanol analysis. This approach may be a useful model for other practitioners to consider in similar cases.

The enzymatic ethanol method used by the hospital (Roche Ethanol Gen.2), and typical of such assays, is an initial rate method based on the rate of appearance of reduced nicotinamide adenine dinucleotide (NADH; $\lambda_{max}$ ← 340 nm) as a function of ethanol oxidation catalyzed by ADH (1). Similarly, oxidation of lactate to pyruvate by LDH also produces NADH (2) and, if generated in the ADH-assay mix, would be interpreted as ethanol oxidation and hence, as a false "ethanol" result. Although recognized as a potential confounder of the assay, neither lactate nor LDH is regularly present in the serum at levels that could affect the validity of the ADH assay.

LDH is primarily a hepatocellular, cytosolic enzyme not usually significantly present in the blood. LDH and other cytosolic enzymes may be released from the liver as a consequence of abdominal trauma and damage to hepatocytes or chronic liver injury or dysfunction [e.g., cirrhosis, hepatocellular necrosis, or inflammation (3)]. Hepatocellular damage may be assessed by evaluation of levels of such hepatic enzymes in serum. Typically, aspartate aminotransferase (ASAT) and alanine aminotransferase (ALAT) are used clinically to assess hepatic trauma (4). Therefore, the appearance of LDH, ASAT, and ALAT in serum levels in a trauma case are indicative of such injury (3,4).

Lactate (the anionic form of β-hydroxypropanoic acid) is a metabolic intermediate with blood reference levels being 0.9–1.7 mmol/L (5). Lactate is the end product of anaerobic glycolysis and also the glycolytic end product in red blood cells. Lactate is readily taken up from the blood by the liver and utilized in gluconeogenesis (6). Lactate blood levels may be elevated when local tissues are hypoxic (e.g., hypovolemic shock, myocardial infarction, pulmonary edema, or musculoskeletal trauma). Blood lactate may also be temporarily elevated because the patient received treatment in the form of Lactated Ringer's solution (which contains 28 mmol/L lactate). In this case, there was no indication in the medical record that the patient received Lactated Ringer's solution.

LDH normally functions as a reductase, producing lactate from the β-keto analogue pyruvate (as a gluconeogenic pre-

\* Author to whom correspondence should be addressed. E-mail: robert.powers@po.state.ct.us

Reproduction (photocopying) of editorial content of this journal is prohibited without publisher's permission.

**Lincoln/Sewell 780**

Journal of Analytical Toxicology, Vol. 33, October 2009

cursor) and oxidized $NAD^+$. In the circumstance of elevated lactate and in the presence of excess $NAD^+$ (as would be found in an ADH-based EtOH assay), the reversible reaction oxidizes lactate to pyruvate with the concomitant reduction of $NAD^+$ to $NADH+H^+$ (Figure 1). Therefore, it is reasonable to suggest that a serum sample containing both LDH and lactate could produce a false-positive result in an ADH-based EtOH assay as the excess NAD drives the reaction towards pyruvate. The essential condition for a false positive contribution is that there be enough LDH and lactate to actually compete with the ADH-ethanol system. Thompson et al. (7) have shown that lactate-based interference with the assay disappears in ultrafiltered (hence LDH-free) serum samples, emphasizing the need for both enzyme (LDH) and substrate (lactate) to be present for the interfering reaction to proceed. Some assays determine the initial rate of NADH production prior to the addition of ADH as a baseline value. Then following the addition of ADH to the reaction mix, the new initial rate (minus the "baseline" rate) is reflective of ADH-catalyzed oxidation and, hence, ethanol concentration. In this manner, the assay can be "controlled" for the presence of lactate and LDH.

In our experience, the suggestion of lactate/LDH interference has been argued in court on a strictly theoretical basis or based only on the possibility of lactate being present. Lactate, a β-hydroxy carboxylic acid, is not a substrate for ADH,



**Figure 1.** Oxidation of lactate and ethanol to pyruvate and acetaldehyde, catalyzed by LDH and ADH.

### Table I. Pertinent Clinical Results

| Analyte | Result | High (H)/Low(L) | Reference Range* |
|---|---|---|---|
| Sodium | 143 | | 138–145 mmol/L |
| Potassium | 3.0 | L | 3.4–5.0 mmol/L |
| Chloride | 112 | H | 98–107 mmol/L |
| $CO_2$ content | 20 | L | 22–29 mmol/L |
| Glucose | 161 | H | 65–99 mg/dL |
| ASAT | 229 | H | 10–50 U/L |
| ALAT | 144 | H | 10–50 U/L |
| Lipase | 204 | H | 0–80 U/L |
| Amylase | 184 | H | 28–100 U/L |

\* Laboratory-specific reference ranges.

which catalyzes the oxidation of short-chain aliphatic alcohols (8). In the absence of LDH, the presence of lactate alone is not, therefore, an adequate basis for the suggestion of interference with ADH-based ethanol assays.

We had the opportunity with this case to present a numerically-based evaluation of the potential for LDH-based interference. Because the potentially competing reaction is dependent upon the amount of lactate and LDH in the assay, we evaluated clinical parameters to estimate reasonable maximal levels for both lactate and LDH. We then calculated the amount of each that would be present in the assay vessel based on the sampling aliquot.

## Case History

The driver in this case (a 33-year-old male) was involved in a single motor vehicle collision by impacting a tree. He was transported to a local hospital emergency department, and blood was drawn shortly thereafter. There was neither radiological nor surgical evidence for intraabdominal organ injury; however, some of his measured serum hepatic and pancreatic enzyme levels were elevated, which was suggestive of some degree of trauma. The authors made the conservative assumption of minor liver injury based upon the approximate fivefold increase of ALAT and eightfold increase of ASAT as compared to the midpoints of the hospital reference ranges (Table I). Because of the rapidity with which hospital testing was performed, aging of samples was not considered to be a significant factor in this case. The treating hospital performed a standard panel of laboratory tests, including a serum alcohol determination using a method based on the rate of NAD reduction by ADH. Serum ethanol was reported as 200 mg/dL, yielding an approximate whole blood % ethanol of 0.17 g/dL. Hospital laboratory results were obtained by warrant, and results of the alcohol test were admitted into evidence during criminal proceedings. Pertinent clinical laboratory findings were as noted in Table I. Anion gap was determined to be 8 mmol/L ($[Na^+] + [K^+] - [Cl^-] - [CO_2]$). The reference range for anion gap is 8–15 (9); therefore, in this case, the anion gap was not elevated. The assay utilized by the hospital laboratory (Roche Ethanol Gen.2) mixes 50 µL of a 37 mU/µL ADH solution with 4-µL sample (1). The assay is an "initial rate" method using $\Delta A_{340}$ as the monitored variable.

## Results and Discussion

This case was focused on the validity of the alcohol determination performed by the hospital laboratory. Although it had been suggested that lactate alone can interfere with the ADH-based assay by "cross-reaction," lactate, as noted previously (8), is not an effective substrate for ADH. It is, however, reasonable to suggest that the combination of high levels of both lactate and LDH can, in the presence of the excess $NAD^+$ in the assay, produce NADH and thereby cause a falsely elevated ethanol reading as reported by Nine et al. (10), who also

Downloaded from https://academic.oup.com/jat/article/33/8/561/777014 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

**Lincoln/Sewell 781**

Journal of Analytical Toxicology, Vol. 33, October 2009

demonstrated the differential susceptibility of specific assays to this interference.

Serum lactate increases rapidly after death, even in the early postmortem period (11). In postmortem samples, it can be reasonably assumed that intracellular material, including lactate and LDH, have been released into the blood as cellular membrane integrity degrades. For this reason, enzymatic-based alcohol analyses are generally recognized as unreliable when used on postmortem samples. (Such determinations are normally performed using the more specific headspace gas chromatography methodology.)

We considered the (albeit indirect) evidence addressing the likelihood of both LDH and lactate being present in the assay mix from this specific case. First, anion gap is well-recognized as an indicator of lactic acidosis, or elevated lactate generated by metabolic processes. In the case noted previously, the anion gap was not elevated at 8 mmol/L, reference range 8–15 mmol/L (9), a result that is inconsistent with significantly elevated serum lactate. However, we did note that the chloride level was slightly elevated, and carbon dioxide was slightly low. We could not preclude the possibility of a correspondingly slightly elevated serum lactate level of ~ 2–8 meq/L based on the anion gap result. As noted previously, normal lactate levels are ~ 1 meq/L. In comparison, a 0.2 g/dL level of ethanol corresponds to ~ 40 meq/L ethanol, so in this case the ratio of ethanol to lactate was probably at least 5:1. So, in the hypothetical case of a 5:1 ethanol/lactate ratio and equivalent amounts of corresponding enzymes (ADH and LDH), we would expect that the rate of the ethanol/ADH reaction would be at least five times the rate of the lactate/LDH reaction.

The second essential element of consideration is the level of LDH. This enzyme may be released as a function of trauma. When the liver is injured, hepatocytes rupture, and their cytosolic contents (enzymes, etc.) spill into the local blood stream and then the general circulation. Trauma-induced enzyme leakage is non-selective; all the elements that had been contained in the once-intact hepatocytes are released into the blood. Because the mechanism of release is non-specific, one can use the levels of other hepatic enzymes as a general indicator of the extent to which hepatic LDH could reasonably have leaked into the blood. We reasoned that the hepatic enzymes ASAT and ALAT would provide a reasonable indication of the extent of LDH release. The usual LDH blood level is ~ 200 U/L (3). In this case, ASAT and ALAT were elevated ~ eight- and ~ fivefold, respectively. Therefore, we conservatively estimated that LDH was maximally elevated approximately 10-fold. This would yield a serum concentration of ~ 2000 U/L, or 2 mU/μL. The 4-μL sample volume used in the enzyme assay would therefore maximally include 8 mU of LDH in the mix. In contrast, the assay mix receives 1850 mU of ADH (this is an assay-specific parameter and would be expected to vary between manufacturers). This > 200-fold excess of ADH to LDH suggests that even with equivalent concentrations of ethanol and lactate (~ 40 meq/L, which we did not have in this case), the contribution of lactate to the final result would be 1 part in 200. In a serum alcohol result of 200 mg/dL correcting for lactate contribution would yield a 199 mg/dL. Combination of the two fac-

tors leads to our expectation that the ethanol level in the assay was at least five times the lactate level, and the ADH level was at least two hundred times the LDH level. Therefore, we concluded that there would be no significant contribution to the ethanol reading in the assay due to the oxidation of lactate.

## Conclusions

A potentially legitimate challenge to the validity of an enzymatically based ethanol assay may be raised based on the presence of both lactate and LDH. Although that contention can be argued on a theoretical basis, evaluation of clinical values provides useful information regarding reasonable concentrations of both lactate and LDH that may be present in a specific case. Neither the presence of lactate nor LDH alone provides an adequate basis to suggest interference with typical ADH-based assays. Hence, clinical data indicating levels of lactate and LDH within reference ranges may be adequate to disprove the interference challenge. Actual calculation of the amount of ADH present in the reaction vessel in comparison to maximal estimates of the amount of LDH available (again based on clinical laboratory values) may provide an even stronger basis for the evaluation of interference potential from lactate and LDH.

## References

1. Roche Diagnostics, Ethanol Gen. 2 Assay Application Sheet. Package Insert Version: 2006–07, V1. Roche Diagnostics, Indianapolis, IN.
2. A.C. Guyton and J.E. Hall. *Guyton and Hall Textbook of Medical Physiology,* 10th ed. W.B. Saunders, Philadelphia, PA, 2000, p 779.
3. J.B. Henry. *Clinical Diagnosis and Management by Laboratory Methods*, 19th ed. W.B. Saunders, Philadelphia, PA, 1996, pp 280–282.
4. A.S. Fauci, E. Braunwald, K.J. Isselbacher, J.D. Wilson, J.B. Martin, D.L. Kasper, S.L. Hauser, and D.L. Longo. *Harrison's Principles of Internal Medicine*. McGraw-Hill, New York, NY, 1998, p 1664.
5. J.B. Henry. *Clinical Diagnosis and Management by Laboratory Methods*, 19th ed. W.B. Saunders, Philadelphia, PA, 1996, p 207.
6. T.M. Devlin. *Textbook of Biochemistry with Clinical Correlations*. Wiley-Liss, New York, NY, 2002, pp 629–632.
7. W.C. Thompson, D. Malhotra, D.P. Schammel, W. Blackwell, M.E. Ward, and A. Dasgupta. False-positive ethanol in clinical and postmortem sera by enzymatic assay: elimination of interference by measuring alcohol in protein-free ultrafiltrate. *Clin. Chem.* **40(8):** 1594–1595 (1994).
8. H. Sund and H. Theorell. Alcohol dehydrogenases. In *The Enzymes,* Vol. 7, P.D. Boyer, H.A. Larda and K. Myerback, Eds. Academic Press, New York, NY, 1963, pp 25–83.
9. S. Bakerman. *ABC's of Interpretive Laboratory Data*. Interpretive Laboratory Data, Greenville, NC, 1984, p 50.
10. J.S. Nine, M. Moraca, M.A. Virji, and K.N. Rao. Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays. *J. Anal. Toxicol.* **19:** 192–196 (1995).
11. J.L. Coe. Postmortem chemistry update. *Am. J. Forensic Med. Pathol.* **14(20):** 91–117 (1993).

Downloaded from https://academic.oup.com/jat/article/33/8/561/777014 by Louisiana State University Health Science Center Library- Shreveport user on 21 June 2024

**Lincoln/Sewell 782**

Journal of Analytical Toxicology, Vol. 19, May/June 1995

# Serum-Ethanol Determination: Comparison of Lactate and Lactate Dehydrogenase Interference in Three Enzymatic Assays

**Jeffrey S. Nine, Michael Moraca, Mohamed A. Virji,** and **Kalipatnapu N. Rao***

*Department of Pathology, Division of Clinical Chemistry, University of Pittsburgh Medical Center, 200 Lothrop Street, Pittsburgh, Pennsylvania*

## Abstract

Gas chromatography is considered to be the reference method for ethyl alcohol determination. However, enzymatic ethanol assays have been developed for use in the clinical laboratory by several commercial vendors. Essentially, these assays utilize the oxidation of ethyl alcohol to acetaldehyde with concurrent reduction of nicotinamide adenine dinucleotide (NAD) to NADH while monitoring the increase in absorbance at 340 nm. The increase in absorbance is theoretically proportional to the ethanol concentration in the sample. Previously, several authors reported that increased concentrations of lactate and lactate dehydrogenase (LDH) can cause false-positive results with certain enzymatic ethyl alcohol assays. In the present investigation, we further studied the interference of lactate and LDH in three enzymatic assays. Apparent ethyl alcohol concentrations in serum spiked with lactate and LDH, as well as patient and autopsy samples, were determined by the Syva, Abbott, and Roche enzymatic assays and by gas chromatography. The effect of coenzyme depletion on the rate of reaction and the interference of hemolysis were also investigated. Based on our results we suggest that coenzyme depletion plays a major role in the severity of the false-positive ethyl alcohol result, and the interference from hemolysis has a negligible effect on these results. We also confirm the previous studies in showing that elevated serum-lactate and LDH concentrations can result in varying degrees of false-positive ethyl alcohol concentrations in the three enzymatic assays. This should be taken into consideration in the management of patients in a tertiary care medical center.

## Introduction

Ethyl alcohol (ethanol) determination is one of the most common toxicology tests performed in clinical chemistry laboratories and is one with many potential medicolegal ramifications. Gas chromatography is the reference method for ethanol determination (1), but it is too costly and time-consuming to be utilized as a primary screening assay. How-

ever, rapid enzymatic ethanol assays for use in clinical laboratories have been developed. These assays utilize the oxidation of ethanol to acetaldehyde by alcohol dehydrogenase, with the concurrent reduction of nicotinamide adenine dinucleotide (NAD) to NADH (2,3) to generate ethanol results. We perform approximately 250 serum-ethanol determinations per month using the Syva EMIT (Syva Company, Palo Alto, CA) ethyl alcohol assay on a Cobas Mira S instrument.

We encountered two cases of apparent false-positive ethanol values from our pediatric population. The first case involved a 4-month old boy (28-week gestation) with extensive postnatal respiratory problems. He was found in cardiopulmonary arrest following an upper respiratory tract infection. Resuscitation included bicarbonate, lidocaine, atropine, and epinephrine administration. A serum sample was obtained in the emergency department. Enzymatic ethanol determination was 105 mg/dL. No ethanol was detected by headspace gas chromatography.

The second case involved a 2-month old, full-term girl, born to a mother with a history of alcohol, cocaine, and tobacco abuse. The infant was found in full cardiopulmonary arrest secondary to accidental asphyxiation while sleeping. Resuscitation included bicarbonate, atropine, and epinephrine administration. A serum sample was obtained in the emergency department. Enzymatic ethanol determination was 60 mg/dL. No ethanol was detected by headspace gas chromatography.

