**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **TIMOTHY SEWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 2:23-cv-00317** |
| **THE LINCOLN NATIONAL LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

By:   /s/ Iwana Rademaekers
Iwana Rademaekers, Attorney in Charge
State Bar of Texas No. 16452560
S.D. of Texas No. 22781
LAW OFFICES OF IWANA RADEMAEKERS, P.C.
17304 Preston Road, Suite 800
Dallas, Texas 75252
Main:  (214) 579-9319
Fax:  (469) 444-6456
Email:  iwana@rademaekerslaw.com

ATTORNEYS FOR DEFENDANT THE
LINCOLN NATIONAL LIFE INSURANCE
COMPANY

## TABLE OF CONTENTS

I. NATURE AND STAGE OF PROCEEDINGS ................................................................1

II. ISSUE FOR THE COURT ...........................................................................................2

III. SUMMARY OF THE ARGUMENT ...........................................................................2

IV. FACTUAL BACKGROUND ........................................................................................4

V. ARGUMENT AND AUTHORITIES ..........................................................................15

   A.  THE COURT MUST REVIEW LINCOLN'S DENIAL OF SEWELL'S CLAIM FOR AD&D BENEFITS UNDER THE "ABUSE OF DISCRETION" STANDARD..............15

     1.  The Court Must Uphold Lincoln's Decision if the Administrative Record Contains Substantial Evidence to Support the Decision, Even if Lincoln's Decision Falls on the Lower End of a Continuum of Reasonableness. ..................... 15

     2.  Based on the Evidence and Administrative Record, Lincoln's Conflict is Not a Significant Factor for the Court to Consider in its Determination of Whether Lincoln Abused its Discretion in Making its Decisions on Sewell's Claim. ............ 16

   B.  THE ADMINISTRATIVE RECORD CONTAINS SUBSTANTIAL EVIDENCE THAT SUPPORTS LINCOLN'S DENIAL OF SEWELL'S CLAIM FOR AD&D BENEFITS DUE TO THE POLICY EXCLUSION. .........................................................19

     1.  Sewell's BAC Level and the Nature of the Incident Provide Substantial Evidence to Support That Lincoln's Decision Was Not an Abuse of Discretion. .................... 19

     2.  The Documents in the Administrative Record that were Submitted by Sewell Fail to Either Rebut the Presumption that Sewell's Alcohol Use Contributed to the Incident or Cast Doubt on the Substantial Evidence Relied upon by Lincoln. ......... 22

VI. CONCLUSION AND PRAYER .................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir, 1996) .............. 16

*Brown v. Liberty Life Assurance Company of Boston*, No. CIV-14-0419-HE at p. 4 (W.D. Okla. June 11, 2015); ................................................................................... 18

*Carter v. Nationwide Mutual Ins. Co.*, 338 F. App'x 377 (5th Cir. 2009) ......................................... 18

*Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) .......................... 16

*Dotsenko v. Liberty Life Assurance Company of Boston*, No. 5:12cv00555 (W.D. Tex. June 11, 2013); ................................................................................... 18

*Dutka v. AIG Life Ins. Co.,* 573 F.3d 210, 214 (5th Cir. June 24, 2009) ..................................... 17, 20

*Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004) .................................... 16

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) .................................................. 15

*George v. Reliance Stand. Life Ins. Co.*, 776 F.3d 349, 352, 354 (5th Cir. 2015) ................. 15, 16, 22

*Gooden v. Provident Life & Acc. Ins. Co.,* 250 F.3d 329, 333 (5th Cir. 2001) ................................. 17

*Hampton v. Liberty Life Assurance Company of Boston*, No. 4:11-CV-100 at p. 17 (S.D. Miss. March 30, 2013); .................................................................. 18

*Hargrave v. Parker Drilling Co.*, 2010 U.S. Dist. LEXIS 93534 at 17 (W.D. La. Aug. 25, 2010) ........................................................................................ 20

*Havens v. Liberty Life Assurance Company of Boston*, No. SA-09-CA-372-H at p. 10-11 (W.D. Tex. July 6, 2010) ...................................................................... 18

*Hill v. Aetna Life Ins. Co.,* 546 F. Supp. 2d 343, 351 (546 F. Supp. 2d 343, 351 (S.D. Miss. 2008) ...................................................................................... 20

*Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. July 16, 2009) .................................................................................. 16, 17

*Johnson v. Liberty Life Assurance Company of Boston*, No. 2:13cv916-WHA at p. 13-15 (M.D. Ala. Jan. 20, 2015); ................................................................ 18

*Jones v. Channel Shipyard & Co.*, 2001 U.S. Dist. LEXIS 19639 at 10 (E.D. La. Nov. 20, 2001) ........................................................................................ 20

*Loucka v. Lincoln Nat'l Life Ins. Co.*, 334 F. Supp. 3d 1 at 21 (D. D.C. 2018) .............................. 19

*MacLachlan v. Exxon Mobil Corp.,* 350 F.3d 472, 478 (5th Cir. 2003) ........................................... 16

*Meditrust Financial Services Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 213, 214, 215 (5th Cir. 1999)............................................................................................................ 15, 16

*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 128 S.Ct. 2343, 2351 (2008) ................. 17, 18, 19

*Michael v. Liberty Life Assurance Company of Boston*, No. 4:13-cv-2733 at p. 13 (S.D. Tex. Oct. 9, 2014); ............................................................................................ 18

*Nichols v. Hartford Life & Accident Ins.*, 2014 U.S. Dist. LEXIS 196645 at 12 (S.D. Tex. June 9, 2014)................................................................................................................ 20

*Sanders v. UNUM Life Ins. Co. of Amer.,* 553 F.3d 922 (5th Cir. 2008) ........................................... 17

*Sanford v. Zurich Am. Ins. Co.*, 2009 U.S. Dist. LEXIS 84327 at 10-11 (N.D. Miss Sept. 15, 2009) ................................................................................................................. 20

*Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 296 (5th Cir. 1999) .............................................. 16

*Whitfield v. Lincoln Nat'l Life Ins. Co.*, 2011 U.S. Dist. LEXIS 112447 at 21 (N.D. Okla. 2011) .................................................................................................................. 18

**STATUTES**

29 U.S.C. § 1001....................................................................................................................1, 4

29 U.S.C. § 1132(a)(1)(B) ......................................................................................................2, 26

29 U.S.C. § 1132(g) ....................................................................................................................26

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | |
|---|---|
| TIMOTHY SEWELL, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) |
| | ) **Case No. 2:23-cv-00317** |
| THE LINCOLN NATIONAL LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| **Defendant.** | ) |

<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**</u>

Defendant The Lincoln National Life Insurance Company ("Lincoln") files this Motion for Summary Judgment and Brief in Support.[1]  This Motion for Summary Judgment is timely filed by Lincoln pursuant to the Court's Order dated September 5, 2024 (D.E. 23).

**I.**
<u>**NATURE AND STAGE OF PROCEEDINGS**</u>

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.("ERISA").  Plaintiff Timothy Sewell ("Sewell") was employed by McLarens, LLC ("McLarens") and filed a claim for Accidental Death and Dismemberment ("AD&D") benefits under the McLarens, LLC Group Life Insurance Plan (the "Life Plan"), which was insured by a Group Life Insurance Policy (the "Policy") issued by Lincoln to McLarens.  Lincoln denied Sewell's claim for AD&D benefits on January 27, 2023, on the grounds that the Policy contains a provision that benefits are not payable if the loss was contributed to or caused by "the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered

---

[1]    Exhibits 1 through 4 referenced throughout this Motion and Brief refer to the Exhibits attached to Defendant's Amended Response to ERISA Case Order (Dkt 21), specifically, Ex. 1 at D.E. 21-1, Ex. 2 at D.E. 21-2, Ex. 3 at D.E. 21-3 and D.E. 21-4, and Ex. 4 at D.E. 21-5.

