## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SHANNON BROWN                     )
                                  )
            Plaintiff,            )
vs.                               )          NO. CIV-14-0519-HE
                                  )
LIBERTY LIFE ASSURANCE            )
COMPANY OF BOSTON,                )
                                  )
            Defendant.            )

### ORDER

Plaintiff Shannon Brown worked as an assistant manager for Home Depot, Inc. Through the company, plaintiff participated in a long-term disability plan ("the Plan") administered and insured by defendant Liberty Life Assurance Company of Boston ("Liberty"). On February 23, 2011, plaintiff was involved in a motor vehicle accident that resulted in significant injuries to him and in his treatment by various medical professionals. After expiration of the 90-day elimination period contemplated by the Plan, Liberty began paying plaintiff long-term disability benefits. During this period, and at defendant's direction, Mr. Brown applied for social security disability benefits. The Social Security Administration ("SSA") concluded he was totally disabled.

According to the Plan, Mr. Brown's eligibility for benefits for the first 24 months depended on whether he was able to engage in his own occupation with Home Depot. Thereafter, to continue receiving long-term disability benefits, plaintiff had to show that he

1

was unable to perform the duties of <u>any</u> occupation.[1] Mr. Brown sought benefits beyond the initial 24 month time period, but Liberty denied his application for further benefits on the basis that he was able to work in some occupations. It identified five sedentary jobs which it viewed Mr. Brown as being able to perform. Plaintiff appealed the termination of benefits. After the termination was upheld in defendant's internal review and appeal process, Mr. Brown filed this suit under the Employment Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(B).

### Standard of Review

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), states the applicable standard of review in cases contesting a benefit determination under an ERISA plan. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If the ERISA plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, [the court] review[s] the

---

[1] *As applicable to plaintiff's claim, "disability" or "disabled" means that "...during the Elimination Period and the next 24 months of Disability and Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation [and] thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." AR 010.*

*"Own Occupation" is defined as "...the Covered Person's occupation that he was performing when his Disability or Partial Disability began..." AR 014.*

*"Any Occupation" is defined as "...any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." AR 009.*

2

administrator's decision for an abuse of discretion." Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151, 1157 (10th Cir.2010) (internal citations omitted). The court's review under the abuse of discretion, or arbitrary and capricious, standard is limited, "...asking only whether the interpretation of the plan 'was reasonable and made in good faith.'"[2] Weber v. GE Group Life Assur. Co., 541 F.3d 1002, 1011 (10th Cir.2008) (quoting Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1189 (10th Cir.2007)). See Cardoza v. United of Omaha Life Ins. Co., 708 F.3d 1196, 1201–02 (10th Cir.2013) ("Certain indicia of an arbitrary and capricious denial of benefits include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.") (internal quotations omitted). Here, the parties agree that the Plan gives the administrator the necessary discretionary authority and that the deferential "arbitrary and capricious" standard of review applies to the court's review.

If the plan administrator which determines benefits eligibility also pays the claims, that conflict of interest is taken into account in determining whether the benefit denial was an abuse of discretion. Where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest is created by the dual role. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). While "the presence of a dual role conflict

_____

[2] The Tenth Circuit "treat[s] the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context." Weber v. GE Group Life Assur. Co., 541 F.3d 1002, 1010 n. 10 (10th Cir.2008) (internal quotations omitted); accord Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231–32 (10th Cir.2012)

does not alter the level of deference accorded an administrator's decision," the court "must weigh the conflict 'as a factor in determining whether there is an abuse of discretion,' according it more or less weight depending on its seriousness." Murphy, 619 F.3d at 1157 n. 1 (quoting Glenn, 554 U.S. at 115). "[A] conflict of interest affects the outcome at the margin, when [the court] waver[s] between affirmance and reversal." Hancock v. Metropolitan Life Ins. Co., 590 F.3d 1141, 1155 (10th Cir.2009). "A conflict is more important when 'circumstances suggest a higher likelihood that it affected the benefits decision,' but less so when the conflicted party 'has taken active steps to reduce potential bias and to promote accuracy.'" Id. (quoting Glenn, 554 U.S. at 117).

Defendant has submitted evidence that it has taken such active steps. Its litigation manager avers that "employees who make claims decisions on behalf of Liberty Life are not evaluated or compensated on the basis of the amount or number of claims paid or denied" and that "Liberty Life in no way discourages its employees from paying claims that are covered and payable under the terms of its policies." Declaration of Paula McGee [Doc. #21] at ¶ 7. She also claims that the efforts made to "separate the claim determination functions from the underwriting/premium functions," including geographical, departmental/managerial, and decisional separation, as well as "management checks" designed to ensure accuracy in the claims process. Id. at ¶¶ 9, 10. Plaintiff argues that this declaration cannot be considered because it is not a part of the administrative record.

Although courts are prohibited from "considering material outside the administrative record where the extra-record materials sought to be introduced relate to a claimant's

4

eligibility for benefits," they may nonetheless consider "extra-record materials related to an administrator's dual role conflict of interest." Murphy, 619 F.3d at 1162. The Murphy exception applies here because the existence of a conflict of interest as to Liberty is not disputed, and the referenced evidence relates to that issue.

### Discussion

The administrative record indicates that, as a result of the car accident, Mr. Brown suffered multiple orthopedic traumas and was diagnosed with Complex Regional Pain Syndrome (CRPS),[3] which is characterized by severe pain. *Id.* at 631. He underwent numerous medical procedures which resulted in some improvement of his condition over time. The question for present purposes is whether, at the time of the determination of his benefits eligibility under the "any occupation" standard,[4] he was able to perform any occupation. The date of termination of disability benefits was May 23, 2013, and the decision process immediately preceded that date.

Plaintiff contends defendant's determination was arbitrary and capricious for several reasons. He asserts defendant abused its discretion by (1) "cherry-picking" the record, (2) not considering or giving appropriate weight to the SSA disability determination, (3) improperly analyzing plaintiff's vocational capabilities, and (4) having a dual role conflict of interest.

---

[3] *This condition is also known as Reflex Sympathetic Dystrophy (RSD) or causalgia. 8 Attorney's Medical Advisor §74:49.*

[4] *"Any Occupation" is defined as "...any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." AR 009.*

The court concludes defendant did not "cherry pick" the evidence or otherwise resolve the disputed issues in an arbitrary or capricious manner. The evidence submitted to Liberty was certainly conflicting and there was evidence which would have supported a determination in plaintiff's favor if considered by itself. At least one of his treating physicians (Dr. Brown; not related to plaintiff) continued to hold the opinion that Mr. Brown could not work, and plaintiff's own statement certainly took that position. However, there is no requirement in this context that defendant must defer to plaintiff's treating physician. *See* Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (noting that the deference owed to treating physicians in Social Security cases is not applicable). Further, one of plaintiff's physicians (Dr. Kammerlocher), concluded that he could do sedentary work.[5] The record indicates that Liberty obtained review of the medical records by an orthopedic surgeon (Dr. Gause) and later, in connection with the internal appeal, by a physician certified in both physical rehabilitation and pain management (Dr. Lobel). Their conclusions were consistent with plaintiff being able to perform full-time sedentary duties, with some limitations, and supported a determination that plaintiff's pain medications did not render him mentally incapable of working.

The record does not support plaintiff's suggestion that defendant simply ignored the conflicting evidence. Obviously, it reached conclusions unfavorable to plaintiff's position,

---

[5] *Dr. Kammerlocher submitted a Restrictions Form, dated February 20, 2013, which stated plaintiff could "work at a desk job until his next appointment" and could do sedentary work on a full-time basis. AR 414.*

6

but there is ample indication that defendant's reviewing physicians considered the opinions of others.[6]

Similarly, the record does not support plaintiff's assertion that Liberty failed to take the social security disability determination into account. It is true that Liberty told plaintiff to pursue social security disability and that, by reason of the policies' coverage, it obtained most of the benefit of the disability determination. However, that fact, while relevant to the question of whether defendant acted reasonably, does not by itself show some unreasonable conduct by defendant. The fact that defendant reached a different conclusion as to disability under the Plan/policy definition from that reached by the Social Security Administration, under the standards applicable to that program, does not necessarily show improper conduct.

What the cases do require, in the face of a seemingly inconsistent determination as to social security disability status, is that the differences be addressed and reconciled in some fashion. *See* Glenn, 554 U.S. at 118 (taking issue with the insurer *ignoring* the SSA's finding in reaching its own contradictory conclusion); Holcomb v. Met. Life. Ins. Co., 615 F.3d 758, 772-73 (7th Cir. 2010) ("An administrator is not forever bound by a Social Security determination of disability, but an administrator's *failure to consider* the determination in making its own benefit decisions suggests arbitrary decisionmaking.") (citing Glenn, 128 S.Ct. at 2352); Liebel v. Aetna Life Ins. Co., 595 Fed. App'x 755, 764 (10th Cir. 2014)

---

[6]*For example, defendant's Appeals Decision Correspondence [Doc. #13-2] lists all of the evidence contained in the file and describes the most relevant evidence, including the evidence plaintiff claims defendant ignored such as his and Dr. Brown's letters. AR 103-04, 106-07.*

7

(requiring "some *reconciliation*" when the SSA and the administrator apply overlapping disability standards but reach opposite conclusions). Here, defendant did not ignore the SSA determination. The letter denying reconsideration of his application specifically noted the existence of the SSA determination and stated that disability determinations were based on the terms of the policy and were not contingent on any SSA determination. It noted that different standards apply to the weight to be given to the opinions of a treating physician and that various medical and vocational rules applicable in SSA determinations do not apply to a determination under the Plan. December 3, 2013, Letter [AR 110]. This is a sufficient treatment and explanation of the different result. *See* Liebel, 595 Fed. App'x at 764 ("Under the circumstances, the discrepancy between the SSA determination, deferring to old treating opinions, and [an insurer's] later decision, based on a greatly augmented medical record unskewed by special deference to evidence provided by [treating] physicians, does not bespeak arbitrary and capricious conduct under the standard governing our review.").

Plaintiff's concerns based on the nature of the vocational analysis are also unpersuasive. Plaintiff argues that Liberty "failed to specifically address whether Plaintiff's restrictions and limitations would be met by the employment identified by Liberty's in-house vocational specialists, and did not address the physical and/or mental requirements of these jobs, such as sitting or standing requirements and whether these employers would allow Plaintiff to take frequent breaks or rests within his restrictions." Opening Brief [Doc. #17] at 21. However, Mr. Miller's report specifically states "I have been asked by the Appeals Review Consultant to base the Transferable Skills Analysis on an Independent Peer Review

8

of the records contained in Mr. Brown's claim file performed by Steven M. Lobel, MD," and then proceeds to review Dr. Lobel's restrictions/limitations before beginning its own analysis. AR 113. Moreover, the report clearly states "[t]he following occupations are consistent with Mr. Brown's training, education, experience, and *are within the physical capabilities for work outlined above*." AR 114 (emphasis added). The emphasized phrase plainly references the restrictions and limitations set out by Dr. Lobel.

As noted above, the existence of a conflict of interest between Liberty's role as administrator and its role as the insurer is a consideration which may tip the scales where the other factors are reasonably balanced or where, under the particular circumstances, it suggests an abuse of discretion. Here, in light of the substantial evidence supporting the conclusion reached by defendant, including the substantially consistent conclusion of one of plaintiff's own doctors, and the evidence of defendant's efforts to minimize the incentives for bias in its consideration,[7] the court concludes that an abuse of discretion has not been shown notwithstanding the conflict of interest. *See* Brown v. Hartford Life Ins. Co., 428 Fed App'x 817, 821 (10th Cir. 2011) (unpublished) (concluding that "separating the initial claims handler from the appeals specialist, paying a fixed salary to its decision makers without

---

[7]*Plaintiff suggests that Liberty has a history of bad claims processing, citing a number of court cases where its benefits determination has been overturned by the court. Though these cases indicate some claims have been decided incorrectly in the particular case, none of them suggest the sort of "history of biased claims administration" referenced by the Supreme Court. See Glenn, 554 U.S. at 117 (citing Langbein at 1317-21, which details one insurer's "cost containment measures" which systematically pressured claims processing personnel to deny valid claims.)*

incentives for denying claims, and separating the financial department from the claims department" are sufficient to minimize the impact of the conflict).

### Conclusion

As noted above, there is evidence in this record which, considered by itself, would support a conclusion contrary to that reached by defendant. However, there is substantial evidence which supports defendant's determination. On this record, and for the reasons set out above, the court cannot conclude that defendant abused its discretion in denying the claims for further (beyond 24 months) disability benefits. The administrator's decision is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated this 11th day of June, 2015.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARGARET MICHAEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 4:13-cv-2733 |
| | § | |
| LIBERTY LIFE ASSURANCE | § | |
| COMPANY OF BOSTON, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## ORDER

Pending before the Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint. (**Instrument No. 38**). The Court has granted Plaintiff leave to file a second amended complaint. Pending before the Court are Plaintiff's motion for summary judgment (**Instrument No. 19**) and Defendant's motion for summary judgment. (**Instrument No. 20**).

### I.

### A.

On September 1, 2013, Plaintiff Margaret Michael ("Plaintiff") filed suit against Defendant Liberty Life Assurance Company of Boston ("Defendant"), in the United States District Court for the Southern District of Texas, alleging that Defendant violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132 by wrongfully denying coverage for long-term disability ("LTD") benefits under a disability insurance policy underwritten and administered by Defendant. (Instrument No. 1). On November 12, 2013, Defendant filed its Answer and Counterclaim, alleging breach of contract, unjust enrichment, and seeking a

constructive trust or other equitable relief under ERISA. Defendant's counterclaim arises from Plaintiff's alleged failure to reimburse Defendant in accordance with the Policy after receiving workers' compensation benefits. (Instrument No. 8 at 15).

On July 31, 2014, Plaintiff filed a motion for summary judgment. (Instrument No. 19). Defendant filed a response on August 20, 2014. (Instrument No. 25).

On July 31, 2014, Defendant filed a motion for summary judgment. (Instrument No. 20). Plaintiff filed a response on August 20, 2014. (Instrument No. 24).

## B.

On August 10, 2009, Plaintiff was hired as a Special Education Teacher with Community Education Partners, Inc. ("CEP"). (Instrument No. 22-20 at 54). CEP had contracted with Defendant Liberty Life to provide and administer a Group Disability Income Policy ("the Policy"). (Instrument Nos. 22-1; 22-22 at 3). The policy insured benefit payments to CEP employees in the event of disability. (Instrument No. 22-1 at 4-6). Plaintiff was eligible for and obtained disability insurance coverage through the Policy. (Instrument No. 22-20 at 54).

Plaintiff's disability first began in November 2007 after a workplace incident at a prior job where an aggressive student caused injury to Plaintiff's cervical spine. (Instrument No. 22-4 at 14-15). Plaintiff sought treatment and was diagnosed with cervical radiculopathy[1] and lumbar facet syndrome, internal derangement of the ankle, and right shoulder contusion, resulting in neck pain, lower back pain, right shoulder pain, right ankle pain, and pain radiating to the right upper extremity. (Instrument No. 28-4 at 14-16). Plaintiff completed six sessions of physical therapy without significant benefit and was then diagnosed in December 2008 with post-

---

[1] Cervical radiculopathy (also known as a pinched nerve) is caused by injury near the root of a spinal nerve and manifests as neck pain that may radiate into the shoulder and arm. American Academy of Orthopaedic Surgeons, *Cervical Radiculopathy (Pinched Nerve)*, ORTHOINFO.AAOS.ORG, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited September 5, 2014).

2

traumatic arthritis of the right ankle, right shoulder internal derangement, and severe back pain radiating down her extremities. (*Id.*). Additionally, Plaintiff suffered from a host of conditions including adhesive capsulitis, subacromial burstitis, rotator cuff syndrome, shoulder impingement, weakness, numbness, right posterior tibial tendonitis, ankle arthritis, diabetes, hypertension, neck pain, and multilevel degenerative cervical spine disease with stenosis. (*Id.*).

Plaintiff's last day of work at CEP was April 1, 2010. Defendant granted disability benefits beginning on April 5, 2010 due to Plaintiff's chronic symptomatic degenerative grade 1 L4-5 spondylolisthesis and lumbar radiculopathy. (*Id.*) Because Plaintiff had been employed by CEP for less than 12 months when she applied for CEP's disability benefits, she was subject to the pre-existing condition limitation in the Policy. (Instrument No. 22-1 at 41-42). On April 26, 2010, Defendant determined that the pre-existing condition limitation applied to all of Plaintiff's disabling conditions and denied benefits to Plaintiff. (Instrument No. 22-20 at 54). Plaintiff appealed Defendant's determination and Defendant overturned its decision as to Plaintiff's lumbar spine condition on December 14, 2010. (Instrument No. 22-14 at 54-55). Defendant awarded Plaintiff disability benefits under the Policy and backdated such benefits to begin on October 2, 2010, after a mandatory 180-day elimination period under the Policy. (Instrument Nos. 22-3 at 5-6; 22-1 at 5-6).

Plaintiff also applied for social security benefits during this time, and in a letter dated June 22, 2011, the Social Security Administration ("SSA") determined that Plaintiff was disabled under Social Security Law as of April 2, 2010. (Instrument No. 22-8 at 59). Plaintiff did not receive social security benefits because she never paid into the system, but she did begin receiving Medicare coverage beginning in October 2012. (*Id.*).

In order to be eligible for benefits under the Policy, the participant must be disabled. The Policy provides two definitions for "disabled" – one for the initial 24 months of the claim and another after 24 months have passed. (Instrument No. 22-1 at 8-10). During the initial 24 months of the claim, a participant is deemed "disabled" and eligible for benefits if she is "unable to perform the Material and Substantial duties of her Own Occupation" due to injury or sickness. (*Id.*). After 24 months have passed, the participant is only deemed "disabled" if she is "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (*Id.*). The Policy defines "Any Occupation" as one which "the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity" to perform. (*Id.*). The Policy also defines "Material and Substantial Duties" as "responsibilities that are normally required to perform [the occupation] and cannot be reasonably eliminated or modified." (*Id.*). Under the Policy, Plaintiff received LTD benefits for 24 months beginning on October 2, 2010, until the "any occupation" limitation became applicable on October 2, 2012. (Instrument No. 22-6 at 6-7).

Beginning on September 11, 2012, Defendant obtained and reviewed medical records from Plaintiffs' physicians to determine whether she could continue to receive benefits under the "any occupation" limitation. (Instrument No. 22-4 at 25). As part of its determination process, Defendant retained an independent board-certified physical medicine and rehabilitation physician, Kimberly Togliatti-Trickett, M.D. ("Dr. Togliatti-Trickett"), to confer with Plaintiff's treating physician and conduct a peer review of Plaintiff's records. (Instrument No. 22-4 at 4-12). In this peer review, Dr. Togliatti-Trickett considered Plaintiff's posterior lateral interbody fusion at L4-L5 on April 5, 2010, Plaintiff's diagnosis of post laminectomy syndrome and

radiculitis[2] on January 19, 2011, Plaintiff's L2-L5 lumbar laminectomy[3] and removal of hardware on August 29, 2011, Plaintiff's post-surgical lumbar spine CT scans on July 17, 2012, and Plaintiff's post-operative office visits on March 6, 2012, and July 31, 2012 with Dr. Howard Cotler ("Dr. Cotler"), her treating physician. (Instrument No. 22-4 at 13-19). On September 21, 2012, Dr. Cotler advised Dr. Togliatti-Trickett that Plaintiff was limited to sedentary level activity due to pain in her lumbar spine, and confirmed his assessment in a signed letter on September 21, 2012. (*Id.*). On September 21, 2012, Dr. Togliatti-Trickett's report stated that Plaintiff was restricted to occasional walking, standing, bending, twisting, turning, and stooping throughout an 8-hour day with frequent sitting, allowing for change in position as needed. (*Id.*). The report also limited Plaintiff to occasional lifting, not to exceed 5 pounds above shoulder level and 10-20 pounds below shoulder level. (*Id.*).

On October 17, 2012, Defendant Liberty Life requested that analyst Bernadette Cook conduct a Transferable Skills Analysis to determine what work classifications were available to Plaintiff based on her training, education, experience, and physical capabilities. (Instrument No. 22-3 at 56-59). Ms. Cook found Plaintiff to be qualified and physically able to work in several sedentary work classifications, including Caseworker, Eligibility Worker, School Secretary, and Customer Service Representative, with monthly wages ranging from $1,779.17 to $3,231.67. (*Id.*). Liberty Life determined that Plaintiff could not continue to receive benefits, and notified

---

[2] Radiculitis is inflammation and possible damage to a nerve as it exits the spinal cord and courses into the arm or leg. Radiculitis affects nerve communication for sensory and motor function. *What is Radiculitis?*, INTEGRATED NEUROLOGY AND PAIN MANAGEMENT, http://integrateddoc.com/blog/what-radiculitis (last visited September 5, 2014).

[3] A lumbar laminectomy is a procedure typically performed to alleviate pain caused by neural impingement that can result from lumbar spinal stenosis. Spinal stenosis is caused by degeneration and enlargement of the facet joints that place pressure on the nerves. Spine-health, *Lumbar Laminectomy Surgery for Spinal Stenosis (Open Decompression)*, SPINE-HEALTH.COM, www.spine-health.com/treatment/back-surgery/lumbar-laminectomy-surgery-spinal-stenosis-open-decompression (last visited September 5, 2014).

5

Plaintiff in writing on October 19, 2012, that her LTD benefits under the Plan were terminated as of October 18, 2012. (Instrument No. 22-3 at 52-55).

On October 30, 2012, Plaintiff contacted Defendant and requested a conference call with Dr. Cotler to show that Dr. Cotler had never released her to work. (Instrument No. 22-2 at 6). Defendant advised Plaintiff to file an appeal and include additional documentation if she disagreed with the decision. (*Id.*). On November 2, 2012, Plaintiff did so and attached documentation from an office visit on August 9, 2012, during which Dr. Cotler diagnosed Plaintiff with L5-S1 pseudoarthrosis and referred Plaintiff to another doctor for weight loss surgery. (Instrument No. 22-2 at 5-6). Plaintiff's appeal was reviewed by Karen McGuire, a nurse, who determined that Plaintiff's appeal contained no new diagnostic studies or clinical findings and that the additional documentation would not alter the conclusions from the previous peer review of Plaintiff's record. (*Id.*). On December 19, 2012, Defendant notified Plaintiff in writing of Defendant's final decision to uphold the termination of Plaintiff's LTD benefits under the Policy. (Instrument 22-21 at 2-8).

In the interim, Plaintiff was receiving weekly workers' compensation benefits through her insurance provider for a previous employer in the amount of $773.00, which began on January 5, 2012. (Instrument No. 22-5 at 69-72). These benefits were suspended on April 25, 2012 due to lack of updated medical documentation. (*Id.*). Plaintiff received a total of $3349.67 per month in workers' compensation benefits during this time. (Instrument No. 22-5 at 61-62). Under the Policy, workers' compensation falls under "Other Income Benefits and Other Income Earnings" and are to be deducted from a claimant's monthly benefits. (Instrument No. 22-5 at 46-48). Additionally, Plaintiff reported receiving retirement benefits from a prior employer of

$1,776.00 in February 2012, $1,882.64 in December 2010, and $2,207.00 in December 2010. (Instrument No. 22-5 at 69; 22-8 at 41; 22-11 at 7).

Plaintiff has moved for summary judgment on all of her claims, asserting that Defendant's determination that Plaintiff is not disabled under the terms of the Policy is not supported by substantial evidence. (Instrument No. 19). Defendant asserts that it did not abuse its discretion in denying LTD benefits to Plaintiff because Defendant considered Plaintiff's complaints of pain, the opinions of her treating physicians, and Plaintiff's disabled status under the SSA in making its determination on appeal. (Instrument No. 25).

Defendant has also moved for summary judgment on Plaintiff's claims and Defendant's counterclaim, asserting that the administrative record substantially supports Defendant's denial of LTD benefits, and that Plaintiff must reimburse Defendant for overpayment of benefits created by Plaintiff's simultaneous receipt of worker's compensation benefits. (Instrument No. 20).

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit

under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by

unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (*quoting Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the District Court does not make credibility determinations or weigh evidence. *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas*, 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## III.

### A.

ERISA confers jurisdiction on federal courts to review benefit determinations by plan administrators. *See* 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521

9

(5th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). When a plan administrator is given discretionary authority, a denial of benefits is reviewed for an abuse of discretion. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006); *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 269 (5th Cir. 2004). In this case, the Policy gives Liberty Life "sole and discretionary authority to construe the terms of this policy and to determine benefit eligibility hereunder." (Instrument No. 22-1 at 47). Therefore, this Court reviews the dispute under the abuse of discretion standard.

"Abuse of discretion review is synonymous with arbitrary and capricious review in the ERISA context." *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009). Courts affirm the administrator's decision if it is supported by substantial evidence, which is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273 (internal quotations omitted). A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence. *Cooper*, 592 F.3d at 652. A court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness— even if on the low end." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (quotation marks omitted). In reviewing the administrator's decision, a court must limit its review to the administrative record available at the time the final decision was made. *Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333 (5th Cir. 2001).

