**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

**TIMOTHY SEWELL**

**CIVIL ACTION NO**
**VS**                                                    **2:23-cv-317**

**THE LINCOLN NATIONAL**
**LIFE INSURANCE COMPANY**

**PLAINTIFF'S RULE 52 MOTION FOR JUDGMENT ON ADMINISTRATIVE**
**RECORD AND BRIEF IN SUPPORT**

**MAY IT PLEASE THE COURT:**

Plaintiff, Timothy Sewell, submits this Motion For Judgment on Administrative Record

and Brief in Support under Fed. R. Civ. P. 52. and the Employee Retirement Income Security Act

of 1774 (ERISA) 29 U.S.C. § 1001 *et seq*.

**OVERVIEW**

On August 28, 2021, Mr. Sewell, age 56, was rendered quadriplegic when he dove from

the back of a bay boat while anchored at a popular swimming spot in Aransas Bay, hitting an

unseen sandbar 2.5 feet deep. He and three business acquaintance friends had been fishing since

dawn, and stopped there to cool off with a swim. Mr. Sewell was a Commercial Property Claims

Adjuster for McLaren's (not a party) and a member of its accident insurance benefits plan (the

Plan). (D.E. 21-3, Page 127-129) [1] Defendant Lincoln insured the Plan.

Mr. Sewell, his wife Gaye, and their three children are eternally grateful that he survived

his tragic accident, though the grueling challenges of his resulting quadriplegia are unfathomable.

(See Exhibit 1, Sewell family photo demonstrating Mr. Sewell's wheelchair-bound quadriplegia.)

(D.E. 21-3, Page 139) As the family breadwinner earning $131,000 annually, Mr. Sewell had paid

---

[1] Citations are made to the Policy and administrative record, filed with the Court at Doc. 21.

premium for basic accident coverage of $264,000 plus optional coverage of $500,000 to protect them. (D.E. 21-4, Page 191; D.E. 21-5, Page 11)

Lincoln denied coverage under the following Policy exclusion:

"*any loss that is contributed to or caused by: ... the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred…*"

(D.E. 21-1, Page 33)

## FACTS

### The Fishing Trip, the Unseen Sandbar, and the Accident[2]

On August 28, 2021, Mr. Sewell, then age 56, was an able-bodied U. S. Navy Veteran, a proud, loving father and husband when he went on a fishing trip in Port Aransas, Texas with three similar-aged business acquaintance friends.  Mr. Sewell, Chris Boswell (Chief Commercial Officer for Morgan Stanley), Paul Boswell (Senior Vice President for Catalytic Claims), and James Fenn (Vice President Claims for Griston Claim Services) were on the water by around 6:30 a.m. in Mr. Fenn's boat. (D.E. 21-3, Page 127-129) They fished in tandem with another boat on which eyewitness Tiffany Weaver (Account Services Manager for Griston Claim Services), age 51 was fishing. (D.E. 21-3, Page 133-134) It was Mr. Sewell's first time in the area. (D.E. 21-3, Page 127-129)

After fishing, they had lunch at Woody's dockside restaurant in the early afternoon, then boated to a spot in Aransas Bay popular for anchoring and swimming to cool off.  Once anchored, Mr. Sewell watched several adults, including Ms. Weaver, jumping and diving from other boats

---

[2]The following facts about the fishing trip, the accident, the nature of Mr. Sewell's dive, his alcohol consumption, and his behavior, come from the undisputed affidavit testimony of Mr. Sewell (D.E. 21-3, Page 127-129), and the only eyewitnesses of record: Sewell boat occupants, James Fenn (D.E. 21-3, Page 131-132), Paul Boswell (D.E. 21-3, Page 135-136), and Chris Boswell (D.E. 21-3, Page 137-138); and also Tiffany Weaver (D.E. 21-3, Page 133-134), who fished from a boat that accompanied them.

anchored just 30 - 40 feet away, the same distance from shore as his boat, and swimming and wading in chest-deep to neck-deep water 4.5-5 ft. in depth. He decided to do the same. Removing his wallet and keys from his pockets, Mr. Sewell made a well-controlled dive out from the rear deck, 18 inches above the water, at an angle intended as a shallow dive. He didn't slip, stumble, or fall, and was in complete control of his actions. (D.E. 21-3, Page 127-129)

Unfortunately, the water was murky, and they couldn't see that where he dove from the rear of the boat was a shallow sandbar only 2.5 ft. deep, with a steep drop-off to the depth where others were seen diving, swimming and wading 4.5-5 ft. deep. (D.E. 21-3, Page 127-129)

Mr. Sewell struck his head on the bottom, was instantly paralyzed, and nearly drowned before his friends pulled him back aboard, calling 911 while rushing him to the dock. (D.E. 21-3, Page 127-129)

At the dock, Port Aransas EMS found Mr. Sewell lying on the rear bench seat of the boat unconscious, unresponsive, not breathing, appearing cyanotic (blue), with his friend holding a finger inside his mouth to keep his airway open. (D.E. 21-3, Page 140-142). "Unresponsive" remained his reported condition from 16:55 hours until 17:40 hours. (D.E. 21-3, Page 140) The report noted "unknown" for alcohol or drugs. (D.E. 21-3, Page 140) He was reported in cardiac arrest for six to eight minutes before being rushed to Corpus Christi Medical Center. (D.E. 21-3, Page 140-142) No mention is made in the EMS report or any medical records of Mr. Sewell smelling of alcohol. After suffering through long, brink-of-death inpatient hospitalization and rehabilitation, Mr. Sewell now suffers permanent quadriplegia. (D.E. 21-3, Page 89)

### Intoxication Did Not Cause or Contribute to Mr. Sewell's Accident

All aboard the Fenn boat testify that, along with breakfast, snacks, several bottles of water and Gatorade throughout the day in the August heat, 190-pound Mr. Sewell consumed no more than six beers, spread out over that day beginning about 9 a.m., until the time of the accident. Mr.

Sewell had brought a 12-pack of 12 oz. Yuengling Light beer aboard the boat. He only drank Yuengling Light beer. The other three men drank only from the Coors Light beer they had brought. (D.E. 21-3, Page 127-129) Mr. Sewell's six-beer consumption was further confirmed when Mr. Fenn cleaned out his boat several days after the fishing trip. He found six unopened Yuengling Light beers remaining from Mr. Sewell's 12-pack. (D.E. 21-3, Page 132) Nobody recalls Mr. Sewell consuming any alcohol at Woody's. (D.E. 21-3, Page 404-407) All agree Mr. Sewell did not exhibit any sign of being impaired at any time that day, and that he was in complete control of himself and his dive.

Mr. Sewell was unfamiliar with saltwater fishing or coastal Texas sandbars, this trip being his first time in this area, and one of the few times in his life saltwater fishing. (D.E. 21-3, Page 127-129) There were no signs or other visible warnings or indications of sandbars in the area or near the Fenn boat. Nor did anyone on the Fenn boat discuss sandbars or the water potentially being shallow before Mr. Sewell dove. The only visual sign suggesting the depth of the water to Mr. Sewell were others he saw diving from boats next to his, which happened without incident. (D.E. 21-3, Page 127-129)

Mr. Sewell was familiar with purposefully making shallow water dives from swimming in lakes, ponds, and rivers throughout his life, and the dive he made would not have resulted in striking the bottom had the water been 4.5 to 5 ft. deep as all indications suggested. (D.E. 21-3, Page 127-129)

Tiffany Weaver, who was acquainted professionally with the Fenn crew (D.E. 21-3, Page 133-134), testified:

> I spent the day of August 28, 2021, on a fishing boat with friends that fished in tandem with the boat owned by James Fenn and occupied by Tim Sewell, Paul Boswell, and Chris Boswell. The two boats followed each other around from fishing spot to fishing spot from early that morning until about 2:30 in the afternoon, when both boats went to dock at port Aransas water-side grill for lunch.

I sat for lunch with Tim Sewell and his boat mates, where we had nice conversation about the day, and decided to go anchor and swim in a popular bay area nearby to cool off.

