**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

**TIMOTHY SEWELL**

**CIVIL ACTION NO**
**VS**                                                                    **2:23-cv-317**

**THE LINCOLN NATIONAL**
**LIFE INSURANCE COMPANY**

**PLAINTIFF'S BRIEF IN OPPOSITION TO LINCOLN'S MOTION FOR**
**SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Mr. Sewell opposes Lincoln's motion for the reasons set forth in his initial motion and brief

as well as the following:

**Lincoln and its Dr. Swotinsky Blatantly Misrepresent the Study Data They Cite Relating**
**Alcohol to Spine Injuries**

The characterization is not overstated. One must assume that Dr. Swotinsky, a physician

and Lincoln's chosen expert, is capable of reading and understanding the study he cites for the

bold assertion in his July 22, 2024 report (D.E. 21-5, Pages 48-49), and Lincoln's same assertion

on page 29 of its memorandum, that "alcohol use results in a 4.31-fold risk of a spinal cord injury

while diving, meaning that 78% of all such diving accidents are attributable to alcohol use." But

a simple glance at the cited 2004 study, titled Garrison A, Clifford K, Gleason S, et al. Alcohol

use associated with cervical spinal cord injury. *J Spinal Cord Med*. 2004;27:111-5, proves those

assertions to be fiction. The study is attached here as **Exhibit 1** for the Court's convenience.

The study actually shows that out of the 33 total people with diving-related cervical spine

injuries, only 13 (39%) answered "yes", and 20 (61%) answered "no" to the question: "At the time

of your spinal cord injury, were you using alcohol?"  (**Exhibit 1, p.7, 3**) Therefore the study does

not at all support the idea that alcohol use "results in a 4.31-fold risk" of spinal injury, or that "78%

of all such diving accidents are <u>attributable</u> to alcohol use" as Dr. Swotinsky and Lincoln posit. Not by a long shot.

The 4.31-fold (or 78%) increase that Dr. Swotinsky and Lincoln mischaracterize was clearly <u>not</u> a comparison of alcohol-use spinal cord injuries from diving with non-alcohol use spinal cord injuries from diving at all. Rather, it was a comparison of alcohol-use diving accidents resulting in <u>cervical spine injuries</u> (13 of them in the study) with alcohol-use diving accidents resulting in <u>non-cervical spine injuries</u> (only one of them in the study). (**Exhibit 1, p.7**) Please read it. This is crystal clear in the study, and obviously expected: In shallow-water diving injuries, people land on their heads. Yet Dr. Swotinsky twisted the clear and simple data into his unsupported conclusion, that in diving accidents, alcohol use results in a 4.31-fold risk increase of spinal injury, or that "78% of all such diving accidents are <u>attributable</u> to alcohol use." (D.E. 21-5, Page 48) Dr. Swotinsky and Lincoln may deny that this was dishonest advocacy for Lincoln. If that's true, it was incompetence. Whether Dr. Swotinsky was a dishonest, biased Lincoln advocate, or merely incompetent, it destroys his credibility as an expert as a whole. Whether by ignorance, or intentionally, Lincoln's act of carrying such a glaring falsity forward into its final appeal denial letter (D.E. 21-5, Page 41) is no way to play around with the livelihood of a family struck by tragedy. It is not the behavior of a fiduciary. Lincoln's final denial on appeal expressly relied on Dr. Swotinsky's garbage interpretation of the study, rendering its reasoning arbitrary and capricious for that reason alone. (None of the above is meant to disparage counsel for Lincoln, who undoubtedly assumed integrity and competence in Dr. Swotinsky's report and Lincoln's denial.)

Further, the study says: "To assess alcohol use at the time of injury, participants were asked, 'At the time of your spinal cord injury, were you using alcohol?'" (**Exhibit 1, p.3**) That's not very

scientific. Nothing was asked about how much or whether they were "intoxicated" or whether "using" included perhaps having one or two beers. Thus, anyone answering "yes" they were using alcohol because they had had one or two poolside beers before their accident was counted as an "alcohol-use" related injury in the study. With the small number of people in the study suffering cervical spine injuries from diving (34), such ambiguity in the question presented renders the results unreliable.  Accordingly, even if this study were considered "evidence" at all, it does not say what Dr. Swotinsky and Lincoln claim it says, and it cannot logically serve as "substantial evidence" which "clearly" supports Lincoln's determination of alcohol causation on <u>our</u> unique facts. The undisputed true factual evidence of our record supports only the opposite. The obvious shortcomings of such studies to help determine causation under a given set of unique facts underscores why courts do not condone using such studies alone to determine alcohol causation for a given set of known facts, as discussed more fully below. Every case is unique.

In evaluating a record to determine if substantial evidence supports a denial of benefits in an ERISA case, a district court "may properly assess each case's individual circumstances and evaluate the witness's credibility." *Salley v. E.I. Dupont de Nemours & Co.*, 966 F.2d 1011, 1016 (5th Cir. 1992). Dr. Swotinsky's credibility is shot on the causation issue. It should be on all issues. None of his opinions should be trusted. Further, an administrator may not rely on an expert opinion without considering its basis. *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 250 (5th Cir. 2007); *Schully, III v. Continental Casualty Company and Hartford Life Group Insurance Company*, 680 Fed. Appx. 437, 439, 2010 WL 2332080 (5th Cir. 2010) ("Nor may an administrator rely on an expert opinion without considering its basis or whether, as was the case here, it is in plain conflict with the medical records." Affirming the district court's finding that Hartford "deliberately

ignored" plaintiff's medical evidence in order to support its "preferential and predetermined conclusions," the Fifth Circuit also affirmed the award of attorney's fees. *Id*., at 439.)

The basis for Dr. Swotinsky's assertion on the causation issue was a falsified reading of a simple study. Lincoln, as fiduciary claim administrator, inappropriately carried the falsity forward to support its denial, or failed to consider his basis for the statement at all.

### Lincoln's Argument that Our Record Reasonably Supports its Conclusion that Alcohol "Contributed to or Caused" Mr. Sewell's Injury is Mistaken

For clarity, this brief will focus only on the essential "contributed to or caused" element of Lincoln's exclusion. The "intoxication" portion, and the inaccuracy of the hospital lab result was fully addressed in Mr. Sewell's opening brief.

When Lincoln first denied Mr. Sewell's claim, Lincoln's only record evidence was that he dove from the back of a boat into three feet of water and the hospital lab result read .222 mg/dL. That's all Lincoln had provided to Dr. Millstein. (D.E. 21-4, Page 168) Lincoln (and Dr. Millstein) knew no other facts. Relying on a generic list of alcohol effects, and a study that concluded that less than 50% of spinal injuries involve alcohol, Lincoln concluded that alcohol did contribute to or caused Mr. Sewell's accident. That one study was Lincoln's only support for the idea that alcohol "contributed to or caused" Mr. Sewell's accident.

On appeal, Mr. Sewell provided Dr. Arnold's report and sworn testimony from Mr. Sewell and four independent eyewitnesses. That testimony addressed three subjects: 1. the number of beers Mr. Sewell drank, 2. his behavior, and 3. the circumstances surrounding and description of his dive.

For the sake of argument only, and to limit focus to the simpler causation issue, assume that Lincoln was reasonable to 1. disregard the opinions of Dr. Arnold about the inaccuracy of the lab result and rely solely on the opinions of its non-toxicologist physicians, whose careers heavily

involve insurance defense; and 2. believe in the lab result over the undisputed sworn testimony of four eyewitnesses about the number of beers Mr. Sewell drank. Even under those assumptions, the accuracy of the lab result and exactly how many beers Mr. Sewell drank only address one of two essential elements of the policy exclusion; that is, whether Mr. Sewell's BAC was or was not above the "under the influence" alcohol threshold under Texas law.

