# *McCann v. Unum Provident*

United States District Court for the District of New Jersey

October 11, 2013, Decided; October 11, 2013, Filed

Civil Action No. 11-3241 (MLC)

**Reporter**

2013 U.S. Dist. LEXIS 147269 *; 2013 WL 5603913

KEVIN MCCANN, M.D., Plaintiff, v. UNUM PROVIDENT, et. al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Prior History:** *McCann v. Unum Provident, 921 F. Supp. 2d 353, 2013 U.S. Dist. LEXIS 13132 (D.N.J., Jan. 31, 2013)*

**Counsel:** [*1] For KEVIN M. MCCANN, M.D., Plaintiff: BENJAMIN CLARKE, JASON D. ATTWOOD, DECOTIIS, FITZPATRICK & COLE, LLP, TEANECK, NJ.

For UNUM PROVIDENT, Defendant: JANET NAGOTKO, STEVEN P. DEL MAURO, LEAD ATTORNEYS, MCELROY DEUTSCH MULVANEY & CARPENTER LLP, NEWARK, NJ.

**Judges:** Tonianne J. Bongiovanni, United States Magistrate Judge.

**Opinion by:** Tonianne J. Bongiovanni

# Opinion

## MEMORANDUM OPINION

## BONGIOVANNI, Magistrate Judge

This matter comes before the Court upon Plaintiff Kevin McCann's ("Plaintiff") motion to strike certain documents from the administrative record submitted by Defendant Unum Provident ("Defendant") [Docket Entry No. 61]. Defendant opposes Plaintiff's motion and cross-moves to supplement the administrative record with said documents [Docket Entry No. 65]. The Court has fully reviewed all of the papers submitted in support of and in opposition to both motions and has considered same without oral argument pursuant to *L.Civ.R. 78.1(b)*. For the reasons set forth more fully below, Plaintiff's motion to strike is GRANTED and Defendant's cross-motion to supplement is DENIED.

## I. Background and Procedural History

The Court and the parties are familiar with the facts underlying this matter and, as such, the Court shall not [*2] restate the facts at length herein. This is a disability insurance case in which the Defendants terminated the Plaintiff's disability benefits. Plaintiff originally brought this action against both Unum Provident and Hartford Life and Accident Insurance Company ("Hartford"). (*See* Compl. at ¶2-3). Hartford was subsequently terminated from this matter after the District Court entered summary judgment in Hartford's favor. [Docket Entry No. 53]. Therefore, the only remaining Defendant in Plaintiff's case is Unum Provident. Plaintiff's complaint alleges that he is still disabled and unable to perform his duties as an interventional radiologist. (Compl. at ¶9). The complaint alleges that Plaintiff suffered from hypertension diagnosed in 2005, and sleep apnea, diagnosed in 2006 which aggravated his hypertension. Plaintiff was later diagnosed in April 2007 with an aneurysm in his ascending aorta (*Id.* at ¶17). Plaintiff consulted Dr. Joseph Coselli, a cardiothoracic surgeon, who advised him that to continue working as an interventional radiologist would be harmful to his

health because of the "stressful nature of his occupation". (*Id.* at ¶18). Dr. Coselli further classified Plaintiff as fully [*3] disabled on March 10, 2008. (*Id.* at ¶19).

On March 10, 2008 Defendant began providing full disability benefits. (*Id.* at ¶31). On January 10, 2009, Defendant notified the Plaintiff that his disability status had been confirmed. (*Id.*) However, on December 23, 2009, Defendant terminated Plaintiff's benefits; a decision which the Plaintiff appealed. (*Id.* at ¶¶34-35). During the appeal, Defendant enlisted several doctors to review the file, including one Dr. Paul W. Sweeney, M.D. F.A.C.C. On September 7, 2010, Dr. Sweeney wrote to Dr. Coselli requesting clarification of his prior opinion regarding Plaintiff's disability. Plaintiff's appeal was denied by Defendant on September 20, 2010 at 4:21pm without Dr. Coselli's response, which was received approximately 45 minutes later that same day. Defendant reviewed Dr. Coselli's clarification letter and subsequently sent another letter to Plaintiff on September 29, 2010 supplementing its decision.

## II. Arguments

Plaintiff has moved to strike the documents Bate-stamped as PLA-CL-IDI-002486 to 002527 from the administrative record. There are, *inter alia*, two specific documents on which Plaintiff focuses. The first is Dr. Coselli's September 20, 2013 [*4] letter responding to Dr. Sweeney's September 7, 2010 letter, clarifying his opinion on Plaintiff's disability status. The second is Defendant's September 29, 2010 letter to Plaintiff's attorney supplementing its decision to deny Plaintiff's appeal.

Plaintiff claims Defendant's official decision was made as of 4:21pm on September 20, 2010 and that any documents considered or issued thereafter should be stricken from the administrative record. (*Plaintiff's Brief in Support* at 3; Docket Entry No. 61-1). Plaintiff relies on the Third Circuit case of *Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997)*, which held that the administrative record "consists of that evidence that was before the administrator when he made the decision being reviewed." *Mitchell, 113 F.3d at 440*. Similarly, where the court is reviewing a claim determination *de novo*, Plaintiff asserts that , under *Viera v. Life Ins Co. of North America, 871 F.Supp.2d 379 (E.D.Pa. 2012)* the Court "should rely substantially on the administrative record, but only allow supplementation of evidence when there is a clear inadequacy in the record." *Viera, 871 F. Supp. 2d at 388*. Plaintiff submits that no clear inadequacy exists and [*5] as such, the documents should not be considered to supplement the administrative record.

Conversely, Defendant contends that "[i]t is the claims administrator, who determines when the administrative record is closed." (*Defendant's Brief in Opposition* at 21; Docket Entry No. 65-1). As such, Defendant submits that September 29, 2010 should close the administrative record because Defendant "issued a letter dated September 29, 2010, supplementing its September 20, 2010, determination." (*Id.* at 21-22). Defendant relies on case law out of the Fifth Circuit holding that the administrative record "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." (*Id.* at 22, quoting *Vega v. Nat'l Life InsServs., Inc., 188 F.3d 287 at 300 (5th Cir. 1999))*. Defendant additionally relies on *Sample v. Shalala, 999 F.2d 1138 (7th Cir. 1993)* which permitted a letter to be part of the administrative record even though it was written subsequent to the Administrative Law Judge's decision because "it was based on information that was part of the administrative record and that [*6] was available prior to the ALJ's decision[.]" (*Id.* at 23, quoting *Sample, 999 F.2d at 1144*). Lastly, Defendant cites to *Fahringer v. Paul Revere Ins. Co., 317 F.Supp.2d 504, 512 n.2 (D.N.J. 2003)* which allowed depositions conducted subsequent to the final decision to be allowed into the "relevant

record" because the depositions were limited to "contents and interpretation of the record." (*Id.* at 23).

As to whether the document in question should be considered "new evidence", Defendant further argues that Dr. Coselli's September 20, 2010 letter "is not new evidence but is based upon medical information that was reviewed and considered by the claims administrator contemporaneous with when it rendered its final determination and in fact, formed part of the final determination as relayed to [Plaintiff's] counsel in [Defendant's] correspondence dated September 29, 2010." (*Id.* at 23-24). Defendant maintains that Plaintiff was "put on notice that [Defendant] had sent correspondence to his treating physician, Dr. Coselli to obtain clarification [of his opinion]" and that such letter is merely a response to that request. (*Id.* at 24). Therefore, Defendant moves this Court to include these documents [*7] as part of the administrative record.

Alternatively, Defendant requests that the Court supplement the record with these documents when exercising Its *de novo* review. Defendant contends that it is well-settled that courts may "look beyond the evidence presented to the administrator at the time the administrator rendered its final determination" when evaluating a claim determination under a *de novo* standard of review. (*Id.* at 30, citing *Jones v. United States Life Ins. Co., 12 F. Supp. 2d 383, 388 (D.N.J. 1998)* and *Luby v. Teamsters Health, Welfare, & Pension Trust Funds, 944 F.2d 1176 (3d Cir. Pa. 1991))*. Finally, Defendant states that under *Viera*, courts may look to supplement the record when it comports with the purposes of ERISA. (*Id.* at 27). *Viera* held that "[w]hen considering whether to permit evidence not before the plan administrator, the reviewing court should balance the...purposes of ERISA and exercise its discretion...when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Viera, 871 F.*

*Supp. 2d at 387* (internal citations and quotation marks omitted). Defendant argues that the inclusion of the [*8] letters would not prejudice Plaintiff and that the Court should consider the responsive nature of the letters, as well as the relatively short timeframe in which they were received. (*Id.* at 28). As such, Defendant submits that, should the Court consider the documents to be outside the timeframe of the administrative record, the Court instead supplement the record when reviewing Plaintiff's claim *de novo.*

In his reply, Plaintiff reiterates his position that the issue here is discrete, and that it is the "letter dated September 20, 2010 that triggered Plaintiff's right to judicial review, and that is the subject of this Court's review." (*Plaintiff's Brief in Reply* at 2; Docket Entry No. 67). Plaintiff claims that Defendant's September 20th determination was in no way "left subject to reconsideration" and cites to the language of same. (*Id.*) Plaintiff notes that the September 20th letter stated, in pertinent part, that "[Defendant] has completed the appeal review on your client [Plaintiff's] Individual Disability claim" and "after a full, fair and impartial appellate review, the determination to deny further benefits is upheld" and furthermore that "if your client disagrees with this decision, [*9] you have a right to bring a civil suit[.]" (*Id.*) (internal citations omitted). Plaintiff distinguishes Defendant's case law in *Vega* and *Sample* as persuasive rather than mandatory authority, as well as inapposite, arguing that neither case dealt with an administrator attempting to supplement the record, but instead involved circumstances where the claimant sought to admit evidence into the record. (*Id.* at 3). Plaintiff further argues that *Vega* has been rejected by other jurisdictions and that *Sample* did not involve a claim brought pursuant to ERISA. (*Id.* at 4). Lastly, Plaintiff distinguishes Defendant's reliance on *Fahringer* as merely a footnote in that opinion which included none of the relevant context in which the depositions were permitted into the relevant record. (*Id.* at 5). As such, Plaintiff submits that the law in the Third Circuit is clear

that the administrative record closes upon the final determination of the claim sought.

In response to Defendant's argument that the documents be considered by the Court in Its *de novo* review of the claim determination, Plaintiff argues that no "clear inadequacy" exists in this case as required under *Viera*. (*Id.* at 6). Plaintiff cites to [*10] *Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017 (4th Cir. 1993)*, relied upon by *Viera*, for the reasoning that "if the evidence is cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant mustered for the claim review, then its admission is not necessary[.]" (*Id.* at 6-7, citing *Quesinberry, 987 F.2d at 1027* (internal quotations omitted)). Therefore, Plaintiff contends that the Court not consider these materials in Its *de novo* review.

## III. Analysis

In the Third Circuit, the administrative record on a claim brought pursuant to ERISA "consists of that evidence that was before the administrator when he made the decision being reviewed." *Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997)*. *See also Fahringer v. Paul Revere Ins. Co., 317 F. Supp. 2d 504, 512 (D.N.J. 2003)* (finding that the administrative record includes all evidence submitted as of the final determination date); *Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40 (3rd Cir. 1993)*, abrogated on other grounds by *Miller v. Am. Airlines, Inc., 632 F.3d 837 (3rd Cir. 2011)* (disallowing medical records submitted after the final determination was made). However, [*11] the Court has the ability to supplement and consider evidence outside the administrative record when reviewing the claim *de novo*. *Luby v. Teamsters Health, Welfare and Pension Trust Funds, 944 F.2d 1176, 1185 (3d Cir. 1991)*. "When considering whether to permit evidence not before the plan administrator, the reviewing court should balance the...purposes of ERISA and exercise its

discretion...when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Viera, 871 F. Supp. 2d at 387*, quoting *Quesinberry, 987 F.2d at 1025* (internal quotations omitted). Further, courts "should rely substantially on the administrative record, but only allow supplementation of evidence when there is a clear inadequacy in the record." *Viera, at 388*.

The Court finds that the law in this Circuit is clear on this issue: documents not available to an administrator at the time the final determination is made are not part of the administrative record. Although Dr. Coselli's letter was received only 45 minutes after the determination was made, the fact remains that the determination was made without reference or reliance upon this later-received [*12] letter. Furthermore, even though Dr. Coselli's letter was responding to Defendant's request for him to clarify his opinion, Defendant still made its determination without yet receiving the letter. Indeed, had Dr. Coselli failed to ever respond to Defendant's request for clarification, presumably all parties would agree that September 20, 2010 at 4:20pm was the close of the administrative record. Moreover, Defendant's own letter belies its argument, having stated that the review was complete, that the appeal was denied, and that Plaintiff had the right to bring suit. (*Plaintiff's Brief in Reply, supra* at 2). Simply because Defendant voluntarily sent another letter on September 29th reiterating its decision in light of Dr. Coselli's clarification letter, such an action does not change the final determination date and hence, the close of the administrative record. "[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *King v. Hartford Life and Accident Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005)*.

Additionally, the Court finds that the holdings in *Vega* and *Sample* [*13] are indeed inapposite to

2013 U.S. Dist. LEXIS 147269, *13

the facts of this case. The Fifth Circuit case of *Vega* has been rejected by other jurisdictions and has indeed been questioned by the Fifth Circuit itself. *See Plaintiff's Brief in Reply* at 4, citing *Majeski v. Metropolitan Life Ins. Co., 590 F.3d 478 (7th Cir. 2009)* and *Keele v. JP Morgan Chase Long Term Disability Plan, 221 Fed. Appx. 316 (5th Cir. 2007)*. Likewise, *Sample* did not involve an insurance claim brought pursuant to ERISA.

Defendant also relies on *Fahringer* for the proposition that the administrative record may be supplemented with evidence obtained subsequent to the final determination. However, the extent of supplementation under *Fahringer* is limited to a footnote in which the court explains that depositions conducted subsequent to the determination, but pursuant to the Magistrate Judge's Order in the existing litigation, were to be allowed in as part of the relevant record. *Fahringer, at 512 n.2*. The Court finds that a similar exception is neither applicable nor warranted in the instant case. As such, the documents date stamped PLA-CL-IDI-002486 to 00-2527 are stricken from the administrative record.

The Court notes that the parties agree that [*14] the District Court's review of this matter is to be conducted *de novo.* With respect to Defendant's argument that the documents be considered by the Court in the scope of Its *de novo* review, the Court finds that this issue is one to be determined by the District Court. While this Court has stricken the aforementioned documents from the administrative record, same are still part of the record of this litigation and, as such, may be considered by the District Court if It so chooses. Therefore, at the time of trial, if the parties deem it necessary, the issue may be raised as to what weight, if any, should be accorded to those excluded documents.

## IV. Conclusion

For the reasons set forth above, Plaintiff's motion to strike documents from the administrative record is GRANTED and Defendant's cross-motion to supplement the record with same is DENIED. An appropriate Order follows.

Dated: October 11, 2013

/s/ Tonianne J. Bongiovanni

**Tonianne J. Bongiovanni**

**United States Magistrate Judge**

---

End of Document

Page 5 of 5

# *Needham v. Tenet Select Benefit Plan*

United States District Court for the Eastern District of Louisiana

January 30, 2004, Decided ; January 30, 2004, Filed, Entered

CIVIL ACTION NO. 02-3291 SECTION "N"

**Reporter**

2004 U.S. Dist. LEXIS 1267 *; 2004 WL 193131

SUSAN VAN VALKENBURGH NEEDHAM VERSUS TENET SELECT BENEFIT PLAN, ET AL

**Disposition:** [*1] Plaintiff's motion for summary judgment granted; Defendants' motions for summary judgment denied.

**Counsel:** For Susan Van Valkenburgh Needham, PLAINTIFF: James Frederick Willeford, James F Willeford, Attorney at Law, New Orleans, LA USA.

For UNUM Life Insurance Company of America, DEFENDANT: Lauren A Welch, McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, Metairie, LA USA.

For Tenet Employee Benefit Plan, DEFENDANT: Dwayne O Littauer, Elizabeth Pugh Odom, The Kullman Firm, New Orleans, LA USA.

**Judges:** KURT D. ENGELHARDT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KURT D. ENGELHARDT

# Opinion

## ORDER AND REASONS

Before the Court are: (1) Defendant's Motion for Summary Judgment, filed by defendant Tenet Employee Benefit Plan (the "Plan"); (2) a Motion for Summary Judgment, filed by defendant UNUM Life Insurance Company of America; and (3) Plaintiff's Cross Motion for Summary Judgment.

For the reasons that follow, plaintiff's motion is GRANTED. The defendants' motions are DENIED.

## I. BACKGROUND

Plaintiff filed this suit against the Tenet Employee Benefit [*2] Plan (the "Plan") and Unum Life Insurance Company of American ("UNUM"), alleging that her long-term disability benefits were wrongfully terminated. Prior to her disability, plaintiff worked as a medical technologist for Northshore Regional Medical Center, an affiliate of Tenet Healthcare Corporation. In November 1999, plaintiff began having numbness in her right hand. (UACL00028). Then, in June or July 2000, she began to have burning pain in her right scapula. (UACL00052). She sought medical treatment for this "right shoulder, right-sided arm pain, and right scapular pain," and was prescribed narcotic pain medication. (UACL00131). A myelogram revealed a defect in her cervical spine, and she underwent a cervical fusion at C5/C6 on August 16, 2000. (UACL00130). Dr. Bert R. Bratton performed the surgery. Plaintiff was then referred to Dr. Robert J. Beck, a chiropractor for post-surgery rehabilitation.

Plaintiff used sick leave beginning in July 2000. (UACL00052). In September 2000, she applied for short-term disability benefits pursuant to the Tenet Employee Benefit Plan, giving a disability date of July 14, 2000. She was approved for these benefits, which were self-insured by Tenet. [*3] *See* Tenet Exh. C, p. 29 ("During the first 180 days of a disability, … payable plan benefits are paid out of the general assets of the Company …. Beginning on the 181st day of a disability, income replacement benefits are insured by UNUM.").

UNUM began providing long-term disability benefits on January 10, 2001.

Beginning in October 2000, according to Dr. Bratton's notes, plaintiff reported an increase in pain, the "same original pain" -- "shoulder pain." (UACL00023). In January 2001, Dr. Beck reported that plaintiff had experienced two episodes of right arm "paralysis." (UACL00101). One of these episodes occurred in his office, and he observed that it involved the bicep, tricep, wrist flexor and extensors, as well as the intrinsic muscles of the right hand. The severity was such that he had difficulty trying to straighten out the affected joints. He had no explanation for what he had observed and was "at a loss" as to why such episodes were occurring, when a January 23, 2001 MRI revealed no problems with plaintiff's cervical spine. At an insured/claimant visit in February 2001, the interviewer similarly recorded that plaintiff reported "seizures" in her right arm. (UACL00114). [*4] In February 2001, Dr. Beck reported that "working over a microscope and other daily tasks were contraindicated" for plaintiff, that she was "under full restriction with no work at this time." (UACL00099-00100).

In March 2001, plaintiff was referred for an MRI and bone scan. These tests revealed nothing to explain plaintiff's symptoms. (UACL00140-143). An ultrasound of plaintiff's right upper extremity in April 2001 likewise revealed no abnormal physiology. (UACL00165).

On May 10, 2001, UNUM sent a letter to Dr. Bratton, stating that UNUM typically anticipates recovery from a cervical fusion to be complete within six to nine months and asking Dr. Bratton to answer a series of questions relating to plaintiff's condition. (UACL00177). Dr. Rand Metoyer responded to the letter on June 14, 2001, stating that he was "not able to determine" plaintiff's current restrictions and limitations or whether she had any work capacity. In response to the question "What are the current barriers for Ms. Needham to return to work? What would need to change in

order for her to get back into the work force?," Dr. Metoyer responded: "Pain. Psychological Support." (UACL00176).

A few days later, on June 21, 2001, UNUM [*5] sent a letter to plaintiff notifying her that it had determined she no longer met the policy's definition of disability [1] and therefore no longer was entitled to long-term disability benefits. (UACL00191-189). According to the letter, UNUM was denying further benefits because information in her file did "not support restrictions and limitations which would preclude [plaintiff] from [her] own occupation." (UACL00187). In particular, the letter focused on the post-surgery MRIs, x-rays, and bone scan, none of which had revealed a physiological explanation for plaintiff's symptoms. The letter noted Dr. Metoyer's statement of pain as a "return to work

---

[1] The policy defines "disability" as follows:

You are disabled when UNUM determines that:

-you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury;**

-you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury; and

-during the first 60 days of the elimination period, you are unable to perform the material and substantial duties of your regular occupation.

After 12 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

*Limited* means what you cannot or are unable to do.

*Material and substantial duties* means duties that:

-are normally required for the performance of your regular occupation; and

-cannot be reasonably omitted or modified.

*Regular occupation* means the occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location. (UACL00465).

barrier," although it gave no explanation for rejecting this doctor's opinion that pain precluded plaintiff from returning to work. Moreover, the letter ignored altogether Dr. Beck's conclusion that "working over a microscope and other daily tasks were contraindicated" for plaintiff and that plaintiff was "under full restriction with no work at this time." Indeed, the only concrete evidence cited in the letter was plaintiff's own report to UNUM that she (as part of her prescribed rehabilitation program) had been doing weight-lifting exercises [*6] up to 30 pounds. The letter gave plaintiff 90 days in which to appeal UNUM's decision.

 [*7] On June 29, 2001, Dr. Peter R. Galvan wrote a letter stating that plaintiff was under his care "with a chronic neuropathy of her shoulder and upper extremity causing physical disability." (UACL00206). On July 2, 2001, Dr. Beck wrote a letter to UNUM stating that plaintiff "continues to experience moderate to severe cervical pain that radiates into the right upper arm and into the right interscapular region." (UACL00208). In this letter, he explained that the controlled exercises he had prescribed for plaintiff did not evidence an absence of reduced capacity to perform her occupation. To the contrary, "simple activities such as bending her neck downward to look into a microscope should be avoided at all times." *Id.* "Any repetitive cervical motion that alters her posture from the neutral position will cause her to have complications." *Id.*

On September 18, 2001, plaintiff wrote a letter to UNUM, informing it that she wished to appeal UNUM's decision to deny her benefits. (UACL00219). In the letter, plaintiff cataloged her continuing attempts to find a medical answer for her condition, including cortisone injections, acupuncture, and possible arthroscopy. She explained that one [*8] could now "physically see the unevenness and drop of [her] right shoulder" and that she continued to have spasms, pain, and an inability to use her right arm and shoulder most of the time. *Id.* As a result, she had increased her use

of prescribed narcotics. *Id.* She also reported that Dr. Galvan has requested a handicapped parking permit on her behalf, which had been approved. *Id.*

In addition, plaintiff sent UNUM information from her employer, Tenet, including a June 30, 2000 letter informing plaintiff that Tenet had received a fax from plaintiff's treating physician indicating that neither Soma nor Vicodin should be taken during work or immediately prior to work. (UACL00215). The letter further instructed plaintiff that if she needed to take either Soma or Vicodin prior to or during work, she would be relieved of her duties for that shift.

