# [Dwyer v. United Healthcare Ins. Co.](#)

United States Court of Appeals for the Fifth Circuit

September 19, 2024, Filed

No. 23-50439

**Reporter**

115 F.4th 640 *; 2024 U.S. App. LEXIS 23866 **

KELLY DWYER, Plaintiff—Appellant, versus UNITED HEALTHCARE INSURANCE COMPANY, Defendant—Appellee.

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Texas. USDC No. 1:17-CV-439.

[Dwyer v. Unitedhealthcare Ins. Co., 2023 U.S. Dist. LEXIS 91870, 2023 WL 3595352 (W.D. Tex., Apr. 14, 2023)](#)

**Counsel:** For Kelly Dwyer, Plaintiff - Appellant: Peter S. Sessions, Esq., Kantor & Kantor, L.L.P., Northridge, CA; Elizabeth K. Green, Green Health Law, A.P.C., Glendale, CA.

For United Healthcare Insurance Company, Defendant - Appellee: Michael Howard Bernstein, Robinson & Cole, L.L.P., New York, NY.

**Judges:** Before HIGGINSON, WILLETT, and OLDHAM, Circuit Judges.

**Opinion by:** Andrew S. Oldham

## Opinion

[*643] ANDREW S. OLDHAM, *Circuit Judge*:

The question presented is whether United Healthcare Insurance Company improperly withheld benefits owed to its beneficiary, Kelly Dwyer. After a bench trial, the district court entered judgment for United. We reverse, render judgment for Mr. Dwyer, and remand for calculation of his damages.

I

Kelly Dwyer seeks to recover for the denial of mental health benefits owed to his minor daughter, E.D., under his employee group benefit health plan issued by Defendant United Healthcare Insurance Company ("United"). We explain (A) the facts, (B) United's coverage decisions, and (C) the litigation history.

A

E.D. began experiencing symptoms of anorexia nervosa when she was a preteen. As her condition worsened, she [**2] lost a significant amount of weight, was only eating fruits and vegetables, and did not like to [*644] eat anything because of the way she felt after eating.

The Dwyers sought out an eating disorder specialist, as well as treatment for E.D. with a dietician and psychologist. But she did not improve. E.D. began asking her mother to blend all her food so she did not have to see what she was consuming. She was also over-exercising, eating with her hands, and getting rid of and spitting out food. E.D.'s parents could not monitor her meals or prevent her from over-exercising because she "react[ed] like a wild animal to monitoring." ROA.2111.

Because of E.D.'s severe and worsening condition, the Dwyers brought her to a residential treatment facility, Avalon Hills. At the time she entered the hospital in February 2015, at age 14, E.D. was 5'2" and weighed 75.8 pounds. During her admission, E.D. stated that "she no longer ever feels hungry"

and "now it hurts to eat or drink anything." She also stated that "food has become the enemy." ROA.2110. The admitting therapist noted that E.D. "appeared emaciated." ROA.2112.

Over the next few months, E.D.'s weight began to improve, as she was placed on a 4,000-calorie-per-day [**3] diet. She was also monitored around the clock to ensure that she complied with the diet and did not over-exercise or engage in other anorexia-related behaviors. Although her weight increased, E.D. still exhibited a number of concerning symptoms. For example, even after three months of treatment, E.D. was still "underplating," taking "small bites," "eating slowly," and "picking at food" while "watching others." ROA.1047. She was also "ditching food." ROA.1062. When she thought no one was watching, E.D. would engage in "leg shaking" and muscle "flexing" to burn additional calories. *Ibid.*

B

Initially, United approved full hospitalization benefits for E.D. But in June 2015, the insurer decided to lower its coverage to partial hospitalization. The Dwyers appealed. United rejected the Dwyers' appeal and then stepped down E.D. to partial hospitalization.

At this time, one of E.D.'s doctors at Avalon Hills said that although she was "about 45-50% improved towards a remitted state" and had "come a long ways from where she started," E.D. was "still not at the point o[f] readiness" for the intensive outpatient program setting. ROA.1222. Even at the lower level of hospitalization, E.D. was receiving [**4] a substantial amount of treatment and spending hours every day at the facility. Most importantly, every meal she ate was monitored by Avalon Hills staff. At this stage of her treatment, E.D. was given a 3,800-calorie daily diet. The high-calorie diet in conjunction with the constant monitoring led her to achieve a weight of 117 pounds by mid-July 2015.

