# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

**TIMOTHY SEWELL**

                                                   **CIVIL ACTION NO**

**VS**                                                **2:23-cv-317**

**THE LINCOLN NATIONAL
LIFE INSURANCE COMPANY**

## <u>PLAINTIFF'S BRIEF IN REPLY TO LINCOLN'S RESPONSE MEMORANDUM</u>

Plaintiff, Timothy Sewell, replies to Lincoln's response memorandum as follows:

**A. Lincoln Bears the Burden of Proving its Exclusion Applies, Including the Causation Element Under Case Law Affirmed by the Fifth Circuit**

Lincoln claims in its response memorandum that it does not bear the burden of proof that

its exclusion applies, noting that the Fifth Circuit has not adopted that view. However, the Fifth

has affirmed a number of district court cases adopting that view under abuse of discretion review:

> "[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." \*908 *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir.2004). These principles apply in an ERISA case. See *id*.

*Est. of Thompson v. Sun Life Assur. Co. of Canada*, 603 F. Supp. 2d 898, 907–08 (N.D. Tex. 2008), aff'd, 354 F. App'x 183 (5th Cir. 2009) (Under abuse of discretion review).

> "A plaintiff suing under this provision [§ 1132(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)). **"But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage."** *Id.* **(citing *Farley*, 979 F.2d at 658). This same standard applies in the Fifth Circuit. *See Perdue v. Burger King Corp.*, 7 F. 3d 1251, 1254 n.9 (5th Cir. 1993); *Estate of Thompson v. Sun Life Assur. Co. of Canada*, 603 F. Supp. 2d 8 98, 908–09 (N.D. Tex. 2008) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies.")** (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)).

*Byerly v. Standard Ins. Co.,* No. 4:18-CV-00592, 2020 WL 1451543, at *16 (E.D. Tex. Mar. 25, 2020), *aff'd*, 843 F. App'x 572 (5th Cir. 2021) (Under abuse of discretion review). See also, *Hillebrandt v. Unum Life Ins. Co. of Am.,* No. 2:16-CV-0844, 2019 WL 1576879, at *9 (W.D. La. Feb. 14, 2019), *report and recommendation adopted,* No. 2:16-CV-0844, 2019 WL 1576650 (W.D. La. Apr. 11, 2019), aff'd, 787 F. App'x 235 (5th Cir. 2019) (Same).

Many other federal courts of appeal and district courts also hold that under abuse of discretion review, where an insurer relies on a plan exclusion as a basis for a denial of benefits, the burden lies with the insurer to prove the exclusion applies. *Kallaus v. Nationwide Death Benefit Plan*, No. 2:09-CV-0899, 2012 WL 5411082, at *10 (S.D. Ohio Nov. 6, 2012) (reviewing under abuse of discretion standard). Moreover, this burden extends to the question of causation; that is, the insurer "must demonstrate by a preponderance of the evidence not only that a condition enumerated within one of its exclusions existed, but that the condition" contributed to the death. *Id.*

More specifically:

> With respect to the burden of proof, Plaintiffs bear the burden of establishing that Bradley's death was an accident within the meaning of the Plan. Cooper v. Unum Life Ins. Co. of America, 2010 U.S. Dist. LEXIS 141525, 2010 WL 5859544 (E.D.Tenn. Nov. 16, 2010), citing Rose v. Hartford Fin. Servs. Group, Inc., 268 Fed. Appx. 444, 452 (6th Cir.2008), and Tracy v. Pharmacia & Upjohn Absence Payment Plan, 195 Fed. Appx. 511, 516 n. 4 (6th Cir.2006). The BAC, however, relies on Plan exclusions as a basis for the denial of benefits, therefore the BAC bears the burden of proving, by a preponderance of the evidence, that the exclusions apply. See Cooper, 2010 U.S. Dist. LEXIS 141525, 2010 WL 5859544 citing Caffey v. Unum Life Ins. Co., 302 F.3d 576, 580 (6th Cir.2002); Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658 (8th Cir.1992); and Miller v. United Welfare Fund, 72 F.3d 1066, 1074 (2d Cir.1995). **Moreover, the BAC's burden of proof extends to the question of causation-it must demonstrate by a preponderance of the evidence not only that a condition enumerated within one of its exclusions existed, but that the condition was the proximate cause of Bradley's death.** See Cornish v. U.S. Life Ins. Co. of City of New York, 2009 U.S. Dist. LEXIS 92326, 2009 WL 3231351 (W.D.Ky. Sept. 30, 2009) (under applicable policy language, "Defendant insurance companies bear the burden to establish a causal relationship between the intoxication of the [decedent] and her resulting death by drowning"); see also Loan v. Prudential Ins. Co. of America, 370 Fed. Appx. 592, 596 (6th Cir.2010) ("After all, if a claimant is intoxicated while standing on a porch, the porch collapses, and he falls to his death, it cannot be said that his death has resulted from being legally intoxicated.").

*Id.,* (emphasis added).

Thus, Lincoln bears the burden of proof on the essential elements of its exclusion, including causation.

**B. Lincoln's Position that Remand Was or Would Have Been Appropriate for Lincoln's Consideration of Dr. Arnold's November 17, 2023 Report After Initially Refusing to Consider is Contrary to Fifth Circuit Law**

Just a few weeks ago the Fifth Circuit flatly rejected Lincoln's idea that remand would have been appropriate after Lincoln refused to consider Dr. Arnold's November 17, 2023 report in *Dwyer v. United Healthcare Insurance Company*, 2024 WL 4230125 (5th Cir. Sept. 19, 2024), explaining:

> In this case, United contravened *Nord* and ERISA by failing to weigh the evidence that supported the Dwyers. And then United simply refused Mr. Dwyer's efforts to have a meaningful dialogue about the problem. As a sister circuit put it when reversing a denial of benefits by United:
>
> United's reviewers were not required to defer to the treating physician opinions provided. However, their duties under ERISA require them to address medical opinions, particularly those which may contradict their findings. This is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions. This back-and-forth is how civilized people communicate with each other regarding important matters. *United Behav. Health*, 67 F.4th at 1241 (quotation omitted). United breached these standards.

