UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| TIMOTHY SEWELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:23-CV-00317 |
| | § | |
| THE LINCOLN NATIONAL LIFE | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION ON PLAINTIFF'S AND DEFENDANT'S CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Timothy Sewell ("Sewell" or "Plaintiff") brings this action against The Lincoln National Life Insurance Company ("Lincoln" or "Defendant") alleging he was wrongfully denied benefits under an ERISA-governed benefit plan. Pending are the parties' cross Motions for Summary Judgment. (D.E. 24, D.E. 25). Both parties have filed responses and replies. (D.E. 26, D.E. 27, D.E. 28, D.E. 29). For the reasons set forth below, the undersigned respectfully recommends Plaintiff's Rule 52 Motion For Judgment on Administrative Record (D.E. 25) be **GRANTED** and Defendant's Motion for Summary Judgment (D.E. 24) be **DENIED**.

## I. JURISDICTION

This case arises under the Employee Retirement Income Security Act of 1972 (ERISA), 29 U.S.C. § 1001, *et. seq.* The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. This case was referred to the undersigned United

1 / 26

States Magistrate Judge for case management and to furnish a recommendation on dispositive motions pursuant to 28 U.S.C. § 636.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Accident[1]

On August 28, 2021, Plaintiff Timothy Sewell went on a fishing trip with three friends to the coastal waters surrounding Port Aransas, Texas. The fishing excursion began at around 6:30 a.m. At the time of the trip, Mr. Sewell was 56 years old and was employed as an insurance professional. He is a husband, father and veteran of the United States Navy. Mr. Sewell and his friends fished at different locations throughout the day. After lunch at around 4:00 p.m., they stopped in a large bay area to take a break and swim. They anchored in an area where there were other boats whose occupants were swimming in chest deep to neck deep water.  Mr. Sewell's friends were avid saltwater fishermen familiar with the area. Mr. Sewell was unfamiliar with the area.  He observed other persons jumping and diving from their boats. Mr. Sewell assumed the water in his vicinity would be the same depth as the other boats as they were 30 to 50 feet from his location.  There were no shallow water signs, no visible sandbars, or other indications the water was shallow. The bottom was not visible from the boat. Mr. Sewell dove into the water from the boat in what he characterizes as a shallow water dive.  The depth of the water was significantly shallower than anticipated, approximately two and a half feet deep, and there was an abrupt drop off. (D.E. 21-3, pp. 127-129). Mr. Sewell broke his neck when his head hit the bottom.

---

[1] *See* Affidavit of Timothy Sewell. (D.E. 21-3, pp. 127-129).

Mr. Sewell's friends removed him from the water, called 911, provided emergency first aid and took him to Port Aransas where paramedics transported him to the Corpus Christi Medical Center, a local hospital. Treating physicians determined Mr. Sewell had suffered a C4-C5 translocation dislocation. (D.E. 21-3, pp. 163). As part of his medical treatment and diagnosis, blood was drawn from Mr. Sewell and the laboratory results from the medical blood draw indicated Mr. Sewell's blood alcohol concentration was 222 mg/dL. (D.E. 21-3 p. 172). This corresponds to a blood alcohol concentration of 0.222%. (D.E. 21-4, p. 9). Mr. Sewell was later airlifted to Atlanta for neuro rehabilitation. (D.E. 21-3, pp. 163). Mr. Sewell has been determined to be permanently rendered a quadriplegic as a result of the accident.

**B. The Claims Process**[2]

Mr. Sewell was employed by McLarens LLC and filed a claim for Accidental Death and Dismemberment ("AD&D") under its Group Life Insurance Plan which was insured by a Group Life Insurance Policy issued by Defendant Lincoln to McLarens. Mr. Sewell filed a claim for AD&D benefits under the Plan. On January 27, 2023, Lincoln denied the claim (D.E. 21-4) based on the Policy containing the following exclusion:

> No benefits are payable for any loss that is contributed to or caused by: . . . 11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred.

---

[2] The undersigned has read and considered the entire administrative record. This summary includes the primary events in the claims process but does not recount the entire correspondence between the parties.

(D.E. 21-1, p. 33).