The ethanol results in these two cases led to a reevaluation of the Syva ethanol assay procedure. Investigation for the source of interference began with an examination of the reaction mechanism used in the Syva assay (4). Alcohol dehydrogenase (ADH) oxidizes ethyl alcohol to acetaldehyde using the coenzyme NAD, which is concurrently reduced to form NADH:

$$\text{ethyl alcohol} + \text{NAD} \overset{\text{ADH}}{\rightleftharpoons} \text{acetaldehyde} + \text{NADH}$$

The increase of absorbance at 340 nm due to NADH formation is proportional to the ethanol concentration in the sample. Therefore, other enzymatic reactions that use NAD as a coenzyme and generate NADH could interfere in the ethanol assay. Based on the findings from recent reports of false-

* Address correspondence to Dr. K.N. Rao, Clinical Chemistry-CLSI, Room 5835 Main Tower, University of Pittsburgh Medical Center, 200 Lothrop Street, Pittsburgh, PA 15213-2582.

Reproduction (photocopying) of editorial content of this journal is prohibited without publisher's permission.

**Lincoln/Sewell 783**

Journal of Analytical Toxicology, Vol. 19, May/June 1995

positive ethanol screens (5,6), we investigated the interference of lactate and lactate dehydrogenase (LDH) on the three enzymatic methods under consideration for ethanol determination in our laboratory. The three assays evaluated were the current assay (Syva), the Abbott REA ethanol assay (Abbott Laboratories, North Chicago, IL), and the Roche ethanol assay (Roche Diagnostic Systems, Nutley, NJ). Headspace gas chromatography was used as the reference method.

## Materials and Methods

*Headspace gas chromatography.* Ethanol analysis was performed on a Perkin-Elmer 8500 gas chromatograph equipped with an HS-6 headspace sampler and a flame-ionization detector; the procedure outlined by Sutheimer et al. (7) was used. A 6-ft. × 2-mm i.d. glass column packed with 5% Carbowax 20M on 60–80 mesh Carbopak B (Perkin-Elmer) was used. The oven temperature was 70°C, carrier gas (helium) flow was 25 mL/min, injector temperature was 150°C, and detector temperature was 250°C. The sample incubation time was 15 min at 60°C. A six-point standard curve (aqueous standards prepared in the laboratory) determined the relationship between peak height and ethanol concentration. The assay is linear to 320 mg/dL and has a limit of quantitation (LOQ) of 1 mg/dL. Bio-Rad trilevel serum-ethanol controls were used for assay validation. *n*-Propanol was used as the internal standard.

*Syva.* Syva EMIT ethyl alcohol assay reagents were used on the Cobas Mira S according to the instrument parameters provided by Syva. The assay, which employs a one-point calibration (Syva 100-mg/dL calibrator), is linear to 600 mg/dL and has an LOQ of 10 mg/dL (4). Bio-Rad trilevel serum-ethanol controls were used for assay validation. No sample pretreatment was required.

*Roche.* Roche reagents for ethanol were used on the Cobas Mira S according to the instrument parameters provided by Roche. This assay, which also employs a one-point calibration (Syva 100-mg/dL calibrator), is linear to 400 mg/dL and has an LOQ of 1 mg/dL (8). Bio-Rad trilevel serum-ethanol controls were used for assay validation. No sample pretreatment was required.

*Abbott.* TDx REA ethanol reagents were used on the Abbott TDx analyzer according to the instrument parameters provided by Abbott. The assay utilizes the linked enzyme-catalytic reactions of the oxidation of ethanol to acetaldehyde by alcohol dehydrogenase with concurrent reduction of the coenzyme NAD to NADH, followed by an additional reaction in which the NADH produced is oxidized to NAD in the presence of monotetrazolium dye by diaphorase to form MT-formazan (a fluorescence attenuator). The fluorescence intensity is measured before and after the generation of the MT-formazan using the radiative energy attenuation (REA) technique (9–11). A six-point standard curve (Abbott ethanol calibrators) determines the relationship between fluorescence intensity and ethanol concentration. Abbott trilevel ethanol controls were used for assay validation. The assay is linear to 300 mg/dL and has an LOQ of 10 mg/dL. No sample pretreatment was required.

Serum samples were obtained from 17 autopsy subjects and from two hospital inpatients, and the levels of lactate and LDH were determined.

Serum was also obtained from a healthy volunteer. Lactate and LDH determinations of this sample were performed, and resultant lactate and LDH concentrations were 1.5mM and 113 international units (IU)/L, respectively. There was no ethanol detectable by headspace gas chromatography. Increasing concentrations of lactate (stock solution of 3.3mM, Sigma Catalog number L 1875) and LDH from beef heart (stock solution of 1000 IU/mL, Sigma Catalog number 826-6) were added to the blank serum to obtain known standard concentrations of lactate and LDH. These values were verified on the Kodak Ektachem chemistry analyzer (Eastman Kodak Company, Rochester, NY).

The apparent ethanol content of each patient and spiked sample in this study was determined by the Syva, Abbott, and Roche enzymatic methods and by headspace gas chromatography.

A false-positive ethanol concentration was defined as an ethanol result greater than 10 mg/dL by the Syva and Abbott assays and greater than 1 mg/dL by the Roche assay, for samples in which the ethanol was undetectable by headspace gas chromatography.

*Other analytes.* The concentration of lactate and the activity of L-lactate–NAD$^+$ oxidoreductase (EC 1.1.1.27, LDH) were determined by the slide methodology on the Kodak Ektachem 700 chemistry analyzer. Hemoglobin concentrations were determined on hemolysate obtained after pretreatment of red blood cells with 0.1M phosphate buffer solution, pH 7.2, and sonication. Oxyhemoglobin was measured at 415 nm and at 380 nm, and background correction was obtained at 450 nm.

## Results

The age, diagnosis, serum-lactate concentration, enzyme activity, and ethanol results by four different assays of 17 autopsy subjects and two hospital inpatients are given in Table I. On comparison of the enzymatic ethanol assay results with those of the gas chromatographic reference method, 15 of the autopsy samples and both inpatient samples showed false-positive serum-ethanol results by the Syva assay. There were three false-positive ethanol results by the Abbott assay and none by the Roche assay. The false-positive ethanol concentrations show a correlation with the elevated lactate and LDH levels.

Sigma stock solutions of LDH and lactate, when analyzed separately for ethanol content, were negative. These stock solutions were then added to the ethanol-free serum to give the samples varying levels of combined lactate and LDH. These levels were then verified by assay on the Kodak Ektachem 700. The spiked samples were then assayed by the three enzymatic methods for apparent ethanol concentration. The results are presented in Table II. All three methods gave false-positive ethanol values to varying levels of combined lactate and LDH. The threshold levels for generating false-positive ethanol results appear to be 682 IU/L LDH and 14mM lactate for the Syva assay,

**Lincoln/Sewell 784**

Journal of Analytical Toxicology, Vol. 19, May/June 1995

26,339 IU/L LDH and 26mM lactate for the Abbott assay, and 43,990 IU/L LDH and 6mM lactate for the Roche assay.

A progressive increase in LDH and lactate concentrations seems to cause a disappearance of false-positive ethanol results by the Syva assay (Figure 1). Supplementation of NAD by the addition of 20 µmol NAD to each of the sample test mixtures resulted in the reappearance of false-positive ethanol levels. This confirms that depletion of NAD in the test mixtures of samples containing very high levels of LDH and lactate was responsible for this phenomenon (Figure 2). Because the false-positive ethanol concentrations by the Abbott and Roche assays are quite low, NAD depletion does not appear to be a factor in these assays.

The results presented in Table III suggest that hemolysis represented by hemolysate hemoglobin concentrations from 2167 to 8667 mg/dL does not seem to result in false-positive ethanol concentrations.

## Discussion

Ethanol is the most commonly abused drug throughout the world, and analysis of blood-alcohol concentrations forms a significant amount of work for hospital and forensic laboratories. Gas chromatography is the reference method for ethanol determination, as ethanol levels obtained by this method are ac-

curate and precise (1). However, the method is costly and time-consuming and may not be available in clinical laboratories. The development of enzymatic assays based on the catalysis of ethanol to acetaldehyde and on the correlation of the rate of conversion of coenzyme NAD to NADH with ethanol concentration, as well as the assays' availability in kit form for use on automated instruments, has simplified the task of ethanol determination. These assays, as exemplified by the Syva (4), Abbott (9,10), and Roche (8) enzymatic assays are rapid, sensitive, and cost-effective. However, high serum-lactate and LDH concentrations appear to interfere in some of these assays, resulting in false-positive ethanol values.

In agreement with what was previously reported in the literature (5,6), our results show a correlation between increasing lactate and LDH concentrations and false-positive ethanol results. This finding is most noticeable with the Syva assay and is less prevalent in the Abbott and Roche assays. In addition, there is a minimum threshold of combined lactate and LDH concentration that must be present to produce the false-positive ethanol results. With the Syva assay, this threshold is approximately a lactate concentration of 14mM with a concomitant LDH activity of 682 IU/L. The threshold is much higher with the Abbott and Roche assays. Therefore, the correct combination of lactate and LDH present in a serum sample could result in false-positive ethanol concentrations for all three assays. These thresholds for interference begin with lactate and LDH concentrations that are commonly encoun-

### Table I. Age, Clinical Information, Serum-Lactate Concentration, and Enzyme Activity

| Samples | Age (yr) | Clinical information | Ethanol by method | | | | LDH[†] (IU/L) | Lactate (mM) |
| | | | GC* (mg/dL) | Abbott (mg/dL) | Roche (mg/dL) | Syva (mg/dL) | | |
|---|---|---|---|---|---|---|---|---|
| *Autopsy subjects* | | | | | | | | |
| A-1 | 15 | Acute lymphoblastic leukemia | <1 | <10 | <1 | <10 | 112 | 27.9 |
| A-2 | 16 | Nodular sclerosing Hodgkin's disease | <1 | <10 | <1 | <10 | 266 | 20.3 |
| A-3 | 16 | Duchenne muscular dystrophy | <1 | <10 | <1 | 40 | 3066 | 29.8 |
| A-4 | 11 | Liver transplant (biliary atresia) | <1 | <10 | <1 | 47 | 1971 | 29.9 |
| A-5 | 4 | Hirschsprung's disease | <1 | <10 | <1 | 63 | 4050 | 30.0 |
| A-6 | 20 | Chronic myelogenous leukemia | <1 | 22 | <1 | 66 | 79,800 | 27.2 |
| A-7 | 55 | Cardiomyopathy and diabetes | <1 | <10 | <1 | 71 | 2413 | 22.9 |
| A-8 | 38 | AIDS and chronic hepatitis | <1 | <10 | <1 | 78 | 2574 | 22.8 |
| A-9 | 67 | Pulmonary disease | <1 | <10 | <1 | 84 | 4302 | 15.0 |
| A-10 | 65 | Cerebral vascular accident | <1 | <10 | <1 | 100 | 17,930 | 14.7 |
| A-11 | 34 | Post-liver transplant lymphoproliferative disease | <1 | 10 | <1 | 107 | 55,429 | 44.4 |
| A-12 | 8 | Acute nonlymphocytic leukemia | 6 | 10 | 3 | 107 | 66,434 | 44.3 |
| A-13 | 39 | Liver transplant secondary to cirrhosis | 3 | 12 | 5 | 116 | 89,670 | 20.0 |
| A-14 | 8 | Chronic active hepatitis | <1 | <10 | <1 | 123 | 13,067 | 42.8 |
| A-15 | 5 | Hollow visceral myopathy syndrome | <1 | <10 | <1 | 126 | 14,797 | 36.2 |
| A-16 | 10 | Liver transplant (biliary atresia) | <1 | 15 | <1 | 130 | 49,005 | 61.4 |
| A-17 | 1 | Glycogen storage disease Type II (Pompe's disease) | <1 | <10 | <1 | 138 | 20,231 | 35.3 |
| *Hospital inpatients* | | | | | | | | |
| IN-1 | 75 | Chronic liver failure, severe metabolic acidosis, renal failure | <1 | QNS[‡] | <1 | 17 | 2379 | 15.4 |
| IN-2 | 55 | End-stage liver disease | <1 | <10 | <1 | 51 | 8015 | 12.3 |
| | | | | | | *Normals* | <170 | 0.7–1.8 |

\* GC = Gas chromatography.
[†] LDH = Lactate dehydrogenase.
[‡] QNS = Quantity not sufficient for analysis.

194

Journal of Analytical Toxicology, Vol. 19, May/June 1995

tered in postmortem blood samples and that may well be seen in samples of living patients with elevated lactate and LDH concentrations due to a variety of clinical conditions (Table I).

The apparent disappearance of interference in ethanol determination in the Syva assay at extremely high levels of LDH and lactate appears to be due to coenzyme (NAD) depletion. The Cobas Mira S instrument takes timed readings of the absorbance at 340 nm. The rate of production of NADH determines the slope of the reaction rate. The instrument measures an initial absorbance reading at time zero, then it measures the addition of Reagent 1 (Tris buffer and stabilizers) at 5 s, fol-

lowed by Reagent 2 (NAD and ADH) at approximately 25 s into the run, resulting in the initiation of the reaction. At this point, absorbance readings are taken at 25-s intervals for a total of 13 cycles. The slope of the reaction rate is determined between Cycles 7 and 13, which are 3 and 6 min after initiation of the reaction. The normal reaction kinetics behave linearly throughout the entire analysis, but in samples with high levels of lactate and LDH, the reaction proceeds rapidly to near completion before the seventh cycle begins. Thus, subsequent read-



**Figure 1.** Apparent ethanol concentrations in serum spiked with several concentrations of lactate dehydrogenase (LDH) and lactate by Syva ethanol assay.



**Figure 2.** Effect of NAD supplementation on the Syva ethanol assay of serum spiked with lactate dehydrogenase (LDH) and lactate.

### Table II. Apparent Ethanol Concentrations in Ethanol-Free Serum Spiked with Several Levels of Lactate Dehydrogenase (LDH) and Lactate

| No. | LDH (IU/L) | Lactate (mM) | Syva | Roche | Abbott |
|---|---|---|---|---|---|
| 1 | 98 | 4 | <10 | <1 | <10 |
| 2 | 96 | 6 | <10 | <1 | <10 |
| 3 | 98 | 14 | <10 | <1 | <10 |
| 4 | 71 | 26 | <10 | <1 | <10 |
| 5 | 69 | 39 | <10 | <1 | <10 |
| 6 | 682 | 4 | <10 | <1 | <10 |
| 7 | 680 | 6 | <10 | <1 | <10 |
| 8 | 682 | 14 | 13 | <1 | <10 |
| 9 | 655 | 26 | 20 | <1 | <10 |
| 10 | 653 | 39 | 27 | <1 | <10 |
| 11 | 2846 | 4 | 19 | <1 | <10 |
| 12 | 2845 | 6 | 28 | <1 | <10 |
| 13 | 2846 | 14 | 45 | <1 | <10 |
| 14 | 2819 | 26 | 65 | <1 | <10 |
| 15 | 2818 | 39 | 86 | <1 | <10 |
| 16 | 3776 | 4 | 24 | <1 | <10 |
| 17 | 3775 | 6 | 34 | <1 | <10 |
| 18 | 3776 | 14 | 54 | <1 | <10 |
| 19 | 3749 | 26 | 75 | <1 | <10 |
| 20 | 3748 | 39 | 95 | <1 | <10 |
| 21 | 10,331 | 4 | 36 | <1 | <10 |
| 22 | 10,330 | 6 | 48 | <1 | <10 |
| 23 | 10,331 | 14 | 70 | <1 | <10 |
| 24 | 10,304 | 26 | 87 | <1 | <10 |
| 25 | 10,303 | 39 | 112 | <1 | <10 |
| 26 | 26,366 | 4 | 20 | <1 | <10 |
| 27 | 26,365 | 6 | 19 | <1 | <10 |
| 28 | 26,366 | 14 | 24 | 1 | <10 |
| 29 | 26,339 | 26 | 33 | 3 | 13 |
| 30 | 26,338 | 39 | 46 | 5 | 15 |
| 31 | 39,341 | 4 | <10 | <1 | <10 |
| 32 | 39,340 | 6 | 13 | <1 | <10 |
| 33 | 39,341 | 14 | 15 | 3 | <10 |
| 34 | 39,314 | 26 | 17 | 6 | 18 |
| 35 | 39,313 | 39 | 14 | 11 | 23 |
| 36 | 43,991 | 4 | <10 | 1 | <10 |
| 37 | 43,990 | 6 | <10 | 2 | 12 |
| 38 | 43,991 | 14 | <10 | 6 | 15 |
| 39 | 43,964 | 26 | <10 | 10 | 26 |
| 40 | 43,963 | 39 | <10 | 17 | 36 |

* Values are in milligrams per deciliter.

### Table III. Effect of Hemolysis on Serum-Ethanol Levels by Three Different Methods

| Sample | Serum Hb* (mg/dL) | LDH† (IU/L) | Lactate (mM) | Syva | Roche | Abbott |
|---|---|---|---|---|---|---|
| 1 | 2167 | 1372 | 1 | <10 | <1 | <10 |
| 2 | 4334 | 2844 | 2 | <10 | <1 | <10 |
| 3 | 6492 | 4111 | 4 | 11 | <1 | <10 |
| 4 | 8667 | 5488 | 5 | 11 | <1 | <10 |

* HB = Hemoglobin.
† LDH = Lactate dehydrogenase.