Person was under the influence of alcohol and contributed to the cause of the accident." Sewell appealed the decision to deny benefits, and Lincoln upheld its decision on September 27, 2023. Upon consideration of a second letter of appeal from Sewell's Counsel, as well as additional documentation, Lincoln denied the second appeal on August 2, 2024.

In his Complaint filed in the above-styled action, Sewell has brought a claim against Lincoln for recovery of benefits under ERISA, specifically 29 U.S.C. § 1132(a)(1)(B) and alleges that he is owed AD&D benefits from Lincoln. Lincoln is entitled to judgment on Sewell's claim to recover benefits because the decision by Lincoln to deny Sewell's appeal of the denial of Sewell's claim for AD&D benefits was not an abuse of discretion.

## II.
## ISSUE FOR THE COURT

A. Whether Lincoln's decision to deny Sewell's claim for AD&D benefits was an abuse of discretion.

## III.
## SUMMARY OF THE ARGUMENT

It is abundantly clear that Lincoln not only did not abuse its discretion but correctly denied Sewell's claim for AD&D benefits from the Life Plan. Lincoln received Sewell's claim for AD&D benefits based on Sewell becoming a quadriplegic after diving into shallow water from the back of a boat. A thorough review of the claim was completed, and it was determined that the AD&D benefits were not payable as the administrative record concerning Sewell's claim supported a finding that Sewell's quadriplegia was contributed to or caused by the presence of alcohol in his blood. Therefore, the Policy exclusion operates to bar payment of Sewell's claim for accidental dismemberment benefits.

The Policy's exclusion that was applied reads, "No benefits are payable for any loss that is contributed to or caused by: . . . 11. the presence of alcohol in the Covered Person's blood

which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred."[2]  Testing of Sewell's blood soon after he arrived at the hospital showed a blood alcohol concentration ("BAC") of .222%, which was almost three times the legal limit in Texas (.08%). The presumption language in the Policy exclusion is significant. Moreover, the evidence in the administrative record lends further support for that presumption. First, Sewell's hospital diagnoses included alcohol abuse with intoxication. Additionally, as the reviewing physician, Dr. Robert Millstein, stated in his report, with a BAC of .222, Sewell would have experienced signs of severe intoxication with impairment in motor function with unsteadiness; incoordination; and impaired vision, cognitive function, and judgment, all of which contributed to the spinal cord injury that caused Sewell's quadriplegia.[3] Thus, with a BAC of .222%, Sewell's judgment when diving into the water would have been significantly and dangerously impaired. Therefore, the Policy exclusion applies, and no accidental dismemberment benefits are payable.

The Policy also includes sufficient discretionary language[4] such that the Court's review of Lincoln's decision will be under the abuse of discretion standard. Lincoln did not abuse its discretion in deciding that the presence of alcohol in Sewell's blood when he dove off the back of the boat while so severely intoxicated meant Sewell's loss was excluded under the Policy provisions. Accordingly, Lincoln did not abuse its discretion in finding that no AD&D benefits were payable.

This Motion is supported by the summary judgment evidence consisting of the Declaration of Kayla Bick (Exhibit A attached hereto), as well as the administrative record, the

---

2   Ex. 1, Policy, Lincoln/Sewell 033 (D.E. 21-1, Page 33).
3   Ex. 3, Administrative Record, Lincoln/Sewell 641 (D.E. 21-4, Page 168).
4   Ex. 1, Policy, Lincoln/Sewell 038 (D.E. 21-1, Page 38).

Policy, and the final appeal decision, which are all attached to Defendant's Amended Response to ERISA Case Order (Dkt 21) filed by Lincoln on August 8, 2024. All summary judgment evidence is fully incorporated into this Motion and Brief.

## IV.
## FACTUAL BACKGROUND

Sewell was employed by McLarens and was a participant in the Life Plan sponsored by McLarens. McLarens had contracted with Lincoln for the Policy to insure payment of certain benefits, including AD&D benefits, to McLarens' employees who participated in the Life Plan.[5]

The Life Plan at issue in this action is an employee welfare benefit plan as defined by 29 U.S.C. § 1001.[6] In his Complaint, Sewell asserts and admits that this action is governed by ERISA.[7]

The Policy provides AD&D benefits are "payable when a Covered Person suffers a loss solely as the result of accidental Injury that occurs while covered."[8] The Policy contains an exclusion that states:

> No benefits are payable for any loss that is contributed to or caused by:
> . . .
> 11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred.[9]

On October 21, 2022, Sewell's employer submitted a claim for AD&D benefits under the Policy to Lincoln on behalf of Sewell, which stated that Sewell "dove off of a boat into water and hit his head on a rock breaking his C3 and C4 and resulting in loss of feeling from his upper

---

[5]  Declaration of Kayla Bick, Exhibit A hereto, at ¶¶ 3; Ex. 1, Policy, Lincoln/Sewell 001-043 (D.E. 21-1, Pages 1-43).
[6]  Ex. 1, Policy, Lincoln /Sewell 001 (D.E. 21-1, Page 1).
[7]  Plaintiff's Complaint at ¶ 2 (Dkt 1, Page 1).
[8]  Ex. 1, Policy, Lincoln /Sewell 22 (D.E. 21-1, Page 22).
[9]  Ex. 1, Policy, Lincoln /Sewell 33 (D.E. 21-1, Page 33).

arms down."[10]  Medical records[11] were sent to Lincoln by Sewell's wife on December 5, 2022, that reflect that on August 28, 2021, at 6:14 p.m. Sewell's blood alcohol level was 222 mg/dl (High) at 6:14 p.m. (blood was collected at 5:46 p.m.),[12] which was more than an hour after the 4:40 p.m. reported time of the injury.[13]  Additionally, a diagnosis of alcohol abuse with intoxication (unspecified) was also noted in these medical records.[14]  During the initial claim evaluation, Lincoln referred Sewell's claim for review by Dr. Robert Millstein, who is Board Certified in Internal Medicine.  Dr. Millstein's January 11, 2023, Clinical Review Memo[15] included the following analysis:

- On 8/28/21 Mr. Sewell sustained a spinal cord injury resulting in quadriplegia in a diving accident into 3 feet of water from the back of the boat.  His blood alcohol level at the time of the diving accident was 222 mg/dL.

- With a blood alcohol level of 222 mg/dL Mr. Sewell would have experienced signs of severe intoxication with impairment in motor function-- unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.[16]

Dr. Millstein further noted:

The predominant effect of alcohol is in the brain.  High alcohol concentrations cause central nervous system depression, judgment disorder, decision inability, and impairment of perception and reaction to events. This impairment develops prior to the onset of more overt symptoms of alcohol intoxication, such as difficulty walking or maintaining balance.