In Plaintiff's motion for summary judgment, Plaintiff claims that Defendant abused its discretion in denying her LTD benefits beginning on October 18, 2012, and in denying Plaintiff's

subsequent appeal on December 19, 2012. (Instrument No. 19). Plaintiff asserts that the administrative record demonstrates Plaintiff's disability under the "any occupation" definition and thus Defendant has violated ERISA in denying her LTD benefits. Specifically, Plaintiff claims that Dr. Togliatti-Trickett's conclusion that Plaintiff is capable of sedentary work contradicts the record because Dr. Cotler never released Plaintiff to work due to her chronic pain. (Instrument No. 19 at 12-20). Plaintiff also claims that Dr. Togliatti-Trickett failed to personally and physically examine Plaintiff before concluding that Plaintiff was capable of sedentary work, and failed to fully develop the treating physicians' opinions. (Instrument No. 19 at 12).

The Policy does not require that Defendant personally and physically examine a claimant before determining disability status. Furthermore, Plaintiff does not present any medical or legal basis for the assertion that she is necessarily disabled because she has not been specifically released for work by her treating physician. The administrative record demonstrates that Plaintiff's subjective pain complaints did not meet the definition of "disabled" under the Policy after the initial 24 months. Plaintiff's treating physician and surgeon, Dr. Cotler, told Dr. Togliatti-Trickett and later signed a statement asserting that Plaintiff could perform limited sedentary work. (Instrument No. 22-4 at 13-19). On appeal, Plaintiff provided no documentation indicating that Dr. Cotler found Plaintiff incapable of performing sedentary work. The medical opinions of Dr. Cotler and Dr. Togliatti-Trickett constitute substantial evidence supporting Defendant's denial of benefits to Plaintiff. *See* 12 A.L.R. Fed. 2d 1 (2006) ("substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker").

Accordingly, the Court finds that Defendant did not abuse its discretion in finding that Plaintiff was not disabled under the terms of the Policy.

**B.**

Plaintiff also contends that a fatal conflict of interest existed in Defendant's exercise of discretionary authority throughout the benefit determination and appeals process. In *Metropolitan Life Insurance, Co. v. Glenn*, the Supreme Court addressed the issue of possible conflicts of interest when a plan administrator makes discretionary benefit determinations and also pays those claims. 554 U.S. 105, 128 (2008). The Court held that a reviewing court should consider the conflict of interest arising from an entity's dual roles as a plan administrator and payer of benefits, and weigh this factor according to the circumstances of each case. *Id.* Plaintiff asks this Court to scrutinize the conflict of interest because Defendant also allegedly disregarded the SSA's finding of disability in this case – circumstances that suggest "procedural unreasonableness." *Id.* at 105. Plaintiff claims that Defendant's conflict of interest was fatal in this case because it was coupled with Defendant's failure to consider the SSA's April 2, 2010 finding that Plaintiff was disabled. (Instrument No. 22-8 at 59). Defendant's denial letters do not address the SSA finding of disability, and Plaintiff claims that Defendant failed to provide this information to Dr. Togliatti-Trickett for her consideration.

The Supreme Court and the Fifth Circuit have held that the "failure to address a contrary SSA award can suggest 'procedural unreasonableness' in a plan administrator's decision [to deny or terminate benefits]." *Tesch v. Prudential Ins. Co. of Am.*, 829 F. Supp. 2d 483, 494-95 (W.D. La. 2011) (citing *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465 (5th Cir. 2010); *Glenn*, 554 U.S. at 118. The *Tesch* Court held that although social security determinations are not binding upon an ERISA plan administrator, "they are relevant and instructive in a court's determination of whether a plan administrator acted arbitrarily and capriciously." *Tesch v. Prudential Ins. Co. of Am.*, 829 F. Supp. 2d at 495 (citing *Schexnayder v. Hartford Life & Acc.*

12

*Ins. Co.*, 600 F.3d at 471); *Adams v. Metro. Life Ins. Co.*, 549 F.Supp.2d 775, 789 (M.D.La.2007); *see also Schully v. Continental Cas. Co.*, 634 F.Supp.2d 663, 685 (E.D.La.2009) ("[T]he Social Security Administration's decision that plaintiff is entitled to recover disability benefits, while only a single factor in the Court's overall analysis, is at least persuasive evidence of plaintiff's condition and should be considered."). The *Tesch* court also held that the ERISA plan administrator abused its discretion in terminating benefits because the administrator dismissed the participant's favorable SSA ruling and relied entirely on an independent physician's file review, to the exclusion of the examining physician's opinion and request for further testing. 829 F. Supp 2d at 483. Where the plan administrator's decision is based in substantial evidence in the record, the existence of a conflict of interest does not automatically result in an abuse of discretion. *Glenn*, 554 U.S. at 105; *Dutka v. AIG Life Ins. Co.*, 573 F.3d 210 (5th Cir. June 24, 2009); *Sanders v. UNUM Life Ins. Co. of Amer.*, 553 F.3d 922 (5th Cir. 2008). The Supreme Court held in *Glenn* that the existence of a conflict of interest is less important when the entity has taken affirmative steps to reduce potential bias and promote accuracy. 554 U.S. at 117.

Defendant does not dispute the existence of a conflict of interest in acting both as the claims administrator and the benefit payer with regard to Plaintiff's LTD claims. However, Defendant took affirmative steps to separate its underwriting and claims functions to assure procedural neutrality and accuracy. Additionally, Defendant asserts that the Policy clearly states that Defendant's determinations are based on the Policy and "not contingent on decisions made by neither [sic] the Social Security Administration nor the Workers' Compensation Carrier." (Instrument No. 22-21 at 8). Defendant also asserts that it had information that the SSA did not have, such as the vocational analysis and Dr. Cotler's signed statement that Plaintiff was able to

function at the sedentary level. (Instrument No. 25 at 9). Accordingly, Defendant argues that the Court should give minimal weight to the conflict of interest in this case because the record plainly supports Defendant's determination. In this case, Defendant physically separated disability case managers and employees who make underwriting and premium decisions, and required managerial oversight and review of all claim denials. Furthermore, this case is distinguishable from *Tesch* because Dr. Togliatti-Trickett consulted directly with the claimant's treating physician and included Dr. Cotler's recommendations into her report. (Instrument No.22-4 at 4-12). Defendant asserts that the Notice of Award letter dated June 22, 2011 from the SSA simply states that Plaintiff is "disabled under Social Security law as of April 2, 2010" and contains no information on the SSA's rationale for this decision or any information concerning Plaintiff's restrictions and limitations or medical history and conditions. (Instrument No. 22-8 at 59). Therefore, although a conflict of interest exists as to Defendant's dual role in the matter, its termination of Plaintiff's benefits is supported by substantial evidence in the administrative record. Defendant's conclusions reflect a rational connection between the known facts and the decision to deny LTD benefits. In light of the foregoing, as well as the weight given to Defendant's conflict of interest, the Court finds that Defendant did not abuse its discretion in denying Plaintiff's claims for disability benefits.

Accordingly, Plaintiff's motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED as to Plaintiff's claims regarding Defendant's alleged abuse of discretion.

## C.

Defendant seeks summary judgment on its counterclaim for alleged overpayment of LTD benefits to Plaintiff under the Policy. Defendant seeks reimbursement of $9,214.67 from Plaintiff

for LTD benefits Defendant paid to Plaintiff while Plaintiff also received workers' compensation benefits.

The administrative record shows that Defendant paid LTD benefits of $2,922.20 per month to Plaintiff while Plaintiff also received $3,349.67 per month in workers' compensation benefits from January 5, 2012 to April 25, 2012. Under the Policy, worker's compensation falls under "Other Income Benefits and Other Income Earnings" and are to be deducted from a claimant's monthly benefits. (Instrument No. 22-5 at 46-48). The Policy also provides that a claimant who receives more benefits under worker's compensation than LTD disability is entitled to the minimum LTD monthly benefit. (*Id.*). The minimum LTD monthly benefit is $100 or 10% of the claimant's gross monthly benefit, whichever is greater. (*Id.*). In this case, the greater figure is 10% of Plaintiff's gross monthly benefit, which is $292.22. According to the Policy, Plaintiff was entitled to a total sum of $1,724.10 during the benefit period but actually received $11,981.02 from Defendant, resulting in overpayment of $10,256.92. After adjusting Plaintiff's benefits payment in June 2012 to satisfy the overpayment, Defendant now seeks the remaining balance of $9,214.67. In *Williams v. Hartford Life Insurance Company*, the Fifth Circuit affirmed summary judgment in favor of an ERISA benefit payer who counterclaimed for reimbursement of overpayment of disability benefits. 493 F. Supp. 2d 825, 832 (S.D. Miss. 2006) aff'd, 243 F. App'x 795 (5th Cir. 2007). In *Williams*, the plaintiff was denied ERISA employee welfare benefits because the applicable policy required him to be unable to perform the essential duties of *any* job for which he was qualified by education, training, or experience. (*Id.*) Similarly, the plan administrator in *Williams* determined that the plaintiff could perform sedentary work, discontinued disability benefits, and counterclaimed for overpaid benefits. (*Id.*). Upon appeal, the Fifth Circuit affirmed the District Court's determination that the participant

15

was liable to the administrator for overpaid long-term disability benefits, as supported by the declaration of an appeals specialist, a copy of a signed agreement by plaintiff that he would be required to refund any overpaid benefits to the administrator, and a copy of the SSA's decision to award plaintiff disability benefits.

Plaintiff argues that Defendant has miscalculated the offsets applicable to her claim because her retirement income is not from a qualifying "Sponsor" under the plan. Under the Policy, a qualifying Sponsor is an employer sponsoring the current plan; in this case, Plaintiff's Sponsor is CEP. (Instrument No. 22-1 at 12). The Policy provides that retirement benefits are considered "Other Income Benefits and Other Income Earnings" and must be deducted from any benefit awarded. (Instrument No. 22-1 at 23). However, Plaintiff's response does not address Defendant's calculations of worker's compensation or otherwise dispute Defendant's claim for overpaid LTD benefits due to Plaintiff's receipt of workers' compensation benefits. The record reflects that Plaintiff signed an Authorization as part of the Policy which reads, "If I receive a disability benefit greater than that which I should have been paid, I understand that [Defendant] has the right to recover such overpayment from me, including the right to reduce future disability payments, if any." (Instrument No. 22-19 at 14).

Accordingly, Defendant's motion for summary judgment is GRANTED.

## IV.

Plaintiff has requested an award of attorney's fees in this case.

ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The decisions to award attorney's fees is purely discretionary. *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1459 (5th Cir.1995). The Supreme Court held that an ERISA statutory fee award is not limited to a prevailing party but that fees and

costs may be awarded to a party that has achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010). In exercising this discretion, courts consider the following five factors:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980).

No one of these factors is decisive, nor is this list exhaustive. *Riley v. Adm'r of the Supersaver 401K Capital Accumulation Plan for Employees of Participating AMR Corp. Subsidiaries*, 209 F.3d 780, 782 (5th Cir. 2000). While other circuits have asserted that there is a presumption under ERISA in favor of awarding attorney's fees, this is not the law in the Fifth Circuit. Harms v. Cavenham Forest Indus., Inc., 984 F.2d 686, 694 (5th Cir. 1993).

In this case, Plaintiff has not achieved success on the merits. Additionally, the Court finds no evidence of bad faith on the part of Defendant nor other evidence supporting a grant of attorney's fees in this case. Accordingly, Plaintiff' request for attorney's fees is DENIED.

## V.

Based on the foregoing, IT IS HEREBY ORDERED THAT Plaintiff's Motion for Summary Judgment is **DENIED. (Instrument No. 19)**, and Defendant's Motion for Summary Judgment is **GRANTED. (Instrument No. 20).**

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the _____ day of October, 2014, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| RONALD JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv916-WHA |
| | ) | |
| LIBERTY LIFE ASSURANCE COMPANY | ) | (wo) |
| OF BOSTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #11), filed by the

Defendant, Liberty Life Assurance Company of Boston ("Liberty"), and   Motion for Summary

Judgment (Doc. #12) filed by the Plaintiff, Ronald Johnson ("Johnson") on November 21, 2014.

The Plaintiff filed a Complaint in this case in the Circuit Court of Montgomery County,

Alabama, bringing a claim for benefits under the Employee Retirement Income Security Act

("ERISA").   The Defendant removed the case to the court, the ERISA claim being a federal

claim, bringing the case within federal court jurisdiction under 28 U.S.C. §1446.

For the reasons to be discussed, the Defendant's Motion for Summary Judgment is due to

be GRANTED and the Plaintiff's Motion for Summary Judgment is due to be DENIED.

**II.   APPLICABLE STANDARDS**

**A. SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and    . . .

the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56 (c)(1)(A),(B).   Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).   On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.   *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).

In resolving the present cross-Motions for Summary Judgment the court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or

inferences are required.  *Barnes v. Southwest Forest Industries*, 814 F.2d 607, 609 (11th

Cir.1987).

### B.  STANDARD FOR REVIEW OF ERISA BENEFITS DECISION

The Eleventh Circuit has a six-part test for review of benefits denial decisions.

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
(3) If the administrator's decision is " de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry and affirm the decision.
(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Melech v. Life Ins. Co. of North America,* 739 F.3d 663, 673 (11th Cir. 2014).


### III. FACTS

The submissions of the parties establish the following facts, construed in a light most

favorable to the non-movant:

The Plaintiff, Johnson, worked as a Maintenance Mechanic IV for the Health Care

Authority for Baptist Health ("HCA"), an affiliate of UAB Health System, for thirty years.   He

sustained back and neck injuries in the scope of his employment.   He had surgery twice in 2011,

and the surgery lead to worsening headaches, low back pain, and pain in his legs.

Johnson's employer had contracted with Defendant Liberty for a Group Disability Income

3

Policy ("the Policy") as part of an employee welfare benefits Plan ("the Plan").   The Summary Plan Description in effect in 2011, (Doc. #20-1 at p.2), explained the procedures to follow in the effect of the denial of a claim, and stated that a claim denial would advise the claimant of a "right to bring a civil action under ERISA following an adverse decision on appeal."   (Doc. #20-1 at p. 68).

Johnson filed a claim with Defendant Liberty against the Plan.   Liberty approved Johnson for long-term disability benefits and began payment on June 29, 2011.   Johnson attempted to return to work on July 25, 2011.   He was working under light-duty restriction.   His light duty restriction kept him from working in the position of Maintenance Mechanic IV.   He was put to work by HCA as a greeter for incoming patients and visitors.   He retired from employment on October 7, 2011.

At Liberty's request, on November 4, 2011, Johnson's treating physician, Dr. Bradley, gave Liberty all of Johnson's current medical records and restriction form.   The Restrictions Form provided releases Johnson to light duty.   (Doc. #15-3 at p.54).   The form also refers to office notes.   In the office notes, Dr. Bradley states that Johnson said that he quit his job because he could not tolerate the pain, and Dr. Bradley "would hope that he could return to some meaningful employment in a light-duty position in the future."   (Doc. #15-3 at p.60).

On November 8, 2011, Liberty sent an email to HCA to inquire whether light duty accommodations were still available to Johnson when he stopped working on October 1, 2011, and was informed that Johnson would have continued on in a light duty position.   (Doc. #15-3). Liberty was also informed that Johnson had received a disability retirement.

Johnson was declared disabled by the Social Security Administration.

On November 11, 2011, Liberty wrote Johnson and advised him that long-term disability

4

benefits were not payable beyond August 21, 2011.   Liberty cited two provisions of the Policy, which are parts of the definition of "disability" or "disabled."   One of these provisions concerned disability from one's "own occupation," and the other one stated that a covered person is disabled if unable to perform the duties of "any occupation."   (Doc. #15-3).[1]  The letter advised that Liberty was aware of the award of SSDI benefits and that Johnson "opted to retire following notification of" that award, but that Liberty's decision was based on Dr. Bradley confirming that Johnson was able to perform light duty work and the continuing availability of accommodations from Johnson's employer.   (Doc. #15-3 at p.35).

The denial of benefits letter provided that "[u]nder the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to" a given address within 180 days.   (Doc. #15-3 at p.35).   The letter also stated that if Liberty did not receive a written request for review within 180 days "our claim decision will be final, your file will remain closed, and no further review of your claim will be conducted."   (Doc. #15-3).

No appeal of the decision in the November 11, 2011 letter was received by Liberty.

Liberty received a letter from Johnson's attorney on October 28, 2013 requesting a copy of the "Long Term Disability Policy." (Doc. #15-3 at p.14).   Liberty sent the Policy the next day. (Doc. #15-3 at p.13).

Liberty has provided affidavit evidence that employees who make claims decisions on behalf of Liberty are not evaluated or compensated based on the amount or number of claims paid or denied, and that Liberty has taken steps to separate in terms of geography and management the claim determination functions and underwriting/premium functions.   (Doc. #15-1 at p.4-5).

---

1   Some of Liberty's evidence was filed under seal to protect the Plaintiff's confidential medical information and the Defendant's propriety information. The court has not referred to any information subject to seal.

5

### IV. DISCUSSION

Liberty has moved for summary judgment on the basis that Johnson failed to exhaust his administrative remedies, and alternatively and that the decision to deny the claim for benefits was not arbitrary or capricious.   Johnson has moved for summary judgment on the basis that Liberty's denial of benefits is arbitrary and capricious, and responds to Liberty's Motion for Summary Judgment that this court ought to exercise its discretion not to enforce the exhaustion of remedies requirement.   The court begins with the exhaustion arguments.

### A.   Exhaustion

"The law is clear in this circuit that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Counts v. Amer. Gen'l Life & Acc. Ins. Co.*, 111 F.3d 105, 108 (11th Cir.1997).   This court must "strictly enforce" the exhaustion requirement, unless an "exceptional circumstance" is presented.   *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000).   Exceptional circumstances may exist " 'when resort to administrative remedies would be futile or the remedy inadequate,' ... or where a claimant is denied 'meaningful access' to the administrative review scheme in place."   *Id.* at 1316.   "The decision of a district court to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision." *Id.*

Johnson does not dispute that he failed to appeal the decision denying long-term disability benefits, but has argued that resort to the administrative remedy would have been futile, and that he was denied meaningful access to the administrative review scheme in place because no binding Plan documents told him how to proceed with an administrative remedy.   Johnson also argues that

6

the letter sent by Liberty did not disclose that the administrative remedy was required.   The court will address each argument in turn.

### 1.   Futility

Johnson argues that administrative review was futile because Liberty had a conflict of interest that promoted its bottom line and that this, along with contrary evidence presented to Liberty, demonstrates that the decision would have come out the same way even if Johnson had appealed the determination.   Johnson points out that Liberty concedes that it had a conflict of interest because Liberty was acting as the claims fiduciary and the insurer.

The futility exception "protects participants who are denied meaningful access to administrative procedures, not those whose claims would be heard by an interested party." *Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1224 -1225 (11th Cir. 2008).   The Eleventh Circuit has explained that "the futility exception is about meaningful access to administrative proceedings, not a potential conflict of interest of the decisionmakers." *Id.*   To demonstrate futility, a plaintiff must make a clear and positive showing of futility.   *Springer v. Wal-Mart Assoc. Grp. Health Plan*, 908 F.2d 897, 901 (11th Cir. 1900).   In this case, the court cannot conclude that the admitted conflict of interest in this case considered by itself, or in conjunction with contrary evidence presented to Liberty, is sufficient to excuse the failure to exhaust administrative remedies.   No clear and positive showing of futility has been made to excuse Johnson's failure to exhaust his administrative remedies.   The court turns, therefore, to Johnson's arguments regarding denial of meaningful access.

### 2. Denial of Meaningful Access to Administrative Procedures

Liberty has provided the affidavit of Lynda Thacker, Benefits Manager for HCA, in which she states that the Summary Plan Description attached to her affidavit is the Summary Plan

7

Description which applied to all HCA employees in 2011.   (Doc. #20-1 at p.2).   The

administrative review provisions of the Plan are contained in the Summary Plan Description.

The Summary Plan Description states that Liberty's notice of a denial of a claim will include a

statement of the claimant's right to bring a civil action under ERISA following an adverse decision

on appeal. (Doc. #20-1 at p.68).   The administrative procedure in place, therefore, identifies a

right to bring a civil action under ERISA after there is an adverse decision on an appeal, not after

the initial denial of benefits.

Johnson admits that administrative procedures are included in the Summary Plan

Description in evidence, (Doc. #19 at p. 9), but argues that the procedures were not available to

him.   Johnson argues that he was provided a copy of the Policy upon request in 2013, and that

Liberty provided additional copies of policies in its initial disclosures, in support of the Motion for

Summary Judgment, and its supplemental disclosures on December 5, 2014.   Johnson states that

the newly-disclosed copy of the Policy also contains a Summary Plan Description.   He points to a

page within the exhibit, however, which states that the date the Policy was "provided" is February

7, 2012, after his employment ended.[2]   Johnson has argued, therefore, that he was denied

meaningful access to an administrative scheme because there is no administrative scheme in the

Policy, and a copy of the Summary Plan Description was "provided" after his employment.

To be clear, Johnson has not argued, or presented any evidence to support an argument,

that he did not have a copy of any Plan documents during his employment, nor has he presented

evidence that Liberty refused to provide him with Plan documents at any time.   This is not like

---

2 Liberty does not explain this date, stating only that the Affidavit of Lynda Thacker states that the document is the Summary Plan Description that applied to all employees of HCA in 2011.   (Doc. #20-1 at p. 2).   For purposes of the Motions for Summary Judgment, therefore, the court will accept that there is no evidence of a Summary Plan Description considered by Johnson at the relevant time, but the court does not consider Johnson to have created a question of fact as to whether there was a Summary Plan Description, nor as to whether the Summary Plan Description which is in evidence was in effect at the relevant time.

8

those cases in the Eleventh Circuit in which exhaustion was excused because the plan refused to

provide plan documents, preventing a claimant from using the administrative procedures.   *See,*

*e.g., Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842, 844 (11th Cir.1990),

*abrogated on other grounds by Murphy v. Reliance Standard Life Ins. Co*., 247 F.3d 1313, 1315

(11th Cir.2001)).   In this case, the undisputed evidence before the court is that Plan documents

were provided to Johnson when requested by his attorney, and there is no evidence of any other

requests being denied.

Johnson's argument is instead that he did not have meaningful access to the administrative

procedure because he could not rely on the procedure set out in the denial of benefits letter.   He

states that he had to rely on a binding Plan document--the Policy, which does not contain the

administrative procedure.   He points out that only an officer can amend the Policy.   Based on this

Policy language, Johnson argues that the denial of benefits letter would be interpreted by a

reasonable person to be an amendment inconsistent with the Policy, and so he reasonably would

not follow the procedure in the letter.

There are two flaws in this argument by Johnson.   First, the administrative claims

procedure is set out in the Summary Plan Description, and the procedure described in the denial of

benefits letter is not inconsistent with the claims procedure in the Summary Plan Description in

effect in 2011.   *See Perrino v. Southern Bell Tel. & Tel. Co*., 209 F.3d 1309, 1316 (11th Cir. 2000)

(stating that "[u]nder ERISA, an employer is required to furnish employees with a 'Summary Plan

Description' that gives details of the benefits provided by the company, and articulates the claims

procedure available to present and adjudicate ERISA claims. *See* 29 U.S.C. § 1021–22; 29 C.F.R.

§ 2560.503–1.").   Second, Johnson's argument is based on Policy language which he says he

received after his attorney requested the Policy in October of 2013, after the 180 days in which he

9

had to seek review of the denial of his claim.   Johnson could not have relied upon the absence of language in the Policy about administrative remedies to make a decision not to appeal during the time to appeal provided by the denial letter.   (Doc. #14-5).

According to Johnson's own argument, when his benefits were denied, he was provided a benefits denial letter, and there is no evidence that he consulted any other source.   The benefits denial letter informed Johnson how to proceed with administrative review of his claim.   The court cannot conclude, therefore, that Johnson was denied meaningful access to the administrative procedure in place.   The court now turns to Johnson's argument based on *Watts*.

3. The *Watts* Exception to the Exhaustion Requirement

Although Johnson concedes that he received the benefits denial letter which outlined his administrative remedy, he cites *Watts v. BellSouth Telecomm., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003), as supporting his argument that he has established futility of exhaustion of administrative remedies based on the content of the letter.

In *Watts* the Eleventh Circuit explained that a futility excuse should succeed if "the reason the claimant failed to exhaust is that she reasonably believed, based upon what the summary plan description said, that she was not required to exhaust her administrative remedies before filing a lawsuit." *Watts*, 316 F.3d at 1207.   The summary plan description in that case stated the participants may use the administrative appeal procedure and may file a suit if their claim is denied, indicating "either route as one the participant 'may' use to obtain relief from the denial" of a claim.   *Id.* at 1208.   The court emphasized that there were "two parts" to the reasonable interpretation of the summary plan description that a claimant had the option of suing without exhausting administrative remedies, one of which was the statement of the right to sue in federal court.   *Id.* at 1209.   The court announced a rule that if a plan claimant reasonably interprets a

10

summary plan description as permitting her to file a lawsuit without exhausting administrative remedies, her lawsuit is not barred if she fails to exhaust administrative remedies.   *Watts*, 316 F.3d at 1210.

A district court examining the *Watts* exception has concluded that the exception requires proof by the plaintiff of three elements:   (i) the relevant plan documents objectively speaking could reasonably be interpreted as permitting the plaintiff to file a lawsuit without exhausting administrative remedies, (ii) that the plaintiff interpreted the documents that way, and (iii) that as a result of the misinterpretation, the plaintiff failed to exhaust the administrative process.   *Spivey v. Southern Co.*, 427 F. Supp. 2d 1144, 1157 (N.D. Ga. 2006).