We anchored next to James Fenn's boat, and our boat occupants were wading in the water chest to neck deep, in water four to five feet deep, next to our boat when Tim Sewell dove into the water. Before Tim Sewell dove, several other people from other boats had dived and jumped into the water, including me, and were in the water chest to neck deep. I saw Tim Sewell dive into the water. He stood on the rear deck of the boat, diving out from the boat, not down. He did not fall or lose his balance or anything like that, but was surefooted and had control of his movements. He would not have hit the bottom if the water had been chest or neck deep, or 4.5 to 5 feet deep where he dove. Where Tim entered the water there was a sandbar with water depth of only about 2.5 feet deep. This depth tapered steeply down a shelf to 4.5 or 5 feet deep where we saw others, including me, entering and wading in the water neck and chest deep. The water was murky, and the bottom could not be seen.

I have perfect recollection of that day. Throughout the day the boat I was on would anchor to fish close enough to the boat Tim Sewell was on to have conversation between occupants of both boats, and I ate lunch at the same table with Tim Sewell. Then the boat I was on was parked next to his where we anchored to swim. I interacted with Tim Sewell in conversation and observed him throughout the entire day. At no time on that day did Tim Sewell or anyone on either boat act, appear or show any signs of being intoxicated. Nobody, including Tim Sewell, appeared unsteady or lacking in judgment. Nobody, including Tim Sewell, spoke in a manner appearing intoxicated or affected at all by alcohol consumption at any time of that day. All were in complete control of their judgment and behavior.

Neither Tim Sewell, nor anyone else on James Fenn's boat drank more than 6 beers each during the course of the day. The idea that Tim Sewell's blood alcohol concentration was over .2 at the hospital strikes me as impossible, inaccurate, and contrary to everything I observed that day. I am well acquainted with James Fenn, Tim Sewell, Chris Boswell, and Paul Boswell. They are not youngsters who go boating to drink excessively. They are all professionals and perfect gentlemen in their mid to late 50's in age. I have never witnessed any of them drink excessively or appear intoxicated. This was just a typical, very relaxed and pleasant day of fishing shared among mature, responsible, professional friends.

(D.E. 21-3, Page 133-134)

Mr. Sewell and his eyewitnesses were all shocked to later hear that a hospital lab result came back as showing a blood-alcohol level of .22 mg/dL, stating the result could not possibly be correct, as Mr. Sewell had only consumed six of his Yuengling Light beers over the course of a

long day. (D.E. 21-3, Page 127-129) The inaccuracy of the lab result is explained below by Medical Toxicologist physician and expert, Dr. Thomas Arnold.

**Lincoln's Initial Claim Denial**

On January 27, 2023, Lincoln denied the claim, concluding that intoxication caused the accident. (D.E. 21-4, Page 165-167) The day before the denial, Lincoln had hired Dr. Millstein on January 10, 2023, to review the claim, and he completed his report the very next day, January 11, 2023. (D.E. 21-4, Page 168-170) Dr. Millstein's *Curriculum Vitae* (CV) demonstrates zero experience in Toxicology Medicine, his clinical experience ending in 2009, and his last 21 years spent consulting for Lincoln and Liberty Mutual on claims. (D.E. 21-3, Page 28-30)  His report notes the hospital serum lab result, and notes:

> With a blood alcohol level of 222 mg/dL Mr. Sewell would have experienced signs of severe intoxication with impairment in motor function—unsteadiness, incoordination; impaired vision, cognitive function, and judgment contributing to the spinal cord injury which caused quadriplegia…. **[The undisputed evidence contradicts the idea of any such behavior.]**

> Serious accidents due to diving into shallow water are rare but potentially devastating as in this case. The incidence of spinal cord injuries following these accidents has been reported to range from 1.2 and 21%. Misjudgments of the water depth **[which certainly happens without intoxication, as here]** and recklessness [sic] behavior have been cited as common factors in these accidents. Alcohol consumption is also important risk factor, thought to be contributory and 38 to 49% of cervical injuries in previously published series. **[This percentage range is for <u>all</u> cervical injuries. It is not confined to diving accidents, or even recreational aquatic accidents in general, and is still under 50%. To rely on this statistic to determine whether intoxication caused or contributed to <u>this</u> accident, under <u>our</u> facts, is speculative advocacy for Lincoln.]**

> Types of accidents associated with traumatic cervical spinal cord injury include motor vehicle crashes in sport related accidents - in particular, diving accidents. Numerous studies have shown that 50% of spinal cord injuries occur while victims are under the influence of alcohol. **[Again, this percentage range is for <u>all</u> spinal cord injuries, and is useless for determining whether any intoxication caused <u>this</u> accident under <u>our</u> facts.]** A 2004 study of persons who sustained spinal cord injury supported the association between alcohol use and cervical spinal cord injury specifically - the spinal cord injury type with the most

severe consequences. The study that [sic] demonstrated that participants with cervical injury were more likely to use alcohol when injured compared with participants without cervical injury. **[Again, this percentage range is for <u>all</u> spinal cord injuries, and is useless for determining whether any intoxication caused <u>this</u> accident under <u>our</u> facts.]**

(D.E. 21-4, Page 170-172) (Bold bracketed added.)

In its denial letter, Lincoln's said nothing about Dr. Millstein's report, his review, his opinion, or the statistics he recited as reasons for denying the claim. The denial letter simply recited the intoxication exclusion and concluded:

> The reports received for Mr. Sewell noted an Ethanol level of .222 mg/dL…. Therefore, there is a presence of alcohol in the Covered Person's blood in this claim. This raises the presumption that Mr. Sewell was under the influence of alcohol and contributed to the cause of his accidental dismemberment. The facts of this claim support this presumption. **[What facts? In truth, Lincoln had not bothered to gather any facts.]** Therefore, alcohol caused or, at a minimum, contributed to the cause of this accident.

(D.E. 21-4, Page 165-167) (Bold bracketed added.)

Thus, Lincoln and its general medicine physician concluded that the presence of alcohol "contributed to or caused" Mr. Sewell's accident based on: 1) a lab result; 2) statistics on the general effects of alcohol at given levels; and 3) their "presumption" that alcohol influence contributed to the cause of the accident. They reached this "presumption" despite admitting that 1) alcohol is involved in far less than 50% of cervical or spinal injuries in general; and 2) simple misjudgments of the water depth, as happened here, are a common cause of shallow dive accidents without <u>any</u> alcohol involvement. And they did so without any actual evidence from readily available eyewitnesses about how much alcohol Mr. Sewell had actually consumed that day, about whether he had exhibited any signs of intoxication, about his controlled behavior in performing the dive itself, or whether surrounding circumstances indicated that he was diving into 4.5-5 ft. deep water, rather than 2.5 ft. deep over a hidden sandbar.

**Plaintiff's May 16, 2023 Appeal Evidence**

On appeal (D.E. 21-3, Page 409-412), Mr. Sewell provided Lincoln with the above undisputed testimony about the accident date, along with the CV and April 28, 2023 Report of Dr. Thomas Arnold.

Dr. Arnold's CV demonstrates the following extensive experience in Toxicology Medicine:

> Diplomat, American Board of Medical Specialties Certified in Medical Toxicology (Subspecialty Board Certification) #22119, February 5, 1999 (re-certified 2009 and 2019); 2003 Fellow, American College of Medical Toxicology; Current Professor of Emergency Medicine, Department of Emergency Medicine, Section of Clinical Toxicology, Louisiana State University Health Sciences Center; Current Reviewer – Annals of Emergency Medicine; Current Reviewer – Journal of Toxicology – Clinical Toxicology; Current Reviewer – Journal of Medical Toxicology; Current EM 400 - Clinical Toxicology- Director for 15 Hour Course for all Fourth-Year Medical Students.