The exclusion still separately requires a second element: that alcohol influence "contributed to or caused" Mr. Sewell's accident. On the "contributed to or caused" issue, Lincoln's wishes and its doctors' opinions cannot serve to refute the undisputed first-hand factual testimony of four eyewitnesses regarding the circumstances surrounding Mr. Sewell's assumption that he could safely make a shallow-angle dive. Those undisputed circumstances include seeing others doing the same thing without issue, all visual signs indicating that the water was 4.5-5 ft. deep, no visual indications of the hidden sandbar with a steep drop off to that depth, Mr. Sewell being unfamiliar with the area, and no mention of sandbars before he dove. Nor can they refute multiple eyewitnesses' testimony describing the dive: that he dove from only 18 inches above the water surface, in a deliberate and controlled manner, outward at a shallow angle to the water. Those are the only facts relevant to causation between any alcohol level and Mr. Sewell's unique accident, and they support only a lack of any causation. No lab result or hospital notation of "Secondary Clinical Impression alcohol intoxication" (D.E. 21-3, Page 178), or "alcohol abuse with intoxication, unspecified" (D.E. 21-4, Page 128), which were nothing more than a simple recognition of that lab result, and no alcohol-related diving accident statistics can serve to negate those facts bearing on causation. While those things may (arguably) support the issue of intoxication, none support causation.

On the issue of causation, Lincoln relies on nothing beyond generic alcohol effects and two studies relating alcohol to spine injuries in general. Of those studies, one (Lincoln's Dr. Millman's cited study) claims that <u>less than</u> 50% are alcohol-related, and the other (Dr. Swotinsky's falsely presented study referenced above) actually claims even less, that only 39% are alcohol-related. Lincoln and its doctors' posited logic of leaping from the statistics they cite to the conclusion that alcohol influence "contributed to or caused" **<u>Mr. Sewell's</u>** accident, under **<u>our undisputed</u>** facts, necessarily concludes that in the absence of alcohol he would **<u>not</u>** have dove under **<u>our</u>** circumstances. That conclusion is supported by nothing more than pure speculation.

On page 20 of its memorandum Lincoln quotes *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004), which stated that a claim for recovery of benefits does not prevail "merely because he has supported his claim with substantial evidence, or even with a preponderance." *Ellis*, 394 F.3d at 273. Rather, "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." <u>*Id*</u>. That is true under abuse of discretion review, but it doesn't change the fact that abuse of discretion review requires the reversal of a denial where "substantial" and "concrete" evidence, in the record, does not "clearly support" the denial on each essential element of Lincoln's exclusion. On the issue of causation, our record is devoid of such evidence. Moreover, the *Ellis* quote Lincoln cites does not support Lincoln's distorted view that it posits, also on page 20 of its memorandum, that "Moreover, it is the evidence in the administrative record that supports Lincoln's decision that should be the focus of the Court's inquiry, and <u>not any evidence that may support Sewell's claim</u>" (emphasis added) to decide whether Lincoln's claim is supported by substantial evidence. No court has ever said such a thing. To the contrary, focus on the <u>entirety</u> of the administrative record is essential to

determine whether a denial is plainly contradicted by the record as a whole on any essential issue, such as causation here.

Just weeks ago, in *Dwyer v. United Healthcare Insurance Company*, 2024 WL 4230125 (5th Cir. Sept. 19, 2024), discussed further below, the Fifth Circuit expressly considered <u>all evidence</u> in the record, finding that the insurer there abused its discretion because the evidence favoring the claimant's position as a whole overwhelmed the insurer's contrary conclusion. See also *Glenn v. Metropolitan Life Ins. Co.*, 461 F.3d 660, 672-74 & n. 4 (6th Cir. 2006) (denial decision arbitrary where plan selectively considered evidence to reach decision unsupported by the record as a whole), aff'd 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 483-84 (7th Cir. 2009) (holding that denial decision was arbitrary where insurer selectively relied on pieces of evidence to support the denial, while that evidence in context did not support the denial); *Leger v. Tribune Co.*, 557 F.3d 823, 832-33 (7th Cir.2009) (denial  decision was arbitrary where insurer "cherry picked the statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally disabled"). Thus proper review absolutely requires the consideration of all evidence, including that supportive of Mr. Sewell's decision, and including the <u>undisputed</u> testimony concerning the circumstances surrounding Mr. Sewell's dive, as well as its deliberate and controlled nature, after seeing others do the same without issue, thus rebutting and negating even any "presumption" of causation.

In Lincoln's causation conclusion is not rational under our facts, and certainly not supported by "substantial" and "concrete" evidence, which "clearly supports" it. It is mere speculation. Any presumption is rebutted by undisputed testimony.

Lincoln's attempt to liken Mr. Sewell's record to the readily distinguishable cases it cites is misguided. Cases involving an intoxicated driver's car leaving the highway and crashing into a tree, or crossing the center line into head-on traffic under perfect driving conditions, for no apparent reason of record other than the intoxication, are not similar. Nor is the case of an intoxicated guy celebrating New Year's by foolishly lighting a firework powerful enough to blow his hand apart while holding it in his hand, and continuing to hold it until it does, on a record that has no explanation for the foolish behavior other than his intoxication.

### The Cases Lincoln Cites are Distinguishable

Lincoln cites the following five nonbinding district court opinions on page 24 of its memorandum for the general idea that district courts within the Fifth Circuit have upheld administrators' intoxication exclusion denials where BAC's of various levels were found by the administrator to have caused or contributed to the incident at issue: *Jones v. Channel Shipyard & Co.*, 2001 U.S. Dist. LEXIS 19639 at 10 (E.D. La. Nov. 20, 2001); *Hargrave v. Parker Drilling Co.*, 2010 U.S. Dist. LEXIS 93534 at 17 (W.D. La. Aug. 25, 2010); *Sanford v. Zurich Am. Ins. Co.*, 2009 U.S. Dist. LEXIS 84327 at 10-11 (N.D. Miss Sept. 15, 2009); *Nichols v. Hartford Life & Accident Ins.*, 2014 U.S. Dist. LEXIS 196645 at 12 (S.D. Tex. June 9, 2014); and *Hill v. Aetna Life Ins. Co.*, 546 F. Supp. 2d 343, 351 (546 F. Supp. 2d 343, 351 (S.D. Miss. 2008).

While nonbinding, these cases are also factually inapplicable. Each case, unlike ours, had no evidence in the record of anything other than intoxication causing the accident. In stark contrast, our record has no evidence to support alcohol playing any causal role in Mr. Sewell's accident, and undisputed eyewitness testimony from four independent witnesses in addition to Mr. Sewell that it did not.

In *Jones*, *supra*, the plaintiff sought medical expenses under a medical insurance policy which excluded treatment for "Injury or Sickness which occurred as a result of that Covered Person's illegal use of alcohol." On the issue of causation, the court found it was rational to conclude that Jones's use of alcohol caused the accident and resulting medical expenses, where it was factually undisputed that "the accident, according to the Police report, occurred when Jones crossed the center line into the opposing lane on dry blacktop, … nothing obscured his vision, and there were no defects in either his vehicle or the road." Thus, with no facts suggesting any reason other than intoxication as the cause of the accident, it was reasonable to find causation by circumstantial evidence. *Id*., 2001 WL 1490915, at *2.