On October 9, 2001, Dr. Bratton (the neurosurgeon who performed the August 16, 2001 cervical fusion) wrote a letter to UNUM, confirming that plaintiff had continued to have pain following the surgery, for which she took pain medication. (UACL00224). Dr. Bratton admitted that he was "somewhat at a loss to explain the significant complaints [*9] based on an uneventful one level fusion with good stability" and that he found it difficult to determine the exact extent of plaintiff's disability. *Id.* Dr. Bratton opined that, although a one-level fusion generally carries with it only a five to ten percent permanent disability, in plaintiff's case, "there is a more significant problem going on." *Id.*

On January 18, 2002, UNUM sent plaintiff a letter stating that the additional information "was not sufficient to reverse" UNUM's previous decision. (UACL00243). The letter stated that plaintiff's claimed disability was inconsistent with her performing the exercises prescribed by Dr. Beck (lateral pull-downs at 20 to 30 pounds, chest press, and rows at 15 pounds). The letter also suggested that plaintiff's claimed limited ability to use her hands for fine dexterity beyond short periods was refuted by her indication that she "would be interested in Rehabilitation taking classes over the computer." In response to plaintiff's complaints that her prescribed narcotic pain medication (Soma and Vicodin) made her groggy, UNUM simply stated

that "use of these medications should not cause significant cognitive impairment." *Id.*

Ten [*10] days later, on January 28, 2002, UNUM sent a letter informing plaintiff that, based on its review, denial of her claim was appropriate. (UACL00248-246). The letter reiterated UNUM's conclusion that plaintiff's claimed limitations were "inconsistent with [her] activities" (the exercises requiring plaintiff to lift 15 to 30 pounds) and that the "severity of [plaintiff's] pain complaints [was] not supported by the clinical data on file or [plaintiff's] reported activities" (presumably the rehabilitation exercises).

One month later, on March 7, 2002, plaintiff called UNUM. According to the UNUM memo documenting this call, plaintiff told the representative that plaintiff had been diagnosed with a progressive condition -- would UNUM reconsider her claim? (UACL00249). The representative told plaintiff that since she was not considered disabled on June 21, 2001, her coverage ended at that time, and any worsening of her condition would not be covered. *Id.* "Her claim therefore could not be reopened." *Id.*

On October 1, 2002, plaintiff's attorney wrote a letter to UNUM, explaining that he had been retained to represent plaintiff. He informed UNUM that plaintiff had been diagnosed [*11] with remote Parsonage-Turner syndrome on November 13, 2001 -- a fact that had not been considered in UNUM's determination of plaintiff's claim. (UACL00430). The letter also informed UNUM that the Social Security Administration had found plaintiff to be disabled, based in part on the Parsonage-Turner diagnosis. *Id.* Counsel enclosed with the letter the November 2001 diagnosis and other medical evidence. He concluded the letter with a request that UNUM reconsider plaintiff's claim for benefits based upon the supplemental information.

Among the materials submitted to UNUM by plaintiff's counsel was a September 25, 2001 letter to UNUM from Dr. Galvan. (UACL00278). It is unclear why this letter was not in UNUM's file when it made its January 2002 decision. In the letter, Dr. Galvan explained how he had referred plaintiff to other physicians and ordered numerous diagnostic tests to determine the cause of the pain that plaintiff "continues to have, even after the successful [fusion]." *Id.* He stated that he had "documented the spasm, paralysis, the tenderness and pain, as well as loss of function she experiences in her right scapula and arm." *Id.* He explained that "in [his] [*12] opinion, this is a physical/neurological problem" the cause of which "has not been able to be identified to date." *Id.* According to Dr. Galvan, plaintiff "is unable to do any type of work what so ever and cannot perform routine daily tasks without assistance or experiencing physical pain." *Id.* In his opinion, plaintiff was "not able to perform" the repetitive procedures required of a medical technologist, including "extensive bending over the microscope." *Id.* In addition, her daily regimen of Valium and Vicodin could interfere with the performance of her job duties such that "she should have no dealings with patient testing and reporting of results." *Id.*

Also among the materials sent to UNUM by plaintiff's counsel were November 2001 medical records from Dr. Felix Savioe and Dr. Art Leis, diagnosing plaintiff's condition as Parsonage-Turner syndrome (also known as neuralgic amyotrophy), based on a nerve conduction study and EMG performed on November 13, 2001. (UACL00284-280, UACL00330). According to other materials submitted by plaintiff's counsel, "this condition presents with severe pain in the shoulder and arm, followed by atrophic paralysis of some muscles." (UACL00279). [*13] Counsel also sent to UNUM the March 22, 2002 decision by the administrative law judge for the Social Security Administration, approving plaintiff's claim for disability benefits. (UACL00311-307).

UNUM replied to plaintiff's counsel in a letter dated October 18, 2002, stating that "no further review [would] be completed" regarding plaintiff's

claim for benefits, but that UNUM would be reviewing plaintiff's file to determine whether, in light of plaintiff's recovery of social security benefits, UNUM might be entitled to a set-off against payments previously made to plaintiff. (UACL00337). Shortly thereafter, on October 31, 2002, plaintiff filed this suit pursuant to the *Employee Retirement Income Security Act of 1974* ("ERISA").

## II. LAW AND ANALYSIS

All parties agree that this Court's review is limited to the administrative record (although there is some dispute as to what materials should be included, as discussed *infra*). Accordingly, they have submitted the matter on cross motions for summary judgment.

### A. Summary Judgment Standard:

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together [\*14] with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Kee v. City of Rowlett, Texas, 247 F.3d 206, 210 (5th Cir.)*, (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (quoting *Fed. R. Civ. P. 56(c)*)), *cert. denied, 534 U.S. 892 (2001)*. "The moving party bears the burden of showing ? that there is an absence of evidence to support the nonmoving party's case." *Id. at 210*. If the moving party meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* "A dispute over a material fact is genuine if the evidence is such that a jury reasonably could return a verdict for the nonmoving party." *Id.* (internal quotations omitted). "The substantive law determines which facts are material." *Id. at 211*.

### B. Standard of Review:

"'[A] denial of benefits challenged under *§ 1132(a)(1)(B)* is to be reviewed under a de novo standard unless the benefit plan gives [\*15] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Vega v. National Life Ins. Services, Inc., 188 F.3d 287, 295 (5th Cir. 1999)* (quoting *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989))*. Factual determinations are also reviewed for abuse of discretion. *Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002)*. When applying the abuse of discretion standard, the Court's task is to determine whether the administrator acted arbitrarily or capriciously. *Id.* "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Id.* (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan, 97 F.3d 822, 828 (5th Cir. 1996))*. Thus, an "administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.' " *Id.* (quoting *Vega, 188 F.3d at 299*). The Court owes no deference to an administrator's "unsupported suspicions" [\*16] and will not uphold the denial of a claim "solely because an administrator suspects something may be awry." *Vega, 188 F.3d at 302*. Simply put, there must be "some concrete evidence in the administrative record that supports the denial of the claim." *Id.* If there is none, the Court must find that " 'the administrator abused its discretion.' " *Lain, 279 F.3d at 342* (quoting *Vega, 188 F.3d at 302*).

This standard of review is somewhat less deferential where, as here, the administrator is operating under a conflict of interest. Here, it is undisputed that UNUM is both the party charged with determining whether claims for long-term benefits will be approved and the insurer responsible for paying claims that are approved. Such administrators "have a financial incentive to deny the claim and often can find a reason to do so." *Vega, 188 F.3d at 296*. This creates a conflict

of interest, as UNUM concedes. [2] The Fifth Circuit has adopted a "sliding scale" standard of review for such cases. *Vega, 188 F.3d at 296*. Using this sliding scale approach, "the court always applies the abuse of discretion standard, [*17] but gives less deference to the administrator in proportion to the administrator's apparent conflict." *Id.* For example, where an administrator is conflicted, the Court will be "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Id. at 299*.

## C. **The Administrative Record:**

The parties concur that the Court is limited in its review [*18] to the administrative record. They vigorously dispute, however, whether the November 2001 diagnosis regarding the cause of plaintiff's right-arm pain, numbness, and paralysis (*i.e.,* Parsonage-Turner syndrome) should be considered part of that record. Plaintiff's counsel submitted this diagnosis (along with additional medical records supporting plaintiff's disability) to UNUM in October 2002 -- before filing suit, but after UNUM had denied plaintiff's *pro se* administrative appeal. UNUM refused to consider the additional material on grounds that plaintiff plaintiff's appeal had been denied and her file closed.

Citing *Vega, supra,* plaintiff argues that the material constitutes part of the administrative record, and thus properly may be considered by the Court, because it was presented to UNUM before filing suit, thereby affording UNUM a fair

---

[2] As the Fifth Circuit explained in *Vega,* "there are two ways employee benefit plans may be created: (1) the employer funds the program and either contracts with a third party who administers the plan or provides for administration by a trustee, individual, committee, or the like; or (2) the employer contracts with a third party that both insures and administers the plan." *Vega, 188 F.3d at 295*. "In the latter situation, the administrator of the plan is self-interested, *i.e.,* the administrator potentially benefits from every denied claim." *Id.*

opportunity to reconsider its decision prior to litigation. UNUM argues that the Court should not consider this material because it was not before UNUM when it made its final decision on January 28, 2002. Alternatively, UNUM argues that the Court should not consider the material because it relates to a "new" condition, which [*19] was not diagnosed until after UNUM's initial decision to terminate plaintiff's benefits and Tenet's consequent decision to terminate plaintiff's employment, thereby disqualifying her as eligible to participate in the plan.

The Court disagrees with UNUM's latter argument. The record contains no evidence to support a determination that the condition diagnosed as Parsonage-Turner syndrome in November 2001 was a new condition. To the contrary, the record evidence is overwhelming that the condition diagnosed (*i.e.,* right scapular pain and right arm/shoulder pain, numbness, and paralysis) was the same as that for which she sought medical treatment in July and August 2000, that she complained of again post-surgery in October 2000, that was painstakingly documented by Dr. Beck in January/February and July 2001, and was described by Dr. Galvan in June 2001. (*e.g.,* UACL00023, UACL00130, UACL0099-101, UACL00206, UACL00208). The record contains no evidence to support a contrary conclusion.

UNUM's primary argument (*i.e.,* that in determining whether UNUM abused its discretion, the Court should limit its review to materials presented to UNUM on or before it made its final decision on [*20] January 28, 2002) is more persuasive. The question is not an easy one, however. Dicta in *Vega,* an en banc Fifth Circuit decision, tends to support plaintiff's argument. "Before filing suit," the *Vega* court stated, "the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it." *Vega, 188 F.3d at 300*. If the claimant's lawyer

does so, then "that additional information should be treated as part of the administrative record." *Id.* [3] [*21] Here, plaintiff's counsel did submit additional material to UNUM prior to filing suit and did ask UNUM to reconsider its decision. *See* UACL00430. He did so, however, eight months after UNUM had denied plaintiff's appeal. [4]

Were this Court seated in a different circuit, the Court would be confident in excluding from its review any materials submitted to UNUM after January 28, 2002, the date on which UNUM issued its decision denying plaintiff's appeal. [5] [*24] The

Fifth Circuit also has made statements that tend to support UNUM on this issue, [6] but it has done so (as far as this Court can determine) only in the context of evidence that had been presented for the first time in the district court, not with respect to evidence that had been presented first (albeit late) to the administrator prior to filing suit. In *Vega,* too, the Fifth Circuit was faced with evidence which the claimants had sought to present to the trial court in the first instance, not with evidence [*22] such as that confronting this Court, which was presented first to the administrator prior to filing suit. *Vega, 188 F.3d at 299-300* ("The testimony that the Vegas sought to introduce is evidence … which easily could have been presented to the administrator by the Vegas' counsel. The district court therefore correctly held that it could not admit new evidence for the purpose of resolving this dispute …."). Thus, while *Vega* does contain dicta that supports plaintiff on this issue, it does not address specifically the question presented here. Nor does it provide any guidance regarding the limits of post hoc accretion of the administrative record. Does an administrator *ipso facto* abuse its discretion by refusing to reconsider its decision after the administrative appeal process is concluded? At what point, if any, may an administrator close its file and simply refuse to consider new evidence? If an administrator legitimately may take this position eight months

---

[3] *See also Estate of Bratton v. National Union Fire Ins. Co. of Pittsburgh, 215 F.3d 516, 521 n.5 (5th Cir. 2000)* ("as a safeguard against possible abuse or mistake, the claimant's lawyer may add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it …. If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record.").

[4] It appears that plaintiff herself attempted to inform UNUM of her November 2001 diagnosis on March 7 2002, only one month after UNUM's final decision. However, this telephone call yielded only a one page internal memo by the UNUM representative who took the call. Thus, even if it were considered part of the record, it adds little that is of substance.

[5] *See, e.g., Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 458 (6th Cir. 2003)* ("The district court did clearly err, however, in relying on Auletta's affidavit to designate a piece of electronic mail sent from Rob McFarlane to Auletta on August 30, 1999, as part of the administrative record. The benefits committee notified Marks that it had denied his appeal on August 27, 1999. Clearly McFarlane's electronic mail could not have been available to the administrators when they made their final decision to deny Marks's claim. Therefore, this document should not be considered part of the administrative record."); *Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999)* ("'In reviewing decisions of plan administrators under the arbitrary and capricious standard, the reviewing court may consider only the evidence that the administrators themselves considered on or before the final decision denying benefits.'… Mr. Kimber appealed from the letter denying his benefits on May 20, 1996 and the plan administrator issued a final decision denying reinstatement for physical disability on August 13, 1996 …. Thus, our review is limited to evidence presented to Thiokol before August 13, 1996."); *Chambers v. Family Health Plan Corp., 100 F.3d 818, 824 (10th Cir. 1996)* (magistrate judge properly limited scope of review to evidence presented to

administrator "on or before its final decision"); *Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 48 n.8 (3rd Cir. 1993)* (holding that evaluations submitted after the committee's final decision cannot be considered in determining whether the decision was arbitrary and capricious); *Alford v. DCH Foundation Group Long-Term Life Ins. Co. of America, 144 F. Supp. 2d 1183 (C.D Cal. 2001)* ("Because this Court is primarily concerned with the propriety of the August 5, 1998 affirmance of the decision to grant benefits only through November 1, 1996, documentation 'received' only after that decision was rendered is not properly part of the 'record' against which it must be judged."), *aff'd, 311 F.3d 955 (9th Cir. 2002).*

[6] *See Denton v. First Nat'l Bank of Waco, Texas, 765 F.2d 1295, 1304 (5th Cir. 1985)* ("In reviewing a decision under the arbitrary and capricious standard, the trial court must focus on the evidence that was before the Plan committee when the final benefit determination was made.").

after denying a claimant's appeal, is it not inconsistent with the abuse of discretion standard of review for the Court to then judge the reasonableness of the denial in light of evidence submitted post [*23] hoc?

Fortunately, in this case, resolution of this difficult issue is not outcome determinative. With the November 2001 diagnosis, and the diagnostic tests that supported it, the main rationale offered by UNUM (*i.e.,* that the "objective medical evidence" did not support her claimed limitations) is thoroughly undermined, thus making UNUM's abuse of discretion more plain. However, even without these materials, the Court is compelled to conclude that UNUM abused its discretion, as discussed *infra.* Thus, the Court is comfortable deciding the administrative record issue in UNUM's favor. In determining whether UNUM abused its discretion in terminating plaintiff's benefits, the Court will restrict its review to the evidence that was before UNUM when it made its final benefits determination on January 28, 2002.

[*25] **D. <u>Analysis of UNUM's Decision:</u>**

UNUM denied plaintiff's claim for benefits based on its finding that she was not "limited from performing the material and substantial duties of [her] regular occupation," as required under the terms of the policy. (UACL00465). The question for the Court is whether this determination was "'based on evidence, even if disputable, that clearly supports the basis for its denial.' "*Lain, 279 F.3d at 342* (quoting *Vega, 188 F.3d at 299*). The Court owes no deference to an administrator's "unsupported suspicions." *Vega, 188 F.3d at 302*. There must be "some concrete evidence in the administrative record that supports the denial of the claim." *Id.*

The Court can find no concrete evidence in the record that supports UNUM's determination that plaintiff was not limited from performing the material and substantial duties of a medical technologist. As specified in the policy, UNUM

looked to the occupation of medical technologist as it is normally performed in the national economy, rather than how work tasks might have been performed for plaintiff's specific employer. (UACL00465). According to UNUM, a [*26] medical technologist's tasks include cutting, staining, and mounting biological material on microscopic slides, examining slides under a microscope, analyzing test results, entering findings into a computer, cultivating and analyzing microbial organisms, conducting medical research, and setting up, cleaning, and maintaining laboratory equipment. (UACL00183-180). The job requires precision working; frequent reaching, handling, and fingering; frequent lifting up to 10 pounds; and occasional lifting up to 20 pounds. *Id.*

Other than evidence that plaintiff was capable of occasional lifting between 10 and 20 pounds (evidenced by plaintiff's performance of her prescribed rehabilitation exercises), the record contains no evidence to support UNUM's conclusion that plaintiff was capable of performing any of the material and substantial duties of a medical technologist. Indeed, the evidence was to the contrary: *e.g.,* Dr. Beck's opinion that "working over a microscope and other daily tasks were contraindicated" for plaintiff and that plaintiff was "under full restriction with no work at this time" (UACL00099-00100, UACL00208); Dr. Metoyer's report of pain as a return-to-work barrier (UACL00176); [*27] Dr. Bratton's opinion that there was "a more significant problem going on" than the normal five to ten percent disability associated with a stable cervical fusion. (UACL00224). As the record stood on January 28, 2002, not a single treating or examining physician was of the opinion that plaintiff was able to perform the sorts of tasks required of a medical technologist. UNUM is correct that these doctors had not yet uncovered the physiological explanation for plaintiff's disability -- and admitted so. However, this fact does not constitute concrete evidence that plaintiff had no such disability, particularly given these doctors' expressed opinions

to the contrary. UNUM was not required to accept these physicians' opinions. But for the Court to uphold UNUM's finding of no disability, the record must contain *some* concrete evidence that supports that finding. Here, the record contains none.

Other than plaintiff's performance of prescribed exercises and the alleged absence of "objective" medical information in the file, the only other evidence cited by UNUM for its finding was plaintiff's expressed interest "in Rehabilitation taking classes over the computer." (UACL00243). According [*28] to UNUM, this interest on plaintiff's part refuted her claimed inability to perform computer work or other fine fingering beyond short periods of time. The Court disagrees. The fact that plaintiff might have *expressed a desire* to take a class via computer does not support a rational inference she was indeed capable of performing the microscope, computer entry, and other fine fingering work required of medical technologists. It does not even demonstrate that she is in fact capable of taking a rehabilitation class via computer -- only that she was interested in doing so.

Based on UNUM's description of a medical technologist's job responsibilities, the occasional lifting of 10 to 20 pounds constitutes only a minute aspect of the job. The overwhelming majority of tasks described require fingering and handling of microscopic slides, cultures, biological samples, microscopes and other laboratory equipment, as well computer data entry. Thus, the fact that plaintiff was able to perform her prescribed weight-lifting exercises cannot support UNUM's conclusion that she was capable of performing the material and substantial duties of her occupation.

In short, even without applying a "sliding [*29] scale" to its standard of review, the Court is able to find no concrete evidence in the record to support UNUM's basis for denying plaintiff's claim for benefits. Thus, it is the conclusion of the Court that UNUM abused its discretion in terminating plaintiff's benefits.

**E. The Plan's Motion for Summary Judgment:**

Under the terms of the Plan, UNUM is both the claims administrator and the insurer responsible for paying long-term disability claims. *See* Tenet Exh.C, p.29 ("Beginning on the 181st day of a disability, income replacement benefits are insured by UNUM. Plan benefits are paid in accordance with the insurance contract between UNUM and Tenet Healthcare Corporation."). The Plan argues that plaintiff's claims against it should be dismissed because UNUM is the party ultimately responsible for paying any claim for long-term disability benefits, the only kind of benefits at issue in this suit.

It is undisputed that, pursuant to the insurance policy between Tenet and UNUM, UNUM is responsible for paying approved long-term disability benefits. However, plaintiff derives her right to benefits from and through the Plan. The Plan has cited no authority to support its [*30] argument that by contracting with a third party to administer and insure claims such as plaintiffs', the Plan is relieved of its responsibility to claimants such as plaintiff. Indeed, as plaintiff points out, there is jurisprudence in this Court holding that the Plan is the only proper defendant in an action to recover benefits pursuant to *29 U.S.C. § 1132(a)(1)(B)*. *See, e.g., Roig v. Ltd. Long Term Disability Program, 2000 U.S. Dist. LEXIS 11379, 2000 WL 1146522 *9 (E.D. La. 2000)* (Vance, J.). Accordingly, the Court finds that Tenet has failed to carry its burden of demonstrating that is entitled to judgment as a matter of law dismissing plaintiff's claims against it.

**F. Amount of Judgment and UNUM's Argument for Set-Off:**

It is uncontested that plaintiff's basic monthly earnings were $ 3,577.77 and that, if found disabled, her gross disability payment would be fifty percent of her basic monthly earnings, or $ 1,788.88. It is further uncontested that plaintiff is receiving Social Security disability benefits in the

amount of $ 1,394.10 per month, which reduces her minimum monthly benefit under the policy to $ 394.78. The parties agree further that, should [*31] this Court rule in plaintiff's favor, plaintiff is entitled to receive this minimum monthly benefit retroactively to June 21, 2001. According to the Court's calculation, this yields 31 months of benefits, totaling $ 12,238.18. UNUM states that all such amounts are subject to any set-offs under the policy. However, UNUM has presented no evidence or argument regarding the amounts of any such set-off. Thus, the Court does not find that UNUM is entitled to any such set-offs as part of the judgment in this case. The Court agrees with plaintiff that prejudgment interest is appropriate under the facts of this case.

Regarding future benefits, the Court agrees with UNUM that plaintiff is simply to be placed "back on claim." Her right to receive future benefits will be subject to the terms of the policy, including the obligation to provide proof of continued disability, as defined by the policy.