Given her improvement, E.D. was approved for a three-day weekend pass so she could leave the facility and visit her home. Her doctors wanted to see how E.D. would fare outside of the tightly controlled clinical environment of Avalon Hills.

The three days at home were filled with difficult, negative experiences for E.D. Over the course of three days, E.D. lost two pounds. She broke down crying on a shopping trip because of her "terrible body image." ROA.2045. Upon her return to Avalon Hills, E.D. was "continuously walking" in an unnatural gait so that her legs would not touch each other; "twisting her body to body check," which she also did in the shower; and "staring at" her own "thighs, bottom, and back." ROA.1322.

For reasons that are difficult to understand, following E.D.'s challenging three days at home, United decided it was appropriate [**5] to discharge E.D. entirely. In [*645] United's view, stated in a July 2015 denial letter, E.D. could be stepped down to outpatient-only treatment. E.D.'s doctors immediately objected. Her providers at Avalon Hills asserted that she could not be stepped down further due to the poor performance on the weekend home, the ongoing fluctuations in her body weight, and her inability to receive the care she needed at the outpatient level. Again, United rejected the Dwyers' appeal. Rather than abide by the company's decision, Mr. Dwyer decided to keep E.D. at Avalon Hills until the end of her treatment. He paid out of pocket for it.

Mr. Dwyer's fight with United was not limited to United's decision to deny hospitalization benefits to E.D. The parties also disagreed over whether the Avalon Hills treatment facility was covered by United's so-called "MultiPlan benefit." MultiPlan is a network provider that "connects insurers with out-of-network providers so that insurers do not have to make arrangements individually with those providers." Blue Br. at 5-6. MultiPlan providers, like in-network providers, have predetermined rates for their services. Mr. Dwyer believed that both Avalon Hills and his United [**6] plan participated in the MultiPlan network. His United insurance

card displayed the MultiPlan logo, and the MultiPlan Network Facility Handbook informed providers they could identify participants based on the MultiPlan logo on an insurance card. Moreover, Avalon Hills had a predetermined contract for services and rates with MultiPlan.

United initially acted in accordance with this straightforward understanding of Mr. Dwyer's MultiPlan benefits. United processed some of

No. 23-50439

E.D.'s claims from Avalon Hills at the MultiPlan rate. This resulted in a zero-dollar out-of-pocket payment for Mr. Dwyer. But for the vast majority of E.D.'s treatment at Avalon Hills, United did not pay claims at the MultiPlan rate. Instead, it treated Avalon Hills as an out-of-network provider— paying only 50% of the billed rate for months of E.D.'s treatment. This resulted in substantial out-of-pocket payments by Mr. Dwyer.

Mr. Dwyer repeatedly asked United to explain this discrepancy. Eventually, an Avalon Hills employee told Mr. Dwyer that she "spoke with Maureen [at] Multiplan today regarding claims not being paid at the Multiplan rate." He learned that United "did not send the claims to Multiplan to be [**7] priced, but used one of their own in-network plans." ROA.2044.

Mr. Dwyer filed a formal appeal of this denial. In his appeal letter, he detailed his position and provided supporting evidence for his entitlement to the MultiPlan rate benefit. He also made a specific request of United:

> If [United] denies this member appeal and request, we need you to provide explicit written support for your position, including: (1) specific references to the paragraph(s) in my plan that support your position, and (2) a specific statement as to how you have determined that those paragraph(s) in my plan supersede the other written documentation that [United] has provided to me, and upon which we have relied (including the materials

enclosed with this letter). ROA.1839-40. Beyond this document request, Mr. Dwyer's letter noted that "on multiple occasions we have been forced to make critical coverage decisions . . . not knowing whether or when [United] will honor our MultiPlan privileges, and having no idea what reimbursement formula [United] would apply." ROA.1839.

United acknowledged receiving this appeal. Inexplicably, however, United never responded to it.

[*646] C

United's non-response precipitated this lawsuit. [**8] Mr. Dwyer sued, alleging that United had breached its obligations under the Employee Retirement Income Security Act of 1974 ("ERISA") by wrongfully terminating E.D.'s partial-hospitalization benefits and by failing to process all her claims under the MultiPlan rate.

In 2019, the district court conducted a bench trial that consisted only of oral argument from the attorneys. No witnesses appeared at the hearing, which lasted approximately an hour and a half. Nearly four years later, the district court ruled in favor of United on both counts. Dwyer now appeals.