*Id.*, at 8 (emphasis added).

> The *Dwyer* Court continued:
>
> ERISA requires *both* the beneficiary *and* the fiduciary to avail themselves of the administrative process. *See Vega*, 188 F.3d at 302 n.13. <u>When one party forfeits that process, it requires us to direct entry of judgment for the opposing party.</u> *See Robinson*, 443 F.3d at 396. As the *en banc* court first explained in *Vega*:
>
> <u>We decline to remand to the administrator to allow him to make a more complete record on this point. We want to encourage each of the parties to make its record before the case comes to federal court, and to allow the administrator another</u>

> opportunity to make a record discourages this effort. Second, allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided. Finally, we have made plain in this opinion that the claimant only has an opportunity to make his record before he files suit in federal court[;] it would be unfair to allow the administrator greater opportunity at making a record than the claimant enjoys.
>
> 188 F.3d at 302 n.13. It is a rule that has been reiterated time and again. For example, we repeated in *Robinson v. Aetna Life Insurance Co.*:
>
> We reject Aetna's suggestion that remand to the administrator is required. In *Vega*, as here, no concrete evidence supported the administrator's basis for denying benefits. We declined a remand to allow the administrator another opportunity to make a record because each of the parties must make its record before the case comes to federal court. For the same reason, we believe that remand is inappropriate here.
>
> 443 F.3d at 397 n.5 (quotation and citation omitted); *see also Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704 F.3d 362, 368 n.2 (5th Cir. 2013) (noting that a remand is unnecessary when it would be an empty formality)….

*Id*., at 8–9 (emphasis added).

Thus the *Dwyer* Court reaffirmed its prior decisions in *Vega* (*en banc*) and *Robinson*, both of which held that evidence made available to the administrator for consideration before a claimant files suit <u>becomes</u> part of the administrative record. The *Dwyer* Court further rejected the idea of granting a remand to Lincoln <u>after</u> Lincoln forfeited the process by refusing to consider Dr. Arnold's November 17, 2023 report after Mr. Sewell made it part of the administrative record under the guidance of *Vega* (*en banc*) and *Robinson*. The fact that a couple of cases Lincoln cites from 17 and 20 years ago, taking place between *Vega* (*en banc*) and *Dwyer,* may have questioned *Vega* (*en banc*) in *dicta* under certain hypothetical scenarios doesn't change *Dwyer'*s clear message that *Vega* and *Robinson* apply under facts like ours.

Lincoln also omits a few critical facts when it claims on page 12 of its response memorandum that:

Nevertheless, Sewell fails to explain the delay in providing the [November 17, 2023] report to Lincoln. Sewell's original appeal contained Dr. Arnold's April 28, 2023, report. Lincoln obtained an additional review, which was completed by Peggy Geimer, M.D., on June 7, 2023. On July 15, 2023, Lincoln sent Sewell's counsel a copy of Dr. Geimer's clinical review and advised him of the opportunity to review and respond with any additional information for consideration before a final determination was made on the appeal. Sewell's counsel then submitted additional medical records and affidavits. However, before the appeal decision, Sewell's counsel did not submit any additional medical report to respond to Dr. Geimer's June 7th report, and Sewell provides no explanation for waiting until after Lincoln denied the appeal to provide an additional medical report.

What Lincoln omits is that the reason for the delay for providing that report, which *Vega* (*en banc*) and *Robinson* condone, was that Dr. Geimer's July 7, 2023 report was not her final report at all. She also issued a September 7, 2023 addendum report never shared with Mr. Sewell before Lincoln denied his appeal on September 27, 2023. Mr. Sewell then took the most immediate steps possible to provide Dr. Geimer's unshared addendum report to Dr. Arnold for response in his November 17, 2023 report. Lincoln then forfeited the process by refusing to consider it. This is the timeline:

5/25/23      Lincoln confirms receipt of Plaintiff's original appeal. (D.E. 21-4, Page 40)

7/14/23      Lincoln sends Plaintiff a 7/7/23 original clinical review report of its retained expert physician Dr. Geimer, to allow Plaintiff to respond by a deadline of August 4, 2023. (D.E. 21-4, Page 7)

7/21/23      Plaintiff by email asks Lincoln for an extension until 8/18/23 to complete Plaintiff's response to Lincoln's expert report. (D.E. 21-3, Pages 392-393)

8/4/23      Lincoln sends letter to Plaintiff stating that if Plaintiff's complete response to Lincoln's expert report is not received by 8/18/23, Lincoln will issue the appeal decision without it. (D.E. 21-3, Page 402)

8/8/23      Plaintiff sends Lincoln a letter attaching the affidavit of witness Chris Boswell. (D.E. 21-3, Page 65)

8/21/23      Plaintiff sends letter to Lincoln attaching affidavit of Paul Boswell stating that this concludes Plaintiff's submission on appeal at this time. (D.E. 21-3, Page 68)

| | |
|---|---|
| 9/7/23 | Lincoln's expert Dr. Geimer issues an <u>updated</u> addendum report for Lincoln, voicing disagreement with Dr. Arnold's initial opinion and report, but does not share it with Mr. Sewell for response before denying the claim. (D.E. 21-3, Page 83) |
| 9/27/23 | Lincoln denies Plaintiff's appeal, quoting Dr. Geimer's new 9/7/23 addendum report, which Plaintiff had never before seen, nor had opportunity to respond to. (D.E. 21-2, Page 2) |
| 10/3/23 | Plaintiff promptly requests the claim file from Lincoln to see Dr. Geimer's new 9/7/23 addendum report so he can share it with Dr. Arnold for response. (D.E. 21-3, Page 39) |
| 10/16/23 | Lincoln sends Plaintiff a letter attaching its claim file. (D.E. 21-3, Page 37) |
| | Plaintiff immediately sends the file and Dr. Geimer's new 9/7/23 addendum report to Dr. Arnold. |
| 11/17/23 | Dr. Arnold issues addendum report responding to Dr. Geimer's new 9/7/23 addendum report. (D.E. 21-3, Page 24) |
| 11/17/23 | Plaintiff immediately sends Dr. Arnold's addendum report to Lincoln, asking Lincoln to reconsider its appeal denial in light of Plaintiff's response to its new evidence. (D.E. 21-3, Page 13) |
| 11/22/23 | Lincoln sends letter to Plaintiff expressly refusing to consider it. (D.E. 21-3, Page 24) |
| 11/30/23 | Plaintiff files suit. (Doc. 1) |