Mr. Sewell appealed Lincoln's decision to deny benefits submitting eyewitness affidavits and an expert report from Dr. Thomas Arnold. (D.E. 21-3, pp. 98-103). Dr. Arnold opined that the "serum alcohol level reported at the hospital **cannot possibly be accurate**." (D.E. 21-3, p 100)(emphasis original). Dr. Arnold's opinion was based, in part, on the testimony of the eyewitnesses who explained in their affidavits that Mr. Sewell did not exhibit any signs of intoxication, was not drinking heavily during the course of the day, consumed no more than six beers over the length of the day and dove in an area that was unexpectedly shallow.

In a letter dated July 14, 2023, Lincoln provided Plaintiff a clinical review memo prepared by Dr. Peggy Geimer.  (D.E. 21-4, pp. 7-14). Dr. Geimer is an Occupational and Environmental Health Consultant. (D.E. 21-3, pp. 321-35). In a letter dated September 26, 2023, Lincoln notified counsel for Plaintiff that it had denied Plaintiff's appeal of the initial denial of benefit. (D.E. 21-3, p. 51).  In making this decision, Lincoln cited the basis for its original decision, but also indicated it had considered Plaintiff's appeal submissions including witness affidavits and a report of Plaintiff's expert, Dr. Arnold. Lincoln also referenced an updated report by Dr. Peggy Geimer. (D.E. 21-4, 24-29).  Dr. Geimer concluded that alcohol caused or contributed to the accident which resulted in Plaintiff's cervical spine injury. (D.E. 21-4, p. 24).

On November 17, 2023, counsel for Mr. Sewell responded to Lincoln's appeal denial attaching Dr. Arnold's Addendum Report. (D.E. 21-3, pp. 21-27). Dr. Arnold noted his disagreement with Dr. Geimer's opinions, identifying what Dr. Arnold characterized as inaccuracies. Dr. Arnold restated his conclusion that the alcohol test performed on Mr. Sewell "cannot be accurate for the many reasons previously stated and can in no way be regarded as reliable." (D.E. 21-3, p. 27).

On November 22, 2023, Lincoln sent counsel for Plaintiff a letter that it would not consider his November 17, 2023 submission. On November 30, 2023, Plaintiff filed suit. (D.E. 1). On March 6, 2024, United States District Judge Nelva Gonzales Ramos entered a scheduling order. (D.E. 9). On December 11, 2024, Lincoln filed a Motion to Extend Cross-Motion Deadline in which Lincoln explained there was a disagreement between the parties as to whether the administrative record included Dr. Arnold's Addendum Report. (D.E. 11). Lincoln sought an extension to consider the report and any additional information Plaintiff wanted to submit. (D.E. 11). The undersigned initially granted the motion, mistakenly believing it to be unopposed. However, the original order was vacated (D.E. 14) after Plaintiff filed his Motion for Reconsideration. (D.E. 13). After considering the parties briefing, the undersigned granted Lincoln's motion for extension. (D.E. 17).

Lincoln then employed an additional doctor, Dr. Robert Swotinsky, to review the case. Dr. Swotinsky is an Occupational Medical Physician and Consultant.

(D.E. 21-5, pp. 93-127). He is the Director of Occupational and Environmental Medicine Services at Boston University Medical Center in Boston, Massachusetts. (D.E. 21-5, pp. 93). Dr. Swotinsky considered and rejected the reasoning set forth in Dr. Arnold's Addendum Report. (D.E. 21-5, pp. 114-119). On June 24, 2024, counsel for Plaintiff submitted to Lincoln a second Addendum Report from Dr. Arnold in which Dr. Arnold criticized and rejected Dr. Swotinsky's report. (D.E. 21-5, p. 50-55).

On August 2, 2024, Lincoln denied Mr. Sewell's final administrative appeal of the denial of his claim (D.E. 21-5, p. 30-43) relying on the hospital drug tests results to opine that Mr. Sewell had a significantly elevated blood alcohol level that caused or contributed to the accident in question. (D.E. 21-5, Page 42).

Lincoln filed the administrative record with this Court on August 8, 2024. (D.E. 21). Lincoln filed its Motion For Summary Judgment on September 16, 2024 (D.E. 24) and Mr. Sewell filed his Rule 52 Motion for Judgment on Administrative Record on the same date (D.E. 25). Both parties filed responses to the opposing motion (D.E. 26, D.E. 27) and replies to the responses (D.E. 28, D.E. 29).