195

**Lincoln/Sewell 786**

Journal of Analytical Toxicology, Vol. 19, May/June 1995



**Figure 3.** Effect of lactate dehydrogenase (LDH) and lactate on reaction kinetics in Syva ethanol assay.

ings result in a near-zero slope (Figure 3). The instrument interprets this as no reaction and will report a low result or a negative result. The depletion of NAD as the rate-limiting factor in the reaction mixture is confirmed when NAD supplement is added to Reagent 2 and the apparent ethanol concentration of ethanol once again becomes measurable (Figures 1 and 2).

In a medical center with trauma and tertiary clinical care, elevated levels of lactate and LDH occur at a frequency such that these will result in false-positive ethanol results by enzymatic assays. The false-positive ethanol result may have an impact on clinical management in such instances. It is important to ensure that a rapid enzymatic ethanol assay method in use in such a setting is not affected by other constituents in the sample that may participate in the enzymatic reaction.

## Acknowledgment

This work was supported in part by the Pathology Education and Research Foundation, University of Pittsburgh School of Medicine, Pittsburgh, PA 15261. The authors gratefully acknowledge the excellent typing skills and patience of Ms. Patricia Arndt.

## References

1. R.V. Blank and W.J. Decker. Analysis of toxic substances. In *Fundamentals of Clinical Chemistry.* N.W. Tietz, Ed., W.B. Saunders, Philadelphia, PA, 1987, pp 889–90.
2. C.A. Sutheimer, E. Lavins, and T. King. Evaluation of the Syva ETS-plus ethyl alcohol assay with application to the analysis of antemortem whole blood, routine postmortem specimens, and synovial fluid. *J. Anal. Toxicol.* **16:** 119–24 (1992).
3. S.A. Jortani and A. Poklis. Emit® ETS® plus ethyl alcohol assay for the determination of ethanol in human serum and urine. *J. Anal. Toxicol.* **16:** 368–71 (1992).
4. EMIT™ ethyl alcohol assay, package insert, Syva Company, Palo Alto, CA, 1991.
5. N.R. Babcock and D.A. O'Reilly. False positive EMIT-st ethanol screen with postmortem infant plasma. *Clin. Chem.* **38:** 434 (1992).
6. K.T. Reynolds and G.F. Johnson. False positive ethanol results by EMIT. *Clin. Chem.* **39:** 1143 (Abstract 0111) (1993).
7. C.A. Sutheimer, R. Bost, and I. Sunshine. Volatiles by headspace chromatography. In *Methodology for Analytical Toxicology,* Vol. 2. CRC Press, Elkins Park, PA, 1982, pp 1–9.
8. Roche ethanol reagent, package insert, Roche Diagnostic Systems, Nutley, NJ, 1992.
9. TDx FLx Ethanol TDx assay manual, Abbott Diagnostics, Chicago, IL, 1988.
10. S.A. Jortani and A. Poklis. Evaluation of the ADx™ REA® assay for determination of ethanol in serum and urine. *J. Anal. Toxicol.* **17:** 307–309 (1993).
11. P.L. Cary, P.D. Whitter, and C.A. Johnson. Abbott radiative energy attenuation method for quantifying ethanol evaluated and compared with gas–liquid chromatography and the DuPont aca. *Clin. Chem.* **30:** 1867–70 (1984).

Manuscript received July 12, 1994;
revision received September 2, 1994.

196

**From:** Mcgee, Paula
**Sent:** Mon, 8 Jul 2024 15:11:52 +0000
**To:** Mack, Lindsay
**Subject:** FW: Sewell - Rebuttal of Dr. Thomas Arnold
**Attachments:** Sewell - Dr. Thomas Arnold Second Rebuttal & Reference Articles - 06-24-24.pdf

Hi Lindsay

The attached was sent to Lincoln's counsel.   I'm forwarding this to you for your review.



**Paula McGee**
AVP, Senior Counsel
GP Legal and Regulatory Compliance

**The Lincoln National Life Insurance Company**
LincolnFinancial.com

813-393-5586 Office
813-416-2061 Mobile

she/her/hers



Notice of Confidentiality: **This E-mail and any of its attachments may contain Lincoln National Corporation proprietary information, which is privileged, confidential, or subject to copyright belonging to the Lincoln National Corporation family of companies. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited and may be unlawful. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout. Thank You.**

---

**From:** iwana@rademaekerslaw.com <iwana@rademaekerslaw.com>
**Sent:** Friday, July 5, 2024 5:38 PM
**To:** Mcgee, Paula <Paula.Mcgee@lfg.com>
**Subject:** FW: Sewell - Rebuttal of Dr. Thomas Arnold

***This email is from an external source. Only open links and attachments from a Trusted Sender.***

I just received the attached response by Dr. Arnold.  Did he also send it directly to Lincoln?
**Iwana Rademaekers**

Law Offices of Iwana Rademaekers, P.C.
17304 Preston Road, Suite 800
Dallas, Texas 75252
Main:  (214) 579-9319
Fax:  (469) 444-6456
Direct:  (214) 564-9542
iwana@rademaekerslaw.com

*CONFIDENTIALITY NOTICE:  THE MESSAGE AND INFORMATION CONTAINED IN OR ATTACHED TO THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND INTENDED ONLY FOR THE PERSON NAMED ABOVE.  IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS TRANSMISSION, YOU ARE HEREBY NOTIFIED*

**Lincoln/Sewell 788**

*THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION TO ANYONE OTHER THAN THE INTENDED RECIPIENT IS STRICTLY PROHIBITED.  IF YOU RECEIVED THIS COMMUNICATION IN ERROR, DO NOT READ IT. PLEASE IMMEDIATELY REPLY TO THE SENDER THAT YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, AND THEN DELETE THIS COMMUNICATION FROM YOUR COMPUTER. THANK YOU.*

**From:** McNamara Law Office Support <support@jpricemcnamara.com>
**Sent:** Friday, July 5, 2024 2:15 PM
**To:** Iwana Rademaekers <iwana@rademaekerslaw.com>; Sandy Acker <sandy@rademaekerslaw.com>
**Subject:** Sewell - Rebuttal of Dr. Thomas Arnold

Iwana -
Attached is Dr. Thomas Arnold's response to the medical report of Dr. Robert Swotinsky.  Please confirm receipt.
Kind regards,
Price

### *Law Offices of J. Price McNamara*

Holding Insurance Companies to Their Promises
**Offices in Louisiana and Texas**
10455 Jefferson Highway | Suite 130 | Baton Rouge, LA 70809
Phone:  225-201-8311   Fax:  225-612-6973   Alt. Fax: 225-201-8313
support@jpricemcnamara.com | www.jpricemcnamara.com

**Lincoln/Sewell 789**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

May 24, 2024



**Recieved from TX Email**
Approved By CIOX at
10:47 am, May 30, 2024

Corpus Christi Medical Center
7101 S. PADRE ISLAND DR
CORPUS CHRISTI, TX 78412

RE:    Waiver of Premium Benefits-Group Life Insurance
       Policyholder: McLarens, LLC
       Policy #: SA3-890-LF0483-01
       Claim #: 12885926

To Whom It May Concern:

\*\*\*URGENT / Please expedite\*\*\*

The Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for employee accidental death and dismemberment benefits under McLarens, LLC's Group Life Insurance Policy (the Policy). We are writing in reference to Timothy Sewell's claim for benefits under the Policy.

Patient's Name: Timothy Sewell
DOB:

To assist in our evaluation to determine if dismemberment benefits are payable, we are requesting the following documentation:

-   **Copies of 8/28/21 lab reports, specifically including any alcohol testing, from Corpus Christi Medical Center (Bay Area and/or Heart Hospital)**

Please send the records to my attention via secure fax to (603) 334-0401 or email to LifeClaimDocs@LFG.com. We would appreciate your response as soon as possible.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lindsay Mack
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-0401

1  of 1

**Lincoln/Sewell 790**

## IMPORTANT INFORMATION REGARDING YOUR REQUEST FOR MEDICAL RECORDS

05/31/2024

From

Corpus Christi Medical
7101 South Padre Island Dr
Corpus Christi TX 78412

To

LINCOLN FINANCIAL GROUP
PO BOX 2578
OMAHA NE 68103-2578

Re: Timothy Sewell

We are unable to comply with your request at this time for the following reason(s):

**Authorization Missing**
We are in receipt of your request for records and noticed an authorization signed by the patient was not provided. An authorization signed and dated by the patient per 45 CFR 164.508, or, in the case of a minor, by his or her parent(s) or legal personal representative under HIPAA (see 45 CFR 164.502(g)), is required. We ask that the attached facility authorization be completed and returned to us, so we may process your request.

Sincerely,
Corpus Christi Medical

**Lincoln/Sewell 791**

**Authorization for Use or Disclosure of Protected Health Information**

**COMPLETE ALL SECTIONS, DATE, AND SIGN**

I.  I, _____, authorize the disclosure of information from my medical record.
    *(Name of Patient)*
    Birthdate: _____ SSN (Last 4 digits): XXX-XX-_____

II.

| The information is to be disclosed by: | And is to be provided/sent to: |
|---|---|
| NAME OF FACILITY | NAME OF PERSON/ORGANIZATION/FACILITY |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP | CITY, STATE, ZIP |

III. **Purpose or need for this disclosure is:**
☐ Continued Treatment  ☐ Attorney  ☐ School  ☐ Research
☐ Personal Use  ☐ Insurance  ☐ Disability  ☐ Other_____

IV. **Information to be disclosed from my medical record:** *(Check appropriate box(es))*
☐ Only information related to (specify) _____
_____
☐ Only for dates of service from _____ to _____
☐ Other (specify) (ex: radiology, billing, etc.) _____
☐ Entire Record

V. **If you would like any of the following sensitive information disclosed, check the applicable box(es) below:**
☐ Alcohol/Drug Abuse Treatment/Referral  ☐ Mental Health *(Other than Psychotherapy Notes)*
☐ Sexually Transmitted Diseases  ☐ Genetic Testing
☐ HIV/AIDS Testing & Treatment  ☐ Sexual & Reproductive Health

VI. I understand that by signing this authorization, my Treatment, Payment and enrollment in a health plan or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

VII. I understand that the information disclosed may be subject to redisclosure by the person or entity receiving it and would then no longer be protected by federal privacy regulations.

VIII. I may revoke this authorization by notifying _____ in writing of my desire to revoke it. However, I understand that any actions already taken based on this authorization cannot be reversed and my revocation will not affect those actions.

IX. This authorization expires on _____, 20_____, OR upon the following event:
_____.
If no date or event is specified, the authorization will automatically expire one (1) year from the signature date.

_____   _____
SIGNATURE OF PATIENT   DATE

_____   _____
SIGNATURE OF PERSONAL REPRESENTATIVE & RELATIONSHIP TO PATIENT   DATE

_____   _____
SIGNATURE OF WITNESS (If signature of patient is a thumbprint or mark)   DATE

**Lincoln/Sewell 792**

Ciox Health - PAYMENTS ONLY
P.O. Box 409875
Atlanta, GA 30384-9875
Fed Tax ID 58 - 2659941
1-800-367-1500

| Date |
| --- |
| 05/31/2024 |
| Request ID # |
| 0462650641 |

Ship To:

LINCOLN FINANCIAL GROUP
LINCOLN FINANCIAL GROUP
PO BOX 2578
OMAHA,NE 68103-2578

Requested By:  LINCOLN FINANCIAL GROUP
Patient Name:  SEWELL TIMOTHY

DOB :

Records From:

CORPUS CHRISTI MEDICAL
7101 SOUTH PADRE ISLAND DR
CORPUS CHRISTI,TX 78412

**Lincoln/Sewell 793**



0003640 -O5764 -C02 -P03640
******AUTO**MIXED AADC 212
3640 2 MB 0.571
LINCOLN FINANCIAL GROUP
PO BOX 2578
OMAHA, NE  68103-2578

4pgs

## ATTENTION

**Ciox is Going Green**

**This request has been printed in the duplex format .. an environmentally friendly way to print.**

Confidential Information enclosed
To be viewed by authorized persons only

If you have questions regarding any information you have requested
please call the phone number on the enclosed invoice

To Whom It Concerns:

CIOX has provided to you protected health information that may contain information that falls under the 42 C.F.R. Part 2. The federal rules prohibit you from making any further disclosure of information in this record that identifies a patient as having or having had a substance use disorder either directly, by reference to publically available information, or through verification of such identification by another person unless further disclosure is expressly permitted by written consent of the individual whose information is being disclosed or as otherwise permitted by 42 CFR part 2. A general authorization for the release of medical or other information is NOT sufficient for this purpose (see 42 CFR §2.31).  The federal rules restrict any use of the information to investigate or prosecute with regard to a crime any patient with a substance use disorder, except as provided at 42 CFR §§ 2.112(c)(5) and 2.65.

If the enclosed record pertains to HIV/AIDs, it has been disclosed to you from records whose confidentiality is protected by federal and perhaps, state law, which prohibits you from making any further disclosure of such information without the specific consent of the person to whom such information pertains or as otherwise permitted by state law.  A general authorization for this release of health or other information is not sufficient for this purpose.

If the information requested is from a facility located within the Washington State area then this information will fall under the RCW 70.02.300 which states that this information has been disclosed to you from records who confidentiality may be protected by state law.  State law prohibits you from making any further disclosure of it without the specific written authorization of the person to whom it pertains, or as otherwise permitted by state law. A general authorization for the release of this protected information is not sufficient for this purpose.



352637206

**Lincoln/Sewell 794**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

| | |
|---|---|
| Date: June 5, 2024 | |
| To: | J. PRICE MCNAMARA<br>LAW OFFICES OF J. PRICE MCNAMARA<br>10455 JEFFERSON HIGHWAY<br>STE 130<br>BATON ROUGE LA 70809 |
| Attn: | |
| Fax: | (225) 201-8313 |
| From: | Lindsay Mack<br>Claim Resolution Specialist<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-0401 |
| Total Pages<br>(Including Cover):   2 | |
| RE:<br><br>Claim #:    12885926<br>Claimant:   Timothy Sewell<br><br>McLarens, LLC | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Sewell 795**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

June 5, 2024

J. Price McNamara
Law Offices of J. Price McNamara
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE, LA 70809

RE:　　Deceased: Timothy Sewell
　　　　Policyholder: McLarens, LLC
　　　　Policy #: SA3-890-LF0483-01
　　　　Claim #: 12885926

Dear J. Price:

The Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for accidental death and dismemberment benefits under McLarens, LLC's Group Life Insurance Policy (the Policy). We are writing regarding Timothy Sewell's claim for accidental dismemberment benefits under the Policy.

We are in receipt of your June 4, 2024 email in which you confirmed your intent to respond to the medical report by Dr. Robert Swotinsky and requested an extension through and including July 6, 2024. Please be advised that we agree to grant the requested extension. Accordingly, Lincoln will issue its decision within 30 days after we receive your response.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lindsay Mack
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-0401

1　of 1

**Lincoln/Sewell 796**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

| | |
|---|---|
| Date:  June 4, 2024 | |
| To:    J. PRICE MCNAMARA<br>LAW OFFICES OF J. PRICE MCNAMARA<br>10455 JEFFERSON HIGHWAY<br>STE 130<br>BATON ROUGE LA 70809 | |
| Attn: | |
| Fax:   (225) 201-8313 | |
| From:  Lindsay Mack<br>Claim Resolution Specialist<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-0401 | |
| Total Pages<br>(Including Cover):    8 | |
| RE:<br><br>Claim #:    12885926<br>Claimant:   Timothy Sewell<br><br>McLarens, LLC | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Sewell 797**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

June 4, 2024

J. Price McNamara
Law Offices of J. Price McNamara
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE, LA 70809

RE:    Deceased: Timothy Sewell
       Policyholder: McLarens, LLC
       Policy #: SA3-890-LF0483-01
       Claim #: 12885926

Dear J. Price:

We are writing in follow up to our letter dated June 3, 2024, with which we attached a copy of a
Clinical Review Memo by Dr. Robert Swotinsky for your review and response.

At the top of page 4 of the original report, there was an incomplete sentence. An updated/corrected
report is attached.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lindsay Mack
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-0401

Attachments:   12885926-MEDICAL-CP/PEER REVIEW-06.03.2024

1   of 1

**Lincoln/Sewell 798**

Clinical Review Memo

| Customer Name | Claimant Name | | Claim Number |
|---|---|---|---|
| McLarens, LLC | Timothy Sewell | | 12885926 |
| Report Date: | 06/03/2024 | | |
| Referred By: | Lindsay Mack | Claimant DOB: | |
| Referral Date: | 05/28/2024 | Job Title: | |
| Due Date: | 06/15/2024 | Med/Surg Condition: | |
| Referral Type: | AD&D Review | Disability Occ Type: | |
| Reason for Priority Handling: | | Product Type: | LIFE |
| Other Considerations | | LDW: | 08/25/2021 |
| | | DOD: | |
| Physical Demands: | | BBD: | |
| Non-Medical Issue: | No | Non-Med Issue Details: | |

**Questions and Answers**

*Q1.     From a medical perspective, is it appropriate for medical providers to defer to the recollections of the claimant and others that the claimant only consumed six beers over seven hours and disregard a serum alcohol level of 222 mg/dL that was recorded in a blood draw at 17:46, less than two hours after the incident?*

A1.     As the claimant's reviewer Thomas Arnold, MD, noted that serum alcohol level corresponded to a blood alcohol concentration (BAC) of approximately 0.185 at 17:46. The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.