With a blood alcohol level of 222 mg/dL Mr. Sewell would likely experience signs of severe intoxication with impairment in motor function-- unsteadiness,

---

10  Ex. 3, Administrative Record, Lincoln/Sewell 49 (Life Notes 23 and 24), and 667-669 (D.E. 21-3, Page 6, and D.E. 21-4, Pages 194-196).
11  Ex. 3, Administrative Record, Lincoln/Sewell 584-602 (D.E. 21-4, Pages 111-129).
12  Ex. 3, Administrative Record, Lincoln/Sewell 226, 237, and 599 (D.E. 21-3, Pages 172, 183, and D.E. 21-4, Page 126).
13  Ex. 3, Administrative Record, Lincoln/Sewell 234 (D.E. 21-3, Page 180).
14  Ex. 3, Administrative Record, Lincoln/Sewell 232 and 601 (D.E. 21-3, Page 178, and D.E. 21-4, Page 128).
15  Ex. 3, Administrative Record, Lincoln/Sewell 641-644 (D.E. 21-4, Pages 168-171).
16  Ex. 3, Administrative Record, Lincoln/Sewell 641 (D.E. 21-4, Page 168).

incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia.[17]

Dr. Millstein's summary of Mr. Sewell's medical treatment also notes "A list of diagnoses from the acute care hospitalization included alcohol abuse with intoxication."[18]

While Lincoln does not dispute and sympathizes with the sad fact that Sewell was rendered a quadriplegic as a result of this incident,[19] the terms of the Policy, specifically a Policy exclusion, meant that Sewell's claim for AD&D benefits must be denied. The bases for Lincoln's decision were outlined in a letter to Sewell dated January 27, 2023, which concluded,[20]

> The toxicology findings concluded that Mr. Sewell's blood ethanol was .222 mg/dL. Therefore, there is a presence of alcohol in the Covered Person's blood in this claim. This raises the presumption that Mr. Sewell was under the influence of alcohol and contributed to the cause of his accidental dismemberment. The facts of this claim support this presumption. Therefore, alcohol caused or, at a minimum, contributed to the cause of this accident. As such, we have determined that no Accidental Dismemberment benefits are payable as outlined in the #11 exclusion of Policy as noted above.[21]

On May 16, 2023, Lincoln received a letter from Sewell's counsel appealing the denial of Sewell's claim for AD&D benefits, along with additional documentation, totaling 33 pages.[22] The additional documentation included medical records from Port Aransas EMS and the Corporate Christi Medical Center, as well as unsigned affidavits of Sewell and others that included statements that Sewell had brought a 12-pack of beer onto the boat on the day of the

---

[17]  Ex. 3, Administrative Record, Lincoln/Sewell 642 (D.E. 21-4, Page 169).
[18]  Ex. 3, Administrative Record, Lincoln/Sewell 643; *see also* Lincoln/Sewell 601 (D.E. 21-4, Pages 170 and 128).
[19]  Lincoln notes that Sewell currently receives benefits from the McLaren Long Term Disability Plan under a group disability income policy issued by Lincoln to McLaren, and he also continues to be covered by the Life Plan by virtue of the waiver of premium provision in the Policy. Lincoln/Sewell 55, 105, and 108 (D.E. 21-3, Pages 12, 51, and 54).
[20]  Ex. 3, Administrative Record, Lincoln/Sewell 638-640 (D.E. 21-4, Pages 165-167).
[21]  Ex. 3, Administrative Record, Lincoln/Sewell 639 (D.E. 21-4, Page 166).
[22]  Ex. 3, Administrative Record, Lincoln/Sewell 516–548 (D.E. 21-4, Pages 43-75).

incident and drank six of them, and that Sewell did not appear to be intoxicated.[23]  Additionally, an April 28, 2023, letter by Dr. Thomas C. Arnold was included, which stated that, "Assuming the testimony in the affidavits listed above are truthful, it is my professional opinion that the serum alcohol level reported at the hospital **cannot possibly be accurate.**" (Emphasis original.)[24]  Again, relying on the affidavits, Dr. Arnold also stated that Sewell would have appeared significantly intoxicated, but none of the affidavits referenced that he was.[25]  Finally, Dr. Arnold stated that he believed that Sewell had accumulated a large amount of lactic acid in his blood that would explain the "inaccurate reading on the hospital serum alcohol assay."[26]

To ensure a full and fair review on appeal, Lincoln reviewed the information in the file in its entirety and considered all information, facts, and circumstances pertaining to this claim. During the appeal evaluation, Lincoln requested a second physician's review, which was conducted on June 7, 2023, by Dr. Peggy Geimer, an independent physician Board Certified in Internal Medicine and Preventive Medicine (Occupational Medicine).[27]  Dr. Geimer was asked to review the evidence in the file and comment on whether the presence of alcohol in Sewell's blood contributed to the cause of the incident, and in her report, she responded:

> Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed alcohol at a concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration of 0.222%. Mr. Sewell's hospital diagnoses included alcohol abuse with intoxication.  Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations.  Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing

---

[23]  Ex. 3, Administrative Record, Lincoln/Sewell 526-537 (D.E. 21-4, Pages 53-64).  Subsequently, signed affidavits were received, which were all signed in either late April or early May 2023, more than twenty months after the incident resulting in Sewell's injury occurred.  Lincoln/Sewell 181-192 (D.E. 21-3, Pages 127-138).

[24]  Ex. 3, Administrative Record, Lincoln/Sewell 524 (D.E. 21-4, Page 51).

[25]  Ex. 3, Administrative Record, Lincoln/Sewell 525 (D.E. 21-4, Page 52).

[26]  Ex. 3, Administrative Record, Lincoln/Sewell 525 (D.E. 21-4, Page 52).

[27]  Ex. 3, Administrative Record, Lincoln/Sewell 497-502 (D.E. 21-4, Pages 24-29).

capability.  Blood alcohol concentrations above 0.10% impair reaction time and control.  Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing.  The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.

Further the clinical review by Dr. Geimer indicated,

**Assessment:** Timothy Sewell is a 58-year-old male who, on 8/28/21, sustained a traumatic spinal cord injury involving his cervical spine when he reportedly dove into shallow water from a boat.  Among other findings, diagnostic imaging on admission revealed C4-C5 locked facet dislocation, C4- C5 anterior subluxation, cord edema from C2 to mid C6.  Blood testing revealed and [sic] ethanol concentration of 222 mg/dL. This is equivalent to a blood alcohol concentration (BAC) of 0.222%...[28]

Dr. Geimer also noted:

**Substances Found:**
**Alcohol:** Blood from the claimant was tested on the day of admission to Corpus Christi Medical Center and revealed alcohol at a concentration of 222 mg/dL (High).   This  is  equivalent  to  a  blood  alcohol  concentration  of  0.222%. Mr. Sewell's hospital diagnoses included alcohol abuse with intoxication.  Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior; reduced coordination, difficulty steering, reduced ability to track moving objects and reduced response to emergency driving situations. Blood alcohol concentrations greater than 0.08% impair muscle coordination (balance, speech, vision, reaction time, and hearing), detection of danger, judgment, self-control, reasoning, memory, concentration, perception, and reduce information processing capability.  Blood alcohol concentrations above 0.10% impair reaction time and control.  Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing.

**Comments on Affidavits submitted by Attorney McNamara:** This [sic] were reviewed in their entirety.  All agreed that Mr. Sewell was drinking on the boat of the day of his accident.  Of interest is the fact that while all of the participants on the boat acknowledged stopping at a "dockside restaurant" around 2:30 PM, the name of the restaurant was not mentioned nor was their [sic] any mention of the quantity or type of beverages consumed by Mr. Sewell or others at this restaurant.