A Seventh Circuit decision, *Gallegos v. Mt. Sinai Medical Center*, 210 F.3d 803 (7th Cir. 2000), relied upon by the Eleventh Circuit in *Watts,* 316 F.3d at 1209, emphasizes the importance of the latter requirements.   In *Gallegos*, the court concluded that the plan language allowed for the interpretation that exhaustion was not required, but because the plaintiff did not allege that she allowed the time for her appeal to lapse because she had chosen to pursue relief in federal court, the court concluded that the exhaustion requirement would be enforced.   210 F.3d at 811.

In this case, the denial of benefits letter sent to Johnson stated that under ERISA he could request a review of the denial of his claim,[3] and that a failure to send a written request for review within 180 days would mean that Liberty's claim decision would be final.   (Doc. #15-3). Accepting Johnson's evidence as true and drawing all reasonable inferences in his favor for purposes of deciding Liberty's motion, Johnson received a denial letter but did not have or consult

---

3 No argument has been raised as to this phrasing, so the court does not address it, but notes that if it is deficient, it would not alter the court's analysis.   *See Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1317 (11th Cir. 2000) (stating that the "exhaustion requirement for ERISA claims should not be excused for technical violations of ERISA regulations that do not deny plaintiffs meaningful access to an administrative remedy procedure through which they may receive an adequate remedy.")

11

other Plan documents.   The facts in this case, therefore, are unlike *Watts* in which the text of documents relied on by the claimant told her there were two remedies she could pursue, and reasonably led her to believe she could pursue either one at her option.   Here, Johnson was told that he could seek review of the denial of his claim, and that failure to seek the specified review would make his claim denial final.   An interpretation of Liberty's letter that if Johnson wanted to pursue additional relief, he did not have to seek the review of his claim as described in the letter would be unreasonable.

Even if Johnson's interpretation was reasonable, this case does not fall within the *Watts* exception because the claimant in *Watts* filed an affidavit in which she stated that she consulted the summary plan description and interpreted it to mean that she could either pursue an administrative remedy or file suit.   *Watts*, 316 F.3d at 1206.   Johnson has provided an affidavit in this case, but in that affidavit he makes no mention of any reliance on language in his denial of benefits letter. (Doc. #13-13).   The court has been pointed to no evidence of reliance by Johnson on any interpretation of language in the benefits denial letter.   Johnson, therefore, has not proven the exception as outlined in *Watts*, and the court declines to extend the exception in this case.

In conclusion, this court must strictly enforce an exhaustion of administrative review requirement for an ERISA plaintiff unless an exceptional circumstance is presented.   Johnson has not demonstrated the exceptional circumstances of futility, lack of meaningful access to administrative procedures, or that he relied on a reasonable interpretation of Plan documents that he did not have to exhaust his administrative remedies.   Therefore, summary judgment is due to be granted Liberty for Johnson's failure to exhaust his administrative remedies.

### B.  Benefits Denial

Even if the court were to exercise its discretion to excuse Johnson's failure to exhaust his

12

administrative remedies, for the reasons discussed below, Liberty would still be entitled to summary judgment in this case.

Following the six steps of analysis outlined above, *see Melech*, 739 F.3d at 673, Liberty argues that its decision to deny Johnson benefits was correct because Johnson voluntarily retired even though his employer continued to make available to him a light duty position at the same pay, and his doctor had stated that he was able to perform a light duty position on a full-time basis, which meant that he was no longer disabled within the meaning of the Policy. Liberty further argues that even if the decision was not correct, its decision still should be upheld because Liberty had sole discretion to construe the terms of the policy, and there were reasonable grounds to support the determination.   Liberty states that although it operated under a conflict of interest, there is evidence that Liberty took affirmative steps to separate underwriting and claims functions.   Liberty cites to unpublished opinions including *Havens v. Liberty Life Assurance Co. of Boston*, No. SA-09-CA-372-H, Slip Op. (W.D. Tex. Jul. 6, 2010), for the proposition that when an insurer takes steps such as physically separating case managers and employees who make underwriting decisions, and requirement management oversight and review of any claim denial, absent other factors giving weight to the conflict of interest, courts should give minimal weight to a conflict of interest.   (Doc. #11, Ex. 2 at p.1).

Johnson argues that he was disabled under the policy because he worked as a Maintenance Mechanic IV which required him to stand, stoop, bend, climb, and worked in cramped positions, but after his surgery, Johnson was unable to perform the duties of his Own Occupation, under the Plan.   The "own occupation" is not the basis for Liberty's motion, however.

In response to the ground for claim denial that Johnson was no longer disabled under the Policy's "any occupation" provision, Johnson argues that Dr. Bradley stated in the medical records

13

provided to Liberty that Johnson was on light-duty restriction, but also directed the reader to his notes in which he stated that Johnson had left employment and he hoped that Johnson would be able to return to light-duty work in the future.   Johnson argues that the greeter position he was placed into was not sustainable employment because it is a volunteer position, although Liberty takes the position that the evidence Johnson relies on for that argument was not information presented to Liberty during his claim and should not be considered now.   Finally, Johnson states that even considering the light-duty position, he was unable to perform the duties of that position.   Johnson also cites *Melech v. Life Ins. Co. of N. Am.,* 739 F.3d 663, 674 (11th Cir. 2014), in which the court remanded a decision on benefits for reconsideration in light of the Social Security disability determination which was not considered by the Plan.

The benefits denial letter Liberty sent to Johnson states that the medical information states that Johnson was released to light duty, that the medical records confirmed an ability to continue with light duty work, and that the employer confirmed that light duty accommodations would have been available if Johnson had continued working.   The letter also acknowledges the determination by the Social Security Administration, distinguishing this case from *Melech*.

Johnson's primary disagreement with the basis for the denial is that the medical records confirmed an ability to continue with light duty work.   Upon review of the information in front of Liberty at the time, the fact that Johnson was not working was not as a result of any recommendation or restriction by his doctor, but was his decision, and his physician, Dr. Bradley, expressed that it was his hope that Johnson would return to light duty.   The form released Johnson to light duty work.   ACH had confirmed that light duty work was available to Johnson.   This decision, therefore, was not "wrong," and, if it was "wrong," Liberty, which had discretionary authority, based the decision on reasonable grounds, i.e. his release to light duty work and the

14

availability of light duty work.   The court is also persuaded by unpublished opinions provided by Liberty that the conflict of interest in this case should not be given great weight.

The court concludes, therefore, that summary judgment is due to be GRANTED as to Liberty on this alternative basis.

### V. CONCLUSION

For the reasons discussed, the Motion for Summary Judgment (Doc. #11), filed by the Defendant, Liberty Life Assurance Company of Boston ("Liberty") is hereby ORDERED GRANTED, and the Motion for Summary Judgment (Doc. #12) filed by the Plaintiff, Ronald Johnson is DENIED.

Done this 20th day of January, 2015.

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ANGELA DOTSENKO | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | No. SA-12-CA-555 |
| | § | |
| LIBERTY LIFE ASSURANCE | § | |
| COMPANY OF BOSTON | § | |
| | § | |
| Defendant | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This is a civil action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132. Both parties have filed briefs requesting judgment in their favor. Having reviewed the briefs, the Court finds that Defendant is entitled to judgment in its favor as a matter of law.

### I.   Background

The following facts are established by the administrative record: Plaintiff Angela Dotsenko was employed as an insurance claims adjuster/examiner for USAA until July 17, 2009. USAA had contracted with Defendant Liberty Life Assurance Company of Boston (Liberty Life) to provide both long term and short term disability benefits to participating USAA employees. On July 18, 2009, Plaintiff was approved for benefits from the USAA Short Term Disability Benefits Plan (the STD Plan) based on a

1

diagnosis of myopic chorioretinal degeneration OU and glaucoma. She collected benefits from the STD Plan until she was approved to receive benefits from the USAA Long Term Disability Plan (the LTD Plan) on January 14, 2010. The LTD Plan provides that, during the initial 24 months of the claim, "disabled" means that the participant "as a result of injury or sickness, is unable to perform the material and substantial duties of [her] own occupation." Group Disability Income Policy (AR 7).

On November 29, 2010, Liberty Life assigned Plaintiff's case for review by a physician in its medical department, Dr. Melvyn Damast.[1] Dr. Damast began his evaluation by reviewing Plaintiff's medical records from her primary ophthalmologist, Dr. W. Darrell Willerson. Her medical records showed a substantial decrease in visual acuity. Specifically, in July 2009 Plaintiff's corrected distance visual acuity was reported at 20/20 in the left eye. Subsequent examinations, however, indicated a decrease in visual acuity to 20/70 in August 2009 and 20/200 in January 2010, which remained unchanged through September 2010. Similarly, corrected distance visual acuity reported in the right eye decreased from 20/20 in August 2009 to 20/30 in January 2010, 20/40 in May 2010 and 20/50 in September

---

[1] It is unclear from the administrative record why Dr. Damast was assigned to Plaintiff's case more than ten months after she had been approved for benefits under the LTD plan.

2

2010. On December 14, 2010, Dr. Damast issued his initial report on Plaintiff's condition. He noted that the decrease in Plaintiff's visual acuity was not explained and informed Defendant that he needed to speak with Dr. Willerson to determine the cause. He also recommended an Independent Medical Evaluation (IME) to determine the level and cause of her alleged visual impairment. Also in December 2010, Dr. Damast attempted to contact Dr. Willerson to learn more about Plaintiff's condition. Dr. Willerson, however, did not respond until May 5, 2011. In a written response, Dr. Willerson did not explain the cause of Plaintiff's decrease in visual acuity. In fact, he did not answer several of Defendant's specific questions. See Letter from Dr. Willerson, dated December 21, 2010, received via fax May 5, 2011 (AR 290).[2] With respect to whether Plaintiff had occupational visual restrictions, Dr. Willerson stated that "[Plaintiff] says . . . she needs magnification at work for reading on the computer." Id.

On February 28, 2011, Plaintiff had undergone the IME, which was performed by a Board Certified Ophthalmologist, Dr. Jason Zhao. Dr. Zhao was charged with taking a complete history and performing an ophthalmological examination (with dilation of the pupils) and a central visual field test in each eye. Dr.

---

[2] The administrative record does not explain this discrepancy.

3

Zhao reported the following findings:

1. She has such a high myopia with the degree that is relatively uncommon. (I have been seeing high myopia mostly less than 15.00 diopters but she is more than 22.00 diopters). With some pathologic changes in her retina, I think she has a pathologic myopia, which may continue to deteriorate with time, particularly in her situation.

2. Macular pathology with neovascular membrane in the left eye. This is a pathologic condition sometimes seen in high myopia, which may compromise the central vision.

3. Glaucoma. She was diagnosed [with] glaucoma by Dr. Willerson. Although the visual field test results . . . are not typical glaucomatous visual field changes, the high eye pressure certainly should be treated.

4. Peripheral retinal degeneration in both eyes.

Letter from Dr. Zhao, dated March 3, 2011 (AR 315). He concluded:

> Based on reviewing the patient's ocular medical records and clinical exam, I think her visual complaints are reasonable. Her retinal pathology, glaucoma, and refractive status are predictable diagnoses in such a high myopia. Plus wearing such a cola bottom-like glasses itself not only causes very restricted peripheral vision, but also affects central vision quality due to tremendously decreased image size through the glasses. She should have some visual limitations such as not driving at night for safety.

(AR 315-316).

After reviewing Dr. Zhao's report, a Liberty Life representative asked Dr. Zhao to express an opinion as to the amount of time that Plaintiff could read or use a computer

4

during an 8-hour workday. Dr. Zhao responded that he could not answer the question with specificity because reading is "subjective." He stated he would not require a patient like Plaintiff to use her eyes beyond her "comfort" level. Letter from Dr. Zhao, dated April 4, 2011 (AR 312). That same representative then contacted Plaintiff to ask what she thought was a comfortable amount of time for reading. The Plaintiff replied that she could only read double-spaced, large-font type, and that she could not use a computer at all because it was too hard to see the monitor.

On July 2, 2011, Dr. Damast submitted a second addendum to his report from December 14, 2010.[3] He stated that having reviewed Dr. Zhao's report and Dr. Willerson's letter, he believed that the following diagnoses were supported: high myopia, myopic degenerative changed (peripapillary and peripheral), myopic maculopathy in left eye, and glaucoma suspect. In addition, he noted that both doctors had concluded that the only real limitation on Plaintiff was her ability to drive. Dr. Willerson stated that Plaintiff could perform occupational near vision functions like reading and using a computer with the use of age-appropriate magnifying glasses, and Dr. Zhao refused to give a definitive opinion on the matter.

---

[3] Dr. Damast filed a first addendum on December 23, 2010.

Having concluded that Plaintiff was able to perform the duties of her own occupation, Defendant found that Plaintiff did not meet the definition of "disabled" under the LTD plan. Plaintiff's benefits were discontinued on July 30, 2011.

In January 2012, Plaintiff appealed the termination of her disability benefits. Defendant reviewed Plaintiff's claim file as well as her Social Security Administration file, and concluded it was unable to alter its original determination. Plaintiff now contends (1) that there is no concrete evidence supporting Defendant's termination of her benefits; (2) that Defendant failed to provide her with a full and fair review as required by federal law; and (3) that Defendant's actions suggest procedural unreasonableness.

## II. Applicable Law and Analysis

The USAA Group Disability Income Policy specifies that Liberty Life shall possess the authority, in its sole discretion, to construe the terms of the policy and to determine benefit eligibility. When a plan grants an administrator discretion in benefits determinations, the Court is required to apply an abuse of discretion standard, **Sanders v. Unum Life Ins. Co. Of Am.**, 553 F.3d 922, 925 (5th Cir. 2008), and determine whether the administrator's factual findings were "arbitrary and capricious." **Love. v. Dell Inc.**, 551 F.3d 333, 336 (5th Cir.

6

2008). An administrator's findings of fact are arbitrary and capricious when there is not a "rational connection between the known facts and the decision or between the found facts and the evidence." **Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.** 97 F.3d 822, 828 (5th Cir. 1996). An administrator's decision to deny benefits must be based on evidence that clearly supports the basis for denial. **Vega v. Nat'l Life Ins. Servs., Inc.,** 188 F.3d 287, 299 (5th Cir. 1999).

Plaintiff first contends that there is no concrete evidence to support Defendant's denial of her benefits. Specifically, she contends that Dr. Damast's report is contradicted by the medical evaluations of Dr. Willerson and Dr. Zhao. The Court disagrees. The administrative record shows that in making its determination, Defendant consulted with three physicians: Dr. Willerson, Plaintiff's treating ophthalmologist, Dr. Zhao, an independent medical examiner, and Dr. Damast, its own consulting ophthalmologist. All three found that Plaintiff suffered from decreased visual acuity. However, none of them concluded that Plaintiff could not perform the duties of her own occupation. Specifically, Dr. Willerson concluded that Plaintiff could use and read the computer with age-appropriate magnifying glasses. Dr. Zhao, after reviewing Dr. Willerson's medical records and performing his own exam, concluded that Plaintiff should not

drive at night. He did not, however, prohibit Plaintiff from using the computer. In short, all three doctors, to varying degrees, agreed that Plaintiff's myopia did not render her incapable of performing the duties of her occupation. Because there is a rational connection between the found facts and the evidence, the administrator's findings of fact were not arbitrary and capricious.

Next, Plaintiff contends that Defendant failed to provide her with a full and fair review because it did not consult a medical expert when considering Plaintiff's appeal. Federal regulations governing ERISA appeals require, inter alia, that the administrator consult with "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). In addition, the health care professional must be an individual who was not previously consulted in connection with the adverse benefit determination that is the subject of the appeal Id. at § 2560.503-1(h)(3)). During Plaintiff's appeal, Defendant consulted with Tammy Scarponi, a registered nurse. Scarponi reviewed Plaintiff's file, which included the reports from Dr. Damast, Dr. Willerson, and Dr. Zhao. She also obtained and reviewed Plaintiffs' Social Security Administration

8

file.[4] The SSA file did not contain any new medical records pertaining to Plaintiff's eyesight. Scarponi concluded that all clinical information pertaining to Plaintiff's eye condition had been reviewed by peer and IME providers, and thus another peer review was unnecessary. Plaintiff has not shown that Scarponi was unqualified to review her file. Because Defendant consulted with an appropriate healthcare professional as required by ERISA, it provided Plaintiff with a full and fair review.

Finally, Plaintiff contends that Defendant's actions suggest procedural unreasonable because there was a conflict of interest. An administrator who both determines eligibility for benefits and provides those benefits operates under a conflict of interest. **Metro. Life Ins. Co. v. Glenn**, 554 U.S.__, 128 S.Ct. 2343, 2349 (2008). If an administrator has a conflict of interest, the Court must weigh the conflict as a factor in determining whether there is an abuse of discretion. **Id.** The weight of a conflict of interest is determined by the circumstances. **Id.** at 2351. A conflict of interest "should prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and]

---

[4] In May 2010, Liberty Life referred Plaintiff to its vendor, The Advocator Group, in order to apply for Social Security Disability benefits. On October 28, 2011, the Social Security Administration (SSA) found that she was disabled and awarded her benefits.

9

less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." **Id.**

In this case there is a conflict of interest, as the policy confers upon Liberty Life both the authority to construe its terms and determine benefit eligibility and the duty to pay benefits. The importance of a conflict of interest, however, is diminished when the administrator takes active steps to prevent bias, such as "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making." **Id.** Defendant did take these steps, including physical separation of disability case managers and employees who make underwriting and premium decisions, and requiring management oversight and review of any claim denial. **See** Affidavit of Heather Heins, Manager/Appeal Review Unit for Defendant, at p. 3, para. 11. In light of these bias-reducing measures, and absent any other factors giving weight to the conflict, the Court should give minimal weight to the demonstrated conflict of interest.

### III. CONCLUSION

Having reviewed the briefs of the parties and the record, the Court concludes that Defendant's denial of LTD Plan benefits to Plaintiff was supported by substantial evidence that was not

outweighed by the conflict of interest, and that Plaintiff has not sustained her burden of showing an abuse of discretion.

It is therefore ORDERED that Plaintiff's claim for legal and equitable relief pursuant to 29 U.S.C. § 1132 (a)(1)(B) be, and it is hereby, DENIED.

It is further ORDERED that judgment be, and it is hereby, ENTERED in favor of Defendant, and that Plaintiff take nothing by her suit.

SIGNED AND ENTERED THIS ___11th___ day of June, 2013.

HARRY LEE HUDSPETH
SENIOR UNITED STATES DISTRICT JUDGE

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**EARNEST HAMPTON**                                                             **PLAINTIFF**

**V.**                                           **CIVIL ACTION NO. 4:11-CV-100-HTW-LRA**

**LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON**                                                                   **DEFENDANT**

<u>**ORDER GRANTING SUMMARY JUDGMENT**</u>

Plaintiff Earnest Hampton ("Hampton") worked at HD Supply, Inc. ("HD Supply"), for thirty years before being diagnosed and treated for endstage renal disease. HD Supply had purchased, from Liberty Life Assurance Company of Boston ("Liberty Life"), a group long-term disability income policy ("Policy"), intended to provide income benefits should Hampton or other employees become unable to work.

Hampton left his job on May 11, 2010, to undergo various surgeries, including removal of his gallbladder. He began dialysis while in the hospital. His doctors determined, after his surgery, that he could return to work with certain restrictions. Unfortunately, HD Supply says it could not accommodate the restrictions necessitated by Hampton's illness and, therefore, did not allow Hampton to return to work. Hampton thereafter sought long-term disability benefits under the Policy. Liberty Life denied the claim, contending that Hampton is not disabled as defined under the Policy.

Hampton has brought this appeal, asking this court to reverse Liberty Life's denial of benefits. Liberty Life has moved this court to grant summary judgment in its favor [docket no. 33]. Because Liberty Life's denial of benefits is supported by the

1

administrative record and, thus, not an abuse of discretion, this court is compelled to grant Liberty Life's motion and dismiss this lawsuit.

## I. Jurisdiction

This court has "federal question" subject matter jurisdiction under Title 28 U.S.C. § 1331.[1] Federal question jurisdiction lies where a dispute or cause of action "arises under" federal law, or federal law "creates the cause of action" pursued in the lawsuit. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 917 (5th Cir. 2001). This dispute clearly qualifies as a federal question because the issues herein are governed by the Employee Retirement Security Act of 1974, Title 29 U.S.C. § 29, *et seq.* ("ERISA"), an enactment authorized by the United States Congress.

## II. Facts

Hampton was enrolled in a long-term disability benefits plan through his employer HD Supply, where he worked from August 15, 1980, until May 10, 2010, in the position of Inside Sales I. Questionnaire, admin. record, Liberty/ Hampton 120, docket no. 38-3. Liberty Life was both the plan administrator and the payor for this Policy.

Hampton has diabetes and underwent laparoscopic cholecystectomy (removal of the gallbladder) in May of 2010. Administrative record, Liberty/Hampton 184-187, docket no. 38-3. Hampton previously had been diagnosed with chronic renal insufficiency and began dialysis while in the hospital for the gallbladder surgery. *Id.* Hampton also had surgery to insert a dialysis catheter and to place an arteriovenous fistula. *Id* at 186-187. These procedures have facilitated Hampton's dialysis, which he

---

[1] Title 28 U.S.C. § 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2

will have to continue for the rest of his life, or until he has a kidney transplant.

The administrative record contains a "restriction form" dated June 16, 2010, signed by William Billups, III, M.D., Hampton's surgeon, indicating that after surgery Hampton was restricted from lifting over 25 pounds for one month, but that he would have no lifting restrictions after July 16, 2010.  Administrative record, Liberty/Hampton 205, docket no. 38-3.  The restriction form states that Hampton could return to full duty as of July 16, 2010.  *Id.*

Hampton did not return to work on July 16, 2010, but advised Liberty Life that he was seeing Dr. Randall Hicks in connection with his dialysis.  Claimant questionnaire, admin. record Liberty/Hampton 117.  The administrative record contains a letter from Dr. Hicks dated July 26, 2010, which stated that Hampton could return to work with the restrictions that he could not tolerate exposure to heat and cold, could not lift heavy objects, and had to go to dialysis three days per week.  Admin. record, Liberty/Hampton 102.

As earlier mentioned, Hampton had surgery in May of 2010, after which he filed a claim for disability benefits with Liberty Life that same month.  The ninety-day elimination period ended on August 10, 2010, at which time Hampton's claim for benefits began.[2]  On his claim form, Hampton stated that he could not perform his "own occupation" because he was "on dialysis, had high blood pressure, and [was] a diabetic."  Questionnaire, Liberty/Hampton 114-118, docket no. 38-3.  He added that

---

[2] "'Elimination period' means a period of consecutive days of Disability or Partial Disability for which no benefit is payable."  Group Disability Income Policy at 11 of 49, docket no. 38-1.  The disability policy in question here required a ninety-day elimination period before an insured could begin collecting long-term disability benefits.

3

dialysis made him weak, that after treatment he had trouble standing, and felt dizzy when he stood for a long period of time. *Id.*

A Liberty Life Nurse Case Manager reviewed the claim file and confirmed that the medical records supported the doctor's restrictions for Hampton–that Hampton could not tolerate extreme hot or cold temperatures and could not lift heavy objects.[3]  Denial of appeal, docket no. 38-2.

Liberty Life then requested a full occupational analysis of Hampton's job duties at HD Supply.  This analysis was conducted on August 26, 2010, by Certified Rehabilitation Counselor/Vocational Case Manager, Michelle A. Truax ("Truax"). Occupational analysis, admin. record, Liberty/Hampton 86-88.  Truax compared Hampton's job at HD Supply to the Dictionary of Occupational Titles and found that Hampton's former job most closely matched that of an Order Clerk, D.O.T. code 249.362.026. *Id* at 87.

Truax also reviewed job postings on Indeed.com and CareerBuilder.com.  She summarized as follows: "I reviewed eleven job postings and none provided physical demands, however all the postings reviewed described job duties of standard office-based work including phone and computer use.  Extreme temperatures or adverse environmental conditions would not be expected in these types of work settings." *Id* at 88.

Truax concluded that the restrictions imposed by Dr. Hicks in his July 26, 2010,

---

[3] Dr. Billups' restrictions form indicated that Hampton could not lift more than 25 pounds after surgery.  Liberty Life's case notes indicate that on August 23, 2010, the Liberty case manager spoke with a nurse in Dr. Hicks' office who stated that Hampton could not "lift, push, or pull" more than 10 pounds.  Admin. record, Liberty/Hampton 54.

4

letter were consistent with the demands of an Order Clerk as defined in the Dictionary of Occupational Titles, and that Hamton's "functional capacity is consistent with the physical requirements for his occupation." *Id* at 88.

Liberty Life sent a form to HD Supply on August 16, 2010, asking if Hampton was "able to return to work in an accommodating position or his job position in a modified manner, which meets the recommendations [provided by the doctor]." Docket no. 38-3 at 42. Shawna M. Pierro, a Human Resources Generalist at HD Supply, signed the form and stated that Hampton could not return to work in an accommodating position. *Id.*

The physical area where Hampton worked at HD Supply was neither heated nor cooled and reached extreme temperatures. Hampton occasionally had to go to the warehouse to pull parts from the shelves. HD Supply said it could not calculate the exact weight of the various parts Hampton would have to lift. Emails, admin. record, Liberty/Hampton 228-230, docket no. 38-3. After reviewing Hampton's medical restrictions, HD Supply did not allow him to return to work.