(D.E. 21-4, Page 65)

> Dr. Arnold further explained his qualifications and opinions as follows:

> I have served as the Chairman of the Department of Emergency Medicine at LSU Health Sciences Center in Shreveport, Louisiana since 2001. I am currently board certified in Emergency Medicine with sub-specialty board certification in Medical Toxicology. As Department Chairman, I currently administer and actively participate in an Emergency Medicine Residency Training Program with a current complement of 34 Emergency Medicine Residents enrolled.  As a practicing Emergency Physician and a teacher of future Emergency Physicians I consider myself qualified to render an opinion regarding matters of Emergency medicine, trauma and medical toxicology. Since 1994, I have served as the Medical Director of the Louisiana Poison Center. I presently maintain a consulting service for medical toxicology at LSU Health- Shreveport and am consulted routinely by physicians throughout the state of Louisiana regarding management of patients with drug, alcohol and toxin related problems. As a Medical Toxicologist, questions of drug, toxin, chemical exposures, substance abuse and addiction are commonly encountered….

(D.E. 21-3, Page 98-103)

After full review of the facts, the EMS record and all medical records, Dr. Arnold explained that the hospital's lab results "cannot possibly" be accurate, and further, that the facts cannot support that alcohol played any causal role in the accident. He opines:

> Most hospitals, as in this case, measure serum alcohol concentrations by enzymatic methodology, reporting results in mg/dL. This method does not measure alcohol directly but uses an indirect measurement of an enzyme involved in the metabolism of alcohol to estimate alcohol in a serum or plasma sample. It has long been known that certain conditions such as high levels of lactic acid in the blood can interfere with this enzymatic testing and cause a falsely elevated alcohol level. Conditions such as low tissue perfusion during cardiac arrest and CPR allow for the build-up of large amounts of lactic acid.

> In the legal system, alcohol is measured in whole blood samples and is reported in g/dL or grams%. This testing is usually by gas chromatography and is considered the "Gold Standard" for blood alcohol testing. This process is more time-consuming and expensive than the enzymatic hospital method, hence the reason most hospitals do not have the capability to measure whole blood alcohol with this gold standard testing. Hospitals use enzymatic testing to help treatment in situations where absolute accuracy is not required and do not have the degree of quality controls and chain of custody requirements that are demanded in the forensic, analytical and legal systems….

Dr Arnold explained that to produce an accurate lab result of above .2 mg/dL Mr. Sewell would need to consume "almost 18 individual beers during that day," and the lab inaccuracy due to lactic acid buildup in the blood was further supported by the <u>undisputed</u> facts. Four eyewitnesses who were with him the entire day reported that Mr. Sewell drank no more than six 12 oz. light beers and showed no signs of intoxication:

> By the report of the insurance companies own expert, Dr. Millstein, Timothy Sewell should have been exhibiting signs of "severe intoxication" which include lack of coordination, incoherent thoughts, confusion, nausea and vomiting. For this result to be credible, Timothy Sewell would have appeared significantly intoxicated to everyone around him. Yet no one with him in the boat reported even the slighted suggestion of intoxication. They describe the actions and behavior of someone completely in control of their balance, coordination, judgement and speech.

> It is certainly that after several minutes of cardiac arrest and CPR being performed, Timothy Sewell would have accumulated a large amount of lactic acid in his blood

that could explain this inaccurate reading on the hospital serum alcohol assay by simple interference with the measured enzyme.

For these reasons, I believe the hospital alcohol test cannot possibly be accurate and is therefore invalid. No claims of impairment can reasonably be made on such an egregiously flawed test.

Additionally, the evidence reviewed cannot reasonably support an opinion that alcohol consumption played a causal role in the accident or injury. To the contrary, all visual indications supported the belief that the water was 4 to 5 feet in depth, and that a controlled dive as described in the affidavits could be performed safely. No evidence reviewed contradicts the consistent statements made by multiple witnesses that there was nothing to indicate that the water was only 2.5 feet in depth where he dived. Lastly, the data cited in the Clinical Report by Dr. Robert P. Millstein reflect that shallow dive injuries are just as likely to occur without alcohol involvement.

This opinion is based on my education, training and experience as an emergency physician and medical toxicologist.

(D.E. 21-3, Page 98-103)

**Lincoln's June 7 and September 7, 2023 Addendum Reports of Dr. Peggy Geimer**

On June 7 and September 7, 2023 Lincoln's new internal medicine/occupational medicine Dr. Peggy Geimer, reviewed the claim for Lincoln. Dr. Geimer's CV demonstrates zero experience in Toxicology Medicine, and zero clinical experience of any kind for the last 35 years. (D.E. 21-3, Page 31-35) Like Lincoln's Dr. Millstein, she notes some general effects from various blood alcohol levels, some general statistics regarding alcohol and accidents, and concludes that Mr. Sewell was intoxicated and his intoxication contributed to the accident. (D.E. 21-4, Page 9-14) Following are pertinent parts of her addendum report (D.E. 21-3, Page 83-90), with <u>underlining</u> and **[bold bracketed]** comments added by the undersigned for continuity and perspective:

While blood alcohol concentrations (BAC) most often refer to serum ethanol (alcohol) concentrations… [and] may be used and are somewhat lower because serum and plasma contain more water than whole blood… <u>Dr. Arnold also proposed that the claimant's BAC was closer to 0.219 grams% at the time of his injury by using generally accepted population average of alcohol metabolism.</u> **[The underlined portion grossly misstates Dr. Arnold's opinion. Dr. Arnold was**

**clear that this <u>would have</u> been the alcohol level <u>if</u> the hospital serum test were accurate, and equally clear that it could not have been accurate.]** I have no disagreement with his calculations. However, I disagree with Dr. Arnold's statement that "serum alcohol level reported at the hospital cannot possibly be accurate." <u>The results were never question [sic] by the treating providers and multiple physicians included the [sic] "Alcohol intoxication" and "ETOH intoxication" in their impression of the claimant's acute medical problems. There [sic] hospital's testing laboratory is required to follow strict guidelines in their testing. There is no evidence that the hospital's testing was flawed</u>. **[The underlined portion lacks the significance that Dr. Geimer and Lincoln pretend. The medical record specifies that this history came from the hospital lab result alone, noting that Mr. Sewell was intubated with no family member present. (D.E. 21-3, Page 190) This was mere recognition of that lab result. Nothing in the EMS or hospital records even mentions the smell of alcohol.]** Dr Arnold stated that the claimant would have accumulated large amounts of lactic acid in his blood that impacted the hospital serum alcohol assay. The initial hospital testing showed only mild acidosis on arterial blood gas testing (ABG) and lactic acid testing was not performed. Lactic acidosis is not mentioned anywhere in the submitted medical records nor did the claimant receive any of the medications typically used in the treatment of lactic acidosis. **[Dr. Arnold addresses why Dr. Geimer's posited logic regarding acidosis is flat wrong the field of Toxicology Medicine below.]…**

Blood alcohol concentrations above 0.16% cause major loss of balance, coordination, reaction time, attention to task and impairment in visual and auditory information processing. **[The record is undisputed that Mr. Sewell did not exhibit any of this.]**

<u>The presence of alcohol in Mr. Sewell's blood caused or contributed to the accident which resulted in his cervical spine injury because it affected his judgment regarding safety and the dangers of diving into water of uncertain depth.</u> **[Common sense and case law, cited below, deems Dr. Geimer's and Lincoln's methodology of leaping from the general effects of a given blood-alcohol level, even assuming undisputed intoxication at the given level (although highly disputed here), to a finding of causation without consideration of the facts, is improper speculation.]**

<u>It should be noted that the claimant swore that he made a shallow dive into the water (less than a 45-degree angle). In affidavits from May 2023, three witnesses swore that the claimant dove "straight out from the boat, not in a downward direction." However, in Port Aransas EMS Patient Care Report dated 8/28/21, it was noted that witness on the boat with the claimant advised them that they watched the claimant perform a headfirst dive into shallow water…</u> **[Dr. Geimer is obviously trying so hard to help Lincoln, but this is nonsensical advocacy. A dive is, by definition, headfirst entry, regardless of how vertical or flat the**