In *Hargrave*, *supra*, the plaintiff dismembered his hand at a New Year's celebration by lighting a powerful firework while holding it in his hand while admittedly intoxicated, an act moronic on its face. The policy at issue stated: "You will be **_conclusively_** *presumed to be intoxicated* if the level of alcohol in Your blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle." *Id.*, 2010 WL 3363087, at *6 (emphasis added). It excluded coverage for "losses caused by, contributed to, or resulting from intoxication." There were no facts in the record suggesting any reason other than intoxication as the cause of the accident. The only evidence plaintiff <u>attempted</u> to offer to negate alcohol causation for his moronic actions while admittedly drunk were affidavits of the plaintiff and his mother, which could not be considered by the court, as they were presented to the court after suit was filed, and were never part of the administrative record: "Additionally, … this Court notes the **plaintiff has pointed to no evidence in the administrative record showing the plaintiff's intoxication did *not* contribute to his accident, other than his own self-serving affidavit and the self-serving affidavit of his mother, which cannot be considered by the Court**." *Id.*, 2010 WL 3363087, at *6 (emphasis added). In other words, *Hargrave* had zero record

evidence to negate causation, unlike Mr. Sewell's record with undisputed testimony describing a perfectly controlled shallow-angled dive from 18 inches above the water surface and describing all circumstances indicating nothing to suggest that his shallow-angled dive would be safe.

*Sanford*, *supra*, involved an unwitnessed drowning accident. There, the insured deceased woman and her male friend, who also drowned, were the only two aboard a pontoon boat "last observed 'dancing and playing' aboard the boat at approximately 6:00 p.m. A short time later, the boat was found adrift and unmanned, with the engine running, the radio playing, and a large dog onboard…. However, no witnesses saw Sanford or McAlexander leave their boat or enter the water, and no one heard any fighting, yelling, or cries for help…. The autopsy revealed that Sanford [the insured] had died as a result of freshwater drowning. Additionally, a toxicological examination of her blood was positive for ethyl alcohol at a level of 0.161 g/dl. In searching and inventorying the contents of the boat, officers had discovered beer and vodka. There was no evidence of foul play. By all accounts, Sanford and McAlexander enjoyed a good relationship…. The available evidence led officers to conclude that Sanford had fallen overboard and drowned. The official cause of death was listed as freshwater drowning with a contributing cause of ethyl alcohol intoxication…. Tishomingo County Medical Examiner Investigator Stewart M. Wileman explicitly stated in Peggie's amended death certificate that "ethyl alcohol intoxication" was a "significant condition ... contributing" to her death." *Id*., at 2-4.

The *Sandford* policy exclusion provided that:

> C. No benefits will be paid for a Covered Loss contributed to, either directly or indirectly, by a Covered Person's being:
> 1. Intoxicated.
> a. A Covered Person will be conclusively presumed to be intoxicated if the level of alcohol in his/her blood exceeds the amount at which a person is presumed, under the law of the locale in which the accident occurred, to be intoxicated if operating a motor vehicle.

b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items shall be considered proof of the Covered Person's intoxication.

*Id*., 2009 WL 2986343, at *2

The record contained no evidence to refute the official death certificate and medical examiner's conclusions. The court found that the plaintiff's arguments "1) that she may have been thrown into the lake by the negligence of the boat's operator; 2) that she may have been thrown into the water by McAlexander during horseplay; and (3) that large waves caused by a thunderstorm may have caused her to fall off the boat" were insufficient speculation, as nothing in the record supported them, unlike in Mr. Sewell's case. *Id*., at 2-4.

In *Nichols, supra,* the insured died following an unwitnessed single-vehicle ATV accident. It was undisputed that he drove it at an unsafe speed, off the road into a ditch, with a BAC of .167. The policy did not require causation, reading: "does not cover any loss caused or contributed to by ... (7) Injury sustained while intoxicated. … [T]he police report notes that the weather at the time of the accident was clear and there were no vehicle defects…. The nature of the accident, which occurred when Mr. Nichols was driving his ATV 'at an unsafe speed' entering a curve, further makes it reasonable to conclude that the accident resulted in part from Mr. Nichols's intoxication." *Nichols,* 2014 WL 12537147, at *1. Thus, not only did the exclusion not require a causal link between the loss and intoxication, but also the factual circumstantial evidence sufficed for this unwitnessed accident where the record supported no other plausible explanation.

In *Hill*, it was "undisputed that alcohol was, in part, the cause of the accident." *Id*., at 351. Thus *Hill* involved no causation issue at all, unlike here. *Hill* is inapposite.

In stark contrast to Lincoln's cases, we have not only Mr. Sewell's testimony, but also that of four independent witnesses who all agree that Mr. Sewell made a completely controlled shallow-

water dive, doing exactly what others around him were doing from other boats with no issue, when indications were that the water was 4.5-5 ft. deep, and that he could do so safely. The record contains zero evidence to dispute that. Thus even if it were reasonable for Lincoln to conclude "intoxication" at some level, the only evidence regarding the nature of Mr. Sewell's dive and the factual circumstances surrounding it, and bearing on whether alcohol contributed to or caused this accident is undisputed. Evidence to support the essential element of "contributed to or caused by" on this record is nonexistent.

Lincoln cites *Dutka v. AIG Life Ins. Co.*, 573 F.3d 210, 214 (5th Cir. June 24, 2009) for the sweeping proposition that, in Lincoln's words: "With regard to what 'contributed to or caused by' in the Policy exclusion means, the Fifth Circuit has stated that even if there is no direct proof that alcohol consumption caused or contributed to Sewell's incident, that does not mean the administrator erred in denying benefits because there rarely is such direct proof. The evidence will always be circumstantial, and Courts should consider the nature of the incident in making that determination. *Dutka,* 573 F.3d at 210, 214." (Lincoln Memorandum, p. 24) But the *Dutka* Court didn't say "[t]he evidence will always be circumstantial." The *Dutka* Court did note in *dicta* "that there was no direct proof that the drugs [in the decedent's system] caused the crash, however, in such a case [where there are no living eyewitnesses] there rarely is—the evidence is circumstantial." *Dutka*, 573 F.3d at 214 (emphasis added).  This *dicta* was far from condoning a denial on less than "concrete" evidence "clearly supporting" a denial, and the *Dutka* record did have concrete evidence clearly supporting the denial.  *Dutka's* facts are nothing like ours.

First, the *Dutka* plane crash was unwitnessed. In contrast, our record has undisputed eyewitness testimony of the circumstances surrounding Mr. Sewell's accident. Additionally, the *Dutka* FAA toxicology report disclosed "the presence of chemicals in the decedent's body

consistent with the use of multiple drugs around the time of the accident." *Id*., at 214. The court reasoned: "With evidence that the decedent was under the influence of Propoxyphene at the time of the crash and that he had recently used alcohol and cocaine, we cannot find arbitrary and capricious the administrator's conclusion that the decedent was intoxicated at the time of the crash" *Id*., at 214 (emphasis added). Turning to causation, the court reasoned that because weather conditions were clear, there was no evidence of mechanical failure, and with expert testimony on piloting airplanes concluding that "the failure to maintain air speed at low altitude is a **fundamental piloting error"** the administrator's decision had a sufficient factual foundation to reasonably conclude that the accident resulted in part from being under the influence of drugs. *Dutka*, 573 F.3d at 214 (emphasis added).