### G. Attorneys' Fees:

An award of attorneys fees is authorized under *29 U.S.C. § 1132(g)(1)*. In determining the appropriateness of such an award, the Court is to consider the following factors: 1) the degree of the opposing parties' culpability or bad faith; 2) [*32] the ability of the opposing parties to satisfy an award of attorneys' fees; 3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; 4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant question regarding ERISA itself; and 5) the relative merits of the parties' positions. *See Riley v. Adm'r of Supersaver 401K Capital Accumulation Plan, 209 F.3d 780, (5th Cir. 2000)* (citing *Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir.1980))*. Weighing these factors in this case, the Court finds that an award of attorneys' fees to plaintiff is appropriate. Plaintiff shall file an appropriate motion within thirty (30) days.

### III. CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that: (1) the Motion for Summary Judgment filed by Tenet Employee Benefit Plan is **DENIED;** (2) the Motion for Summary Judgment filed by defendant UNUM Life Insurance Company of America is **DENIED;** and (3) [*33] Plaintiff's Cross Motion for Summary Judgment is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment in favor of plaintiff and against defendants in the amount of $ 12,238.18, with legal interest thereon from date of judicial demand, plus attorneys fees and costs.

New Orleans, Louisiana, this 30th day of January 2004.

KURT D. ENGELHARDT

UNITED STATES DISTRICT JUDGE

**End of Document**

United States District Court for the Southern District of Texas, Houston Division

May 29, 2013, Decided; May 29, 2013, Filed

CIVIL ACTION NO. H-12-1955

**Reporter**

2013 U.S. Dist. LEXIS 75397 *; 2013 WL 2368328

BOB G. JONES, Plaintiff, vs. METROPOLITAN LIFE INSURANCE CO., et al., Defendants.

**Counsel:** [*1] For Bob G. Jones, Plaintiff, Counter Defendant: Adam P Criaco, Criaco & Associates, Houston, TX.

For Metropolitan Life Insurance Company, Defendant, Counter Claimant: Andrew C Whitaker, LEAD ATTORNEY, Figari and Davenport, Dallas, TX.

For Lyondell Chemical Company, Defendant: Scott Robert McLaughlin, LEAD ATTORNEY, Jackson Walker LLP, Houston, TX; Matthew Dudley Cavenaugh, Jackson Walker, Houston, TX.

For Houston Refining LP, Defendant: Matthew Dudley Cavenaugh, Jackson Walker, Houston, TX.

**Judges:** Lee H. Rosenthal, United States District Judge.

**Opinion by:** Lee H. Rosenthal

# Opinion

## MEMORANDUM AND ORDER

This is a suit for benefits under an employee-welfare benefit plan (the "Plan") governed by the Employee Retirement Income Security Act of 1974, *29 U.S.C. § 1001, et seq.* The issue is remand to the Plan Administrator for consideration of information submitted after the administrative appeal ended. Based on the complaint, the motions, responses, and exhibits, the arguments of counsel, and the relevant law, this court grants the motion to remand. This suit is remanded to the plan administrator for 90 days to permit the Plan Administrator to consider evidence that was submitted after the administrative appeal ended. This [*2] case is stayed and administratively closed pending that review. The parties may reinstate this case to the active docket by filing a motion to do so within 14 days after the Plan Administrator concludes its review.

The reasons for this ruling are explained below.

## I. Background

Bob Jones worked as an accountant for Lyondell Chemical Company from 1972 to 2009. Lyondell established the Plan to provide long-term disability ("LTD") benefits to its eligible employees. Lyondell is the Plan's sponsor and administrator. Lyondell self-funded the Plan, designated Metropolitan Life Insurance Co. ("MetLife") as the claims fiduciary, and granted MetLife discretionary authority to determine eligibility for Plan benefits and to interpret its terms.

In January 2010, Jones filed a claim for LTD fits under the Plan, claiming that he had become disabled in July 2009 due to severe chest pain. (Docket Entry No. 24, Appx., at 1-12). On February 25, 2010, MetLife informed Jones that it was denying his claim and described his appeal rights. (*Id.* at 13-17). Jones retained a lawyer, Tom Shipp, to represent him. In April 2010, Shipp appealed MetLife's denial on Jones's behalf and submitted records from two of Jones's [*3] treating physicians. (*Id.* at 18-19). MetLife sent Shipp a detailed report and a copy of MetLife's

administrative claim file for Jones, which included the documents MetLife received from Shipp during the appeal process.

In an Agust 23, 2010 letter, MetLife provided a detailed synopsis of the medical information in the claim file and informed Shipp that it was upholding the denial of Jones's claim. The letter stated:

> Upon request, MetLife will provide you with a copy of the documents, records or other information, we have that are relevant Mr. Jones's claim and identify any medical or vocational expert(s) whose advice was obtained in connection with his claim. You also have the right to bring [a] civil action under *Section 502(a) of the Employee Retirement Income Security Act of 1974*.
> Please be advised that under the provisions of Mr. Jones' Plan, no further administrative appeals are available to him concerning his disability benefit.

(*Id.* at 36).

The letter also stated:

> Mr. Jones' file did not warrant further review by a board certified cardiologist in an effort to determine his functional limitation, as Dr. Uddin had explained several times during this appeal review that Mr. Jones' cardiac [*4] condition was stable and his chronic pain condition was not cardiac related. Please be advised, if additional medical information is submitted, by Dr. Uddin or any treating provider, in support of Mr. Jones functional limitations being related to his Coronary Artery Disease, we will be happy to review this information for consideration of benefits.

(*Id.* at 35-36).

On April 28, 2011, Adam Criaco, Jones's lawyer in this action, notified MetLife that he was representing Jones and asked about additional information or documentation needed for MetLife to complete its claim evaluation. (*Id.* at 37). MetLife responded as follows:

> Please be advised the uphold determination of August 23, 2010 constituted completion of the full and fair review required by Mr. Jones' long term disability plan. Therefore, Mr. Jones already exhausted his administrative remedies under the plan and no further appeals will be considered.
>
> Please be advised you have the right to bring [a] civil action under *Section 502(a) of the Employee Retirement Income Security Act of 1974*.
> Under the provision of Mr. Jones' Plan, no further administrative appeals are available to him concerning his disability benefit.

(*Id.* at 38).

In mid-June [*5] 2011, Criaco sent MetLife a series of letters requesting (among other things) the documents MetLife used to evaluate Jones's claim. (*Id.* at 39-42). In a letter dated July 12, 2011, MetLife sent Criaco a copy of the administrative claim file. (*Id.* at 43). Neither Jones nor Criaco sought to supplement the administrative record at that point. Instead, on August 8, 2011, Jones filed suit in the 152nd Judicial District Court of Harris County, Texas. (*Id.* at 44-62). The defendants removed the lawsuit to federal court, where it was docketed as Civil Action No. 4:11-cv-03328.

Jones served the defendants with written discovery and a copy of a subpoena that he had served on the Social Security Administration for a copy of its file on his claim for Social Security Disability Income ("SSDI") benefits. Before the initial pretrial and scheduling conference could occur, Jones voluntarily dismissed the suit. In a letter dated December 14, 2011, Criaco informed the defendants that Jones wanted to dismiss his pending action "[f]or personal reasons and time constraints." (*Id.* at 63). The next day, Jones filed an Unopposed Motion to Dismiss Without Prejudice, which was granted on December 16,

2011.

After [*6] the dismissal, Criaco sent MetLife additional documents in an attempt to supplement the administrative record. On January 6, 2012, Criaco sent defendants' counsel 280 pages of additional documents "offered for incorporation into the administrative record." (*Id.* at 64-70). Criaco explained that "[m]ost, if not all of the information and documentation that is attached for incorporation and re-evaluation was provided in some form or fashion in previous correspondence." (*Id.* at 70). Criaco included the following chronology of the documents:

⊞*Go to table1*

The [*7] neurostimulator referred to appears to be treatment after a late 2009 diagnosis of reflex sympathetic dystrophy syndrome. (Docket Entry No. 15, ¶ 7). Criaco did not include the date of diagnosis in his chronology. Paragraphs 11 and 12 of the Jones's complaint in the first lawsuit alleged that he was afflicted with reflex sympathy dystrophy and that Aetna had reversed its earlier refusal to pay for a neurostimulator, which was surgically implanted in the spring of 2011. (Docket Entry No. 24, Appx., at 47-48). Criaco did not supplement the record before filing the first suit with the additional information for the period between January and August 2011.

In a letter dated January 30, 2012, Criaco sent defense counsel what was purportedly a complete copy of the Social Security Administration's record on Jones's claim for SSDI benefits. (*Id.* at 71-72). Jones had applied for SSDI benefits on April 10, 2011 and had been awarded them on August 17, 2011. (Docket Entry No. 15, ¶¶ 11, 15-16, Ex. E).

In a letter dated February 16, 2012, MetLife informed Criaco that because Jones had closed the administrative record by filing the first lawsuit, the letters and the additional documents Criaco had [*8] recently submitted would not be considered. (*Id.* at 81-82). Later that same month, Criaco sent

MetLife copies of the documents he had sent to defense counsel. (*Id.* at 83-99). In March 2012, Criaco sent MetLife additional documents. The new documents included vocational assessments from Robert Cox dated January 28, 2012 and February 13, 2012, (*id.* at 100-13); the claims-handling report of Ted Marules, Sr. dated February 20, 2012, (Docket Entry No. 15, Ex. F); and an SSA "Function Report" dated July 11, 2011, (*id.*, Ex. G).

In a letter dated April 26, 2012, MetLife stated that Criaco's efforts to supplement the administrative record were untimely. The letter then stated:

> In August 2010, we notified your client, that we were upholding the denial of your client's claim and stated that we would consider additional materials relating to your client's cardiac condition should you decide to submit them. However, this was not an open-ended invitation. Under governing law, you were not entitled to submit, and have MetLife consider, additional materials after your client filed suit on August 8, 2011. By filing suit, the administrative record closed. *Vega v. National Life Ins. Servs., Inc., 188 F.3d 287, 300 (5th Cir. 1999)*. [*9] As such, your February 20, and March 12, 2012 attempts to supplement the administrative record [are] untimely, and we will not consider the additional materials you provided.
>
> In addition, as the administrative record in this matter includes only those materials compiled through the date your client filed suit, enclosed as you requested is a copy of the administrative claim file compiled through August 8, 2011.

(Docket Entry No. 24, Appx., at 120-21).

On June 28, 2012, Jones filed this lawsuit. (Docket Entry No. 1). On November 5, 2012, Jones moved to remand to MetLife so that the Plan Administrator could consider "new medical and vocational evidence" that "came into existence after the LTD appeal deadline had expired." (Docket Entry No. 15, ¶¶ 22-23). Jones also argued that MetLife

should be equitably estopped from opposing remand based on the August 23, 2010 letter stating that MetLife would consider any additional medical information that Jones submitted.

In response, MetLife argued that as a matter of law the administrative record closed when Jones filed his first lawsuit. (Docket Entry No. 24, at 10). MetLife also argued that its August 23, 2010 statement did not estop it from opposing [*10] remand because the letter was not an offer to continue submitting future evidence and because Jones had chosen to file suit rather than pursue additional administrative remedies. (*Id.* at 18-20). Lyondell responded on similar grounds, arguing that this court should not remand because Jones never moved to remand his first lawsuit. (Docket Entry No. 25, at 1-2). In reply, Jones argued that his dismissal of his first lawsuit served no improper purpose and that remand would have no prejudicial effect on the defendants. (Docket Entry No. 26, at 4-6).

These arguments and the responses are discussed below.

## II. The Legal Standard for a Motion to Remand

In an ERISA dispute, parties are required to exhaust their administrative remedies before filing suit in federal court. *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps., 215 F.3d 475, 479 (5th Cir. 2000)*. The district court reviews the administrative record to determine whether the plan administrator abused its discretion in denying benefits. *Holland Int'l Paper Co. Ret. Plan, 576 F.3d 240, 247 (5th Cir. 2009)*. Once suit has been filed, the parties are not permitted except under limited circumstances to supplement or expand the record. [*11] *Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 298-300 (5th Cir. 1999)* (en banc), *abrogated on other grounds by Metro. Life Ins. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)*. Each party must generally make its record before the case comes to federal court.

*Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 397 n.5 (5th Cir. 2006)*.

Courts have found "special circumstances" justifying remand when new evidence arises that was unavailable before suit, but have refused to remand when the evidence existed before suit. *See Hamburg v. Life Ins. Co. of N. Am., 470 F. App'x 382, 385-86 (5th Cir. 2012)* (per curiam) (finding remand improper when the plaintiff had an opportunity to provide claims administrator with an SSA decision before filing suit); *Offutt v. Prudential Ins. Co. of Am., 735 F.2d 948, 950 (5th Cir. 1984)* ("If new evidence is presented to the reviewing court on the merits of the claim for benefits, the court should, as a general rule, remand the matter to the plan administrator for further assessment."); *Mercer v. Life Ins. Co. of N. Am., 874 F. Supp. 2d 610, 633 (W.D. La. 2012)* (declining to remand when the plan administrator "already had the opportunity to consider the SSA decision, but declined [*12] to do so."); *Kelley v. Life Ins. Co. of N. Am., 2007 U.S. Dist. LEXIS 54460, 2007 WL 2159366, at *5 n.7 (S.D. Miss. July 26, 2007)* (remanding where evidence became available only after administrative process had been completed and suit had been filed); *Hedgepeth v. Blue Cross & Blue Shield of Miss., 2006 U.S. Dist. LEXIS 56636, 2006 WL 2331191, at *1 (N.D. Miss. Aug. 10, 2006)* ("[N]ew evidence on the merits of Plaintiff's claim for benefits qualifies as a special circumstance sufficient to warrant this case being remanded to the plan administrator for further review."). Some courts, however, have concluded that remand is more broadly justified. *See Moller v. El Campo Aluminum Co., 97 F.3d 85, 89 (5th Cir. 1996)* (remanding when an SSA decision issued before the plaintiff filed suit challenging the benefits denial was not provided to the doctors on the plan's medical board who resolved administrative appeals from benefits-denial decisions); *Hartwell v. U.S. Foodservice, Inc., 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496, at *9 (S.D. Miss. Sept. 13, 2010)*.

## III. Analysis

It is undisputed that at least some of the evidence submitted after the administrative appeal from the benefits denial did not exist when Jones filed his first lawsuit. MetLife appears to have taken the position [*13] that once Jones filed suit, it was under no obligation to consider evidence related to his benefits claim, even if that evidence did not exist before the suit was filed. MetLife relied on *Vega* for the proposition that the administrative record closed once Jones filed his first lawsuit.

"[T]he administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega, 188 F.3d at 300*. But the administrative record may also include new evidence obtained after suit is filed. *See Offutt, 735 F.2d at 950*; *see also Hamburg, 470 F. App'x at 385-86* (holding that remand under *Offutt* was inappropriate in light of *Vega* because the plaintiff obtained the additional evidence at issue nearly 18 months before filing suit). Courts may remand when, after filing suit, the plaintiff obtains new evidence that he could not have submitted before filing suit. *See, e.g., Kelley, 2007 U.S. Dist. LEXIS 54460, 2007 WL 2159366, at *5 n.7* (remanding to allow the plan administrator to consider evidence that became available only after the administrative process had been completed and suit had been [*14] filed); *Hedgepeth, 2006 U.S. Dist. LEXIS 56636, 2006 WL 2331191, at *1* (same).

At least one court within this circuit has expressed skepticism about interpreting *Vega* as an inflexible and unwavering rule. *See Hartwell, 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496, at *7* ("Defendant baldly argues that 'the court may only consider the evidence presented to [the plan administrator] when it made the decision to deny Plaintiff's claim and appeal.' Defendant offered no authority for this position, and the issue delves into a potentially murky area of Fifth Circuit jurisprudence . . . [because] *Vega* fails to 'provide any guidance regarding the limits of post hoc accretion of the administrative record.'" (citation omitted) (quoting *Needham v. Tenet Select Benefit Plan, 2004 U.S. Dist. LEXIS 1267, 2004 WL 193131, at *7 (E.D. La. Jan. 30, 2004))*). "'[P]assages [from *Vega*] suggest that new evidence submitted by the claimant becomes a part of the administrative record even if it is submitted after the administrator has reached its final decision.'" *Id.* (quoting *Keele v. JP Morgan Chase Long Term Disability Plan, 221 F. App'x 316, 320 (5th Cir. 2007))*.

It appears that Jones's counsel tried to submit documents after the first suit was filed but before the second suit was filed. It [*15] is appears that at least some of what counsel submitted included documents that could not have been submitted before the administrative process was completed and the first lawsuit was filed. It is unclear precisely which documents could not have been submitted until after the administrative appeal ended and which could have been submitted during the appeal. Some of the documents appear to predate the final appeal and were submitted before the first suit was filed. Some documents appear to predate the final appeal but were not submitted until after the first suit was filed. Other documents appear to postdate the final appeal and the filing of the first lawsuit. A critical document in this last category is the Social Security Administration's determination awarding Jones SSDI benefits. MetLife refused to consider any of the documents.

Remand is appropriate based on the unusual circumstances of this case. What constitutes the administrative record for ERISA review purposes is a context-dependent question for this court. *See, e.g., Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 970 (9th Cir. 2006)* ("[W]hen deciding what record a court should use to decide whether the administrator's [*16] decision was reasonable, '[i]t is not clear that any single answer covers all of the

variations in ERISA cases; the 'record' may depend on what has been decided, by whom, based on what kind of information, and also on the standard of review and the relief sought[.]'" (quoting *Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999)))*. The record this court must consider includes not only documents submitted to the Plan Administrator during the administrative appeal and considered in deciding the appeal, but also documents submitted after the appeal ended that the Plan Administrator had a "fair opportunity to consider" before suit was filed, *Vega, 188 F.3d at 300*, and new evidence that the plaintiff gained access to only after filing suit, *Offutt, 735 F.2d at 950*. It is appropriate for courts to remand for a plan administrator to consider evidence that was not in the administrative record before suit is filed because that evidence came into existence only after suit was filed. *See Offutt, 735 F.2d at 950*. "If, as *Vega* suggests, this Court's review is not limited to the information presented to the Plan Administrator prior to the decision, then remand would be consistent with *Vega*'s [*17] policy of encouraging resolution at the administrative level." *Hartwell, 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496, at *9*.

The fact that Jones voluntarily dismissed his first suit without seeking remand is not a sufficient basis to preclude remand at this point. At least some of the evidence, and potentially important evidence, that Jones now asks the Plan Administrator to consider did not exist when the first suit was dismissed. A primary goal of remand is to avoid judicial resolution of purely administrative benefits determinations. *See Moller, 97 F.3d at 89* ("[O]nce it was known that relevant evidence had not been given to the doctors, the evidence should have been supplied to them for redetermination and the lawsuit dropped. The judiciary's scarce resources should not be wasted on problems the parties could have, and should have, taken care of themselves."); *Ciaramitaro v. Unum Life Ins. Co. of Am., 521 Fed. Appx. 430, 2013 U.S. App. LEXIS 6968, 2013 WL 1339076, at *3 n.1 (6th Cir. Apr. 4, 2013)*

("[W]here additional evidence is submitted to the plan, especially evidence as compelling as a confirmation of a diagnosis, ERISA ought to encourage plans to reevaluate their previous decisions, not bind themselves to them.").

*Vega* does not prevent remand for [*18] MetLife to consider the evidence Jones submitted after filing the first suit; given the nature of the evidence, remand would hardly be a "useless formality." *See Offutt, 735 F.2d at 950*. The parties will not be prejudiced by remand for a limited period to consider Jones's additional evidence. *See, e.g., Kelley, 2007 U.S. Dist. LEXIS 54460, 2007 WL 2159366, at *6* ("[Defendant argues that it would be prejudiced by a remand because it would delay the adjudication of this dispute and increase expenses. The court does not find this to be compelling. Remand for sixty days to allow [the Plan Administrator] to consider [additional evidence] and make a new disability determination (while staying this action) would be a minor inconvenience. After the new disability determination is made, LNA can (if necessary) re-urge and supplement its existing motion for summary judgment, without having to duplicate its work, thus cutting down on additional expenses."). There is support within this circuit for remanding so that the Plan Administrator has a fair opportunity to review evidence previously submitted that the administrator refused to consider. *See, e.g., French v. Dade Behring Life Ins. Plan, 2011 U.S. Dist. LEXIS 132653, 2011 WL 5599186, at *4 (M.D. La. Nov. 17, 2011)*; [*19] *Hartwell, 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496, at *9*.

This court will remand this suit to the Plan Administrator for 90 days to permit it to consider the evidence Jones submitted after the administrative appeal ended. This case is stayed and administratively closed pending that review. The parties may reinstate this case to the active docket by filing a motion to do so within 14 days after the plan administrator concludes its review.

## IV. Conclusion

The motion to remand is granted. The Plan Administrator is ordered to consider Jones's additional evidence and make a new disability determination within 90 days of entry of this order. This case is stayed and administratively closed pending that review. The parties may reinstate this case to the active docket by filing a motion to do so within 14 days after the Plan Administrator concludes its review.

SIGNED on May 29, 2013, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United States District Judge


## ORDER

The motion to remand is granted. The Plan Administrator is ordered to consider Jones's additional evidence and make a new disability determination within 90 days of entry of this order. This case is stayed and administratively closed pending that review. [*20] The parties may reinstate this case to the active docket by filing a motion to do so within 14 days after the Plan Administrator concludes its review.

SIGNED on May 29, 2013, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United          States          District          Judge

## Table1 (*Return to related document text*)

| | | |
|---|---|---|
| May 2007 | Dr. Ott and Pain | Heart bypass. Coronary artery grafting Management Group at St. Lukes |
| 2007 | Dr. Uddin | Thallium Stress Test |
| February 2008 | Dr. Ott | Chest X-Ray |
| June 2008 | Dr. Singleton | Started pain management |
| August 2008 | Dr. Uddin | Thallium Stress Test |
| February 2009 | Dr. Uddin | Heart Catheterization |
| June-July 2009 | Dr. Uddin | External Contrapulsation Therapy (ECP) |
| July 10, 2009 | Dr. Uddin | Instructed not to return to work |
| July 22, 2009 | Dr. Singleton | ESI injections at T7, T8, T9, T10 |
| August 2009 | Dr. Ott | Wire removal from 5/07 heart surgery |
| August 2009 | Dr. Ott | CAT scan |
| September 23, 2009 | Dr. Singleton | ESI injections at T7, T8, T9, T10 |
| September 23, 2009 | Dr. Singleton | ESI injections at T7, T8, T9, T10 |
| October 2009 | Dr. Singleton | Referred to Dr. Phan for neurostimulator |
| December 2009 | Steve Smith, PhD | Psychological Exam related to neurostimulator |
| January 2010 | | Heath insurance (Aetna) denied neurostimulator |
| December 1, 2010 | | Aetna reversed decision for neurostimulator |
| December 22, 2010 | Dr. Phan | Trial neurostimulator (dorsal column stimulator) |
| January 26, 201[1] | Dr. Phan | Permanent neurostimulator (dorsal column stimulator) |

## Table1 (*Return to related document text*)

**End of Document**

# *Colvin v. 88 Bd.*

United States District Court for the Western District of Texas, San Antonio Division

April 11, 2018, Decided; April 11, 2018, Filed

Civil Action No. SA-17-CV-974-XR

**Reporter**

2018 U.S. Dist. LEXIS 61818 *; 2018 WL 1756738

JAMES R. COLVIN, Plaintiff, v. 88 BOARD, THE JOINT BOARD OF TRUSTEES FOR THE 88 PLAN, Defendant.