II

We reverse and render judgment for Mr. Dwyer. First, we (A) explain ERISA and the obligations that it places on United. Next, we (B) reject United's understanding of its hospitalization-coverage obligations. Then we (C) explain that United's failure to pay the MultiPlan rate was improper.

A

Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90, 103 S. Ct. 2890, 77 L. Ed. 2d 490*

*(1983)*. In doing so, it created a "comprehensive and reticulated statute," *Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 447, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)* (quotation omitted), designed "to protect contractually defined benefits," *Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 148, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)*.

ERISA furthers these goals by circumscribing how plans can process claims. *See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)* ("Plans must 'provide adequate notice in writing to any participant [**9] or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.'" (quoting *29 U.S.C. § 1133(1)*)). The statute additionally requires plans to "'afford a reasonable opportunity . . . for a full and fair review' of dispositions adverse to the claimant." *Id. at 830-31* (quoting *29 U.S.C. § 1133(2)*).

In processing those claims, plans have a fiduciary duty to act "in the interest of the participants and beneficiaries." *29 U.S.C. § 1104*. That means, as a fiduciary, a plan has a duty of loyalty and a duty of care to plan beneficiaries. *See Russell, 473 U.S. at 143 n.10*. Relatedly, ERISA "explicitly authorizes suits against fiduciaries and plan administrators to remedy statutory violations, including breaches of fiduciary duty and lack of compliance with benefit plans." *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)* (citing *29 U.S.C. § 1132(a)*, *(f)*).

Our review under ERISA is twofold: We look to both substance and procedure. In looking to substance, we ask whether the beneficiary was substantively entitled to the claimed benefits "under the terms of the plan." *29 U.S.C. § 1132(a)(1)(B)*. On procedure, we ask whether the ERISA fiduciary employed "full and fair review" of the claim as required by law. *Id. § 1133(2)*. On both inquiries, our review is *de novo*, "regardless [**10] of whether the denial is based on factual determinations or interpretation of the plan's language." *Miller v. Reliance Standard Life Ins. Co., 999 F.3d 280, 283 (5th Cir. 2021)*.

[*647] B

Mr. Dwyer first challenges United's denial of partial-hospitalization benefits. That denial was both (1) substantively and (2) procedurally deficient. And (3) United's counterarguments are unavailing.

1

Substance first. When making a substantive benefits determination, the text of the plan is the alpha and the omega. *See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995)* (ERISA's entire scheme "is built around reliance on the face of written plan documents"). The statute empowers a beneficiary to bring suit "to recover benefits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*." *29 U.S.C. § 1132(a)(1)(B)* (emphasis added).

An ERISA plan must explain its decision to deny benefits, and its denial must be based on concrete evidence. *See, e.g.*, *Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 397 n.5 (5th Cir. 2006)* (rendering judgment in favor of beneficiary when "no concrete evidence supported the administrator's basis for denying benefits"); *Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 302 (5th Cir. 1999)* (en banc) (rendering judgment in favor of beneficiary when there was a lack of contemporaneous "concrete evidence in the administrative record that supports the denial of the claim"), [**11] *overruled on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)*; *Napoli v. Johnson & Johnson, Inc., 624 F. App'x 861, 863-64 (5th Cir. 2015)* (same).

The terms of Mr. Dwyer's plan specify that United would cover a "Health Service if it is Medically Necessary." ROA.704. The phrase "Medically Necessary" is a defined term in the plan. To qualify as "Medically Necessary," a claimed health care service must be:

• In accordance with Generally Accepted Standards of Medical Practice.
• Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.
• Not mainly for your convenience or that of your doctor or other health care provider.
• Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.

ROA.758-59 (italics omitted). All agree that E.D.'s treatment was in accordance with the first requirement (generally accepted medical standards) and the third requirement (not for her convenience). The clash in this case is limited to the second and fourth requirements.

United contends that, in July [**12] 2015, E.D.'s continued partial hospitalization at Avalon Hills was not clinically appropriate (the second requirement) and was more costly than the therapeutically equivalent treatment of partial hospitalization (the fourth requirement). Here is what United wrote in its formal benefits termination letter:

You were admitted for treatment of anorexia nervosa, restricting type. After talking with your doctor, it is reported that you have made progress and no longer need the type of care and services provided in this setting. You are [*648] better. You have achieved 100% of your ideal body weight. You are eating all of your meals. You are not trying to harm yourself. You are not trying to harm others.