Lincoln's hypotheticals aside, our facts certainly favor application of *Vega* (*en banc*), *Robinson*, and *Dwyer* to bar Lincoln's attempts to add anything to the administrative record after Mr. Sewell filed suit on November 30, 2023.

**C. Our Record Does Not Contain Substantial Evidence Supporting the Causation Element of Lincoln's Exclusion. Lincoln's Posited Reasons for Finding Causation are Rejected by Courts Across the Country as Speculative under Abuse of Discretion Review**

Lincoln issued its first denial based on a lab result and the barest information that Mr. Sewell dove from a boat and suffered quadriplegia. It had no factual knowledge beyond that. Then

Mr. Sewell provided detailed testimony of Mr. Sewell and four independent eyewitnesses about how many beers he drank that day (six), his behavior, and the nature and circumstances of his dive.

Responding to that evidence, Lincoln repeats the following statements of Dr. Swotinsky as support for its final denial of August 2, 2024:

> It is inaccurate and contrary to the evidence for medical providers to defer to the recollections of the claimant and others about how much the claimant had to drink. The evidence indicates the recollections underreported actual alcohol consumption. This is as expected since people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters. In the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain.

Lincoln final denial (D.E. 21-5, Page 36); Dr. Swotinsky final report (D.E. 21-5, Page 114); Lincoln original memorandum, page 15.

Lincoln's further response to the unrefuted eyewitness testimony, on page 17 of its memorandum, is:

> Dr. Swotinsky also noted that the submitted affidavits were redundant, indicating that one person was their primary author. Therefore, he stated that the medical records, including the BAC level, were a more reliable source of evidence because those are contemporaneous, came from independent sources, and came from qualified individuals. Dr. Swotinsky summarized his report, stating:

> Dr. Arnold's reference articles indicate that the claimant's alcohol test result of 0.222 g/dL cannot be attributed to the effect of presumed high levels of lactate and lactate dehydrogenase.

> While Dr. Arnold relies on the statements submitted by the claimant and his friends almost two years after the accident, those statements are contradicted by the contemporaneous, medical records.

Neither Dr. Swotinsky nor Lincoln cite any source for their claims that "people tend to underestimate their heavy drinking, and people with more drinking experience tend to be less reliable reporters." But directly contradicting those claims, the very same article that Dr. Swotinsky and Lincoln cite to falsely claim that "alcohol use results in a 4.31-fold risk…[or] 78% of all such diving accidents are attributable to alcohol use" also reports that "validity studies show

that self-reports of alcohol use tend to be accurate," and that "[i]n a reliability study of alcohol abusers' self-reports of drinking and life events that occurred in the distant past, Sobell, et al, found that alcohol abusers' reports of drinking and life events occurring many years prior to the date of interview were reliable." (Garrison A, Clifford K, Gleason S, et al. Alcohol use associated with cervical spinal cord injury. J Spinal Cord Med. 2004;27:111-5, p. 8-9 attached as **Exhibit 1** to Plaintiff's opposition brief) (D.E. 26-1, Page 8-9)

Thus Lincoln and Dr. Swotinsky spout not only <u>unsupported</u> statements they believe will help them deny this claim, but even statements <u>directly contradicted</u> by their own cited resources. Moreover, the idea that "[i]n the claimant's case, his recollection of alcohol consumption may be influenced by secondary gain" is speculative on its face. The same "may be" true of every worthy claimant of insurance benefits. Finally, Lincoln's speculation that "people tend to underestimate their heavy drinking" is only directed toward a person's self-reporting of alcohol consumption. Here, we have not just Mr. Sewell, but four independent eyewitnesses testifying as to Mr. Sewell's alcohol consumption, one of whom (Mr. Fenn, the boat owner) was able to give an exact count of six beers because Mr. Sewell only drank Yuengling, brought a 12-pack on board, and six remained unopened when the trip was over. The record is devoid of any reason to doubt Mr. Sewell and his four eyewitnesses.

Regardless, the accuracy of the eyewitness testimony on alcohol consumption only addresses the "level of alcohol" element of the exclusion. It does not address the essential "contributed to or caused by" element. Thus, even if the Court were to find Lincoln "reasonable" in relying on the hospital lab result and the medical notations of "Secondary Clinical Impression alcohol intoxication" (D.E. 21-3, Page 178), and "alcohol abuse with intoxication, unspecified" (D.E. 21-4, Page 128) over the undisputed eyewitness testimony on the issue of how many beers

Mr. Sewell drank, the lab result and medical record mention of alcohol only address the "presence of alcohol" element of the exclusion. "Contributed to or caused by" is a separate essential element for its application.

The facts relevant to causation are those regarding the controlled manner in which Mr. Sewell dove and the circumstances surrounding his decision to dive. Those facts are proven by the testimony of four separate eyewitnesses, and their testimony as to those facts is uncontested, in a record containing no reason to question it. Neither a lab result nor notations of alcohol in the medical record, which speak only to alcohol presence and level, can contradict those uncontested facts. Therefore, there is no record evidence, much less "concrete" evidence, to "clearly support" the essential "contributed to or caused by" element of the exclusion.