III.   **LEGAL STANDARDS**

   **A. Summary Judgment**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict

6 / 26

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In making this determination, the court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Expl. & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a

genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence, . . . a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

### B. ERISA Standards

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). A suit under ERISA is similar to a suit to challenge an administrative decision; it is a review proceeding, not an evidentiary proceeding. *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011) (citing *See Doe v. Blue Cross & Blue Shield United of Wis.,* 112 F.3d 869, 875 (7th Cir. 1997)). "A plaintiff suing under this provision bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)). "But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.* (citing *Farley*, 979 F.2d at 658); *See Perdue v. Burger King Corp.*, 7 F. 3d 1251, 1254 n.9 (5th Cir. 1993); *Estate of Thompson v. Sun Life Assur. Co. of Canada*, 603 F. Supp. 2d 898, 908-09 (N.D. Tex.

8 / 26

2008). "[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." *Mario v. P C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002).

When these cases are filed in federal court, the district court reviews the plan administrators' determinations *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing *Firestone Tire Rubber Co.*, 489 U.S. at115).

The parties do not dispute that the plan at issue delegates discretionary authority to the plan administrator. However, the parties dispute which is the correct standard of review. Plaintiff maintains the appropriate standard of review is *de novo*. (D.E. 1, p. 9; D.E. 25, p. 22). Plaintiff cites several district court cases[3] for the proposition that because Texas law prohibits discretionary clauses under section 1701.062 of the Texas Insurance Code, courts reviewing denial of benefits decisions under ERISA must apply a *de novo* standard of review. (D.E. 25, p. 22). Defendant responds that the policy at issue contains a choice of law provision making the laws of Georgia the governing jurisdiction and that Georgia does not have a prohibition on discretionary clauses. (D.E. 27, p. 27; D.E. 21-1, p.

---

[3] *See Koch v. Metro. Life Ins. Co.* No. 7:18-cv-00154, 2019 6329383 *4 (N.D. Tex. Nov. 26, 2019); *Woods v. Riverbend Country Club, Inc.*, 320 F. Supp. 3d 901, 909 (S.D. Tex. 2018).

9 / 26

1). Defendant cites several Fifth Circuit decisions[4] in support of its position. Of these, the undersigned finds *Rittinger v. Healthy Alliance*, 914 F.3d 952, 955 (5th Cir. 2019) on point. In *Rittinger*, the Fifth Circuit applied an abuse of discretion standard of review where the plan contained a Missouri choice of law provision, despite the Texas prohibition on discretionary clauses. Therefore, the undersigned will apply an abuse of discretion standard in considering the parties' cross motions for summary judgment.

When applying the abuse of discretion standard in cases challenging the denial of benefits under an ERISA plan, the district court is serving in an appellate role and is not sitting as a court of first impression. *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014). "Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts." *Ariana M. v. Humana Health Plan of Texas, Inc.,* 884 F.3d 246, 256 (5th Cir. 2018) (en banc).

"Abuse of discretion review is synonymous with arbitrary and capricious review in the ERISA context." *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009) (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999)). "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Meditrust*, 168

---

[4] *See Jimenez v. Sun Life Assurance. Co. of Canada*, 486 F. App'x 398, 406-408 (5th Cir. 2012); *See also, Singletary v. Prudential Ins. Co. of Am.*, 828 F.3d 342, 351 (5th Cir. 2016); *Rittinger v. Healthy Alliance*, 914 F.3d 952, 955 (5th Cir. 2019).

F.3d at 215. The administrator's decision may only be disturbed if it is not "supported by substantial evidence." *See Rittinger*, 914 F.3d at 956 (quoting *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 468 (5th Cir. 2010)). "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)). "This review is deferential," requiring only an "'assurance that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end.'" *Id.* at 957-58 (quoting *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 140 (5th Cir. 2016)). The Court cannot substitute its own judgment for the plan administrator's. *Id.* at 959. The review of the administrator's decision does not need to be complex or technical. *Corry v. Liberty Life Assurance Co. of Boston,* 499 F.3d 389, 398 (5th Cir. 2007) .

When "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. . . . [T]his dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co.*, 554 U.S. at 108 (citing *Firestone Tire & Rubber Co.,* 489 U.S. at 115).  In the present case, because Lincoln was acting as both the claims administrator and the insurer, it is deemed to have a conflict of interest. (D.E. 24, p. 21).