The claimant weighed 82 kg. An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking.[i] If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking,[1] his BAC would have been essentially undetectable. The calculation is:

$$0.12 - \left( \frac{9\ hrs\ x\ 60\frac{min}{hr}}{40} \times 0.01 \right) = -0.015$$

Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking. His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.

It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink. The evidence indicates the recollections underreported actual alcohol consumption. This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters.[ii,iii,iv] In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.

---

[1] The nine hours accounts for about two hours between the injury and alcohol test.

*Q2.      Review the medical records and state if it is correct that the 222 mg/dL serum alcohol level result was impacted by lactic acid in Sewell's system.  If the answer is yes, what would be the estimated impact on the serum alcohol level due to the claimant's injuries and treatment as of the 17:46 blood draw on August 28, 2023, and how is this estimated impact determined?*
*Q3.      Has the impact of lactic acid on serum alcohol level testing been clearly established through research?  For reference, see, "Can elevated lactate and LDH produce a false positive enzymatic ethanol result in live patients presenting to the emergency department?" Nacca N., et al.  Clin Toxicol (Phila).  2018 Mar;56 (3):189-192*

A2/3.  Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test.   Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase.[v] Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur.[vi]  In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured.

*In Dr. Arnold's opinion, lactic acid made the alcohol test result inaccurate.*

In May 2023, claimant's reviewer Dr. Arnold opined that due to cardiac arrest and cardiopulmonary resuscitation, the claimant "would have accumulated a large amount of lactic acid in his blood" which interfered with the alcohol test and made the result falsely high.  Dr. Arnold assumes the result was falsely high because it indicates more alcohol consumption than the claimant reported and because no-one who was with the claimant at the time of his injury reported that the claimant seemed intoxicated.

On 09/07/23, the insurer's reviewer Peggy Geimer, M D, addressed lactic acid and the alcohol test result as follows:

> "Dr. Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay.  The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed.  Lactic acidosis is not mentioned any where in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis."

On 11/17/23, Dr. Arnold responded to this as follows

> "Lactic acid is produced any time there is underperfusion of body tissues.  The EMS providers on the scene reported that [the claimant] was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation.  There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood..It is not uncommon for large lactic acid levels to be present without significant acidosis of the blood... [The claimant] received

**Lincoln/Sewell 800**

Claimant: Timothy Sewell                          June 03, 2024
Claim # 12885926                         Report by R Swotinsky M D; page 3

> IV fluids and the hospital record repeatedly shows [the claimant] being on vaso-
> active pressor agents to support low blood pressure and increase tissue
> perfusion.  All of these interventions treat lactic acidosis so the claim that [the
> claimant] did not receive treatment for lactic acidosis cannot be supported."

Dr. Arnold also notes that a laboratory test report footnote states the results are "not for
legal or employment evaluative purposes."  Dr. Arnold says this footnote is additional
evidence that the test results are unreliable.

Dr. Arnold's reports include no supporting citation(s) from the medical/scientific literature.
Dr. Arnold's reports do not quantify the effect he believes lactic acid had on the test result.

*The medical/scientific literature lacks support for Dr. Arnold's theory.*

Dr. Arnold's makes assumptions.  He assumes that the claimant:

1.     Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused high
       lactic acid level to be present.
2.     Had an inaccurate test result due to the lactic acid in his blood.

The first assumption is contradicted by the medical records.  The second assumption is
unsupported by medical/scientific literature.  I explain why:

1.     *Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused a high
       level of lactic acid in his blood.*

The Port Arkansas EMS record states that CPR compressions were started at 16:51,
an EKG was performed at 16:55 showing a sinus rhythm and heart rate of 60, and
thus CPR compressions were discontinued.  The record thus indicates that the
claimant underwent <u>CPR compressions for up to four minutes</u>.  The Port Arkansas
EMS record does not indicate that the claimant was in cardiac arrest, and instead
indicates that he had faint pulses when first checked at 16:51 and his heart was in
normal sinus rhythm and his blood pressure was 135/62 at 16:55 when first checked
by EKG, i.e., <u>he was not in cardiac arrest</u>.

Most cases of elevated lactic acid are due to marked tissue hypoperfusion resulting
from low fluid volume (e.g., "bleeding out"), heart failure, sepsis, or heart attack.
Before the claimant's blood was collected for ethanol, the claimant did not have
health condition associated with elevated lactic acid.  While Dr. Arnold implies that
performing CPR causes elevated lactic acid levels, my search of the medical literature
did not find evidence of this.  (There is an association of lactic acid elevations in
patients who have had CPR.  That association is because many patients who need
CPR have suffered a condition that causes elevated lactic acid levels.  The claimant,
however, did not.)

**Lincoln/Sewell 801**

Claimant: Timothy Sewell                                              June 03, 2024
Claim # 12885926                                        Report by R Swotinsky M D; page 4

Dr. Arnold does not mention lactate dehydrogenase. As noted above, the literature about elevated enzymatic ethanol test results involves elevations of both lactic acid and lactate dehydrogenase at the same time.

2.    Had an inaccurate ethanol test result due to a high level of lactic acid in his blood.

The phenomenon of elevated lactic acid and lactate dehydrogenase causing elevated enzymatic ethanol test results has been described in autopsy blood samples.[vii,viii] It has been raised as a possibility when trauma patients with elevated levels of lactate and/or lactate dehydrogenase levels were admitted to the hospital for treatment. However, studies have found little evidence to support this possibility in live patients.[ix] For example:

- A study of 37 patients hospitalized with elevated lactate and lactate dehydrogenase levels failed to find an elevation in ethanol content. The study concludes, "This data does not support the contention that an elevated LDH[2] and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."[x]

An article describes two children who were tested around the time they died, and who had elevated levels of both lactic acid and lactic dehydrogenase leading to elevated ethanol concentrations.[x] I can't tell if this article falls in the category of dead patients or living patients. In any event, there is little or no evidence to support Dr. Arnold's contention that high levels of lactic acid (and lactate dehydrogenase?) caused elevation of the claimant's enzymatic ethanol test result.

Dr. Arnold does not address elevated lactate dehydrogenase. I don't know if he is assuming lactate dehydrogenase was also elevated. The record presents no measurement of lactate dehydrogenase or indication that it was elevated.

----------

In summary, Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:

- Unquantified. To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?
- Presented without corroborating facts
- Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.
- Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.

----

[2] LDH = lactate dehydrogenase.

**Lincoln/Sewell 802**

Claimant: Timothy Sewell                                    June 03, 2024
Claim # 12885926                          Report by R Swotinsky M D; page 5

*Q4.   How quickly does lactic acid clear from the bloodstream after "a spontaneous heartbeat and adequate blood pressure," as described in Dr. Arnold's November 17, 2023, report?*

A4.   Lactic acid is a normal constituent of blood. It can accumulate to elevated levels after certain medical conditions, most commonly hypovolemia, heart failure, sepsis, and heart attack. The claimant did not have a condition causing significant elevated lactic acid levels before or when he was tested for ethanol. Dr. Arnold's 11/17/23 report assumes elevated lactic acid because the claimant was in cardiac arrest for 6-8 minutes and had CPR for 6-8 minutes. But, the medical records indicate the claimant was not in cardiac arrest for 6-8 minutes (or at all), and had CPR chest compressions for no more than 4 minutes. Furthermore, my search of the medical/scientific literature found a lack of support for Dr. Arnold's assertion that CPR causes elevated lactic acid levels.

*Q5.   Would the 222 mg/dL serum alcohol level be relied upon by medical professional if relevant to the claimant's treatment, despite the disclaimer in the notes that, "Results are for medical purposes only and not for legal or employment evaluative purposes."*

A5.   The claimant's ethanol test at the hospital is assumed to have been an enzymatic test. Hospitals commonly use enzymatic-based ethanol assays for diagnostic and medical purposes. The results of such testing may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.[vi] The laboratory's legal counsel would be better positioned to address the purpose of having that disclaimer on their reports.

*Q6.   At what serum alcohol level would the claimant's judgment be sufficiently impaired to have contributed to the cause of the incident that resulted in the claimant's quadriplegia?*

A6.   Per Dr. Arnold, based on the measured BAC at 17:49, the claimant's BAC at the time of the injury was 0.22. A person's impairment at a given BAC is subject to factors like drinking history (trolerance) and timing (is the BAC going up or going down?). Thus, the medical literature presents overlapping ranges of impairment corresponding with BAC. For example:[xii]

**Table IV.** Most Recent Version of the Dubowski Alcohol Table (2012) Depicting Seven Stages of Alcohol Influence with Overlapping Ranges of BAC and the Associated Clinical Signs and Symptoms of Intoxication (43)

| BAC (g/100 mL) | Stage of alcoholic influence | Clinical signs and/or symptoms |
|---|---|---|
| 0.01–0.05 | Subclinical | Behavior nearly normal by ordinary observation. Influence/effects usually not apparent or obvious. Impairment detectable by special tests. |
| 0.03–0.12 | Euphoria | Mild euphoria, sociability, talkativeness. Increased self-confidence; decreased inhibitions. Diminished attention, judgment and control. Some sensory-motor impairment. Slowed information processing. Loss of efficiency in critical performance tests. |
| 0.09–0.25 | Excitement | Emotional instability; loss of critical judgment. Impairment of perception, memory, and comprehension. Decreased sensatory response; increased reaction time. Reduced visual acuity and peripheral vision and slower glare recovery. Sensory-motor incoordination; impaired balance; slurred speech. Vomiting; drowsiness. |
| 0.18–0.30 | Confusion | Disorientation, mental confusion; vertigo; dysphoria. Exaggerated emotional states (fear, rage, grief, etc.). Disturbances of vision (diplopia, etc.) and of perception of color, form, motion, dimensions. Increased pain threshold. Increased muscular incoordination; staggering gait; ataxia. Memory loss. Apathy with progressive lethargy. |
| 0.25–0.40 | Stupor | General inertia; approaching loss of motor functions. Markedly decreased response to stimuli. Marked muscular incoordination; inability to stand or walk. Vomiting; incontinence of urine and feces. Impaired consciousness; sleep or stupor; deep snoring. |
| 0.35–0.50 | Coma | Complete unconsciousness; coma; anesthesia. Depressed or abolished reflexes. Subnormal temperature. Impairment/irregularities of circulation and respiration. Possible death. |
| Mean, median 0.36 (90% 0.21–0.50) | Death | Death from respiratory failure and/or cardiac arrest. |

**Lincoln/Sewell 803**

Claimant: Timothy Sewell                                    June 03, 2024
Claim # 12885926                              Report by R Swotinsky MD; page 6

Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.

───────────────

*All medical records provided by Lincoln Financial Group as of today's date were reviewed, including the most recent document in the file which is fax-stamped 05/16/23.*

───────────────

*Electronically Signed:*

Robert Swotinsky MD
Bd Cert, Occupational Medicine

───────────────────────────

References

[i] Alcohol impairment charts for men and women. In: *UpToDate*. Waltham, MA: Wolters-Kluwer. 2024.
[ii] Northcote J. Livingston M. Accuracy of self-reported drinking: observational verification of 'last occasion' drink estimates of young adults. *Alcohol Alcohol*. 2011;46:709-13.
[iii] McKenna H, Treanor C, O'Reilly D, Donnelly M. Evaluation of the psychometric properties of self-reported measures of alcohol consumption: a COSMIN systematic review. *Substance Abuse Treatment, Prevention, and Policy*. 2018;13:6.
[iv] Del Boca F, Darkes J. The validity of self-reports of alcohol consumption: state of the science and challenges for research. *Addiction*. 2009;98:1-12.
[v] Powers R, Dean D. Evaluation of potential lactate/lactate dehydrogenase interference with an enzymatic alcohol analysis. *J Anal Toxicol*. 2009;33:561-3.
[vi] Goldberger B, Caplan Y, Levine B. Methods for fluid analysis. In: Caplan Y, Goldberger B (eds). *Garriott's Medicolegal Aspects of Alcohol, 6th Ed*. Tucson, AZ: Lawyers& Judges Publishing Company. Inc. 2015. Pgs. 256-257.
[vii] Badcock N, O'Reilly D. False-positive EMIT-st ethanol screen with post-mortem infant plasma. *Clin Chem*. 1992;38:434.
[viii] Nine J, Moraca M, Virji M, et al. Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays. *J Anal Toxicol*. 1995;19:192-6.
[ix] Winek C, Wahba W. A response to "serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays." *J Anal Toxicol*. 1996;20:211.
[x] Nacca N, Hodgman M,, Lao K, et al. Can elevated lactate and LDH produce a false-positive enzymatic ethanol result in live patients presenting to the emergency department? *Clin Toxicol (Phila)*. 2018;56:189-92. Abstract: https://pubmed.ncbi.nlm.nih.gov/28812382/
[xi] Bishop-Freeman S, Bertholf R, Powers R, et al. False-positive enzymatic alcohol results in perimortem specimens. *Lab Med*. 2020;51:394-401.
[xii] Dubowski K. The Dubowski alcohol table. *IACT Newsletter*. 2012;23:7-8.

# Robert Swotinsky, MD, MPH



## EMPLOYMENT

**2013 - current**  **Consultant, Occupational Medicine.** Clinical and non-clinical services including:
- Occupational health clinical services.
- Independent medical evaluations for insurers, state agencies, and others.
- Consulting physician for insurers with regard to impairment, drug and alcohol use, toxicology, and other issues.
- Medical review officer (workplace drug test interpretation) services.
- Litigation support services.

**1998 - 2013**  **Occupational Medicine Physician,** Reliant Medical Group, Worcester MA.
- Occupational medicine physician at Reliant Medical Group, a large group practice. From 1999 through 2010, Chair of the department, directing 5 occupational health clinic sites and physician and nursing staff on-site at several corporations. Provided injury care, physical examinations, and related clinical services for employees in central Massachusetts.
- Medical Review Officer and manager of drug and alcohol testing programs encompassing more than 8000 tests/year

**1995 - 1998**  **Director of Occupational and Environmental Medicine Services**, Boston University Medical Center, Boston MA.
- Director of the Occupational Medicine Residency Program.
- Director of employee health services for Boston University Medical Center.
- Director of an occupational health clinic that served the City of Boston and over two hundred other employers in the Boston area.
- Direct supervisor of the division's 10 employees.

**1987 - 1995**  **Senior Clinical Associate**, Washington Occupational Health Associates, Inc., Washington DC.
- Development and management of national medical programs for employers.
- Consultation to federal agencies, corporations, and individuals regarding a broad range of occupational and environmental health issues.
- Production and negotiation of bids, proposals, and contracts.
- Expert testimony.
- Independent medical evaluations, screening examinations, and treatment of workplace injuries and of general internal medicine patients.

REV: 11/05/21

**Lincoln/Sewell 805**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 2

---

## EDUCATION

| | |
|---|---|
| *1985 to 1987* | Residency in Occupational Medicine, University of Southern California. |
| *1987* | M.P.H., Epidemiology; UCLA, National Research Award Traineeship. |
| *1984 to 1985* | Intern, Department of Medicine; Hartford Hospital, Connecticut. |
| *1984* | M.D., Vanderbilt University |
| *1980* | B.S., Chemical Engineering; B.S., Life Sciences; Massachusetts Institute of Technology. |

---

## CURRENT MEDICAL LICENSES

Massachusetts - 80808
New Hampshire - 17354

---

## CERTIFICATIONS

- American Board of Preventive Medicine (Occupational Medicine)
- Medical Review Officer (MROCC)
- Certified Medical Examiner, FMCSA. 6781813845
- Civil Surgeon, USDHS. 109558.
- Certified to prescribed buprenorphine (HHS/DEA)

---

## HOSPITAL APPOINTMENT

Consulting Staff, Milford Regional Medical Center; Milford, MA

---

## ACADEMIC APPOINTMENT

Assistant Professor, School of Medicine, University of Massachusetts

---

## SCHOLARSHIPS, HONORS & AWARDS

| | |
|---|---|
| 1980 | - Tau Beta Pi (Engineering Honor Society) |
| 1985 | - National Research Service Award Traineeship |
| 1992 | - Fellow, American College of Occupational and Environmental Medicine. |
| 1999 | - Award of Leadership Recognition, American College of Occupational and Environmental Medicine |
| 2018 | - Health Achievement in Occupational Medicine Award, American College of Occupational and Environmental Medicine. |

**Lincoln/Sewell 806**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 3


## PROFESSIONAL ORGANIZATIONS, APPOINTMENTS

Metropolitan Washington College of Occupational Medicine
- President-Elect, 1994-95
- Board of Directors, 1992-1995
- Delegate to ACOEM, 1992 - 1994

New England College of Occupational and Environmental Medicine, 1995 -current
- Board of Directors, 1997-99

American College of Occupational and Environmental Medicine
- Board of Directors, 1995-99
- Associate Chairman, Council for Scientific Affairs, 1997-99
- Media Spokesperson, 1993-99
- Chairman, Internal Affairs Reference Committee, 1993-94
- Founding member and organizer of the MRO Section, 1994
- Membership and Membership Award Committee, 1994-96
- Committee to Review Creation of Certifying Bodies in Occupational and Environmental Competence, 1994-95

Manuscript reviewer
- *Journal of Occupational and Environmental Medicine*, 1998 - ongoing
- *Journal of Addiction Medicine,* 2013 - ongoing
- *Drug Testing & Analysis,* 2013 - ongoing

RTI International (formerly MROCC)
- MRO Certification Examination Writing Committee, 1992 - ongoing

---

## SELECTED RESEARCH & CONSULTING ACTIVITIES

2022 - ongoing   **Work Group, Substance Abuse and Mental Health Services Administration.**  Serve on advisory panel of professionals to help the Substance Abuse and Mental Health Services Administration update its workplace drug testing programs.