**Comments on Medical Report from Dr. Thomas Arnold:** Records including the Port Aransas EMS Run Report and Medical Records from Corpus Christi

---

[28]   Ex. 3, Administrative Record, Lincoln/Sewell 498 (D.E. 21-4, Page 25).

Medical Center were made available to Dr. Arnold for his review.  These [sic] documents are not contained within the claim file, therefore the information regarding the clinical status prior to and at the time of admission cannot be confirmed.  He comments regarding the validity of the hospital's alcohol testing results are in question as well as they appear to be based primarily on statements from individuals on the boat that Mr. Sewell did exhibit "signs of severe intoxication".  As mentioned above, Mr. Sewell's doctors made and documented in the record the diagnosis of alcohol abuse with intoxication casting doubt on the opinion of lay bystanders.[29]

Lincoln sent a letter dated July 15, 2023, to Sewell's counsel enclosing a copy of Dr. Geimer's clinical review and advising of an opportunity to review and respond with any additional information for consideration before a final determination was made on the appeal.[30] Following receipt of the additional information received in connection with Sewell's appeal, including signed affidavits, medical records from Corpus Christi Medical Center – Bay Area, Port Aransas EMS Patient Care Record,[31] and additional affidavits,[32] Sewell's file was referred for an addendum review by Dr. Geimer whose September 7, 2023, report[33] concluded that review of the newly available records did not alter her prior assessment.[34]  Dr. Geimer noted that although Dr. Arnold believed that the BAC level could not be accurate, there was no evidence that the hospital's testing was flawed.  With regard to Dr. Arnold's statement that the presence of lactic acid impacted the tested BAC level, Dr. Geimer noted that only mild acidosis was noted on arterial blood gas testing, and lactic acid blood testing was not performed.  Moreover, lactic acidosis was not mentioned in the medical records, and Sewell did not receive any medications used to treat lactic acidosis.[35]

---

[29]  Ex. 3, Administrative Record, Lincoln/Sewell 499 (emphasis original) (D.E. 21-4, Page 26)
[30]  Ex. 3, Administrative Record, Lincoln/Sewell 488-490 (D.E. 21-4, Pages 15-17).
[31]  Ex. 3, Administrative Record, Lincoln/Sewell 181-420 (D.E. 21-3, Pages 127-366).
[32]  Ex. 3, Administrative Record, Lincoln/Sewell 449, 454, and 472-474 (D.E. 21-3, Pages 395, 400, and 418-419, D.E. 21-4, Page 1).
[33]  Ex. 3, Administrative Record, Lincoln/Sewell 137-144 (D.E. 21-3, Pages 83-90).
[34]  Ex. 3, Administrative Record, Lincoln/Sewell 137 (D.E. 21-3, Page 83).
[35]  Ex. 3, Administrative Record, Lincoln/Sewell 137-138 (D.E. 21-3, Pages 83-84).

Accordingly, after having conducted a thorough and independent review of Sewell's entire claim, Lincoln concluded that the decision to deny Sewell's claim would be upheld on appeal because "Sewell's accident was caused by or, at a minimum, contributed to by the influence of alcohol in his blood."[36]  Therefore, the Policy exclusion applied, and no accidental dismemberment benefits were payable.  The basis for the decision was outlined in a letter to Sewell's counsel dated September 27, 2023.[37]  Accordingly, Sewell had exhausted administrative remedies and the claim file was then closed.[38]

Subsequent to Lincoln's final appeal decision, on November 17, 2023, Sewell's counsel submitted an additional medical report prepared by Dr. Thomas C. Arnold.[39]  However, because the November 17, 2023, report was received after the final appeal decision, Lincoln did not consider the report in its final decision.[40]

The above-styled action was filed on November 30, 2023.  During the course of the litigation, the Parties disagreed regarding whether the November 17, 2023, report would be part of the administrative record.  Accordingly, to resolve this dispute between Sewell and Lincoln and to conserve the Court's efforts in its consideration of the matter, as well as eliminate the need for any potential Court remand for Lincoln to consider the report, Lincoln agreed to conduct an additional review of Sewell's claim to include the November 17, 2023, report.[41]  Sewell's counsel was advised that Sewell may submit whatever additional documentation that he desires Lincoln consider in connection with this review of the claim.[42]

---

[36]    Ex. 2, Appeal Decision Letter Dated September 27, 2023, Lincoln/Sewell 101 (D.E. 21-2, Page 9).
[37]    Ex. 2, Appeal Decision Letter Dated September 27, 2023, Lincoln/Sewell 093-103 (D.E. 21-2, Pages 1-11).
[38]    Ex. 2, Appeal Decision Letter Dated September 27, 2023, Lincoln/Sewell 102 (D.E. 21-2, Page 10).
[39]    Ex. 3, Administrative Record, Lincoln/Sewell 66-70 (D.E. 21-3, Pages 23-27).
[40]    Ex. 3, Administrative Record, Lincoln/Sewell 65 (D.E. 21-3, Page 22).
[41]    Lincoln's Motion to Extend Cross-Motion Deadline, (D.E. 11, Page 2).
[42]    Lincoln's Motion to Extend Cross-Motion Deadline, (D.E. 11, Page 2).

Lincoln requested an additional physician review, which was completed on June 3, 2023, by Dr. Robert Swotinsky, who is Board Certified in Occupational Medicine.[43] Dr. Swotinsky is eminently qualified to opine regarding the matters at issue with Sewell's claim as he has extensive experience and training in substance testing,[44] having published articles and having held many positions involving the review of substance testing programs.[45] Additionally, Dr. Swotinsky has authored a textbook for physicians who provide workplace drug and alcohol testing services.[46] Finally, he also serves as Assistant Professor for the University of Massachusetts Medical School.[47] In his report, Dr. Swotinsky noted the following with regard to Sewell's BAC:

> The recollected consumption of six beers over seven hours prior to the accident does not explain this BAC.
>
> The claimant weighed 82 kg. An 82 kg man who consumes six beers would have a 0.12 BAC minus 0.01 percent for every 40 minutes of drinking. If the claimant spread out six beers over 7 hours and was tested 9 hours after he started drinking, his BAC would have been essentially undetectable. The calculation is:
>
> $$0.12 - \left( \frac{9\ hrs\ x\ 60\frac{min}{hr}}{40} X\ 0.01 \right) = -0.015$$
>
> Instead, the claimant had a BAC of approximately 0.185 at 17:46, nine hours after he started drinking. His measured BAC is evidence that he had more than six beers over seven hours. As Dr. Arnold noted in his report, the measured BAC indicated the claimant consumed at least twice as much alcohol as he said he did.
>
> It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink. The evidence indicates the recollections underreported actual alcohol consumption. This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable

---

[43]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 826-831 (D.E. 21-5, Pages 114-119). An earlier draft dated June 1, 2023, is also in the claim file, but this draft had an incomplete sentence on page 4. Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 798 and 832-837 (D.E. 21-5, Pages 86 and 120-125).
[44]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 805-815 (D.E. 21-5, Pages 93-103).
[45]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 808-815 (D.E. 21-5, Pages 96-103).
[46]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 809 (D.E. 21-5, Page 97).
[47]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 808 (D.E. 21-5, Page 96).

reporters.  In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.[48]

In addressing Dr. Arnold's arguments regarding lactic acid rendering the alcohol test result inaccurate, Dr. Swotinsky stated:

> Because hospitals commonly used enzymatic analyzers for alcohol test, the claimant's alcohol test is assumed to have been an enzymatic test.  Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase.  Both elevated lactic acid and lactate dehydrogenase must be present for this potential interference to occur.  In the claimant's case, neither lactic acid nor lactate dehydrogenase were measured.[49]

Dr. Swotinsky also noted that Dr. Arnold neither included supporting medical literature citations for his opinion about the inaccuracy of Sewell's BAC result nor quantified the effect he believed it had on the test results.[50]  Moreover, Dr. Swotinsky stated that Dr. Arnold assumed that Sewell was in cardiac arrest, but the medical records indicate that Sewell underwent CPO compressions for up to four minutes, the EKG reflected a normal sinus rhythm, and Sewell was not in cardiac arrest.[51]  Additionally, Dr. Swotinsky stated that medical studies have found little evidence to support elevated BAC in conjunction with elevated lactate and/or lactate dehydrogenase in live patients, and he provided the citations for those studies in his report.[52] Dr. Swotinsky summarized by stating,

> Dr. Arnold's theory about elevated lactic acid causing an elevated enzymatic ethanol test result is:
>
> - Unquantified. To what extent does Dr. Arnold think the elevated result is attributable to ethanol consumption vs. lactic acid?
> - Presented without corroborating facts

---

[48]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 826 (D.E. 21-5, Page 114).
[49]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 827 (D.E. 21-5, Page 115).
[50]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 828 (D.E. 21-5, Page 116).
[51]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 828 (D.E. 21-5, Page 116).
[52]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 829 (D.E. 21-5, Page 117).

- Based on assumptions that are contradicted by the medical records and unsupported by medical/scientific literature.
- Fails to address lactate dehydrogenase, which also must be present at elevated levels to cause elevated enzymatic ethanol test results.[53]

A copy of Dr. Swotinsky's report was sent to Sewell's counsel, and Sewell was given the opportunity to review it and provide any response he wished to be considered prior to a final decision being rendered on Sewell's claim.[54] Sewell's counsel requested an extension to provide a response until July 6, 2024, which was granted.[55] On July 5, 2024, Sewell's counsel submitted another report from Dr. Arnold dated June 24, 2024.[56] Dr. Arnold's report disagreed with Dr. Swotinksy that Sewell was not in cardiac arrest, and Dr. Arnold continued to rely on the affidavits regarding Sewell's alcohol consumption.[57] Moreover, Dr. Arnold stated there was no way to estimate the degree of interference lactic acid may have played in the BAC level.[58]

Lincoln sent Dr. Arnold's report to Dr. Swotinsky, who addressed each point raised by Dr. Arnold's report in detail in a new report dated July 22, 2024.[59] In this report, Dr. Swotinsky concluded that Dr. Arnold's latest report provided no basis for altering his conclusions as outlined in his previous report.[60] Dr. Swotinsky noted that, at best, the medical records were contradictory regarding whether Sewell was in cardiac arrest,[61] and the studies cited by Dr. Arnold described much lower BAC values than Sewell's – about 1/4 to 1/3 of Sewell's .222% BAC.[62] Dr. Swotinsky also noted that the submitted affidavits were redundant, indicating that one person was their primary author. Therefore, he stated that the medical records, including the BAC level, were a more reliable source of evidence because those were

---

[53]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 829 (D.E. 21-5, Page 117).
[54]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 818-819 (D.E. 21-5, Pages 106-107).
[55]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 796 and 816 (D.E. 21-5, Pages 84 and 104).
[56]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 762-767 (D.E. 21-5, Pages 50-55).
[57]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 763-764 (D.E. 21-5, Pages 51-52).
[58]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 765 (D.E. 21-5, Page 53).
[59]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 756-761 (D.E. 21-5, Pages 44-49).
[60]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 760 (D.E. 21-5, Page 48).
[61]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 757 (D.E. 21-5, Page 45).
[62]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 757-758 (D.E. 21-5, Pages 45 and 46).

contemporaneous, came from independent sources, and came from qualified individuals.[63]

Dr. Swotinsky summarized his report, stating:

- Dr. Arnold's reference articles indicate that the claimant's alcohol test result of 0.222 g/dL cannot be attributed to the effect of presumed high levels of lactate and lactate dehydrogenase.

- While Dr. Arnold relies on the statements submitted by the claimant and his friends almost two years after the accident, those statements are contradicted by the contemporaneous, medical records.

- The claimant's alcohol level corresponded with diminished judgment, increased self-confidence, and decreased inhibition. Misjudgments of water death and reckless behavior have been cited as common factors in diving-related cervical spine injuries. The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water. The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident.[64]

The review of the additional documentation submitted by Sewell's counsel after the appeal was complete was fully considered. After having conducted an additional thorough and independent review of Sewell's entire claim, it was concluded that the accidental dismemberment benefit was not payable. The basis for the decision was outlined in a letter to Sewell's counsel dated August 3, 2024.[65] Lincoln thoroughly evaluated all of the information provided in support of Sewell's claim and did not find persuasive evidence to invalidate the BAC testing performed by Corpus Christi Medical Center, which demonstrated a significantly elevated blood alcohol level that resulted in impairments in Sewell's judgement and perception, which caused or contributed to the accident that resulted in Sewell's quadriplegia.[66] Therefore, based on the administrative record, Lincoln found that no AD&D benefits were payable under the provisions of the Policy.

---

[63]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 759-760 (D.E. 21-5, Pages 47-48).
[64]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 760-761 (D.E. 21-5, Pages 48-49).
[65]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 742-755 (D.E. 21-5, Pages 30-43).
[66]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 754 (D.E. 21-5, Page 42).

**V.**

**ARGUMENT AND AUTHORITIES**

A.     **THE COURT MUST REVIEW LINCOLN'S DENIAL OF SEWELL'S CLAIM FOR AD&D BENEFITS UNDER THE "ABUSE OF DISCRETION" STANDARD.**

       1.     The Court Must Uphold Lincoln's Decision if the Administrative Record Contains Substantial Evidence to Support the Decision, Even if Lincoln's Decision Falls on the Lower End of a Continuum of Reasonableness.

Sewell cannot recover on his ERISA claim for recovery of AD&D benefits because the decision by Lincoln to deny his claim for AD&D benefits from the Life Plan was not an abuse of discretion. In the ERISA context, it is well established that in reviewing the denial of benefits under an ERISA plan, the court will apply an "abuse of discretion" standard if the plan document grants such discretionary authority to the administrator. *Meditrust Financial Services Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). The Policy specifically states, "Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."[67] Therefore, in reviewing Lincoln's decision to deny AD&D benefits to Sewell, the Court must apply an abuse of discretion standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Moreover, it is Sewell's burden as "an ERISA claimant [to bear] the burden to show that the administrator abused its discretion." *George v. Reliance Stand. Life Ins. Co.*, 776 F.3d 349, 352 (5th Cir. 2015).

"In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously." *Meditrust Financial Services Corp.,* 168 F.3d at 214. An administrator is deemed to have abused its discretion only if a decision is made "without a

---

[67]     Ex. 1, Policy, Lincoln/Sewell 38 (D.E. 21-1, Page 38).

rational connection between the known facts and the decision or between the found facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir, 1996); *Meditrust Financial Services Corp.,* 168 F.3d at 215.    A court must affirm an administrator's decision if it is supported by "substantial evidence." *George,* 776 F.3d at P. 349, 354; *Meditrust Financial Services Corp.,* 168 F.3d at 215.    Ultimately, "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness – even if on the low end." *Holland v. Int'l Paper Co. Ret. Plan,* 576 F.3d 240, 246 (5th Cir. 2009); *MacLachlan v. Exxon Mobil Corp.*, 350 F.3d 472, 478 (5th Cir. 2003); *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007).