Liberty Life denied Hampton's initial claim on August 26, 2010. Hampton filed an appeal, which Liberty Life denied on December 8, 2010. Hampton did not provide any additional clinical records with his appeal, but submitted a letter from Dr. Hicks dated August 25, 2010, which said that he was permanently disabled because he required dialysis three times per week.

Meanwhile, on July 16, 2010, as Liberty Life was reviewing Hampton's claim for benefits, the United States Social Security Administration ("SSA") issued to Hampton a letter granting him disability benefits. The SSA found that Hampton became disabled as

5

of May 13, 2010, and was entitled to monthly disability benefits starting in November of 2010. Notice of award, admin. record, Liberty/Hampton 170-172.

### III. Motion for Summary Judgment

Liberty Life asks this court to dismiss Hampton's appeal. To support its motion, Liberty Life has submitted the administrative record which contains medical records, evaluations, status notes from Liberty Life's computer system, and correspondence. Liberty Life also has submitted a sworn affidavit from Heather Heins, a Manager of the Appeal Review Unit for Liberty Life. Heins states in her affidavit that "it is Liberty Life's practice and intention to review . . . claims fairly, without regard to the manner in which the plan is funded, and to pay claims consistently and in accordance with the applicable benefit provisions." Docket no. 38, ¶ 7. Heins says that "the employees who make claims decisions on behalf of Liberty Life are not evaluated or compensated on the basis of the amount or number of claims paid or denied. Liberty Life in no way discourages its employees from paying claims that are covered and payable under the terms of its policies." *Id* at ¶ 8.

Heins described the steps which Liberty Life has taken to separate the claim functions from the underwriting/premium functions. She says that these groups are geographically separated, the departments and managements are separate, and underwriting makes rate decisions without input from disability case managers and without access to claim files.

Heins also says that specific management review features are integral to the claims process to ensure accurate decison-making. A denial of a claim requires a manager's review, says Heins. When a claim is appealed, Heins says, the file is

6

directed to an independent appeal review unit at a different location from the first level claims managers.

Finally, Heins adds, when Hampton did not return to work on July 26, 2010, he was no longer an employee and "no longer a 'covered person' eligible for benefits under the plan." *Id* at ¶ 12. Regarding this last point, Liberty Life says that it is not challenging Hampton's eligibility to pursue his existing claim under the Policy; rather, contends Liberty Life, a subsequent condition or the worsening of Hampton's current condition occurring after the instant claim has been decided will not serve to revive Hampton's claim for benefits.

Hampton counters that the plan administrator's denial of benefits does not merit deference because the administrator acted under a conflict of interest when denying Hampton's claim,[4] as evidenced by the following: 1) that Liberty Life is both the administrator and payor of claims; 2) that statistics of claims which were approved, closed, and denied by Liberty Life from 2009 to 2012 show bias; 3) that the person who conducted the occupational analysis of Hampton's job is a paid employee of Liberty Life and, thus, allegedly not independent; 4) that the Social Security Administration granted disability benefits to Hampton; and 5) that Liberty Life unfairly disregarded, or did not accord any weight to, Dr. Hicks' August 25th letter stating Hampton was permanently disabled.

## A. Summary Judgment Standard

---

[4] "Conflict of interest is a real or seeming incompatibility between one's private interests and one's public or fiduciary duties." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)(internal citations omitted).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In response to a motion for summary judgment, the non-moving party must provide specific proof demonstrating a triable issue of fact as to each of the elements required to establish the claim asserted. Washington v. Armstrong World Indus., 839 F.2d 1121, 1122-23 (5th Cir. 1988). The court must resolve all reasonable doubts about the existence of a genuine issue of material fact against the movant. Byrd v. Roadway Express, Inc., 687 F.2d 85, 87 (5th Cir. 1982).

**B. Standard of Review of Administrator's Denial of Benefits**

When an ERISA plan vests discretionary authority in a plan administrator or fiduciary to interpret plan language and determine eligibility, the district court will review that plan administrator's decision under an abuse of discretion standard. Holland v. International Paper Co. Retirement Plan, 576 F.3d 240, 246 (5th Cir. 2009). This means that the plan administrator's denial of benefits will not be overturned unless the decision was arbitrary or capricious. Id. A decision by a plan administrator is deemed not to be arbitrary or capricious if substantial evidence supports the administrator's decision. Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 273 (2004).

When reviewing a plan administrator's decision, the court must rely upon the administrative record. Lifecare Mgmt. Svcs. LLC v. Insurance Mgmt. Administrators Incorp., 703 F.3d 835, 841 (5th Cir. 2013).

If "a benefit plan gives discretion to an administrator or fiduciary who *is operating*

8

*under a conflict of interest*, that conflict must be *weighed as a 'factor* in determining whether there is a abuse of discretion.'" *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)(emphasis in original). An administrator is deemed to have a conflict of interest when "a plan administrator both evaluates claims for benefits and pays benefits claims." *Id.*

The Fifth Circuit, at one time, applied a "sliding scale" of deference depending on the degree of conflict of interest. *Holland*, 576 F.3d at 247-248 (discussing *Glenn*, 554 U.S. 105). The United States Supreme Court has abrogated application of a lower standard of review in cases of conflict of interest, i.e., a sliding scale of deference, saying that the standard is still abuse of discretion. *Id.* A conflict of interest is merely one factor for the court to consider when deciding if the plan administrator has abused its discretion. *Id.*

The court applies a two-step process to review the plan administrator's interpretation of the ERISA plan. The court must determine if the plan administrator applied a legally correct interpretation of the plan. *Ellis*, 394 F.3d at 269-70. If the plan administrator gave an incorrect interpretation of the plan, the court then goes on to determine if the incorrect legal interpretation was an abuse of discretion. *Id* at 270.

To determine if a plan administrator's interpretation of an insurance plan was legally correct, the court considers: "1) whether the administrator has given the plan a uniform construction; 2) whether the interpretation is consistent with a fair reading of the plan; and 3) any unanticipated costs resulting from different interpretations of the plan." *Ellis*, 394 F.3d at 270.

## C. The Long-term Disability Policy

9

ERISA-regulated plans fall under federal law, and "federal common law governs rights and obligations" under these ERISA-regulated insurance contracts. *Garcia v. American United Life Ins. Co.*, 422 Fed.Appx. 306, 310 (5th Cir. 2011). When interpreting the language of the ERISA-governed insurance contract, "courts are to give the language of an insurance contract its ordinary and generally accepted meaning if such a meaning exists." *Id.*

The plaintiff has not challenged any provisions of the insurance contract, nor Liberty Life's interpretation of the contract as it applies to his claim for benefits. The parties, therefore, have provided no evidence challenging the administrator's legal interpretation of the plan. Neither has this court any evidence whether the administrator has applied a uniform construction to the plan in the past, or if a different interpretation of the plan would generate unanticipated costs–two factors used to determine if the plan administrator's interpretation is legally correct. *Ellis*, 394 F.3d at 270. The third factor–whether the interpretation is consistent with a fair reading of the plan–supports the plan administrator's interpretation. The court finds that the plan language, as discussed below, is clear, unambiguous, and consistent with the plan administrator's interpretation.

Following are the relevant provisions and definitions from the Policy provided by Liberty Life. The plan grants Liberty Life the discretion to interpret the plan in the following paragraph:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding. Policy, Liberty/Hampton 44, docket no. 38-1.

10

The plan provides the following definitions applicable to this dispute:

> i. "Disability" or Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

> ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation. Policy, Liberty/ Hampton 10, docket no. 28-1.

> "Any Occupation" means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity. Policy, Liberty/Hampton 8, docket no. 38-1.

> "Own Occupation" means that the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy. Policy, Liberty/ Hampton 14, docket no. 28-1.

> "Material and Substantial Duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified. Policy, Liberty/ Hampton 13, docket no. 28-1.

The Policy also has a provision for partial disability which states that:

> When Liberty receives Proof that a Covered Person is Partially Disabled and has experienced a loss of earnings due to Injury or Sickness and requires Regular Attendance of a Physician, he may be eligible to receive a Monthly Benefit, subject to any other provision of this policy. To be eligible to receive Partial Disability benefits, the Covered Person may be employed in his Own Occupation or another occupation, must satisfy the Elimination Period and must be earning between 20% and 80% of his Basic Monthly Earnings. Policy, Liberty/Hampton 27, docket no. 38-1.

As Liberty Life has determined, during the first 24 months of disability, Liberty Life will pay disability benefits if the claimant is unable to perform the material and substantial duties of his "_own occupation_." Policy, Liberty/Hampton 10, docket no. 38-1 (emphasis added). The plan states in clear and unambiguous terms that "own

11

occupation" refers to the demands and activities of a job as it is defined in the national economy.  This does not mean that Hampton is disabled if he is unable to work at HD Supply in the same job he held before becoming ill.  Hampton will only be considered "disabled" under the Liberty Life plan if he cannot perform the material and substantial duties of his job as it is defined in the national economy.  Policy, Liberty/ Hampton 14, docket no. 28-1.

After 24 months of disability, the plan will pay benefits only if the claimant is unable to perform the material and substantial duties of "any occupation," as defined in the plan.  Policy, Liberty/ Hampton 10, docket no. 28-1.

### D.  The Record Before the Plan Administrator

Liberty Life says that it duly considered the medical records provided by Hampton's doctors.

The following shows as much.  Liberty Life's letter denying Hampton's appeal cited:  Dr. Hicks' May 20th note that Hampton "had very little pain and [Hampton's] appetite and edema was improved" [Liberty/Hampton 101, docket no. 38-3]; Dr. Billups' June 16th report saying that Hampton "had the capacity for light physical demand work with no lifting greater than 25 pounds and that [Hampton] had no restrictions as of July 16, 2010" [Liberty/Hampton 205, docket no. 38-3]; and Dr. Hicks' letter of July 26, 2010 [Liberty/Hampton 102].  Letter denying appeal, docket no. 38-2.

Liberty Life accepted the restrictions listed in Dr. Hicks' July 26th letter.  Liberty Life says it based its denial of benefits on rehabilitation counselor Truax's assessment that the restrictions recommended by Dr. Hicks would allow Hampton to work in the occupation of Order Clerk.  Dr. Hicks' letter stated:

12

> Mr. Earnest Hampton is a 56 year old man who is currently under my care for endstage renal disease, requiring dialysis three times a week. Mr. Hampton may return to his job at this time, but must avoid extreme temperatures, both hot and cold. He must also avoid heavy lifting and strenuous activities that would apply pressure over his dialysis catheter site. He must avoid overheating during the summer months. He works full days Monday, Wednesday, and Friday, and half days on Tuesday and Thursday. Admin. record, Liberty/Hampton 102.

Dr. Hicks wrote a subsequent letter on August 25, 2010, which plaintiff characterizes as reversing his position on whether Hampton could work. The administrative record contains progress notes indicating that Dr. Hicks saw Hampton twice between writing the July 26th letter and the August 25th letter. These progress notes state:

7/29/2010   The patient is asymptomatic today. His blood pressure is well controlled. Interim weight gains are acceptable. His temporary catheter is working well with a flow rate of 300. He does have permanent access followup scheduled with the surgeons in August. Adequacy parameters have been reviewed. No changes in his medications were made today. Admin. record, Liberty/Hampton 101.

8/5/2010   The patient's blood pressure is well controlled. Interim weight gains are acceptable. His access is working very well with a flow rate of 315. Adequacy parameters have been reviewed. No changes in his medication were made today. *Id.*

Dr. Hicks' August 25th letter forms the primary basis for Hampton's appeal to this court. Hampton submitted this letter to Liberty Life with his administrative appeal. The letter stated:

> Mr. Hampton is a patient whom I follow for endstage renal disease. He has required dialysis three times weekly since May 2010. He is disabled *because of this*. His condition is not reversible and is considered permanent. Admin. record, Liberty/Hampton 79, docket no. 38-3 (emphasis added).

The occupational analysis done by Certified Rehabilitation Counselor Michelle Truax formed, in significant part, the basis for denial of Hampton's benefits. That

13

analysis indicated that Hampton's job of Inside Sales I closely correlated with the duties and tasks of the Department of Labor's occupation of Order Clerk. Truax found that the occupation of Order Clerk could be performed by someone with Hampton's medical restrictions. Occupational analysis, admin. record, Liberty/Hampton 86-88.

### E. Analysis

#### 1. Dr. Hicks' letters

Hampton argues that the final letter from Dr. Hicks indicated that Hampton is permanently and irreversibly disabled, but that Liberty Life disregarded this letter and failed to investigate further.

In its initial denial letter, Liberty Life said that Hampton could request a review of the denial by writing to Liberty Life within 180 days. Admin. record, Liberty/ Hampton 84. The request for review, continued the denial letter, must "state the reasons why you feel your claim should not have been denied." *Id.* Liberty Life directed Hampton to include with his request "any additional office notes, diagnostic test results, consultations, evaluations, any additional restrictions imposed by your treating physicians, medical opinions from your treating physicians, as well as any additional information that you feel will support your claim [. . .]." *Id.*

Despite having an opportunity to supplement the record during the appeals process, Hampton chose to submit a four sentence letter from Dr. Hicks. The letter repeats the statement from Dr. Hicks' July 26th letter that Hampton has to go to dialysis three times per week, but also states that Hampton "is disabled *because of this*." Dr. Hicks' August 25th letter did not indicate that Hampton's condition had changed since Dr. Hicks had released Hampton to return to work in his July 26th letter. Dr. Hicks'

14

progress reports regarding Hampton's visits between the July 26th letter and the August 25th letter do not indicate any problems in Hampton's recovery or with dialysis. The record shows no evidence that Dr. Hicks made any new medical findings or diagnoses between his first and second letter.

Moreover, even if Dr. Hicks intended in his second letter to say that the Hampton's dialysis schedule precluded Hampton from working during normal office hours from Monday through Friday, the Policy does not state that the claimant's work hours must occur between Monday and Friday. Further, if Hampton were able to work part-time, he would not be considered disabled under the Policy. In the case of partial disability, Hampton might be eligible for partial disability payments. Policy, Liberty/Hampton 27, docket no. 38-1.

Hampton then argues that Liberty Life should have contacted Dr. Hicks and investigated the letter further if it found it insufficient. But Hampton also had a responsibility to develop the administrative record.

When Liberty initially denied Hampton's claim, it had before it the restriction form signed by Hampton's surgeon, Dr. Billups, releasing Hampton to return to work with no restrictions; the July 26th letter from Dr. Hicks releasing Hampton to return to work with restrictions; progress notes from Dr. Hicks indicating that Hampton was doing well; and Truax's occupational analysis which said that Hampton's medical restrictions were consistent with returning to work in the occupation of Order Clerk.

This court cannot find that Liberty Life abused its discretion based on this record. The record contains substantial evidence to support Liberty Life's decision.

When Hampton appealed, he provided the August 25th letter from Dr. Hicks

15

which this court interprets as a reiteration of Dr. Hicks' July 26th letter. The August 25th letter provides no new information about Hampton's condition.

This court, therefore, finds that Liberty Life's denial of Hampton's appeal did not constitute an abuse of discretion. The record contains substantial evidence to support Liberty Life's initial denial of benefits. Hampton's appeal was accompanied by only one additional document, a letter from Dr. Hicks which shows that Dr. Hicks made no new assessments, evaluations or diagnoses with respect to Hampton's condition or restrictions.

### 2.  Social Security Administration benefits

Hampton says that his grant of benefits from the SSA is evidence that he is disabled and that Liberty Life wrongfully has denied his claim. Hampton also argues that this case is "on all fours with" the *Metropolitan Life Insurance v. Glenn* case in which the United States Supreme Court determined that Metropolitan Life ("MetLife"), the plan administrator and payor for Sears, Roebuck & Company's long-term disability insurance plan, had abused its discretion when it denied benefits to an employee who had been approved for disability benefits from the SSA. *See Glenn*, 554 U.S. 105. This case decided the role that a conflict of interest plays in the court's review of a plan administrator's decision. In the *Glenn* case, MetLife "had encouraged Glenn to argue to the Social Security Administration that she could do no work, [MetLife] received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended),[5] and then [MetLife] ignored the [Social Security Administration's]

---

[5]  MetLife approved benefits for Glenn for the first 24 months of her disability finding that "she could not 'perform the material duties of [her] **own job**.'" *Glenn*, 554 U.S. at 109 (emphasis

16

finding" and made its own contrary finding that Glenn could do sedentary work. *Id* at 118.

The United States Supreme Court found, further, that the record provided little information about any steps MetLife took to ensure accuracy of its claims assessment or to minimize its conflict of interest. *Id.* The Court decided that MetLife's conflict of interest should carry a greater weight than other factors used to determine whether MetLife had abused its discretion. In its final analysis, the Court said that MetLife's pushing Glenn to obtain disability benefits from the SSA, and then ignoring the SSA's determination, "was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous)." *Id.*

This case is distinguishable from *Glenn*. The plaintiff here has not alleged that Liberty Life encouraged him to apply for SSA benefits, nor referred him to an attorney to pursue such claims. Liberty Life also has provided a lengthy, sworn affidavit from Heather Heins, a Liberty Life Manager for the Appeal Review Unit. In her affidavit, Heins details the measures which Liberty Life has taken to combat a real or perceived conflict of interest in handling claims. Docket no. 38.

---

added). The plan administrator then encouraged Glenn to apply for long-term disability benefits from the SSA, and recommended an attorney to assist her. MetLife was able to recoup payments it had made to Glenn during the first 24 months from Glenn's social security disability benefits. "An Administrative Law Judge [from the SSA] found that Glenn's illness prevented her from not only performing her own job, but also 'from performing **any jobs** [for which she could qualify] existing in significant numbers in the national economy.'" *Id* (emphasis added). MetLife denied Glenn benefits after the initial 24-month period, finding that "she was 'capable of performing full time sedentary work.'" *Id.*

17

Further, Liberty Life has considered the SSA's grant of benefits and stated that it has made its determination on a different record. Liberty Life relies heavily on the occupational assessment done by Truax, to which, says Liberty Life, the SSA would not have had access.

In the letter denying Hampton's appeal, Liberty Life stated:

An award of Social Security Benefits is not determinative of entitlement to benefits under the specific terms and conditions of the HD Supply, Inc. Group Disability Income Policy ("th Policy"). Moreover, the Social Security Administration ("SSA") will afford special deference to the opinion of the treating physician over the opinion of a non-treating physician. The treating physician rule that is followed by the SSA is not applicable in ERISA benefit cases. In our review, we fully considered the totality of all medical and vocational documentation received, and in accordance with the terms of the Policy, determined that you retain the capacity to perform your sedentary occupation. In the course of our claim review, we conducted a review by a Disability Nurse Case Manager and a vocational analysis by a certified rehabilitation consultant. Our determination was based upon different medical and vocational documentation that was not considered by the SSA. Denial of appeal letter, docket no. 38-2.

Finally, the record evidence provides substantial support to Liberty Life's determination–that Hampton does not meet the definition of disability under the Policy. Hampton has not challenged Liberty Life's interpretation of the Policy language, nor the record upon which Liberty Life made its determination. Under these circumstances, and with the administrative record presented here, this court cannot find that Liberty Life has abused its discretion.

### 3. Other Evidence

Hampton filed, in this court's record, a one-page summary of statistics of Liberty Life's decisions regarding applications for long-term disability benefits from 2009 through 2012. Docket no. 48. The statistics are raw numbers of claims which were

approved, closed, and denied in each year.  The numbers appear to show that less than 19% of all claims filed during that period were approved.  Hampton, thus, urges this court to conclude that Liberty Life is biased and acting under a conflict of interest.

Liberty Life explains that the number of closed cases, which represents the bulk of cases reported during those years, are cases in which Liberty Life initially paid benefits, but later ended the benefits because the claimant either went back to work, or became ineligible to receive benefits.

The raw numbers presented by Hampton, unaccompanied by any meaningful analysis, leave too much open for speculation and provide inconclusive information to the court about how Liberty Life conducts its claim reviews.  This evidence, furthermore, is wholly insufficient to overcome the substantial record evidence supporting Liberty Life's decision here to deny benefits.

### IV. Conclusion

Liberty Life has submitted an administrative record containing substantial evidence that Hampton's medical condition allows him to perform the sedentary position defined by the Department of Labor as Order Clerk.  This court has taken into consideration the inherent conflict of interest created by Liberty Life serving as both plan administrator and payor, and found that this factor does not outweigh the other evidence supporting Liberty Life's denial of Hampton's claim.  For this reason, this court finds that it should grant Liberty Life's motion for summary judgment [docket no. 33].

This lawsuit is dismissed.  This court will enter a separate final judgment dismissing this case with prejudice.

**SO ORDERED AND ADJUDGED**, this, the 30th of March, 2013.

19

s/ HENRY T. WINGATE
**UNITED STATES DISTRICT JUDGE**

**Civil Case No. 4:11-cv-100-HTW-LRA**
**Order Granting Summary Judgment**

20

**FILED**

JUL - 7 2010

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

CORINNE HAVENS,                    §
                                   §
        Plaintiff,                 §
                                   §
v.                                 §   NO. SA-09-CA-372-H
                                   §
LIBERTY LIFE ASSURANCE            §
COMPANY OF BOSTON,                §
                                   §
        Defendant.                 §

## MEMORANDUM OPINION AND ORDER

This is a civil action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132. Both parties have briefs requesting judgment in their favor. Having reviewed the motions and the responses, the Court finds that Defendant is entitled to judgment in its favor as a matter of law.

### I. INTRODUCTION

The following facts are established by the administrative record: Plaintiff Corinne Havens was employed as a Network Analyst for USAA from 1979 until June 21, 2005. USAA had contracted with Defendant Liberty Life Assurance Company of Boston for a policy to provide disability benefits to participating USAA employees. In June 2005, Plaintiff was approved for benefits from the USAA Short Term Disability Benefits Plan ("STD Plan") because of a diagnosis of rheumatoid arthritis. She collected benefits from the STD Plan until she was approved for the USAA Long Term Disability Plan ("LTD Plan") on November 21, 2005.

1

At the time of that approval, Defendant required Plaintiff to apply for Social Security Disability benefits (Joint Ex. 29). The Social Security Administration (SSA) found that she was disabled and awarded her benefits, which were used as offsets to the benefits received from Defendant.

The LTD Plan provides that, during the initial 24 months of the claim, "disabled" means that the participant is "unable to perform all of the material and substantial duties of [her] occupation on an Active Employment basis because of an Injury or Sickness" (Joint Ex. 674). After the initial 24 months, a participant is considered disabled if she is "unable to perform, with reasonable continuity, all of the material and substantial duties of [her] own or any other gainful occupation for which [she] is or becomes reasonably fitted" (Joint Ex. 674).

Upon reviewing her medical records, Defendant determined that Plaintiff was disabled under the "own occupation" definition and approved her for benefits under the LTD Plan. Plaintiff collected benefits provided in the Plan for 24 months from December 19, 2005 until December 19, 2007.

After the initial 24-month benefit period, Defendant re-evaluated Plaintiff's claim to determine whether she qualified for continued benefits under the "any other occupation" definition of disability. Dr. Howard, a rheumatologist and consultant for Defendant, reviewed Plaintiff's medical records and consulted with

2

her treating physicians about her condition. He concluded that her condition had improved substantially since her initial evaluation and that, while she had some physical limitations due to her condition, there were fewer limitations on her capacity to work, and she could return to work with restrictions (Joint Ex. 220).

Based on Dr. Howard's conclusions, Defendant requested a Transferable Skills Analysis and Labor Market Information Report ("TSA Report"), which concluded that Plaintiff was capable of performing the tasks of a Computer Support Specialist and a Computer Security Specialist (Joint Ex. 209). Having concluded that Plaintiff was able to perform the duties of another occupation, Defendant found that Plaintiff did not meet the "any other occupation" definition of disability and, therefore, discontinued her LTD Plan benefits (Joint Ex. 202).

Plaintiff appealed the decision and submitted additional documentation for review. Defendant referred the file to Medicolegal Services for a review and peer consultation where it was assigned to Dr. Stephen G. Gelfand. Dr. Gelfand reviewed her file and submitted an updated report on her functional capacity, which he, too, characterized as not limited to sedentary work (Joint Exs. 071 & 063). Defendant conducted an updated TSA Report, which identified three positions as occupations Plaintiff could perform based on her abilities and qualifications. Defendant then informed Plaintiff that, based on her claim file and her appeal,

3

the termination of her benefits would be upheld. This completed the appeals process.

## II. APPLICABLE LAW

When a plan grants an administrator discretion in benefits determinations, the Court is required to apply an abuse of discretion standard. **Sanders v. Unum Life Ins. Co. Of Am.**, 553 F.3d 922, 925 (5th Cir. 2008). Factual findings underlying a claim decision are always reviewed under an abuse of discretion standard. **Love. v. Dell Inc.**, 551 F.3d 333, 336 (5th Cir. 2008). The abuse of discretion standard requires the Court to determine whether the administrator's factual findings were "arbitrary and capricious." **Id.** An administrator's findings of fact are arbitrary and capricious when there is not a "rational connection between the known facts and the decision or between the found facts and the evidence." **Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.** 97 F.3d 822, 828 (5th Cir. 1996). An administrator's decision to deny benefits must be based on evidence that clearly supports the basis for denial. **Vega v. Nat'l Life Ins. Servs., Inc.**, 188 F.3d 287, 299 (5th Cir. 1999).