**degree of its angle in relation to the water. No inconsistency in the dive descriptions exists here.]…**

Misinterpretation of the depth of water, careless behavior and alcohol consumption are risk factors for these accidents. In fact, alcohol use is involved in up to 70% of deaths associated with water recreation, like boating or swimming; nearly 25% of ED visits for drowning and 20% of boating deaths. **[What do drowning and boating deaths have to do with our quadriplegia diving injury or unique facts?]…** Mr. Sewell acknowledged drinking beer on the boat during the day of his accident, this was confirmed by others. The claimant swore that he drank no alcohol during his lunch at the Woody's Sports Center. However, Mr. Sewell's serum alcohol concentration was 0.222% on hospital admission…. **[Prevailing case law, cited below, deems Dr. Geimer's and Lincoln's methodology of leaping from the general statistics, <u>even assuming undisputed intoxication</u> (although highly disputed here), to a finding of causation without consideration of the facts, is improper speculation.]**

[Dr. Arnold's] <u>comments regarding the validity of the hospital's alcohol testing results are in question as well as they appear to be based primarily on statements from individuals on the boat that Mr. Sewell did exhibit not [sic] "signs of severe intoxication". As mentioned above, Mr. Sewell's doctors made and documented in the record the diagnosis of alcohol abuse with intoxication casting doubt on the opinion of lay bystanders</u>… **[First, Dr. Geimer's suggestion that she is quoting witness testimony that Mr. Sewell "did exhibit not [sic] signs of <u>severe</u> intoxication" is misleading. <u>Every</u> witness testified that Mr. Sewell exhibited <u>no</u> signs of <u>any</u> intoxication, and that his dive was deliberate and perfectly controlled. <u>No</u> evidence in the record disputes this. And again, the doctors' notations in the ER record of "alcohol abuse with intoxication" were obviously mere recognition of the serum lab result, carried forward in other notes. Nobody disputes the presence of that lab result in the record. Its accuracy is the issue, and the only Medical Toxicologist opinion of record, that of Dr. Arnold, concludes that it cannot be accurate. Thus neither the lab result nor the ER doctors' notation of it can cast any "doubt" on undisputed witness factual recollection of Mr. Sewell's undisputed behavior that day or the circumstances of his dive. Even if it could, "casting doubt" cannot carry Lincoln's burden of <u>proof</u> not only of being under "influence" but also that it caused or contributed.]**

(D.E. 21-3, Page 83-90)

### Lincoln's September 26, 2023 Denial on Appeal

On September 26, 2023, Lincoln denied Plaintiff's appeal, adopting the opinions of Drs.

Millstein and Geimer, and finding that alcohol contributed to the accident. (D.E. 21-3, Page 51-

60) Lincoln expressly based its appeal denial, at least in part, on a critical and inaccurate understanding, or mischaracterization, of the undisputed facts of the record, and as found by Dr. Arnold. Lincoln stated in its appeal denial:

> Further the clinical review by Dr. Geimer indicated [that Dr. Arnold's] comments regarding the validity of the hospital's alcohol testing results are in question as well as they appear to be based primarily on statements from individuals on the boat that Mr. Sewell did exhibit "signs of severe intoxication."

(D.E. 21-3, Page 56)

Nothing in the record supports Lincoln's idea that "individuals on the boat" suggested that Mr. Sewell exhibited "signs of severe intoxication." All eyewitness testimony is to the contrary, as set forth above. Lincoln's complete mischaracterization of these critical facts alone renders its claim denial arbitrary and capricious.

Lincoln's appeal denial letter was Plaintiff's first awareness of Dr. Geimer's report commenting negatively on Dr. Arnold's opinion. Accordingly, Plaintiff requested the claim file to obtain her full report for Dr. Arnold's review and comment. The following sequence then transpired:

| | |
|---|---|
| 10/3/23 | Plaintiff requests the claim file from Lincoln. (D.E. 21-3, Page 39) |
| 10/16/23 | Lincoln sends Plaintiff a letter attaching its policy and claim file. (D.E. 21-3, Page 37) |
| 11/17/23 | Dr. Arnold reviews Dr. Geimer's new addendum report, and issues his own addendum report responding to it. (D.E. 21-3, Page 24) |

**Dr. Arnold's November 17, 2023 Response to Dr. Geimer's Addendum Report**

Responding to Lincoln's Dr. Geimer, Dr. Arnold's November 17, 2023 response report states:

> As to the matter of the lactic acidosis, Dr. Geimer states correctly that lactic acid testing was not performed on Mr. Sewell. I would suggest that just because it was not tested for, in no way proves it was not present and had the blood been tested for

lactic acid, there is no question it would have shown a significant level. Lactic acid is produced any time there is under perfusion of body tissues. The EMS providers on the scene reported that Mr. Sewell was in cardiac arrest for 6 to 8 minutes before return of spontaneous circulation. There is no question that after 6 to 8 minutes of CPR, there would be large amounts of lactic acid produced and present in his blood. But, this lactic acidosis would not have persisted indefinitely, in fact, his body would have begun clearing the lactic acid buildup as soon as he regained a spontaneous heartbeat and adequate blood pressure. Dr. Geimer wrongly assumes that since hospital testing only showed a mild acidosis that the presence of lactic acid was precluded. In fact, it is not uncommon for large lactic acid levels to be present without significant acidosis of the blood. There are so many other factors that are involved in acid-base status that a simple direct correlation of lactic acid to blood pH does not exist. Blood pH is very sensitive to ventilation rate and respiratory status and a severe acidosis can easily be corrected with a few minutes of hyperventilation. The mild (pH 7.3) acidosis therefore in no way precludes the presence of a large amount of lactic acid present in Mr. Sewall's blood at the time of the serum alcohol testing.

Dr. Geimer also reports that Mr. Sewell did not *"receive any of the medications typically used in the treatment of lactic acidosis".* This statement is patently false as Mr. Sewell received aggressive Advanced Cardiac Life Support (ACLS) at the scene with 6-8 minutes of CPR. He received IV fluids and the hospital record repeatedly shows Mr. Sewell being on vase-active presser agents to support low blood pressure and increase tissue perfusion. All of these interventions treat lactic acidosis so the claim that Mr. Sewell did not receive treatment for lactic acidosis cannot be supported.

Dr. Geimer stated that *'There (sic) hospital's testing laboratory is required to follow strict guidelines in their testing."* I agree with this sentiment completely and the hospital laboratory is very careful to point out the limitations of its testing results. Review of the hospital lab results will show footnotes at the end of almost every report. The purpose of these footnotes are to guide the clinician in how to best interpret and utilize the results…. the footnote regarding the serum alcohol testing result noted on page 110 of 204 in the hospital record clearly states:

- **"RESULTS ARE FOR MEDICAL PURPOSES ONLY AND NOT FOR LEGAL OR EMPLOYMENT EVALUATIVE PURPOSES."**

The sole reason for this statement is that the hospital knows full well the limitations of this assay and are not confident in its accuracy. The hospital laboratory reports this disclaimer with every serum alcohol result. It clearly understands the limitations and multiple likely situations that can lead to a false result. If the validity of this test was trustworthy and accurate, there would be no need for such a strong and emphatic disclaimer statement. Notice that this disclaimer does not exist for any of the other test results reported by this laboratory. If the laboratory reporting the result has no confidence in this result, neither should anyone else. Nor should it

be relied upon when not supported by the facts of the situation or known human physiology….It therefore continues to be my conclusion that the serum alcohol test performed on Mr. Sewell cannot be accurate for the many reasons previously stated and in no way can be regarded as reliable. This opinion is based on my education, training and experience as an emergency physician and medical toxicologist.