Our case is far different. Failing to maintain air speed while flying at low altitude, in good weather with no mechanical failure, a fundamental piloting error, while intoxicated by drugs and alcohol, with the record containing no evidence of causes other than impairment for making such a fundamental piloting error, bears no resemblance to our facts. Our record shows Mr. Sewell's simple decision to make a controlled and calculated dive, a reasonable decision based on all surrounding circumstances, with four eyewitnesses agreeing that Mr. Sewell exhibited no signs of intoxication and dove in a controlled manner in a safe outward direction from 18 inches above the water, after watching others doing the same thing with no problem from boats anchored next to them the same distance from shore, landing and wading in water 4.5-5ft. deep. Those facts are undisputed, rendering Lincoln's finding of causation pure speculation without concrete evidence clearly supporting it, not even slightly supporting it.   *Dutka* is inapplicable on our facts and does not support Lincoln's position.

## Case Law from the Fifth Circuit and Around the Country
## Directly Supports Mr. Sewell's Position

Post-*Dutka* cases from the Fifth Circuit and other circuits are instructive and consistent with the Fifth Circuit rule as stated in *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 544 (5th Cir. 2012) (declining to impose a blanket standard of allowing insurers to consider injuries resulting from a crash involving an intoxicated driver as non-accidental. Rather, insurance companies must consider the circumstances of the fatal event in question and adduce some other evidence in addition to toxicology results). Compare *Green v. Life Insurance Co. of North America*, 754 F.3d 324, 331 (5th Cir.2014), where the record did contain sufficient other evidence in addition to toxicology results. Green died of head injuries in an unwitnessed boat accident. Distinguishing *Firman*, the *Green* Court noted, "there is evidence in addition to Green's blood alcohol content [a BAC of .243, which was uncontested] that supports the denial of benefits." *Id*., at 331. The additional evidence included Green's actions of operating a boat at night without lights, and running into the support legs of a landing light at Keesler Air Force base, and other supporting circumstances, including empty beer bottles and cans found in the boat, and his wife's statement that before making his boat run he sounded intoxicated. *Id*. See also *Kovach v. Zurich Am. Ins. Co*., 587 F.3d 323, 331 (6th Cir. 2009) (same) See *id*. (citing *Wickman v. Northwestern Nat'l Ins. Co*., 908 F.2d 1077, 1990 U.S. App. LEXIS 12175, 28 Employee Benefits Cas. (BNA) 1071 (1st Cir. 1990); see also *Hastie v. J. C. Penney Life Ins. Co*., 115 F.3d 895, 895-97 (11th Cir. 1997) (the "insurance company had the burden of showing some causal connection between the intoxication and the insured's death in order for the exclusion to be effective.")

**Lincoln's Cited Studies and Alcohol-Related Diving Accident Statistics Cannot Qualify as Substantial Evidence That Alcohol Caused or Contributed to Mr. Sewell's Accident Under Established Case Law**

Courts reject Lincoln's approach of merely relying on studies showing the generic effects of alcohol and medication to conclude causation without factual support. See, e.g., *Horton v. Life Ins. Co. of N. Am., Civil Action No.* ELH-14-3, 2015 U.S. Dist. LEXIS 39980, at *52 (D. Md. Mar. 30, 2015), conducting an extensive survey of ERISA intoxication exclusion cases from multiple federal circuits, concluding "notwithstanding a minimal burden of proof and a deferential standard of review, an insurer cannot merely rest upon blood alcohol level and a generic list of alcohol's effects to establish a causative link between intoxication and loss." Otherwise, "Defendant's position is tantamount to the argument that the presence of blood alcohol above a certain limit automatically establishes causation and precludes coverage as a matter of law." *Id*. at *72. Rather, "there must be some evidence of the role of alcohol [or medication] in the loss, beyond the insured's intoxicated state, to establish the applicability of the exclusion." *Id*., at *72. To establish the causal link, the courts generally relied on direct evidence of <u>unexplained</u> driver error and other corroborating factors such as the lack of adverse conditions. *Id*., at *46-65. (citing *James-Smith v. Total Affiliates Accidental Death & Dismemberment Ins. Plan*, No. 3:10 CV 2640, 2011 U.S. Dist. LEXIS 118474, 2011 WL 4899992, at *6 (N.D. Ohio Oct. 13, 2011) (noting that police observed the insured's conduct and the insured failed to brake prior to the collision); *Dipper v. Union Labor Life Ins. Co.*, 400 F. Supp. 2d 604, 611 (S.D.N.Y. 2005) (highlighting "no evidence about abnormal conditions on the trail prior to the accident" or "evidence that the [vehicle] was prone to low-speed rolling or tipping"); *Bickel v. Sunbelt Rentals, Inc.*, WMN-09-2735, 2010 U.S. Dist. LEXIS 106546, 2010 WL 3938348, at *5 (D. Md. Oct. 6, 2010) ("the road conditions on the night of the accident were dry and [the police report] identified no other adverse conditions."); *Cornish v.*

*United States Life Ins. Co.*, No. 3:06CV-344-DW, 2009 U.S. Dist. LEXIS 92326, at *21 (W.D. Ky. Sep. 30, 2009) (the "insurance companies bear the burden to establish a causal relationship between the intoxication of the [insured] and her resulting death.") See also, *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189 (11th Cir. 2010) (requiring evidence beyond establishing intoxication and statistics to satisfy the role of alcohol as causing or contributing to the accident when exclusion included a caused or contributed to component.)

This line of cases makes perfect sense. Allowing insurers to rely on evidence of intoxication alone to support causation would effectively read the causation element out of their exclusions. For insurers wanting to do so, the answer is simple. Write your policy the way you want it to apply. Insurers can, and do, write alcohol and intoxication exclusions to bar coverage for accidents that happen, or losses that are suffered, while the insured had a certain blood-alcohol level without any causation requirement at all. See *Nichols, supra,* 2014 WL 12537147, at *1 ("does not cover any loss caused or contributed to by ... (7) Injury sustained while intoxicated…); *Papotto v. Hartford Life & Acc. Ins. Co.*, 731 F.3d 265, 267–68 (3d Cir. 2013) (losses caused or contributed to by an "Injury sustained while Intoxicated" are excluded.) Lincoln could easily have written its exclusion that way but did not. Lincoln's exclusion applies only if a certain blood-alcohol level caused or contributed to the accident. It does not apply merely on a finding that the accident took place while its insured had a certain blood-alcohol level. This record has no concrete evidence to clearly support the contributed to or caused component of the exclusion. It has evidence to support only the opposite.

**Lincoln's Cited Studies of Alcohol-Related Spine Injuries Sustained in Diving Accidents Cannot Serve as "Concrete Evidence" which "Clearly Supports" Causation**

Lincoln's cited studies relating percentages of spinal injuries to alcohol intoxication does not constitute "substantial evidence" which "clearly" supports its finding of causation, especially upon reviewing the sources more closely.