**Counsel:** [*1] For James R. Colvin, Plaintiff: Robert E. Valdez, Valdez & Trevino Attorneys at Law, P.C., San Antonio, TX; Stephen Rolfe Walker, George E. Chandler, Chandler, Mathis & Zivley, P.C., Lufkin, TX.

For 88 Board, the Joint Board of Trustees for the 88 Plan, Defendant: D. Mitchell McFarland, LEAD ATTORNEY, Munsch Hardt Kopf & Harr, P.C., Houston, TX; Michael L. Junk, Groom Law Group, Washington, DC.

**Judges:** XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** XAVIER RODRIGUEZ

## Opinion

### ORDER

On this date, the Court considered Plaintiff's Motion to Supplement the Administrative Record (docket no. 23) and Defendant's Motion for Protective Order (docket no. 28). Because the Court grants Plaintiff's motion to supplement the administrative record with materials that were not considered by the 88 Plan Board, the Court finds that remand is appropriate. The motion for protective order is therefore dismissed as moot.

### Background

The National Football League Players Association and the National Football League Management Council created the 88 Plan, which is an ERISA plan that provides benefits to eligible former NFL players who have dementia, amyotrophic lateral sclerosis, or Parkinson's disease. The 88 Plan provides that dementia [*2] excludes substance-induced persisting dementia. To receive reimbursement from the Plan, a player must first apply to become an "88 Eligible Player." Initial applications are reviewed by the 88 Committee, and denials may be appealed to the 88 Board, which conducts a de novo review and then issues a final determination.

Plaintiff James R. Colvin played football for the NFL from 1960 to 1967. Plaintiff asserts that the traumatic injuries he received from playing football have manifested into neurological and physical disabilities, including the onset of dementia. He applied for benefits initially in 2013, asserting dementia as a basis for eligibility. His treating physician, Dr. R. Braden Neiman, completed part of the application (as required), noting that a 2012 PET scan "showed early dementia and Alzheimer's disease." Dr. Neiman also provided records in support of the application, and a July 5, 2012 record stated that the PET scan showed "some changes that could be consistent with a dementia process" but it "was still indeterminate" and "they recommended follow-up in six months to a year." The Committee denied the application on the basis that the record did not show that Colvin had [*3] been diagnosed with dementia, ALS or Parkinson's, and informed Plaintiff by letter on April 3, 2013.

In February 2015, Plaintiff filed an application with

the Bert Bell/Pete Rozelle NFL Player Retirement Plan for total and permanent disability benefits and/or the 88 Plan for dementia benefits. He was asked to submit an application with the appropriate section completed by Plaintiff's treating physician, and he did so on May 5, 2015. Dr. Neiman checked the box "yes" for the question "Does Player have Dementia as defined in the Diagnostic and Statistical Manual of Mental Disorders (4th E., Text Revision)?" He checked "no" for the question "Is (1) Substance-Induced Persisting Dementia or (2) Dementia Due to Multiple Etiologies where Substance-Induced Persisting Dementia is the primary cause?"

The Plan informed Plaintiff in June 2015 that medical reports from the physician documenting and/or providing a basis for the dementia diagnosis were missing from the application such that it was incomplete. Medical records were submitted on June 16, 2015. The Committee denied the application in July 2015. The denial letter states that the application indicates that Colvin may be eligible for benefits [*4] due to a diagnosis of dementia but the medical records "do not show that you have been diagnosed with Dementia by a physician with experience in the field of treating Dementia."

Colvin appealed in December 2015 and submitted additional records, including those related to an evaluation by Dr. Neiman on December 7, 2015 and a referral to Dr. Douglas Cooper with South Texas Neuropsychology. The 88 Board referred Colvin for an evaluation with a Plan neurologist, Dr. Eric Brahin, for a dementia evaluation in June 2016. Dr. Brahin noted that Plaintiff had been drinking since age 12 and would drink 2-4 "big drinks" per night, each containing 2-3 shots of alcohol per night. Dr. Brahin concluded that Colvin had a substance abuse problem with alcohol and that he was "unable to properly determine whether or not [Plaintiff] suffers from dementia due to his alcohol abuse." However, Dr. Brahin also noted additional facts that he felt made a diagnosis of

dementia unlikely, such as the fact that Colvin lives independently.

The 88 Plan Board denied the appeal on August 17, 2016. The denial letter was sent on August 26, 2016. It explained that the Board denied benefits for two reasons: (1) based on the [*5] medical reports, the Board found that Plaintiff did not have dementia; and (2) even if he did have dementia, his alcohol abuse precludes a finding that he is an 88 Eligible Player because substance abuse dementia is excluded from the plan and Dr. Brahin found that Plaintiff's alcohol abuse interfered with a reliable diagnosis of dementia. The letter informed Plaintiff that he "should regard this letter as a final decision on review within the meaning of *Section 503* of the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder by the Department of Labor." It further informed him of his right to bring an action under ERISA.

Apparently before receiving that letter, Plaintiff's attorney sent Defendant a letter on August 29, 2016 objecting to Dr. Brahin's report based on asserted factual errors and attaching an August 23, 2016 report from Dr. Neiman rebutting Dr. Brahin's statements and conclusions. Plaintiff's counsel noted that Dr. Neiman questioned whether Dr. Brahin's report was actually about Plaintiff or was confused with another patient given its "many factual errors." Counsel asked that Dr. Brahin's report be disregarded or, if considered by the appeals [*6] Board, that Dr. Neiman's report also be considered in rebuttal.

Dr. Neiman's August 23 report stated that Plaintiff had no indications of alcohol abuse and that Dr. Neiman was confident that Plaintiff has Alzheimer's. Dr. Neiman stated that, in all the years he had known Plaintiff, he had never reported an alcohol history substantial to the one that Dr. Brahin listed, nor had there been evidence of it. Dr. Neiman also noted that Dr. Brahin conducted only a short meeting with Plaintiff and conducted the

Montreal Cognitive Assessment, which is a quick, mini-assessment for screening and not a diagnostic tool. He also rebutted Dr. Brahin's conclusion that someone with dementia could not live alone as Plaintiff did, noting that Plaintiff could live alone "at his level, especially given that he has close family support." He concluded by stating that, "full neurological work-up has revealed changes consistent with Alzheimer's disease and I am confident with my diagnosis. There is no evidence of alcohol abuse to question Jim's diagnosis, and in speaking with Jim, he disputes the statements made by Dr. Brahin regarding his alcohol use."

On September 27, 2016, Plaintiff's attorney sent a second [*7] letter refuting Dr. Brahin's report and emphasizing Dr. Neiman's letter and asking for reconsideration. The letter states that Dr. Brahin's report was not timely provided to Colvin and, had it been, he could have provided Dr. Neiman's rebuttal report for review at the August 17, 2016 meeting of the 88 Board. The letter also states that both Colvin and his son (who was present at Dr. Brahin's evaluation of Colvin) deny the statements that Dr. Brahin reported about Colvin's drinking habits. On October 19, 2016, counsel for the 88 Plan responded to the August 29 and September 27 letters, informing them that the letters were being forwarded to Dr. Brahin and asking him to respond. The letter said, "When we have Dr. Brahin's reply, we will share it and discuss with you the appropriate next steps, if any."

On November 3, 2016, Dr. Brahin issued a second opinion regarding Colvin. Dr. Brahin stood by his statement that Colvin admitted to two to four "big drinks" per day with two to three shots of alcohol in each drink and criticized Dr. Neiman for not fully exploring Colvin's alcohol use. Defendant's counsel forwarded Dr. Brahin's rebuttal to Plaintiff's former counsel on November 8, stating [*8] "I enclose for your review a November 3, 2016 letter from Dr. Brahin, which addresses the issues you raised concerning Dr. Brahin's evaluation of Mr. Colvin. As you can see, Dr. Brahin stands by his report. If

you have any questions or concerns, please let me know. Otherwise, I will consider the matter closed."

On March 31, 2017, Plaintiff's attorney sent Defendant a letter outlining Plaintiff's position and attaching additional documentation, including a March 14, 2017 report from Dr. Neiman. The report stated that Colvin's initial neurological work-up revealed some changes consistent with a dementia process but was still indeterminate, but he had continued to have progression of memory changes and a full neurological work-up was repeated, including a brain MRI and PET scan, "which revealed changes consistent with progression of hippocampal atrophy and posterior hypometabolism consistent with Alzheimer's disease." It further stated that there was no evidence of alcoholism as suggested by Dr. Brahin and that he disagreed with Dr. Brahin's evaluation.

On April 13, 2017, counsel for the Board responded, stating that the August 2016 decision was "a final decision that is not subject to [*9] further administrative review" and that Plaintiff could bring suit under ERISA if he would like to challenge the decision or could file a new application. Colvin filed this lawsuit on October 2, 2017. Colvin brings this ERISA suit on the basis that he is an eligible former NFL Player entitled to receive 88 Plan benefits and Defendant wrongfully denied those benefits in violation of the plan provisions and ERISA.

## Applicable Law

ERISA provides the federal courts with jurisdiction to review determinations made by certain benefit plans. *29 U.S.C. § 1132(a)(1)(B)*. When assessing factual questions, the district court is constrained to the evidence before the plan administrator. *Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999)*. The plan administrator has the obligation to identify the evidence in the administrative record and the claimant must be

afforded a reasonable opportunity to contest whether that record is complete. *Estate of Bratton v. Nat'l Union Fire Ins. Co., 215 F.3d 516, 521 (5th Cir. 2000)*. "Once the administrative record has been determined, the district court may not stray from it but for limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical [*10] terminology or practice related to a claim." *Id.*

In *Vega*, the Fifth Circuit held that "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega, 188 F.3d at 300*. Relying on *Vega*, Plaintiff moves to include in the administrative record certain materials provided by Plaintiff to the Board after its decision but with sufficient time for the Board to consider it before Plaintiff filed suit in October 2017. The Board opposes inclusion of the materials, asserting that the administrative record should only include documents considered up to the August 2016 final decision. Relatedly, Plaintiff seeks to conduct certain discovery, and the Board has moved for a protective order to quash three deposition notices.

**Analysis**

In December 2017, the Board produced the Administrative Record, a 200-page compilation of documents that included "the evidence before the 88 Board at the time of its August 17, 2016 decision on Plaintiff's application to become an 88 Eligible Player." Docket no. 28-1 at 6. Colvin seeks to include in the administrative record the three [*11] letters sent by Plaintiff's counsel on 8/29/16 (Ex. B), 9/27/16 (Ex. C), and 3/31/17 (Ex. D) to the Board, and "documents created by Defendant or others acting on behalf of Defendant"

that "were available to Defendant prior to Mr. Colvin filing his lawsuit" including: the 88 Plan Playbook (Ex. E); the 88 Plan Summary of Material Modifications (Ex. F); and the November 3, 2016 opinion letter from Dr. Brahin (Ex. G).

Defendant does not object to the inclusion of Ex. E (the 88 Plan Playbook) and Ex. F (88 Plan Summary of Material Modifications) but does object to the other exhibits because they were not before the 88 Plan administrator at the time of its final decision on August 17, 2016 and the administrator did not have a fair opportunity to consider them thereafter. Docket no. 27 at 1. Defendant further requests that, if the Court grants the motion to include these documents, it remand to the plan administrator for further consideration because this Court should not decide the merits by considering evidence not considered by the plan administrator. Docket no. 27 at 8.

Defendant contends that the language in *Vega* is dictum and "is impossible to understand and difficult to apply." Docket [*12] no. 27 at 6. It notes that a later Fifth Circuit panel observed that it "conflict[s] with prior cases in which [the Fifth Circuit] indicated that the administrative record consisted of those documents before the administrator at the time the claims decision was made" and that it "poses a number of practical problems." Docket no. 27 at 6 (quoting *Keele v. JP Morgan Chase Long Term Disability Plan, 221 F. App'x 316, 320 (5th Cir. 2007))*. Defendant notes that "district courts have echoed these legitimate concerns." Docket no. 27 at 6. Defendant further argues that *Vega* does not control here because it involved a plan that was administered by a full-time, professional administrator, whereas this plan is administered by a Taft-Hartley board of trustees that meets on a quarterly basis. Before each meeting, plan staff gather and prepare application-related material for presentation and review by the Board, and no materials were prepared for or presented to the Board after August 17, 2016 in this matter. Thus, Defendant contends, even under the

logic of *Vega*, the 88 Board did not have a fair opportunity to consider the evidence that Plaintiff submitted. Defendant states it is unaware of any case applying *Vega* in the context of a Taft-Hartley plan administered like the 88 Plan, [*13] and Plaintiff has cited none. Plaintiff responds that "the only reason the proposed supplemental documents were not before Defendant is because Defendant's representatives were intentionally not presenting them to Defendant for their consideration." Docket no. 29 at 3.

In *Vega*, the *en banc* court considered what evidence becomes part of the administrative record. *Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999)*. It emphasized the "motivating concern" that the rules encourage the parties to resolve their dispute at the administrator's level and not circumvent the administrator's review of claims. *Id. at 300*. It further held that "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Id.* Specifically, it noted that the bar to a party's seeking to introduce evidence into the administrative record was not "particularly high" and that, "if the claimant submits additional information to the administrator . . and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record." *Id.*; *see also id.* ("Before filing [*14] suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it."). Although this language was subsequently affirmed in *Estate of Bratton v. National Union Fire Ins. Co. of Pittsburgh, Pa., 215 F.3d 516, 521 & n.5 (5th Cir. 2000)*, Defendant is correct that subsequent decisions in the Fifth Circuit courts have noted

concern over this holding.[1]

The Fifth Circuit acknowledged in *Keele v. JP Morgan Chase Long Term Disability Plan, 221 Fed. App'x 316, 321-22 (5th Cir. 2007)* that *Vega* appeared to conflict with prior cases indicating that the record was only those documents before the administrator at the time the claims decision was made, and also noted that it could cause practical problems in terms of setting standards for when the administrator could close a matter. But it did not decide the question because the later information did not change the outcome.

*Keele* was unpublished, and later that same year the Fifth Circuit issued *Corry v. Liberty Life Assurance Co. of Boston, 499 F.3d 389 (5th Cir. 2007)*, in which it held that affidavits from the plaintiff and doctors mailed seven months after Liberty issued a final denial letter were correctly determined to be part of the administrative record because they were submitted over a year before the plaintiff filed the lawsuit, thereby giving Liberty a fair opportunity to consider [*15] them. *Id. at 398 n.12*.

In *Anderson v. Cytec Industries, Inc., 619 F.3d 505, 516 (5th Cir. 2010)*, the Fifth Circuit noted that "subsequent panels of this court and several district courts within this circuit have wrestled with [the] language from *Vega*, which could be read to allow claimants to add material to the administrative record long after exhausting their final administrative appeal, even without a showing that the evidence was unavailable to them while their administrative appeal was pending or that they made a good-faith effort to discover or submit the information during the administrative process." It noted that this would "make this circuit's administrative record law more expansive than that of the rest of the circuits." *Id. at 516 n.9*.[2] It did not

---

[1] In addition, the Seventh Circuit has called *Vega* an "outlier" that does not rest on firm ground. *Majeski v. Met Life, 590 F.3d 478 (7th Cir. 2009)*.

[2] Some litigants have argued, however, that *Vega* prevents a self-

resolve the problem or directly confront *Vega*, however, because it held that the defendant did not abuse its discretion even considering the extended administrative record. *Id. at 511 n.5*; *see also McCorkle v. Met. Life Ins. Co., 757 F.3d 452, 458 n.18 (5th Cir. 2014)* (again noting the *Vega* language and stating "we may sidestep any 'thorny timing issues posed by *Vega*' when the additional information is 'cumulative' or 'irrelevant'").

In *Killen v. Reliance Standard Lift Ins. Co., 776 F.3d 303 (5th Cir. 2015)*, the Court cited *Vega* and noted that a "fair opportunity" must come in time for the administrator to reconsider his decision. Where the file was already closed and the [*16] plaintiff had exhausted two internal appeals, submission of evidence four weeks before filing suit did not give a fair opportunity. But the Court also concluded that the new evidence would not change the outcome.

Despite certain language questioning it in later opinions, *Vega* is an *en banc* opinion that has not been overruled. *Vega* and *Corry* strongly support Plaintiff's motion to include the letters sent by Plaintiff's counsel, which included Dr. Neiman's rebuttal to Dr. Brahin's letter, to the Plan in August 2016, September 2016, and March 2017 and the second opinion letter from Dr. Brahin. The goal in *Vega* was to encourage the parties to consider *all* the evidence before filing the lawsuit. Plaintiff's attempt to rebut Dr. Brahin's report is consistent with this goal. Colvin was first made aware of Dr. Brahin's opinion that Colvin suffered from a substance-abuse problem and did not appear to have dementia when he received the report, and Colvin quickly responded with a rebuttal letter from Dr. Neiman, not realizing that the Board had already reached a decision. This rebuttal was not something that Colvin was aware that he needed to include before that time.

interested administrator from manipulating the process unfairly by closing the record prematurely and excluding information that would weigh in favor of the claimant. *Corbello v. Sedgwick Claims Mgmt. Servs., Inc., 856 F. Supp. 2d 868, 887 (N.D. Tex. 2012)*.

Moreover, although the 88 [*17] Board may not have considered the evidence because it was not presented at a quarterly meeting, *Vega* permits inclusion in the record all "relevant information *made available* to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator fair opportunity to consider it." *Vega, 188 F.3d at 300*; *see also Atkins v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, No. A-10-CA-515-SS, 2011 U.S. Dist. LEXIS 163893, 2011 WL 13269723, at *3 (W.D. Tex. Aug. 8, 2011)* ("There is clearly no standard that an administrative record only include documents 'presented to,' as opposed to 'made available' to the fiduciary."). The Board met again in November 2016, and in February and May 2017, long before suit was filed. All of the policy and technical requirements justifying the rule in *Vega* are satisfied here. Thus, the Court concludes that Exhibits B, C, D, and G must be considered part of the administrative record, as well as Ex. E and Ex. F, which are unobjected to.

Defendant has asked that, if the Court requires the supplemental exhibits to be included in the record, it remand rather than determine the merits of this case. The "job of weighing valid, conflicting professional medical opinions is not the job of the courts" but of "the administrators [*18] of ERISA plans." *Corry, 499 F.3d at 401*; *see also McDonald v. Hartford Life Group Ins. Co., 361 F. App'x 599, 612 (5th Cir. 2010)*. Although the Board may choose between competing medical opinions, according to Defendant, the Board did not review or evaluate Dr. Neiman's letters disputing Dr. Brahin's conclusions regarding substance abuse and dementia. It would be improper for this Court to evaluate the information without the plan administrator first having the opportunity to do so.

In *Hartwell v. U.S. Foodservice, No. 3:09-cv-00260-DPJ-FKB, 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496 (S.D. Miss. Sept. 13, 2010)*, the district court noted that if new information was presented, then remand would be consistent with

*Vega*'s policy of encouraging resolution at the administrative level. It further noted that "[h]istorically, the Fifth Circuit has sanctioned remand for review of evidence or issues that the plan administrator failed to consider" and thus it remanded with instructions for the plan administrator to consider the new evidence. *2010 U.S. Dist. LEXIS 95258, [WL ] at *9*. Similarly, Defendant cites *Abate v. Hartford, 471 F. Supp. 2d 724 (E.D. Tex. 2006)*, in which the court allowed the claimant to supplement the administrative record with relevant materials and remanded because the administrator's decision was based on an incomplete record and overlooked pertinent information. The Court finds that remand is appropriate here.

## Conclusion

Plaintiff's Motion to [*19] Supplement the Administrative Record (docket no. 23) is GRANTED. Further, the case is REMANDED to the plan administrator to consider the supplemental evidence. Defendant's motion for protective order (docket no. 28) is DISMISSED AS MOOT. The Clerk shall administratively close this case. Either party may move to reopen this case after the administrator's final decision following further review.

It is so ORDERED.

SIGNED this 11th day of April, 2018.

/s/ Xavier Rodriguez

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE

**End of Document**

United States District Court for the Western District of Louisiana, Lake Charles Division

September 15, 2017, Decided; September 15, 2017, Filed

CIVIL ACTION NO. 16-cv-844

**Reporter**

2017 U.S. Dist. LEXIS 219303 *; 2017 WL 8229513

CHRISTI HILLEBRANDT VERSUS UNUM LIFE INSURANCE CO. OF AMERICA

**Subsequent History:** Adopted by, Remanded by, Motion denied by, As moot, Stay granted by *Hillebrandt v. Unum Life Ins. Co. of Am., 2018 U.S. Dist. LEXIS 43162 (W.D. La., Mar. 14, 2018)*

Magistrate's recommendation at *Hillebrandt v. Unum Life Ins. Co. of Am., 2019 U.S. Dist. LEXIS 63203 (W.D. La., Feb. 13, 2019)*

Adopted by, Objection overruled by, Dismissed by *Hillebrandt v. Unum Life Ins. Co. of Am., 2019 U.S. Dist. LEXIS 62918 (W.D. La., Apr. 10, 2019)*

**Counsel:** [*1] For Christi Hillebrandt, Plaintiff: J Rock Palermo, III, LEAD ATTORNEY, Jere Jay Bice, Veron Bice et al, Lake Charles, LA.

For Unum Life Insurance Co of America, Defendant: Lauren A Welch, LEAD ATTORNEY, McCranie Sistruck et al (NO), New Orleans, LA.

**Judges:** KATHLEEN KAY, UNITED STATES MAGISTRATE JUDGE. UNASSIGNED DISTRICT JUDGE.

**Opinion by:** KATHLEEN KAY

# Opinion

## REPORT AND RECOMMENDATION

Before the court is a "Motion for Judgment Based on the Administrative Record" [doc. 12] filed by defendant Unum Life Insurance Company of America ("Unum"). Plaintiff Christi Hillebrandt ("plaintiff") has also filed a memorandum [doc. 11], pursuant to the *Employee Retirement Income Security Act* ("ERISA") case order issued in this matter [doc. 9], seeking judgment as a matter of law or remand of this matter to the plan administrator.