Your primary care physician is involved in your treatment. Your care could continue at the intensive outpatient level of care.

ROA.1769. After the Dwyers appealed that decision, United sent a final denial letter that was materially identical.

United's denial letters are not supported by the underlying medical evidence. In fact, they are *contradicted* by the record. It merits parsing these statements in detail.

**"After talking with your doctor, it is reported that you have made progress and no longer need [**13] the type of care and services provided in this setting."**

At no time prior to July 2015, when United denied E.D.'s hospitalization benefits, did E.D.'s doctors say she no longer needed the type of care provided by Avalon Hills. To the contrary, E.D.'s doctors vigorously disagreed with that characterization and appealed United's determination to cut benefits.

E.D.'s doctors detailed several distressing incidents that occurred during the three days at home with her family that all pointed to the conclusion that she was not ready to leave the hospital. E.D.'s doctors noted that she had "3-4 hours a day of intrusive thoughts of restriction," was still "monitored 24/7 . . . with her eating," had "terrible body image," and still engaged in ritualistic eating disorder behaviors. ROA.2045-46. All of this was reported to United as reasons that E.D. was *not* ready to exit a hospital setting.

Notwithstanding the contrary reporting of E.D.'s doctors, United simply said the opposite when it terminated her benefits.

**"You have achieved 100% of your ideal body weight."**

United's own files memorialize that E.D. had *not* in fact "achieved" her "ideal body weight" but was

instead experiencing bodyweight fluctuations. [**14] When, for the first time in months, E.D. was let out of a hospitalization setting and returned home for three days, she lost two pounds. Further, E.D.'s doctors pressed upon the insurance company that she was clearly still suffering from wild fluctuations of weight. They also insisted that such fluctuations had occurred the moment she was let out of the strict supervision of the hospital setting. The doctors concluded that E.D. was "not ready to be stepped down" because, among other reasons, "she was down 2 lbs upon her return. She is starting to make that up now." ROA.2045.

United's July 2015 benefits denial ignored all of that.

**"You are eating all your meals."**

This statement might have been true but was in any event irrelevant. It might have been true that E.D. was eating all her meals at Avalon Hills, but she was doing so under constant observation in a hospitalization setting. That says little or nothing about whether she would eat all her meals if she were discharged from the facility. When E.D. was allowed to leave the facility for three days, she suffered near-instant weight loss—which should have been a warning that she might not eat all her meals outside the hospital. This sentence [**15] therefore does not support United's conclusion that hospitalization and outpatient care were therapeutically equivalent treatments.

**"Your care could continue at the intensive outpatient level of care."**

Again, this statement is true but irrelevant. The fact that E.D. *could* continue treatment in an outpatient setting says [*649] nothing about whether an outpatient setting would be therapeutically equivalent to the care she was receiving at Avalon Hills. It says nothing about E.D.'s risk of relapse.

And it says nothing about E.D.'s "terrible body image" and difficulties during her three days at home. ROA.2045-46.

**"You are not trying to harm yourself.**

**You are not trying to harm others."**

It is unclear what the first sentence is supposed to mean. If United's contention was that E.D. was not trying to harm herself by self-starvation, it is flatly inconsistent with the record. If instead United meant that E.D. was not engaging in *other*, *non-starvation-related* behaviors that would harm her or others, the assertion is irrelevant. At no point in her entire difficult journey was E.D. ever treated for the latter behaviors. United's reference to self-harm thus suggests that its denial letter was not based on [**16] an individual consideration of E.D.'s circumstances.

**"You are better."**

This one is a doozy. When United denied E.D.'s benefits, she was still very ill. She was suffering from rapid swings in her weight, terrible body image, terrible experiences while home for three days, continuous body checking, and multiple hours every day of intrusive thoughts about restricting food. United's own files reveal: "[she] is continuing to body check; [she] does continue to walk in an attempt to not have thighs touch due to when [she] was in EDO behaviors [she] had thigh gap." ROA.1330. United's files thus reveal a beneficiary who was struggling with her treatment—not one who was "better."