Dr. Swotinsky's and Lincoln's only feigned reason to question the eyewitnesses' testimony on those causation facts, in addition to Mr. Sewell's own testimony as to those facts, is unfounded speculation. They claim that their testimony is redundant. But redundant just means consistent and by more than one witness. Better reason to doubt their undisputed testimony would be if it were inconsistent. Lincoln's feigned reasoning for doubting those facts is flawed. The eyewitness testimony is solid, consistent, and unrefuted.

Thus on the issue of causation, in the face of that unrefuted testimony, Lincoln is left to get even more speculative. Using "studies" alone, Lincoln claims that since alcohol affects judgment, and "misjudgments of water depth and reckless behavior have been cited as common factors" in diving injuries, alcohol contributed to <u>this</u> accident despite the undisputed facts of Mr. Sewell's controlled dive under circumstances indicating to Mr. Sewell that it could be made safely. In other words, Lincoln determined, based only on "studies," that Mr. Sewell's accident would not have happened under those same circumstances in the absence of alcohol. That has been Lincoln's

repeated mantra from day one through the present:

> The claimant's alcohol level corresponded with diminished judgment, increased self-confidence, and decreased inhibition. Misjudgments of water death [sic] and reckless behavior have been cited as common factors in diving-related cervical spine injuries. **[Now the speculative leap...]** The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water. The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident.

(Lincoln quoting Dr. Swotinsky on page 17 of their opposition memorandum, bracketed added.)

Under the undisputed circumstances surrounding Mr. Sewell's dive, and the careful manner in which he dove from a mere 18 inches above the water surface, one cannot reasonably conclude that his decision in the moment, while seeing others diving into 4.5 to 5-foot-deep water just a few feet away, was caused by or contributed to by alcohol. Even if we go so far as to call his decision to make such a dive "poor judgment" in 20-20 hindsight, despite all indications telling him it was safe to do so, losses caused by "poor judgment" are not excluded by the policy. It is pure speculation to conclude that the same decision would not have been made if Mr. Sewell had not had a single beer that day. Some people are more cautious by nature than others, but any number of people would have done the same under similar circumstances without alcohol involvement, as Mr. Sewell did, seeing others doing the same just a few feet away. Even if it were "poor judgment" in 20-20 hindsight, people exercise poor judgment every day without the help of alcohol. In fact, <u>every</u> study cited by Lincoln and its experts (accurately interpreted) found that <u>less than</u> 50% of diving accident injuries involve alcohol, meaning <u>more than</u> 50% do not. The study Lincoln inaccurately claimed said "alcohol use results in a 4.31-fold risk of a spinal cord injury while diving, meaning that 78% of all such diving accidents are attributable to alcohol use," actually reported that out of the 33 total people with diving-related cervical spine injuries, only 13 (39%) answered "yes," and 20 (61%) answered "no" to the question: "At the time of your spinal

cord injury, were you using alcohol?" (Mr. Sewell's opposition brief, Exhibit 1, p.7, 3)  Thus Lincoln's cited studies cannot possibly serve as concrete evidence to clearly support Lincoln's affirmative conclusion that alcohol played a causal role in Mr. Sewell's accident under our undisputed facts.

To be clear, the "50%" figure, and the and the "more likely to use alcohol" comment in the following passage on page 16 of Lincoln's opposition memorandum (D.E. 27, Page 16) came from the same "*Garrison A*" study referenced above, and it was referring to <u>all types</u> of spinal cord injuries from <u>all types </u>of accidents:

> Types of accidents associated with traumatic cervical spinal cord injury include motor vehicle crashes in sport related accidents – in particular, diving accidents. Numerous studies have shown that 50% of spinal cord injuries occur while victims are under the influence of alcohol. A 2004 study of persons who sustained spinal cord injury supported the association between alcohol use and cervical spinal cord injury specifically – the spinal cord injury type with the most severe consequences. The study that [sic] demonstrated that participants with cervical injury were more likely to use alcohol when injured compared with participants without cervical injury.

(Garrison A, Clifford K, Gleason S, et al. Alcohol use associated with cervical spinal cord injury. J Spinal Cord Med. 2004; 27:111-5, p. 7, attached as **Exhibit 1** to Plaintiff's opposition brief) (D.E. 26-1, Page 7)

Lincoln's "studies" cannot rationally support a conclusion of alcohol contribution to Mr. Sewell's accident under our undisputed facts related to causation.

In *Napoli v. Johnson & Johnson, Inc.*, 624 F.Appx. 861, 863-864 (5th Cir. 2015), the court explained:

> In the seminal case of *Vega v. National Life Insurance Services, Inc.*, we explained that "we will not countenance a denial of a claim solely because an administrator suspects something may be awry." 188 F.3d 287, 302 (5th Cir.1999) *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343 141 L.Ed.2d 299 (2008). Although we owe deference to an administrator's *reasoned* decision, **"we owe no deference to the administrator's unsupported suspicions. Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion."**

(Emphasis added.)

Thus, "[a]n administrator's factual determinations will be reviewed with "due deference [to the extent they] reflect a reasonable and impartial judgment." *Pierre v. Connecticut General Life Insurance Co.*, 932 F.2d 1552, 1563 (5th Cir. 1991) Stated another way, "[d]eferential review is not no review; deference need not be abject." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir.1996) (emphasis added). "Innuendos and hints" supportive of a denial are not enough. *Vega*, at 302.

That is exactly why the court in *Capone v. Aetna Life Ins. Co*., 592 F.3d 1189, 1200 (11th Cir. 2010) rejected the reasoning Lincoln posits for finding causation here, almost word-for-word:

> Aetna claims that because Capone was intoxicated, his judgment was necessarily impaired. Aetna reasons that since the decision to dive required a degree of judgment, alcohol necessarily caused or contributed to his injury. This assertion, without more, cannot meet Aetna's burden of proving the exclusion applies.

The *Capone* Court also rejected Lincoln's idea that Mr. Sewell's medical record mention of alcohol could support the causation element of the exclusion, noting:

> Both hospitals characterized his injury as a result of diving into shallow water and the Miami hospital labeled the incident as a "+ETOH diving accident"4 and recorded that Capone "noted a history of alcohol abuse."