## IV.   DISCUSSION & ANALYSIS

### A. The policy exclusion presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident.

On a cursory review, this tragic case appears to be a straightforward denial of benefits based on a policy exclusion that excludes coverage based on intoxication. The policy exclusion states no benefits are payable for any loss that is contributed to or caused by "the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred." (D.E. 21-1, p. 33). The exclusion language is not confusing. Mr. Sewell had blood drawn at a hospital after the accident that reported he had a blood alcohol content of .222 mg/dl which was almost three times the legal limit for driving while intoxicated in Texas (.08%).  Lincoln's experts opined that at the reported blood alcohol level Mr. Sewell would have experienced signs of "severe intoxication with impairment of motor function – unsteadiness, incoordination, impaired vision, cognitive function, and judgment contributing to the spinal cord injury." (D.E. 21-3, p. 52). This abbreviated summary of the record may seem to warrant the denial of benefits. However, the record as a whole does not support this conclusion. Further, Lincoln did not engage in a fair, impartial, or thorough review of the record. Instead, Lincoln's analysis relied exclusively on the blood test results. For the reasons discussed below, Lincoln did not consider or follow a plain reading of the policy exclusion, the decision was not supported by substantial evidence and this case

12 / 26

represents a claims administrator operating under a conflict of interest to reach a predetermined result.

The policy exclusion maintains that a certain blood alcohol level creates a *presumption* that the insured was under the influence of alcohol and contributed to the cause of the accident. That presumption is not the end of the analysis. However, for Lincoln and its experts for the defense, the presumption of intoxication was in fact the end of the analysis. Considering a presumption is only one step in the legal and factual analysis. Presumptions can be rebutted. In this case, the presumption of intoxication was rebutted with facts which were not appropriately accounted for by Lincoln or its experts.

**B. The presumption was rebutted.**

Mr. Sewell's own affidavit indicates he ate breakfast, lunch and snacks throughout the day. Mr. Sewell states he drank six beers over the course of the entire day from about 9:00 a.m. to 4:00 p.m.. Mr. Sewell also consumed water and Gatorade. Mr. Sewell knows he only drank six beers from a 12 pack of Yuengling light beer and he did not drink any other alcohol that day. Witnesses later verified that six unopened cans of Yuegling light beer remained from Mr. Sewell's twelve pack. The other fisherman drank a different brand. Mr. Sewell did not feel drunk or unsteady at any time during the day nor at the time of the accident. He has a clear memory of the events and was shocked when he learned of the hospital blood test results. (D.E. 21-3, pp 127-129). Mr. Sewell's wife states in her affidavit that her husband's affidavit recounts the same information she learned about the events from Mr. Sewell and witnesses. (D.E. 21-3, p. 130).

Mr. Sewell's version of facts is supported by the other eyewitnesses. Affiant James Fenn, the Vice President of Claims for Griston Claims Services, was present and an eyewitness for the relevant events. (D.E. 21-3, pp. 131-132). Mr. Fenn's affidavit is consistent with Mr. Sewell's in the amount of alcohol Mr. Sewell consumed and that they also drank water and Gatorade and consumed food. Mr. Fenn states in his affidavit that, "[a]t no time during the day did Tim [Sewell] appear intoxicated or "drunk", unsteady, or impaired in his actions or speech." (D.E. 21-3, p. 132). Mr. Fenn watched Mr. Sewell dive into the water when Mr. Sewell broke his neck. Mr. Fenn reported that Mr. Sewell removed his wallet and cell phone and took off his shirt before entering the water. "[Mr. Sewell] stood on the rear deck of the boat and did not fall or lose his balance, and had control of his movements." (D.E. 21-3, p. 132). Mr. Fenn also stated he and the other witnesses spoke with several Game Wardens about "exactly what happened. They boarded the boat, and counted our beer cans and fish. None of them even raised a question about alcohol consumption, as we were obviously showing zero effects of alcohol." (D.E. 21-3, p. 132).