**Lincoln/Sewell 807**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 4

2020 - ongoing   **Medical Director, Occupational Medicine and Employee Health. Milford Regional Medical Center.  Milford, MA.**  Supervise clinical staff providing services to employees of the medical center and community employers.

2019 - ongoing   **Swotinsky & Emma Occupational Medicine Associates; Avon, MA.**  Professional corporation providing (primarily) DOT physicals, drug tests, and immigration exams.

2018 - ongoing   **Fiat Chrysler Automobiles; Detroit, MI.**  Review drug test results for this auto manufacturer.

2015 - ongoing   **Advantage Drug Testing; Burlington, MA.**  Supervise DOT physical exams performed by advanced practitioners.  Review steroid test results for law enforcement client.

*2014 - ongoing*   **Concentra; Massachusetts and New Hampshire.**  *"*As needed" coverage for vacations, illness, etc., at occupational health clinics. ~6-8 shifts/month.

*2013 - ongoing*   **Lincoln Financial Group (formerly Liberty Mutual Insurance). Omaha, NE.**  Review medical records re: disability claims.  Discuss cases with treating physicians and with claims managers.  Submit reports for use in determining claims status.

2013 - ongoing   **Independent Medical Examinations.**  Contracted directly and through vendors to insurers and employers (e.g., MES Solutions, Network Medical Review, MCMC, ExamWorks, etc.) to examine people, review their medical records, and respond to the clients' questions.  These exams are performed in several Massachusetts locations.

*1992 - ongoing*   **Contributing Author, MRO Certification Examination**.  Have served on a panel of six experts who created and have kept current the certification examination offered to physicians by the Medical Review Officer Certification Council.

2009 - ongoing   **Assistant Professor, University of Massachusetts Medical School.**  Taught courses at UMass Medical School and hosted preventive medicine residents during their rotations at Reliant Medical Group.

*1998 - ongoing*   **Fleet Safety Services, Inc.  Worcester, MA.**  Review drug test results for this Massachusetts-based third party administrator

.

**Lincoln/Sewell 808**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 5

1999 -
2021
**Author, *Medical Review Officer Manual*.**  Commissioned by the Medical Review Officer Certification Council to write a text for physicians who provide workplace drug and alcohol testing services.  "The book is well written and easy to use...Dr. Swotinsky is a recognized expert in the field, with a wealth of knowledge about drug testing.  His expertise is invaluable and this manual brings that expertise to hand" [*AOEC News*].  "The new Sixth Edition of Swotinsky's *MRO Manual* is a ground-breaking update to the first five editions of this comprehensive guidebook and resource manual.*" [J Occ and Env Med].*  "Readers will find this book indispensable to their study.  The writing style is both inviting and thoughtful." [*Doody's Book Review Service*]  More than 10,000 books sold.

1995 -
ongoing
**Medical Review Officer, Corporate Health Resources, Inc.  Rockville, MD.**  Reviewed workplace drug test results and advised employer clients on behalf of this national third party administrator.

1995 -
ongoing
**Expert witness, multiple.**  Retained by attorneys nationwide to review cases and provide expert testimony.\

2003 -
ongoing
**Impartial Medical Examiner, Department of Industrial Accidents, Commonwealth of Massachusetts.**  Serve on a panel of physicians selected to evaluate employees with disputed workers' compensation claims.

1994 -
2022
**Editor, *MRO Update*.**  Founding Editor of this monthly newsletter on workplace drug and alcohol testing, the most widely subscribed newsletter of its kind.  *MRO Update* is published by the American College of Occupational and Environmental Medicine.

2014 -
2019
**New Horizons; Brookline and Framingham, MA.**  2 days/week treating opioid-dependent patients, including drug testing to monitor compliance.

1998 -
2018
**Public Employee Retirement Administration Commission.  Boston, MA.**  Appointed by the Commonwealth of Massachusetts to perform fitness-for-duty evaluations of police, fire, and other state employees who have applied for, or have already been granted, disability retirement.

2012 -
2017
**MRO Work Group, Substance Abuse and Mental Health Services Administration.**  Serve on advisory panel of 7 professionals to help the Substance Abuse and Mental Health Services Administration revise and develop new procedures for interpretation of workplace drug test results.

**Lincoln/Sewell 809**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 6

*2012 -*
*2015*    **Faculty member, Medical Examiner training course.**  One of three faculty members of a course given 15 times, mostly in New England, sponsored by the New England College of Occupational and Environmental Medicine for Medical Examiners.  Attended by >1000 physicians and advanced practitioners preparing for certification to serve as Medical Examiners for the Federal Motor Carrier Safety Administration.

*2010 -*
*2015*    **Aetna Insurance; Hartford, CT.**  Reviewed medical records of covered individuals who filed disability claims. Spoke with treating providers and claims managers. Submitted reports used to determine claims status.

*2013 -*
*2014*    **Medical Examiner Refresher Training Panel, Federal Motor Carrier Safety Administration.**  Served on advisory panel of 9 health care providers to help the Federal Motor Carrier Safety Administration develop refresher training for Medical Examiners.

2009 -
2010    **Work Group for the Federal Motor Carrier Safety Administration's Office of Medical Programs.**  One of 14 members of this advisory panel that helped improve the medical examination procedures for commercial motor vehicle drivers.

*2009 -*
*2012*    **Nypro, Inc.  Clinton, MA.**   Consulting occupational medical director for this international plastics company.

*2007 -*
*2009*    **CME Program for Medical Review Officers.**  Commissioned by MROCC to write a series of three monographs and self-assessment exams for continuing medical education of medical review officers.

*2006*    **Federal Motor Carrier Safety Administration, Schedule II Medications Panel.**  Appointed to panel of scientific experts to revise and develop federal standards for medication use by commercial motor vehicle operators.

*2004 -*
*2005*    **CME Program for Medical Review Officers.**  Developed, on behalf of ACOEM and MROCC, two continuing medical education programs for medical review officers.

*2004*    **CME Program for Commercial Motor Vehicle Medical Examiners.** Part of a team that helped develop, on behalf of ACOEM, a continuing medical education program for medical examiners of commercial motor vehicle drivers.

**Lincoln/Sewell 810**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 7

*2004*   **Physician Panel Member, National Institute on Occupational Safety and Health, Energy Employees Occupational Illness Compensation Program.**  Appointed to review claim files of former employees of Department of Energy contractor employees who have applied for state workers' compensation benefits.

*2002 - 2009*   **Consulting Massachusetts Medical Director, United States Postal Service.**  Reviewed records of USPS employees who have filed claims for disability or other medical leave, are returning to work after extended illness, etc.  Provided automatic external defibrillator training, assist with drug testing program, and provide other services as needed. Consultant on issues of medical policy and procedure.

*1998 - 2007*   **Medical Director, Waters Corporation.**  On-site and consulting services including policy development, review of disability claims, health and safety training, surveillance exams, and coordination of services provided by local medical providers in Massachusetts and out-of-state.

*1997 - 1998*   **Principal Investigator, Surveillance of Post-Exposure Events Among Hospital Health Care Workers**.  Received grant #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 from the Centers for Disease Control and Prevention to collect and analyze data from blood exposure events at Boston Medical Center.

*1996 - 1998*   **Principal Investigator, Pilot Testing of the National Surveillance System for Hospital Health Care Workers**.  Received grant #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 from the Centers for Disease Control and Prevention to help develop and test an employee health surveillance system and perform several research studies.

## PUBLICATIONS

Contributing Author, Occupational Medicine Forum, *Journal of Occupational Medicine*: 1987-1995.

Swotinsky RB: Heat Stress.  *Occupational and Environmental Reporter*, 3: June 1989.

Buckley JD, Robinson LL, Swotinsky RB, et al: Occupational Exposures of Parents of Children with Acute Nonlymphocytic Leukemia, Cancer Research:49:4030-37, 1989.

Swotinsky RB, Chase KC: Health Effects of Exposure to Ammonia. *American Journal of Industrial Medicine*: 17:515-21, 1990.

Swotinsky RB, Chase KC:  The Medical Review Officer. *Journal of Occupational Medicine:* 32:1003-8, 1990.

Swotinsky RB (ed):  *The Medical Review Officer's Guide to Drug Testing.*  New York: Van Nostrand Reinhold, 1992.

Swotinsky RB, Beatey JJ: Urine Collection Procedures, In: Swotinsky RB (ed), *The Medical Review Officer's Guide to Drug Testing*. New York: Van Nostrand Reinhold, 1992.

**Lincoln/Sewell 811**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 8

Swotinsky RB: The Medical Review Officer Function, In: Swotinsky RB (ed), *The Medical Review Officer's Guide to Drug Testing.* New York: Van Nostrand Reinhold, 1992.

Judge W, Swotinsky RB: Risk Management Strategies, In: Swotinsky RB (ed), *The Medical Review Officer's Guide to Drug Testing.* New York: Van Nostrand Reinhold, 1992.

Swotinsky RB: Case Studies, In: Swotinsky RB (ed), *The Medical Review Officer's Guide to Drug Testing*. New York: Van Nostrand Reinhold, 1992.

Paul D, Jones F, Swotinsky RB, et al: Model Contract for Occupational Health and Safety Services. *ACOEM Report*, November 1993.

Swotinsky RB (ed), *MRO Update* newsletter (10 x/year). Chicago: ACOEM, 1994 - 2022.

Swotinsky RB: Letter to the Editor: Code of Ethics. *AOEC News*, 7(2):1996.

Contributing Author, Recommended library for occupational and environmental physicians, *Journal of Occupational and Environmental Medicine*, 39:469-80, 1997.

Steger K, Swotinsky R, Snyder S, Craven D.  Recent experience with post-exposure prophylaxis with combination anti-retrovirals for occupational exposure to HIV. (abstract and poster).  Infectious Diseases Society of America 35th Annual Meeting, San Francisco CA, 1997.  See also *Clin Infect Dis*.  1997;25:444.

Swotinsky RB.  MRO Case studies illustrate variations in interpretation. *Forensic Urine Drug Testing*, September 1998:2-3.

Swotinsky R, Steger K, Sulis C, Snyder S, Craven D.  Occupational exposure to HIV: Experience at a tertiary care center, *Journal of Occupational and Environmental Medicine*, 40(12):1102-1109, 1998.

Swotinsky RB.  Confidentiality and commercial motor vehicle driver exams.  *CDME Review,* July/August 2001.

Swotinsky RB.  Drug and alcohol testing in the transportation industry.  In: Hartenbaum N (ed), *Clinics in Occupational and Environmental Medicine*, 2:1; 2002.

Hartenbaum N, Holland M, Osbahr A, Riba M, Swotinsky R.  Expert Panel Commentary and Recommendations: Licit Schedule II Drug Use and Commercial Motor Vehicle Driver Safety.  Washington, DC: U.S. Department of Transportation : Federal Motor Carrier Safety Administration; December 9, 2006.

Swotinsky RB.  Prescription opiates and CMV operation.  *CDME Review*.  Chicago; ACOEM. Winter 2007.

Swotinsky RB.  *How to Collect Workplace Drug Test Specimens.* Schaumburg, IL: MROCC, 2007.

Swotinsky RB.  *Alternative Specimens for Workplace Drug Testing.*  Schaumburg, IL: MROCC, 2008.

Swotinsky RB.  *Workplace Testing for Prescription Drugs*.  Schaumburg, IL: MROCC, 2009.

Swotinsky RB, Smith DS.  *Medical Review Officer Manual,* Beverly, MA: OEM Press, 1999 (1st ed), 2002 (2nd ed), 2006 (3rd ed), 2010 (4th ed)..

Swotinsky, RB.  Letter to the Editor: Opioids and Safety-Sensitive Work.  *Journal of Occupational and Environmental Medicine.*  2014;56:e133.

Swotinsky RB. *Medical Review Officer Manual, 5th Ed (2015), 6th Ed (2021).*  Beverly, MA: OEM Press.

**ROBERT B. SWOTINSKY, MD, MPH**
Page 9

## PRESENTATIONS

"Asbestos: Regulations and Health Effects."  Southeastern Electric Exchange - Alexandria VA, 1988

Faculty and Moderator, Medical Review Officer Training Course:  American College of Occupational and Environmental Medicine - Courses given throughout the United States and Canada, 1990-2009.

"The Medical Review Officer Role in DOT Drug Testing."  American Occupational Health Conference - Houston TX, 1990.

"Workplace Drug Testing Programs."  Kentucky Medical Association Annual Meeting - Louisville KY, 1990.

"The Medical Review Officer."  Kentucky Occupational Medical Association Annual Meeting - Louisville KY, 1990.

"Drug Testing in the Pipeline Industries."  Buckeye Pipe Line Annual Meeting - Skytop PA, 1990.

"The Physician's Role in Workplace Drug Testing Programs."  American College of Preventive Medicine Annual Meeting - Baltimore MD, 1991.

"Drug Testing in the Workplace."  Semiconductor Safety Association Annual Meeting - Phoenix AZ, 1991.

"Drug Testing in the Workplace".  Trade Waste Incineration, Chemical Waste Management - Sauget IL, 1991.

Faculty, Medical Review Officer Training Course Update.  American College of Occupational Medicine Meetings - San Francisco CA (1991), Dallas TX (1993), Denver CO (1994), Las Vegas NV (1995).

"Medical Surveillance in the Petroleum Industry."  Buckeye Pipe Line Oil Spill School - Allentown PA, 1991.

Session Organizer and Moderator, American Occupational Health Conference Scientific Session on Workplace Drug Testing Issues -  Washington DC, 1992.

"Medical Review Officer Duties and Responsibilities, Advanced Problem Solving for Medical Review Officers."  Florida Occupational and Environmental Medical Association Scientific Session - Miami Beach FL, 1993.

"MRO Issues."  Consolidation Conference on Federal Drug-Free Workplace Programs, Department of Health and Human Services - Washington DC, 1993.

"Gearing Up for Drug and Alcohol Testing (film)."  STA United, Inc. - Lincoln NE, 1994.

"Medical Review Officer Update."  Metropolitan Washington College of Occupational and Environmental Medicine Meeting - Bethesda MD, 1995.

"The Medical Review Officer."  Fourth Annual Workers' Compensation Defense and Occupational Medicine Seminar - San Francisco CA, 1995.

"Medical Surveillance of Hazardous Waste/Emergency Response Workers."  Fourth Annual Workers' Compensation Defense and Occupational Medicine Seminar - San Francisco CA, 1995.

"Advanced Topics for the MRO."  American Occupational Health Conference - Boston MA, 1998.

"Workplace Drug and Alcohol Testing Update."  New England College of Occupational and Environmental Health Annual Conference - Boston, MA, 1998.

"Advanced Topics for the MRO."  American Occupational Health Conference - New Orleans LA, 1999.

**Lincoln/Sewell 813**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 10

"Workplace Drug and Alcohol Testing Update." Central Massachusetts Association of Occupational Health Nurses - Worcester MA, 1999.

"A Forklift Operator on Methadone." Seminar, Harvard School of Public Health - Cambridge MA, 2000.

"Methadone Case Study." Seminar, University of Massachusetts School of Medicine - Worcester MA, 2000.

"Advanced Topics for the MRO." American Occupational Health Conference - Philadelphia PA, 2000.

"Ask the Expert: Regulatory Issues." American Occupational Health Conference - Philadelphia PA, 2000.

"Critical Overview of Various Methods of Drug & Alcohol Testing." Lewis Millender Annual Conference - Burlington MA, 2000.

"Workplace Drug and Alcohol Testing Update." Region I Fitness for Duty and Access Authorization Conference - Portsmouth NH, 2000.

"DOT Procedures Update." Lewis Millender Annual Conference - Danvers MA, 2001.

"Advanced Topics for the MRO." American Occupational Health Conference - San Francisco CA, 2001.

"Workplace Drug and Alcohol Testing Update." Lewis Millender Annual Conference - Newton MA, 2002.

"MRO Controversies." American Occupational Health Conference – Chicago, IL, 2002.

"Comprehensive Medical Evaluations of Public Safety Workers." Public Employee Retirement Administration Commission Conference – Amherst MA, 2002.

"Drug Testing in the Workplace." Division of Occupational Medicine, U. Conn – Farmington CT, 2002.

MRO case study presentation. New England College of Occupational and Environmental Medicine, Waltham, MA. 2003.

"Drug and Alcohol Testing Update." 23rd Annual National Workers' Compensation and Occupational Medicine Seminar. Hyannis MA. 2003.

"Drug and Alcohol Testing Update." Connecticut Occupational and Environmental Medicine Association. Hartford CT. 2003.

"MRO Controversies." American Occupational Health Conference - Kansas City, MO. 2004.