Moreover, it is the evidence in the administrative record that supports Lincoln's decision that should be the focus of the Court's inquiry, and not any evidence that may support Sewell's claim.  In *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004), the Fifth Circuit held that under ERISA Plaintiff's claim for recovery of benefits does not prevail "merely because he has supported his claim with substantial evidence, or even with a preponderance." *Ellis*, 394 F.3d at 273.  "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." Id.  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis,* 394 F.3d at 273.

> 2.   Based on the Evidence and Administrative Record, Lincoln's Conflict is Not a Significant Factor for the Court to Consider in its Determination of Whether Lincoln Abused its Discretion in Making its Decisions on Sewell's Claim.

In the past, the Fifth Circuit has applied a "sliding scale" to the abuse of discretion standard where it is determined that the administrator acted under a conflict of interest.  *Vega v.*

*Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 296 (5th Cir. 1999). "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." Id. at 297. An entity that acts as both insurer and administrator that determines whether to pay claims has a conflict of interest. *Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333 (5th Cir. 2001). Because Lincoln was acting as both the claims administrator and the insurer with regard to Sewell's claim for benefits from the Life Plan under the Policy, it will be deemed to have a conflict of interest. However, this is the sole source of Lincoln's alleged conflict of interest in this action.

Additionally, the impact of the Supreme Court's ruling in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 128 S.Ct. 2343 (2008) on the standard of review for a "conflicted" claim decision-making entity has been considered by several panels of the Fifth Circuit. One Fifth Circuit panel has held that *Glenn* invalidated the heightened, "sliding scale" standard of review in cases where conflict was present. *Holland,* 576 F.3d at 240. This panel noted that "nearly every other court of appeals to consider the sliding-scale approach or similar methodology in the wake of *Glenn* has concluded that *Glenn* supersedes such alterations to the abuse of discretion standard of review." *Holland*, at p. 8. In *Glenn*, the Supreme Court has stated that several different factors, including the existence and extent of conflict, must be considered in reaching results in these cases, but that "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 128 S.Ct. at 2351. See also, *Dutka v. AIG Life Ins. Co.*, 573 F.3d 210 (5th Cir. June 24, 2009), ("in light of the evidence supporting the plan administrator's decision, the conflict of interest is not a 'tiebreaking' factor."); *Sanders v. UNUM*

*Life Ins. Co. of Amer.*, 553 F.3d 922 (5th Cir. 2008); *Carter v. Nationwide Mutual Ins. Co.*, 338 F. App'x 377 (5th Cir. 2009) (use of conflict as "tiebreaker" determined to be unnecessary).

However, even when used as a factor, conflict can prove less important, even to the vanishing point, where the entity in question has taken affirmative steps to reduce potential bias and promote accuracy. *Glenn*, 128 S.Ct. at 2351. There is evidence before the Court that Lincoln took affirmative steps to separate its underwriting and claims functions and to ensure accuracy in its claim process.[68] Moreover, Lincoln, as well as the issuer of the Policy, Lincoln Life Assurance Company of Boston (formerly known as Liberty Life Assurance Company of Boston)[69] have specifically been found to have taken "steps, including physical separation of disability case managers and employees who make underwriting and premium decisions, and requiring management oversight and review of any claim denial" such that "the Court should give minimal weight to the demonstrated conflict of interest" that results from its both determining eligibility for benefits and providing those benefits. *Brown v. Liberty Life Assurance Company of Boston*, No. CIV-14-0419-HE at p. 4 (W.D. Okla. June 11, 2015); *Michael v. Liberty Life Assurance Company of Boston*, No. 4:13-cv-2733 at p. 13 (S.D. Tex. Oct. 9, 2014); *Johnson v. Liberty Life Assurance Company of Boston*, No. 2:13cv916-WHA at p. 13-15 (M.D. Ala. Jan. 20, 2015); *Dotsenko v. Liberty Life Assurance Company of Boston*, No. 5:12cv00555 (W.D. Tex. June 11, 2013); *Hampton v. Liberty Life Assurance Company of Boston*, No. 4:11-CV-100 at p. 17 (S.D. Miss. March 30, 2013); *Havens v. Liberty Life Assurance Company of Boston*, No. SA-09-CA-372-H at p. 10-11 (W.D. Tex. July 6, 2010); *Whitfield v. Lincoln Nat'l Life Ins. Co.*, 2011 U.S. Dist. LEXIS 112447 at 21 (N.D. Okla. 2011)

---

[68]   Declaration of Kayla Bick, Exhibit A hereto, at ¶¶ 4-8.
[69]   Lincoln purchased Liberty Life Assurance Company of Boston and renamed it Lincoln Life Assurance Company of Boston. Subsequently, Lincoln Life Assurance Company of Boston was absorbed into Lincoln. https://www.libertymutualgroup.com/about-lm/investor-relations/documents/lnc-llac-press-release-jan2018.pdf

(copies attached); *Loucka v. Lincoln Nat'l Life Ins. Co.*, 334 F. Supp. 3d 1 at 21 (D. D.C. 2018).

Accordingly, the importance of Lincoln's conflict should be reduced to the vanishing point in the

Court's consideration of whether Lincoln abused its discretion.  *Glenn*, 128 S.Ct. at 2351 .

> **B.** **THE ADMINISTRATIVE RECORD CONTAINS SUBSTANTIAL EVIDENCE THAT SUPPORTS LINCOLN'S DENIAL OF SEWELL'S CLAIM FOR AD&D BENEFITS DUE TO THE POLICY EXCLUSION.**

> > 1. Sewell's BAC Level and the Nature of the Incident Provide Substantial Evidence to Support That Lincoln's Decision Was Not an Abuse of Discretion.

The administrative record, which is the documentation before Lincoln on August 2, 2024,

the date it denied Sewell's final appeal, clearly contains overwhelming evidence in support of

Lincoln's decision to apply the Policy's exclusion, which states:

> No benefits are payable for any loss that is contributed to or caused by:
> . . .
> 11.   the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident.  The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred.[70]

Not only did Lincoln not abuse its discretion in applying the alcohol exclusion to

Sewell's claim for AD&D benefits, but Lincoln also undoubtedly made the correct decision, as

explained below.

The Policy exclusion that Lincoln applied to Sewell's claim[71] is significant and unique.

Rather than simply stating that benefits are not payable if alcohol use caused or contributed to

the accident, the Policy states that a presumption is raised that Sewell's alcohol use, as reflected

by the .222% BAC, contributed to the incident that led to his quadriplegia.  Additionally,

Sewell's BAC far exceeded the .08% threshold for legal intoxication in Texas, which satisfies

the other criteria in the Policy exclusion.

---

[70]   Ex. 1, Policy, Lincoln /Sewell 33 (D.E. 21-1, Page 33).
[71]   Ex. 1, Policy, Lincoln /Sewell 33 (D.E. 21-1, Page 33).

This means that it is presumed the exclusion will be applied unless the contents of the administrative record provide evidence to effectively rebut the presumption. When this is coupled with the applicable standard of review in this case, it means that Lincoln's decision must be upheld by the Court unless it finds that Lincoln abused its discretion in determining that the presumption was not rebutted, effectively adding another hurdle to Sewell's path to recovery of benefits in this Court.