If an administrator has a conflict of interest, the Court must weigh the conflict as a factor in determining whether there is an abuse of discretion. **Metro. Life Ins. Co. v. Glenn**, 554 U.S. _, 128 S.Ct. 2343, 2349 (2008). A demonstrated conflict of interest does not change the abuse of discretion standard, but rather is a factor

4

weighing against the administrator's decision. **Id.** An administrator who both determines eligibility for benefits and provides those benefits operates under a conflict of interest. **Id.**

The weight of a conflict of interest is determined by the circumstances. **Id.** at 2351. A conflict of interest "should prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." **Id.**

## III. ANALYSIS

### A. Standard of Review

The USAA Group Disability Income Policy specifies that "Liberty [Life Assurance Company of Boston] shall possess the authority, in its sole discretion, to construe the terms of this policy as to the determination of benefit eligibility and payment of benefits under the policy. Liberty's decisions regarding the determination of benefit eligibility and payment of benefits under the policy shall be conclusive and binding" (Joint Ex. 693). Because the plan grants Liberty discretion to determine a claimant's entitlement to disability benefits, the Court will apply the "abuse of discretion" standard. **Sanders**, 553 F.3d at 925.

### B. Medical Evidence

The administrative record reveals that Defendant was presented

with conflicting medical evidence concerning the severity of Plaintiff's condition. Ultimately, Defendant relied on the conclusions of its consulting physicians who found that Plaintiff's rheumatoid arthritis did not render her incapable of performing the duties of a sedentary occupation. Plaintiff claims that the consulting physicians' conclusions are not supported by the evidence and that they unreasonably disregarded the opinions of her treating physician. Administrators are not required to accord special weight to the opinions of a treating physician, but they may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." **Black & Decker Disability Plan v. Nord**, 538 U.S. 822, 834 (2003).

Plaintiff claims that Dr. Howard, Defendant's medical consultant for the initial review, misrepresented her performance on the Bruce Protocol. In his February 5, 2008 report, Dr. Howard wrote that Plaintiff completed 10 minutes of exercise and that it was not stopped because of any physical complaints (Joint Ex. 268). He noted that this was evidence that she had an above-sedentary functional capacity (Joint Ex. 268). Plaintiff argues that this clearly contradicts the treating doctor's May 6, 2008 statement, included only in the appeal, that Plaintiff became tired, short of breath, and experienced extreme pain while completing the Bruce Protocol (Joint Ex. 83). Dr. Gelfand, in his review of the appeal, does not rely on Plaintiff's performance on the Bruce Protocol in

6

coming to the conclusion that she has a functional capacity which would not limit her to sedentary work (Joint Exs. 48-53).

That a consultant's report contradicted evidence not in the consultant's possession is not a demonstration of a discrepancy between the found facts and the evidence. Because Defendant did not rely on the successful completion of the Bruce Protocol in upholding its denial of benefits once it had this additional evidence in its possession, this discrepancy does not tend to support a finding of abuse of discretion.

Plaintiff next argues that Dr. Howard's conclusion that there was no evidence of active synovitis in her hands since her last visit with Dr. Pineda (her treating physician), and in her elbows and shoulders for the past six months, was unsupported by the evidence (Joint Ex. 220). The evidence includes a letter, signed by Dr. Pineda, confirming that she had informed Dr. Howard that, as of her last visit, there was no evidence of active synovitis (Joint Ex. 210). Plaintiff cites a note written by Dr. Pineda indicating that she informed Dr. Howard that multiple factors could be causing her pain and that she "had objective synovitis of her fingers" (Joint Ex. 117).

It is not an abuse of discretion for an administrator to rely upon the conclusions of a consulting physician, even if they are inconsistent with those of the claimant's treating physician, so long as the administrator does not arbitrarily disregard the

7

conflicting evidence. **Id**. Defendant did not arbitrarily disregard Dr. Pineda's opinion by relying on one of two seemingly contradictory statements. Its reliance on Dr. Pineda's statement that Plaintiff had no signs of synovitis since her last visit was supported by substantial evidence and does not require a finding that Defendant abused its discretion.

Plaintiff next contends that Defendant arbitrarily disregarded evidence that she was suffering from inflammatory arthritis of the cervical spine. It cites Dr. Howard's conclusion that she had received no treatment for this condition and, therefore, it did not result in any functional impairment (Joint Ex. 200). The record indicates that she began treatment for this condition in July, 2008, after the completion of Dr. Howard's initial review (Joint Ex. 89-90). Dr. Gelfand, the physician who reviewed the records on appeal, noted the evidence of arthritis of the cervical spine and included an estimate of the extent of her limitations due to that condition (Joint Exs. 51-52). Given that the reports relied upon by Defendant in determining benefits eligibility acknowledge the condition, it is clear that Defendant did not disregard this evidence, arbitrarily or otherwise.

Plaintiff argues that Defendant's consulting physician acknowledged that she suffered from fibromyalgia, but then disregarded her fatigue as self-reported, even though it is a known symptom of fibromyalgia. Defendant's consulting physician on appeal

8

concluded that Plaintiff did not meet the criteria for a diagnosis of fibromyalgia "based on the finding of only 6 out of 18 tender points" (Joint Ex. 50). Defendant relied on this conclusion, which was based on evidence from the record, in denying Plaintiff's disability benefits. It goes without saying that Defendant was not required to consider the effects of a disease from which substantial evidence indicated Plaintiff did not suffer.

The only real tension between Defendant's findings and the record evidence concerns Plaintiff's treatment regimen. In both its initial claim denial and its appeal denial, Defendant characterizes her drug treatment as "as needed Prednisone (5mg), Plaquenil and Celebrex" (Joint Exs. 200 & 705). The record indicates that, at the time of the initial denial, Plaintiff was taking Prednisone as needed, but both Plaquenil and Celebrex daily (Joint Ex. 118). By the time of her appeal, she was taking all three medications daily (Joint Exs. 99-100). There is no evidence in the record that Plaintiff was ever taking all three medications on an "as needed" basis. This finding, therefore, is not supported by substantial evidence and cannot form the basis of a claim denial.

Considering the substantial nature of the other evidence that Plaintiff did not qualify for LTD Plan benefits, including evidence that Dr. Pineda, her treating physician, believed that her condition was under much better control than it was in 2006 (Joint Ex. 610) when she completed a Functional Capacities Form indicating

9

that her restrictions were consistent with a sedentary occupation (Joint Ex. 517), the Court concludes that the discrepancy concerning Plaintiff's drug treatment regimen is not enough to render Defendant's other evidence insubstantial.

After reviewing the record, the Court concludes that the denial of Plaintiff's LTD Plan benefits was supported by substantial evidence. However, the Court must consider the possible existence and effect of a conflict of interest.

## C. Conflict of Interest

Because Defendant both determines eligibility for benefits and provides those benefits, it is operating under a conflict of interest. **Glenn**, 554 U.S. at _, 128 S.Ct. at 2349. The weight of this conflict will be determined by the circumstances surrounding the claim denial.

The importance of a conflict of interest is diminished when the administrator takes active steps to prevent bias, such as "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking." **Id.** at 2351. Defendant did take these steps, including physical separation of disability case managers and employees who make underwriting and premium decisions, and requiring management oversight and review of any claim denial (Aff. of Heather Heins, p. 3, para. 11). In light of these bias-reducing measures, and absent any other factors giving weight to the

10

conflict, the Court should give minimal weight to the demonstrated conflict of interest.

Plaintiff claims that Defendant, after encouraging her to seek SSA disability benefits and receiving financial benefits in the form of an offset, did not consider the SSA's determination that she was unable to work when determining whether she qualified for continued LTD Plan benefits.

In *Glenn*, the Supreme Court found that, because the administrator encouraged a claimant to pursue benefits from the SSA, received financial benefits from her SSA award, and then ignored the SSA's finding in administering her claim, the conflict of interest should be afforded more weight. **Id.** at 2351. In *Schexnayder v. Hartford Life and Accident Ins. Co.*, the Fifth Circuit found that encouraging a claimant to pursue SSA benefits and then not addressing the SSA award in its denial letters is procedurally unreasonable and, therefore, adds weight to any conflict of interest. 600 F.3d 465, 471 (5th Cir. 2010).

In both *Glenn* and *Schexnayder*, the administrator ignored the SSA benefit award in determining whether the claimant was disabled. That is not what happened in the instant case. In the letter denying Plaintiff's appeal, Defendant specifically addresses the SSA award, stating that its denial of continued benefits was "based on different medical and vocational documentation that was not considered by the SSA" and noting that the SSA disability

11

determination was made in 2005, when Plaintiff also qualified for LTD Plan benefits (Joint Ex. 707).

Unlike Social Security Disability benefits, determinations of qualification for ERISA-governed benefit plans need not give special deference to the conclusions of a treating physician. **Corry v. Liberty Life Assurance Co. Of Boston**, 499 F.3d 389, 401 (5th Cir. 2007). Defendant, therefore, while required to consider the SSA's determination, is not required to follow it, particularly when it is weighing different evidence and reviewing different medical records than were available to the SSA. The fact that a plan administrator examined different medical records than the SSA and came to a different conclusion is not enough to add weight to the conflict of interest or to tip the balance in favor of Plaintiff.

### IV. CONCLUSION

Having reviewed the briefs of the parties and the record, the Court concludes that Defendant's denial of LTD Plan benefits to Plaintiff was supported by substantial evidence that was not overcome by the conflict of interest, and that Plaintiff has not sustained her burden of showing an abuse of discretion.

It is therefore ORDERED that Plaintiff's claim for legal and equitable relief pursuant to 29 U.S.C. § 1132 (a)(1)(B) be, and it is hereby, DENIED.

12

It is further ORDERED that judgment be, and it is hereby, ENTERED in favor of Defendant, and that Plaintiff take nothing by her suit.

SIGNED AND ENTERED this __6th__ day of July, 2010.

HARRY LEE HUDSPETH
SENIOR UNITED STATED DISTRICT JUDGE

13

# Whitfield v. Lincoln Nat'l Life Ins. Co.

United States District Court for the Northern District of Oklahoma

September 30, 2011, Decided; September 30, 2011, Filed

Case No. 10-CV-096-JHP-FHM

**Reporter**

2011 U.S. Dist. LEXIS 112447 *; 2011 WL 4607224

GREGG D. WHITFIELD, Plaintiff, v. LINCOLN NATIONAL LIFE INSURANCE COMPANY, formerly JEFFERSON PILOT FINANCIAL INSURANCE COMPANY, Defendant.

**Counsel:** [*1] For Gregg D Whitfield, Plaintiff: Joseph Francis Clark, Jr, Richard Edward Warzynski, LEAD ATTORNEYS, Clark & Warzynski PA, TULSA, OK.

For Lincoln National Life Insurance Company, The, a foreign insurance corporation formerly known as Jefferson Pilot Financial Insurance Company, Defendant: Arlen E Fielden, LEAD ATTORNEY, Crowe & Dunlevy (OKC), OKLAHOMA CITY, OK; Madalene A B Witterholt, LEAD ATTORNEY, Crowe & Dunlevy (Tulsa), TULSA, OK.

**Judges:** James H. Payne, United States District Judge.

**Opinion by:** James H. Payne

# Opinion

## OPINION AND ORDER

Before the court in this ERISA[1] case are Plaintiff Gregg D. Whitfield's Opening and Response Briefs (Docket Nos. 20, 25), and Defendant Lincoln National Life Insurance Company's opening[2] and

Response Briefs (Docket Nos. 21, 26). For the reasons cited herein, Lincoln National's denial of Whitfield's long-term disability claim is affirmed.

BACKGROUND

I. Policy Coverage and Provisions

Until June 9, 2006, Plaintiff Gregg Whitfield worked at the Christian Family Service Management Corporation as a "Case Manager/Therapist."[3] Admin. Rec. at 447, Docket Nos. 18, 19 (hereinafter "Admin. Rec."). As a result of this employment, Plaintiff had certain long term disability benefits through a policy issued by Defendant, Lincoln National.[4] This long-term disability policy provides a Total Disability Monthly Benefit if the employee is (a) totally disabled, (b) under the regular care of a physician, and (c) submits proof of continued "total disability"

---

Record" by Defendant, this document discusses the merits of the case and will be construed as an "Opening Brief" in accordance with the schedule entered for this case on July [*2] 26, 2010. *See* Minute Sheet *re: Scheduling Conference,* Docket No. 17.

[3] The Job Description provided by Plaintiff's employer and signed by Plaintiff summarizes Plaintiff's job as follows:

> Manages a caseload of foster [*4] children, acting as a resource to the child and foster family and serving as a liaison among the biological family, the referring agency and the child. Facilitates the provision of safe, secure and nurturing living experiences in accordance with The Blair Foundation's mission.

*See* Admin. Rec. at 499.

[4] At the time of Plaintiff's employment the long term disability policy was issued by Jefferson Pilot Financial Insurance Corporation. During the administrative review of this case, Jefferson Pilot merged with Defendant Lincoln National Life Insurance Company. *See* Amended Complaint ¶ III, Docket No. 4; Answer ¶ 3, Docket No. 11.

---

[1] The parties have stipulated that "[t]his case is governed by ERISA." *See* Joint Status Report at 3, Docket No. 14.

[2] Though termed a "Motion for Judgment on the Administrative

and "physician's care" to the insurer upon request. *Id.* at 59. The long-term benefits provided by the plan are divided into two general time periods: (a) the "Own Occupation" period, which begins after the initial 180-day elimination period and lasts through the following twenty-four months, and (b) all the time thereafter.[5] *See id.* at 42, 46, 59. The terms "total disability" or "totally disabled" are defined separately during these two time periods. During the "Own Occupation Period," total disability "means that due to [*3] a Disability the Insured Employee is unable to perform all of the material and substantial duties of his or her own occupation." *Id.* at 59. To elaborate on this definition, "own occupation" is defined as

> the occupation, trade or profession:
>> 1. in which the Insured Employee was employed with the Employer prior to Disability; and
>> 2. which was his or her primary source of earned income prior to Disability.
>
> It includes any work in the same occupation for pay or profit; whether such work is with the Employer, with some other firm or on a self-employed basis. It includes the main duties of that occupation as performed in the national workforce; not as performed for a certain firm or at a certain work site.

*Id.* at 47. Once the "Own Occupation Period" passes, "total disability" occurs when "due to a Disability the Insured Employee is unable to perform all of the material and substantial duties of his or her own or any other gainful occupation which his or her training, education, experience or physical or mental capacity will reasonably allow." *Id.* at 59.

─────────────────────

[5] The policy provides that if the onset of the disability occurs when the insured is under the age of 60, the benefits last until age 65. Admin Rec. at 42. Thus, because plaintiff was less than 40 years old when the disability began he is potentially eligible for monthly benefits for over 25 years. *See id.* at 447 (listing Plaintiff's date of birth as August 3, 1969; stating that Plaintiff's last day of work was June 9, 2006).

Additionally, the Policy states that

> the Company has sole authority to manage this Policy, to administer claims, to interpret Policy provisions, [*5] and to resolve questions arising under the Policy. The Company's authority includes (but is not limited to) the right to:
>> 1. establish and enforce procedures for administering this Policy and claims under it;
>> 2. determine Employees' eligibility for insurance and entitlement to benefits;
>> 3. determine what information the Company reasonably requires to make such decisions; and
>> 4. resolve all matters when a claim review is requested.
>
> Any decision the Company makes in the exercise of its authority shall be conclusive and binding.

*Id.* at 49.

## II. Administrative Adjudication of Plaintiff's Claim

Plaintiff first submitted his claim for long-term disability benefits under the Policy in 2006. On December 21, 2006, Plaintiff's employer submitted an Employer's Statement to Defendant, stating that Plaintiff's position was "Case Manager/Therapist" and that Plaintiff had last worked on June 9, 2006. *Id.* at 447. Plaintiff submitted an Employee Statement on January 5, 2007 in which he stated he was unable to "function normally due to limited mobility & pain" and that he had "difficulty driving, typing and sitting for long periods." *Id.* at 431-32. Plaintiff also listed his treating physicians on this form. *Id.* at 432. [*6] Dr. Main, a neurosurgeon, submitted a Physician's Statement in which he found that Plaintiff suffered cervical radiculopathy and had undergone an "anterior cervical discectomy fusion." *Id.* at 433. Dr. Main further stated that Plaintiff had "moderate limitations – capable of doing clerical work" and that he was "unable to drive long distances and

[was] currently on meds which may alter mental status slightly." *Id.* at 434. Other medical records gathered by Defendant in January 2007 (*see id.* at 418-424) demonstrate that Plaintiff had been diagnosed with degenerative disc disease and a herniated disc in his neck (*id.* at 387) and had undergone cervical fusion surgery to correct the herniated disc (*id.* at 407).

Plaintiff's initial claim for long-term disability benefits was approved via letter from Defendant dated February 7, 2007. *Id.* at 349-52. The letter described important policy provisions and instructed the Plaintiff to promptly reply to any requests made by the insurer during coverage. *Id.* The letter did not guarantee benefits for any period of time, stating that Plaintiff would receive monthly benefits "as long as [he] remain[ed] eligible by the terms of this policy." *Id.* at 349.

Three [*7] months later, Defendant obtained updated records from Dr. Main, which indicated that in April 2007, Plaintiff reported that his neck pain was constant yet bearable with medications. *Id.* at 326. At that time, Dr. Main instructed Plaintiff to continue on his medications and that surgery would be considered if symptoms worsen. *Id.* The Administrative Record reflects no further treatment of Plaintiff by Dr. Main after April 2007. *Id.* at 264, 297-98.

On October 4, 2007 Defendant sent a letter to Plaintiff requesting that he provide Defendant with a list of his "current treating medical providers." *Id.* at 296. Having received no response to this request by Plaintiff, on November 5, 2007 Defendant sent Plaintiff a letter stating that his disability benefits "beyond November 9, 2007 have been suspended" due to Plaintiff's noncompliance with the Defendant's request for information regarding current treating physicians, in accordance with the Policy. *Id.* at 295; *see id.* at 50 (Policy language: "Proof of continued Disability, regular care of a Physician, and any other income benefits affecting the claim must be given to the Company. This must be supplied within 45 days after the Company

requests [*8] it. If it is not, benefits may be denied or suspended."). Subsequently, on November 8, 2007, Plaintiff identified two current treating physicians: Dr. Main, his neurosurgeon, and Dr. Sorensen, a pain management specialist. *Id.* at 293.

Medical records show that Plaintiff saw Dr. Sorensen four times between October 21, 2007 and November 27, 2007. *Id.* at 286-89. In his initial visit with Dr. Sorensen, Plaintiff complained of neck and left arm pain, sudden onset of pain in neck and left shoulder, decreased sensitivity and motion in the left arm, and migraines. *Id.* at 289. On November 27, 2007 Plaintiff visited Dr. Sorensen with complaints of decreased ability to concentrate and focus, insomnia, nausea, and constipation. The medical record for this visit states Plaintiff was "doing better pain-wise." *Id.* at 286. In January 2008, Defendant sent Dr. Sorensen an occupational description for "Case Worker" and requested Dr. Sorensen's opinion of whether Plaintiff could return to "light occupation" work. *See id.* at 272-78. Defendant sent a copy of this letter to Defendant, requesting his assistance in the submission of Dr. Sorensen's opinion. *Id.* at 271. Dr. Sorensen did not respond to this request. [*9] *See id.* at 268. Defendant then contacted Plaintiff to notify him of this situation and again requested his assistance in the collection of medical records from his treating physician. *See id.* at 264. On April 7, 2008, Defendant faxed additional medical records demonstrating that Dr. Sorensen continued to treat Plaintiff between December 26, 2007 and March 27, 2008. *Id.* at 255-59.

A internal medical review of Dr. Sorensen's medical records was completed by registered nurse Linda Brandenburg on April 16, 2011. *See id.* at 16-17. Brandenburg stated that the pain management care provided by Dr. Sorensen appeared to be conservative in nature. *Id.* at 17. She further noted that from the medical records available, Plaintiff should not be precluded from working "in a light occupation from [April 9, 2008] forward, with the exception of no repetitive

overhead lifting." *Id.* Subsequently, on April 21, 2008, Defendant denied Plaintiff's claim for long-term disability and notified Plaintiff via letter. The letter delineated the records and documents reviewed, described Defendant's reasoning for the denial, and instructed Plaintiff of his right to appeal and the procedure for appeal. *Id.* at 239. Though [*10] Defendant had determined that Plaintiff was not "totally disabled" according to the Policy and was therefore ineligible for disability benefits on April 21, 2008, Defendant extended one additional monthly benefit to assist Defendant in his return to work. *See id.* at 3-4.

On June 17, 2008, Plaintiff wrote to Defendant requesting information in anticipation of making an appeal. *Id.* at 236. Defendants responded on July 2, 2008 with copies of documents used in the consideration of Plaintiff's claim, including the claim file, Policy, job description provided by Plaintiff's employer, the occupational definition from the Department of Labor's Dictionary of Occupational Titles (DOT), all doctors' medical records and medical information, and medical and vocational reviews. *See id.* at 234-35. After further communication between the parties (*see id.* at 221-29), Plaintiff submitted his first appeal on October 24, 2008, which included, among other things, argument in response to Defendant's initial denial of his claim (*see id.* 193-200), a personal statement of how his disability has affected his ability to work (*see id.* at 202-04), and additional medical records from Dr. Sorensen and letters from [*11] Dr. Sorensen and Dr. Gonzalez (*see id.* at 211-20).

The medical records from Dr. Sorensen demonstrated that Plaintiff continued monthly visits between March 27, 2008 and September 23, 2008. *Id.* at 211-17. The letters from Dr. Sorensen states that, "Gregg Whitfield is unable to work full time," and "[h]is inability to work is due to chronic pain, headaches, and difficulty with movement," and he is "experiencing some problems with the sedative effects of his medication." *See id.* at 218-19. Dr. Gonzalez stated that Plaintiff was under his care for

neck pain, cervical spondylosis and stenosis subsequent to his fusion surgery in 2006, and that Plaintiff was experiencing increasing left upper extremity pain. *See id.* at 220.

Defendant acknowledged receipt of Plaintiff's first appeal by letter dated October 29, 2008. *Id.* at 161. In response to the appeal, Defendant sought a complete occupational analysis report and an independent medical evaluation/peer review. *See id.* at 3. The independent medical review was completed by Dr. Jonathan Sands, board certified in Internal Medicine, Psychiatry and Neurology. *Id.* at 159. After reviewing the medical records, Dr. Sands noted that the record contained [*12] "no recent musculoskeletal or neurologic examinations" and stated that "the restrictions and limitations placed upon the claimant's work activities by the attending physician(s) are not reasonable and consistent with medical findings" because they are "not supported by . . . objective documentation of a loss of range of motion of any joint, or any objective documentation of a neurologic impairment." *Id.* at 156-57. Dr. Sands found that there was no documentation of any condition, deficit, or limitation that would prohibit Plaintiff's performance of light or sedentary work, and concluded: "Given the radiographically documented cervical spondylosis it is reasonable that the claimant has cervical pain and restriction of motion without any objective neurologic deficits present. He could safely perform full time light duty work." *Id.* at 158-59.

On December[6] 18, 2008, Defendant sent Plaintiff a letter informing him that after review of his appeal, Defendant was still "unable to approve benefits." *Id.* at 140. While recognizing that Plaintiff's appeal claimed his job required "medium to heavy" duty, Defendant highlighted the fact that the "Own

---

[6] The original letter was misdated as November 18, 2008. Admin. Rec. at 140. Review of Defendant's internal notes on the Long-Term Disability Claim Profile demonstrate that the first appeal was actually disposed of in December, 2008. *Id.* at 3.

Occupation" term was defined by how that occupation [*13] was performed in the "national workforce; not as performed for a certain firm or at a certain work site." *See id.* at 141. Defendant went on to emphasize that the job description provided by Plaintiff's employer and signed by Plaintiff described functions that amounted to "light work," which is defined as "standing or walking for six hours out of an eight-hour day, lifting no more than 20lbs occasionally . . . and possible frequent lifting of small objects weighing less than 10 lbs." *See id.* Defendant also noted, "the primary duty of the case manager is social work and program evaluation, not driving." *See id.* Finally, the letter cited Dr. Sands' independent medical evaluation as basis for Defendant's finding that Plaintiff's condition did not "meet the policy provision of totally disabled." *See id.* at 143.

By letter on January 16, 2009, Plaintiff requested additional information from Defendant in order to prepare a second and final administrative [*14] appeal. *See generally id.* at 137-39. Defendant responded in writing on February 19, 2009 and provided a complete copy of Plaintiff's claim file including copies of all phone notes, requested curriculum vitas, medical and vocational reviews, and the Policy. *See id.* at 134-36. On February 28, 2009[7] Plaintiff filed his second and final appeal with Defendant. *See id.* at 111 33. Notably, attached to the Plaintiff's second appeal is a Medical Source Statement regarding Plaintiff's physical capabilities completed by Dr. Sorensen on February 22, 2009. *See id.* at 128-33. In the Statement, Dr. Sorensen indicates that Plaintiff's symptoms include neck and shoulder pain, migraine headaches and fatigue, among other things. *See id.* at 128. Dr. Sorensen noted that the "positive objective signs" of Plaintiff's pain were a reduced range of motion in the cervical spine and

shoulders, reduced grip strength, sensory and reflex changes, impaired sleep, weight change, tenderness, trigger points, swelling, muscle spasm, and muscle weakness. *See id.* Depression and anxiety were recognized as psychological conditions affecting Plaintiff's pain. *See id.* at 129. Dr. Sorensen concluded that Plaintiff was severely [*15] limited in his ability to deal with work stress, could not stand or sit for more than fifteen minutes without changing position, was limited to one hour each of sitting and standing per eighthour work day, needed to elevate legs to relieve pain, and that Plaintiff would need to lie down or recline in a supine position in excess of six hours during an eight-hour work day. *See id.* at 130-31.