(D.E. 21-3, Page 24-27)

### Lincoln Refuses to Consider Dr. Arnold's November 17, 2023 Response to Dr. Geimer's Addendum Report

The following sequence then took place:

11/17/23    Plaintiff submits Dr. Arnold's addendum report to Lincoln to consider. (D.E. 21-3, Page 22)

11/22/23    Lincoln sends letter to Plaintiff declaring that it will not. (D.E. 21-3, Page 23)

11/30/23    Plaintiff files suit. (Doc. 1)

2/1/24    Lincoln Answers. (Doc. 6)

3/5/24    Plaintiff and Lincoln jointly move for entry of a Scheduling Order with opening briefs due on 6/16/24. (Doc. 8)

3/6/24    Court enters the Scheduling Order that Plaintiff and Lincoln jointly requested. (Doc. 9)

On May 15, 2024, thirty days before the agreed opening brief deadline, Lincoln filed a Motion to Extend Briefing Deadline to conduct an additional administrative review to consider and respond to Dr. Arnold's report that it had expressly refused to consider six months earlier before suit was filed. The Court granted Lincoln's motion over Plaintiff's opposition. [3]

Lincoln then had a new physician, occupational medicine Dr. Robert Swotinsky, review the case. (D.E. 21-5, Page 114-119) Dr. Swotinsky's practice has involved "medical evaluations

---

[3] Plaintiff maintains his objection to the Court considering any physician report or other evidence not made part of the administrative record prior to Plaintiff filing suit on November 30, 2023, including any expert report or opinion by Lincoln's Dr. Swotinsky, for the reasons set forth in his Motion to Reconsider and Sur-reply Memorandum to Lincoln's Motion to Extend Briefing Deadline (Docs. 13, 16), adopting those reasons by reference here. While preserving that issue for appeal, Plaintiff addresses why Lincoln's untimely physician claim reviews cannot support its denial.

for insurers" for the past eleven years. (D.E. 21-5, Page 93-103) Despite his lack of toxicology expertise, his June 3, 2024, report rejects Dr. Arnold's opinion regarding lactic acid and inaccurate lab results by ignoring the EMS record. On the separate issue of causation, he summarily dismisses the undisputed testimony of all eyewitnesses on alcohol consumption, Mr. Sewell's sober behavior, and all indications suggesting his dive could be made safely. Instead, he reverts back to Dr. Millstein's and Dr. Geimer's leap from statistics to a finding of causation as if our undisputed factual record did not exist. He says: "Without regard to overlapping ranges, a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries." (D.E. 21-5, Page 119)

### On June 24, 2024, Dr. Arnold Responded to Dr. Swotinsky's Report as Follows:

Dr. Swotinsky states my exact point that that the consumption of six beers over seven hours prior to the accident cannot explain the serum alcohol level reported by the hospital. He also states that people tend to underestimate their alcohol consumption, but he completely omits the sworn affidavits of five other individuals listed in my original report who corroborate Mr. Sewell's account of his alcohol consumption that day….

Dr. Swotinsky would like to change the facts that were documented by the EMS providers on the scene and state that Mr. Sewell never experienced a cardiac arrest. The record very clearly states that he was in cardiac arrest at the time of their arrival, and he was down 3 minutes before CPR was started. Compressions were begun at 16:50 and return of spontaneous circulation (ROSC) was obtained at 16:55. That five minutes plus the three minutes before CPR was started equals 8 minutes in cardiac arrest. They also record the initial ECG rhythm as Pulseless Electrical Activity (PEA). This is verification that Mr. Sewell was pulseless at that time. No reasonable physician or informed layperson who reviews this EMS chart can conclude that Mr. Sewell did not suffer a cardiac arrest. To ignore the clear documentation of this EMS record is intellectually disingenuous….

Dr. Swotinsky states in his own report, "Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase." In addition, several of the references he listed discuss the possibility of this phenomenon occurring.

The hospital test does NOT directly measure alcohol in the blood. The simple explanation is that the hospital enzymatic test for alcohol in the serum measures a co-factor that is produced when alcohol is metabolized to acetaldehyde. This co-factor is called NADH. It is universally accepted that there are other compounds, illnesses and situations that can produce NADH that have nothing to do with alcohol metabolism. One of these compounds is lactic acid which is produced in situations of tissue hypoxia as would occur during a cardiac arrest event. When lactate is converted to pyruvate by the enzyme lactate dehydrogenase, NADH is produced. The hospital test has no way to differentiate NADH produced from alcohol metabolism or from lactate metabolism. This is the basis for my contention that Mr. Sewell's test was erroneous…. [references supporting medical literature]

He also criticizes me for not quantifying the amount of alcohol elevation is attributable to the lactic acid. The fact is that there is no linear relationship for this interference so no estimations can be made. The result is spurious and therefore unreliable…

Dr. Swotinsky misinterprets a very clear medical record documented by medical professionals who were at the scene and documenting the events at the time they occurred. The EMS record clearly documents that Mr. Sewell had a "CARDIAC ARREST". This contention otherwise should be viewed as a Hail Mary Pass by Lincoln Financial to attempt to suggest that lactic acid could not have been present because they know and fully understand that there is a problem with this alcohol test when lactic acid is present….

The matter of the clear disclaimer in the medical record that "Results are for medical purposes only and not for legal or employment purposes." As I have already stated, this disclaimer is present because the labs and hospitals know that this type of testing is subject to error and misapplication. This statement is a clear pronouncement that they are aware of the significant issues related to this type of testing and cannot stand behind the results as being valid or accurate….

My point is that Mr. Sewell did not have these levels of alcohol in his system at the time of the accident. It was the build-up of lactic acid from 8 minutes of low or no circulation that resulted in a spurious result on the hospital serum alcohol assay.

**Finally, I address the issue of whether alcohol was a "contributing cause" of Mr. Sewell's accident. Even if one were to assume that Mr. Sewell had a BAC of 0.22 at the time of the accident, the undisputed facts still could not support a finding that alcohol played any contributing role in causing the accident.**

**Accepted scientific methodology is fact based, not speculation based. The undisputed facts, attested to by multiple witnesses, are that Mr. Sewell exhibited no signs of intoxication, and made a perfectly controlled, outward dive from a boat, which is exactly what others were observed doing in close proximity from other boats, then witnessed wading and swimming in chest-deep water. There were no visual indications that the water was dramatically shallower where Mr. Sewell dove. Thus, there is nothing fact-based in the record to support the idea that any diminished judgment or other alcohol effect played any part in the decision to dive or the tragic accident.**

**Dr. Swotinsky's leap from generalities regarding impaired judgment to his claimed "contributing factor" conclusion is based upon pure speculation that has no support in the undisputed evidence. His scientific methodology is flawed and not appropriately applied. Likewise, previous statements presented by insurance company experts noting the percent of water-recreation accidents that involve alcohol are inadequate to support an opinion that alcohol was a "contributing cause." The mere fact that a given percentage of cervical injuries or water-recreation accidents may involve alcohol cannot support the conclusion that alcohol contributed to Mr. Sewell's accident. All available evidence is to the contrary….**

It should also be noted that I do not advertise my services as an expert witness, nor am I affiliated with any organization that solicits cases for me. I took on this case because I saw a miscarriage of justice being attempted on a helpless individual and family.

(D.E. 21-5, Page 50-55) (Emphasis added.)

On August 2, 2024, Lincoln again denied Mr. Sewell's appeal (D.E. 21-5, Page 30-43), finding that the hospital lab result "demonstrated a significantly elevated blood alcohol level, which would have resulted in impairments, including but not limited to judgement and perception, that caused or contributed to the accident that resulted in his quadriplegia." (D.E. 21-5, Page 42)

### ARGUMENT AND LAW

**The Administrative Record is Limited to the Evidence Lincoln Considered, and Had Opportunity to Consider, Before Plaintiff Filed Suit**

The evidence considered in review of an ERISA benefits denial under section 502(a)(1)(B) is confined to the administrative record. *Vega v. National Life Insurance Services, Inc.*, 188 F.3d

287, 299 (5th Cir.1999) (en banc), abrogated on other grounds by *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

In *Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 393 (5th Cir. 2006), the Fifth Circuit, citing *Vega*, stated: "Aetna was required to develop its factual record at the administrative level. *See Vega,* 188 F.3d at 302." *Id.,* at 397. The *Robinson* Court further stated: "We declined a remand to allow the administrator "another opportunity to make a record" because "each of the parties" must "make its record before the case comes to federal court." *See Vega,* 188 F.3d at 302 n. 13. For the same reason, we believe that remand is inappropriate here." *Id.,* at 397, n.5

Fifth Circuit case law holds that if a claimant submits additional information or evidence to the administrator in a manner that gives the administrator a fair opportunity to consider it and to reconsider its decision denying benefits, that additional information becomes part of the administrative record.  More specifically: The Fifth Circuit, sitting *en banc*, spoke clearly in *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287 (5th Cir.1999) (*en banc*). No dissents, no concurrences, the decision was unanimous:

> **We hold today** that the administrative record consists of relevant information made available to the administrator **prior to the complainant's filing of a lawsuit** and in a manner that gives the administrator a fair opportunity to consider it. Thus, if the information in the doctors' affidavits had been presented to National Life **before filing this lawsuit** in time for their fair consideration, they could be treated as part of the record.[FN10] Furthermore, in restricting the district court's review to evidence in the record, we are merely encouraging attorneys for claimants to make a good faith effort to resolve the claim with the administrator before filing suit in district court; we are not establishing a rule that will adversely affect the rights of claimants.