**The first study** is from Dr. Millstein, who reviewed the case for Lincoln before the initial denial. Lincoln states on page 25 of its memorandum that "Moreover, Dr. Millman [sic] pointed out, 'Alcohol consumption is also important risk factor [for spinal cord injuries following diving into shallow water], thought to be contributory and [sic] 38 to 49% of cervical injuries in previously published series.'" Dr. Millstein's cited study, cited in Lincoln's footnote 80 at page 26 of its memorandum, is attached hereto as **Exhibit 2** for the Court's convenience. The study was of 34 people over a ten-year period from 1996-2006 from one rehabilitation facility, involving only swimming pool accidents in Europe. **Exhibit 2, p. 1-2.** And the study itself didn't even purport to evaluate alcohol-relatedness, noting: "In our study, blood alcohol levels were not available in all the medical reports." **Exhibit 2, p. 8.** Rather, as an aside, it quoted the 38-49% statistic from another "previously published series" that Dr. Millstein didn't even bother to read to see what they involved factually. **Exhibit 2, p. 8.** This is not surprising, as Dr. Millstein delivered his report to Lincoln the day after Lincoln gave him the assignment. The study also suggests that the "previously published series" included cases involving diving from balconies, rooftops, retaining walls, slides, and other pool equipment, noting that the dangers of such idiotic diving "must also be emphasized." **Exhibit 2, p. 9.** This demonstrates why courts do not condone using such studies alone to determine alcohol causation for a given set of known facts. Every case is unique.

Regardless, even if we were to assume that the "previously published series" was reliable and pretend that the circumstances of their diving accidents were comparable to ours, the result

was that <u>more</u> shallow-water diving accidents were <u>non-alcohol</u> related than those that were alcohol-related. So even if the series were considered "evidence" at all, it could not logically serve as "substantial evidence" which "clearly" supports Lincoln's determination of alcohol causation on our unique facts. One cannot reasonably conclude that, because alcohol was "thought to be contributory" (whatever that means) in <u>less than half</u> of all diving accidents of the "previously published series," which included consideration of diving accidents from balconies, rooftops, retaining walls, and slides, then alcohol caused or contributed to Mr. Sewell's accident under <u>our</u> facts.

This is why *Capone*, *Horton, supra,* and so many other cases hold that "there must be some evidence of the role of alcohol [or medication] in the loss, beyond the insured's intoxicated state, to establish the applicability of the exclusion." *Id*., at *72.  The undisputed true factual evidence of our record supports only the opposite of any notion of causation.

**The second study**, attached as **Exhibit 1,** is from Dr. Swotinsky, who flat-out misinterpreted its data to favor Lincoln in his final report of July 22, 2024, as detailed at the beginning of this brief.  Beyond the controversial content of Dr. Swotinsky's final report itself, Lincoln failed to share it with Mr. Sewell for consideration or response before filing it as a purported part of administrative record with the Court. Lincoln's failure to share the report before doing so constitutes procedural unreasonableness as discussed further below.

### The Court Should Not Consider Lincoln's New Evidence, First Created After Mr. Sewell Filed Suit and After the Court Granted Lincoln's Motion to Remand the Claim Back to Lincoln's Administrative Process

Mr. Sewell's opening brief outlined how Lincoln first refused to consider Dr. Arnold's report, which became part of the administrative record when it was provided to Lincoln for consideration before filing suit. Lincoln's refusal to consider the report constitutes procedural

unreasonableness. Then after waiting until just before the agreed-upon briefing schedule, and over Plaintiff's objection, the Court granted Lincoln's motion to extend the briefing schedule to remand the case back to its administrative process to consider the same report it had refused to consider months earlier

Without waiving his objection to the remand, Mr. Sewell maintains that, regardless, no evidence generated after he filed suit is part of the administrative record for consideration in the Court's review of Lincoln's denial for the reasons addressed in Mr. Sewell's opening brief. Still, even after the Court granted Lincoln's contested motion, Lincoln engaged in further procedural unreasonableness by stuffing the record with evidence it wants the Court to review without having first shared it with Mr. Sewell for consideration and response.

Following are what has been added to the administrative record after suit was filed, and after the Court granted Lincoln's motion to remand back to the administrative process:

**June 3, 2024** – Dr. Swotinsky's report rejecting Dr. Arnold's opinion regarding lactic acid and inaccurate lab results. Like Lincoln's other non-toxicologist physicians, on the issue of causation, Dr. Swotinsky jumps from statistics (fraudulently presented) indicating that "alcohol consumption is a risk factor for diving-related cervical spine injuries" to the conclusion "The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries." (D.E. 21-5, Page 119) Not a single fact in our record bridges the gap between the "risk factor" notion and "contributing factor" for our case.

**June 24, 2024** - Dr. Arnold addresses Dr. Swotinsky's lack of understanding of the lactic acid science, and perhaps more important, his leap in logic from risk-factor statistics to his causation conclusion in disregard of the record facts, stating:

> Finally, I address the issue of whether alcohol was a "contributing cause" of Mr.
> Sewell's accident. Even if one were to assume that Mr. Sewell had a BAC of 0.22

at the time of the accident, the undisputed facts still could not support a finding that alcohol played any contributing role in causing the accident. Accepted scientific methodology is fact based, not speculation based. The undisputed facts, attested to by multiple witnesses, are that Mr. Sewell exhibited no signs of intoxication, and made a perfectly controlled, outward dive from a boat, which is exactly what others were observed doing in close proximity from other boats, then witnessed wading and swimming in chest-deep water. There were no visual indications that the water was dramatically shallower where Mr. Sewell dove. Thus, there is nothing fact-based in the record to support the idea that any diminished judgment or other alcohol effect played any part in the decision to dive or the tragic accident.

Dr. Swotinsky's leap from generalities regarding impaired judgment to his claimed "contributing factor" conclusion is based upon pure speculation that has no support in the undisputed evidence. His scientific methodology is flawed and not appropriately applied. Likewise, previous statements presented by insurance company experts noting the percent of water-recreation accidents that involve alcohol are inadequate to support an opinion that alcohol was a "contributing cause." The mere fact that a given percentage of cervical injuries or water-recreation accidents may involve alcohol cannot support the conclusion that alcohol contributed to Mr. Sewell's accident. All available evidence is to the contrary….

It should also be noted that I do not advertise my services as an expert witness, nor am I affiliated with any organization that solicits cases for me. I took on this case because I saw a miscarriage of justice being attempted on a helpless individual and family.

(D.E. 21-5, Page 50-55)

**July 22, 2024** - Dr. Swotinsky issues yet another report, addressing points raised by Dr. Arnold's June 24, 2024 report, and citing to nine new sources of literature. (D.E. 21-5, Pages 44-49) This was the report in which he misconstrued one study to falsely claim that in diving accidents resulting in spinal injuries, alcohol use results in a 4.31-fold risk increase, or that "78% of all such diving accidents are attributable to alcohol use" as noted above. (D.E. 21-5, Page 48) It was also the report that Lincoln did not share with Mr. Sewell for consideration or response before issuing its final, post-remand claim denial on August 2, 2024 and purporting to include it in the administrative record it filed into the Court record on August 8, 2024.

**August 2, 2024** – Lincoln's final denial of Mr. Sewell's appeal (D.E. 21-5, Page 30-43), finding, with no real analysis, that the hospital lab result "demonstrated a significantly elevated blood alcohol level, which would have resulted in impairments, including but not limited to judgement and perception, that caused or contributed to the accident that resulted in his quadriplegia." (D.E. 21-5, Page 42) Again, not only is the "caused or contributed to" element completely conclusory, but critically, Lincoln expressly relies on the same false information referenced above from the unshared final Dr. Swotinsky report to support that element.

**August 8, 2024** – Lincoln files what it claims to be the administrative record into the Court record, including the unshared July 22, 2024 final report of Dr. Swotinsky containing the false data.