This matter has been referred to the undersigned in accordance with the provisions of *28 U.S.C. § 636*. For the following reasons, **IT IS RECOMMENDED** that the plaintiff's request for remand [doc. 11] be **GRANTED**, that her request for judgment as a matter of law be **DENIED AS MOOT**, and that Unum's Motion [doc. 12] be **DENIED AS MOOT**, and that the matter be remanded to Unum for consideration of plaintiff's additional evidence. [*2]

## I.

### BACKGROUND

This matter arises from the denial of claims for accidental death benefits filed with Unum by plaintiff following the death of her husband, Charles Hillebrandt ("decedent"). The decedent had basic and supplemental life insurance coverage through group policies governed by ERISA and issued to his employer, Emerson.[1] Both policies provide for payment of additional benefits in the event that an accidental bodily injury results in a covered loss. *See* doc. 10, att. 2, pp. 34-40; doc. 10,

---

[1] *See* doc. 10, att. 2 (basic life insurance policy) and doc. 10, att. 4 (supplemental life policy).

att. 4, pp. 46-52. The policies define "accidental bodily injury" as "bodily harm resulting from accident and independently of all other causes," and "injury" as "bodily injury that is the direct result of an accident and not related to any other cause." Doc. 10, att. 2, pp. 45, 46; doc. 10, att. 4, pp. 58, 59. Unum has discretionary authority under these policies, as delegated by the plan administrator, to make benefits determinations. Doc. 10, att. 2, p. 54; doc. 10, att. 4, p. 67.

The decedent, a 58 year old, was scuba diving in Cozumel on May 3, 2015, when he "surfaced due to difficulty breathing." Doc. 10, att. 1, p. 38. He passed into a coma and was airlifted to a hospital in Houston, [*3] Texas, where he died on May 6, 2015. *Id.* In the autopsy report it was noted that the decedent had a history of hypertension, dyslipidemia, and asthma, and that the body showed signs of "[h]ypertensive and atherosclerotic cardiovascular disease" and "[e]arly acute bronchopneumonia." *Id.* at 38, 42. Microscopic examination of the lungs also showed "[f]ocal dilated airways with alveolar septal rupture." *Id.* at 43. The autopsy report concluded with the following comment:

> Although the death may have resulted from a cardiac event due to underlying cardiovascular disease, the scuba diving equipment must be examined and tested in deaths that occur in this setting. Because the scuba diving equipment is unavailable for testing, the cause and manner of death are classified as undetermined.

*Id.* at 42.

On August 18, 2015, Unum received a letter and claim form from the plaintiff,[2] making claims under the Basic and Supplemental Life policies as well as the Basic and Supplemental Accidental Death policies owned by the decedent. *Id.* at 34-35. She attached medical records for the decedent and a copy of the autopsy report. *Id.* She also provided

the following account:

> To assist you in a determination of this claim, you should know that Charles (Charlie) [*4] and I along with friends, were scuba diving in Cozumel, Mexico on May 3, 2015 when, while at a depth of approximately 35 feet, Charlie began to experience problems with his equipment. As Charlie began to surface, the dive master witnessed the issue and went up with him. At the surface, Charlie evidenced labored breathing and oxygen was initiated. Horribly, Charlie never recovered from the episode.
> After an extensive autopsy, the examining pathologist could only opine that the missing link in the determination was the ability to examine the diving equipment which apparently was the source of the problem. Upon reflection, we recognize that the equipment we rented was neither the newest or in the best shape for this dive. It is my belief and the consensus of our friends that there was an equipment failure, either mold in a line or some other defect that was the source of the resulting death.

*Id.*

Unum submitted the information provided for internal review by a consulting physician as to cause of death. *See id.* at 358-59. This review was completed on September 23, 2015, by Dr. Barbara Golder, a pathologist, who noted that the autopsy showed "no evidence of trauma apart [from] that incurred by resuscitation" [*5] and that no evaluation of the scuba gear was available. *Id.* at 359. She came to the following conclusion:

> Although it is plausible that cardiac disease is the cause of the insured's surfacing, breathing difficulty, and death, the possible contribution of equipment failure cannot be evaluated from the information in the file. As a result, I concur with the medical examiner that neither the cause nor the manner of death can be

---

[2] The plaintiff is the designated primary beneficiary under both policies. Doc. 10, att. 1, p. 31; doc. 10, att. 3, p. 30.

determined form [*sic*] the available information to a reasonable degree of medical certainty.

*Id.* Unum then sent a letter to the plaintiff on September 28, 2015, approving her claims for benefits under the Basic and Supplemental Life policies and advising that it was awaiting accident reports from Mexico before it made a determination as to her Accidental Death claim. *Id.* at 369-71. In November 2015, Unum received an Emergency Medical Report from the Cozumel International Clinic, which described the decedent's condition upon admission on May 3, 2015, and an incident report from the dive instructor. *Id.* at 389-90, 399-402, 418.

Dr. Golder reviewed both reports received from Mexico and concluded:

> The incident report contains no information that bears on either disease of the body or malfunction of the equipment. From [*6] a medical standpoint, given all the information in the file, I am unable to conclude that disease of the body contributed to death. Cause and manner of death remain undetermined.

*Id.* at 435-37. Accordingly, Unum wrote to the plaintiff on December 17, 2015, denying her claims for accidental death benefits and informing her of her right to appeal. *Id.* at 502-05.

The plaintiff submitted a letter in response on January 29, 2016, stating that she was making an appeal and understood that an independent review of the file would be made as a result. *Id.* at 522. She asked "that the reviewing party or agency consider the chain reaction theory of recovery for such incidents as there is no question that Charlie did not die of natural causes." *Id.* However, it does not appear that she attached any new information for review. On February 15, 2016, Unum wrote to the plaintiff to advise that, after independent review of the available information, its original decision denying eligibility for accidental death benefits was being upheld. *Id.* at 533-36.

On May 5, 2016, the plaintiff filed suit against Unum in the Fourteenth Judicial District Court, Calcasieu Parish, Louisiana. Doc. 1, att. 1, pp. 4-8. Unum removed the matter to this court, invoking federal [*7] jurisdiction under ERISA. Doc. 1. This court issued an ERISA case order [doc. 9], pursuant to which Unum has now provided the administrative record [doc. 10 and attachments] cited above. The time for moving to supplement the record under that order has passed, and the plaintiff has submitted her memorandum in accordance with that case order, seeking judgment as a matter of law or remand of this matter to the plan administrator. Doc. 11. In return, Unum has filed a motion seeking judgment as a matter of law based on the administrative record, which plaintiff opposes. Docs. 12, 14.

## II.

### LAW & APPLICATION

In this matter the plaintiff contends that Unum's review of her claims was unreasonable and arbitrary. Doc. 1, att. 1, p. 6. She seeks a declaration of entitlement to accidental death benefits pursuant to ERISA's civil enforcement provisions, *29 U.S.C. § 1132*, and now offers new information purporting to show how Unum erred in its decision. *Id.*; *see* doc. 11. She requests judgment as a matter of law on that showing or, alternatively, remand for the plan administrator to consider her new evidence. Unum opposes this, and maintains that its decision on the claims should be upheld. Doc. 12, att. 1.

### A. ERISA Standard [*8] of Review

Under ERISA, federal courts have jurisdiction to review benefit determinations of qualifying plans by fiduciaries or plan administrators. *Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 215 F.3d 516, 521-22 (5th Cir. 2000)*. However,

"district courts hearing complaints from disappointed ERISA plan . . . beneficiaries for the administrative denial of benefits are *not* sitting, as they usually are, as courts of first impression. Rather, they are serving an appellate role." *McCorkle v. Metro. Life Ins. Co., 757 F.3d 452, 456 (5th Cir. 2014)* (emphasis in original). In such cases, of course, the court may not substitute its own judgment for that of the plan administrator. *Id. at 457-58*.

As the parties agree, Unum's denial of accidental death benefits is subject to an abuse of discretion standard of review, based on the authority vested in the plan administrator and delegated to Unum. Doc. 11, p. 6; doc. 12, att. 1, p. 20; *see, e.g., Duhon v. Texaco, Inc., 15 F.3d 1302, 1305 (5th Cir. 1994)*. The plaintiff bears the burden of showing an abuse of discretion by the plan administrator. *E.g., Hargrave v. Parker Drilling Co., 2010 U.S. Dist. LEXIS 93534, 2010 WL 3363087, *4 (W.D. La. Aug. 25, 2010)* (citations omitted).

A plan administrator or fiduciary's decision to deny benefits must be based on "substantial evidence." *Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 273 (5th Cir. 2004)* (citation omitted). "A plan administrator abuses its discretion where the decision is not based on evidence, even if it is disputable, that clearly supports the basis for its denial." *McCorkle, 757 F.3d at 457* (quoting [*9] *Holland v. Int'l Paper Co. Retirement Plan, 576 F.3d 240, 246 (5th Cir. 2009))*. "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis, 394 F.3d at 273*. The court's review of the plan administrator's decision "need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *McCorkle, 757 F.3d at 457* (internal quotations and alterations omitted).

**B. New Evidence**

The plaintiff's memorandum cites to various medical texts and attaches an expert opinion on the decedent's cause of death, which opinion is dated December 2016. *See* doc. 11; doc. 11, att. 1. Both parties agree that, "[i]n reviewing an [ERISA plan] administrator's decision, a court must focus on the evidence before the administrator at the time his final decision was rendered." *Offutt v. Prudential Ins. Co. of America, 735 F.2d 948, 950 (5th Cir. 1984)*. Plaintiff contends, however, that the proper course of action based on her new evidence is to remand this matter to the plan administrator for further consideration. Meanwhile, Unum maintains that the evidence should be excluded as it was not in the administrative record and this court should proceed with a determination of whether the plan administrator committed an abuse of discretion based [*10] only on that record.

The Fifth Circuit remarked in *Offutt, supra*, that "[i]f new evidence is presented to the reviewing court on the merits of the claim for benefits, the court should, as a general rule, remand the matter to the plan administrator for further assessment." *735 F.2d at 950*. Remand allows the parties "to avoid judicial resolution of purely administrative benefits determinations." *Jones v. Metro. Life Ins. Co., 2013 U.S. Dist. LEXIS 75397, 2013 WL 2368328, *6 (S.D. Tex. May 29, 2013)* (citations omitted). Thus, "[h]istorically, the Fifth Circuit has sanctioned remand for review of evidence or issues that the plan administrator failed to consider." *Hartwell v. U.S. Foodservice, Inc., 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496, *9 (S.D. Miss. Sep. 13, 2010)* (citations omitted). However, "[n]o remand is necessary . . . when it would be a useless formality." *Offutt, 735 F.2d at 950*.

The Fifth Circuit has since underscored the importance of submitting any additional evidence to a plan administrator prior to filing a lawsuit. *See Hamburg v. Life Ins. Co. of North America, 470 Fed. App'x 382, 385 (5th Cir. 2012)* (citing *Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 300 (5th Cir. 1999)* (en banc), *abrogated on other grounds*

by *Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 171 L. Ed. 2d 299 (2008))*. The court emphasizes that it "want[s] to encourage each of the parties to make its record before the case comes to federal court," and that "allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided."[3] *Id.* (quoting *Vega, 188 F.3d at 302 n. 13*) (emphasis removed from [*11] *Hamburg*). Thus, "special circumstances" must exist to justify remand. *Fells v. Hartford Life and Acc. Ins. Co., 2012 U.S. Dist. LEXIS 98805, 2012 WL 2921795, *2 (S.D. Miss. Jul. 17, 2012)* (citations omitted). Courts have found such special circumstances "where new evidence arises that was unavailable prior to suit, but have refused to remand where the evidence existed prior to suit." *Id.* (citations omitted).

Plaintiff's expert report points to specific findings in the medical records and autopsy report to support

---

[3] However, other courts within this Circuit recognize that "*Vega* fails to provide any guidance regarding the limits of post hoc accretion of the administrative record." *Hartwell, 2010 U.S. Dist. LEXIS 95258, 2010 WL 3713496 at *6* (citing *Needham v. Tenet Select Benefit Plan, 2004 U.S. Dist. LEXIS 1267, 2004 WL 193131, *7 (E.D. La. Jan. 30, 2004))* (internal quotations omitted). As the Fifth Circuit observed shortly thereafter:

> Subsequent panels of this court and several district courts within the circuit have wrestled with this language from *Vega*, which could be read to allow claimants to add material to the administrative record long after exhausting their final administrative appeal, even without a showing that the evidence was unavailable to them while their administrative appeal was pending or that they made a good-faith effort to discover or submit the information during the administrative process . . . . Indeed, *Vega* could be read to require ERISA administrators to keep the administrative record open . . . almost indefinitely.

*Anderson v. Cytec Indus., Inc., 619 F.3d 505, 516 & n. 9 (5th Cir. 2010)* (internal citations omitted). However, the court declined in that matter to address "the thorny timing issues posed by *Vega*" and its requirements remain uncertain with regard to submission and consideration of evidence post-administrative process and pre-suit. *Id. at 516*; *Richardson v. Metro. Life Ins. Co., 2014 U.S. Dist. LEXIS 33491, 2014 WL 1050758, *8 (E.D. La. Mar. 14, 2014)*.

a conclusion that the decedent died of an arterial gas embolism, a condition for which plaintiff's expert maintains that it is unnecessary to test the decedent's equipment. Doc. [*12] 11, att. 1, pp. 8-9. Specifically, he contends that alveolar septal rupture "is consistent with pulmonary over-expansion and arterial gas embolism." *Id.* at 8. He also states that the decedent's normal echocardiogram after resuscitation, apparently a reference to the Cozumel clinic's records, "is not a typical finding in an individual who had just sustained a fatal primary cardiac event." *Id.* at 9; *see* doc. 10, att. 1, p. 390. He maintains that "[t]he standard dictum in diving medicine is that a loss of consciousness within ten minutes after surfacing from a compressed gas dive is an air embolism until proven otherwise." Doc. 11, att. 1, p. 9.

While understanding and appreciating the Fifth Circuit's pronouncement that these types of proceedings should be decided quickly and the proceedings should not oscillate between the courts and the administrative process, we also observe that, throughout the administrative process, Unum regarded plaintiff's husband's cause of death as undetermined. Plaintiff offers no explanation for her failure to offer medical literature or expert reports prior to filing suit in May 2016, or for failing to move to supplement the record in this court;[4] but we do note that the report, [*13] dated December 28, 2016, did not exist when plaintiff filed suit in state court, that plaintiff was proceeding *pro se* during the administrative process, and that there are practical limits on introduction of evidence after completion of the administrative process, *supra* note 3. We believe neither plaintiff's claims nor her evidence sought to be introduced constitute a "relatively small matter," and so remand in this instance would not be a "useless formality." Accordingly, the request for

---

[4] Even after Unum raised the issue of plaintiff's failure to introduce the new material to the plan administrator before filing suit or file a motion to supplement, plaintiff offers no explanation. *See* doc. 12, att. 1, p. 17; doc. 14.

remand should be granted in order to allow Unum to consider the new evidence on plaintiff's claims for accidental death benefits.

## III.

### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that the plaintiff's request for remand [doc. 11] be **GRANTED** and request for judgment on the record be **DENIED AS MOOT**, and that Unum's Motion for Judgment as a Matter of Law [doc. 12] be **DENIED AS MOOT**. It is also recommended that the matter be remanded to Unum to consider plaintiff's additional evidence and make a new determination on her claims within a time limit as determined by the district judge, and that the case be stayed pending that review.

Pursuant to *28 U.S.C. § 636(b)(1)(C)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties have fourteen (14) days from receipt [*14] of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n, 79 F.3d 1415, 1429-30 (5th Cir. 1996)*.

THUS DONE this 15th day of September, 2017.

/s/ Kathleen Kay

**KATHLEEN KAY**

**UNITED STATES MAGISTRATE JUDGE**

End of Document

# [Clark v. Cingular Wireless Bargained](#)

United States District Court for the Northern District of Texas, Wichita Falls Division

December 23, 2010, Decided; December 23, 2010, Filed

Civil Action No. 7:09-CV-177-O

**Reporter**

2010 U.S. Dist. LEXIS 163580 *

PENNY CLARK, Plaintiff, v. CINGULAR WIRELESS BARGAINED, DISABILITY BENEFITS PLAN NO. 554, Defendant.

**Counsel:** [*1] For Penny Clark, Plaintiff: Bernard A Guerrini, LEAD ATTORNEY, Guerrini & Thompson PC, Dallas, TX USA.

For Cingular Wireless Bargained Disability Benefits Plan No. 554, Defendant: Lawrence Alan Fogel, Jr, LEAD ATTORNEY, AT & T, Dallas, TX USA.

**Judges:** Reed O'Connor, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Reed O'Connor

## Opinion

### ORDER

Pending before the Court are Plaintiff's Motion for Partial Summary Judgement (ECF No. 24), Brief in Support (ECF No. 25), Appendix in Support (ECF No. 26), Defendant's Response (ECF No. 32), and Plaintiff's Reply (ECF No. 35). Also pending are Defendant's Motion for Summary Judgement (ECF No. 27), Defendant's Brief in Support (ECF No. 28), Appendix in Support (ECF No. 29), Plaintiff's Response (ECF No. 31), and Defendant's Reply (ECF No. 35). After considering the foregoing, and the applicable authorities, the Court concludes Plaintiff's motion should be granted and Defendant's motion should be denied for the following reasons:

Factual Background

Because this case will be remanded to the claims administrator, the following facts, taken in a light most favorable to Defendant, are pertinent to this decision.

Plaintiff began working for AT&T Mobility Services, LLC f/k/a Cingular Wireless Employee [*2] Services, LLC ("Cingular") in October 2001 as a customer service representative. The job duties of a customer service representative require her to type on a computer and talk with customers on the telephone.

Cingular employees, including Plaintiff, were covered by an employee welfare benefits plan (the "Plan") which provided, among other things, disability benefits. Sedgwick Claims Management Services, Inc. ("Sedgwick") was the Plan's claim administer.

On October 1, 2008, Plaintiff made a claim for short-term disability benefits because of debilitating pain in her neck and lower back. This request was initially approved for a period beginning October 8, 2008, through December 31, 2008. In December 2008, Plaintiff had gynecological surgery. As a result, her short-term benefit period was extended through January 12, 2009.

Prior to January 13, 2009, Sedgwick attempted, but was unable, to contact Plaintiff to determine whether an extension of her short-term benefit period would be needed. However, Sedgwick was able to contact Plaintiff's doctor who provided that

Plaintiff was scheduled to see him on January 13, 2009. Based on this communication, Sedgwick extended Plaintiff's benefits through [*3] January 18, 2010.

On January 19, 2009, Sedgwick received additional medical records from two of Plaintiff's physicians. One document requested that Plaintiff's disability be extended for thirty days. As a result of this request, Sedgwick extended Plaintiff's short-term disability benefit period until February 10, 2009.

Plaintiff's physicians then submitted additional records to Sedgwick and requested Plaintiff be granted an additional ninety days of disability coverage because of back pain. Based on these records, Sedgwick extended Plaintiff's disability period until March 17, 2009, to allow Plaintiff to submit the results of an additional medical test.

On March 17, 2009, Plaintiff notified Sedgwick that she was scheduled to have carpal tunnel surgery on her right hand within the next three weeks and needed an additional disability period. In addition to Plaintiff's request, her physician submitted a letter which stated that she was scheduled to have carpal tunnel surgery and would need approximately three months to recover. The physician also provided additional records which stated, in part, that Plaintiff was having "intermittent neck and extremity pain" and "occasional low back and [*4] lower extremity pain." Based on these documents, Defendant extended Plaintiff's benefits through April 9, 2009.

Plaintiff had carpal tunnel surgery on her right hand on April 24, 2009. As a result, Sedgwick extended her short-term benefits through June 7, 2009.

Prior to the June 7, 2009, expiration of short term benefits, Sedgwick contacted Plaintiff to inquire as to her status. Plaintiff told Sedgwick that she would not return to work because she had not yet scheduled the carpal tunnel surgery for her left hand. At this point, Sedgwick classified Plaintiff's short-term benefits as unapproved as of June 8, 2009.

On June 11 and 15, 2009, Plaintiff presented Sedgwick additional medical records. After reviewing these medical records, Sedgwick concluded Plaintiff was not entitled to additional shortterm disability benefits.

Based on this conclusion, Sedgwick sent Plaintiff's medical records to a third-party physician to review and provide an opinion. After reviewing Plaintiff's medical records, the third-party physician determined Plaintiff could perform sedentary work and was therefore not disabled. In turn, Sedgwick notified Plaintiff on June 26, 2009, that her request for additional disability [*5] benefits was denied effective June 8, 2009.

On June 30, 2009, Plaintiff's doctor submitted additional medical records to Sedgwick in which he concluded she was disabled due to chronic pain and recovery from her right wrist. After reviewing these records, Sedgwick did not change its earlier conclusion.

Plaintiff appealed the denial of her claim on July 8, 2009, pursuant to the terms of the Plan. Sedgwick told Plaintiff that any additional medical information she wished to submit in support of her appeal must be provided by July 27, 2009, so that the appeal could be resolved in a timely manner. Sedgwick and Plaintiff exchanged communications concerning the submission of additional medical records and, on August 4, 2009, Plaintiff represented that her file was complete and ready to be resolved.

Sedgwick then sent Plaintiff's file to a physician for review. This physician determined that Plaintiff was not disabled from her regular job as of June 8, 2009. Following this review, Sedgwick denied Plaintiff's claim on August 20, 2009. Plaintiff did not return to work and was terminated on September 9, 2009.

On September 24, 2009, Plaintiff submitted a

Functional Capacity Evaluation ("FCE") in support [*6] of her claim and asked Sedgwick to reconsider its decision. She contends that these records support her contention that her disability benefits were wrongfully denied. Sedgwick refused to reopen the appeal. Plaintiff filed this lawsuit on November 3, 2009 pursuant to *29 U.S.C. § 1132* of the Employee Retirement Income Security Act of 1974 ("ERISA") based on the denial of disability benefits under a qualified employees welfare benefits.

## The Motions

Both parties have filed motions for summary judgment. The sole basis for Plaintiff's motion is that this case should be remanded to the claims administrator to require it to consider the FCE she submitted in support of her claim.

Defendant opposes re-opening the appeals process. Defendant argues the authority Plaintiff relies on in support of her argument does not require a remand and, even had it considered the FCE, its decision to deny the claim would remain the same. Defendant's motion for summary judgment contends Plaintiff's suit should be dismissed because as a matter of law it did not abuse its discretion when it denied Plaintiff's claim.