What is more, "You are better" has no medical significance. *See, e.g.*, *S.B. v. Oxford Health Ins., Inc., 419 F. Supp. 3d 344, 367 n.14 (D. Conn. 2019)* (holding a United denial letter that relied on the fact that a beneficiary was "doing better" too vague to support a denial of benefits). The plan

does not countenance any discussion of this sort of vague platitude. Rather, the plan requires a particularized evaluation of E.D.'s medical needs and therapeutic alternatives for meeting those needs. Here, there is not sufficient "concrete evidence in the administrative record that supports the denial of [**17] the claim." *Vega, 188 F.3d at 302*; *see also Robinson, 443 F.3d at 395-97*.

2

Second, procedure. Under ERISA, when health benefits are terminated, the beneficiary is entitled to the procedural right of a "full and fair review by the appropriate named fiduciary." *29 U.S.C. § 1133(2)*. To comply with the statute, this review must be based on a "meaningful dialogue between the beneficiary and administrator." *Lafleur v. La. Health Serv. & Indem. Co., 563 F.3d 148, 154 (5th Cir. 2009)* (quotation omitted). This "meaningful dialogue" has been described as "an ongoing, good faith exchange of information to ensure that the terms of the plan are applied accurately and the benefits are dispensed fairly." *Ian C. v. UnitedHealthcare Ins. Co., 87 F.4th 1207, 1223 (10th Cir. 2023)* (quotation omitted).

ERISA regulations further compel this dialogue. For example, when benefits are first denied, the plan administrator must provide "[t]he specific reason or reasons for the adverse determination" and "the specific plan provisions on which the determination is based." *29 C.F.R. § 2560.503-1(g)(1)(i)*, *(ii)*. In the specific case of health benefits denied on the basis of "medical necessity," a beneficiary is entitled to "either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be [*650] provided free of charge upon request." [**18] *Id. § 2560.503-1(g)(1)(v)(B)*.

We cannot overstate the importance of a fiduciary's duty to engage in a good faith "meaningful dialogue" under the plan. Failure to do so

represents an "independent basis to overturn a plan administrator's denial of benefits." *Truitt v. Unum Life Ins. Co. of Am., 729 F.3d 497, 510 n.6 (5th Cir. 2013)* (citing *Lafleur, 563 F.3d at 160*).

In this case, however, United not only failed to engage in a "meaningful dialogue" with Mr. Dwyer; the ERISA fiduciary engaged in no dialogue at all. The July 2015 denial letter failed to state "[t]he specific reason or reasons for the adverse determination" and "the specific plan provisions on which the determination is based" in violation of *29 C.F.R. § 2560.503-1(g)(1)(i)* and *(ii)*. Also, because this was a denial on the basis of "medical necessity," E.D. was entitled to "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." *Id. § 2560.503-1(g)(1)(v)(B)*. No explanation was provided or offered. The denial letter said nothing about the plan provisions or how E.D.'s medical circumstances were evaluated under the plan. We therefore join a growing number of decisions rejecting similar denial letters issued by United across the country. *See, e.g.*, *Ian C., 87 F.4th at 1223-24* (rejecting denial letter); *David P. v. United Healthcare Ins. Co., 77 F.4th 1293, 1311-13 (10th Cir. 2023)* (same); *D. K. v. United Behav. Health, 67 F.4th 1224, 1243 (10th Cir. 2023)* (same); *Pac. Shores Hosp. v. United Behav. Health, 764 F.3d 1030, 1044 (9th Cir. 2014)* (similar).

3

United [**19] makes three principal counterarguments. None avails.

*First*, United has maintained in litigation that the July 2015 denial letter was supported by concrete evidence mentioned nowhere in that letter— namely, that E.D. could have lost two pounds in three days by menstruating. *See* Red Br. at 31 (arguing the "more probable and positive medical explanation for her weight fluctuation [during the three days at home was that] E.D. had started menstruating for the first time in her life two weeks

earlier").

We reject United's litigating position. It is a bedrock proposition of ERISA law that we "review the actual 'basis for the administrator's denial' of benefits, not its post-hoc rationalization." *Robinson, 443 F.3d at 395 n.4* (alteration omitted) (quoting *Vega, 188 F.3d at 299*). United's menstruation-weight-loss theory appears nowhere in its denial letter. To the contrary, in its denial letter, United asserted that E.D. had "achieved 100% of [her] ideal body weight." ROA.1804. The fiduciary therefore cannot conjure up a contrary justification after the fact. Moreover, even now, United offers no explanation for how menstruation could be a "more probable" medical explanation for E.D.'s sudden weight loss.