*Id.,* at 1193.

In *Murchison v. Reliance Standard Life Ins. Co.,* 2020 WL 19629874 (W.D. Tenn. Apr. 23, 2020), the court found that Reliance abused its discretion in finding that a BAC of .144 contributed to an insured's ATV rollover accidental death shortly after he also accidentally shot his friend nonfatally and did not accompany him to seek medical care. The exclusion at issue excluded losses "to which the Insured's acute or chronic alcoholic intoxication is a contributing

factor." *Id*., at *1. The *Murchison* Court conducted an extensive survey of case law from around

the country, and concluded that proof of intoxication was not enough to trigger the exclusion:

> The Plaintiffs do not dispute that Mr. Murchison had drugs and/or alcohol in his system. Because the Exclusion contains a causation element, mere reference to the fact that he had been drinking and/or taking medication is insufficient to invoke the Exclusion. *See James-Smith*, 2011 WL 4899992, at *6 (mere reference to insured's intoxication was not, under the second category, enough to establish the required causal link). Instead, "there must be some evidence of the role of alcohol [or medication] in the loss, beyond the insured's intoxicated state, to establish the applicability of the exclusion." *Horton v. Life Ins. of N. Am.*, Civil Action No. ELH-14-3, 2015 WL 1469196, at *18 (D. Md. Mar. 30, 2015)…. Reliance maintains that it also relied on the generic effects of alcohol and drugs, as were alluded to in the sheriff's report, Reynolds' email, and the Virginia Tech study. This, however, is tantamount to an assertion that a BAC above a certain limit automatically demonstrates causation, which has been rejected by the courts. *See Horton*, 2015 WL 1469196, at *28-29…

*Id*., at *4.

The *Murchison* Court turned to the facts leading up to the ATV accident that Reliance

claimed supported its determination of causation, calling the determination speculative:

> Further, Defendant repeatedly contends that the incidents of September 10, 2017, provide "ample evidence confirming impairment of judgment and motor skills" and, thus, that alcohol and/or drugs contributed to the loss. (D.E. 24-2 at PageID 115.) However, this "evidence" consists of mere speculation on Reliance's part. There is no evidence in the record as to why or how the shooting occurred, other than that it was accidental. It is just as likely that the gun malfunctioned or that Mr. Murchison's view was obstructed by vegetation or a structure such that he was unable to see his friend until it was too late. As for his disappearance from the scene thereafter, Defendant suggests that Mr. Murchison rode away to avoid investigation for the shooting because he was severely impaired. But the record does not indicate that police were called to investigate the shooting. It reflects only that officers assisted in searching for Mr. Murchison after he failed to return home. Reliance also points to the fact that Mr. Murchison did not go with his friend to obtain medical assistance. As there is no information that the other friends at the scene left with the injured individual, it seems unremarkable that Mr. Murchison did not.
>
> It is the opinion of the Court that Reliance's reasoning in making its determination falls short of what is required to survive arbitrary and capricious review.
>
> In doing so, the Court has reviewed decisions of other federal courts called upon to interpret intoxication exclusions requiring a causation showing and finds the

following cases instructive. In *Ciberay v. L-3 Communications Corp. Master Life & Accidental Death & Dismemberment Insurance Plans*, No. 3:12-cv-1218-GPC-MDD, 2013 WL 2481539 (S.D. Cal. June 10, 2013), the insured fell down a flight of stairs while carrying a plate and drinking glasses. *Ciberay*, 2013 WL 2481539, at *2. At the hospital, his BAC was measured at .422 mg/dL and he was reported to drink vodka intermittently in addition to two to three beers per day. *Id.* After he died a few days later, the medical examiner listed his manner of death as accidental and the cause of death as complications following pelvic fractures from the fall, with alcohol abuse, diabetes mellitus, obesity, and hypertensive cardiovascular disease as other significant conditions. *Id.* at *3.

The insurer's denial of benefits letter stated as follows:

> *12 The records we reviewed indicate that [the insured] died as a result of complications of a pelvic fracture with other significant conditions causing death listed to be hypertensive cardiovascular disease, alcohol abuse, obesity, and diabetes mellitus on February 16, 2010.
> * * *
> The medical records and fire department report indicate that [the insured] fell down some stairs and sustained a pelvis fracture as a result of a fall on February 7, 2010 and passed away on February 16, 2010. His blood alcohol level was determined to be 422 mg/dL, or .422% when tested at the hospital. He admitted to drinking heavily that day. A BAC level of .422% has the following typical effects: ataxia, tremors, disorientation disturbed equilibrium, and can even lead to unconsciousness, depressed respiration, and death.
> * * *
> Based on our review of the available records, we determined that [the insured's] death ... was caused in whole or in part by, or resulting in whole or in part from, [the insured] being under the influence of intoxicants.
> *Id.* at *4.

The insured's wife appealed the denial of benefits, arguing that, while her husband was intoxicated at the time of the fall, he did not die of intoxication. *Id.* On appeal, the insurer hired a forensic pathologist to review the claim file. *Id.* at *5. The pathologist opined that the manner of death was an accident and that he agreed complications of pelvic fractures from the fall were the direct cause of death, adding that the insured's very high BAC played a role in causing the fall. *Id.* at *5-6. The claim was again denied for the same reasons articulated in the initial denial letter. *Id.* at *6.

On arbitrary and capricious review, the federal court found that, in light of the medical examiner and pathologist's opinions that complications from the pelvic fractures caused his death, there was "simply insufficient evidence to reasonably conclude [the insured's] intoxication caused him to fall." *Id.* at *7, 13. This was true even though it could be argued, as the insurer did, that his intoxication "began the chain of events leading to his death." *Id.* at *13. The court went on to state that

"[o]ther than a generic list of the typical effects associated with a blood alcohol level similar to that of [the insured's] at the time of his fall, ... one may only speculate as to what actually caused [him] to fall." *Id.* at *14.