Tiffany Weaver, an Account Services Manager for Griston Claim Services, was also present and provided an affidavit. (D.E. 21-3, pp. 133-134). Ms. Weaver fished from a separate boat from Mr. Sewell, but they fished in tandem throughout the day and her boat was close enough to the boat Mr. Sewell occupied to have conversations with him. She also sat with Mr. Sewell when they had lunch. Ms. Weaver reported interacting, conversing, and observing Mr. Sewell throughout the day. Ms. Weaver also personally observed the accident. She reports: "I saw Tim Sewell dive into the water. He stood on

the rear deck of the boat, diving out from the boat, not down. He did not fall or lose his balance or anything like that, but was surefooted and had control of his movements." (D.E. 21-3, p. 133). "At no time on that day did Tim Sewell or anyone on either boat act, appear or show any signs of being intoxicated. Nobody, including Tim Sewell, appeared unsteady or lacking in judgment. Nobody, including Tim Sewell, spoke in a manner appearing intoxicated or affected at all by alcohol consumption at any time of that day. All were in complete control of their judgment and behavior." (D.E. 21-3, p. 134). "The idea that Tim Sewell's blood alcohol concentration was over .2 at the hospital strikes me as impossible, inaccurate, and contrary to everything I observed that day." (D.E. 21-3, p. 134). Further, Ms. Weaver provided character testimony stating that she is well acquainted with Mr. Sewell and the other fishermen. "They are not youngsters who go boating to drink excessively. They are all professionals and perfect gentlemen in their mid to late 50's in age. I have never witnessed any of them drink excessively or appear intoxicated. This was just a typical, very relaxed and pleasant day of fishing among mature, responsible, professional friends." (D.E. 21-3, p. 134).

Paul Boswell, Senior Vice President for Catalytic Claims, was also present and provided an affidavit. (D.E. 21-3, pp. 135-37) as did Chris Boswell, the Chief Commercial Officer for a Morgan Stanley portfolio company. (D.E. 21-3, pp. 137-138). Both witnesses sworn affidavits are entirely consistent with the summaries of the witnesses above.

Mr. Sewell subsequently submitted an affidavit that he did not consume any alcohol at lunch (D.E. 21-3, p. 405) which was corroborated by additional affidavits from Tiffany

Weaver (D.E. 21-3, p. 406), James Fenn, (D.E. 21-3, p. 407) and Chris Boswell (D.E. 21-3, p. 400) his lunch companions.

**C. The defense experts' reports did not provide substantial evidence to support Lincoln's decision to deny coverage.**

Lincoln's initial consulting expert, Dr. Millstein, has consulted for Lincoln for 21 years. (D.E. 21-3, p. 28-30). Dr. Millstein did not spend much time on the case. He was hired on January 10, 2023, and issued his report the next day. (D.E. 21-4, pp. 168-70). His report relies almost exclusively on the blood alcohol results. (D.E. 168-170). Dr. Millstein opined that with a blood alcohol level of 222 mg/dL Mr. Sewell would have experienced signs of severe intoxication with impairment in motor function – unsteadiness, incoordination; impaired vision, cognitive function, and judgment. Dr. Millstein also opines that accidents due to diving in shallow water are rare and that studies indicate alcohol is a risk factor in cervical injuries. Dr. Millstein made his report without the benefit of any facts relating to the circumstances of the accident, or that with the exception of the blood alcohol results, there is no evidence Mr. Sewell was intoxicated and all of the other evidence indicates otherwise.

In response to Lincoln's denial of benefits, Plaintiff submitted an appeal and request for reconsideration to Lincoln. (D.E. 21-3, P. 409-12). Plaintiff attached to his appeal the report (D.E. 21-3 pp 98-103) and curriculum vitae (D.E. 21-4, pp. 65-74) of toxicologist Dr. Thomas Arnold (D.E. 32-3, pp. 99-103) along with witness affidavits,[5] medical records

---

[5] The substance of the witnesses' affidavits has been summarized above and need not be set forth again.

and other affidavits. Dr. Arnold is the Chairman of the Department of Emergency Medicine at LSU Health Sciences Center in Shreveport, Louisiana and is board certified in emergency medicine and toxicology. Dr. Arnold considered the facts and circumstances of the accident including the eyewitness affidavits, the geography of the accident and hidden sandbar, and medical records including the blood alcohol results. Dr. Arnold opined that "the hospital alcohol test cannot possibly be accurate and is therefore invalid. No claims of impairment can reasonably be made on such an egregiously flawed test." (D.E. 21-3, p. 103). In reaching this conclusion, Dr. Arnold, among other things, considered the nature of the testing, the facts surrounding the accident, and that the reported blood tests would have resulted in Mr. Sewell being severely intoxicated which was contradicted by all of the evidence.