"Drug and Alcohol Testing Update." 10th Annual Lewis Millender MD Conference - Newton, MA. 2004.

"MRO Controversies." American Occupational Health Conference - Washington, DC. 2005.

"How to Work With Your MRO." Web-based presentation on behalf of Quest Diagnostics Inc., May 25, 2005.

"Workplace Drug and Alcohol Testing Update." University of Connecticut Occupational and Environmental Medicine Colloquium - Farmington, CT. 2006.

"Alternative Testing in the Workplace." 26th Annual National Workers' Compensation and Occupational Medicine Seminar. Hyannis MA. 2006.

"Workplace Drug Testing and Alternative Specimens." ORC Occupational Safety and Health Physicians Group. Washington DC. 2006.

MRO case study presentation. Michigan Occupational and Environmental Medicine Annual Meeting. Traverse City, MI. 2006.

"Workplace Testing for Prescription Drugs." Drug Testing Advisory Board, Substance Abuse and Mental Health Services Administration. Rockville, MD. 2008

**Lincoln/Sewell 814**

**ROBERT B. SWOTINSKY, MD, MPH**
Page 11


"Alternative Specimens for Workplace Drug Testing."  Grand Rounds, Harvard School of Public Health.  Cambridge, MA.  2008.

"MRO Without a Net."  Keynote speaker at Society of Forensic Toxicologists' Annual Meeting.  Phoenix AZ.  2008.

"Workplace Testing for Prescription Drugs."  New England College of Occupational and Environmental Medicine Annual Meeting.  Bedford MA.  2008.

"Workplace Drug and Alcohol Testing Update."  Web-based presentation on behalf of Ryan Associates, Inc.  April 29, 2009.

Prescription Drug Use: Implications for the Workplace.  Central Massachusetts Chapter of the American Association of Occupational Health Nurses.  Marlborough, MA. 2010.

Workplace Testing for Prescription Drugs.  Central States Occupational and Environmental Medicine Association Annual Meeting.  Naperville IL.  2012.

Workplace Testing for Prescription Drugs.  Tennessee College of Occupational and Environmental Medicine Spring Meeting.  Nashville TN.  2012.

Medical Examiner Training Course Faculty, New England College of Occupational and Environmental Medicine.  Hartford and Mystic, CT; Bangor, Bethel, and Portland, ME; Chicopee, Newton, and Springfield, MA; Tarrytown, NY.  2012 - 2015.

Medical Review Officer and Substance Abuse Professional presentations.  Federal Transit Administration 8th Annual Drug and Alcohol Program National Conference. Phoenix, AZ.  2013.

Kingkade & Kelly Show.  News Talk 770, CHQR.  Calgary, Alberta.  Interviewed about workplace drug testing.  March 27, 2014.

MRO Without a Net.  University of Connecticut, Occupational Medicine Seminar. Hartford, CT.  2015.

**Lincoln/Sewell 815**

**From:**McNamara Law Office Support <support@jpricemcnamara.com>
**Sent:**Tue, 4 Jun 2024 12:41:03 -0500
**To:**Mack, Lindsay
**Cc:**Iwana Rademaekers;Sandy Acker
**Subject:**Sewell v. The Lincoln National Life Insurance Company - IME Response

***This email is from an external source. Only open links and attachments from a Trusted Sender.***

Dear Ms. Mack,

I am in receipt of your June 3, 2024, letter and report and your June 4, 2024,  letter with the corrected report inviting a response by June 6, 2024 for claim number 12885926. We will be responding, but will need an extension. We request through and including July 6, 2024, to respond. Our expert wants the opportunity to appropriately review and respond to the reports you provided, but he is currently on vacation, has other professional obligations, and this is his first notice of Lincoln's new expert's opinion on a complex set of facts and medical science.

To the extent it would conflict with the Court's May 21, 2024, order that Lincoln file the administrative record with the Court by June 10, 2024, we will agree to extend that deadline and the briefing deadlines accordingly. That will not pose a problem.

Please confirm Lincoln's agreement to this extension by return email or fax.

Sincerely,

Price
### *Law Offices of J. Price McNamara*

Holding Insurance Companies to Their Promises

**Offices in Louisiana and Texas**

10455 Jefferson Highway | Suite 130 | Baton Rouge, LA 70809
Phone:  225-201-8311   Fax:  225-612-6973   Alt. Fax: 225-201-8313
support@jpricemcnamara.com | www.jpricemcnamara.com

**Lincoln/Sewell 816**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

| | |
|---|---|
| Date:  June 3, 2024 | |
| To:    J. PRICE MCNAMARA<br>LAW OFFICES OF J. PRICE MCNAMARA<br>10455 JEFFERSON HIGHWAY<br>STE 130<br>BATON ROUGE LA 70809 | |
| Attn: | |
| Fax:    (225) 201-8313 | |
| From:  Lindsay Mack<br>Claim Resolution Specialist<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5711 | |
| Total Pages<br>(Including Cover):     9 | |
| RE:<br><br>Claim #:     12885926<br>Claimant:   Timothy Sewell<br><br>McLarens, LLC | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Sewell 817**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

June 3, 2024

J. Price McNamara
Law Offices of J. Price McNamara
10455 JEFFERSON HIGHWAY
STE 130
BATON ROUGE, LA 70809

RE:    Employee: Timothy Sewell
       Policyholder: McLarens, LLC
       Policy #: SA3-890-LF0483-01
       Claim #: 12885926

Dear J. Price:

The Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for accidental death and dismemberment benefits under McLarens, LLC's Group Life Insurance Policy (the Policy).  We are writing regarding Timothy Sewell's claim for accidental dismemberment benefits under the Policy.

We are in process of conducing further review of Mr. Sewell's appeal of our denial determination regarding the above-referenced claim.  The purpose of this letter and enclosure(s) is to provide you with an opportunity to review and comment on new/ additional evidence that has been received before a final decision is rendered.

Please find attached Clinical Review Memo by Dr. Robert Swotinsky, which is new or additional evidence in connection with Mr. Sewell's appeal.  You may review the report and provide a written response to us, which we will consider in making our decision on Mr. Sewell's appeal.

Please submit any written comments or additional documentation that you wish to be considered by June 6, 2024. Information may be submitted via fax to (603) 334-5711 or via email to Lindsay.Mack@LFG.com.

Upon receipt of your response, we will promptly complete our review and render a determination on Mr. Sewell's appeal.  If your response is not received by **June 6, 2024**, we will proceed with making a determination on the appeal based on the information contained in Mr. Sewell's file. If you do not intend to provide a response, please notify us in writing as soon as possible.

If you have any questions regarding this matter, please contact me.

1  of 2

**Lincoln/Sewell 818**

Sincerely,

Lindsay Mack
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-5711

Attachments:    12885926-MEDICAL-CP/PEER REVIEW-06.01.2024

**Lincoln/Sewell 819**

Clinical Review Memo

| Customer Name | Claimant Name | | Claim Number |
|---|---|---|---|
| McLarens, LLC | Timothy Sewell | | 12885926 |
| **Report Date:** | 06/01/2024 | | |
| **Referred By:** | Lindsay Mack | **Claimant DOB:** | |
| **Referral Date:** | 05/28/2024 | **Job Title:** | |
| **Due Date:** | 06/15/2024 | **Med/Surg Condition:** | |
| **Referral Type:** | AD&D Review | **Disability Occ Type:** | |
| **Reason for Priority Handling:** | | **Product Type:** | LIFE |
| **Other Considerations** | | **LDW:** | 08/25/2021 |
| | | **DOD:** | |
| **Physical Demands:** | | **BBD:** | |
| **Non-Medical Issue:** | No | **Non-Med Issue Details:** | |

**Questions and Answers**

*Q1.    From a medical perspective, is it appropriate for medical providers to defer to the recollections of the claimant and others that the claimant only consumed six beers over seven hours and disregard a serum alcohol level of 222 mg/dL that was recorded in a blood draw at 17:46, less than two hours after the incident?*

A1.    As the claimant's reviewer Thomas Arnold, MD, noted that serum alcohol level corresponded to a blood alcohol concentration (BAC) of approximately 0.185 at 17:46. The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.

The claimant weighed 82 kg. An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking.[i] If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking,[1] his BAC would have been essentially undetectable. The calculation is:

$$0.12 - \left( \frac{9\ hrs\ x\ 60\frac{min}{hr}}{40} X\ 0.01 \right) = -0.015$$

Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking. His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.

It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink. The evidence indicates the recollections underreported actual alcohol consumption. This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters.[ii,iii,iv] In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.

---

[1] The nine hours accounts for about two hours between the injury and alcohol test.

**Lincoln/Sewell 820**

Claimant: Timothy Sewell                                                June 01, 2024
Claim # 12885926                                    Report by R Swotinsky MD; page 2


*Q2.     Review the medical records and state if it is correct that the 222 mg/dL serum alcohol level result was impacted by lactic acid in Sewell's system.  If the answer is yes, what would be the estimated impact on the serum alcohol level due to the claimant's injuries and treatment as of the 17:46 blood draw on August 28, 2023, and how is this estimated impact determined?*

*Q3.     Has the impact of lactic acid on serum alcohol level testing been clearly established through research?  For reference, see, "Can elevated lactate and LDH produce a false positive enzymatic ethanol result in live patients presenting to the emergency department?" Nacca N., et al. Clin Toxicol (Phila). 2018 Mar;56 (3):189-192*

A2/3.  Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test.  Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase.[v] Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur.[vi]  In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured.

*In Dr. Arnold's opinion, lactic acid made the alcohol test result inaccurate.*

In May 2023, claimant's reviewer Dr. Arnold opined that due to cardiac arrest and cardiopulmonary resuscitation, the claimant "would have accumulated a large amount of lactic acid in his blood" which interfered with the alcohol test and made the result falsely high.  Dr. Arnold assumes the result was falsely high because it indicates more alcohol consumption than the claimant reported and because no-one who was with the claimant at the time of his injury reported that the claimant seemed intoxicated.

On 09/07/23, the insurer's reviewer Peggy Geimer, MD, addressed lactic acid and the alcohol test result as follows:

> "Dr. Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay.  The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed.  Lactic acidosis is not mentioned any where in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis."

On 11/17/23, Dr. Arnold responded to this as follows

> "Lactic acid is produced any time there is underperfusion of body tissues.  The EMS providers on the scene reported that [the claimant] was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation.  There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood..It is not uncommon for large lactic acid levels to be present without significant acidosis of the blood... [The claimant] received

**Lincoln/Sewell 821**

Claimant: Timothy Sewell                                      June 01, 2024
Claim # 12885926                                   Report by R Swotinsky MD; page 3

> IV fluids and the hospital record repeatedly shows [the claimant] being on vaso-active pressor agents to support low blood pressure and increase tissue perfusion. All of these interventions treat lactic acidosis so the claim that [the claimant] did not receive treatment for lactic acidosis cannot be supported."

Dr. Arnold also notes that a laboratory test report footnote states the results are "not for legal or employment evaluative purposes." Dr. Arnold says this footnote is additional evidence that the test results are unreliable.

Dr. Arnold's reports include no supporting citation(s) from the medical/scientific literature. Dr. Arnold's reports do not quantify the effect he believes lactic acid had on the test result.

*The medical/scientific literature lacks support for Dr. Arnold's theory.*

Dr. Arnold's makes assumptions. He assumes that the claimant:

1.    Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused high lactic acid level to be present.
2.    Had an inaccurate test result due to the lactic acid in his blood.

The first assumption is contradicted by the medical records. The second assumption is unsupported by medical/scientific literature. I explain why:

1.    Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused a high level of lactic acid in his blood.

The Port Arkansas EMS record states that CPR compressions were started at 16:51, an EKG was performed at 16:55 showing a sinus rhythm and heart rate of 60, and thus CPR compressions were discontinued. The record thus indicates that the claimant underwent CPR compressions for up to four minutes. The Port Arkansas EMS record does not indicate that the claimant was in cardiac arrest, and instead indicates that he had faint pulses when first checked at 16:51 and his heart was in normal sinus rhythm and his blood pressure was 135/62 at 16:55 when first checked by EKG, i.e., he was not in cardiac arrest.

Most cases of elevated lactic acid are due to marked tissue hypoperfusion resulting from low fluid volume (e.g., "bleeding out"), heart failure, sepsis, or heart attack. Before the claimant's blood was collected for ethanol, the claimant did not have health condition associated with elevated lactic acid. While Dr. Arnold implies that performing CPR causes elevated lactic acid levels, my search of the medical literature did not find evidence of this. (There is an association of lactic acid elevations in patients who have had CPR. That association is because many patients who need CPR have suffered a condition that causes elevated lactic acid levels. The claimant, however, did not.)

**Lincoln/Sewell 822**

Claimant: Timothy Sewell                                    June 01, 2024
Claim # 12885926                              Report by R Swotinsky M D; page 4

Dr. Arnold does not mention lactate dehydrogenase. As noted above, elevations of both lactic acid and lactate dehydrogenase are necessary to

2.    Had an inaccurate ethanol test result due to a high level of lactic acid in his blood.

The phenomenon of elevated lactic acid and lactate dehydrogenase causing elevated enzymatic ethanol test results has been described in autopsy blood samples.[vii,viii] It has been raised as a possibility when trauma patients with elevated levels of lactate and/or lactate dehydrogenase levels were admitted to the hospital for treatment. However, studies have found little evidence to support this possibility in live patients.[ix] For example:

- A study of 37 patients hospitalized with elevated lactate and lactate dehydrogenase levels failed to find an elevation in ethanol content. The study concludes, "This data does not support the contention that an elevated LDH[2] and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."[x]

An article describes two children who were tested around the time they died, and who had elevated levels of both lactic acid and lactic dehydrogenase leading to elevated ethanol concentrations.[x] I can't tell if this article falls in the category of dead patients or living patients. In any event, there is little or no evidence to support Dr. Arnold's contention that high levels of lactic acid (and lactate dehydrogenase?) caused elevation of the claimant's enzymatic ethanol test result.

Dr. Arnold does not address elevated lactate dehydrogenase. I don't know if he is assuming lactate dehydrogenase was also elevated. The record presents no measurement of lactate dehydrogenase or indication that it was elevated.

_____

In summary, Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:

- Unquantified. To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?
- Presented without corroborating facts
- Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.
- Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.

_____

[2] LDH = lactate dehydrogenase.

**Lincoln/Sewell 823**

Claimant: Timothy Sewell                                              June 01, 2024
Claim # 12885926                                      Report by R Swotinsky MD; page 5

*Q4.    How quickly does lactic acid clear from the bloodstream after "a spontaneous heartbeat and adequate blood pressure," as described in Dr. Arnold's November 17, 2023, report?*

A4.    Lactic acid is a normal constituent of blood. It can accumulate to elevated levels after certain medical conditions, most commonly hypovolemia, heart failure, sepsis, and heart attack. The claimant did not have a condition causing significant elevated lactic acid levels before or when he was tested for ethanol. Dr. Arnold's 11/17/23 report assumes elevated lactic acid because the claimant was in cardiac arrest for 6-8 minutes and had CPR for 6-8 minutes. But, the medical records indicate the claimant was not in cardiac arrest for 6-8 minutes (or at all), and had CPR chest compressions for no more than 4 minutes. Furthermore, my search of the medical/scientific literature found a lack of support for Dr. Arnold's assertion that CPR causes elevated lactic acid levels.

*Q5.    Would the 222 mg/dL serum alcohol level be relied upon by medical professional if relevant to the claimant's treatment, despite the disclaimer in the notes that, "Results are for medical purposes only and not for legal or employment evaluative purposes."*

A5.    The claimant's ethanol test at the hospital is assumed to have been an enzymatic test. Hospitals commonly use enzymatic-based ethanol assays for diagnostic and medical purposes. The results of such testing may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.[vi] The laboratory's legal counsel would be better positioned to address the purpose of having that disclaimer on their reports.

*Q6.    At what serum alcohol level would the claimant's judgment be sufficiently impaired to have contributed to the cause of the incident that resulted in the claimant's quadriplegia?*

A6.    Per Dr. Arnold, based on the measured BAC at 17:49, the claimant's BAC at the time of the injury was 0.22. A person's impairment at a given BAC is subject to factors like drinking history (trolerance) and timing (is the BAC going up or going down?). Thus, the medical literature presents overlapping ranges of impairment corresponding with BAC. For example:[xii]

**Table IV.** Most Recent Version of the Dubowski Alcohol Table (2012) Depicting Seven Stages of Alcohol Influence with Overlapping Ranges of BAC and the Associated Clinical Signs and Symptoms of Intoxication (43)

| BAC (g/100 mL) | Stage of alcoholic influence | Clinical signs and/or symptoms |
|---|---|---|
| 0.01–0.05 | Subclinical | Behavior nearly normal by ordinary observation. Influence/effects usually not apparent or obvious. Impairment detectable by special tests. |
| 0.03–0.12 | Euphoria | Mild euphoria, sociability, talkativeness. Increased self-confidence; decreased inhibitions. Diminished attention, judgment and control. Some sensory-motor impairment. Slowed information processing. Loss of efficiency in critical performance tests. |
| 0.09–0.25 | Excitement | Emotional instability; loss of critical judgment. Impairment of perception, memory, and comprehension. Decreased sensatory response; increased reaction time. Reduced visual acuity and peripheral vision and slower glare recovery. Sensory-motor incoordination; impaired balance; slurred speech. Vomiting; drowsiness. |
| 0.18–0.30 | Confusion | Disorientation, mental confusion; vertigo; dysphoria. Exaggerated emotional states (fear, rage, grief, etc.). Disturbances of vision (diplopia, etc.) and of perception of color, form, motion, dimensions. Increased pain threshold. Increased muscular incoordination; staggering gait; ataxia. Memory loss. Apathy with progressive lethargy. |
| 0.25–0.40 | Stupor | General inertia; approaching loss of motor functions. Markedly decreased response to stimuli. Marked muscular incoordination; inability to stand or walk. Vomiting; incontinence of urine and feces. Impaired consciousness; sleep or stupor; deep snoring. |
| 0.35–0.50 | Coma | Complete unconsciousness; coma; anesthesia. Depressed or abolished reflexes. Subnormal temperature. Impairment/irregularities of circulation and respiration. Possible death. |
| Mean, median 0.36 (90% 0.21–0.50) | Death | Death from respiratory failure and/or cardiac arrest. |

**Lincoln/Sewell 824**

Claimant: Timothy Sewell                                    June 01, 2024
Claim # 12885926                                Report by R Swotinsky M D; page 6

Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.