Nevertheless, even without the presumption being in place due to the Policy language, it is clear that Sewell's alcohol use contributed to the incident. Courts within the Fifth Circuit have upheld administrator's denial of claims when a BAC of .05% (minor driver),[72] .138%,[73] .161%,[74] .167%,[75] or .22%,[76] were found by the administrator to have caused or contributed to the incident at issue in the case.

With regard to what "contributed to or caused by" in the Policy exclusion means, the Fifth Circuit has stated that even if there is no direct proof that alcohol consumption caused or contributed to Sewell's incident, that does not mean the administrator erred in denying benefits because there rarely is such direct proof. The evidence will always be circumstantial, and Courts should consider the nature of the incident in making that determination. *Dutka,* 573 F.3d at 210, 214.

When considering the nature of Sewell's incident, as Dr. Millstein and Dr. Swotinsky noted, a BAC at the .222% level would result in impaired judgment and cognition and impaired

---

[72] *Jones v. Channel Shipyard & Co.*, 2001 U.S. Dist. LEXIS 19639 at 10 (E.D. La. Nov. 20, 2001) (copy attached).
[73] *Hargrave v. Parker Drilling Co.*, 2010 U.S. Dist. LEXIS 93534 at 17 (W.D. La. Aug. 25, 2010) (copy attached).
[74] *Sanford v. Zurich Am. Ins. Co.*, 2009 U.S. Dist. LEXIS 84327 at 10-11 (N.D. Miss Sept. 15, 2009) (copy attached).
[75] *Nichols v. Hartford Life & Accident Ins.*, 2014 U.S. Dist. LEXIS 196645 at 12 (S.D. Tex. June 9, 2014) (copy attached).
[76] *Hill v. Aetna Life Ins. Co.,* 546 F. Supp. 2d 343, 351 (546 F. Supp. 2d 343, 351 (S.D. Miss. 2008).

detection of danger.  Even assuming that Sewell's affidavit, which was prepared 20 months after the incident, is a reliable source of information, Sewell does not state in the affidavit that he entered the water to check for depth or that he jumped in feet first to determine if it was safe to dive.  Sewell does not state that others who were on the boat with him dove or jumped in or entered the water before he did.  Sewell admits that he dove into murky water without taking any of the normal precautions that a person without impaired judgment due to alcohol consumption would take in these circumstances.[77]  As Dr. Geimer stated, "The presence of alcohol in Mr. Sewell's blood caused or contributed to the incident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth."[78]  Moreover, Dr. Millman pointed out,[79]

> Alcohol consumption is also important risk factor [for spinal cord injuries following diving into shallow water], thought to be contributory and 38 to 49% of cervical injuries in previously published series.4[80]

> Types of accidents associated with traumatic cervical spinal cord injury include motor vehicle crashes in sport related accidents – in particular, diving accidents. Numerous studies have shown that 50% of spinal cord injuries occur while victims are under the influence of alcohol. A 2004 study of persons who sustained spinal cord injury supported the association between alcohol use and cervical spinal cord injury specifically – the spinal cord injury type with the most severe consequences. The study that demonstrated that participants with cervical injury were more likely to use alcohol when injured compared with participants without cervical injury.5[81]

That 50% of all spinal cord injuries occur while the victims are under the influence of alcohol is a telling statistic.  Given that only a very small percentage of the population could be

---

[77]    Ex. 3, Administrative Record, Lincoln/Sewell 159 (D.E. 21-3, Page 105).
[78]    Ex. 3, Administrative Record, Lincoln/Sewell 497 (D.E. 21-4, Page 24).
[79]    Ex. 3, Administrative Record, Lincoln/Sewell 641-642 (D.E. 21-4, Pages 168-169).
[80]    Footnote 4 cite:  Pierre-Yves Borius, Ismail Gouader, Philippe Bousquet, Louisa Draper, and Franck Emmanuel Roux Cervical spine injuries resulting from diving accidents in swimming pools: outcome of 34 patients Eur Spine J. 2010 Apr; 19(4): 552–557. Lincoln/Sewell 643 (D.E. 21-4 Page 170).
[81]    Footnote 5 cite:  Anne Garrison, BS, Kara Clifford, BA, Stacy F. Gleason, MPH, Carlos G. Tun, MD, Robert Brown, MD, and Eric Garshick, MD. MOH Alcohol Use Associated With Cervical Spinal Cord Injury J Spinal Cord Med. 2004; 27(2): 111–115. Lincoln/Sewell 643 (D.E. 21-4 Page 170).

expected to be under the influence of alcohol at any one time, 50% of the accidents coming from that small population of people who are under the influence is quite significant.  The same can be said for the statistic that 38-49% of all spinal cord injuries resulting from diving into shallow water are connected to alcohol use.  Again, of all the population of people diving into water at any given time, only a small percentage of them would be expected to be intoxicated, yet that group makes up 38-49% of all of the people who suffer a cervical injury as a result.  A study cited by Dr. Swotinsky found that alcohol use results in a 4.31-fold increase in risk of a spinal cord injury while diving, meaning that 78% of all such diving accidents are attributable to alcohol use.[82]  As Dr. Geimer stated, "The presence of alcohol in Mr. Sewell's blood caused or contributed to the incident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth."[83]

Substantial[84] (more than a scintilla) and arguably overwhelming evidence is contained in the administrative record to support Lincoln's decision to deny Sewell's claim for AD&D benefits from the Policy.  Accordingly, it is clear that Lincoln did not abuse its discretion, and the Court must uphold its decision.

2. <u>The Documents in the Administrative Record that were Submitted by Sewell Fail to Either Rebut the Presumption that Sewell's Alcohol Use Contributed to the Incident or Cast Doubt on the Substantial Evidence Relied upon by Lincoln.</u>

Two primary categories of documentation were submitted by Sewell to Lincoln that were asserted to support Sewell's claim for benefits.  The first category is a number of affidavits from Sewell and others describing the events on the day of the incident.[85]  These affidavits were all signed in April, May, July, and August of 2023, which was 20-24 months after the incident on

---

[82]    Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 760 (D.E. 21-5, Page 48).
[83]    Ex. 3, Administrative Record, Lincoln/Sewell 497 (D.E. 21-4, Page 24).
[84]    *George v. Reliance Standard Life Ins. Co.,* 776 F.3d at 354.
[85]    Ex. 3, Administrative Record, Lincoln/Sewell 434, 451, 459-461, and 181-192 (D.E. 21-3, Pages 380, 397, 405-407, and 127-138).

August 28, 2021.  This long span of time casts doubts on the accuracy of the statements made in the affidavits regarding events that occurred almost two years before the affidavits were signed. Additionally, as Dr. Swotinsky noted, the language in many of these affidavits is redundant, indicating that one person was their primary author,[86] which further damages the credibility of the affidavits.  Dr. Swotinsky also points out that the statements in the affidavits that Sewell was not intoxicated are controverted by Sewell's documented BAC level and the ER physician's opinion that Sewell had presented with "alcohol intoxication."[87]  Moreover, the medical records state that Sewell was diagnosed with alcohol abuse with intoxication (unspecified) on August 28, 2021.[88]  Finally, Dr. Swotinsky opined that he viewed the medical records from the day of the incident as more reliable than the affidavits because they were contemporaneous, came from independent sources not subject to biased recall, and came from medical professionals who were better qualified than the affiants at recognizing and documenting Sewell's intoxication.[89]  While these affidavits were fully considered by the reviewing physicians and by Lincoln, reasonably, they were not deemed to effectively controvert the BAC and the medical records.