To evaluate Plaintiff's final appeal, Defendant ordered both an occupational analysis from a vocational expert and a second independent medical evaluation. The occupational analysis was completed on April 2, 2009 by Debora Frazee. *See id.* at 2, 455-56. The occupational analysis highlighted the distinction between "occupation" on the national scale and job-specific requirements, noting that under the language of the Policy it is one's total disability from the "occupation in the national economy" that is relevant, not disability from job-specific conditions. *See id.* at 456. Further, "[t]ravel [*16] in and of itself does not add physical requirement to the work and may be considered job specific." *Id.* Ms. Frazee specifically noted that in the instant case, driving "could be performed by an alternate driver . . . ." *Id.* Ms. Frazee concluded that "Based upon the available information, it would appear that Mr. Whitfield's job is that of a case worker (social service worker), listed in the DOT as # 195.107-010. This occupation is **sedentary** physical requirement by U.S. Department of Labor Standards." *See id.* at 455 (emphasis original). This conclusion differs from Defendant's original assertion that Plaintiff's work involved "light duty." *See, e.g. id.* at 141, 241.

The independent medical evaluation was completed by Dr. Vicki Kalen, board certified in Orthopedic

---

[7] Plaintiff's second appeal is inaccurately dated February 28, 2008; it was actually submitted on February 28, 2009, as demonstrated by Defendant having received the document on March 4, 2009. *See id.* at 86, 111.

Surgery on April 28, 2009. *See generally id.* at 80-84. After a thorough review of Plaintiff's medical records (*see id.* at 80-82), Dr. Kalen reached the conclusion that the restrictions placed on Plaintiff by Dr. Sorensen were not accurate or appropriately tailored to his diagnoses:

> [T]he restrictions and limitations placed upon the claimant's work activities by the attending physician(s) are not reasonable and consistent with [*17] the medical findings. The restrictions outlined by Dr. Sorensen on his Medical Source Statement of 02/20/2009 are not consistent with neck pain and/or cervical radiculopathy and degenerative disease. With the diagnoses Dr. Sorensen has given the claimant, there is still no explanation for restrictions in sitting, standing, needing to elevate legs to relieve pain, and having to lie down for one hour after standing for less than fifteen minutes. These are restrictions that have nothing to do with cervical pathology. In fact, the only mention of a restriction that would be consistent with cervical radiculopathy and degenerative disease is regarding neck motion. Dr. Sorensen said that the claimant could occasional [*sic*] flex and rotate his neck which is less of a restriction than Dr. Sorensen gave the claimant in all other activities. This is inexplicable and counter to the diagnoses the claimant was given.
>
> . . .
>
> The findings reported in the Medical Source Statement on 02/20/2009 by Dr. Sorensen are not documented in Dr. Sorensen's office notes and are entirely vague giving no details or specific nerve root involvement. There is no objective documentation on either physical examination, [*18] imaging, or electrodiagnostic testing to support any restrictions or limitations in this claimant beyond the date of 05/09/2008.

*see id.* at 83-84).

By letter dated May 19, 2009, Defendant provided Dr. Kalen's evaluation to Plaintiff in order to provide Plaintiff "the opportunity to provide this assessment to your treating physician for further review." *Id.* at 73. Defendant instructed Plaintiff that "[i]f your physician should disagree with the assessment then we would appreciate any information that he or she could provide to us that would dispute [Dr. Kalen's] findings." *Id.* The letter also informed Plaintiff that if no response was received by June 9, 2009, Defendant would continue the requested review and render a final decision on the claim. *See id.* After receiving no response from Plaintiff, Defendant proceeded with its final review of Plaintiff's long-term disability claim on June 12, 2009. *See id.* at 2. Defendant completed its review on June 25, 2009 and informed Plaintiff of its decision upholding the denial of long-term disability benefits by letter. *See generally id.* at 67-72. The letter discussed the most recent occupational analysis, summarized and responded to Plaintiff's [*19] arguments in his first and second appeals, cited Dr. Kalen's findings that the medical records did not support Dr. Sorensen's stated restrictions, and concluded that "[t]here is insufficient medical documentation in the file to support that you would have restrictions and limitations from performing your own occupation." *See id.* at 68-72. The letter concluded by advising Plaintiff that his administrative appeal was exhausted and he had the right to pursue litigation. *Id.* at 72.

III. Procedural History

Plaintiff chose to pursue litigation by filing a Complaint against Jefferson Pilot Financial Insurance Company on February 17, 2010. The Complaint requested a declaratory judgment stating that Plaintiff is entitled to long-term disability benefits under the policy. Docket No. 2. The Complaint was amended on March 10, 2010 to replace defendant Jefferson Pilot with current defendant Lincoln National Life Insurance Company, as a result of the companies having merged during the pendency of Plaintiff's

administrative claim. Docket No. 4; *see supra* note 4. The case was fully briefed pursuant to an ERISA schedule. *See* Docket Nos. 17, 20, 21, 25, 26, 29.

DISCUSSION

I. Standard of Review and Conflict [*20] of Interest

When the governing ERISA plan or policy gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a challenge to the the administrator's decision is to be reviewed under an arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989); Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1002-03 (10th Cir. 2004) (quoting *Firestone, 489 U.S. at 115*). However, if the plan administrator or fiduciary operates under a conflict of interest, such conflict may provide reason for the court to give the administrator's decision less deference under the arbitrary and capricious standard. *See Fought,* 379 F.3d at 1005 (quoting Ladd v. ITT Corp., 148 F.3d 753, 754 (7th Cir. 1998) (adopting "sliding scale" analysis for ERISA conflict of interest analysis, wherein "the court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict."). Courts are instructed to weigh any conflict of interest as a factor, in combination with other [*21] case-specific factors, to reach a determination as to whether the administrator's decision was arbitrary and capricious. Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187 (10th Cir. 2009) (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)). The Supreme Court gave an example of this sliding-scale deference in *Metropolitan Life Insurance Co. v. Glenn* by stating that a conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." 554 U.S. at 117.

In the instant case, the Policy clearly gives Defendant Lincoln National discretionary authority over the administration of the ERISA policy, therefore Defendant's decision is subject to the arbitrary and capricious standard of review pursuant to Firestone. *See* Admin. Rec. at 49 (language of policy: "the Company has sole authority to manage this Policy, to administer claims, to interpret Policy provisions, and to resolve questions arising under the Policy"); [*22] *see also supra* BACKGROUND part I. Defendant does not appear to contest Plaintiff's allegation that Lincoln National operates under an inherent conflict of interest because it operates as both the insurer and the administrator of the Policy under which Plaintiff was insured. *See* Response at 6-7, Docket No. 26; *see also Fought,* 379 F.3d at 1006. Defendant does, however, contest Plaintiff's argument that Defendant's inherent conflict of interest should be given substantial weight. *See id.* Plaintiff's argument in favor of giving the conflict of interest substantial weight turns on its assertion that the value of long-term disability benefits for Plaintiff surpassed $800,000.00,[8] a large quantity of money that Defendant would not want to lose. *See* Plaintiff's Opening Brief at 2, 5, Docket No. 20. While *Glenn* recognizes that a conflict should be given more weight when it is more likely to affect the benefits decision—and it could certainly be argued that a substantial monetary loss would affect and administrator's decision—*Glenn* also recognizes that a conflict is "less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy." 554

---

[8] Defendant [*23] believes the actual value of benefits to be closer to $525,000.00, but in any case argues the calculation of benefits cannot be determined at this time and is irrelevant to whether its decision was arbitrary and capricious. *See* Defendant's Response Brief at 2, 6-7, Docket No. 26.

U.S. at 117.

In this case, Defendant has in fact taken steps to reduce bias and promote accuracy. The Tenth Circuit stated in *Holcomb v. Unum Life Insurance Co. of America* that the insurer-defendant in that case, Unum, "took steps to reduce its inherent bias by *hiring two independent physicians* . . . . Unum did not rely solely on the evaluations and medical opinions of its own on-site physicians and nurses." 578 F.3d 1187, 1193 (10th Cir. 2009) (emphasis supplied). Like the defendant in *Holcomb,* Defendant herein hired two independent physicians to review the records: Dr. Sands reviewed the records for the first administrative appeal, and Dr. Kalen reviewed the records for the second administrative appeal.

The Tenth Circuit also noted in *Holcomb* that the defendant "diligently endeavored to discover the nature of [Plaintiff's] ailments [by] routinely request[ing] [Plaintiff's] updated medical records . . . conduct[ing] its [*24] own clinical reviews of these records . . . solicit[ing] expert evaluations . . . and . . . perform[ing] both vocational assessments and occupational analyses." *Id.* This diligent review served as evidence supporting the court's conclusion that the insurer-defendant's conflict of interest was minimal and deserved little weight. *See id.* Defendant Lincoln National has completed the same type of diligent review. Defendant repeatedly requested medical records from the Plaintiff and his treating physicians beginning soon after Plaintiff's initial claim in December 2006. Defendant even allowed Plaintiff's physician, Dr. Sorensen, the opportunity to respond to Dr. Kalen's report, which strongly disagreed with Dr. Sorensen's opinion of Plaintiff's restrictions. One in-house registered nurse reviewed the claim file, followed by two independent physicians hired by Defendant, each analyzing a different level of appeal. Defendant also undertook occupational analysis at each level of appeal. The facts in this case demonstrate that, as the Tenth Circuit found in *Holcomb,* the conflict of interest factor deserves "limited weight" in the

evaluation of whether Defendant Lincoln National's determination [*25] to deny long-term disability benefits was an abuse of discretion. *See id.*

II. Defendant Lincoln National's Denial of Plaintiff Whitfield's Claim

The court finds that Defendant Lincoln National's decision to deny Plaintiff's claim for long-term disability benefits was not arbitrary or capricious. In fact, the determination that Plaintiff did not qualify as "totally disabled" for his "own occupation" pursuant to the terms of the Policy is wholly supported by the Administrative Record. Though Dr. Sorensen, Plaintiff's pain management physician, essentially concluded that Plaintiff was severely restricted by pain and limited mobility and was therefore unable to work full time (*see generally* Admin. Rec. at 128-33, the Medical Source Statement), those conclusions were drastically undermined by Dr. Kalen's report which stated, among other things, that the restrictions suggested by Dr. Sorensen had "no relationship to [Plaintiff's] cervical impairment in any way" (*see id.* at 84). ERISA policy administrators are not required to give special weight to a treating physician's opinions; they may credit any reliable evidence appearing in the administrative record. *See* Black & Decker Disability Plan v. 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) [*26] (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why the credit reliable evidence that conflicts with a treating physician's evaluation").

For example, in *Grosvenor v. Qwest Communications International,* the Tenth Circuit held that it was not an abuse of discretion for the administrator to consider, but not credit the opinions of treating physicians when such opinions were "unsupported by 'objective' medical documentation that the Plan requires and indeed, neither doctor explained why [Plaintiff's disability]

would preclude him from performing any of his managerial responsibilities." 191 F. App'x 658, 663 (10th Cir. 2006) (unpublished). The court went on to note, "The Administrator's decision concerning the weight to be given [the] opinions [of treating physicians] after considering the underlying evidence or lack thereof differs from ignoring them." *Id.* It is within reason for a plan administrator to reject a physician's report "when [*27] there was no accompanying data to support that conclusion." *Id.* (citing Kimber v. Thiokol Corp., 196 F.3d 1092, 1099 (10th Cir. 1999). In the instant case, the Administrative Record demonstrates that Defendant considered the opinions of the treating physicians—it even solicited the opinion of Dr. Sorensen on more than one occasion (*see* Admin. Rec. at 73, 266-67)—though in the end Defendant decided not to credit the opinions of the treating physicians. One obvious reason for its decision to discredit the treating physicians' opinions was that both independent physicians reviewing the Plaintiff's records noted that there was no objective data supporting those opinions (*see id.* at 82-84 (Dr. Kalen), 156-58 (Dr. Sands)). Additionally, Dr. Kalen's report stated that "[t]he restrictions and limitations given [Plaintiff by Dr. Sorensen] have no objective foundation and are not even consistent with the diagnoses the claimant has been given." *See id.* at 83. Plaintiff failed to rebut Dr. Kalen's report, despite being given the opportunity to do so. Thus, under the circumstances, it was reasonable for Defendant to credit the findings of the independent physicians and doing so was neither arbitrary [*28] nor capricious.

Plaintiff makes at least one argument that merits consideration. Plaintiff argues that Defendant should have ordered him to undergo a functional capacity examination, which he alleges would have definitively shown whether he was capable of performing work duties in his occupation. *See* Plaintiff's Opening Brief at 5-8, Docket No. 20. This argument is unpersuasive. At the outset, the court notes that under the terms of the Policy the claimant bears the burden of submitting proof of continuing disability (*see* Admin. Rec. at 50) and Plaintiff could have supplied a functional capacity examination at any point during the administrative process. Moreover, caselaw cited by Plaintiff to support this argument is either unpersuasive or distinguishable. For example, Plaintiff correctly cites *Hightshue v. AIG Life Insurance Co.* for the proposition that "when it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in *an intensive and scrupulous independent investigation* of their options to insure that they act in the best interests of the plan beneficiaries.'" 135 F.3d 1144, 1148 (7th Cir. 1998) (citing Leigh v. Engle, 727 F.2d 113, 125-26 (7th Cir. 1984)) [*29] (emphasis supplied); *see* Plaintiff's Opening Brief at 5, Docket No. 20. This quotation is indeed correct, however Defendants have not failed to "engage in an intensive and scrupulous independent investigation" simply because they did not compel a functional capacity examination. In affirming the denial of benefits, the *Hightshue* court found that the "intensive and scrupulous independent investigation" standard was fulfilled by the defendant's regular collection of the claimant's medical records, submission of those records to an independent and qualified medical expert, and providing that expert with complete and accurate information. *See Hightshue,* 135 F3d at 1148. Defendant has done nothing less in this case, and in fact it has done more by submitting Plaintiff's claim file for review by *two* independent physicians who were board certified in relevant areas of medicine. The additional cases cited by Plaintiff in support of this argument are similarly unpersuasive.[9] Defendant's failure to order a

---

[9] Plaintiff additionally cites Toland v. McCarthy, 499 F. Supp. 1183 (D. Mass. 1980) [*30] and Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 804-08 (10th Cir. 2004). The court finds *Toland* unpersuasive for substantially the same reasons set forth in Defendant's Response Brief at 9, Docket No. 26. In *Gaither,* the Tenth Circuit held, "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement *and* when they have little or no evidence in the record to refute that theory." 394 F.3d at

functional capacity evaluation does not render its final determination on the merits arbitrary and capricious.

In conclusion, the court finds that Defendant Lincoln National's denial of Plaintiff's claim for long-term disability benefits was not arbitrary and capricious. On the contrary, Defendant's determination was reasonable. The court can find no evidence of bias resulting from the inherent [*31] conflict of interest in the Administrative Record. Defendant diligently collected and updated Plaintiff's medical records throughout the appeal, twice provided complete medical records to independent physicians who performed medical evaluations based on their relevant expertise, and even provided Plaintiff and his treating physician the opportunity to respond to one independent physician's negative review. Plaintiff was given every opportunity to put forth his best argument and evidence in support of his claim, and after he failed to respond to Defendant's final request, the appeal was denied based on credible evidence.

CONCLUSION

For the reasons cited herein, Defendant Lincoln National's denial of Plaintiff Whitfield's longterm disability claim is hereby AFFIRMED. A separate Judgment is filed herewith.

IT IS SO ORDERED this 30th day of September, 2011.

/s/ James H. Payne

James H. Payne

United States District Judge

Northern District Oklahoma

---

807 (emphasis supplied). The court finds that *Gaither* is distinguishable because (a) the *potential that* a functional capacity evaluation could be completed is not the equivalent of "readily available information," and (b) Defendant Lincoln National did in fact have significant evidence to refute Plaintiff's theory of entitlement, including the independent medical evaluations, among other things.

End of Document

# Jones v. Channel Shipyard & Co.

United States District Court for the Eastern District of Louisiana

November 20, 2001, Decided ; November 20, 2001, Filed

CIVIL ACTION NO. 00-3703 SECTION "C" (2)

**Reporter**

2001 U.S. Dist. LEXIS 19639 *; 27 Employee Benefits Cas. (BNA) 1224

GLENN JONES versus CHANNEL SHIPYARD AND COMPANY, INC., AND NATIONAL EMPLOYEE BENEFIT ADMINISTRATORS, INC.

**Disposition:** [*1] Defendants' Motion for Summary Judgment GRANTED. Jones' claims DISMISSED.

**Counsel:** For GLENN - JONES, plaintiff: Daryl James Daigle, Courtenay, Forstall, Hunter & Fontana, New Orleans, LA.

For NATIONAL EMPLOYEE BENEFIT ADMINISTRATORS, INC., CHANNEL SHIPYARD OF NEW ORLEANS, INC., CHANNEL SHIPYARD COMPANY, INC., CHANNEL SHIPYARD COMPANY, INC.-EMPLOYEE BENEFIT PLAN, defendants: Clave E. Gill, Thomas Michael Keiffer, Gill & Keiffer, LLC, Covington, LA.

**Judges:** HELEN G. BERRIGAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** HELEN G. BERRIGAN

## Opinion

### ORDER & REASONS

Before the Court is Defendants' Motion for Summary Judgment. After reviewing the arguments of counsel, the record, and the applicable law, IT IS ORDERED that Defendants' Motion is hereby GRANTED.

Standard of Review

A district court can grant a motion for summary judgment only when the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) [*2] (quoting Fed. R. Civ. P. 56 (c)). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 322 - 24, and Fed. R. Civ. P. 56(e)). [*3] The mere argued existence of a factual

dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citations omitted).

Background

On the morning of December 10, 1998, Jones, then 20, consumed alcohol at a friend's house. *See* Rec. Doc. 14 at Aff. Later in the morning, at about 7:00, he was injured in an automobile accident, which left him a quadriplegic. *See* Rec. Doc. 11, Mem. in Supp. of Mot. for Summ. J. at 1. According to a State of Louisiana Official Motor Vehicle Traffic Accident Report, Jones crossed the center line of the dry blacktop into the opposing lane. *See* Rec. Doc. 11 at Ex. 1. According to the report, nothing obscured his vision, and there were no defects in either his vehicle or the road. *See id.* A blood sample was taken from Jones at the accident scene. *See id.* The Louisiana State Police Crime Laboratory found that Jones' blood alcohol content was 0.05 percent. *See id.* at Ex. 2. Two hours after the accident, a urine sample taken from [*4] Jones showed alcohol in his system. *See id.* at Ex. 3. Jones was charged with careless operation of a motor vehicle. *See* La. R.S. 32:58.

At the time of the accident, Jones was employed by Defendant Channel Shipyard of New Orleans, Inc. (Channel/New Orleans). [1] *See id.* Jones sought payment of medical expenses resulting from the accident under the terms of the Channel/New Orleans Employee Benefit Plan ("the Plan"). *See id.* at 4. The Plan is a qualified employee benefit plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* See id.

In a May 25, 1999, letter, the Plan [2] denied Jones' claims based on Plan coverage exclusions for injuries resulting from illegal use of alcohol and illegal acts. *See* Rec. Doc. 12 at Ex. A. The Plan provides, in pertinent [*5] part:

Plan Exclusions

For all Medical Benefits shown in the Schedule of Benefits, a charge for the following is not covered:

....
(2) Alcohol. Services, supplies, care or treatment to a Covered Person for an Injury or Sickness which occurred as a result of that Covered Person's illegal use of alcohol. Expenses will be covered for injured Covered Persons other than the person illegally using alcohol.

....

(17) Illegal acts. Charges for services received as a result of Injury or Sickness caused by or contributed to by engaging in an illegal act or occupation; by committing or attempting to commit any crime, criminal act, assault or [*6] other felonious behavior; or by participating in a riot or public disturbance.
Rec. Doc. 11, Ex. 4 at 29-30.

The Plan denied coverage under Exclusion (2) because it concluded that Jones was a minor, it is illegal to consume alcohol as a minor, and this illegal consumption caused the accident and resulting medical expenses. *See* Rec. Doc. 12 at Ex. A. It denied coverage under Exclusion (17) because it had been determined that Jones committed the illegal act of careless operation of a motor vehicle and that the "reckless" (sic) operation of a motor vehicle caused his medical expenses. *Id.*

---

[2] This letter was written by the Plan Supervisor, National Employee Benefits Administrators, Inc. ("NEBA"), *see* Rec. Doc. 12 at Ex. A, which, Defendants assert, has processed all claims for Plan benefits on behalf of the Plan Administrator, Defendant Channel Shipyard Company, Inc. ("Channel"), a company related to Channel/New Orleans, *see* Rec. Doc. 11 at 5-6.

---

[1] Channel/New Orleans contends that it is erroneously identified in the caption as Channel Shipyard and Company, Inc. *See* Rec. Doc. 11, Mem. in Supp. of Mot. for Summ. J. at 3, 3 n. 1

Jones now challenges the denial, *see* Rec. Doc. 9, and a Motion for Summary Judgment has been filed by the Plan, Channel/New Orleans, Channel, and NEBA, *see* Rec. Doc. 11.

Analysis

The Court first turns to the Plan's assertion that summary judgment should be granted in its favor. The theory of recovery asserted by Jones and the basis of the Plan's denial of that recovery rest upon whether Channel as the plan administrator abused its discretion in denying coverage under the above-mentioned exclusions. *See* *Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 643 (5th Cir. 1997). [*7]

As an initial matter, "[a] denial of ERISA benefits by a plan administrator is reviewed by the courts *de novo* unless the plan gives the plan administrator discretionary authority to determine the eligibility for benefits or to construe the terms of the plan." *Id.* (internal quotations omitted). "Because ERISA does not dictate the appropriate standard of review for evaluating benefit determinations of plan administrators, courts must first look to the plan terms to determine if the plan administrator has the discretionary authority to interpret the plan terms." *Id.* "The abuse of discretion standard is the appropriate standard of review to challenges to a plan administrator's interpretation of the plan terms when that plan grants the administrator the authority to make a final and conclusive determination of the claim." *Id.* at 643-44.

Here, the Plan grants the Plan Administrator:

> maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide [*8] questions of Plan interpretation and those of fact relating to the Plan. The decisions of the

Plan Administrator will be final and binding on all interested parties.

Rec. Doc. 11, Ex. 4 at 40. Thus, because the Plan grants the Administrator final and binding decisionmaking authority, the abuse of discretion standard is the appropriate standard of review here.

When applying the abuse of discretion standard, it is necessary to analyze whether the plan administrator acted arbitrarily or capriciously. *See* *Dowden,* 126 F.3d at 644. "An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* [3]

 [*9]  Channel first asserts that it did not abuse its discretion in denying coverage under the alcohol exclusion. *See* Rec. Doc. 11 at 11-13. Channel contends that, *inter alia*, Jones' blood alcohol level of 0.05 percent exceeded the 0.02 percent legal limit for drivers under 21. *See* La. R.S. 14:98.1(A). Consequently, it was neither arbitrary, nor capricious to find that illegal use of alcohol caused the accident and the resulting medical expenses. *See id.*

Jones asserts that Channel erroneously applied the alcohol exclusion by concluding that Jones illegally used alcohol and that this illegal use of alcohol caused the accident and resulting medical expenses. *See* Rec. Doc. 12, Mem. in Opp'n of Def's Mot. for Summ. J. at 7-9. Jones contends that Channel erred because his use of alcohol, *i.e.*, the actual drinking of alcohol, was not illegal. *See id.* As Jones asserts, and Defendants do not deny, Jones was drinking only in a private residence before the accident. *See*

---

[3] Some cases in the Fifth Circuit that have analyzed questions similar to the one before the Court today have suggested a two-step analysis. *See* *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 n.3 (5th Cir. 1994). First, the court determines the legally correct interpretation of the plan. *See id.* If the administrator did not so correctly interpret the plan, the court must determine whether the administrator's decision constituted an abuse of discretion. *See id.* Courts, however, are not "rigidly confined to this two-step analysis in every case." *Id.* Because the Court concludes that Channel did not abuse its discretion, it is unnecessary for the court to conduct the two-step analysis.

*id.* Under Louisiana law, it is not illegal for minors to drink in private residences. *See* La. R.S. §§ 14:93.10 - 14:93.14. Thus, Jones contends, his use of alcohol was legal and therefore not subject [*10] to the "illegal use" exclusion. *See* Rec. Doc. 12, Mem. in Opp'n of Def's Mot. for Summ. J. at 9. [4]

Although when subjected to Jones' close scrutiny, the Plan's denial reveals a gap in the chain of its reasoning, the Court here analyzes the denial for a rational connection between the known facts and the decision. *See Dowden, 126 F.3d at 644.* The denial states, [*11] "Given the nature of the accident that occurred, the Plan takes the position that illegal use of alcohol caused the accident, which thereby caused the medical expenses." Rec. Doc. 12 at Ex. A. Although the Plan erroneously characterized Jones' use of alcohol as illegal, the sample of Jones' blood taken at the accident scene revealed an alcohol content of 0.05 percent, more than twice the legal limit of 0.02 percent for drivers younger than twenty-one under Louisiana law. *See* La. R.S. 14:98.1(A). It was thus rational for Channel to conclude that Jones illegally used alcohol--not because the drinking in and of itself was illegal but, because, combined with driving, it was. Channel's denial quoted above, in fact, specifically couches its determination that the use of alcohol was illegal because it was in connection with driving.