> FN10. Because there is no evidence in either the administrative record or the record before the district court to support the Vegas' contention that they presented the information in the doctors' affidavits to National Life, we cannot treat this information as part of the record.  **However, had the Vegas demonstrated to the district court that the information in the doctors' affidavits was presented to the administrator, the district court should have treated that information as part of the record.**

*Vega*, at 300 (emphasis added).

The *Vega* Court further explained:

> **Our motivating concern here is that our procedural rules encourage the parties to resolve their dispute at the administrator's level.**  If a claimant believes that the district court is a better forum to present his evidence and we permit the claimant to do so, the administrator's review of claims will be circumvented.  This result is plainly contrary to *Bruch*, which requires us to apply an abuse of discretion standard of review.  Although we recognize that there is a concern that a self-interested administrator can manipulate this process unfairly (e.g., by permitting the administrator to exclude from the record information that would weigh in favor of granting the claim), we think that this concern is largely unwarranted in the light of adequate safeguards that can be put in place.
>
> **Before filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.**  In *Moore*, we said that Awe may consider only the evidence that was available to the plan administrator in evaluating whether he abused his discretion in making the factual determination. *Moore, 993 F.2d at 102.*  **If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record.  *See, e.g., Wildbur*, 974 F.2d at 634-35.  Thus, we have not in the past, nor do we now, set a particularly high bar to a party's seeking to introduce evidence into the administrative record.**

*Vega*, at 300 (emphasis added).

In *Estate of Bratton v. National Union Fire Insurance Company of Pittsburgh, P.A.*, 215 F.2d 516 (5th Cir.2000), the Fifth Circuit reaffirmed its *en banc* holding in *Vega*, stating again:

> The plan administrator has the obligation to identify the evidence in the administrative record **and the claimant must be afforded a reasonable opportunity to contest whether that record is complete.**  *See Vega v. National Life Ins. Services*, 188 F.3d 287, 295, 299 (5th Cir.1999) (en banc) (citing *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201-02) (5th Cir.1997)).  Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim.  *See id.* At 299.[FN5] **Thus, the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.**  *See id.*  If an administrator has made a decision denying benefits when the record does not

support such a denial, the court may, upon finding an abuse of discretion on the administrator's part, award the amount due on the claim and attorney's fees. *See id.* At 302 (citing *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.1992)).

FN5. **Further, as a safeguard against possible abuse or mistake, the claimant's lawyer may add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.** *See Vega*, 188 F.3d at 300. **If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record.** *See id.* at 300 (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 634-35 (5th Cir.1992)).

*Id.*, at 521 (emphasis added).

Here, before filing suit, Mr. Sewell provided Lincoln with Dr. Arnold's November 17, 2023, report. Lincoln chose to expressly refuse to consider it. Thus, as in *Robinson*, Lincoln denied Plaintiff's claim and appeal after fully developing its factual record to its own satisfaction. Lincoln's September 27, 2023 appeal denial was Plaintiff's first exposure to Lincoln's expert physician, Dr. Geimer's September 7, 2023 commentary on Dr. Arnold's opinion and report. Plaintiff immediately sent an October 3, 2023 claim file request to Lincoln, Lincoln sent the claim file by letter dated October 16, 2023. Plaintiff's response to Lincoln with Dr. Arnold's brief explanation of disagreement with Dr. Geimer was sent to Lincoln just a month later on November 17, 2023 with request and full opportunity to consider it and reconsider its denial exactly as *Vega*, *supra*, contemplates, deeming it part of the administrative record by law.

Plaintiff did not file suit until after Lincoln <u>expressly</u> refused to consider it. Under the above Fifth Circuit precedent, Dr. Swotinsky's reports and opinions should not be considered part of the administrative record or considered by the court. If Lincoln is permitted to first refuse to consider evidence reasonably offered by a claimant before filing suit as contemplated by *Vega,* then permitted to halt Plaintiff's right to court review just days before it is scheduled to take place,

to <u>now</u> consider that very same evidence, then *Vega* and *Robinson* would be rendered meaningless, and insurers would be encouraged to behave similarly.

**Lincoln's Denial is Reviewed by the Court *De Novo***

When an ERISA plan lawfully delegates discretionary authority to the plan administrator, court review assesses whether the administrator abused its discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Absent a lawful delegation clauses, the Supreme Court holds: "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard." *Id. Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 247 (5th Cir. 2018).

The standard of review for this case is *de novo*, because Texas law prohibits discretionary clauses under section 1701.062 of the Texas Insurance Code. *See  Koch v. Metropolitan Life Ins. Co.*, Civil Action No. 7:18-cv-00154-O, 2019 WL 6329383 *4 (N.D. Tex. Nov. 26, 2019) (finding that "the Texas Insurance Code prevents application of the Plan's discretionary clause"); *Woods v. Riverbend Country Club, Inc.*, 320 F.Supp.3d 901, 909 (S.D. Tex. 2018) (finding the plan's discretionary clause unenforceable under Texas law). In fact, parties litigating ERISA cases in Texas commonly agree on the *de novo* standard of review. *E.g., Brandt v. Unum Life Ins. Co. of America*, 377 F.Supp.3d 683, 691 (S.D. Tex. 2019) (applying *de novo* standard where Defendant conceded in its briefing that a *de novo* standard should be applied); *Pike v. Hartford Life and Accident Ins. Co.*, 368 F.Supp.3d 1018, 1028-29 (E.D. Tex. 2019) (parties agreed that *de novo* standard applied); *Chavez v. Standard Ins. Co.*, Civil Action No. 3:18-CV-2013-N, 2019 WL 1767000 *2 (N.D. Tex. Apr. 22, 2019) (parties agreed that *de novo* standard applied).

Under *de novo* review, the Court must "determine whether the administrator made a correct decision." *Pike, at* 1030 (quoting *Niles v. Am. Airlines, Inc.*, 269 Fed. Appx. 827, 832 (10th Cir.

2008)). "[T]he Court's 'job is to make [its] own independent determination of whether [the claimant] was entitled to the ... benefits. The correctness, not the reasonableness, of [the] denial of ... benefits is [the Court's] only concern....'" *Mantica v. Unum Life Ins. Co. of Am.*, No. CV RDB-18-0632, 2019 WL 1129438, at \*7 (D. Md. Mar. 12, 2019) (quoting *Weisner*, 192 F.Supp.3d at 613 (quoting *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013))). The *de novo* standard gives no deference to the plan administrator. *Gluth v. Fed. Home Loan Mortg. Corp. Long–Term Disability Plan*, Civ. No. 1:11-cv-1126, 2013 WL 246897, at \*4 (E.D. Va. Jan. 17, 2013) *aff'd*, 548 Fed. Appx. 73 (4th Cir.2013) (mem.). *Pike*, at 1035.