**September 16, 2024** - Lincoln files its opening memorandum, asking the Court to consider not only all post-lawsuit evidence referenced above, but also more new proposed new evidence, not included in the August 8, 2024 administrative record Court filing, and not even related to responding to Dr. Arnold's report, which was the only claimed basis for Lincoln's request for remand. This new evidence, created September 13, 2024, and attached to its memorandum as Exhibit A, is the self-serving Declaration of Lincoln employee Ms. Bick, who attempts to further expand the record on the substantive issue of what weight the Court should give to Lincoln's conflict of interest through her description of Lincoln's purported pious claim-handling practices, both in general, and for Mr. Sewell's claim in particular. (D.E. 24-2, page 1-4)

Under Fifth Circuit case law, the Declaration of Kayla Bick and Dr. Swotinsky's reports cannot be considered by the Court because they were not made part of the administrative record, nor did they exist, before Mr. Sewell filed suit. By refusing to consider Dr. Arnold's report that

Mr. Sewell properly presented to Lincoln before filing suit under prevailing case law to make it part of the administrative record, Lincoln forfeited any return to its administrative process.

Just a few weeks ago, the Fifth Circuit reversed and rendered a district court judgment that upheld the denial of healthcare benefits in *Dwyer, supra,* addressing this very issue. Writing for the *Dwyer* Panel, Judge Oldham wrote:

> Under ERISA, when health benefits are terminated, the beneficiary is entitled to the procedural right of a "full and fair review by the appropriate named fiduciary." 29 U.S.C. § 1133(2). To comply with the statute, this review must be based on a "meaningful dialogue between the beneficiary and administrator." *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009) (quotation omitted). This "meaningful dialogue" has been described as "an ongoing, good faith exchange of information to ensure that the terms of the plan are applied accurately and the benefits are dispensed fairly." *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1223 (10th Cir. 2023) (quotation omitted)….

> *7 We cannot overstate the importance of a fiduciary's duty to engage in a good faith "meaningful dialogue" under the plan. Failure to do so represents an "independent basis to overturn a plan administrator's denial of benefits." *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 510 n.6 (5th Cir. 2013) (citing *Lafleur*, 563 F.3d at 160)….

> In this case, United contravened *Nord* and ERISA by failing to weigh the evidence that supported the Dwyers. And then United simply refused Mr. Dwyer's efforts to have a meaningful dialogue about the problem. As a sister circuit put it when reversing a denial of benefits by United:

> United's reviewers were not required to defer to the treating physician opinions provided. However, their duties under ERISA require them to address medical opinions, particularly those which may contradict their findings. This is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions. This back-and-forth is how civilized people communicate with each other regarding important matters. *United Behav. Health*, 67 F.4th at 1241 (quotation omitted). United breached these standards.
> *Id*., at 8 (emphasis added)

The *Dwyer* Court continued:

> ERISA requires *both* the beneficiary *and* the fiduciary to avail themselves of the administrative process. *See Vega*, 188 F.3d at 302 n.13. When one party

forfeits that process, it requires us to direct entry of judgment for the opposing party. *See Robinson*, 443 F.3d at 396. As the en banc court first explained in *Vega*:

> We decline to remand to the administrator to allow him to make a more complete record on this point. We want to encourage each of the parties to make its record before the case comes to federal court, and to allow the administrator another opportunity to make a record discourages this effort. Second, allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided. Finally, we have made plain in this opinion that the claimant only has an opportunity to make his record before he files suit in federal court[;] it would be unfair to allow the administrator greater opportunity at making a record than the claimant enjoys.

188 F.3d at 302 n.13.

It is a rule that has been reiterated time and again. For example, we repeated

in *Robinson v. Aetna Life Insurance Co.*:

> We reject Aetna's suggestion that remand to the administrator is required. In *Vega*, as here, no concrete evidence supported the administrator's basis for denying benefits. We declined a remand to allow the administrator another opportunity to make a record because each of the parties must make its record before the case comes to federal court. For the same reason, we believe that remand is inappropriate here.
> 443 F.3d at 397 n.5 (quotation and citation omitted); *see also Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704 F.3d 362, 368 n.2 (5th Cir. 2013) (noting that a remand is unnecessary when it would be an empty formality)….

*Id.*, at 8–9 (emphasis added).

*Dwyer* is nothing new.

Fifth Circuit case law has long held that if a claimant submits additional information or evidence to the administrator in a manner that gives the administrator a fair opportunity to consider it and to reconsider its decision denying benefits, that additional information becomes part of the administrative record. More specifically: The Fifth Circuit, sitting *en banc*, spoke clearly in *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287 (5th Cir.1999) (*en banc*). No dissents, no concurrences, the decision was unanimous:

**We hold today** that the administrative record consists of relevant information made available to the administrator **prior to the complainant's filing of a lawsuit** and in a manner that gives the administrator a fair opportunity to consider it. Thus, if the information in the doctors' affidavits had been presented to National Life **before filing this lawsuit** in time for their fair consideration, they could be treated as part of the record.[FN10] Furthermore, in restricting the district court's review to evidence in the record, we are merely encouraging attorneys for claimants to make a good faith effort to resolve the claim with the administrator before filing suit in district court; we are not establishing a rule that will adversely affect the rights of claimants.

FN10. Because there is no evidence in either the administrative record or the record before the district court to support the Vegas' contention that they presented the information in the doctors' affidavits to National Life, we cannot treat this information as part of the record.  **However, had the Vegas demonstrated to the district court that the information in the doctors' affidavits was presented to the administrator, the district court should have treated that information as part of the record.**

*Vega*, at 300 (emphasis added).

The *Vega* Court further explained:

**Our motivating concern here is that our procedural rules encourage the parties to resolve their dispute at the administrator's level.**  If a claimant believes that the district court is a better forum to present his evidence and we permit the claimant to do so, the administrator's review of claims will be circumvented.  This result is plainly contrary to *Bruch*, which requires us to apply an abuse of discretion standard of review.  Although we recognize that there is a concern that a self-interested administrator can manipulate this process unfairly (e.g., by permitting the administrator to exclude from the record information that would weigh in favor of granting the claim), we think that this concern is largely unwarranted in the light of adequate safeguards that can be put in place.

**Before filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.**  In *Moore*, we said that Awe may consider only the evidence that was available to the plan administrator in evaluating whether he abused his discretion in making the factual determination. *Moore, 993 F.2d at 102.*  **If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record.  *See, e.g., Wildbur*, 974 F.2d at 634-35.  Thus, we have not in the past, nor do we now, set a particularly high bar to a party's seeking to introduce evidence into the administrative record.**

*Vega*, at 300 (emphasis added).

In *Estate of Bratton v. National Union Fire Insurance Company of Pittsburgh, P.A.*, 215 F.2d 516 (5th Cir.2000), the Fifth Circuit reaffirmed its *en banc* holding in *Vega*, stating again:

> The plan administrator has the obligation to identify the evidence in the administrative record **and the claimant must be afforded a reasonable opportunity to contest whether that record is complete.** *See Vega v. National Life Ins. Services*, 188 F.3d 287, 295, 299 (5th Cir.1999) (en banc) (citing *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201-02) (5th Cir.1997)). Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim. *See id.* At 299.[FN5] **Thus, the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.** *See id.* If an administrator has made a decision denying benefits when the record does not support such a denial, the court may, upon finding an abuse of discretion on the administrator's part, award the amount due on the claim and attorney's fees. *See id.* At 302 (citing *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.1992)).
>
> FN5. **Further, as a safeguard against possible abuse or mistake, the claimant's lawyer may add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.** *See Vega*, 188 F.3d at 300. **If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record.** *See id.* at 300 (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 634-35 (5th Cir.1992)).

*Id.*, at 521 (emphasis added).