## Authority

ERISA permits plan participants to initiate suit to recover benefits owed. *See 29 U.S.C. § 1132*. When making benefit determinations, [*7] an administrator is required to interpret and construe the terms of the plan and to determine the facts underlying the claim. *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan, 493 F.3d 533, 537 (5th Cir. 2007)*. An administrator's decision to deny benefits is reviewed under a *de novo* standard unless the terms of the plan confer discretionary authority to determine benefits and interpret the terms. *Lain v. UNUM Life Ins. Co. of*

*Am., 279 F.3d 337, 342 (5th Cir. 2002)*. In this case, both parties agree Defendant has discretionary authority to determine benefits and interpret the plan terms. *See* Pl. Br. in Supp. 2, ECF No. 25; Def. Br. in Supp. 14-16, ECF No. 28.

Because the claims administrator has discretionary authority, Plaintiff bears the burden to show that the administrator abused his discretion. *Dowden v. Blue Cross Blue Shield, 126 F.3d 641, 644 (5th Cir. 1997)*. In addition, when a plan grants the administrator the authority to interpret the plan, he is also empowered to resolve ambiguities contained within the plan. *See High v. E-Systems Inc., 459 F.3d 573, 579 (5th Cir. 2006)*.

Regardless of the discretion granted to the administrator to interpret the terms, his factual determinations are upheld unless he abuses his discretion. *Meditrust Fin. Servs. Corp. v. The Sterling Chems., Inc., 168 F.3d 211, 213 (5th Cir. 1999)*. This requires courts to determine whether the administrator's decision was reasonable. *MacLachlan v. ExxonMobil, 350 F.3d 472, 478 (5th Cir. 2003)*. A decision will be found reasonable if there is a rational connection between known facts and the decision, or between the found facts [*8] and the evidence. *Meditrust, 168 F.3d at 215*. Courts will affirm an administrator's decision if it is supported by substantial evidence in the administrative record. *Id.* Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Corry v. Liberty Life Assurance Co. of Boston, 499 F.3d 389, 398 (5th Cir. 2007)*.

With limited exceptions, courts review the administrative record as it was presented to the administrator when making this decision. *Denton v. First Nat'l Bank of Waco, Tex., 765 F.2d 1295, 1304 (5th Cir.1985)* ("In reviewing a decision under the arbitrary and capricious standard, the trial court must focus on the evidence that was before the Plan committee when the final benefit

determination was made."). The administrative record consists of all of the documents "made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega v. Nat'l Life Ins. Servs., 188 F.3d 287, 300 (5th Cir. 1999)* (en banc) *abrogated on other grounds Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)*. "If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record." *Estate of Bratton v. Nat'l Union Fire Ins. Co., 215 F.3d 516, 521 n. 5 (5th Cir. 2000)*.

Discussion

Plaintiff argues that *Vega* requires the claims administrator [*9] to re-open her claim and consider the FCE because she provided it to Sedgwick before she filed this lawsuit. In *Vega*, the Fifth Circuit, sitting en banc, wrote, in part, that the administrative record consists of all of the documents "made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Id. at 300*. The purpose of permitting a plaintiff to supplement the record before the claims administrator is to "encourage the parties to resolve their dispute at the administrator's level." *Id.*

Defendant opposes this request and argues this portion of the *Vega* opinion is *dicta*. Since defining the administrative record in this fashion, courts have wrestled with how to apply this portion of *Vega*. *See Keele v. JP Morgan Chase Long Term Disability Plan, 221 F. Appx. 316 (5th Cir. 2007)*; *Shaikh v. Liberty Life Assurance Co., No. H-08-0204, 2010 U.S. Dist. LEXIS 66907, 2010 WL 2710606 (S.D.Tex. July 6, 2010)*; *Keller v. AT&T Disability Income Plan, 664 F. Supp. 2d 689, 702-*

*03 (W.D.Tex. 2009)*; *Needham v. Tenet Select Benefit Plan, No. 02-3291, 2004 U.S. Dist. LEXIS 1267, 2004 WL 193131 (E.D.La. Jan. 30, 2004)*. For instance, one district court has formulated a two-pronged test balancing whether the plaintiff had an opportunity to present the evidence during the appeal process with a showing of good cause for the failure to present it during the administrative process. *See Anderson v. Cytec Indus., No. 07-5518, 2009 U.S. Dist. LEXIS 34969, 2009 WL 911296 (E.D.La. Mar. 27, 2009)*. More generally, however, it appears that most courts within the Fifth Circuit have considered the additional evidence in its review [*10] of whether the administrator abused his discretion in denying benefits. *See Keele, 221 F. Appx. 316*; *Shaikh, 2010 U.S. Dist. LEXIS 66907, 2010 WL 2710606*; *Keller*, 664 F. Supp. at 702-03.

In those cases where the plaintiff has been denied the opportunity to submit additional evidence, the courts seem to focus on whether the additional information was provided "in a manner that gives the administrator a fair opportunity to consider it." *See Scheffer v. Benefit Plan of Exxon Corp., 151 F. Supp. 2d 799, 809 (S.D.Tex. 2001)*. In *Scheffer*, the plaintiff attempted to present additional evidence relevant to the claim more than two years following the denial of her claim. *Id.* The court held documents submitted this late after the final decision were not provided in a manner that fairly permitted the administrator to consider it. *Id.* In *Provencio v. SBC Disability Income Plan, No. SA-05-CA-0032-WWJ, 2006 U.S. Dist. LEXIS 94845, 2006 WL 3927168 (W.D.Tex. Dec. 6, 2006)*, the plaintiff was not permitted to supplement the administrative record after the claims administrator delayed ruling on multiple occasions to permit the plaintiff to submit additional evidence because to do so "well after the conclusion of his appeal-would be to sanction an abuse of the administrative process . . . ".

As was the case in *Provencio*, Plaintiff in this case was afforded a number of delays during the appeals

process to permit her to submit additional records. Further, there [*11] is nothing in the pleadings before the Court to indicate why Plaintiff could not submit the FCE prior to the decision by the appeals committee, or that she sought an additional delay from the appeals committee to allow her time to submit the FCE. Indeed, Plaintiff told Defendant that she wanted the record closed and her appeal promptly decided. Therefore, these facts weigh against permitting Plaintiff to submit the additional evidence.

On the other hand, Plaintiff presented the FCE just over one month following the receipt of the administrator's decision denying her claim. Even though she has provided no basis for not timely providing it, this short delay and the seeming lack of prejudice to having the decision reconsidered, weigh in favor of considering the FCE.

The FCE contains a description of Plaintiff's duties and the treatment provider's opinion as to her ability to complete these tasks. Even though Defendant argues in its pleadings that the result would have been the same even if the administrator had considered the FCE, this is no substitute to having its claims administrator actually review and opine on this medical test. These facts should be reviewed by the claims administrator [*12] who has the authority to consider this information and resolve any conflicts that may exist between it and the other information contained in the administrative record. Only after doing so can the Court determine whether there is a rational connection between the known facts and the decision, or between the found facts and the evidence.

The Court is sympathetic to Defendant's claim that to permit a plaintiff to supplement the record at will until suit is filed will permit a plaintiff to keep the record open until obtaining a favorable decision. This concern seemed to be the basis for the court's refusal to allow additional documents to be submitted in *Provencio*. To ensure there is no abuse of the process in this case, the Court remands this matter to the claims administrator but does not dismiss the case. Instead, this case will remain pending but will be stayed until a decision has been reached by the claims administrator after including the FCE in the records reviewed as part of Plaintiff's appeal. In this regard, the administrative record will contain the FCE but otherwise will remain closed pursuant to *Vega* because Plaintiff has filed her complaint.

Based on the foregoing, the claims [*13] administrator is **ORDERED** to accept the FCE as part of the administrative record and reconsider Plaintiff's appeal. The parties are further **ORDERED** to provide a joint report no later than ten days following the claim administrator's decision outlining how this case should proceed.

Signed this 23rd day of December, 2010.

/s/ Reed O'Connor

**Reed O'Connor**

**UNITED STATES DISTRICT JUDGE**

End of Document

# [Jones v. Channel Shipyard & Co.](#)

United States District Court for the Eastern District of Louisiana

November 20, 2001, Decided ; November 20, 2001, Filed

CIVIL ACTION NO. 00-3703 SECTION "C" (2)

**Reporter**

2001 U.S. Dist. LEXIS 19639 *; 27 Employee Benefits Cas. (BNA) 1224

GLENN JONES versus CHANNEL SHIPYARD AND COMPANY, INC., AND NATIONAL EMPLOYEE BENEFIT ADMINISTRATORS, INC.

**Disposition:** [*1] Defendants' Motion for Summary Judgment GRANTED. Jones' claims DISMISSED.

**Counsel:** For GLENN - JONES, plaintiff: Daryl James Daigle, Courtenay, Forstall, Hunter & Fontana, New Orleans, LA.

For NATIONAL EMPLOYEE BENEFIT ADMINISTRATORS, INC., CHANNEL SHIPYARD OF NEW ORLEANS, INC., CHANNEL SHIPYARD COMPANY, INC., CHANNEL SHIPYARD COMPANY, INC.-EMPLOYEE BENEFIT PLAN, defendants: Clave E. Gill, Thomas Michael Keiffer, Gill & Keiffer, LLC, Covington, LA.

**Judges:** HELEN G. BERRIGAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** HELEN G. BERRIGAN

# Opinion

## ORDER & REASONS

Before the Court is Defendants' Motion for Summary Judgment. After reviewing the arguments of counsel, the record, and the applicable law, IT IS ORDERED that Defendants' Motion is hereby GRANTED.

### Standard of Review

A district court can grant a motion for summary judgment only when the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) [*2] (quoting Fed. R. Civ. P. 56 (c)). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.,* 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing *Celotex,* 477 U.S. at 322 - 24, and Fed. R. Civ. P. 56(e)). [*3] The mere argued existence of a factual

dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citations omitted).

Background

On the morning of December 10, 1998, Jones, then 20, consumed alcohol at a friend's house. *See* Rec. Doc. 14 at Aff. Later in the morning, at about 7:00, he was injured in an automobile accident, which left him a quadriplegic. *See* Rec. Doc. 11, Mem. in Supp. of Mot. for Summ. J. at 1. According to a State of Louisiana Official Motor Vehicle Traffic Accident Report, Jones crossed the center line of the dry blacktop into the opposing lane. *See* Rec. Doc. 11 at Ex. 1. According to the report, nothing obscured his vision, and there were no defects in either his vehicle or the road. *See id.* A blood sample was taken from Jones at the accident scene. *See id.* The Louisiana State Police Crime Laboratory found that Jones' blood alcohol content was 0.05 percent. *See id.* at Ex. 2. Two hours after the accident, a urine sample taken from [*4] Jones showed alcohol in his system. *See id.* at Ex. 3. Jones was charged with careless operation of a motor vehicle. *See* La. R.S. 32:58.

At the time of the accident, Jones was employed by Defendant Channel Shipyard of New Orleans, Inc. (Channel/New Orleans). [1] *See id.* Jones sought payment of medical expenses resulting from the accident under the terms of the Channel/New Orleans Employee Benefit Plan ("the Plan"). *See id.* at 4. The Plan is a qualified employee benefit plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* See id.

In a May 25, 1999, letter, the Plan [2] denied Jones' claims based on Plan coverage exclusions for injuries resulting from illegal use of alcohol and illegal acts. *See* Rec. Doc. 12 at Ex. A. The Plan provides, in pertinent [*5] part:

Plan Exclusions

For all Medical Benefits shown in the Schedule of Benefits, a charge for the following is not covered:

....

(2) Alcohol. Services, supplies, care or treatment to a Covered Person for an Injury or Sickness which occurred as a result of that Covered Person's illegal use of alcohol. Expenses will be covered for injured Covered Persons other than the person illegally using alcohol.

....

(17) Illegal acts. Charges for services received as a result of Injury or Sickness caused by or contributed to by engaging in an illegal act or occupation; by committing or attempting to commit any crime, criminal act, assault or [*6] other felonious behavior; or by participating in a riot or public disturbance.

Rec. Doc. 11, Ex. 4 at 29-30.

The Plan denied coverage under Exclusion (2) because it concluded that Jones was a minor, it is illegal to consume alcohol as a minor, and this illegal consumption caused the accident and resulting medical expenses. *See* Rec. Doc. 12 at Ex. A. It denied coverage under Exclusion (17) because it had been determined that Jones committed the illegal act of careless operation of a motor vehicle and that the "reckless" (sic) operation of a motor vehicle caused his medical expenses. *Id.*

---

[1] Channel/New Orleans contends that it is erroneously identified in the caption as Channel Shipyard and Company, Inc. *See* Rec. Doc. 11, Mem. in Supp. of Mot. for Summ. J. at 3, 3 n. 1

[2] This letter was written by the Plan Supervisor, National Employee Benefits Administrators, Inc. ("NEBA"), *see* Rec. Doc. 12 at Ex. A, which, Defendants assert, has processed all claims for Plan benefits on behalf of the Plan Administrator, Defendant Channel Shipyard Company, Inc. ("Channel"), a company related to Channel/New Orleans, *see* Rec. Doc. 11 at 5-6.

Jones now challenges the denial, *see* Rec. Doc. 9, and a Motion for Summary Judgment has been filed by the Plan, Channel/New Orleans, Channel, and NEBA, *see* Rec. Doc. 11.

Analysis

The Court first turns to the Plan's assertion that summary judgment should be granted in its favor. The theory of recovery asserted by Jones and the basis of the Plan's denial of that recovery rest upon whether Channel as the plan administrator abused its discretion in denying coverage under the above-mentioned exclusions. *See Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 643 (5th Cir. 1997). [*7]

As an initial matter, "[a] denial of ERISA benefits by a plan administrator is reviewed by the courts *de novo* unless the plan gives the plan administrator discretionary authority to determine the eligibility for benefits or to construe the terms of the plan." *Id.* (internal quotations omitted). "Because ERISA does not dictate the appropriate standard of review for evaluating benefit determinations of plan administrators, courts must first look to the plan terms to determine if the plan administrator has the discretionary authority to interpret the plan terms." *Id.* "The abuse of discretion standard is the appropriate standard of review to challenges to a plan administrator's interpretation of the plan terms when that plan grants the administrator the authority to make a final and conclusive determination of the claim." *Id.* at 643-44.

Here, the Plan grants the Plan Administrator:

> maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide [*8] questions of Plan interpretation and those of fact relating to the Plan. The decisions of the

Plan Administrator will be final and binding on all interested parties.

Rec. Doc. 11, Ex. 4 at 40. Thus, because the Plan grants the Administrator final and binding decisionmaking authority, the abuse of discretion standard is the appropriate standard of review here.

When applying the abuse of discretion standard, it is necessary to analyze whether the plan administrator acted arbitrarily or capriciously. *See Dowden*, 126 F.3d at 644. "An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* [3]

[*9] Channel first asserts that it did not abuse its discretion in denying coverage under the alcohol exclusion. *See* Rec. Doc. 11 at 11-13. Channel contends that, *inter alia*, Jones' blood alcohol level of 0.05 percent exceeded the 0.02 percent legal limit for drivers under 21. *See* La. R.S. 14:98.1(A). Consequently, it was neither arbitrary, nor capricious to find that illegal use of alcohol caused the accident and the resulting medical expenses. *See id.*

Jones asserts that Channel erroneously applied the alcohol exclusion by concluding that Jones illegally used alcohol and that this illegal use of alcohol caused the accident and resulting medical expenses. *See* Rec. Doc. 12, Mem. in Opp'n of Def's Mot. for Summ. J. at 7-9. Jones contends that Channel erred because his use of alcohol, *i.e.*, the actual drinking of alcohol, was not illegal. *See id.* As Jones asserts, and Defendants do not deny, Jones was drinking only in a private residence before the accident. *See*

---

[3] Some cases in the Fifth Circuit that have analyzed questions similar to the one before the Court today have suggested a two-step analysis. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 n.3 (5th Cir. 1994). First, the court determines the legally correct interpretation of the plan. *See id.* If the administrator did not so correctly interpret the plan, the court must determine whether the administrator's decision constituted an abuse of discretion. *See id.* Courts, however, are not "rigidly confined to this two-step analysis in every case." *Id.* Because the Court concludes that Channel did not abuse its discretion, it is unnecessary for the court to conduct the two-step analysis.

*id.* Under Louisiana law, it is not illegal for minors to drink in private residences. *See* La. R.S. §§ 14:93.10 - 14:93.14. Thus, Jones contends, his use of alcohol was legal and therefore not subject [*10] to the "illegal use" exclusion. *See* Rec. Doc. 12, Mem. in Opp'n of Def's Mot. for Summ. J. at 9. [4]

Although when subjected to Jones' close scrutiny, the Plan's denial reveals a gap in the chain of its reasoning, the Court here analyzes the denial for a rational connection between the known facts and the decision. *See Dowden, 126 F.3d at 644*. The denial states, [*11] "Given the nature of the accident that occurred, the Plan takes the position that illegal use of alcohol caused the accident, which thereby caused the medical expenses." Rec. Doc. 12 at Ex. A. Although the Plan erroneously characterized Jones' use of alcohol as illegal, the sample of Jones' blood taken at the accident scene revealed an alcohol content of 0.05 percent, more than twice the legal limit of 0.02 percent for drivers younger than twenty-one under Louisiana law. *See* La. R.S. 14:98.1(A). It was thus rational for Channel to conclude that Jones illegally used alcohol--not because the drinking in and of itself was illegal but, because, combined with driving, it was. Channel's denial quoted above, in fact, specifically couches its determination that the use of alcohol was illegal because it was in connection with driving.

Moreover, the interpretation of the Plan urged by Jones leads to an arbitrary result. Under Jones' reading, if he had been drinking in a public place and thus illegally, *see* La. R.S. § 14:93.12(A), the injuries resulting from his accident would not be covered. It is not apparent why the Plan would seek to cover injuries resulting from alcohol-related driving [*12] accidents depending on the location of the consumption.

In addition, it was rational for Channel to conclude that Jones' use of alcohol caused the accident and resulting medical expenses. Jones' blood-alcohol content was well above the legal limit for drivers younger than twenty one, *see* La. R.S. § 14:98.1(A), and the accident, according to the Police report, occurred when Jones crossed the center line into the opposing lane on dry blacktop, *see* Rec. Doc. 11 at Ex. 1. According to the report, nothing obscured his vision, and there were no defects in either his vehicle or the road. *See id.* Moreover, there is evidence to suggest that underage drinking and driving is particularly dangerous. *See State v. Ferris, 99-2329 (La. 5/16/00), 762 So. 2d 601, 606*. As such, it is not necessary to disturb Channel's finding on the ground asserted here. [5]

[*13] Finally, Defendants assert that Channel/New Orleans, Channel, and NEBA are entitled to summary judgment because only the employee benefit plan can be liable for a money judgment in an action to recover plan benefits, absent an independent basis for individual liability against the other entities. *See* 29 U.S.C. § 1132(d)(2). Jones only conclusorily asserts a basis for liability in his opposition. As such, it is appropriate to grant the motion as to these Defendants. *See Anderson, 477 U.S. at 248*.

## Conclusion

---

[4] Jones asserts that it is the Plan's burden to prove by a preponderance of the evidence that Jones was illegally using alcohol and that this illegal use caused his injuries. *See id.* at 9 (citing *Landry v. J.C. Penney Life Ins. Co., 920 F. Supp. 99, 102 (W.D. La. 1995); Moore v. Cent. Am. Life Ins. Co., 535 So. 2d 773 (La. App. 2 Cir. 1988).* Those cases, however, did not involve coverage under ERISA plans, where exclusion decisions are reviewed under the abuse of discretion standard. *See, e.g., James v. La. Laborers Health & Welfare Fund, 29 F.3d 1029, 1032-33 (5th Cir. 1994)*.

---

[5] As Channel did not abuse its discretion in denying Jones' claim under the Alcohol exclusion, it is unnecessary to address the propriety of the denial under the Illegal Acts exclusion. The Court notes, however, that it is a crime for a person younger than twenty-one to operate a vehicle with a blood alcohol concentration of 0.02 percent or more. *See* **La. R.S. 14:98.1(A)**.

Therefore, for the reasons stated above, IT IS ORDERED that:

Defendants' Motion for Summary Judgment is hereby GRANTED. Accordingly, Jones' claims are hereby DISMISSED.

New Orleans, Louisiana, this 20 day of November 2001.

HELEN G. BERRIGAN,

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# [Hargrave v. Parker Drilling Co.](#)

United States District Court for the Western District of Louisiana, Lafayette Division

August 25, 2010, Decided; August 25, 2010, Filed

CIVIL ACTION NO.: 10-0141

**Reporter**

2010 U.S. Dist. LEXIS 93534 *; 2010 WL 3363087

KYLE P. HARGRAVE VERSUS PARKER DRILLING CO., ET AL.

**Counsel:** [*1] For Kyle P Hargrave, Plaintiff: Wade A Mouton, LEAD ATTORNEY, Kaplan, LA.

For Zurich American Insurance Co, Defendant: Glen E Mercer, Salley Hite et al, New Orleans, LA.

For Parker Drilling Co, Defendant: Glen E Mercer, LEAD ATTORNEY, Salley Hite et al, New Orleans, LA.

**Judges:** REBECCA F. DOHERTY, UNITED STATES DISTRICT JUDGE. MAGISTRATE JUDGE HILL.

**Opinion by:** REBECCA F. DOHERTY

## Opinion

Before the Court is the Motion for Summary Judgment [Doc. 10] filed by defendants Parker Drilling Company ("Parker") and Zurich American Insurance Company ("Zurich"). Defendants seek dismissal of all claims alleged against them on grounds there are no genuine issues of material fact that the plaintiff was intoxicated at the time he was injured and that the two benefit policies at issue exclude coverage for losses caused by, contributed to, or resulting from intoxication. Plaintiff opposes the motion [Doc. 12], and defendants have filed a reply brief [Doc. 17].

Although the defendant filed the instant motion as a motion for summary judgment, because this matter is one sounding in ERISA, this Court notes what the parties are, in fact, seeking is a determination on the merits. That is, the defendants seek a ruling as to whether the benefits [*2] determinations made by Zurich were proper. Thus, the procedural posture in which the issues have been presented to the Court is not appropriate. The parties have been contacted by the Court and have agreed that the matter should be presented on the merits of the plaintiff's claims. Therefore, this Court will consider the briefs filed as if they were briefs on the merits and will consider whether Zurich properly denied plaintiff's claims for benefits.