*Second*, United says some of E.D.'s providers [**20] thought she could be stepped down to a lower level of treatment in the future. Yet again, that is true but irrelevant. Some of E.D.'s providers wanted to give her a weeklong pass to see if she would continue struggling during her time away from Avalon Hills. If E.D. were able to cope with the weeklong pass, then her providers would be open to stepping her down to outpatient treatment. But United did *none* of this. It stepped E.D. down without the weeklong pass and without concrete evidence that she would be able to manage outside of Avalon Hills. The fact that [*651] E.D.'s doctors might have been comfortable *if* she had taken a weeklong leave and *if* she had coped with it says nothing about United's decision to step her down in the absence of either contingency.

*Third*, United contends that reversing its denial would require adopting a "treating physician" rule, which would unduly privilege E.D.'s treating providers over United's paper reviewers. Red Br. at 34-36. True, ERISA does not require United to give preference to E.D.'s treating physicians. *See Nord, 538 U.S. at 834*. But it is also true that ERISA does not create a *per se* rule favoring the administrator's doctors. Rather "[p]lan administrators, of course, [**21] may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Ibid.*

In this case, United contravened *Nord* and ERISA by failing to weigh the evidence that supported the Dwyers. And then United simply refused Mr. Dwyer's efforts to have a meaningful dialogue about the problem. As a sister circuit put it when reversing a denial of benefits by United:

> United's reviewers were not required to defer to the treating physician opinions provided. However, their duties under ERISA require them to address medical opinions, particularly those which may contradict their findings. This is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions. This back-and-forth is how civilized people communicate with each other regarding important matters.

*United Behav. Health, 67 F.4th at 1241* (quotation omitted). United breached these standards.

C

Finally, the MultiPlan issue. For some of E.D.'s stay at Avalon Hills, United reimbursed Mr. Dwyer at the out-of-network rate, not the better MultiPlan rate. Mr. Dwyer appealed that decision, but United never responded to him. We (1) hold United [**22] forfeited its rights to contest Mr. Dwyer's MultiPlan benefits by failing to answer his appeal. Then we (2) reject United's counterarguments.

1

ERISA requires *both* the beneficiary *and* the fiduciary to avail themselves of the administrative process. *See Vega, 188 F.3d at 302 n.13*. When one party forfeits that process, it requires us to direct entry of judgment for the opposing party. *See Robinson, 443 F.3d at 396*. As the en banc court

first explained in *Vega*:

> We decline to remand to the administrator to allow him to make a more complete record on this point. We want to encourage each of the parties to make its record before the case comes to federal court, and to allow the administrator another opportunity to make a record discourages this effort. Second, allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided. Finally, we have made plain in this opinion that the claimant only has an opportunity to make his record before he files suit in federal court[;] it would be unfair to allow the administrator greater opportunity at making a record than the claimant enjoys.

*188 F.3d at 302 n.13*. It is a rule that has been reiterated time and again. [**23] For example, we repeated in *Robinson v. Aetna Life Insurance Co.*:

> [*652] We reject Aetna's suggestion that remand to the administrator is required. In *Vega*, as here, no concrete evidence supported the administrator's basis for denying benefits. We declined a remand to allow the administrator another opportunity to make a record because each of the parties must make its record before the case comes to federal court. For the same reason, we believe that remand is inappropriate here.

*443 F.3d at 397 n.5* (quotation and citation omitted); *see also Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan, 704 F.3d 362, 368 n.2 (5th Cir. 2013)* (noting that a remand is unnecessary when it would be an empty formality).

Under Mr. Dwyer's plan, United promised to pay "Eligible Expenses." ROA.792. Those expenses differ substantially based on whether a benefit was paid at the in-network or out-of-network rate. Under the plan, when a beneficiary uses a non-network vendor, the reimbursement rate depends on the "[n]egotiated rates agreed to by the non-Network provider and either us or one of our vendors, affiliates or subcontractors, at our discretion." ROA.793. If there is no rate negotiated at all, then a different clause controls. Thus, as relevant here, the plan contemplates three reimbursement rates: in-network (high), [**24] out-of-network with a negotiated rate (middle), and out-of-network without a negotiated rate (low). Mr. Dwyer contends his payments to Avalon Hills should fall in the middle reimbursement rate because it operated under a negotiated "MultiPlan" rate with United. United disputes that assertion—but we do not know why because United never responded to Mr. Dwyer's administrative appeal.