*Id.*, at 11-12.

Significantly, on the causation issue, like Dr. Arnold, even Reliance's expert in *Murchison* calls Lincoln's and its experts' jump from "risk factor" to a finding of causation "scientifically irresponsible," and the *Murchison* Court criticized Reliance's attempt to "conflate 'risk factor' and 'contributed to'" as Lincoln tries to do here:

> Perhaps most stunning is the statement of Reliance's only expert, who opined, in response to the question whether it was reasonable to conclude that Mr. Murchison's consumption of drugs and/or alcohol was a contributing factor in the loss, that it was not. In doing so, Dr. Matshes stated that alcohol and sedating drugs could have been "a risk factor for the circumstances that lead to the accident." Although the Defendant attempts to conflate "risk factor" and "contributed to," Dr. Matshes did not treat them as the same thing. He specifically found that, while the risk factor was present, he could not opine that it contributed to the loss, which is what the Exclusion requires. In fact, he cautioned that it was "impossible" and "scientifically irresponsible" to use numerical toxicology data in isolation to determine whether alcohol or drugs contributed to the loss.

*Id.*, at 11.

Finally, the *Murchison* Court distinguished the Fifth Circuit's *Dutka*, cited by Lincoln, stating:

> Defendant makes much of a statement by the Fifth Circuit in *Dutka ex rel. Estate of T.M. v. AIG Life Insurance Co.*, 573 F.3d 210 (5th Cir. 2009), that "there was no *direct* proof that the drugs caused the crash, however, in such a case there rarely is -- the evidence is circumstantial. The nature of the accident itself supports the conclusion that drugs contributed." *Dutka*, 573 F.3d at 214. In that case, the insured was piloting a private plane on a reconnaissance flight of deer hunting sites, which required low altitude flying. *Id.* at 212. He and his passengers were killed after he failed to maintain adequate air speed that resulted in a stall/spin from which, at low altitude, it was impossible to recover. *Id.* The insurer denied the claim under an exclusion for losses caused by or resulting from the insured being under the influence of intoxicants or drugs, specifically, in that case, cocaine. *Id.* When the matter reached the Fifth Circuit, the court found as to causation, on an arbitrary and capricious review, that [i]n good visual meteorological conditions and with no evidence of mechanical failure, as the NTSB report found in this case, the failure

> to maintain airspeed at low altitude is a fundamental piloting error making it reasonable to conclude that the accident resulted in part from the pilot being under the influence of drugs.

*Id.,* at 214.

> While the Court does not disagree with the Fifth Circuit's determination on the facts before it, the decision has less than persuasive appeal here. The facts before this Court, as explained herein, are not as clear-cut.

*Id.*, at *10, n. 4

Thus, case law from around the country consistently rejects finding that alcohol contributed to or caused an accident based on studies, numerical data, or risk factors as Lincoln did here.

Finally, Lincoln's attempt to discredit the affidavits of Mr. Sewell and his four eyewitnesses on page 18 of its response memorandum, stating: "While these affidavits were fully considered by the reviewing physicians and by Lincoln, reasonably, they were not deemed to effectively controvert the BAC and the medical records," and citing in Lincoln's footnote 41 "*Rittinger*, 914 F.3d at 958 (administrator did not abuse its discretion in crediting [assumed typo, meaning to say "discrediting"] after-the-fact, self-serving affidavits)" is misplaced. In *Rittinger*, there was ample factual record evidence to contradict the affidavits. *Id*., at 958. Here, the BAC and medical records can arguably only contradict the eyewitness testimony regarding number of beers consumed. They do not contradict the facts bearing on causation – the manner and circumstances of Mr. Sewell's dive. Neither do any other facts in the record contradict that testimony. Additionally, the affidavit testimony of the four independent eyewitnesses cannot be "self-serving." They gain nothing by Mr. Sewell recovering the benefits Lincoln owes. *Rekstad v. U.S. Ban 6 Corp*, 451 F.3d 1114 (10th Cir. 2006), *McDonald v. Western-Southern LifeInsur. Co*., 347 F.3d 161 (6th Cir. 2003) and *DiPietro v. Prudential Insurance Company of America*, 2004 U.S.

Dist. LEXIS 5004 (N.D. III. 3/26/2004) all value third-party observations as evidence in ERISA benefit claims.

**D. Lincoln's Newly Cited Red Cross "Standards" and Newly Argued Reasons for Denial are Prohibited From Consideration**

In its response memorandum, Lincoln again attempts to expand the administrative record and add reasons for claim denial never mentioned before.

In *George v. Reliance Standard Life Ins. Co.,* 776 F.3d 349, 353 (5th Cir. 2015), the Fifth Circuit held:

> [W]e hold that we are limited to considering whether the record supports the reasons that RSL provided to George *during the claims proceeding. See Spradley v. Owens–Ill. Hourly Emps. Welfare Benefit Plan,* 686 F.3d 1135, 1140 (10th Cir.2012) (holding same); *cf. Truitt,* 729 F.3d at 510 (holding that our review of an administrator's decision to deny benefits "focus[es] on whether the record adequately supports *the administrator's decision* " (emphasis added) (quoting *Vega,* 188 F.3d at 298)). Allowing plan administrators to offer new justifications for a denial after the claims process has ended would undermine the claims system that Congress envisioned when it drafted ERISA's administrative review provisions. *See* 29 U.S.C. § 1133 (requiring administrator to give clear notice and providing for administrative review); 29 C.F.R. § 2560.503–1(g) (same); *Spradley,* 686 F.3d at 1140 (noting that Congress's purposes, as expressed in these provisions, would be undermined if administrators could add new rationales to support decision after claims process ends). "A plan administrator may not treat the administrative process as a trial run and offer a post hoc rationale in district [or circuit] court." *Spradley,* 686 F.3d at 1140–41 (internal quotation marks omitted).