In response to Plaintiff's appeal, Lincoln retained Dr. Peggy Geimer to review the claim and prepare a report. (D.E. 21-4, pp. 9-14). Dr. Geimer also prepared an Addendum to her report, dated September 7, 2023. (D.E. 21-3, pp. 83-90). Dr. Geimer is an Occupational and Environmental Health Consultant. Dr. Geimer opined that there is no evidence the hospital blood tests results are inaccurate and that the witness testimony is not credible. Dr. Geimer also notes the hospital records include a statement diagnosis of "alcohol abuse." However, there is nothing in the record to suggest that "diagnosis" is based on anything other than the one blood test result. (D.E. 21-4, p 11). Dr. Geimer discounts the witness affidavits noting the witnesses state Mr. Sewell made a shallow water dive, but the EMS reports indicate Mr. Sewell dove headfirst into shallow water. How Dr.

Geimer considers there to be any inconsistency between the witnesses' statements and the EMS records is bewildering. Dr. Geimer's CV indicates a career spent on the east coast of the United States and her report does not indicate she has any experience or knowledge of the geography of the coastal Texas waters where the accident occurred or that she considered any facts in the record to support her conclusions, which are clearly not supported by the administrative record.

In a letter dated September 26, 2023, Lincoln denied Mr. Sewell's appeal citing its initial decision, sections from its expert reports, and Plaintiff's submissions. (D.E. 21-3, pp. 51-60). Counsel for Plaintiff sent Lincoln a letter and an Addendum Report, both dated November 17, 2023. (D.E. 21-3, pp. 21-22; D.E. 21-23, pp. 24-27). On November 23, 2023, Lincoln sent counsel for Plaintiff a letter that its decision was final, and it would not consider any additional submissions, which included Plaintiff's November 17, 2023 submission. (D.E. 21-3, p. 22). After the lawsuit was filed, to prevent a dispute as to what was properly included in the record, the undersigned entered an order (D.E. 17) which resulted in Lincoln considering Plaintiff's November 17, 2023 letter, and Lincoln then hiring another expert, Dr. Robert B. Swotinsky. (D.E. 21-5. 93-103; D.E. 21-5, pp. 114-119). Dr. Swotinsky's report can be summarized as his opining that it is inappropriate for medical providers to defer to the testimony of the claimant and witnesses as to the amount of alcohol consumed by Mr. Sewell.

Plaintiff submitted Dr. Arnold's final report dated June 24, 2024, to Lincoln. (D.E. 21-5, pp. 50-55). Dr. Arnold pointed out his disagreement with Dr. Swotinsky's report and his rationale.

The only evidence of intoxication present in the administrative record is a single blood test result.[6] Without that blood test result, the entirety of the opinions of Lincoln's experts and the administrative record do not provide any evidence of intoxication. But for the blood test result, Lincoln's experts do not provide anything which could be fairly considered supportive of Lincoln's decision. One would hope that absent the blood test results even Lincoln's experts would either opine that alcohol played no role in the occurrence of the accident in question or at least that there is no evidence to draw that conclusion. The question for the Court is whether the blood test results standing alone, supported by experts who rely on those results, provide substantial evidence to support Lincoln's decision deny benefits when the administrative record contains significant evidence undermining the reliability of the test results.

**D. The evidence in the administrative record does not contain substantial evidence to support Lincoln's decision to deny coverage.**

The administrative record does not contain substantial evidence that intoxication contributed to or caused the accident. The circumstances of the event were not considered by Lincoln or its experts. The circumstances of the accident establish that alcohol had

---

[6] Mr. Sewell's medical records contain the following disclaimer regarding the blood test results: "Results are for medical purposes only and not for legal or employment evaluative purposes." (D.E. 21-3, p. 271). The parties and their experts dispute the significance of the disclaimer. However, the administrative record does not contain information from the laboratory or hospital administering the test as to the accuracy or reliability of the test in the instant case.