_____

*All medical records provided by Lincoln Financial Group as of today's date were reviewed, including the most recent document in the file which is fax-stamped 05/16/23.*

_____

*Electronically Signed:*

Robert Swotinsky M D
Bd Cert, Occupational Medicine

---

References

[i] Alcohol impairment charts for men and women. In: *UpToDate*. Waltham, MA: Wolters-Kluwer. 2024.
[ii] Northcote J. Livingston M. Accuracy of self-reported drinking: observational verification of 'last occasion' drink estimates of young adults. *Alcohol Alcohol*. 2011;46:709-13.
[iii] McKenna H, Treanor C. O'Reilly D, Donnelly M. Evaluation of the psychometric properties of self-reported measures of alcohol consumption: a COSMIN systematic review. Substance Abuse Treatment, Prevention, and Policy. 2018;13:6.
[iv] Del Boca F, Darkes J. The validity of self-reports of alcohol consumption: state of the science and challenges for research. *Addiction*. 2009;98:1-12.
[v] Powers R, Dean D. Evaluation of potential lactate/lactate dehydrogenase interference with an enzymatic alcohol analysis. *J Anal Toxicol*. 2009;33:561-3.
[vi] Goldberger B, Caplan Y, Levine B. Methods for fluid analysis. In: Caplan Y, Goldberger B (eds). *Garriott's Medicolegal Aspects of Alcohol, 6th Ed*. Tucson, AZ: Lawyers& Judges Publishing Company. Inc. 2015. Pgs. 256-257.
[vii] Badcock N, O'Reilly D. False-positive EMIT-st ethanol screen with post-mortem infant plasma. *Clin Chem*. 1992;38:434.
[viii] Nine J, Moraca M, Virji M, et al. Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays. *J Anal Toxicol*. 1995;19:192-6.
[ix] Winek C, Wahba W. A response to "serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays." *J Anal Toxicol*. 1996;20:211.
[x] Nacca N, Hodgman M,, Lao K, et al. Can elevated lactate and LDH produce a false-positive enzymatic ethanol result in live patients presenting to the emergency department? *Clin Toxicol (Phila)*. 2018;56:189-92. Abstract: https://pubmed.ncbi.nlm.nih.gov/28812382/
[xi] Bishop-Freeman S, Bertholf R, Powers R, et al. False-positive enzymatic alcohol results in perimortem specimens. *Lab Med*. 2020;51:394-401.
[xii] Dubowski K. The Dubowski alcohol table. *IACT Newsletter*. 2012;23:7-8.

**Lincoln/Sewell 825**

## Clinical Review Memo

| Customer Name | Claimant Name | | Claim Number |
|---|---|---|---|
| McLarens, LLC | Timothy Sewell | | 12885926 |
| Report Date: | 06/03/2024 | | |
| Referred By: | Lindsay Mack | Claimant DOB: | |
| Referral Date: | 05/28/2024 | Job Title: | |
| Due Date: | 06/15/2024 | Med/Surg Condition: | |
| Referral Type: | AD&D Review | Disability Occ Type: | |
| Reason for Priority Handling: | | Product Type: | LIFE |
| Other Considerations | | LDW: | 08/25/2021 |
| | | DOD: | |
| Physical Demands: | | BBD: | |
| Non-Medical Issue: | No | Non-Med Issue Details: | |

Questions and Answers

*Q1.    From a medical perspective, is it appropriate for medical providers to defer to the recollections of the claimant and others that the claimant only consumed six beers over seven hours and disregard a serum alcohol level of 222 mg/dL that was recorded in a blood draw at 17:46, less than two hours after the incident?*

A1.    As the claimant's reviewer Thomas Arnold, MD, noted that serum alcohol level corresponded to a blood alcohol concentration (BAC) of approximately 0.185 at 17:46.  The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.

The claimant weighed 82 kg.  An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking.[i]  If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking,[1] his BAC would have been essentially undetectable.  The calculation is:

$$0.12 - \left( \frac{9 \ hrs \ x \ 60\frac{min}{hr}}{40} \ X \ 0.01 \right) = \ -0.015$$

Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking.  His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.

It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink.  The evidence indicates the recollections underreported actual alcohol consumption.  This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters.[ii,iii,iv]  In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.

---

[1] The nine hours accounts for about two hours between the injury and alcohol test.

**Lincoln/Sewell 826**

Claimant: Timothy Sewell                                    June 03, 2024
Claim # 12885926                              Report by R Swotinsky MD; page 2

*Q2.    Review the medical records and state if it is correct that the 222 mg/dL serum alcohol level result was impacted by lactic acid in Sewell's system. If the answer is yes, what would be the estimated impact on the serum alcohol level due to the claimant's injuries and treatment as of the 17:46 blood draw on August 28, 2023, and how is this estimated impact determined?*

*Q3.    Has the impact of lactic acid on serum alcohol level testing been clearly established through research? For reference, see, "Can elevated lactate and LDH produce a false positive enzymatic ethanol result in live patients presenting to the emergency department?" Nacca N., et al. Clin Toxicol (Phila). 2018 Mar;56 (3):189-192*

A2/3.   Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test. Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase.[v] Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur.[vi] In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured.

*In Dr. Arnold's opinion, lactic acid made the alcohol test result inaccurate.*

In May 2023, claimant's reviewer Dr. Arnold opined that due to cardiac arrest and cardiopulmonary resuscitation, the claimant "would have accumulated a large amount of lactic acid in his blood" which interfered with the alcohol test and made the result falsely high. Dr. Arnold assumes the result was falsely high because it indicates more alcohol consumption than the claimant reported and because no-one who was with the claimant at the time of his injury reported that the claimant seemed intoxicated.

On 09/07/23, the insurer's reviewer Peggy Geimer, MD, addressed lactic acid and the alcohol test result as follows:

> "Dr. Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay. The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed. Lactic acidosis is not mentioned any where in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis."

On 11/17/23, Dr. Arnold responded to this as follows

> "Lactic acid is produced any time there is underperfusion of body tissues. The EMS providers on the scene reported that [the claimant] was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation. There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood...It is not uncommon for large lactic acid levels to be present without significant acidosis of the blood.... [The claimant] received

**Lincoln/Sewell 827**

Claimant: Timothy Sewell                                    June 03, 2024
Claim # 12885926                              Report by R Swotinsky MD; page 3

> IV fluids and the hospital record repeatedly shows [the claimant] being on vaso-active pressor agents to support low blood pressure and increase tissue perfusion.  All of these interventions treat lactic acidosis so the claim that [the claimant] did not receive treatment for lactic acidosis cannot be supported."

Dr. Arnold also notes that a laboratory test report footnote states the results are "not for legal or employment evaluative purposes."  Dr. Arnold says this footnote is additional evidence that the test results are unreliable.

Dr. Arnold's reports include no supporting citation(s) from the medical/scientific literature.  Dr. Arnold's reports do not quantify the effect he believes lactic acid had on the test result.

*The medical/scientific literature lacks support for Dr. Arnold's theory.*

Dr. Arnold's makes assumptions.  He assumes that the claimant:

1.      Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused high lactic acid level to be present.
2.      Had an inaccurate test result due to the lactic acid in his blood.

The first assumption is contradicted by the medical records.  The second assumption is unsupported by medical/scientific literature.  I explain why:

1.      Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused a high level of lactic acid in his blood.

The Port Arkansas EMS record states that CPR compressions were started at 16:51, an EKG was performed at 16:55 showing a sinus rhythm and heart rate of 60, and thus CPR compressions were discontinued.  The record thus indicates that the claimant underwent <u>CPR compressions for up to four minutes</u>.  The Port Arkansas EMS record does not indicate that the claimant was in cardiac arrest, and instead indicates that he had faint pulses when first checked at 16:51 and his heart was in normal sinus rhythm and his blood pressure was 135/62 at 16:55 when first checked by EKG, i.e., <u>he was not in cardiac arrest</u>.

Most cases of elevated lactic acid are due to marked tissue hypoperfusion resulting from low fluid volume (e.g., "bleeding out"), heart failure, sepsis, or heart attack.  Before the claimant's blood was collected for ethanol, the claimant did not have health condition associated with elevated lactic acid.  While Dr. Arnold implies that performing CPR causes elevated lactic acid levels, my search of the medical literature did not find evidence of this.  (There is an association of lactic acid elevations in patients who have had CPR.  That association is because many patients who need CPR have suffered a condition that causes elevated lactic acid levels.  The claimant, however, did not.)

**Lincoln/Sewell 828**

Claimant: Timothy Sewell                                                    June 03, 2024
Claim # 12885926                                          Report by R Swotinsky MD; page 4

Dr. Arnold does not mention lactate dehydrogenase.  As noted above, the literature about elevated enzymatic ethanol test results involves elevations of both lactic acid and lactate dehydrogenase at the same time.

2.    Had an inaccurate ethanol test result due to a high level of lactic acid in his blood.

The phenomenon of elevated lactic acid and lactate dehydrogenase causing elevated enzymatic ethanol test results has been described in autopsy blood samples.[vii,viii]  It has been raised as a possibility when trauma patients with elevated levels of lactate and/or lactate dehydrogenase levels were admitted to the hospital for treatment.  However, studies have found little evidence to support this possibility in live patients.[ix]  For example:

- A study of 37 patients hospitalized with elevated lactate and lactate dehydrogenase levels failed to find an elevation in ethanol content.  The study concludes, "This data does not support the contention that an elevated LDH[2] and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."[x]

An article describes two children who were tested around the time they died, and who had elevated levels of both lactic acid and lactic dehydrogenase leading to elevated ethanol concentrations.[xi]  I can't tell if this article falls in the category of dead patients or living patients.  In any event, there is little or no evidence to support Dr. Arnold's contention that high levels of lactic acid (and lactate dehydrogenase?) caused elevation of the claimant's enzymatic ethanol test result.

Dr. Arnold does not address elevated lactate dehydrogenase.  I don't know if he is assuming lactate dehydrogenase was also elevated.  The record presents no measurement of lactate dehydrogenase or indication that it was elevated.

_____

In summary, Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:

- Unquantified.  To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?
- Presented without corroborating facts
- Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.
- Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.

_____

[2] LDH = lactate dehydrogenase.

**Lincoln/Sewell 829**

Claimant: Timothy Sewell
Claim # 12885926

June 03, 2024
Report by R Swotinsky MD; page 5

*Q4.      How quickly does lactic acid clear from the bloodstream after "a spontaneous heartbeat and adequate blood pressure," as described in Dr. Arnold's November 17, 2023, report?*

A4.      Lactic acid is a normal constituent of blood.  It can accumulate to elevated levels after certain medical conditions, most commonly hypovolemia, heart failure, sepsis, and heart attack.  The claimant did not have a condition causing significant elevated lactic acid levels before or when he was tested for ethanol.  Dr. Arnold's 11/17/23 report assumes elevated lactic acid because the claimant was in cardiac arrest for 6-8 minutes and had CPR for 6-8 minutes.  But, the medical records indicate the claimant was not in cardiac arrest for 6-8 minutes (or at all), and had CPR chest compressions for no more than 4 minutes.  Furthermore, my search of the medical/scientific literature found a lack of support for Dr. Arnold's assertion that CPR causes elevated lactic acid levels.

*Q5.      Would the 222 mg/dL serum alcohol level be relied upon by medical professional if relevant to the claimant's treatment, despite the disclaimer in the notes that, "Results are for medical purposes only and not for legal or employment evaluative purposes."*

A5.      The claimant's ethanol test at the hospital is assumed to have been an enzymatic test.   Hospitals commonly use enzymatic-based ethanol assays for diagnostic and medical purposes.  The results of such testing may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.[vi]  The laboratory's legal counsel would be better positioned to address the purpose of having that disclaimer on their reports.

*Q6.      At what serum alcohol level would the claimant's judgment be sufficiently impaired to have contributed to the cause of the incident that resulted in the claimant's quadriplegia?*

A6.      Per Dr. Arnold, based on the measured BAC at 17:49, the claimant's BAC at the time of the injury was 0.22.  A person's impairment at a given BAC is subject to factors like drinking history (trolerance) and timing (is the BAC going up or going down?).  Thus, the medical literature presents overlapping ranges of impairment corresponding with BAC.  For example:[xii]

**Table IV.** Most Recent Version of the Dubowski Alcohol Table (2012) Depicting Seven Stages of Alcohol Influence with Overlapping Ranges of BAC and the Associated Clinical Signs and Symptoms of Intoxication (43)

| BAC (g/100 mL) | Stage of alcoholic influence | Clinical signs and/or symptoms |
|---|---|---|
| 0.01–0.05 | Subclinical | Behavior nearly normal by ordinary observation. Influence/effects usually not apparent or obvious. Impairment detectable by special tests. |
| 0.03–0.12 | Euphoria | Mild euphoria, sociability, talkativeness. Increased self-confidence; decreased inhibitions. Diminished attention, judgment and control. Some sensory-motor impairment. Slowed information processing. Loss of efficiency in critical performance tests. |
| 0.09–0.25 | Excitement | Emotional instability; loss of critical judgment. Impairment of perception, memory, and comprehension. Decreased sensatory response; increased reaction time. Reduced visual acuity and peripheral vision and slower glare recovery. Sensory-motor incoordination; impaired balance; slurred speech. Vomiting; drowsiness. |
| 0.18–0.30 | Confusion | Disorientation, mental confusion; vertigo; dysphoria. Exaggerated emotional states (fear, rage, grief, etc.). Disturbances of vision (diplopia, etc.) and of perception of color, form, motion, dimensions. Increased pain threshold. Increased muscular incoordination; staggering gait; ataxia. Memory loss. Apathy with progressive lethargy. |
| 0.25–0.40 | Stupor | General inertia; approaching loss of motor functions. Markedly decreased response to stimuli. Marked muscular incoordination; inability to stand or walk. Vomiting; incontinence of urine and feces. Impaired consciousness; sleep or stupor; deep snoring. |
| 0.35–0.50 | Coma | Complete unconsciousness; coma; anesthesia. Depressed or abolished reflexes. Subnormal temperature. Impairment/irregularities of circulation and respiration. Possible death. |
| Mean, median 0.36 (90% 0.21–0.50) | Death | Death from respiratory failure and/or cardiac arrest. |

**Lincoln/Sewell 830**

Claimant: Timothy Sewell                                      June 03, 2024
Claim # 12885926                              Report by R Swotinsky MD; page 6

Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions.  As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries.  The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.

_____

*All medical records provided by Lincoln Financial Group as of today's date were reviewed, including the most recent document in the file which is fax-stamped 05/16/23.*

_____

*Electronically Signed:*

Robert Swotinsky MD
Bd Cert, Occupational Medicine
_____

References

[i] Alcohol impairment charts for men and women.  In: *UpToDate.*  Waltham, MA: Wolters-Kluwer.  2024.

[ii] Northcote J, Livingston M.  Accuracy of self-reported drinking: observational verification of 'last occasion' drink estimates of young adults.  *Alcohol Alcohol.*  2011;46:709-13.

[iii] McKenna H, Treanor C, O'Reilly D, Donnelly M.  Evaluation of the psychometric properties of self-reported measures of alcohol consumption: a COSMIN systematic review.  Substance Abuse Treatment, Prevention, and Policy.  2018;13:6.

[iv] Del Boca F, Darkes J.  The validity of self-reports of alcohol consumption: state of the science and challenges for research.  *Addiction.*  2009;98:1-12.

[v] Powers R, Dean D.  Evaluation of potential lactate/lactate dehydrogenase interference with an enzymatic alcohol analysis.  *J Anal Toxicol.*  2009;33:561-3.

[vi] Goldberger B, Caplan Y, Levine B.  Methods for fluid analysis.  In: Caplan Y, Goldberger B (eds).  *Garriott's Medicolegal Aspects of Alcohol, 6th Ed.*  Tucson, AZ: Lawyers& Judges Publishing Company, Inc.  2015.  Pgs. 256-257.

[vii] Badcock N, O'Reilly D. False-positive EMIT-st ethanol screen with post-mortem infant plasma.  *Clin Chem.* 1992;38:434.