The second category of documentation submitted by Sewell are three reports by Dr. Arnold.  The first of these is dated April 28, 2023,[90] and this report is rebutted by Dr. Geimer's June 7, 2023, and September 7, 2023, reports.[91]  The second report by Dr. Arnold is dated November 17, 2023,[92] and it is rebutted by Dr. Swotinsky's June 3, 2024, report.[93]

---

[86]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 759 (D.E. 21-5, Page 47).
[87]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 759 (D.E. 21-5, Page 47).
[88]   Ex. 3, Administrative Record, Lincoln/Sewell 232 and 601 (D.E. 21-3, Page 178, D.E. 21-4, Page 128).
[89]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 759-760 (D.E. 21-5, Pages 47-48).
[90]   Ex. 3, Administrative Record, Lincoln/Sewell 520-525 (D.E. 21-4, Pages 47-52).
[91]   Ex. 3, Administrative Record, Lincoln/Sewell 137-144 and 497-502 (D.E. 21-3 Pages 83-90, D.E. 21-4, Pages 24-29).
[92]   Ex. 3, Administrative Record, Lincoln/Sewell 66-70 (D.E. 21-3, Pages 23-27).
[93]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 826-831 (D.E. 21-5, Pages 114-119).

Dr. Arnold's third and final report is dated June 24, 2024,[94] and Dr. Swotinsky's July 22, 2024, report[95] was issued in rebuttal.

Dr. Arnold makes two primary arguments in these reports – both of which are deeply flawed and well refuted by Dr. Geimer and Dr. Swotinsky. The first argument is that Dr. Arnold views the affidavits as firm support that Sewell's incident was not the result of his alcohol use. He states that the affidavits contain "undisputed facts" that Sewell was not intoxicated,[96] which is wholly incorrect. As explained by Dr. Swotinsky and described above, the affidavits are far less reliable than the medical records, which directly dispute the affidavits.

The second argument Dr. Arnold makes is that the production of lactic acid in Sewell's body led to a false BAC reading. However, Dr. Arnold never states the degree to which the lactic acid would affect the reading. Additionally, there were no test results for either lactic acid or lactate dehydrogenase in Sewell's medical records, so whether these were present in Sewell's blood is unknown.[97]

Moreover, as Dr. Swotinsky noted, "The medical/scientific literature that Dr. Arnold cites to support his claim describe this phenomenon as contributing at most low levels of alcohol, about ¼ - ⅓ of the claimant's level.[98] However, even if, for the sake of argument (but not contained in the administrative record), it was shown that lactic acid was present and the accurate BAC was half of what was measured (.222% X 50%), the resulting BAC would be .111%, which would still well exceed the State of Texas threshold for legal intoxication.

Nevertheless, Dr. Arnold never states any opinion about the degree of error that might be expected in the BAC due to the presence of lactic acid. In fact, Dr. Arnold actually agrees with

---

[94]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 762-767 (D.E. 21-5, Pages 50-55).
[95]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 756-761 (D.E. 21-5, Pages 44-49).
[96]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 762-767 (D.E. 21-5, Pages 50-55).
[97]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 827 (D.E. 21-5, Page 115).
[98]   Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 758 (D.E. 21-5, Page 46).

Dr. Swotinsky that the degree of error caused by the lactic acid, if any, in the BAC cannot be determined.  Dr. Arnold states, "The fact is that there is no linear relationship for this interference so no estimations can be made.  The result is spurious and therefore unreliable."[99]

Moreover, Dr. Arnold's theory regarding the connection between lactic acid and the BAC is just that – a theory.  While case reports cited by Dr. Arnold each involved 2 or 3 patients, some of whom had died before the BAC testing was conducted, the study cited by Dr. Swotinsky involved 37 live patients with confirmed elevated lactate and lactate dehydrogenase levels.[100] This 2018 study concluded, "This data does not support the contention that an elevated LDH and lactate can yield a false positive serum ethanol result as run by enzymatic ethanol assay in live patients presenting to the emergency department.iv"[101]  Additionally, Dr. Swotinsky noted that a critique of one of the case reports referenced by Dr. Arnold states that studies in general have found little evidence to support this phenomenon in live patients.v[102]

_____

As Dr. Swotinsky stated in his final report,

The claimant's alcohol level corresponded with diminished judgment, increased self confidence, and decreased inhibition.  Misjudgments of water death and reckless behavior have been cited as common factors in diving-related cervical spine injuries.ix[103]  The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water.  The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident.[104]

---

[99]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 765 (D.E. 21-5, Page 53).
[100]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 758 (D.E. 21-5, Page 46).
[101]  Footnote iv cite:  Nacca N, Hodgman M, Lao K, et al. Can elevated lactate and LDH produce a false-positive enzymatic ethanol result in live patients presenting to the emergency department? Clin Toxicol (Phila). 2018;56:189-92. Lincoln/Sewell 761 (D.E. 21-5, Page 49).
[102]  Footnote v cite:  Winek C, Whaba W. A response to "serum-ethanol determination: comparison of lactate and lactate dehydrogenase interference in three enzymatic assays." J Anal Toxicol. 1996;20:211. Lincoln/Sewell 761 (D.E. 21-5, Page 49).
[103]  Footnote ix cite:  Blanksby B, Wearne F, Elliott B, Blitrich J. Aetiology and occurrence of diving injuries. Sports Med. 1997;23:228-46. Lincoln/Sewell 761 (D.E. 21-5, Page 49).
[104]  Ex. 4, Administrative Record Supplementation, Lincoln/Sewell 761 (D.E. 21-5, Page 49).

Accordingly, Lincoln properly applied the Policy exclusion, and certainly, it did not abuse its discretion based on the administrative record, as abundant evidence supported Lincoln's decision. Therefore, Sewell should not prevail on his claim for recovery of AD&D benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), and the Court should uphold Lincoln's decision and dismiss Sewell's claim for recovery of AD&D benefits from Lincoln.

**VI.**
**CONCLUSION AND PRAYER**

It is clear that, based on the administrative record, Lincoln's decision to deny Sewell's claim for AD&D benefits from the Life Plan under the Policy was not an abuse of discretion and was actually the correct decision. Substantial evidence in the administrative record establishes that Sewell's incident and resulting quadriplegia was contributed to or caused by the presence of alcohol in Sewell's blood, and Sewell failed to rebut the presumption created by the Policy exclusion or show that Lincoln abused its discretion in making the decision that no AD&D benefits were payable to Sewell under the Policy. Therefore, Lincoln requests that the Court enter a take-nothing judgment on Sewell's claims in this action and award Lincoln its attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

Dated this 16th day of September. 2024.

Respectfully submitted,

By:   /s/ Iwana Rademaekers
Iwana Rademaekers, Attorney in Charge
State Bar of Texas No. 16452560
S.D. of Texas No. 22781
LAW OFFICES OF IWANA RADEMAEKERS, P.C.
17304 Preston Road, Suite 800
Dallas, Texas 75252
Main:  (214) 579-9319
Fax:  (469) 444-6456
Email:  iwana@rademaekerslaw.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing pleading was electronically filed with the clerk for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means, as follows:

J. PRICE McNAMARA
Email:  price@jpricemcnamara.com

 September 16, 2024                         /s/ Iwana Rademaekers
Date                                             Iwana Rademaekers