Moreover, the interpretation of the Plan urged by Jones leads to an arbitrary result. Under Jones' reading, if he had been drinking in a public place and thus illegally, *see* La. R.S. § 14:93.12(A), the

injuries resulting from his accident would not be covered. It is not apparent why the Plan would seek to cover injuries resulting from alcohol-related driving [*12] accidents depending on the location of the consumption.

In addition, it was rational for Channel to conclude that Jones' use of alcohol caused the accident and resulting medical expenses. Jones' blood-alcohol content was well above the legal limit for drivers younger than twenty one, *see* La. R.S. § 14:98.1(A), and the accident, according to the Police report, occurred when Jones crossed the center line into the opposing lane on dry blacktop, *see* Rec. Doc. 11 at Ex. 1. According to the report, nothing obscured his vision, and there were no defects in either his vehicle or the road. *See id.* Moreover, there is evidence to suggest that underage drinking and driving is particularly dangerous. *See State v. Ferris, 99-2329 (La. 5/16/00), 762 So. 2d 601, 606.* As such, it is not necessary to disturb Channel's finding on the ground asserted here. [5]

 [*13] Finally, Defendants assert that Channel/New Orleans, Channel, and NEBA are entitled to summary judgment because only the employee benefit plan can be liable for a money judgment in an action to recover plan benefits, absent an independent basis for individual liability against the other entities. *See* 29 U.S.C. § 1132(d)(2). Jones only conclusorily asserts a basis for liability in his opposition. As such, it is appropriate to grant the motion as to these Defendants. *See Anderson, 477 U.S. at 248.*

Conclusion

---

[4] Jones asserts that it is the Plan's burden to prove by a preponderance of the evidence that Jones was illegally using alcohol and that this illegal use caused his injuries. *See id.* at 9 (citing *Landry v. J.C. Penney Life Ins. Co.*, 920 F. Supp. 99, 102 (W.D. La. 1995); *Moore v. Cent. Am. Life Ins. Co.*, 535 So. 2d 773 (La. App. 2 Cir. 1988).* Those cases, however, did not involve coverage under ERISA plans, where exclusion decisions are reviewed under the abuse of discretion standard. *See, e.g., James v. La. Laborers Health & Welfare Fund*, 29 F.3d 1029, 1032-33 (5th Cir. 1994).

---

[5] As Channel did not abuse its discretion in denying Jones' claim under the Alcohol exclusion, it is unnecessary to address the propriety of the denial under the Illegal Acts exclusion. The Court notes, however, that it is a crime for a person younger than twenty-one to operate a vehicle with a blood alcohol concentration of 0.02 percent or more. *See* **La. R.S. 14:98.1(A)**.

2001 U.S. Dist. LEXIS 19639, *13

Therefore, for the reasons stated above, IT IS ORDERED that:

Defendants' Motion for Summary Judgment is hereby GRANTED. Accordingly, Jones' claims are hereby DISMISSED.

New Orleans, Louisiana, this 20 day of November 2001.

HELEN G. BERRIGAN,

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Hargrave v. Parker Drilling Co.

United States District Court for the Western District of Louisiana, Lafayette Division

August 25, 2010, Decided; August 25, 2010, Filed

CIVIL ACTION NO.: 10-0141

**Reporter**

2010 U.S. Dist. LEXIS 93534 *; 2010 WL 3363087

KYLE P. HARGRAVE VERSUS PARKER DRILLING CO., ET AL.

**Counsel:** [*1] For Kyle P Hargrave, Plaintiff: Wade A Mouton, LEAD ATTORNEY, Kaplan, LA.

For Zurich American Insurance Co, Defendant: Glen E Mercer, Salley Hite et al, New Orleans, LA.

For Parker Drilling Co, Defendant: Glen E Mercer, LEAD ATTORNEY, Salley Hite et al, New Orleans, LA.

**Judges:** REBECCA F. DOHERTY, UNITED STATES DISTRICT JUDGE. MAGISTRATE JUDGE HILL.

**Opinion by:** REBECCA F. DOHERTY

## Opinion

Before the Court is the Motion for Summary Judgment [Doc. 10] filed by defendants Parker Drilling Company ("Parker") and Zurich American Insurance Company ("Zurich"). Defendants seek dismissal of all claims alleged against them on grounds there are no genuine issues of material fact that the plaintiff was intoxicated at the time he was injured and that the two benefit policies at issue exclude coverage for losses caused by, contributed to, or resulting from intoxication. Plaintiff opposes the motion [Doc. 12], and defendants have filed a reply brief [Doc. 17].

Although the defendant filed the instant motion as a motion for summary judgment, because this matter is one sounding in ERISA, this Court notes what the parties are, in fact, seeking is a determination on the merits. That is, the defendants seek a ruling as to whether the benefits [*2] determinations made by Zurich were proper. Thus, the procedural posture in which the issues have been presented to the Court is not appropriate. The parties have been contacted by the Court and have agreed that the matter should be presented on the merits of the plaintiff's claims. Therefore, this Court will consider the briefs filed as if they were briefs on the merits and will consider whether Zurich properly denied plaintiff's claims for benefits.

## I. Factual and Procedural Background

Plaintiff, Kyle P. Hargrave, contends on or about January 1, 2009 at 5:45 p.m., he was discharging fireworks with friends to celebrate the New Year. Plaintiff was in the process of discharging a firework when it malfunctioned in his left hand. [1] Plaintiff allegedly suffered "severe and painful personal injuries, including an open fracture-

---

[1] Plaintiff argues in an Affidavit attached to his brief that the fireworks did [*3] not explode in his left hand, but rather, exploded on a table where he placed it. As discussed herein, the Affidavit presented by the plaintiff is not part of the administrative record and cannot be considered by this Court in evaluating the factual findings made by Zurich. *See Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 102 (5th Cir. 1993)* (emphasis added), *citing Wildbur v. ARCO Chemical Co., 974 F.2d 631, 639 (5th Cir. 1992)*. A full discussion of the interplay between the standard of review and factual findings is found within the text. Furthermore, the records from the Kaplan emergency room indicate the "fireworks exploded in hand." *See* Exhibit 2, attached to defendants' brief, Doc. 10, at p. 3. As the documents contained in the administrative record clearly indicate the fireworks exploded in the plaintiff's left hand, and Zurich so found in its claims process, this Court must evaluate the plaintiff's claims in light of that factual determination.

dislocation, MCP joint, left thumb, with cicuferential degloving of thumb and thonar eminence, degloving of the ring finger with fracture of the DIP joint and multiple open wounds of the hand with burns, laceration to the branch radial artery, mid palmer arch, and disabling dismemberment." [2]

It is undisputed the plaintiff was intoxicated at the time of the accident. Records from Acadian Ambulance Service, which transported the plaintiff to Abrom Kaplan Memorial Hospital immediately [*4] after the accident, indicate "pt admitted to etoh use." Plaintiff arrived at Kaplan's emergency room at 6:25 p.m. and again admitted "to drinking beer/whiskey today." Before being transferred to Lafayette General Medical Center, plaintiff had blood drawn and screened at Kaplan at 7:15 p.m. Plaintiff's blood alcohol content — approximately one and a half hours after the accident — was "out of range" at 138 mg/dL, which translates to 0.138% blood alcohol content. The reference range noted on the emergency room records is "0-3." [3] This Court notes the amount required in Louisiana to be convicted of operating a vehicle while intoxicated is 0.08%. The foregoing records are attached to defendants' brief, and are also made part of the administrative record, which all parties stipulate is complete.

At the time of the accident at issue, the plaintiff was insured under a Basic Accidental Death and Dismemberment Group Policy (Policy Number GTU 4279153) (the "Basic Policy") and a Supplemental Accidental Death and Dismemberment Group Policy (Policy Number GTU 0016229) (the "Supplemental policy") issued by Zurich to Parker [*5] Drilling, plaintiff's employer. In their brief, defendants claim Zurich is the named fiduciary under both policies for purposes of claims processing and review. Despite

failing to Bates-stamp the administrative record in this matter, which made the following task inordinately difficult, this Court was able to locate the portion of the Basic Policy which states Zurich has "the discretionary authority to determine eligibility for benefits and to construe the terms of the plan." [4] However, this Court was unable to locate any reference to Zurich being a claims fiduciary under the Supplemental Policy. Zurich admits there is no provision in the Supplemental Policy granting Zurich the discretionary authority to determine eligibility for benefits and to construe the terms of the plan. Thus, the review of the benefits determination under the *Supplemental Policy* will be de novo.

As stated previously, the Basic Policy grants discretion to Zurich to determine eligibility for benefits and to construe the terms of the plan. Therefore, this Court reviews Zurich's benefits determination under the Basic Policy for an abuse of discretion. Under the Basic Policy, coverage is provided for the following:

**The Hazards insured against by the Policy are**

> A. A Covered Injury sustained by You anywhere in the world subject to the terms, conditions, exclusions and limitations under this Policy. [5]

---

[2] *See* Plaintiff's Petition, ¶ 4.

[3] *See* exhibits attached to defendants' motion for summary judgment, Doc. 10.

---

[4] *See* Basic Policy, Section XII, entitled "General Policy Conditions," Paragraph K, which states:

> **ERISA Claims Fiduciary**. Under the Employee Retirement Income Security Act of 1974 as amended (ERISA), the Policyholder designates Us [Zurich] as the claims fiduciary of this plan and gives Us [Zurich] the discretionary authority [*6] to determine eligibility for benefit and to construe the terms of the plan. The Policyholder agrees to comply with the disclosure and reporting requirements of ERISA regarding the plan and Our designation and authority as the claims fiduciary.

*See* Exhibit 8-2, p. 29, attached to defendants' Response to ERISA Case Order, Doc. 8.

[5] *See* Basic Policy, Section IV, entitled Coverages, Exhibit 8-2, p. 7 to defendants' Response to ERISA Case Order, Doc. 8.

A "Covered Injury" is defined in the Basic Policy as "an Injury directly caused by accidental means, which is independent of all other causes, results from a Covered Accident, occurred while You are insured under the policy, and results in a Covered [*7] Loss." [6] An "Injury" is defined as a "bodily Injury." [7] A "Covered Loss" is defined as:

> Covered Loss means a loss which meets the requisites of one or more benefits or additional benefits, results from a Covered Injury, and for which benefits are payable under the policy. [8]

Under the Supplemental Policy, the following coverages are provided:

**Hazards Insured Against by the Policy**

**24 Hour Accident Protection, Business and pleasure, H-19**

The Hazards insured against by the Policy are:
> Injury sustained by a Covered Person anywhere in the world. . . [9]

Under the Supplemental Policy, "Injury" is defined as "an accidental bodily injury, which is a direct result, independent of all other causes, of a hazard set forth in the 'Description of Hazards.'" [10]

Both policies contain the following exclusion:

**A loss will not be a Covered Loss if it is caused by, contributed to, or results from**:

**7. being intoxicated**.

---

[6] *Id*. at Section III, "Definitions," p. 5.

[7] *Id*.

[8] *Id*.

[9] *See* Supplemental Policy, Exhibit 8-3 to defendants' Response to ERISA Case order, Doc. 8, at p. 8.

[10] *Id*. at "Definitions," p. 5.

a. An insured will be conclusively presumed to be intoxicated if the level of alcohol in his or her blood exceeds the amount [*8] at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.

b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of the Insured's intoxication. [11]

It is unclear when the plaintiff filed his claims for benefits, however, on April 13, 2009, Zurich acknowledged receipt of plaintiff's filing of a claim [*9] *under the Basic Policy* and a claim for benefits *under the Supplemental Policy*. On November 10, 2009, Zurich denied the claim under the *Supplemental Policy* on two grounds: (1) plaintiff did not suffer a "loss" within the meaning of the policy as there was no actual severance "through or above the metacarpophalangeal joint of a thumb or index finger," [12] and (2) plaintiff was

---

[11] *See* Basic Policy, Section VII, entitled "General Exclusions," ¶ 7(a) & (b), Exh. 8-2, p. 11; *see* Supplemental Policy, "Coverage Excluded," ¶ 7(a) & (b), Exh. 8-3 to Doc. 8, p. 12.

Under the Basic Policy, the exclusion is worded as follows:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from:

7. being intoxicated.

> a. You will be conclusively presumed to be intoxicated if the level of alcohol in Your blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.
>
> b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of Your intoxication.

[12] Specifically, Zurich explained although the plaintiff did sustain the complete amputation involving the thumb and ring finger of his left hand, there was no actual severance of his left index finger at the metacarpophalengeal joint, nor was there total paralysis of his left

intoxicated at the time of the accident. Plaintiff's claim under the *Basic Policy* was denied for identical reasons on November 10, 2009. [13] Plaintiff appealed on December 3, 2009.

On January 26, 2010, plaintiff was informed by Zurich's ERISA Review Committee that there is no requirement that both plaintiff's thumb and index finger be severed above the metacarpophalangeal joint in order to constitute a "loss" within the meaning of [*10] the policies. Rather, because the plaintiff sustained actual severance of a thumb above the metacarpophalangeal joint, this injury qualified as a "loss" within the terms of the policies. However, the denial of benefits on both claims was affirmed based on plaintiff's intoxication at the time of the accident. [14]

Plaintiff filed suit in the Fifteenth Judicial District Court for the Parish of Vermilion, State of Louisiana, on December 30, 2009 against Zurich and Parker Drilling, plaintiff's employer. Plaintiff alleges Zurich arbitrarily denied coverage for his injuries, and alleges Parker Drilling was negligent in failing to represent him or mediate his claims despite deductions made from his salary for premiums paid to Zurich. The lawsuit was removed to this Court on February 2, 2010.

On April 14, 2010, [*11] an ERISA Case Order was issued by the magistrate judge. Under that Case Order, the parties stipulated ERISA governs

───────────────

arm. *See* Exh. 8-4, p. 6, attached to defendants' Response to ERISA Case Order, Doc. 8.

[13] *Id*. at Exh. 8-4, pp. 8-11.

[14] On appeal, Zurich argued that Exclusion 1 also applies:

> 1. Suicide or any attempt at suicide or *intentionally self inflicted Injury or any attempt at intentionally self inflicted Injury*.

(emphasis in original).

Zurich refers to this exclusion as existing in "the policy," although Zurich presumably reviewed each claim under the Basic Policy and the Supplemental Policy.

See Exh. 8-4, pp. 17-19.

the employee benefit plan at issue; ERISA preempts all state law claims; the Basic Policy grants Zurich discretionary authority to determined eligibility for benefits and to construe the terms of the plan; the administrative record is complete; and, at the time of his accident, the level of alcohol in plaintiff's blood exceeded the level at which he would have been presumed to be intoxicated under Louisiana law if operating a motor vehicle. [15]

Defendants filed the instant motion on July 9, 2010, contending there are no genuine issues of material fact that under the language of the policies at issue, plaintiff was properly denied coverage under both the Basic Policy and the Supplemental Policy for his injuries. As previously noted, this Court considers all briefs before the Court as briefs on the merits.

## II. Law and Analysis

### 1. Legal Standard — ERISA

The parties to this matter have stipulated the plaintiff's claims against Zurich are controlled by ERISA, and ERISA preempts all state law claims, presumably, including any claims of negligence alleged against Parker [*12] Drilling. As such, the plaintiff's claims are limited to an appeal of the Plan Administrator's denial of their claims pursuant to 29 U.S.C. § 1132(a)(1)(B): "A civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

"ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators." *Bratton v. National Union Fire Insurance Company of Pittsburgh, PA,* 215 F.3d 516, 521-22 (5th Cir. 2000). "[A] denial of benefits

───────────────

[15] Docs. 7, 9.

challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 521. "When an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion." Id. at 521 n.4.

The Fifth Circuit has described the nature of the abuse of discretion review. "When applying the abuse of discretion standard, [*13] 'we analy[ze] whether the plan administrator acted arbitrarily or capriciously. A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence. An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.' We must find that '[w]ithout some *concrete evidence* in the administrative record that supports the denial of the claim, . . . the administrator abused its discretion.'" *Lain v. Unum Life Insurance Company of America*, 279 F.3d 337, 342-43 (5th Cir. 2002) (citations omitted) (emphasis in original).

The plaintiff bears the burden of proving the Plan Administrator abused her discretion in concluding they were not entitled to benefits under the terms of the Plan. *See Dowden v. Blue Cross & Blue Shield of Texas, Inc.*, 126 F.3d 641, 644 (5th Cir. 1997); *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993). The abuse of discretion standard of review requires that this Court determine, first, whether the Administrator's interpretations and constructions are legally correct and, if legally correct interpretations [*14] or constructions were used by the Plan Administrator, whether she abused her discretion in reaching those conclusions upon which her decision is based.

Under the de novo standard, the Fifth Circuit has held the court should review the claim "as it would...any other contract claim — by looking to the terms of the plan and other manifestations of the parties' intent." *Bratton*, 215 F.3d at 516, *citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Nevertheless, even where the court employs the de novo standard to the ultimate benefits determination of the plan administrator, for factual determinations under ERISA plans, the Fifth Circuit has held federal courts owe due deference to an administrator's findings and, for their review, the abuse of discretion standard is appropriate. *Bratton*, 215 F.3d at 522, *citing Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir.1993); *Pierre v. Connecticut Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir.1991).

Finally, it is well-settled "a district court should evaluate the administrator's fact findings regarding the eligibility of a claimant *based [*15] on the evidence before the administrator*....'" *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir. 1993) (emphasis added), *citing Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 639 (5th Cir. 1992).

In the instant case, the *Basic Policy* gives Zurich complete discretion "to construe and interpret all terms and provisions of the Policy" and the parties have stipulated as such. However, the *Supplemental Policy* does not grant Zurich such discretionary authority. Thus, although this Court will be reviewing essentially two identical claims decisions (as identical claims were made under the two separate policies), technically, this Court will review Zurich's claims decision under the Basic Policy for an abuse of discretion, but must review Zurich's claims decision under the Supplemental Policy de novo. Notwithstanding the foregoing, any *factual findings* made by Zurich will be analyzed under the abuse of discretion standard and will be evaluated solely on the basis of the administrative record. *See Bratton*, 215 F.3d at 521.

## 2. Analysis of Motion

In their brief, defendants contend it is undisputed the plaintiff's blood alcohol content was nearly twice the legal limit at the time [*16] the plaintiff injured himself while detonating the firecracker. In his brief, plaintiff argues the following:

> II.
> Paragraph 2 of defendants['] motion [sic] over look, the possibility that while plaintiff may have been intoxicated which would prevent him from legally operating an automobile on public roads, still, plaintiff's loss while lighting a defective firework may have had nothing to do with his level of intoxication.
>
> III.
>
> Plaintiff will show at the trial on the merits of this cause and the record will reveal that defendants, through their own admission, were arbitrary in waiting almost twelve (12) months, despite repeated demand for relief by plaintiff's mother to advise Plaintiff that his claim had been denied on November 10, 2009 leaving him only twenty (20) days to appeal his claim or file suit [for] his loss. [16]

To his brief, plaintiff attaches the affidavits of the plaintiff and the plaintiff's mother, wherein the affiants attest the plaintiff's accident was not due to plaintiff's drinking.

This Court reviews Zurich's factual finding that the plaintiff was intoxicated at the time of the accident under the abuse of discretion standard. [*17] Additionally, this Court is restricted to a review of the administrative record in this regard, which all parties have stipulated is complete. After review of the administrative record, the Court concludes as to this factual finding, Zurich did not abuse its discretion in concluding plaintiff was

intoxicated at the time of the accident. The record shows the plaintiff admitted alcohol use on the date of his accident, which was confirmed by a blood alcohol screening showing the presence of alcohol in plaintiff's blood that was almost twice the legal limit allowed in Louisiana to operate a motor vehicle. Additionally, the plaintiff *stipulated* his blood alcohol level exceeded the amount at which he would have been presumed to be intoxicated, under Louisiana law, if operating a motor vehicle.

The Court next considers whether Zurich's ultimate benefits determinations were erroneous. Because it must consider the claim determination made under the Supplemental Policy de novo, this Court will consider that claims determination first. This Court must review plaintiff's claim under the Supplemental Policy "as it would...any other contract claim — by looking to the terms of the plan and other manifestations [*18] of the parties' intent." *Bratton*, 215 F.3d at 516, *citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the instant case, the Supplemental Policy contains the following exclusion:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from:

7. being intoxicated.

> a. An insured will be conclusively presumed to be intoxicated if the level of alcohol in his or her blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.
> b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of the Insured's intoxication. [17]

---

[16] *See* plaintiff's brief, Doc. 12, ¶¶II-III.

[17] *See* Basic Policy, Section VII, entitled "General Exclusions," ¶ 7(a) & (b), Exh. 8-2, p. 11; *see* Supplemental Policy, "Coverage

Here, it is undisputed the level of blood alcohol in the plaintiff's blood exceeded the amount at which a person would be presumed, under Louisiana law, to be intoxicated if operating a motor vehicle. Under the language of the Supplemental Policy, the plaintiff is presumed to have "be[en] intoxicated" at the time of his injury. Also under the terms of the policy, "A loss will not be a Covered Loss if it is caused by, contributed to, or results from: being intoxicated."

Defendants contend given plaintiff's blood alcohol content at the time of the accident, there can be no doubt plaintiff's intoxication at least "contributed to" his injuries and, therefore, plaintiff's claim was properly denied. In response, the plaintiff presents his affidavit and the affidavit of his mother, in which both state the plaintiff's drinking did not cause plaintiff's injuries. To that end, plaintiff [*20] states he was "fully in control of his faculties at the time of the accident." Additionally, plaintiff argues the standard for intoxication for driving an automobile differs from the standard that may be required when lighting fireworks. Therefore, the plaintiff appears to be arguing the evidence of his blood alcohol content should not be conclusive of coverage.

The affidavits presented by the plaintiff are not part of the administrative record and therefore, this

---

Excluded," ¶ 7(a) & (b), Exh. 8-3 to Doc. 8, p. 12.

Under the Basic Policy, the exclusion is worded as follows:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from:

7. being intoxicated.

> a. You will be conclusively presumed to be intoxicated if the level of alcohol in Your [*19] blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.
>
> b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of Your intoxication.

Court cannot consider them in reviewing the factual findings upon which Zurich based its benefits determinations. The administrative record does, however, contain the Supplemental Policy itself, which contains an exclusion stating a loss is not a "Covered Loss" if it was caused by, contributed to, or results from: being intoxicated." The exclusion further states "You will be *conclusively presumed to be intoxicated* if the level of alcohol in Your blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle."

Here, it is undisputed the level of blood alcohol in the plaintiff's blood exceeded the amount at which a person would [*21] be presumed, under Louisiana law, to be intoxicated if operating a motor vehicle. Therefore, plaintiff's argument that there is a different "standard" for intoxication while operating fireworks is immaterial. Additionally, it is not unreasonable to conclude the plaintiff's intoxication at least "contributed to" the plaintiff's injury, and this Court notes the plaintiff has pointed to no evidence in the administrative record showing the plaintiff's intoxication did *not* contribute to his accident, other than his own self-serving affidavit and the self-serving affidavit of his mother, which cannot be considered by the Court. Furthermore, plaintiff's statement in his opposition brief that Zurich's position overlooked "the possibility" that alcohol played no role in his accident is insufficient to override the policy's intoxication exclusion.

Considering the foregoing, this Court concludes the intoxication exclusion in the Supplemental Policy applies, and consequently, Zurich properly denied plaintiff's claim for benefits under the Supplemental Policy.

Turning now to the Basic Policy, this Court must only review Zurich's claims decision under that policy for an abuse of discretion. Because [*22] Zurich denied plaintiff's claim under this policy for the same reason it denied plaintiff's claim under the Supplemental Policy, and because the

two policies have almost identical exclusions, this Court concludes Zurich did not abuse its discretion in denying plaintiff's claim for benefits under the Basic Policy.

Considering the foregoing, this Court concludes Zurich properly denied plaintiff's claim for benefits under the Basic Policy and the Supplemental Policy, and plaintiff's claims against defendants, therefore, are DENIED AND DISMISSED WITH PREJUDICE.

IT IS ORDERED that the parties submit a Judgment, approved as to form, within ten (10) days of the date of this Order.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 25 day of August 2010.

/s/ Rebecca F. Doherty

REBECCA F. DOHERTY

UNITED STATES DISTRICT JUDGE

---

**End of Document**

## Sanford v. Zurich Am. Ins. Co.

United States District Court for the Northern District of Mississippi, Eastern Division

September 15, 2009, Decided; September 15, 2009, Filed

Case No. 1:08cv107

**Reporter**

2009 U.S. Dist. LEXIS 84327 *; 2009 WL 2986343

WILLIAM D. SANFORD, PLAINTIFF vs. ZURICH AMERICAN INSURANCE COMPANY, DEFENDANT

**Counsel:** [*1] For William D. Sanford, Plaintiff: John Booth Farese, LEAD ATTORNEY, FARESE, FARESE & FARESE, Ashland, MS.

For Zurich American Insurance Company, Defendant: Jeffrey S. Dilley, William Kurt Henke, LEAD ATTORNEYS, HENKE, HEATON & BUFKIN, Clarksdale, MS.