### However, Lincoln's Denial Fails Abuse of Discretion Review as Well; Deference Under Abuse of Discretion Review is Not Abject, and Substantial Evidence Does Not Support Lincoln's Denial

### Deference Under ERISA's Abuse of Discretion Review is Not Abject

When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion [absent some exception]. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Ariana M. v. Humana Health Plan of Texas, Inc.,* 854 F.3d 753 5th Cir. 2017), on reh'g *en banc*, 884 F.3d 246 (5th Cir. 2018) the Fifth Circuit court stated: "A plan administrator abuses its discretion if it acts 'arbitrarily or capriciously.' *Truitt v. Unum Life Ins. Co. Of Am.*, 729 F.3d 497, 508 (5th Cir.2013) (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir.1999))." "A decision is arbitrary and capricious only if it is 'made without a rational connection between the known facts and the decision or between the found facts and the decision.'" *Id*. (quoting *Meditrust*, 168 F.3d at 215). "**In addition to not being arbitrary and capricious**, the plan administrator's decision to deny benefits must be supported by substantial evidence." *Anderson*, 619 F.3d at 512. "Substantial evidence is more than

a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Corry v. Liberty Life Assurance Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004)). *Id.*, at 758 (emphasis added).

In other words, "An abuse of discretion occurs when 'the decision is not based on **evidence**, even if disputable, that **clearly** supports the basis for its denial.' *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir.2009) (internal quotation marks and citations omitted)." *Firman v. Life Ins. Co. of North America,* 684 F.3d 533, 539 (5th Cir. 2012) (emphasis added).

In *Napoli v. Johnson & Johnson, Inc.*, 624 F.Appx. 861, 863-864 (5th Cir.2015), the court explained:

> In the seminal case of *Vega v. National Life Insurance Services, Inc.*, we explained that "we will not countenance a denial of a claim solely because an administrator suspects something may be awry." 188 F.3d 287, 302 (5th Cir.1999) *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343 141 L.Ed.2d 299 (2008). Although we owe deference to an administrator's *reasoned* decision, **"we owe no deference to the administrator's unsupported suspicions. Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion."** (Emphasis added.)
>
> Thus, "[a]n administrator's factual determinations will be reviewed with "due deference [to the extent they] reflect a reasonable and impartial judgment."[4] Stated another way, "[d]eferential review is not no review; deference need not be abject."[5] "Innuendos and hints" supportive of a denial are not enough. *Vega*, at 302.

---

[4] *Pierre v. Connecticut General Life Insurance Co.,* 932 F.2d 1552, 1563 (5th Cir.1991).
[5] *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir.1996) (emphasis added).

**Lincoln's Conflict of Interest and Conduct Must Be Considered Under Abuse of Discretion Review**

In *White v. Life Ins. Co. of N. Am.,* 892 F.3d 762 (5th Cir. 2018), *as revised* (June 14, 2018), the Fifth Circuit explained that under abuse of discretion review:

> "In reviewing the plan administrator's decision, we 'take into account ... several different considerations.' " *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (quoting *Glenn*, 554 U.S. at 117, 128 S.Ct. 2343). Such considerations "are case-specific and must be weighed together before determining whether a plan administrator abused its discretion in denying benefits." *Id.*....When, as here, the insurer of the plan also determines whether the claimant is entitled to benefits, a conflict of interest arises. <u>*Glenn*, 554 U.S. at 108, 128 S.Ct. 2343</u>.... Thus, our task is determining the weight to give to LINA's conflict of interest in the overall review of the administrator's decision. *See <u>id.</u>* "[C]onflicts are but one factor among many that a reviewing judge must take into account." <u>*Schexnayder*, 600 F.3d at 470</u> (quoting <u>*Glenn*, 554 U.S. at 116, 128 S.Ct. 2343</u>). A conflict of interest, such as the one in this case, "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." <u>*Glenn*, 554 U.S. at 117, 128 S.Ct. 2343</u>....

*Id*., at 767.

Additionally, in a close case, the conflict can act as a "tie-breaker" for finding abuse of discretion, and an insurer's "procedural unreasonableness" can warrant the reversal of a denial even if substantial evidence does support it. *Id*. See also *Truitt v. Unum Life Ins. Co. of Am.,* 729 F.3d 497, 509-510 (5th Cir. 2013); *Schexnayder v. Hartford Life & Accident Ins. Co.,* 600 F.3d 465, 469 (5th Cir.2010).

**Lincoln Bears the Burden of Proof That the Facts Trigger its Exclusion**

An ERISA insurer bears the burden of proving that a policy exclusion applies to prevent coverage. See, Couch on Insurance, Principles Applicable to Group Insurance; ERISA Actions §254:16 (3rd Ed.) (in ERISA actions, "if the insurer claims that a specific exclusion applies, the insurer has the burden to prove its applicability"); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

**The Record Does Not Contain Substantial Evidence That Mr. Sewell's Quadriplegia was "Contributed To or Caused By the Presence of Alcohol" in Mr. Sewell's Blood**

The Court need not even reach the more complex issue of the accuracy of the lab result, although the facts and reports of Dr. Arnold clearly demonstrate that it cannot be accurate.[6]

The reason: Even if the Court were to find the record adequate to support Lincoln's reliance on the lab result to find Mr. Sewell under alcohol "influence", its exclusion independently requires substantial record evidence that Mr. Sewell's loss, that is, his quadriplegia was "contributed to or caused by" such a level of alcohol, which the Fifth Circuit defines as a "but for" cause, as in but for the presence of alcohol, the accident loss could not have occurred.

The record does not contain substantial evidence of causation between alcohol and the accident. It contains none. In a matter of first impression, the Fifth Circuit in *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 355-356 (5 Cir. 2015), interpreted "caused by or contributed to by" language in an analogous exclusionary clause to mean "but-for cause" it defined as a "cause without which the event could not have occurred." George involved an exclusionary provision limiting disability benefits to twenty-four months if "caused by or contributed to by mental or nervous disorders..." Since the George plaintiff had both physical and mental disabilities, the court reasoned that the limitation applied only if, in the absence of his mental issues, his disability could not have occurred.

---

[6] The hospital's serum lab result was inherently unreliable, unsuitable for use in legal proceedings, and "cannot possibly be" accurate due to the buildup of lactic acid in Mr. Sewell's blood, as Dr. Arnold, the only Medical Toxicology expert in this record explained in detail above. Thus this record, taken as a whole, does not contain substantial evidence to reasonably support Lincoln's conclusion that Mr. Sewell even had the alcohol level in his blood which would raise a presumption that he was "under the influence of alcohol and contributed to the cause of the accident" under Texas law (where the accident occurred) as Lincoln's exclusion requires.

Thus, Lincoln's exclusion is narrower than the common broader exclusions found in other policies, that exclude an accident or loss simply because it occurs <u>while</u> an insured is intoxicated without regard to causation between the intoxication and the loss, although insurers do commonly write exclusions that way. (*See, e.g.*, *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 328 (5th Cir. 2014)(Policy excluded losses suffered when "[O]perating any type of vehicle <u>while</u> under the influence of alcohol… Under the influence of alcohol, for purposes of this exclusion, means intoxicated, as defined by the law of the state in which the Covered Accident occurred."); *Papotto v. Hartford Life & Acc. Ins. Co.*, 731 F.3d 265, 267–68 (3d Cir. 2013): "The Policy states that losses caused or contributed to by an "Injury sustained <u>while</u> Intoxicated" are excluded…. The Policy defines "Intoxicated" as when the insured's "blood alcohol content" or "the results of other means of testing blood alcohol level ... meet or exceed the legal presumption of intoxication, or under the influence, under the *268 law of the state where the accident occurred."…) In contrast, under Lincoln's exclusion here, the loss must be "contributed to or caused by" a presence of alcohol.

The undisputed facts of record negate any reasonable conclusion of such causation. Mr. Sewell watched several adults, including Ms. Weaver, jumping and diving from other boats anchored just 30 - 40 feet away, the same distance from shore as his boat, and swimming and wading in chest-deep to neck-deep water 4.5-5 ft. in depth. He decided to do the same. Removing his wallet and keys from his pockets, Mr. Sewell made a well-controlled dive out from the rear deck, 18 inches above the water, at an angle intended as a shallow dive. He didn't slip, stumble, or fall, and was in complete control of his actions. Were it not for the unfortunate presence of an unseen sandbar 2.5 ft. deep under murky water where Mr. Sewell dove, with a steep drop-off to

the four to five foot depth where others were seen diving, swimming and wading 4.5-5 ft. deep, his dive would have been perfectly safe. Others were seen doing the same thing without issue.