In *Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 393 (5th Cir. 2006), the Fifth Circuit, citing *Vega*, stated: "Aetna was required to develop its factual record at the administrative level. *See Vega,* 188 F.3d at 302." *Id.,* at 397. The *Robinson* Court further stated: "We declined a remand to allow the administrator "another opportunity to make a record" because "each of the

parties" must "make its record before the case comes to federal court." *See Vega,* 188 F.3d at 302 n. 13. For the same reason, we believe that remand is inappropriate here." *Id.,* at 397, n.5.

Here, Lincoln's September 27, 2023 appeal denial was Plaintiff's first exposure to Lincoln's expert physician, Dr. Geimer's September 7, 2023 commentary on Dr. Arnold's opinion and report. Plaintiff immediately sent an October 3, 2023 claim file request to Lincoln in order to review Dr. Geimer's full report. Lincoln sent the claim file by letter dated October 16, 2023. Plaintiff's response to Lincoln with Dr. Arnold's brief explanation of disagreement with Dr. Geimer was sent to Lincoln just a month later on November 17, 2023 with request and full opportunity to consider it and reconsider its denial exactly as *Vega*, *supra*, contemplates, thus deeming it part of the administrative record by law. Plaintiff did not file suit until after Lincoln <u>expressly</u> refused to consider it.

Thus, as in *Robinson*, Lincoln had fully developed its factual record to its own satisfaction. As *Dwyer* explains, Lincoln forfeited the process when it refused to consider Dr. Arnold's report that Mr. Sewell presented to Lincoln for consideration before filing suit, exactly as the Fifth Circuit instructs, to make it part of the administrative record. *Dwyer* explains that once Lincoln forfeited the process, a remand to give it a second shot at developing evidence was improper. Therefore, both of Dr. Swotinsky's reports and Lincoln's Kayla Bick Declaration should never have come before the Court, as they were created after Mr. Sewell filed suit. They should not be considered by the Court because they are not part of the administrative record. If Lincoln is permitted to first refuse to consider evidence reasonably offered by a claimant before filing suit as contemplated by *Vega,* then permitted to halt Plaintiff's right to pursue court review just days before it is scheduled to take place, to <u>now</u> consider that very same evidence, then *Vega,  Robinson, Estate of Bratton,* and *Dwyer* would be rendered meaningless, and insurers would be encouraged to behave similarly.

**The Recent *Dwyer* Decision Supports the Reversal of
Lincoln's Denial on Substantive Grounds as Well**

In addition to its instructions regarding forfeiture of the administrative process, the Fifth

Circuit's recent *Dwyer* opinion also emphasized the often glossed-over central purpose of ERISA:

> Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans….designed "to protect contractually defined benefits…"
>
> ERISA furthers these goals by circumscribing how plans can process claims. See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("Plans must 'provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.'" (quoting 29 U.S.C. § 1133(1))). The statute additionally requires plans to "'afford a reasonable opportunity ... for a full and fair review' of dispositions adverse to the claimant." Id. at 830–31, 123 S.Ct. 1965 (quoting 29 U.S.C. § 1133(2)).
>
> In processing those claims, plans have a fiduciary duty to act "in the interest of the participants and beneficiaries." 29 U.S.C. § 1104. That means, as a fiduciary, a plan has a duty of loyalty and a duty of care to plan beneficiaries….
>
> *4 Our review under ERISA is twofold: We look to both substance and procedure. In looking to substance, we ask whether the beneficiary was substantively entitled to the claimed benefits "under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). On procedure, we ask whether the ERISA fiduciary employed "full and fair review" of the claim as required by law. Id. § 1133(2)…
>
> Substance first….
>
> An ERISA plan must explain its decision to deny benefits, and its denial must be based on concrete evidence.

*Id*., at 3-4 (emphasis added, citations omitted).

The *Dwyer* Court chastised United's sloppy denial letter statements that fell into two

categories, both present in Lincoln's denial of Mr. Sewell's claim: 1. those that misstated the

record, and 2. those that were perhaps true, but were either irrelevant to the issue, or not based on

an individual consideration of [the insured's] circumstances. In the *Dwyer* excerpts quoted below,

United's denial letter statements are in bold, followed by the Court's comments:

**"After talking with your doctor, it is reported that you have made progress and no longer need the type of care and services provided in this setting."**

At no time prior to July 2015, when United denied E.D.'s hospitalization benefits, did E.D.'s doctors say she no longer needed the type of care provided by Avalon Hills. To the contrary, E.D.'s doctors vigorously disagreed with that characterization and appealed United's determination to cut benefits…. Notwithstanding the contrary reporting of E.D.'s doctors, United simply said the opposite when it terminated her benefits….

**"You are eating all your meals."…**

This statement might have been true but was in any event irrelevant. It might have been true that E.D. was eating all her meals at Avalon Hills, but she was doing so under constant observation in a hospitalization setting…

**"Your care could continue at the intensive outpatient level of care."**

Again, this statement is true but irrelevant. The fact that E.D. could continue treatment in an outpatient setting says nothing about whether an outpatient setting would be therapeutically equivalent to the care she was receiving at Avalon Hills….

**"You are not trying to harm yourself. You are not trying to harm others"…**

At no point in her entire difficult journey was E.D. ever treated for [self-harm other than for refusing to eat, or] the latter behaviors. United's reference to self-harm <u>thus suggests that its denial letter was not based on an individual consideration of [the insured's] circumstances.</u>

**"You are better."…**

'You are better' has no medical significance. *See, e.g., S.B. v. Oxford Health Ins., Inc.*, 419 F. Supp. 3d 344, 367 n.14 (D. Conn. 2019) (holding a United denial letter that relied on the fact that a beneficiary was "doing better" too vague to support a denial of benefits). <u>The plan does not countenance any discussion of this sort of vague platitude. Rather, the plan requires a particularized evaluation of E.D.'s medical needs and therapeutic alternatives for meeting those needs. Here, there is not sufficient "concrete evidence in the administrative record that supports</u>

the denial of the claim." *Vega*, 188 F.3d at 302; *see also Robinson*, 443 F.3d at 395–97.

*Id.*, at 5-6 (emphasis added).

Lincoln's January 27, 2023 initial denial letter fails *Dwyer's* requirement that it "explain its decision to deny benefits, and its denial must be based on concrete evidence" and demonstrates that it is "not based on an individual consideration of [the insured's] circumstances" as *Dwyer* criticized as improper. *Id.*, at 3-6. The letter recites nothing about the individual circumstances of Mr. Sewell's accident. It recites no evidence at all beyond the blood lab result. One cannot tell from reading it whether Mr. Sewell's accident involved driving off a cliff for no apparent reason, or making a shallow-angle dive from a bay boat 18 inches above the water surface, like others were doing with no problem, when all indications suggested it was safe to do so. One cannot even tell whether his loss was of a leg, an eye, or Mr. Sewell's tragic quadriplegia. The letter does not suggest anything even about the generic descriptions of alcohol effects and studies about alcohol-related spine injuries, having nothing to do with our facts, that Dr. Millstein provided to Lincoln in his one-day turnaround report after Lincoln referred him the case. The letter simply recited the exclusion and said:

> Based on the above exclusions and the review of Medical Records received, as well as the Toxicology and Lab Reports it has been determined the Accidental Dismemberment benefit is not payable. The reports received for Mr. Sewell noted an Ethanol level of .222 mg/dL.
>
> The toxicology findings concluded that Mr. Sewell's blood ethanol was .222 mg/dL. Therefore, there is a presence of alcohol in the Covered Person's blood in this claim. This raises the presumption that Mr. Sewell was under the influence of alcohol and contributed to the cause of his accidental dismemberment. The facts of this claim support this presumption. Therefore, alcohol caused or, at a minimum, contributed to the cause of this accident. As such, we have determined that no Accidental Dismemberment benefits are payable as outlined in the #11 exclusion of Policy as noted above.