## I. Factual and Procedural Background

Plaintiff, Kyle P. Hargrave, contends on or about January 1, 2009 at 5:45 p.m., he was discharging fireworks with friends to celebrate the New Year. Plaintiff was in the process of discharging a firework when it malfunctioned in his left hand. [1] Plaintiff allegedly suffered "severe and painful personal injuries, including an open fracture-

---

[1] Plaintiff argues in an Affidavit attached to his brief that the fireworks did [*3] not explode in his left hand, but rather, exploded on a table where he placed it. As discussed herein, the Affidavit presented by the plaintiff is not part of the administrative record and cannot be considered by this Court in evaluating the factual findings made by Zurich. *See [Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 102 (5th Cir. 1993)](#)* (emphasis added), *citing [Wildbur v. ARCO Chemical Co., 974 F.2d 631, 639 (5th Cir. 1992)](#)*. A full discussion of the interplay between the standard of review and factual findings is found within the text. Furthermore, the records from the Kaplan emergency room indicate the "fireworks exploded in hand." *See* Exhibit 2, attached to defendants' brief, Doc. 10, at p. 3. As the documents contained in the administrative record clearly indicate the fireworks exploded in the plaintiff's left hand, and Zurich so found in its claims process, this Court must evaluate the plaintiff's claims in light of that factual determination.

dislocation, MCP joint, left thumb, with cicuferential degloving of thumb and thonar eminence, degloving of the ring finger with fracture of the DIP joint and multiple open wounds of the hand with burns, laceration to the branch radial artery, mid palmer arch, and disabling dismemberment." [2]

It is undisputed the plaintiff was intoxicated at the time of the accident. Records from Acadian Ambulance Service, which transported the plaintiff to Abrom Kaplan Memorial Hospital immediately [*4] after the accident, indicate "pt admitted to etoh use." Plaintiff arrived at Kaplan's emergency room at 6:25 p.m. and again admitted "to drinking beer/whiskey today." Before being transferred to Lafayette General Medical Center, plaintiff had blood drawn and screened at Kaplan at 7:15 p.m. Plaintiff's blood alcohol content — approximately one and a half hours after the accident — was "out of range" at 138 mg/dL, which translates to 0.138% blood alcohol content. The reference range noted on the emergency room records is "0-3." [3] This Court notes the amount required in Louisiana to be convicted of operating a vehicle while intoxicated is 0.08%. The foregoing records are attached to defendants' brief, and are also made part of the administrative record, which all parties stipulate is complete.

At the time of the accident at issue, the plaintiff was insured under a Basic Accidental Death and Dismemberment Group Policy (Policy Number GTU 4279153) (the "Basic Policy") and a Supplemental Accidental Death and Dismemberment Group Policy (Policy Number GTU 0016229) (the "Supplemental policy") issued by Zurich to Parker [*5] Drilling, plaintiff's employer. In their brief, defendants claim Zurich is the named fiduciary under both policies for purposes of claims processing and review. Despite

failing to Bates-stamp the administrative record in this matter, which made the following task inordinately difficult, this Court was able to locate the portion of the Basic Policy which states Zurich has "the discretionary authority to determine eligibility for benefits and to construe the terms of the plan." [4] However, this Court was unable to locate any reference to Zurich being a claims fiduciary under the Supplemental Policy. Zurich admits there is no provision in the Supplemental Policy granting Zurich the discretionary authority to determine eligibility for benefits and to construe the terms of the plan. Thus, the review of the benefits determination under the *Supplemental Policy* will be de novo.

As stated previously, the Basic Policy grants discretion to Zurich to determine eligibility for benefits and to construe the terms of the plan. Therefore, this Court reviews Zurich's benefits determination under the Basic Policy for an abuse of discretion. Under the Basic Policy, coverage is provided for the following:

**The Hazards insured against by the Policy are**

> A. A Covered Injury sustained by You anywhere in the world subject to the terms, conditions, exclusions and limitations under this Policy. [5]

---

[2] *See* Plaintiff's Petition, ¶ 4.

[3] *See* exhibits attached to defendants' motion for summary judgment, Doc. 10.

[4] *See* Basic Policy, Section XII, entitled "General Policy Conditions," Paragraph K, which states:

> **ERISA Claims Fiduciary**. Under the Employee Retirement Income Security Act of 1974 as amended (ERISA), the Policyholder designates Us [Zurich] as the claims fiduciary of this plan and gives Us [Zurich] the discretionary authority [*6] to determine eligibility for benefit and to construe the terms of the plan. The Policyholder agrees to comply with the disclosure and reporting requirements of ERISA regarding the plan and Our designation and authority as the claims fiduciary.

*See* Exhibit 8-2, p. 29, attached to defendants' Response to ERISA Case Order, Doc. 8.

[5] *See* Basic Policy, Section IV, entitled Coverages, Exhibit 8-2, p. 7 to defendants' Response to ERISA Case Order, Doc. 8.

A "Covered Injury" is defined in the Basic Policy as "an Injury directly caused by accidental means, which is independent of all other causes, results from a Covered Accident, occurred while You are insured under the policy, and results in a Covered [*7] Loss." [6] An "Injury" is defined as a "bodily Injury." [7] A "Covered Loss" is defined as:

> Covered Loss means a loss which meets the requisites of one or more benefits or additional benefits, results from a Covered Injury, and for which benefits are payable under the policy. [8]

Under the Supplemental Policy, the following coverages are provided:

## Hazards Insured Against by the Policy

### 24 Hour Accident Protection, Business and pleasure, H-19

The Hazards insured against by the Policy are:
> Injury sustained by a Covered Person anywhere in the world. . . [9]

Under the Supplemental Policy, "Injury" is defined as "an accidental bodily injury, which is a direct result, independent of all other causes, of a hazard set forth in the 'Description of Hazards.'" [10]

Both policies contain the following exclusion:

**A loss will not be a Covered Loss if it is caused by, contributed to, or results from**:

**7. being intoxicated**.

---

[6] *Id*. at Section III, "Definitions," p. 5.

[7] *Id*.

[8] *Id*.

[9] *See* Supplemental Policy, Exhibit 8-3 to defendants' Response to ERISA Case order, Doc. 8, at p. 8.

[10] *Id*. at "Definitions," p. 5.

a. An insured will be conclusively presumed to be intoxicated if the level of alcohol in his or her blood exceeds the amount [*8] at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.
b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of the Insured's intoxication. [11]

It is unclear when the plaintiff filed his claims for benefits, however, on April 13, 2009, Zurich acknowledged receipt of plaintiff's filing of a claim [*9] *under the Basic Policy* and a claim for benefits *under the Supplemental Policy*. On November 10, 2009, Zurich denied the claim under the *Supplemental Policy* on two grounds: (1) plaintiff did not suffer a "loss" within the meaning of the policy as there was no actual severance "through or above the metacarpophalangeal joint of a thumb or index finger," [12] and (2) plaintiff was

---

[11] *See* Basic Policy, Section VII, entitled "General Exclusions," ¶ 7(a) & (b), Exh. 8-2, p. 11; *see* Supplemental Policy, "Coverage Excluded," ¶ 7(a) & (b), Exh. 8-3 to Doc. 8, p. 12.

Under the Basic Policy, the exclusion is worded as follows:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from:

7. being intoxicated.

a. You will be conclusively presumed to be intoxicated if the level of alcohol in Your blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.

b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of Your intoxication.

[12] Specifically, Zurich explained although the plaintiff did sustain the complete amputation involving the thumb and ring finger of his left hand, there was no actual severance of his left index finger at the metacarpophalengeal joint, nor was there total paralysis of his left

intoxicated at the time of the accident. Plaintiff's claim under the *Basic Policy* was denied for identical reasons on November 10, 2009. [13] Plaintiff appealed on December 3, 2009.

On January 26, 2010, plaintiff was informed by Zurich's ERISA Review Committee that there is no requirement that both plaintiff's thumb and index finger be severed above the metacarpophalangeal joint in order to constitute a "loss" within the meaning of [*10] the policies. Rather, because the plaintiff sustained actual severance of a thumb above the metacarpophalangeal joint, this injury qualified as a "loss" within the terms of the policies. However, the denial of benefits on both claims was affirmed based on plaintiff's intoxication at the time of the accident. [14]

Plaintiff filed suit in the Fifteenth Judicial District Court for the Parish of Vermilion, State of Louisiana, on December 30, 2009 against Zurich and Parker Drilling, plaintiff's employer. Plaintiff alleges Zurich arbitrarily denied coverage for his injuries, and alleges Parker Drilling was negligent in failing to represent him or mediate his claims despite deductions made from his salary for premiums paid to Zurich. The lawsuit was removed to this Court on February 2, 2010.

On April 14, 2010, [*11] an ERISA Case Order was issued by the magistrate judge. Under that Case Order, the parties stipulated ERISA governs

---

arm. *See* Exh. 8-4, p. 6, attached to defendants' Response to ERISA Case Order, Doc. 8.

[13] *Id*. at Exh. 8-4, pp. 8-11.

[14] On appeal, Zurich argued that Exclusion 1 also applies:

> 1. Suicide or any attempt at suicide or *intentionally self inflicted Injury or any attempt at intentionally self inflicted Injury*.

(emphasis in original).

Zurich refers to this exclusion as existing in "the policy," although Zurich presumably reviewed each claim under the Basic Policy and the Supplemental Policy.

See Exh. 8-4, pp. 17-19.

the employee benefit plan at issue; ERISA preempts all state law claims; the Basic Policy grants Zurich discretionary authority to determined eligibility for benefits and to construe the terms of the plan; the administrative record is complete; and, at the time of his accident, the level of alcohol in plaintiff's blood exceeded the level at which he would have been presumed to be intoxicated under Louisiana law if operating a motor vehicle. [15]

Defendants filed the instant motion on July 9, 2010, contending there are no genuine issues of material fact that under the language of the policies at issue, plaintiff was properly denied coverage under both the Basic Policy and the Supplemental Policy for his injuries. As previously noted, this Court considers all briefs before the Court as briefs on the merits.

## II. Law and Analysis

### 1. Legal Standard — ERISA

The parties to this matter have stipulated the plaintiff's claims against Zurich are controlled by ERISA, and ERISA preempts all state law claims, presumably, including any claims of negligence alleged against Parker [*12] Drilling. As such, the plaintiff's claims are limited to an appeal of the Plan Administrator's denial of their claims pursuant to 29 U.S.C. § 1132(a)(1)(B): "A civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

"ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators." *Bratton v. National Union Fire Insurance Company of Pittsburgh, PA, 215 F.3d 516, 521-22 (5th Cir. 2000)*. "[A] denial of benefits

---

[15] Docs. 7, 9.

challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 521. "When an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion." Id. at 521 n.4.

The Fifth Circuit has described the nature of the abuse of discretion review. "When applying the abuse of discretion standard, [*13] 'we analy[ze] whether the plan administrator acted arbitrarily or capriciously. A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence. An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.' We must find that '[w]ithout some *concrete evidence* in the administrative record that supports the denial of the claim, . . . the administrator abused its discretion.'" *Lain v. Unum Life Insurance Company of America*, 279 F.3d 337, 342-43 (5th Cir. 2002) (citations omitted) (emphasis in original).

The plaintiff bears the burden of proving the Plan Administrator abused her discretion in concluding they were not entitled to benefits under the terms of the Plan. *See Dowden v. Blue Cross & Blue Shield of Texas, Inc.*, 126 F.3d 641, 644 (5th Cir. 1997); *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993). The abuse of discretion standard of review requires that this Court determine, first, whether the Administrator's interpretations and constructions are legally correct and, if legally correct interpretations [*14] or constructions were used by the Plan Administrator, whether she abused her discretion in reaching those conclusions upon which her decision is based.

Under the de novo standard, the Fifth Circuit has held the court should review the claim "as it would...any other contract claim — by looking to the terms of the plan and other manifestations of the parties' intent." *Bratton*, 215 F.3d at 516, *citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Nevertheless, even where the court employs the de novo standard to the ultimate benefits determination of the plan administrator, for factual determinations under ERISA plans, the Fifth Circuit has held federal courts owe due deference to an administrator's findings and, for their review, the abuse of discretion standard is appropriate. *Bratton*, 215 F.3d at 522, *citing Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir.1993); *Pierre v. Connecticut Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir.1991).

Finally, it is well-settled "a district court should evaluate the administrator's fact findings regarding the eligibility of a claimant *based [*15] on the evidence before the administrator....*'" *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir. 1993) (emphasis added), *citing Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 639 (5th Cir. 1992).

In the instant case, the *Basic Policy* gives Zurich complete discretion "to construe and interpret all terms and provisions of the Policy" and the parties have stipulated as such. However, the *Supplemental Policy* does not grant Zurich such discretionary authority. Thus, although this Court will be reviewing essentially two identical claims decisions (as identical claims were made under the two separate policies), technically, this Court will review Zurich's claims decision under the Basic Policy for an abuse of discretion, but must review Zurich's claims decision under the Supplemental Policy de novo. Notwithstanding the foregoing, any *factual findings* made by Zurich will be analyzed under the abuse of discretion standard and will be evaluated solely on the basis of the administrative record. *See Bratton*, 215 F.3d at 521.

## 2. Analysis of Motion

In their brief, defendants contend it is undisputed the plaintiff's blood alcohol content was nearly twice the legal limit at the time [*16] the plaintiff injured himself while detonating the firecracker. In his brief, plaintiff argues the following:

> II.
>
> Paragraph 2 of defendants['] motion [sic] over look, the possibility that while plaintiff may have been intoxicated which would prevent him from legally operating an automobile on public roads, still, plaintiff's loss while lighting a defective firework may have had nothing to do with his level of intoxication.
>
> III.
>
> Plaintiff will show at the trial on the merits of this cause and the record will reveal that defendants, through their own admission, were arbitrary in waiting almost twelve (12) months, despite repeated demand for relief by plaintiff's mother to advise Plaintiff that his claim had been denied on November 10, 2009 leaving him only twenty (20) days to appeal his claim or file suit [for] his loss. [16]

To his brief, plaintiff attaches the affidavits of the plaintiff and the plaintiff's mother, wherein the affiants attest the plaintiff's accident was not due to plaintiff's drinking.

This Court reviews Zurich's factual finding that the plaintiff was intoxicated at the time of the accident under the abuse of discretion standard. [*17] Additionally, this Court is restricted to a review of the administrative record in this regard, which all parties have stipulated is complete. After review of the administrative record, the Court concludes as to this factual finding, Zurich did not abuse its discretion in concluding plaintiff was intoxicated at the time of the accident. The record shows the plaintiff admitted alcohol use on the date of his accident, which was confirmed by a blood alcohol screening showing the presence of alcohol in plaintiff's blood that was almost twice the legal limit allowed in Louisiana to operate a motor vehicle. Additionally, the plaintiff *stipulated* his blood alcohol level exceeded the amount at which he would have been presumed to be intoxicated, under Louisiana law, if operating a motor vehicle.

The Court next considers whether Zurich's ultimate benefits determinations were erroneous. Because it must consider the claim determination made under the Supplemental Policy de novo, this Court will consider that claims determination first. This Court must review plaintiff's claim under the Supplemental Policy "as it would...any other contract claim — by looking to the terms of the plan and other manifestations [*18] of the parties' intent." *Bratton, 215 F.3d at 516*, *citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112-13, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)*. In the instant case, the Supplemental Policy contains the following exclusion:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from:

7. being intoxicated.

> a. An insured will be conclusively presumed to be intoxicated if the level of alcohol in his or her blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.
> b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of the Insured's intoxication. [17]

---

[16] *See* plaintiff's brief, Doc. 12, ¶¶II-III.

[17] *See* Basic Policy, Section VII, entitled "General Exclusions," ¶ 7(a) & (b), Exh. 8-2, p. 11; *see* Supplemental Policy, "Coverage

Here, it is undisputed the level of blood alcohol in the plaintiff's blood exceeded the amount at which a person would be presumed, under Louisiana law, to be intoxicated if operating a motor vehicle. Under the language of the Supplemental Policy, the plaintiff is presumed to have "be[en] intoxicated" at the time of his injury. Also under the terms of the policy, "A loss will not be a Covered Loss if it is caused by, contributed to, or results from: being intoxicated."

Defendants contend given plaintiff's blood alcohol content at the time of the accident, there can be no doubt plaintiff's intoxication at least "contributed to" his injuries and, therefore, plaintiff's claim was properly denied. In response, the plaintiff presents his affidavit and the affidavit of his mother, in which both state the plaintiff's drinking did not cause plaintiff's injuries. To that end, plaintiff [*20] states he was "fully in control of his faculties at the time of the accident." Additionally, plaintiff argues the standard for intoxication for driving an automobile differs from the standard that may be required when lighting fireworks. Therefore, the plaintiff appears to be arguing the evidence of his blood alcohol content should not be conclusive of coverage.

The affidavits presented by the plaintiff are not part of the administrative record and therefore, this

---

Excluded," ¶ 7(a) & (b), Exh. 8-3 to Doc. 8, p. 12.

Under the Basic Policy, the exclusion is worded as follows:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from:

7. being intoxicated.

> a. You will be conclusively presumed to be intoxicated if the level of alcohol in Your [*19] blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle.

> b. An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items will be considered proof of Your intoxication.

Court cannot consider them in reviewing the factual findings upon which Zurich based its benefits determinations. The administrative record does, however, contain the Supplemental Policy itself, which contains an exclusion stating a loss is not a "Covered Loss" if it was caused by, contributed to, or results from: being intoxicated." The exclusion further states "You will be *conclusively presumed to be intoxicated* if the level of alcohol in Your blood exceeds the amount at which a person is presumed, under the law of the locale in which the Accident occurred, to be intoxicated, if operating a motor vehicle."

Here, it is undisputed the level of blood alcohol in the plaintiff's blood exceeded the amount at which a person would [*21] be presumed, under Louisiana law, to be intoxicated if operating a motor vehicle. Therefore, plaintiff's argument that there is a different "standard" for intoxication while operating fireworks is immaterial. Additionally, it is not unreasonable to conclude the plaintiff's intoxication at least "contributed to" the plaintiff's injury, and this Court notes the plaintiff has pointed to no evidence in the administrative record showing the plaintiff's intoxication did *not* contribute to his accident, other than his own self-serving affidavit and the self-serving affidavit of his mother, which cannot be considered by the Court. Furthermore, plaintiff's statement in his opposition brief that Zurich's position overlooked "the possibility" that alcohol played no role in his accident is insufficient to override the policy's intoxication exclusion.

Considering the foregoing, this Court concludes the intoxication exclusion in the Supplemental Policy applies, and consequently, Zurich properly denied plaintiff's claim for benefits under the Supplemental Policy.

Turning now to the Basic Policy, this Court must only review Zurich's claims decision under that policy for an abuse of discretion. Because [*22] Zurich denied plaintiff's claim under this policy for the same reason it denied plaintiff's claim under the Supplemental Policy, and because the

two policies have almost identical exclusions, this Court concludes Zurich did not abuse its discretion in denying plaintiff's claim for benefits under the Basic Policy.

Considering the foregoing, this Court concludes Zurich properly denied plaintiff's claim for benefits under the Basic Policy and the Supplemental Policy, and plaintiff's claims against defendants, therefore, are DENIED AND DISMISSED WITH PREJUDICE.

IT IS ORDERED that the parties submit a Judgment, approved as to form, within ten (10) days of the date of this Order.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 25 day of August 2010.

/s/ Rebecca F. Doherty

REBECCA F. DOHERTY

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Sanford v. Zurich Am. Ins. Co.

United States District Court for the Northern District of Mississippi, Eastern Division

September 15, 2009, Decided; September 15, 2009, Filed

Case No. 1:08cv107

**Reporter**
2009 U.S. Dist. LEXIS 84327 *; 2009 WL 2986343

WILLIAM D. SANFORD, PLAINTIFF vs. ZURICH AMERICAN INSURANCE COMPANY, DEFENDANT

**Counsel:** [*1] For William D. Sanford, Plaintiff: John Booth Farese, LEAD ATTORNEY, FARESE, FARESE & FARESE, Ashland, MS.

For Zurich American Insurance Company, Defendant: Jeffrey S. Dilley, William Kurt Henke, LEAD ATTORNEYS, HENKE, HEATON & BUFKIN, Clarksdale, MS.

**Judges:** MICHAEL P. MILLS, CHIEF JUDGE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MICHAEL P. MILLS

## Opinion

### ORDER

This cause comes before the court on the competing motions of the parties for summary judgment, pursuant to Fed. R. Civ. P. 56. The court, having reviewed the memoranda and submissions of the parties, concludes that plaintiff's motion should be denied and that defendant's motion should be granted.

This is an ERISA case seeking damages arising out of defendant Zurich American Insurance Company's ("Zurich") denial of a claim for accidental death benefits pursuant to two group insurance policies issued to Sysco Corporation. The decedent Peggie Sanford ("Sanford") was employed by a Sysco affiliate and thus qualified for the accidental death and dismemberment ("AD&D") coverage afforded under both policies. William D. Sanford (the "Plaintiff") was designated as the sole beneficiary of Sanford's death benefits. On August 6, 2006, Sanford drowned at Pickwick Lake, and [*2] the plaintiff submitted a claim for accidental death benefits in the amount of $ 227,000. Zurich, which serves as ERISA Claims Fiduciary, denied benefits on the basis of an "intoxication" exclusion in both policies, concluding that ethyl alcohol intoxication contributed to Peggie's death. Feeling aggrieved, plaintiff filed this action on March 27, 2008, in the Circuit Court of Tishomingo County, and Zurich subsequently removed the case to this court. The parties have each filed motions for summary judgment, contending that there exists no genuine issue of fact and that they are entitled to judgment as a matter of law.

Prior to addressing the facts of this case, the court initially notes that plaintiff's state law claims are pre-empted by ERISA, which limits this action to one for benefits. 29 U.S.C. § 1132(a)(1)(B). Moreover, ERISA provides that Zurich's denial of the subject claim is reviewable only for an abuse of discretion, since the plan in this case provides Zurich with "the discretionary authority to determine eligibility for benefits and to construe the terms of the plan." *See Tolson v. Avondale Indus., Inc., 141 F.3d 604, 608 (5th Cir. 1998)*. In defending its decision to deny [*3] coverage based upon the "intoxication" exclusion in the ERISA policies, defendant describes the facts of the case as follows:

> Sanford and a companion, Albert McAlexander ("McAlexander"), died on or about August 6,

2006, while on a leisure outing at Pickwick Lake. Several witnesses observed Sanford and McAlexander aboard a pontoon boat near the waterfalls area of Pickwick Lake during the daylight hours on August 6. They were last observed "dancing and playing" aboard the boat at approximately 6:00 p.m. A short time later, the boat was found adrift and unmanned with the engine running, the radio playing, and a large dog onboard. A search was immediately launched by officers representing the Mississippi Department of Wildlife, Fisheries & Parks, the Tishomingo County Sheriff's Department, and the Tennessee Valley Authority. On the morning of August 7, the bodies of Sanford and McAlexander were discovered floating in the lake.