Under our longstanding rule from *Vega*, United's non-response ends the matter and requires judgment for Mr. Dwyer. *188 F.3d at 302 n.13*; *Robinson, 443 F.3d at 397 n.5*.

2

United offers three counterarguments. Again, none avails.

*First*, United contends that its failure to respond is irrelevant because Mr. Dwyer's administrative appeal constituted inadmissible hearsay under the Federal Rules of Evidence. This assertion is bizarre because Mr. Dwyer's appeal was obviously not a "proceeding" in a "United States court," so the Rules of Evidence do not apply to it. *Fed. R. Evid. 101(a)*; *see also Speciale v. Blue Cross & Blue Shield Ass'n, 538 F.3d 615, 622 n.4 (7th Cir. 2008)* ("A plan administrator is not a court of law and is not bound by the rules of evidence."). Moreover, in evaluating an ERISA benefits decision, the statute and our precedent require us to "focus on the evidence that was before the Plan" at the time "the final benefit determination was made." *Denton v. First Nat'l Bank of Waco, 765 F.2d 1295, 1304 (5th Cir. 1985)*; *see also [**25] Black v. Long Term Disability Ins., 582 F.3d 738, 746 n.3 (7th Cir. 2009)* ("The Federal Rules of Evidence, however,

do not apply to an ERISA administrator's benefits determination, and we review the entire administrative record, including hearsay evidence relied upon by the administrator."); *Herman v. Hartford Life & Accident Ins. Co., 508 F. App'x 923, 928 (11th Cir. 2013)* (per curiam) (same). Mr. Dwyer's appeal is part of the administrative record; United was obligated to respond to it; and we are obligated to consider it.

*Second*, United says its failure to respond is irrelevant because "it is well-settled Texas law that doctrines of waiver and estoppel cannot be used to create insurance coverage where none exists under [*653] the terms of the policy." Red Br. at 46 (quoting *Pa. Nat'l Mut. Cas. Ins. Co. v. Kitty Hawk Airways, Inc., 964 F.2d 478, 480-81 (5th Cir. 1992)* (quotation omitted)). Whatever the truth of that assertion may be, it has no bearing on this case. This is an ERISA case, so Mr. Dwyer's claim arises under federal law, not Texas state law. Under ERISA, the doctrines of waiver and estoppel *can* apply. For example, the Supreme Court has held: "If the administrator's conduct causes a participant to miss the deadline for judicial review, waiver or estoppel may prevent the administrator from invoking the limitations provision as a defense." *Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 114, 134 S. Ct. 604, 187 L. Ed. 2d 529 (2013)*. So too here with United's default by failing to respond to Mr. Dwyer's appeal nine [**26] years ago.

*Third*, despite its failure to respond to Mr. Dwyer's administrative appeal, United says it should be allowed to urge its understanding of the plan documents before our court. And in United's view, its *post hoc* reading of those plan documents shows that Mr. Dwyer was not entitled to MultiPlan reimbursements.

We again reject this contention. As an initial matter, United is not entitled to offer such *post hoc* arguments at all. *See Robinson, 443 F.3d at 397 n.4*; *Vega, 188 F.3d at 299*. United is limited to the

arguments it made at the administrative level, which were none.[*]

In any event, Mr. Dwyer's reading of the plan documents is correct. Before the district court, Mr. Dwyer introduced the contract that creates this relationship. The "MultiPlan Negotiation Services Global Agreement" with Avalon Hills describes a discount of "19.00% off Billed Charges." ROA.328. Accordingly, Mr. Dwyer is correct to require United to honor the rates that MultiPlan negotiated with Avalon Hills. That is the most straightforward reading of the contract based on "the face of written plan documents." *Curtiss-Wright Corp., 514 U.S. at 83*.

* * *

The holdings above entitle Mr. Dwyer to judgment. We nonetheless remand to the district court solely to calculate Mr. Dwyer's compensatory damages, [**27] statutory penalties under *29 U.S.C. §§ 1024(b)(4)* and *1132(c)(1)*, attorneys' fees, and other relief. Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

---

---

[*] United contests the admissibility of the plan documents. True, the general rule is that an administrator's decision must be reviewed on the administrative record alone. But by failing to respond to Mr. Dwyer's appeal, United forfeited any right to invoke that rule here. It would be freakish to allow United to default on the administrative appeal and then complain about the state of the record in this court.