Citing and linking "Red Cross standards," Lincoln argues for the first time at page 14 and 15 of its response memorandum (D.E. 27 Page 14-15) that:

> Sewell does not state in the affidavit that he entered the water to check for depth or that he jumped in feet first to determine if it was safe to dive. Sewell does not state that others who were on the boat with him dove or jumped in or entered the water before he did. Sewell admits that he dove into murky water without taking any of the normal precautions that a person without impaired judgment due to alcohol consumption would take in these circumstances. Safety standards for entering an unknown body of water are well known, and Sewell violated a number of those standards, further evidencing reckless behavior by Sewell that is explained by his level of intoxication. Sewell's affidavit stated that he had experience diving into

"ponds, lakes, rivers, and other natural bodies of water," so his experience would indicate that he would have been aware of safety rules for diving into natural bodies of water. His reckless behavior in not being cautious, diving into murky water that he thought was 4.5 feet deep, diving from the rear deck of a boat, and after he had been drinking provide additional circumstantial evidence that his intoxication was the reason for his failure to follow known safety standards.

No Red Cross "standards" that Lincoln now cites (then morphs into "safety rules") were mentioned as a rationale for denying the claim in any denial letter. Lincoln first does so in its response memorandum. Nor were any Red Cross "standards" that Lincoln now links in its memorandum and asks the Court to consider made part of the administrative record. Thus, this argument is a prohibited post-hoc rationale that was not part of the reasons Lincoln mentioned when denied the claim during the administrative process, and it is based on evidence that is not even part of the administrative record.

Moreover, even if Lincoln's so-called Red Cross standards were to be considered, nothing in the record indicates that they are "well known" as Lincoln claims. Nor does anything in the record support the idea that Lincoln's self-determined "normal precautions" would have been shared by others under the circumstances apparent to Mr. Sewell when he dove. By no stretch do they serve as concrete evidence clearly supporting alcohol contributing to or causing Mr. Sewell's accident.

Lincoln's purported _reasons,_ expressed during the claim process, for finding that alcohol contributed to or caused Mr. Sewell's accident cannot serve as concrete evidence clearly supporting that finding. Lincoln's August 23, 2024 final denial letter (D.E. 21-5, Page 30-43) spans 13 pages. The first 10 pages address only the alcohol level element of the exclusion, criticizing Dr. Arnold for giving any consideration to eyewitness testimony, as well as his opinion regarding lactic acid producing a falsely elevated lab result. The first 10 pages do not address the "contributed to or caused by" element of the exclusion at all. The following are the entirety of

Lincoln's final denial *reasons* addressing the "contributed to or caused by" element of the exclusion, analyzed with comment **[in bracketed bold]**. Aside from being riddled with factual inaccuracies, they amount to nothing beyond concluding causation strictly from finding intoxication and noting "risk factor" statistics alone. Lincoln states:

> Per Dr. Arnold: There are no facts in the record to support the idea that alcohol-related impairment played any part in the claimant's accident. Multiple people who were there when the claimant was injured say he:
> - Had 5-6 beers spread out throughout the day before his accident. **[This only addresses intoxication, not causation]**
> - Dove into 4.5 – 5 feet deep water. **[This is inaccurate. Neither Dr. Arnold, nor any eyewitness claimed that Mr. Sewell dove into 4.5 – 5 feet deep water.]**
> - Did not appear intoxicated

> Dr. Swotinsky's response: The record indicates the claimant's alcohol level was 0.222 g/dL. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. This is a level that put him at high risk for a diving-related cervical spine injury. **[Lincoln here claims alcohol as a "risk factor." Courts universally reject intoxication and "risk factor" as sufficient to reasonably conclude causation.]**

> The file includes from May 2023 the claimant's statement and several statements from the claimant's friends who state they were with the claimant when he was injured on 08/28/21. These statements were submitted in response to the insurer questioning the claim based on alcohol intoxication. These statements are redundant, which suggests one person was their primary author. **[Redundancy just means consistent, which only supports reliability of the testimony. If they were inconsistent, Lincoln would have called that into question with better reason.]**

> The May 2023 recollection differs from the 08/28/21 EMS, emergency room, and hospital records which state:
> - The claimant's BAC was .222 g/dL. By contrast, had the claimant's alcohol consumption been limited to 5-6 beers spread out throughout the day, his BAC would have been essentially undetectable. **[This only addresses intoxication, not causation]**
> - The claimant dove into 3 feet deep water. **[This is consistent with eyewitness testimony. Neither Dr. Arnold, nor any eyewitness testify that Mr. Sewell dove into 4.5 – 5 feet deep water, as Lincoln inaccurately finds, as noted above.]**
> - ER Dr. Truman Milling's opinion on 08/28/21 that the claimant had presented with "alcohol intoxication." **[This only addresses intoxication, not causation facts regarding nature and circumstances of Mr. Sewell's dive.]**

Dr. Arnold accepts the May 2023 recollection as "undisputed evidence," i.e., more reliable than the contemporaneous records from health care providers. By contrast, I view the records from 08/28/21 as a more reliable source of evidence because they:

a. Were contemporaneous,

b. Come from independent sources not subject to biased recall

c. Come from medical professionals who were likely better qualified than the claimant's friends at recognizing and documenting the claimant's intoxication. **[These "records from 8/28/21" only address issues relating to intoxication. Nothing in them contradicts eyewitness testimony on the causation facts regarding nature and circumstances of Mr. Sewell's dive.]**

The medical/scientific literature consistently finds that alcohol use increases the risk of spinal cord injury from diving. One study reports that alcohol increases the risk 4.31-fold. The claimant's alcohol use either did, or did not, contribute to his accident. A 4.31-fold increase in risk indicates it likely did contribute to the accident because, in any group of people who have diving accidents while using alcohol, 78% of such accidents are attributable to alcohol use. **[This is inaccurate. This was Lincoln parroting Dr. Swotinsky's gross misinterpretation of his cited source. Regardless, courts universally reject intoxication and "risk factor" as sufficient to reasonably conclude causation.]**