nothing to do with Mr. Sewell's injuries. The location of the accident happened in the Texas coastal waters in an area where other boats were anchored close together. Other persons were swimming in the immediate area and the depth of the water was known to be chest to neck deep high based on those persons already being in the water at the time of the accident. Mr. Sewell and the eyewitnesses state he made a shallow water dive. The defense experts discounted and rejected Mr. Sewell's and the eyewitnesses' accounts of the accident without any sound reason asserting the nature of the injury could only have occurred had the dive been at a steep angle. These conclusions are not only unsupported by the record, they are contradicted. The witnesses explain the accident occurred on the face of a hidden sand bar. A sand bar, by one commonsense definition, is "a ridge of sand in a river or sea, built up by the action of tides, currents etc. and often exposed at low tide." [7] Mr. Sewell's affidavit and eye witnesses describe the exact location of the accident in a similar way, as "an abrupt drop off, or transition of water depth from about 2.5 feet to four or five feet deep where I had seen others diving, swimming and wading minutes before chest and neck deep." (D.E. 21-3, pp. 127-129). The evidence in the record indicates Mr. Sewell made a shallow dive and hit the face of the sand bar, not the flat bottom of the bay. This evidence and description of the accident was completely ignored by Lincoln and the defense experts. The defense experts concluded without any evidence that the accident occurred in an area with a flat bottom. That assumption is contradicted by the record. Additionally, the eyewitnesses observed Mr. Sewell as he prepared to dive into the water.

---

[7] Dictionary.com (last visited February 25, 2025).

They watched him remove his wallet, cell phone and take off his shirt. They described his movements as controlled. The record indicates the eyewitnesses were not under the influence of alcohol. None of the witnesses, who were all familiar with the area, warned Mr. Sewell of any danger. This accident was just that, a horrible and unfortunate accident caused by a hidden danger. Mr. Sewell would have been well advised not to dive into the water, but hindsight is 20/20 and the administrative record establishes that alcohol had nothing to do with the occurrence of this tragedy. Lincoln simply ignored or failed to consider important evidence that is contained in the administrative record. *See Sapp v. Liberty Life Assurance Co. of Boston*, 210 F. Supp. 3d 846, 852 (E.D. Va. 2016) (granting covered person's motion for summary judgment in ERISA case where plan administrator failed to consider important evidence).

In *Dwyer v. United Healthcare Ins. Co.*, the Fifth Circuit stated, "We cannot overstate the importance of a fiduciary's duty to engage in a good faith 'meaningful dialogue' under the plan. Failure to do so represents an 'independent basis to overturn a plan administrator's denial of benefits.'" 115 F.4th 640, 650 (5th Cir. 2024) (citing *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 510 n.6 (5th Cir. 2013) (citing *Lafleur v. La. Health Serv. And Indem. Co.*, 563 F.3d 148,160 (5th Cir. 2009)). *Dwyer* is a particularly egregious ERISA case where the insurer simply refused or failed to consider evidence that supported the covered person's claim. The Court noted that plan administrators may not fail to consider a claimant's reliable evidence. *Id.* at 651 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003)). While the eyewitness affidavits of Plaintiff's

witnesses were mentioned in Lincoln's denial letters, they simply rejected the affidavits without reason or with conclusions that were clearly wrong. For example, as stated above, the affidavits explain how Mr. Sewell made a shallow water dive and broke his neck on a sand bar. Lincoln and its experts simply rejected these explanations as implausible. Lincoln failed to consider the nature of sand bars or the circumstances of the accident. In a similar vein, Lincoln and its experts dismissed Plaintiff's evidence that Mr. Sewell was not intoxicated and exhibited no signs of intoxication. *See Helton v. AT&T Inc.*, 709 F.3d 343, 359 (4th Cir. 2013). ("While an administrator has the authority to weigh conflicting pieces of evidence, it abuses its discretion when it fails to address conflicting evidence.") The experts for both parties cite studies relating to alcohol use and personal injury accidents, arguing the studies are relevant as to causation. However, none of these studies relate to an occurrence similar to accident in question and the results are simply not helpful in the instant case.