[viii] Nine J, Moraca M, Virji M, et al.  Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays.  *J Anal Toxicol.*  1995;19:192-6.

[ix] Winek C, Wahba W.  A response to "serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays."  *J Anal Toxicol.*  1996;20:211.

[x] Nacca N, Hodgman M,, Lao K, et al.  Can elevated lactate and LDH produce a false-positive enzymatic ethanol result in live patients presenting to the emergency department?  *Clin Toxicol (Phila).*  2018;56:189-92.  Abstract: https://pubmed.ncbi.nlm.nih.gov/28812382/

[xi] Bishop-Freeman S, Bertholf R, Powers R, et al.  False-positive enzymatic alcohol results in perimortem specimens.  *Lab Med.* 2020;51:394-401.

[xii] Dubowski K.  The Dubowski alcohol table.  *IACT Newsletter.*  2012;23:7-8.

**Lincoln/Sewell 831**

## Clinical Review Memo

| Customer Name | Claimant Name | | Claim Number |
|---|---|---|---|
| McLarens, LLC | Timothy Sewell | | 12885926 |
| Report Date: | 06/01/2024 | | |
| Referred By: | Lindsay Mack | Claimant DOB: | |
| Referral Date: | 05/28/2024 | Job Title: | |
| Due Date: | 06/15/2024 | Med/Surg Condition: | |
| Referral Type: | AD&D Review | Disability Occ Type: | |
| Reason for Priority Handling: | | Product Type: | LIFE |
| Other Considerations | | LDW: | 08/25/2021 |
| | | DOD: | |
| Physical Demands: | | BBD: | |
| Non-Medical Issue: | No | Non-Med Issue Details: | |

Questions and Answers

*Q1.    From a medical perspective, is it appropriate for medical providers to defer to the recollections of the claimant and others that the claimant only consumed six beers over seven hours and disregard a serum alcohol level of 222 mg/dL that was recorded in a blood draw at 17:46, less than two hours after the incident?*

A1.    As the claimant's reviewer Thomas Arnold, MD, noted that serum alcohol level corresponded to a blood alcohol concentration (BAC) of approximately 0.185 at 17:46.  The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.

The claimant weighed 82 kg.  An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking.[i]  If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking,[1] his BAC would have been essentially undetectable.  The calculation is:

$$0.12 - \left( \frac{9 \; hrs \; x \; 60\frac{min}{hr}}{40} \; X \; 0.01 \right) = \; -0.015$$

Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking.  His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.

It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink.  The evidence indicates the recollections underreported actual alcohol consumption.  This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters.[ii,iii,iv]  In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.

---

[1] The nine hours accounts for about two hours between the injury and alcohol test.

**Lincoln/Sewell 832**

Claimant: Timothy Sewell                                          June 01, 2024
Claim # 12885926                                       Report by R Swotinsky MD; page 2

*Q2.    Review the medical records and state if it is correct that the 222 mg/dL serum alcohol level result was impacted by lactic acid in Sewell's system.  If the answer is yes, what would be the estimated impact on the serum alcohol level due to the claimant's injuries and treatment as of the 17:46 blood draw on August 28, 2023, and how is this estimated impact determined?*
*Q3.    Has the impact of lactic acid on serum alcohol level testing been clearly established through research?  For reference, see, "Can elevated lactate and LDH produce a false positive enzymatic ethanol result in live patients presenting to the emergency department?" Nacca N., et al.  Clin Toxicol (Phila).  2018 Mar;56 (3):189-192*

A2/3.   Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test.   Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase.[v] Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur.[vi]  In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured.

*In Dr. Arnold's opinion, lactic acid made the alcohol test result inaccurate.*

In May 2023, claimant's reviewer Dr. Arnold opined that due to cardiac arrest and cardiopulmonary resuscitation, the claimant "would have accumulated a large amount of lactic acid in his blood" which interfered with the alcohol test and made the result falsely high.  Dr. Arnold assumes the result was falsely high because it indicates more alcohol consumption than the claimant reported and because no-one who was with the claimant at the time of his injury reported that the claimant seemed intoxicated.

On 09/07/23, the insurer's reviewer Peggy Geimer, MD, addressed lactic acid and the alcohol test result as follows:

> "Dr. Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay.  The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed.  Lactic acidosis is not mentioned any where in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis."

On 11/17/23, Dr. Arnold responded to this as follows

> "Lactic acid is produced any time there is underperfusion of body tissues.  The EMS providers on the scene reported that [the claimant] was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation.  There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood...It is not uncommon for large lactic acid levels to be present without significant acidosis of the blood.... [The claimant] received

**Lincoln/Sewell 833**

Claimant: Timothy Sewell                                          June 01, 2024
Claim # 12885926                                  Report by R Swotinsky MD; page 3

> IV fluids and the hospital record repeatedly shows [the claimant] being on vaso-active pressor agents to support low blood pressure and increase tissue perfusion.  All of these interventions treat lactic acidosis so the claim that [the claimant] did not receive treatment for lactic acidosis cannot be supported."

Dr. Arnold also notes that a laboratory test report footnote states the results are "not for legal or employment evaluative purposes."  Dr. Arnold says this footnote is additional evidence that the test results are unreliable.

Dr. Arnold's reports include no supporting citation(s) from the medical/scientific literature.  Dr. Arnold's reports do not quantify the effect he believes lactic acid had on the test result.

*The medical/scientific literature lacks support for Dr. Arnold's theory.*

Dr. Arnold's makes assumptions.  He assumes that the claimant:

1.      Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused high lactic acid level to be present.
2.      Had an inaccurate test result due to the lactic acid in his blood.

The first assumption is contradicted by the medical records.  The second assumption is unsupported by medical/scientific literature.  I explain why:

1.      Was in cardiac arrest and underwent CPR for 6-8 minutes, which caused a high level of lactic acid in his blood.

The Port Arkansas EMS record states that CPR compressions were started at 16:51, an EKG was performed at 16:55 showing a sinus rhythm and heart rate of 60, and thus CPR compressions were discontinued.  The record thus indicates that the claimant underwent <u>CPR compressions for up to four minutes</u>.  The Port Arkansas EMS record does not indicate that the claimant was in cardiac arrest, and instead indicates that he had faint pulses when first checked at 16:51 and his heart was in normal sinus rhythm and his blood pressure was 135/62 at 16:55 when first checked by EKG, i.e., <u>he was not in cardiac arrest</u>.

Most cases of elevated lactic acid are due to marked tissue hypoperfusion resulting from low fluid volume (e.g., "bleeding out"), heart failure, sepsis, or heart attack.  Before the claimant's blood was collected for ethanol, the claimant did not have health condition associated with elevated lactic acid.  While Dr. Arnold implies that performing CPR causes elevated lactic acid levels, my search of the medical literature did not find evidence of this.  (There is an association of lactic acid elevations in patients who have had CPR.  That association is because many patients who need CPR have suffered a condition that causes elevated lactic acid levels.  The claimant, however, did not.)

**Lincoln/Sewell 834**

Dr. Arnold does not mention lactate dehydrogenase.  As noted above, elevations of both lactic acid and lactate dehydrogenase are necessary to

2.      Had an inaccurate ethanol test result due to a high level of lactic acid in his blood.

The phenomenon of elevated lactic acid and lactate dehydrogenase causing elevated enzymatic ethanol test results has been described in autopsy blood samples.[vii,viii]  It has been raised as a possibility when trauma patients with elevated levels of lactate and/or lactate dehydrogenase levels were admitted to the hospital for treatment.  However, studies have found little evidence to support this possibility in live patients.[ix]  For example:

- A study of 37 patients hospitalized with elevated lactate and lactate dehydrogenase levels failed to find an elevation in ethanol content.  The study concludes, "This data does not support the contention that an elevated LDH[2] and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department."[x]

An article describes two children who were tested around the time they died, and who had elevated levels of both lactic acid and lactic dehydrogenase leading to elevated ethanol concentrations.[xi]  I can't tell if this article falls in the category of dead patients or living patients.  In any event, there is little or no evidence to support Dr. Arnold's contention that high levels of lactic acid (and lactate dehydrogenase?) caused elevation of the claimant's enzymatic ethanol test result.

Dr. Arnold does not address elevated lactate dehydrogenase.  I don't know if he is assuming lactate dehydrogenase was also elevated.  The record presents no measurement of lactate dehydrogenase or indication that it was elevated.

_____

In summary, Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:

- Unquantified.  To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?
- Presented without corroborating facts
- Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.
- Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.

---

[2] LDH = lactate dehydrogenase.

**Lincoln/Sewell 835**

Claimant: Timothy Sewell                                                June 01, 2024
Claim # 12885926                                  Report by R Swotinsky MD; page 5

*Q4.      How quickly does lactic acid clear from the bloodstream after "a spontaneous heartbeat and adequate blood pressure," as described in Dr. Arnold's November 17, 2023, report?*

A4.      Lactic acid is a normal constituent of blood.  It can accumulate to elevated levels after certain medical conditions, most commonly hypovolemia, heart failure, sepsis, and heart attack.  The claimant did not have a condition causing significant elevated lactic acid levels before or when he was tested for ethanol.  Dr. Arnold's 11/17/23 report assumes elevated lactic acid because the claimant was in cardiac arrest for 6-8 minutes and had CPR for 6-8 minutes.  But, the medical records indicate the claimant was not in cardiac arrest for 6-8 minutes (or at all), and had CPR chest compressions for no more than 4 minutes.  Furthermore, my search of the medical/scientific literature found a lack of support for Dr. Arnold's assertion that CPR causes elevated lactic acid levels.

*Q5.      Would the 222 mg/dL serum alcohol level be relied upon by medical professional if relevant to the claimant's treatment, despite the disclaimer in the notes that, "Results are for medical purposes only and not for legal or employment evaluative purposes."*

A5.      The claimant's ethanol test at the hospital is assumed to have been an enzymatic test.   Hospitals commonly use enzymatic-based ethanol assays for diagnostic and medical purposes.  The results of such testing may be used to establish blood alcohol concentrations and to form opinions about alcohol intoxication.[vi]  The laboratory's legal counsel would be better positioned to address the purpose of having that disclaimer on their reports.

*Q6.      At what serum alcohol level would the claimant's judgment be sufficiently impaired to have contributed to the cause of the incident that resulted in the claimant's quadriplegia?*

A6.      Per Dr. Arnold, based on the measured BAC at 17:49, the claimant's BAC at the time of the injury was 0.22.  A person's impairment at a given BAC is subject to factors like drinking history (trolerance) and timing (is the BAC going up or going down?).  Thus, the medical literature presents overlapping ranges of impairment corresponding with BAC.  For example:[xii]

**Table IV.** Most Recent Version of the Dubowski Alcohol Table (2012) Depicting Seven Stages of Alcohol Influence with Overlapping Ranges of BAC and the Associated Clinical Signs and Symptoms of Intoxication (43)

| BAC (g/100 mL) | Stage of alcoholic influence | Clinical signs and/or symptoms |
| --- | --- | --- |
| 0.01–0.05 | Subclinical | Behavior nearly normal by ordinary observation. Influence/effects usually not apparent or obvious. Impairment detectable by special tests. |
| 0.03–0.12 | Euphoria | Mild euphoria, sociability, talkativeness. Increased self-confidence; decreased inhibitions. Diminished attention, judgment and control. Some sensory-motor impairment. Slowed information processing. Loss of efficiency in critical performance tests. |
| 0.09–0.25 | Excitement | Emotional instability; loss of critical judgment. Impairment of perception, memory, and comprehension. Decreased sensatory response; increased reaction time. Reduced visual acuity and peripheral vision and slower glare recovery. Sensory-motor incoordination; impaired balance; slurred speech. Vomiting; drowsiness. |
| 0.18–0.30 | Confusion | Disorientation, mental confusion; vertigo; dysphoria. Exaggerated emotional states (fear, rage, grief, etc.). Disturbances of vision (diplopia, etc.) and of perception of color, form, motion, dimensions. Increased pain threshold. Increased muscular incoordination; staggering gait; ataxia. Memory loss. Apathy with progressive lethargy. |
| 0.25–0.40 | Stupor | General inertia; approaching loss of motor functions. Markedly decreased response to stimuli. Marked muscular incoordination; inability to stand or walk. Vomiting; incontinence of urine and feces. Impaired consciousness; sleep or stupor; deep snoring. |
| 0.35–0.50 | Coma | Complete unconsciousness; coma; anesthesia. Depressed or abolished reflexes. Subnormal temperature. Impairment/irregularities of circulation and respiration. Possible death. |
| Mean, median 0.36 (90% 0.21–0.50) | Death | Death from respiratory failure and/or cardiac arrest. |

**Lincoln/Sewell 836**

Claimant: Timothy Sewell                                          June 01, 2024
Claim # 12885926                                    Report by R Swotinsky MD; page 6

Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions.  As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries.  The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.

_____

*All medical records provided by Lincoln Financial Group as of today's date were reviewed, including the most recent document in the file which is fax-stamped 05/16/23.*

_____

*Electronically Signed:*

Robert Swotinsky MD
Bd Cert, Occupational Medicine
_____

## References

[i] Alcohol impairment charts for men and women.  In: *UpToDate*.  Waltham, MA: Wolters-Kluwer.  2024.

[ii] Northcote J, Livingston M.  Accuracy of self-reported drinking: observational verification of 'last occasion' drink estimates of young adults.  *Alcohol Alcohol.*  2011;46:709-13.

[iii] McKenna H, Treanor C, O'Reilly D, Donnelly M.  Evaluation of the psychometric properties of self-reported measures of alcohol consumption: a COSMIN systematic review.  Substance Abuse Treatment, Prevention, and Policy.  2018;13:6.

[iv] Del Boca F, Darkes J.  The validity of self-reports of alcohol consumption: state of the science and challenges for research.  *Addiction.*  2009;98:1-12.

[v] Powers R, Dean D.  Evaluation of potential lactate/lactate dehydrogenase interference with an enzymatic alcohol analysis.  *J Anal Toxicol.*  2009;33:561-3.

[vi] Goldberger B, Caplan Y, Levine B.  Methods for fluid analysis.  In: Caplan Y, Goldberger B (eds).  *Garriott's Medicolegal Aspects of Alcohol, 6th Ed.*  Tucson, AZ: Lawyers& Judges Publishing Company, Inc.  2015.  Pgs. 256-257.

[vii] Badcock N, O'Reilly D. False-positive EMIT-st ethanol screen with post-mortem infant plasma.  *Clin Chem.* 1992;38:434.

[viii] Nine J, Moraca M, Virji M, et al.  Serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays.  *J Anal Toxicol.*  1995;19:192-6.

[ix] Winek C, Wahba W.  A response to "serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays."  *J Anal Toxicol.*  1996;20:211.

[x] Nacca N, Hodgman M,, Lao K, et al.  Can elevated lactate and LDH produce a false-positive enzymatic ethanol result in live patients presenting to the emergency department? *Clin Toxicol (Phila).*  2018;56:189-92. Abstract: https://pubmed.ncbi.nlm.nih.gov/28812382/

[xi] Bishop-Freeman S, Bertholf R, Powers R, et al.  False-positive enzymatic alcohol results in perimortem specimens.  *Lab Med.* 2020;51:394-401.

[xii] Dubowski K.  The Dubowski alcohol table.  *IACT Newsletter.*  2012;23:7-8.

**Lincoln/Sewell 837**

| | |
|---|---|
| From: | LFGNotifications@LFG.com |
| Sent: | Friday, May 24, 2024 11:58:41 AM |
| To: | PARA.HCARECORDSREQUESTTX@HCAHEALTHCARE.COM; |
| CC: | |
| BCC: | |
| Subject: | [Send Secure]McLarens, LLC Claim No. 12885926 Timothy Sewell |
| Attachments: | iocflba0agk0iglmr5nv_17910573.pdf; |

This notification contains important information regarding a claim with Lincoln Financial Group company. THIS IS AN AUTOMATED EMAIL. PLEASE DO NOT RESPOND. You may use the contact information in the attached letter to respond if needed.

**Lincoln/Sewell 838**



The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

May 24, 2024

Corpus Christi Medical Center
7101 S. PADRE ISLAND DR
CORPUS CHRISTI, TX 78412

RE:    Waiver of Premium Benefits-Group Life Insurance
       Policyholder: McLarens, LLC
       Policy #: SA3-890-LF0483-01
       Claim #: 12885926

To Whom It May Concern:

\*\*\*URGENT / Please expedite\*\*\*

The Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for employee accidental death and dismemberment benefits under McLarens, LLC's Group Life Insurance Policy (the Policy). We are writing in reference to Timothy Sewell's claim for benefits under the Policy.

Patient's Name: Timothy Sewell
DOB:

To assist in our evaluation to determine if dismemberment benefits are payable, we are requesting the following documentation:

- **Copies of 8/28/21 lab reports, specifically including any alcohol testing, from Corpus Christi Medical Center (Bay Area and/or Heart Hospital)**

Please send the records to my attention via secure fax to (603) 334-0401 or email to LifeClaimDocs@LFG.com. We would appreciate your response as soon as possible.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lindsay Mack
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 14698
Secure Fax No.: (603) 334-0401

1  of 1

**Lincoln/Sewell 839**