**Judges:** MICHAEL P. MILLS, CHIEF JUDGE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MICHAEL P. MILLS

## Opinion

### ORDER

This cause comes before the court on the competing motions of the parties for summary judgment, pursuant to Fed. R. Civ. P. 56. The court, having reviewed the memoranda and submissions of the parties, concludes that plaintiff's motion should be denied and that defendant's motion should be granted.

This is an ERISA case seeking damages arising out of defendant Zurich American Insurance Company's ("Zurich") denial of a claim for accidental death benefits pursuant to two group insurance policies issued to Sysco Corporation. The decedent Peggie Sanford ("Sanford") was employed by a Sysco affiliate and thus qualified for the accidental death and dismemberment ("AD&D") coverage afforded under both policies. William D. Sanford (the "Plaintiff") was designated as the sole beneficiary of Sanford's death benefits. On August 6, 2006, Sanford drowned at Pickwick Lake, and [*2] the plaintiff submitted a claim for accidental death benefits in the amount of $ 227,000. Zurich, which serves as ERISA Claims Fiduciary, denied benefits on the basis of an "intoxication" exclusion in both policies, concluding that ethyl alcohol intoxication contributed to Peggie's death. Feeling aggrieved, plaintiff filed this action on March 27, 2008, in the Circuit Court of Tishomingo County, and Zurich subsequently removed the case to this court. The parties have each filed motions for summary judgment, contending that there exists no genuine issue of fact and that they are entitled to judgment as a matter of law.

Prior to addressing the facts of this case, the court initially notes that plaintiff's state law claims are pre-empted by ERISA, which limits this action to one for benefits. 29 U.S.C. § 1132(a)(1)(B). Moreover, ERISA provides that Zurich's denial of the subject claim is reviewable only for an abuse of discretion, since the plan in this case provides Zurich with "the discretionary authority to determine eligibility for benefits and to construe the terms of the plan." *See Tolson v. Avondale Indus., Inc., 141 F.3d 604, 608 (5th Cir. 1998)*. In defending its decision to deny [*3] coverage based upon the "intoxication" exclusion in the ERISA policies, defendant describes the facts of the case as follows:

Sanford and a companion, Albert McAlexander ("McAlexander"), died on or about August 6,

2006, while on a leisure outing at Pickwick Lake. Several witnesses observed Sanford and McAlexander aboard a pontoon boat near the waterfalls area of Pickwick Lake during the daylight hours on August 6. They were last observed "dancing and playing" aboard the boat at approximately 6:00 p.m. A short time later, the boat was found adrift and unmanned with the engine running, the radio playing, and a large dog onboard. A search was immediately launched by officers representing the Mississippi Department of Wildlife, Fisheries & Parks, the Tishomingo County Sheriff's Department, and the Tennessee Valley Authority. On the morning of August 7, the bodies of Sanford and McAlexander were discovered floating in the lake.

There were a number of other boaters in the area of the waterfalls during the period that Sanford and McAlexander would have entered the water. However, no witnesses saw Sanford or McAlexander leave their boat or enter the water, and no one heard any fighting, yelling, [*4] or cries for help. Sanford's body was sent to Jackson for an autopsy and forensic analysis. The autopsy revealed that Sanford had died as a result of freshwater drowning. Additionally, a toxicological examination of her blood was positive for ethyl alcohol at a level of 0.161 g/dl. In searching and inventorying the contents of the boat, officers had discovered beer and vodka. There was no evidence of foul play. By all accounts, Sanford and McAlexander enjoyed a good relationship. Likewise, as noted above, none of the other boaters in the area observed any yelling or cries for help. The available evidence led officers to conclude that Sanford had fallen overboard and drowned. The official cause of death was listed as freshwater drowning with a contributing cause of ethyl alcohol intoxication.

Citing these facts, Zurich denied plaintiff's claim for benefits based upon a policy exclusion which provided that:

> **C.** No benefits will be paid for a Covered Loss contributed to, either directly or indirectly, by a Covered Person's being:
>
> **1.** Intoxicated.
>
> a. A Covered Person will be conclusively presumed to be intoxicated if the level of alcohol in his/her blood exceeds the amount at which a person [*5] is presumed, under the law of the locale in which the accident occurred, to be intoxicated if operating a motor vehicle.
>
> **b.** An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items shall be considered proof of the Covered Person's intoxication.
>
> **2.** Under the influence of any controlled substance, unless such controlled substance was prescribed by a physician and taken in accordance with the prescribed dosage.

In setting forth his own theories regarding the cause of Peggie's death, plaintiff writes as follows:

> The Plaintiff submitted supplemental information to Defendant Zurich's ERISA Committee, including four sworn affidavits from Cynthia Hodges, Robert B. Moorman, Tam're Moorman, and William Sanford (the Plaintiff), respectively, which stated that Peggie Sanford was completely incapable of swimming and which stated that if Peggie Sanford fell into water she would drown unless she was saved by another person. The Plaintiff also provided Defendant Zurich's ERISA Committee with the results of an investigation conducted by Terry R. Cox, a certified legal investigator. Cox interviewed the following individuals: Ricky Cornelison, the MDWFP officer [*6] who prepared the *Official Water Accident Report;* Stewart M. "Mack" Wilemon, the Tishomingo County Medical Examiner

Investigator; and, Terry Burcham, a law enforcement officer with the Tennessee Valley Authority Police Department.

The *Official Water Accident Report,* which was prepared following Cornelison's investigation into the drowning death of Peggie Sanford, recites that the cause of death was drowning, that Sanford was a non-swimmer, and that "what victim was doing" at the time of the drowning is "unknown." Notably, the pre-printed portion of the *Official Water Accident Report* contains a section captioned "Probable Cause of Accident" which lists common possible causes of accidents, to-wit: Swimming in unknown waters; Physical failure or exhaustion; Non-proficient swimmer; Fell through ice; Fell from bridge; Fell from bank; Fell from dock; Fell from poolside; and, Suicide or attempt. Also listed as a "Probable Cause of Accident" on the pre-printed *Official Water Accident Report* form is "Other." When Cornelison prepared the *Official Water Accident Report,* he placed a check by "Other" under "Probable Cause of Accident" and did not include any further explanatory notation.

The January [*7] 26, 2007, letter from Defendant Zurich to Plaintiff William D. Sanford in which Zurich denies the claim for Peggie Sanford's death benefits states (in the fourth full paragraph on page 2) as follows: "The police crime report also states that alcohol was a factor in the incident." This statement is false. Cornelison's *Official Water Accident Report* actually states: "A small amount of vodka, beer and a green leafy substance that appeared to be marijuana along with paraphernalia were located on the boat leading officers to believe that the victims *may* have been under the influence." (Emphasis added.) This statement reflects nothing more than speculation. No where within Cornelison's twenty-seven page *Official Water Accident Report* it is affirmatively stated that "alcohol

was a factor in the incident" as claimed by Defendant Zurich. When Cornelison was interviewed by Terry Cox, the certified legal investigator, Cornelison admitted that there is no evidence to indicate that alcohol caused or contributed to the drowning death of Peggie Sanford.

The claim file made available to the Plaintiff by Defendant Zurich indicates that Zurich's investigators never spoke directly with Cornelison. Stewart [*8] M. "Mack" Wilemon, the Tishomingo County Medical Examiner Investigator, prepared the written *Report of Death Investigation* as required by Mississippi Medical Examiner Act of 1986 (MISS. CODE ANN. § 41-61-51, *et seq.).* Wilemon's *Report of Death Investigation* recites the "Probable Cause of Death" as "Freshwater Drowning" and recites "Ethyl Alcohol Intoxication" as a "Contributing factor" in Peggie Sanford's death. Wilemon's report also recites:

> Subject was found floating in lake near a rocky shoreline. Thought to have been occupant of pontoon boat which was found unoccupied last p.m. That to have been in company of male subject not accounted for at time of Ms. Sanford's discovery. *No known witnesses to subject's distress or demise.* 8/30 Subject believed to have fallen overboard due to Ethyl Alcohol Intoxication. Results received 8/30/06

When Wilemon was interviewed by Cox, however, Wilemon agreed that there is no evidence to indicate that alcohol caused or contributed to the drowning death of Peggie Sanford. Notably, the Report of Death Investigation specifically states that Peggie Sanford "could not swim." Again, the statement "Subject believed to have fallen overboard due to Ethyl Alcohol [*9] Intoxication" is nothing more than mere speculation.

Terry Burcham is a law enforcement officer

with the Tennessee Valley Authority ("TVA") Police Department who produced a written *TVA Police Crime Report* relating to the death of Peggie Sanford. Burcham's report recites law enforcement officers found "alcohol and marijuana" on the pontoon boat, but Burcham's report contains no statement whatsoever regarding whether ethyl alcohol intoxication may have caused or contributed to the drowning death of Peggie Sanford. WhenBurcham was interviewed by Cox, Burcham agreed that there is no evidence to indicate that alcohol caused or contributed to the drowning death of Peggie Sanford.

In rebutting these arguments, defendant writes as follows:

While not contesting Zurich's determination that Peggie Sanford ("Sanford") was intoxicated at the time she drowned, Plaintiff does challenge the determination by Zurich that Sanford's intoxication contributed, either directly or indirectly, to her death. Plaintiff cites to evidence that Sanford was not able to swim and asserts that this inability to swim, rather than intoxication, was the sole cause of her death. Plaintiff also notes that no onesaw Sanford [*10] enter the water and poses several different explanations as to how Sanfordcould have entered the water regardless of whether she was impaired. According to the Plaintiff, because no one observed Sanford enter the water, it is simply impossible to determine whether intoxication was a factor in her death.

Contrary to Plaintiffs' argument, the evidence in the record supports Zurich's determination that intoxication was a factor in Sanford's death. In order to prevail in this action, Zurich need not establish that intoxication was the only cause or even the predominate cause of Sanford's death. Rather, the Court is compelled to uphold Zurich's determination if the administrative record contains substantial

evidence that intoxication contributed, either directly or indirectly, to Sanford's death. It is inconsequential for purposes of the Court's review that there may have been other, more direct causes. Clearly, Zurich did not abuse its discretion because the underlying evidence supports its denial of Plaintiff's claim for benefits.

Ultimately, it seems clear that no party to this litigation has definitive proof regarding exactly how and why Peggie Sanford tragically drowned. Plaintiff has [*11] offered alternate explanations for Peggie's drowning, including 1) that she may have been thrown into the lake by the negligence of the boat's operator; 2) that she may have been thrown into the water by McAlexander during horseplay; and (3) that large waves caused by a thunderstorm may have caused her to fall off the boat. This court can certainly not exclude the possibility that one of these explanations may be accurate.

The court agrees with defendant, however, that the highly deferential "abuse of discretion" standard which applies in this case, along with the fact that the policies in this case exclude coverage in cases where intoxication "contributed … either directly or indirectly" to the covered loss indicates that Zurich's decision to deny benefits must be upheld. It would be very difficult for this court to conclude that Zurich abused its discretion in concluding that intoxication was at least a contributing factor in Peggie's death when 1) her post-mortem blood test was positive for ethyl alcohol at a level of 0.161 g/dl; 2) Tishomingo County Medical Examiner Investigator Stewart M. Wileman explicitly stated in Peggie's amended death certificate that "ethyl [*12] alcohol intoxication" was a "significant condition … contributing" to her death. [1] The court

---

[1] In the court's view, this would be true even under the application of the somewhat less deferential standard of review which would apply if this court were to conclude that Zurich had a conflict of interest by serving as both plan administrator and insurer in this case. *See e.g., Wade v. Hewlett-Packard Development Co. LP Short Term*

2009 U.S. Dist. LEXIS 84327, *12

readily agrees with plaintiff that there are other possible explanations for Peggie's death which do not involve intoxication, but there is clearly substantial evidence supporting Zurich's conclusion that intoxication was a contributing factor in her death. Zurich's motion for summary judgment will therefore be granted, and plaintiff's motion will be denied.

It is therefore ordered that Zurich's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

A separate judgment will be issued this date, pursuant to Fed. R. Civ. P. 58. THIS the 15th [*13] day of September, 2009.

/s/ MICHAEL P. MILLS

**CHIEF JUDGE**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF MISSISSIPPI**

---

End of Document

---

*Disability Plan,* 493 F.3d 533, 541 (5th Cir. 2007). Wileman had no such conflict of interest, and he independently concluded that intoxication was a contributing factor in Peggie's death.

# Nichols v. Hartford Life & Accident Ins.

United States District Court for the Southern District of Texas, Houston Division

June 9, 2014, Decided; June 9, 2014, Filed

Civil Action No. 4:13-cv-03048

**Reporter**

2014 U.S. Dist. LEXIS 196645 *; 2014 WL 12537147

JENNIFER NICHOLS, Plaintiff v. HARTFORD LIFE & ACCIDENT INS., Defendant

**Counsel:** [*1] For Jennifer Nichols, Plaintiff: Lennon C Wright, LEAD ATTORNEY, Houston, TX, USA.

For Hartford Life And Accident Insurance Company, Defendant: Theodore Christian Schultz, Lindow Stephens Treat LLP, San Antonio , TX, USA.

**Judges:** VANESSA D. GILMORE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** VANESSA D. GILMORE

# Opinion

## ORDER

Pending before the Court is Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford")'s Motion for Summary Judgment. **(Instrument No. 15)**.

## I.

## A.

On August 23, 2013, Plaintiff Jennifer Nichols ("Plaintiff") filed suit against Defendant in the 80th Judicial District of Harris County, Texas, alleging that Defendant failed to pay benefits owed under a life insurance policy. (Instrument No. 1-2).

Defendant removed the suit to this Court on October 16, 2013 because the policy at issue is governed by the Employee Retirement Income Security Act ("ERISA"), creating a basis for federal jurisdiction. (Instrument No. 1). Plaintiff filed a First Amended Complaint on December 17, 2013, alleging that Defendant has refused to pay life insurance proceeds that Plaintiff is due under her late husband's policy. (Instrument No. 7). Defendant filed a motion for summary judgment on April 15, 2014 (Instrument [*2] No. 15), and Plaintiff has not filed a response.

## B.

Hartford insures the Group Basic Dependent Life, Basic Term Life, Basic Accidental Death and Dismemberment Plan for employees of Clean Harbors Environmental Services, Inc. (Instrument No. 15-2 at 31). Hartford is the Plan's claims fiduciary and has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (Instrument No. 15-2 at 31).

The Policy contains an exclusion which states that it "does not cover any loss caused or contributed to by: . . . (7) Injury sustained while intoxicated." (Instrument No. 15-2 at 19). The Policy further states that:

Intoxicated means:

1) the blood alcohol content;

2) the results of other means of testing blood alcohol level; or

3) the results of other means of testing other

substances; that meet or exceed the legal presumption of intoxication, or under the influence, under the law of the state where the accident occurred.

(Instrument No. 15-2 at 19). Hartford admits that Michael Nichols ("Mr. Nichols"), Plaintiff's husband, was enrolled in the Plan and insured under the Policy. (Instrument No. 15 at 2).

On November 8, 2012, Mr. Nichols [*3] was involved in a single-vehicle accident while driving an all-terrain vehicle in Tyler County, Texas. (Instrument No. 15-3 at 4-11). The police report indicated that Mr. Nichols "was traveling at an unsafe speed" entering a curve and his ATV eventually fell into a ditch and struck a tree, rolling over two times and ejecting Mr. Nichols. (Instrument No. 15-3 at 5). The report noted that Mr. Nichols "had been drinking and was possible [sic] under the influence of alcohol." (Instrument No. 15-3 at 5). The weather at the time of the accident was clear, and there were no vehicle defects. (Instrument No. 15-3 at 5, 7-8).

Mr. Nichols was taken to the Conroe Regional Medical Center, where he was admitted for a traumatic brain injury. (Instrument No. 15-4 at 2). His laboratory work revealed an "elevated" blood alcohol content of 167 mg/dL. (Instrument No. 15-4 at 4, 6). The legal level for intoxication in Texas is a blood alcohol content of 80 mg/dL, or 0.08. Tex. Penal Code § 49.01(2)(B). Mr. Nichols was pronounced dead at the hospital on November 8. (Instrument No. 15-4 at 2).

Defendant admits that Plaintiff made a timely claim for accidental death benefits and life insurance benefits under the Policy. (Instrument No. [*4] 15 at 3). Hartford paid the life insurance benefits, but it determined that the intoxication exclusion applied and that Plaintiff was therefore not entitled to accidental death benefits. (Instrument No. 15-6 at 2-4). On June 7, 2013, Plaintiff appealed the decision to deny accidental death benefits. (Instrument No. 15-7). Plaintiff argued that

Hartford had an obligation to show that Mr. Nichol's intoxication caused the accident, and she also claimed that the hospital toxicology tests were inaccurate to determine Mr. Nichol's blood alcohol content. (Instrument No. 15-7 at 1). Hartford denied the appeal on July 11, 2013. (Instrument No. 15-8 at 2-4). Hartford claimed that its Policy does not require it to establish that intoxication caused the accident, but only that the injury was sustained while the individual was intoxicated. (Instrument No. 15-8 at 3). However, Hartford claims that even if the Policy does require causation, Hartford specifically found that the accident was caused by Mr. Nichol's intoxication. (Instrument No. 15-8 at 3). Hartford also noted that there was no evidence in the record to suggest that the hospital's toxicology testing or method was incorrect or unreliable. [*5] (Instrument No. 15-8 at 3).

**II**.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex, 477 U.S. at 325*. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)* (citation omitted). "If the moving party fails to meet [*6] [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency, 537 F.3d 504, 507 (5th Cir. 2008)* (quoting *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992)*. The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little, 37 F.3d at 1075*. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Baranowski v. Hart, 486 F.3d 112, 119 (5th Cir. 2007)*. Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves, 538 F.3d 373, 376 (5th Cir. 2008)*, the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux, 402 F.3d at 540* (quoting

*Little, 37 F.3d at 1075*). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken, 110 F.3d 295, 297 (5th Cir. 1997)*.

In deciding a summary [*7] judgment motion, the district court does not make credibility determinations or weigh evidence. *Chevron Phillips, 570 F.3d 606, 612 n.3 (5th Cir. 2009)*. Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 379-80 (5th Cir. 2010)*; *Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003)*; *Ragas*, 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir.1988)* (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara, 353 F.3d at 405*.

In this case, Plaintiff has not filed a response to Defendant's Motion for Summary Judgment. This failure, of course, does not permit the Court to enter a default summary judgment. *Eversley v. MBank of Dallas, 843 F.2d 172, 174 (5th Cir. 1988)*. Nevertheless, if no response to the motion for summary judgment has been filed, the Court may find as undisputed the statement of facts in the motion for summary judgment. *Eversley, 843 F.2d at 174*; *Jegart v. Roman Catholic Church of the Diocese of Houma-Thibodaux, 384 Fed. Appx. 398, 400 (5th Cir. 2010)*; *see, e.g., Thompson v. Eason, 258 F.Supp.2d 508, 515 (N.D. Tex. 2003)* (where no opposition is filed, the movant's evidence may be accepted as undisputed); *Unum Life Ins. Co. of America v. Long, 227 F. Supp. 2d 609, 614 (N.D.*

Tex. 2002) ("Although the court may not enter a 'default' summary judgment, it may accept evidence submitted by [movant] as undisputed."). [*8] Accordingly, the Court treats the movant's evidence as undisputed.

## III.

### A.

ERISA confers jurisdiction on federal courts to review benefit determinations by fiduciaries or plan administrators. *See* 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). When a plan administrator or fiduciary is given discretionary authority, a denial of benefits is reviewed for an abuse of discretion. *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 269 (5th Cir. 2004); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006). Here, the Policy gave Defendant discretionary authority to construe the terms of the Plan, and Defendant's determinations will be reviewed for abuse of discretion. *See* (Instrument No. 15-2 at 31).

"Abuse of discretion review is synonymous with arbitrary and capricious review in the ERISA context." *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009). Courts affirm the administrator's decision if it is supported by substantial evidence, which is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273 (internal quotations omitted). A decision is arbitrary only [*9] if made without a

rational connection between the known facts and the decision or between the found facts and the evidence. *Cooper*, 592 F.3d at 652. A court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness— even if on the low end." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (quotation marks omitted).

### B.

The Court first must consider whether there was sufficient evidence for Defendant to conclude that Mr. Nichols was intoxicated at the time of his death. "[T]he question of the cause of death [is] a factual determination." *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 213 (5th Cir. 2009). The Court reviews this factual determination for abuse of discretion. *Ellis*, 394 F.3d at 269.

The Policy states that whether an individual is intoxicated is demonstrated through the results of blood alcohol level testing "that meet[s] or exceed[s] the legal presumption of intoxication, or under the influence, under the law of the state where the accident occurred." (Instrument No. 15-2 at 19). The legal level for intoxication in Texas is a blood alcohol content of 80 mg/dL, or 0.08. Tex. Penal Code § 49.01(2)(B).

Here, in order to find that Mr. Nichols was intoxicated under Texas law, Hartford relied on the report of an investigating police officer, who stated that [*10] Mr. Nichols had been drinking and that he suspected that Mr. Nichols was possibly under the influence of alcohol. (Instrument No. 15-3 at 5). Hartford also relied on a hospital admission report and toxicology report from blood drawn at the treating hospital, which indicated that Mr. Nichols's blood alcohol content was 167 mg/dL, over twice the legal limit. (Instrument No. 15-4 at 4, 6; Instrument No. 15-5 at 4). The Fifth Circuit has

held that similar, or even less persuasive, evidence provides substantial evidence of intoxication. In *Dutka*, a toxicology report was conducted fifty days after the accident in question, and the medical expert interpreting the report "was not unequivocal as to the content of drugs present in the decedent's blood *at the time of the accident*." *Dutka*, 573 F.3d at 213 (emphasis in original). Nevertheless, the Fifth Circuit held that because "the evidence [of intoxication] is consistent with the conclusion," the administrator's finding of intoxication was not arbitrary and capricious. *Id.* Similarly, in *Jimenez v. Sun Life Assur. Co. of Canada*, 486 F. App'x 398, 410 (5th Cir. 2012), the police officer at the scene of the accident suspected that alcohol was involved in the accident, hospital staff indicated that the decedent was "intoxicated" when he was admitted, [*11] and his blood test indicated that his blood alcohol content was almost twice the legal limit under Louisiana law. *Id.* at 410-11. The court concluded that this was "substantial" evidence of intoxication. *Id.* at 410. In this case, Hartford relies on similar evidence of intoxication. *See* (Instrument No. 15-3 at 5; Instrument No. 15-4 at 4, 6; Instrument No. 15-5 at 4). The Court therefore finds that Hartford did not abuse its discretion in finding that Mr. Nichols was intoxicated at the time of the accident. *See Dutka*, 573 F.3d at 214; *Jimenez*, 486 F. App'x at 411.

## C.

The Court next considers whether Hartford correctly applied the intoxication exclusion to deny Plaintiff accidental death benefits. The Court reviews this determination for abuse of discretion. *Ellis*, 394 F.3d at 269.

The Policy "does not cover any loss caused or contributed to by" . . . (7) Injury sustained while intoxicated." (Instrument No. 15-2 at 19). Plaintiff argued on administrative appeal that there was no evidence that intoxication caused Mr. Nichols's death because there were no witnesses to the crash.

Hartford argues first that the Policy does not require causation. (Instrument No. 15 at 9). The Court need not address this issue, because even if the Policy does require causation, Hartford specifically found [*12] that the accident was caused by Mr. Nichols's intoxication. (Instrument No. 15-8 at 3). In *Dutka*, the court noted "that there was no *direct* proof that the drugs [in the decedent's system] caused the crash, however, in such a case there rarely is—the evidence is circumstantial." *Dutka*, 573 F.3d at 214 (emphasis in original). The *Dutka* court noted that because the weather conditions were clear and there was no evidence of mechanical failure, "[t]he nature of the accident itself supports the conclusion that drugs contributed." *Id.* The court therefore concluded that the plan administrator's causation finding was not arbitrary and capricious. *Id.* Similarly, here, the police report notes that the weather at the time of the accident was clear and there were no vehicle defects. (Instrument No. 15-3 at 5, 7-8). The nature of the accident, which occurred when Mr. Nichols was driving his ATV "at an unsafe speed" entering a curve, further makes it reasonable to conclude that the accident resulted in part from Mr. Nichols's intoxication. (Instrument No. 15-3 at 5); *Dutka*, 573 F.3d at 214.

Therefore, the Court finds that Hartford's finding that intoxication caused Mr. Nichols's accident was not arbitrary and capricious. Furthermore, Hartford's [*13] decision to apply the intoxication exclusion based on this factual finding was not arbitrary and capricious.

Accordingly, Defendant's motion for summary judgment is GRANTED.

## V.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment is **GRANTED. (Instrument No. 15)**.

2014 U.S. Dist. LEXIS 196645, *13

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the 9th day of June, 2014, at Houston, Texas.

/s/ Vanessa D. Gilmore

**VANESSA D. GILMORE**

**UNITED STATES DISTRICT JUDGE**

## FINAL JUDGMENT

For the reasons stated in the Court's Order, signed on the 9th day of June, 2014, this action is **DISMISSED**.

**THIS IS A FINAL JUDGMENT**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the 9th day of June, 2014, at Houston, Texas.

/s/ Vanessa D. Gilmore

**VANESSA D. GILMORE**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**