All aboard the Fenn boat testify that, along with breakfast, snacks, several bottles of water and Gatorade throughout the day in the August heat, 190 pound Mr. Sewell consumed no more than six beers, spread out over that day beginning about 9 a.m., until the time of the accident. All agree Mr. Sewell did not exhibit any sign of being impaired at any time that day, and that he was in complete control of himself and his dive. Eyewitness Tiffany Weaver, who fished in another boat in tandem with the Fenn boat, conversed with the Fenn crew all day, had lunch with them, and witnessed Mr. Sewell's dive, fully corroborated their testimony.

Mr. Sewell was unfamiliar with saltwater fishing or coastal Texas sandbars, this trip being his first time in this area, and one of the few times in his life saltwater fishing. (D.E. 21-3, Page 127-129) There were no signs or other visible warnings or indications of sandbars in the area or near the Fenn boat. Nor did anyone on the Fenn boat discuss sandbars or the water potentially being shallow before Mr. Sewell dove. The only visual sign suggesting the depth of the water to Mr. Sewell were others he saw diving from boats next to his, which happened without incident.

Mr. Sewell was familiar with purposefully making shallow water dives from swimming in lakes, ponds, and rivers throughout his life, and the dive he made would not have resulted in striking the bottom had the water been 4.5 to 5 ft. deep as all indications suggested. (D.E. 21-3, Page 127-129)

*Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189 (11th Cir. 2010) is on point. Although finding that Capone was intoxicated when he died in an accident diving from a pier, the *Capone* Court reasoned that the record simply could not factually support Aetna's conclusion that intoxication "caused or contributed" to his loss. The *Capone* Court rejected Aetna's idea, like Lincoln's here,

that "since the decision to dive required a degree of judgment, alcohol necessarily caused or contributed to his injury." *Id*., at 1200. The *Capone* Court stated:

> Aetna cites the policy's alcohol exclusion as an independent ground for denial of Capone's claim. The policy provides, in relevant part:
>
> No benefits are payable for a loss **caused or contributed to by**:… Use of alcohol, intoxicants, or drugs, except as prescribed by a physician….
> Aetna relied on the toxicology tests over the contradictory affidavit of Kevin Zeh and the statements of Capone himself…. While we agree that it is reasonable to draw the conclusion that Capone was under the influence of alcohol, it is unreasonable to conclude that his intoxication caused his injury…. Capone has the burden of proving a *prima facie* case of entitlement to contractual benefits under the policy. *See Con't Assurance Co. v. Rothell,* 227 Ga. 258, 181 S.E.2d 283, 285 (1971)*.* We hold that Capone has met this burden. Capone established that several other individuals were diving from the dock in a contemporaneous fashion. Capone claims they dove irrespective of their consumption of alcohol, and Aetna offers no evidence to refute this claim.
>
> **The burden then shifts to Aetna to prove that Capone is not entitled to benefits.** *See id.* **… Aetna claims that because Capone was intoxicated, his judgment was necessarily impaired. Aetna reasons that since the decision to dive required a degree of judgment, alcohol necessarily caused or contributed to his injury. This assertion, without more, cannot meet Aetna's burden of proving the exclusion applies.**

*Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1200–01 (11th Cir. 2010)(emphasis added).

Our facts warrant the same conclusion. There are simply no facts of record to reasonably support the idea that Mr. Sewell's loss was "contributed to or caused by" a presence of alcohol; *i.e.*, that his decision to make a shallow water dive would not have occurred "but for" an alcohol level in Mr. Sewell. All indications were that it was safe to do so, that the water was 4.5 to 5 ft. deep, that others were doing so without issue, that Mr. Sewell exhibited no signs of impairment, and made a perfectly controlled dive. Substantial evidence simply does not support Lincoln's denial.

This record cannot support Lincoln's denial. It supports only a reversal and judgement that Lincoln pay full benefits to Mr. Sewell for the protection he paid Lincoln to provide him and his family, along with attorney fees.

The administrative record and Lincoln's conduct demonstrate Lincoln's disregard of ERISA's broad remedial purposes, intended to "protect... participants in employee benefit plans and their beneficiaries... by providing for appropriate remedies, sanctions and ready access to Federal Courts." 29 U.S.C. § 1001(b); quoted in *Varity Corporation v. Howe*, 116 S.Ct. 1065, 1078 (1996); *Black & Decker Disability Plan v. NORD*, 538 U.S.A. 22, 123 S.Ct. 1965, 1970 (2003) ("ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113; 109 S.Ct. 948 (1989). (Internal quotation marks and citations omitted.)

Lincoln has taken a purely adversarial position against Mr. Sewell, first refusing to consider relevant evidence Plaintiff provided before filing suit, then halting Court review just days before the opening briefing deadline to consider the same evidence <u>after</u> first filing a Joint Scheduling Order agreeing to that deadline. Those actions demonstrate financially conflicted, self-interested behavior, along with mischaracterizing parts of the record, claiming that bystanders stated that Mr. Sewell showed signs of "severe intoxication" with no record support, and ignoring or summarily dismissing undisputed testimony of four eyewitnesses who were with Mr. Sewell the entire day, all to reach a pre-determined goal of denial. Lincoln's handling of this claim demonstrates procedural unreasonableness, warranting the Court to give more weight to Lincoln's conflict of interest and acting as a tiebreaker even if the Court considered the case to be "close," which Mr. Sewell contends it is not.

## CONCLUSION AND REQUESTED RELIEF

The Court should reverse the denial and render judgment in Plaintiff's favor for benefits due under the policy plus appropriate attorney's fees, judicial interest and court costs under the criteria set forth in *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011 (5th Cir.1992).[7]

The award of attorney's fees should be determined after entry of judgment in accordance with Fed. R. Civ. P. 54(d)(2).[8]

Accordingly, the Court should enter the attached proposed Order.

---

[7] "If an administrator has made a decision denying benefits when the record does not support such a denial, the court may, upon finding an abuse of discretion on the part of the administrator, award the amount due on the claim and attorney's fees. See, e.g. *Salley*, 966 F.2d at 1014. We find such an abuse of discretion here, and we will remand to the district court for a determination of damages and reasonable attorney's fees and for entry of judgment." *Vega v. Nat'l Life Ins. Servs.,* 188 F.3d 287, 302 (5th Cir. 1999) (en banc), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

[8] Fed. R. Civ. P. 54(d)(2) provides:

(2) *Attorney's Fees.*

(A) *Claim to Be by Motion.* A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

(B) *Timing and Contents of the Motion.* Unless a statute or a court order provides otherwise, the motion must:

(i) be filed no later than 14 days after the entry of judgment;

(ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

(iii) state the amount sought or provide a fair estimate of it; and

(iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

(C) *Proceedings.* Subject to Rule 23(h), the court must, on a party's request, give an opportunity for adversary submissions on the motion in accordance with Rule 43(c) or 78. The court may decide issues of liability for fees before receiving submissions on the value of services. The court must find the facts and state its conclusions of law as provided in Rule 52(a).

(D) *Special Procedures by Local Rule; Reference to a Master or a Magistrate Judge.* By local rule, the court may establish special procedures to resolve fee-related issues without extensive evidentiary hearings. Also, the court may refer issues concerning the value of services to a special master under Rule 53 without regard to the limitations of Rule 53(a)(1), and may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.

Respectfully Submitted,

s/J. Price McNamara

_____

**J. PRICE McNAMARA**
Bar Nos: LA 20291 & TX 24084626
10455 Jefferson Highway, Ste. 130
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313
price@jpricemcnamara.com
Attorney for Complainant

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of September, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

s/J. Price McNamara

_____
**J. PRICE McNAMARA**