(D.E. 21-4, Pages 165-167)

Thus, the initial denial fell far short of providing "[t]he specific reason or reasons for the adverse determination" as contemplated by 29 C.F.R. § 2560.503-1(g)(1)(i), (ii) and the Fifth Circuit's *Dwyer*. It was also "not based on an individual consideration of [Mr. Sewell's] circumstances" as *Dwyer* instructs it should be. *Id*., at 3-6.  Instead, it was purely conclusory – blood lab result equals denial with zero analysis of any other fact. Lincoln's initial denial improperly treated its exclusion, which requires that intoxication "contributed to or caused" the "loss," as a *per se* intoxication exclusion. This is an indication of conflicted Lincoln having a predetermined goal of denial.

Also as in *Dwyer*, Lincoln's appeal denial letters include purported statements of fact that plainly contradict the record. Lincoln's final appeal denial letter expressly relies on claims that a study demonstrated that alcohol use results in a 4.31-fold risk of a spinal cord injury while diving, meaning that 78% of all such diving accidents are attributable to alcohol use, when it was simply untrue. Its denial on appeal letter claims that eyewitnesses on the boat with Mr. Sewell said that Mr. Sewell did show "signs of severe intoxication" as if referencing a direct quote (D.E. 21-3, Page 56), when they said just the opposite, that he <u>did not</u> show <u>any</u> sign of <u>any</u> intoxication. Lincoln's appeal denial letter also included irrelevant and nonsensical notions, such as claiming that a record noting a "head-first" dive contradicts testimony that Mr. Sewell's dive was outward or at a shallow angle to the water. This is nonsensical because any dive is head-first, regardless of its angle. The two are plainly not contradictory as Lincoln asserts. Lincoln's purported reasons for denial are at least as bad those the *Dwyer* Court criticized as "vague platitudes" and as "not based on an individual consideration of [the insured's] circumstances." In Mr. Sewell's case, these individual circumstances include the uncontested controlled manner in which Mr. Sewell dove into the water, from only 18 inches above the surface, which all evidence indicated was 4.5-5 ft. deep,

after watching others do the same with no issue. As in *Dwyer*, the Court should reverse Lincoln's

denial and award Mr. Sewell the benefits he paid for and his family deserves.

**Conflicted Lincoln's Procedural Unreasonableness Warrants Placing More
Weight on its Financial Conflict of Interest**

As set forth in Mr. Sewel's opening brief, in the case of a financially conflicted

administrator like Lincoln here,  "A conflict of interest, such as the one in this case, "should

prove more important (perhaps of great importance) where circumstances suggest a higher

likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117, 128 S.Ct. 2343…."

*White v. Life Ins. Co. of N. Am.,* 892 F.3d 762, 767 (5th Cir. 2018), *as revised* (June 14, 2018).

Additionally, in a close case, the conflict can act as a "tie-breaker" for finding abuse of

discretion, and an insurer's "procedural unreasonableness" can warrant the reversal of a denial

even if substantial evidence does support it. *Id*. See also *Truitt v. Unum Life Ins. Co. of Am.,*

729 F.3d 497, 509-510 (5th Cir. 2013); *Schexnayder v. Hartford Life & Accident Ins. Co.,* 600

F.3d 465, 469 (5th Cir.2010). In *Truit,* the court explained that "the 'procedural

unreasonableness' of a plan administrator's decision is a separate concept that is a subset of our

conflict of interest analysis." *Id*., at 509 n.4

*Schexnayder* found Hartford's mere failure to address a Social Security determination

of disability in its denial letter procedurally unreasonable, and reversed its benefits denial

despite expressly finding that "substantial evidence" in the record supported its denial. *White*

found that LINA's failure to disclose an expert report until after suit was filed was procedurally

unreasonable, and expressly used it as a tie-breaker, calling the case otherwise "close."

Lincoln's behavior here is much worse, and certainly suggests a higher likelihood that

its financial conflict affected its benefits decision. Its initial denial letter violated applicable

regulations as described above. Then Lincoln refused to consider relevant evidence Plaintiff

provided for consideration before filing suit, in violation of Fifth Circuit law as cited above. Then Lincoln halted Court review just days before the opening briefing deadline to consider the same evidence it had refused to consider, <u>after</u> first filing a Joint Scheduling Order agreeing to that deadline. Then Lincoln failed to share its final expert report from Dr. Swotinsky, in which Dr. Swotinsky falsely inflated data from the study he cited on the percentage of spinal cord injuries from diving that are alcohol-related, for Mr. Sewell's review and response. Then Lincoln relied on Dr. Swotinsky's unshared report, quoting the falsely inflated data in support of its final appeal denial. Now Lincoln attempts to introduce yet more clearly prohibited evidence into the record - its Declaration of Ms. Bick on the substantive issue of Lincoln's claim handling process in general and for Mr. Sewell's claim specifically, as they may bear on the conflict-of-interest analysis.

Lincoln also mischaracterized other parts of the record, claiming that bystanders stated that Mr. Sewell showed signs of "severe intoxication" with no record support, and nonsensically pretended to reason that testimony describing an outward shallow-angled dive contradicts a cryptic report notation of a head-first dive to disparage the credibility of four eye-witnesses. Lincoln's selective consideration of evidence not only indicates that its decision was arbitrary (as discussed above), but also demonstrates its conflict of interest as well as a reason to give more weight to the conflict factor. See *Glenn*, *supra*, 128 S.Ct. at 2352. A claimant may demonstrate conflict of interest by showing that the administrator "emphasized a certain medical report that favored a denial of benefits [and] de-emphasized certain other reports that suggested a contrary conclusion." *Id.*

Lincoln's behavior as a whole demonstrates procedural unreasonableness, warranting the Court to give more weight to Lincoln's conflict of interest, and acting as a tie-breaker even if the Court were to consider the case to be "close."

On the conflict of interest issue, on page 22 of its memorandum, Lincoln cites several district court cases for the idea that they commented that the record before them had evidence showing that Liberty Life, a different company, had once separated its underwriting employees from those in claims. But logic doesn't support Lincoln's conclusion that its later purchase of Liberty Life somehow serves as evidence in this record that Lincoln does the same. Nor should the Court consider Lincoln's Ms. Bick Declaration as weighing against its conflict of interest influencing Lincoln's claim decision because her Declaration is not part of the administrative record. Regardless, none of that negates the irrefutable procedural unreasonableness of Lincoln in this record.

## CONCLUSION

This was a bad denial by Lincoln, applying an exclusion without adequate support in the record, and overwhelming undisputed evidence negating the essential element of causation that Lincoln chose to include in its exclusion. Mr. Sewell and his family are entitled benefits from Lincoln for which Mr. Sewell paid premium to protect his family. Mr. Sewell prays for judgment that Lincoln pay him full benefits and judicial interest, and make an attorney fee determination in accordance with the relief requested at the end of Mr. Sewell's opening brief, and the proposed order filed therewith.

Respectfully Submitted,

s/J. Price McNamara

_____

**J. PRICE McNAMARA**
Bar Nos: LA 20291 & TX 24084626
10455 Jefferson Highway, Ste. 130
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313
price@jpricemcnamara.com
Attorney for Complainant

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of October, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

s/J. Price McNamara

_____

**J. PRICE McNAMARA**