There were a number of other boaters in the area of the waterfalls during the period that Sanford and McAlexander would have entered the water. However, no witnesses saw Sanford or McAlexander leave their boat or enter the water, and no one heard any fighting, yelling, [*4] or cries for help. Sanford's body was sent to Jackson for an autopsy and forensic analysis. The autopsy revealed that Sanford had died as a result of freshwater drowning. Additionally, a toxicological examination of her blood was positive for ethyl alcohol at a level of 0.161 g/dl. In searching and inventorying the contents of the boat, officers had discovered beer and vodka. There was no evidence of foul play. By all accounts, Sanford and McAlexander enjoyed a good relationship. Likewise, as noted above, none of the other boaters in the area observed any yelling or cries for help. The available evidence led officers to conclude that Sanford had fallen overboard and drowned. The official cause of death was listed as freshwater drowning with a contributing cause of ethyl alcohol intoxication.

Citing these facts, Zurich denied plaintiff's claim for benefits based upon a policy exclusion which provided that:

> **C.** No benefits will be paid for a Covered Loss contributed to, either directly or indirectly, by a Covered Person's being:
>
> **1.** Intoxicated.
>
> a. A Covered Person will be conclusively presumed to be intoxicated if the level of alcohol in his/her blood exceeds the amount at which a person [*5] is presumed, under the law of the locale in which the accident occurred, to be intoxicated if operating a motor vehicle.
>
> **b.** An autopsy report from a licensed medical examiner, law enforcement officer reports, or similar items shall be considered proof of the Covered Person's intoxication.
>
> **2.** Under the influence of any controlled substance, unless such controlled substance was prescribed by a physician and taken in accordance with the prescribed dosage.

In setting forth his own theories regarding the cause of Peggie's death, plaintiff writes as follows:

> The Plaintiff submitted supplemental information to Defendant Zurich's ERISA Committee, including four sworn affidavits from Cynthia Hodges, Robert B. Moorman, Tam're Moorman, and William Sanford (the Plaintiff), respectively, which stated that Peggie Sanford was completely incapable of swimming and which stated that if Peggie Sanford fell into water she would drown unless she was saved by another person. The Plaintiff also provided Defendant Zurich's ERISA Committee with the results of an investigation conducted by Terry R. Cox, a certified legal investigator. Cox interviewed the following individuals: Ricky Cornelison, the MDWFP officer [*6] who prepared the *Official Water Accident Report;* Stewart M. "Mack" Wilemon, the Tishomingo County Medical Examiner

Investigator; and, Terry Burcham, a law enforcement officer with the Tennessee Valley Authority Police Department.

The *Official Water Accident Report,* which was prepared following Cornelison's investigation into the drowning death of Peggie Sanford, recites that the cause of death was drowning, that Sanford was a non-swimmer, and that "what victim was doing" at the time of the drowning is "unknown." Notably, the pre-printed portion of the *Official Water Accident Report* contains a section captioned "Probable Cause of Accident" which lists common possible causes of accidents, to-wit: Swimming in unknown waters; Physical failure or exhaustion; Non-proficient swimmer; Fell through ice; Fell from bridge; Fell from bank; Fell from dock; Fell from poolside; and, Suicide or attempt. Also listed as a "Probable Cause of Accident" on the pre-printed *Official Water Accident Report* form is "Other." When Cornelison prepared the *Official Water Accident Report,* he placed a check by "Other" under "Probable Cause of Accident" and did not include any further explanatory notation.

The January [*7] 26, 2007, letter from Defendant Zurich to Plaintiff William D. Sanford in which Zurich denies the claim for Peggie Sanford's death benefits states (in the fourth full paragraph on page 2) as follows: "The police crime report also states that alcohol was a factor in the incident." This statement is false. Cornelison's *Official Water Accident Report* actually states: "A small amount of vodka, beer and a green leafy substance that appeared to be marijuana along with paraphernalia were located on the boat leading officers to believe that the victims *may* have been under the influence." (Emphasis added.) This statement reflects nothing more than speculation. No where within Cornelison's twenty-seven page *Official Water Accident Report* it is affirmatively stated that "alcohol

was a factor in the incident" as claimed by Defendant Zurich. When Cornelison was interviewed by Terry Cox, the certified legal investigator, Cornelison admitted that there is no evidence to indicate that alcohol caused or contributed to the drowning death of Peggie Sanford.

The claim file made available to the Plaintiff by Defendant Zurich indicates that Zurich's investigators never spoke directly with Cornelison. Stewart [*8] M. "Mack" Wilemon, the Tishomingo County Medical Examiner Investigator, prepared the written *Report of Death Investigation* as required by Mississippi Medical Examiner Act of 1986 ([MISS. CODE ANN. § 41-61-51, *et seq.*]). Wilemon's *Report of Death Investigation* recites the "Probable Cause of Death" as "Freshwater Drowning" and recites "Ethyl Alcohol Intoxication" as a "Contributing factor" in Peggie Sanford's death. Wilemon's report also recites:

> Subject was found floating in lake near a rocky shoreline. Thought to have been occupant of pontoon boat which was found unoccupied last p.m. That to have been in company of male subject not accounted for at time of Ms. Sanford's discovery. *No known witnesses to subject's distress or demise.* 8/30 Subject believed to have fallen overboard due to Ethyl Alcohol Intoxication. Results received 8/30/06

When Wilemon was interviewed by Cox, however, Wilemon agreed that there is no evidence to indicate that alcohol caused or contributed to the drowning death of Peggie Sanford. Notably, the Report of Death Investigation specifically states that Peggie Sanford "could not swim." Again, the statement "Subject believed to have fallen overboard due to Ethyl Alcohol [*9] Intoxication" is nothing more than mere speculation.

Terry Burcham is a law enforcement officer

with the Tennessee Valley Authority ("TVA") Police Department who produced a written *TVA Police Crime Report* relating to the death of Peggie Sanford. Burcham's report recites law enforcement officers found "alcohol and marijuana" on the pontoon boat, but Burcham's report contains no statement whatsoever regarding whether ethyl alcohol intoxication may have caused or contributed to the drowning death of Peggie Sanford. WhenBurcham was interviewed by Cox, Burcham agreed that there is no evidence to indicate that alcohol caused or contributed to the drowning death of Peggie Sanford.

In rebutting these arguments, defendant writes as follows:

> While not contesting Zurich's determination that Peggie Sanford ("Sanford") was intoxicated at the time she drowned, Plaintiff does challenge the determination by Zurich that Sanford's intoxication contributed, either directly or indirectly, to her death. Plaintiff cites to evidence that Sanford was not able to swim and asserts that this inability to swim, rather than intoxication, was the sole cause of her death. Plaintiff also notes that no onesaw Sanford [*10] enter the water and poses several different explanations as to how Sanfordcould have entered the water regardless of whether she was impaired. According to the Plaintiff, because no one observed Sanford enter the water, it is simply impossible to determine whether intoxication was a factor in her death.

> Contrary to Plaintiffs' argument, the evidence in the record supports Zurich's determination that intoxication was a factor in Sanford's death. In order to prevail in this action, Zurich need not establish that intoxication was the only cause or even the predominate cause of Sanford's death. Rather, the Court is compelled to uphold Zurich's determination if the administrative record contains substantial

evidence that intoxication contributed, either directly or indirectly, to Sanford's death. It is inconsequential for purposes of the Court's review that there may have been other, more direct causes. Clearly, Zurich did not abuse its discretion because the underlying evidence supports its denial of Plaintiff's claim for benefits.

Ultimately, it seems clear that no party to this litigation has definitive proof regarding exactly how and why Peggie Sanford tragically drowned. Plaintiff has [*11] offered alternate explanations for Peggie's drowning, including 1) that she may have been thrown into the lake by the negligence of the boat's operator; 2) that she may have been thrown into the water by McAlexander during horseplay; and (3) that large waves caused by a thunderstorm may have caused her to fall off the boat. This court can certainly not exclude the possibility that one of these explanations may be accurate.

The court agrees with defendant, however, that the highly deferential "abuse of discretion" standard which applies in this case, along with the fact that the policies in this case exclude coverage in cases where intoxication "contributed … either directly or indirectly" to the covered loss indicates that Zurich's decision to deny benefits must be upheld. It would be very difficult for this court to conclude that Zurich abused its discretion in concluding that intoxication was at least a contributing factor in Peggie's death when 1) her post-mortem blood test was positive for ethyl alcohol at a level of 0.161 g/dl; 2) Tishomingo County Medical Examiner Investigator Stewart M. Wileman explicitly stated in Peggie's amended death certificate that "ethyl [*12] alcohol intoxication" was a "significant condition … contributing" to her death. [1] The court

---

[1] In the court's view, this would be true even under the application of the somewhat less deferential standard of review which would apply if this court were to conclude that Zurich had a conflict of interest by serving as both plan administrator and insurer in this case. *See e.g., Wade v. Hewlett-Packard Development Co. LP Short Term*

readily agrees with plaintiff that there are other possible explanations for Peggie's death which do not involve intoxication, but there is clearly substantial evidence supporting Zurich's conclusion that intoxication was a contributing factor in her death. Zurich's motion for summary judgment will therefore be granted, and plaintiff's motion will be denied.

It is therefore ordered that Zurich's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

A separate judgment will be issued this date, pursuant to Fed. R. Civ. P. 58. THIS the 15th [*13] day of September, 2009.

/s/ MICHAEL P. MILLS

**CHIEF JUDGE**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF MISSISSIPPI**

---

End of Document

---

*Disability Plan,* 493 F.3d 533, 541 (5th Cir. 2007). Wileman had no such conflict of interest, and he independently concluded that intoxication was a contributing factor in Peggie's death.

# Nichols v. Hartford Life & Accident Ins.

United States District Court for the Southern District of Texas, Houston Division

June 9, 2014, Decided; June 9, 2014, Filed

Civil Action No. 4:13-cv-03048

**Reporter**

2014 U.S. Dist. LEXIS 196645 *; 2014 WL 12537147

JENNIFER NICHOLS, Plaintiff v. HARTFORD LIFE & ACCIDENT INS., Defendant

**Counsel:** [*1] For Jennifer Nichols, Plaintiff: Lennon C Wright, LEAD ATTORNEY, Houston, TX, USA.

For Hartford Life And Accident Insurance Company, Defendant: Theodore Christian Schultz, Lindow Stephens Treat LLP, San Antonio , TX, USA.

**Judges:** VANESSA D. GILMORE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** VANESSA D. GILMORE

# Opinion

## ORDER

Pending before the Court is Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford")'s Motion for Summary Judgment. **(Instrument No. 15)**.

## I.

### A.

On August 23, 2013, Plaintiff Jennifer Nichols ("Plaintiff") filed suit against Defendant in the 80th Judicial District of Harris County, Texas, alleging that Defendant failed to pay benefits owed under a life insurance policy. (Instrument No. 1-2).

Defendant removed the suit to this Court on October 16, 2013 because the policy at issue is governed by the Employee Retirement Income Security Act ("ERISA"), creating a basis for federal jurisdiction. (Instrument No. 1). Plaintiff filed a First Amended Complaint on December 17, 2013, alleging that Defendant has refused to pay life insurance proceeds that Plaintiff is due under her late husband's policy. (Instrument No. 7). Defendant filed a motion for summary judgment on April 15, 2014 (Instrument [*2] No. 15), and Plaintiff has not filed a response.

### B.

Hartford insures the Group Basic Dependent Life, Basic Term Life, Basic Accidental Death and Dismemberment Plan for employees of Clean Harbors Environmental Services, Inc. (Instrument No. 15-2 at 31). Hartford is the Plan's claims fiduciary and has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (Instrument No. 15-2 at 31).

The Policy contains an exclusion which states that it "does not cover any loss caused or contributed to by: . . . (7) Injury sustained while intoxicated." (Instrument No. 15-2 at 19). The Policy further states that:

Intoxicated means:

1) the blood alcohol content;

2) the results of other means of testing blood alcohol level; or

3) the results of other means of testing other

substances; that meet or exceed the legal presumption of intoxication, or under the influence, under the law of the state where the accident occurred.

(Instrument No. 15-2 at 19). Hartford admits that Michael Nichols ("Mr. Nichols"), Plaintiff's husband, was enrolled in the Plan and insured under the Policy. (Instrument No. 15 at 2).

On November 8, 2012, Mr. Nichols [*3] was involved in a single-vehicle accident while driving an all-terrain vehicle in Tyler County, Texas. (Instrument No. 15-3 at 4-11). The police report indicated that Mr. Nichols "was traveling at an unsafe speed" entering a curve and his ATV eventually fell into a ditch and struck a tree, rolling over two times and ejecting Mr. Nichols. (Instrument No. 15-3 at 5). The report noted that Mr. Nichols "had been drinking and was possible [sic] under the influence of alcohol." (Instrument No. 15-3 at 5). The weather at the time of the accident was clear, and there were no vehicle defects. (Instrument No. 15-3 at 5, 7-8).

Mr. Nichols was taken to the Conroe Regional Medical Center, where he was admitted for a traumatic brain injury. (Instrument No. 15-4 at 2). His laboratory work revealed an "elevated" blood alcohol content of 167 mg/dL. (Instrument No. 15-4 at 4, 6). The legal level for intoxication in Texas is a blood alcohol content of 80 mg/dL, or 0.08. Tex. Penal Code § 49.01(2)(B). Mr. Nichols was pronounced dead at the hospital on November 8. (Instrument No. 15-4 at 2).

Defendant admits that Plaintiff made a timely claim for accidental death benefits and life insurance benefits under the Policy. (Instrument No. [*4] 15 at 3). Hartford paid the life insurance benefits, but it determined that the intoxication exclusion applied and that Plaintiff was therefore not entitled to accidental death benefits. (Instrument No. 15-6 at 2-4). On June 7, 2013, Plaintiff appealed the decision to deny accidental death benefits. (Instrument No. 15-7). Plaintiff argued that

Hartford had an obligation to show that Mr. Nichol's intoxication caused the accident, and she also claimed that the hospital toxicology tests were inaccurate to determine Mr. Nichol's blood alcohol content. (Instrument No. 15-7 at 1). Hartford denied the appeal on July 11, 2013. (Instrument No. 15-8 at 2-4). Hartford claimed that its Policy does not require it to establish that intoxication caused the accident, but only that the injury was sustained while the individual was intoxicated. (Instrument No. 15-8 at 3). However, Hartford claims that even if the Policy does require causation, Hartford specifically found that the accident was caused by Mr. Nichol's intoxication. (Instrument No. 15-8 at 3). Hartford also noted that there was no evidence in the record to suggest that the hospital's toxicology testing or method was incorrect or unreliable. [*5] (Instrument No. 15-8 at 3).

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex, 477 U.S. at 325*. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)* (citation omitted). "If the moving party fails to meet [*6] [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency, 537 F.3d 504, 507 (5th Cir. 2008)* (quoting *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992)*. The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little, 37 F.3d at 1075*. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Baranowski v. Hart, 486 F.3d 112, 119 (5th Cir. 2007)*. Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves, 538 F.3d 373, 376 (5th Cir. 2008)*, the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux, 402 F.3d at 540* (*quoting*

*Little, 37 F.3d at 1075*). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken, 110 F.3d 295, 297 (5th Cir. 1997)*.

In deciding a summary [*7] judgment motion, the district court does not make credibility determinations or weigh evidence. *Chevron Phillips, 570 F.3d 606, 612 n.3 (5th Cir. 2009)*. Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 379-80 (5th Cir. 2010)*; *Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003)*; *Ragas*, 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir.1988)* (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara, 353 F.3d at 405*.

In this case, Plaintiff has not filed a response to Defendant's Motion for Summary Judgment. This failure, of course, does not permit the Court to enter a default summary judgment. *Eversley v. MBank of Dallas, 843 F.2d 172, 174 (5th Cir. 1988)*. Nevertheless, if no response to the motion for summary judgment has been filed, the Court may find as undisputed the statement of facts in the motion for summary judgment. *Eversley, 843 F.2d at 174*; *Jegart v. Roman Catholic Church of the Diocese of Houma-Thibodaux, 384 Fed. Appx. 398, 400 (5th Cir. 2010)*; *see, e.g., Thompson v. Eason, 258 F.Supp.2d 508, 515 (N.D. Tex. 2003)* (where no opposition is filed, the movant's evidence may be accepted as undisputed); *Unum Life Ins. Co. of America v. Long, 227 F. Supp. 2d 609, 614 (N.D.*

Tex. 2002) ("Although the court may not enter a 'default' summary judgment, it may accept evidence submitted by [movant] as undisputed."). [*8] Accordingly, the Court treats the movant's evidence as undisputed.

## III.

### A.

ERISA confers jurisdiction on federal courts to review benefit determinations by fiduciaries or plan administrators. *See* 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). When a plan administrator or fiduciary is given discretionary authority, a denial of benefits is reviewed for an abuse of discretion. *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 269 (5th Cir. 2004); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006). Here, the Policy gave Defendant discretionary authority to construe the terms of the Plan, and Defendant's determinations will be reviewed for abuse of discretion. *See* (Instrument No. 15-2 at 31).

"Abuse of discretion review is synonymous with arbitrary and capricious review in the ERISA context." *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009). Courts affirm the administrator's decision if it is supported by substantial evidence, which is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis, 394 F.3d at 273* (internal quotations omitted). A decision is arbitrary only [*9] if made without a rational connection between the known facts and the decision or between the found facts and the evidence. *Cooper, 592 F.3d at 652*. A court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness— even if on the low end." *Corry v. Liberty Life Assurance Co. of Boston, 499 F.3d 389, 398 (5th Cir. 2007)* (quotation marks omitted).

### B.

The Court first must consider whether there was sufficient evidence for Defendant to conclude that Mr. Nichols was intoxicated at the time of his death. "[T]he question of the cause of death [is] a factual determination." *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 213 (5th Cir. 2009). The Court reviews this factual determination for abuse of discretion. *Ellis, 394 F.3d at 269*.

The Policy states that whether an individual is intoxicated is demonstrated through the results of blood alcohol level testing "that meet[s] or exceed[s] the legal presumption of intoxication, or under the influence, under the law of the state where the accident occurred." (Instrument No. 15-2 at 19). The legal level for intoxication in Texas is a blood alcohol content of 80 mg/dL, or 0.08. Tex. Penal Code § 49.01(2)(B).

Here, in order to find that Mr. Nichols was intoxicated under Texas law, Hartford relied on the report of an investigating police officer, who stated that [*10] Mr. Nichols had been drinking and that he suspected that Mr. Nichols was possibly under the influence of alcohol. (Instrument No. 15-3 at 5). Hartford also relied on a hospital admission report and toxicology report from blood drawn at the treating hospital, which indicated that Mr. Nichols's blood alcohol content was 167 mg/dL, over twice the legal limit. (Instrument No. 15-4 at 4, 6; Instrument No. 15-5 at 4). The Fifth Circuit has

held that similar, or even less persuasive, evidence provides substantial evidence of intoxication. In *Dutka*, a toxicology report was conducted fifty days after the accident in question, and the medical expert interpreting the report "was not unequivocal as to the content of drugs present in the decedent's blood *at the time of the accident*." *Dutka*, 573 F.3d at 213 (emphasis in original). Nevertheless, the Fifth Circuit held that because "the evidence [of intoxication] is consistent with the conclusion," the administrator's finding of intoxication was not arbitrary and capricious. *Id.* Similarly, in *Jimenez v. Sun Life Assur. Co. of Canada*, 486 F. App'x 398, 410 (5th Cir. 2012), the police officer at the scene of the accident suspected that alcohol was involved in the accident, hospital staff indicated that the decedent was "intoxicated" when he was admitted, [*11] and his blood test indicated that his blood alcohol content was almost twice the legal limit under Louisiana law. *Id.* at 410-11. The court concluded that this was "substantial" evidence of intoxication. *Id.* at 410. In this case, Hartford relies on similar evidence of intoxication. *See* (Instrument No. 15-3 at 5; Instrument No. 15-4 at 4, 6; Instrument No. 15-5 at 4). The Court therefore finds that Hartford did not abuse its discretion in finding that Mr. Nichols was intoxicated at the time of the accident. *See Dutka, 573 F.3d at 214*; *Jimenez, 486 F. App'x at 411*.

### C.

The Court next considers whether Hartford correctly applied the intoxication exclusion to deny Plaintiff accidental death benefits. The Court reviews this determination for abuse of discretion. *Ellis, 394 F.3d at 269*.

The Policy "does not cover any loss caused or contributed to by" . . . (7) Injury sustained while intoxicated." (Instrument No. 15-2 at 19). Plaintiff argued on administrative appeal that there was no evidence that intoxication caused Mr. Nichols's death because there were no witnesses to the crash.

Hartford argues first that the Policy does not require causation. (Instrument No. 15 at 9). The Court need not address this issue, because even if the Policy does require causation, Hartford specifically found [*12] that the accident was caused by Mr. Nichols's intoxication. (Instrument No. 15-8 at 3). In *Dutka*, the court noted "that there was no *direct* proof that the drugs [in the decedent's system] caused the crash, however, in such a case there rarely is—the evidence is circumstantial." *Dutka, 573 F.3d at 214* (emphasis in original). The *Dutka* court noted that because the weather conditions were clear and there was no evidence of mechanical failure, "[t]he nature of the accident itself supports the conclusion that drugs contributed." *Id.* The court therefore concluded that the plan administrator's causation finding was not arbitrary and capricious. *Id*. Similarly, here, the police report notes that the weather at the time of the accident was clear and there were no vehicle defects. (Instrument No. 15-3 at 5, 7-8). The nature of the accident, which occurred when Mr. Nichols was driving his ATV "at an unsafe speed" entering a curve, further makes it reasonable to conclude that the accident resulted in part from Mr. Nichols's intoxication. (Instrument No. 15-3 at 5); *Dutka, 573 F.3d at 214*.

Therefore, the Court finds that Hartford's finding that intoxication caused Mr. Nichols's accident was not arbitrary and capricious. Furthermore, Hartford's [*13] decision to apply the intoxication exclusion based on this factual finding was not arbitrary and capricious.

Accordingly, Defendant's motion for summary judgment is GRANTED.

### V.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment is **GRANTED. (Instrument No. 15)**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the 9th day of June, 2014, at Houston, Texas.

/s/ Vanessa D. Gilmore

**VANESSA D. GILMORE**

**UNITED STATES DISTRICT JUDGE**

## FINAL JUDGMENT

For the reasons stated in the Court's Order, signed on the 9th day of June, 2014, this action is **DISMISSED**.

**THIS IS A FINAL JUDGMENT**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the 9th day of June, 2014, at Houston, Texas.

/s/ Vanessa D. Gilmore

**VANESSA D. GILMORE**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**