Dr. Swotinsky concluded that Dr. Arnold's June 24, 2024 submission provided no basis for altering his conclusions as outlined in his previous report. In particular, he summarized that: Dr. Arnold's reference articles indicate that the claimant's alcohol test result of 0.222 g/dL cannot be attributed to the effect of presumed high levels of lactate and lactate dehydrogenase. While Dr. Arnold relies on the statements submitted by the claimant and his friends almost two years after the accident, those statements are contradicted by the contemporaneous, medical records. **[The contemporaneous medical records only address issues, and arguably testimony, relating to intoxication. Nothing in them contradicts eyewitness testimony on the causation facts regarding nature and circumstances of Mr. Sewell's dive.]**

The claimant's alcohol level corresponded with diminished judgment, increased self-confidence, and decreased inhibition. Misjudgments of water death [sic] and reckless behavior have been cited as common factors in diving-related cervical spine injuries. The claimant sustained his cervical spine injury when intoxicated by alcohol and diving into shallow water. The evidence demonstrates, consistent with published data about risk, that this claimant's alcohol use was a contributing factor in his accident. **[Lincoln reaches its conclusion based on studies and "risk factors", none of which contradict the undisputed eyewitness testimony on the causation facts regarding nature and circumstances of Mr. Sewell's dive.]**

(D.E. 21-5, Page 40-42)

Lincoln's posited *reasons* for finding causation in its initial denial and initial appeal denial are no better. In fact Lincoln expressly based its appeal denial, at least in part, on another critical and inaccurate understanding, or mischaracterization, of the undisputed facts of the record, and as found by Dr. Arnold. Lincoln stated in its appeal denial:

> Further the clinical review by Dr. Geimer indicated [that Dr. Arnold's] comments regarding the validity of the hospital's alcohol testing results are in question as well as they appear to be based primarily on statements from individuals on the boat that Mr. Sewell did exhibit "signs of severe intoxication."

(D.E. 21-3, Page 56)

Nothing in the record supports Lincoln's idea that "individuals on the boat" suggested that Mr. Sewell exhibited "signs of severe intoxication." All eyewitness testimony is to the contrary, as set forth above. Lincoln's complete mischaracterization of these critical facts alone renders its claim denial arbitrary and capricious.

In sum, Lincoln's denial *reasons* for finding causation from beginning to end are based on inaccurate assessment of the record facts, and at best, studies and "risk factor" statistics, one of which it misrepresents in its final appeal denial.

### E. Lincoln Mistakenly Wants the Court to Interpret its Exclusion as One Having a Conclusive Presumption of Causation, or Alternatively as a Status Intoxication Exclusion

Lincoln's policy excludes:

> "*any loss that is contributed to or caused by: ... the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred...*"

(D.E. 21-1, Page 33)

One thing clear about the exclusion is that it requires proof that the presence of alcohol, at a certain threshold level, contributed to or caused the accident. "Contributed to or caused" is an

essential element for exclusion. But what is the threshold "presence" level? The concluding sentence states: "The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred [Texas here]." But that sentence is without meaning standing alone. It tells us a jurisdiction only. The only way to make sense of the exclusion as a whole is to interpret the threshold "presence" level to be the <u>level</u> "which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident" under Texas law. Thus the presumption in the exclusion only reasonably defines what alcohol level under Texas law will be used in the exclusion – the level which, under Texas law, raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. It does not apply a presumption to the exclusion itself in the case in chief based on that level. . Regardless, "contributed to or caused" is an essential element for exclusion.

Lincoln essentially asks the Court to interpret its exclusion as one having a <u>conclusive</u> presumption of causation. But it does not. For instance, the following example of a conclusive presumption was noted in *Capone*, *supra*: "An accident in which the blood alcohol level of the operator of a motor vehicle meets or exceeds the level at which intoxication would be presumed under the law of the State where the accident occurred <u>shall be deemed</u> to be caused by the use of alcohol." *Capone*, *supra*, at 1200 (emphasis added). It would also like the court to interpret its exclusion as a status intoxication exclusion. But it is not. Examples of status intoxication exclusions are found in *Nichols, supra,* 2014 WL 12537147, at *1 ("does not cover any loss caused or contributed to by ... (7) Injury sustained <u>while</u> intoxicated…); and *Papotto v. Hartford Life & Acc. Ins. C*o., 731 F.3d 265, 267–68 (3d Cir. 2013) (losses caused or contributed to by an "Injury sustained <u>while</u> Intoxicated" are excluded.)

Allowing insurers with exclusions that require proof of causation to rely on evidence of intoxication, statistics and "studies" alone to support causation would effectively read the causation element out of their exclusions. For an intoxicated claimant killed by a stray bullet while pumping gas in a high-crime area, the insurer could argue that but for alcohol-induced poor judgment, the claimant would not have chosen to refuel in a dangerous neighborhood. For insurers wanting no causation requirement, the answer is simple. Write your policy like the conclusive presumption or status intoxication examples above. This record has no concrete evidence to clearly support the contributed to or caused component of Lincoln's exclusion. It has evidence to support only the opposite.

**CONCLUSION**

This was a bad denial by Lincoln, applying an exclusion without adequate support in the record, and overwhelming undisputed evidence negating the essential element of causation that Lincoln chose to include in its exclusion. Mr. Sewell and his family are entitled benefits from Lincoln for which Mr. Sewell paid premium to protect his family. Mr. Sewell prays for judgment that Lincoln pay him full benefits and judicial interest, and make an attorney fee determination in accordance with the relief requested at the end of Mr. Sewell's opening brief, and the proposed order filed therewith.

Respectfully Submitted,

s/J. Price McNamara

_____
**J. PRICE McNAMARA**
Bar Nos: LA 20291 & TX 24084626
10455 Jefferson Highway, Ste. 130
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313
price@jpricemcnamara.com
Attorney for Complainant

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

s/J. Price McNamara

_____

**J. PRICE McNAMARA**