On the issue of causation, *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1200–01 (11th Cir. 2010), is instructive. In *Capone*, the plaintiff joined a group of guests who were diving off a dock at the Wyndham Resort. Mr. Capone's first dive occurred without incident. However, he broke his neck on the bottom after his second dive and suffered permanent quadriplegia. The plaintiff had an employee benefits plan, however, AETNA denied coverage on the basis that the plaintiff had a blood alcohol content of .244. Plaintiff sued under ERISA. The district court granted AETNA's motion for summary judgment. The Eleventh Circuit reversed. When analyzing the alcohol exclusion in the applicable

policy, the Court found there was not enough in the record to sufficiently connect the Plaintiff's decision to dive with his state of intoxication. AETNA relied on the toxicology tests over contradictory evidence. Similar to the instant case, in *Capone,* the plan administrator relied on a toxicology report over contradictory evidence. The undersigned is aware the Court in *Capone* applied a *de novo* standard of review, and the policy did not have a presumption clause for non-motor vehicle accidents. Nevertheless, the undersigned finds the non-binding analysis instructive.

### E. Lincoln was operating under a conflict of interest that is apparent after considering the administrative record.

Lincoln is an entity that administers the plan and determines whether an employee is eligible for benefits and also pays these benefits out of its own pocket. It is well established that this dual role creates a conflict of interest that a reviewing court should consider as a factor in determining whether the plan administrator has abused its discretion in denying benefits. *Firestone Tire & Rubber Co.,* 489 U.S. at 115. The existence of a conflict is only one factor in the Court's analysis.

Lincoln agrees the circumstances will deem it to have a conflict but argues the circumstances of the conflict is not a significant factor because it has taken steps to ensure accuracy in its claims process. The undersigned has read and considered Lincoln's briefing and evidence including the affidavit of Kayla Bick, Lincoln's Director of Claims. (D.E. 24-2). However, despite Lincoln taking steps to separate the claims process from the underwriting process, the claims record in the instant case evidences Lincoln was in fact conflicted. First, when Lincoln first denied Mr. Sewell's claim, the denial said nothing of

Dr. Millstein's report. The report was not provided to Plaintiff's counsel until he requested the file. That practice may, or may not be, the industry norm for such denials, but the lack of transparency is troubling. Additionally, Dr. Millstein has worked for Lincoln for 21 years and therefore can be said to be operating under the same conflict as Lincoln. What is telling to the undersigned is that, after Plaintiff submitted his appeal, the claims process became adversarial. Lincoln's expert reports do not read like the impartial expert reports expected of an impartial fiduciary. And that's the point. Lincoln is not impartial and the conflict in the present case is real. The summary refusal of Plaintiff's evidence and Lincoln's experts' reports is akin to the frequent battle of experts our Courts see all the time. Defendants' experts and their reports are an indication to the undersigned that Lincoln is operating under an actual conflict of interest. Accordingly, this factor weighs against Lincoln.

Additionally, Lincoln's refusal (D.E. 21-3, p. 22) to consider Dr. Arnold's November 17, 2023 report (D.E. 21-3, pp 24-27) is telling. The undersigned understands the claims process must come to an end at some point, and a plan administrator must be able to close the file. However, in the instant case, Mr. Sewell suffered a catastrophic injury resulting in his permanent quadriplegia and the record contained substantial evidence that the decision to deny coverage was not supportable. Lincoln put its desire to close its claim file in this case over providing Mr. Sewell a full opportunity to adjudicate the claim. Lincoln's actual conflict as evidenced by the record weighs against Lincoln.

24 / 26

While the undersigned has not assigned great weight to Lincoln's conflict, the undersigned has considered the conflict as a factor..

## V.    CONCLUSION

This is not a case of the undersigned merely disagreeing with the decision of the plan administrator. It is a case where Lincoln's decision to deny benefits is not supported by substantial evidence. Lincoln failed to consider the entirety of the evidence in the record. While Lincoln and its experts may have mentioned Plaintiff's evidence in the denial letters and expert reports, the summary dismissal of Plaintiff's evidence amounts to a failure to consider it and is a clear indication Lincoln was operating under a conflict of interest. The undersigned finds the blood tests results standing alone do not provide substantial evidence to support Lincoln's decision to deny benefits where the reliability of those tests has been solidly undermined within the administrative record to clearly rebut the presumption of intoxication contained in the policy exclusion. Having considered the entire administrative record, the undersigned further finds that Lincoln's decision to deny benefits to Mr. Sewell was arbitrary and capricious and was an abuse of discretion. Therefore, the undersigned respectfully recommends Plaintiff's Rule 52 Motion For Judgment on Administrative Record (D.E. 25) be **GRANTED** and Defendant's Motion for Summary Judgment (D.E. 24) be **DENIED**.

Respectfully submitted on March 3, 2025.

Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).