**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

**TIMOTHY SEWELL**

**CIVIL ACTION NO**
**VS**                                                              **2:23-cv-317**

**THE LINCOLN NATIONAL**
**LIFE INSURANCE COMPANY**

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION ON PLAINTIFF'S AND DEFENDANT'S CROSS MOTIONS FOR RULE 52 JUDGMENT ON ADMINISTRATIVE RECORD

Now comes Plaintiff, Timothy Sewell, who opposes the Objections of Defendant, The Lincoln National Life Insurance Company ("Lincoln" or "Defendant") to Magistrate Judge Libby's Memorandum and Recommendation ("M&R") granting Plaintiff's, and denying Lincoln's Cross Motions for Rule 52 Judgment on Administrative Record. Plaintiff adopts by reference his initial, opposition, and reply briefing on the merits (D.E. 25, 26, 29) to oppose Lincoln's Objections, and adds the following:

#### STANDARD OF REVIEW

As this Court recently stated:

> The district court conducts a de novo review of any part of a magistrate judge's disposition that has been properly objected to. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3); Warren v. Miles, 230 F.3d 688, 694 (5th Cir. 2000). "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987) (discussing pro se petitioner's objections to M&R), overruled on other grounds Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996).1 As to any portion for which no objection is filed, a district court reviews for clearly erroneous factual findings and conclusions of law. United States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989) (per curiam).

FN 1. See also Aldrich v. Bock, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004)

(discussing pro se petitioner's objections to M&R) ("An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context."); Jones v. Hamidullah, No. 2:05-2736, 2005 WL 3298966, at *3 (D.S.C. Dec. 5, 2005) (noting a pro se petitioner's M&R objections were "on the whole ... without merit in that they merely rehash [the] general arguments and do not direct the court's attention to any specific portion of the [M&R]."). In explaining the policy supporting this rule, the Supreme Court noted that "[t]he filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." Thomas v. Arn, 474 U.S. 140, 147 (1985).

*Descant v. CTCI Americas, Inc.*, No. 2:22-CV-00308, 2025 WL 444421, at *1 (S.D. Tex. Feb. 10, 2025).

Lincoln's Objection arguments amount to general disagreement with the Memorandum and Recommendation ("M&R") and rehashing the arguments of its prior briefing. It simply "summarizes what was presented before", and is therefore not a valid Rule 72 objection. Therefore, the Court should review only for clearly erroneous factual findings and conclusions of law. Regardless, each of Lincoln's argued points, and Plaintiff's opposition to them are addressed below in the same order that Lincoln presented them.

## THE M&R IS CORRECT

After thoroughly laying out the factual background of this matter, the standard under which an ERISA action is reviewed, and other applicable law in a 26-page M&R, Magistrate Judge Libby correctly found that the record as a whole lacked substantial evidence to support Lincoln's denial of benefits. The ruling came after the Court gave Lincoln more than gracious opportunity to develop support for its denial. The Court granted Lincoln's request to postpone an imminent final briefing schedule on the merits, remanding the case to allow Lincoln to hire a third reviewing expert in a failed attempt to rehabilitate an unsupportable denial. The third expert's report, and Lincoln's reliance on it, were riddled with inaccuracy and false representations of studies they claimed supported their positions. The third expert's final report addendum was not even shared

with Plaintiff for comment or rebuttal before Lincoln issued its final denial before final Court briefing resumed. Our record fully supports the M&R finding of abuse of discretion. Plaintiff respectfully requests that the Court adopt it in full and overrule Lincoln's Objections.

**LINCLON'S OBJECTIONS**

**LINCOLN OBJECTION A:**

**LINCOLN OBJECTS TO THE M&R TO THE EXTENT THAT IT PLACED THE BURDEN ON LINCOLN TO PROVE THE POLICY EXCLUSION WAS PROPERLY APPLIED TO DENY SEWELL'S CLAIM.**

**Lincon objects that** "[w]hile it is correct that in the state law context of insurance, the Fifth Circuit has held that the insurer must prove the exclusion prevents coverage, the Fifth Circuit has not made such a finding with regard to claims governed by ERISA."

**Plaintiff's response:** The above deeply-entrenched common law concept is well-established in case law within the Fifth Circuit as applied in ERISA cases. The Fifth Circuit follows federal common law in ERISA cases:

> "Interpretations of policy provisions in ERISA-regulated plans are governed by federal common law." *Talamantes v. Metro. Life Ins. Co.*, 3 F.4th 166, 169 (5th Cir. 2021); *see also Ramirez v. United of Omaha Life Ins. Co.*, 872 F.3d 721, 725 (5th Cir. 2017). Federal common law rules of contract construction and interpretation incorporate ordinary rules of contract construction. *See Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 331 (5th Cir. 2014).

*Krishna v. Life Ins. Co. of N. Am.,* No. 22-20516, 2023 WL 4676822, at *6 (5th Cir. July 21, 2023).

The Fifth has also affirmed a number of district court cases holding that the insurer bears the burden of proving that an exclusion bars coverage under abuse of discretion review:

> "[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." *908 *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir.2004). These principles apply in an ERISA case. See *id*.

*Est. of Thompson v. Sun Life Assur. Co. of Canada*, 603 F. Supp. 2d 898, 907–08 (N.D. Tex. 2008), aff'd, 354 F. App'x 183 (5th Cir. 2009) (Under abuse of discretion review).

> "A plaintiff suing under this provision [§ 1132(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)). **"But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.* (citing *Farley*, 979 F.2d at 658). This same standard applies in the Fifth Circuit. *See Perdue v. Burger King Corp.*, 7 F. 3d 1251, 1254 n.9 (5th Cir. 1993); *Estate of Thompson v. Sun Life Assur. Co. of Canada*, 603 F. Supp. 2d 8 98, 908–09 (N.D. Tex. 2008) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies.")** (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)).

*Byerly v. Standard Ins. Co.,* No. 4:18-CV-00592, 2020 WL 1451543, at *16 (E.D. Tex. Mar. 25, 2020), *aff'd*, 843 F. App'x 572 (5th Cir. 2021) (Under abuse of discretion review). See also, *Hillebrandt v. Unum Life Ins. Co. of Am.,* No. 2:16-CV-0844, 2019 WL 1576879, at *9 (W.D. La. Feb. 14, 2019), *report and recommendation adopted,* No. 2:16-CV-0844, 2019 WL 1576650 (W.D. La. Apr. 11, 2019), aff'd, 787 F. App'x 235 (5th Cir. 2019) (Same).

Many other federal courts of appeal and district courts also hold that under abuse of discretion review, where an insurer relies on a plan exclusion as a basis for a denial of benefits, the burden lies with the insurer to prove the exclusion applies, including specifically the element of causation. *Kallaus v. Nationwide Death Benefit Plan*, No. 2:09-CV-0899, 2012 WL 5411082, at *10 (S.D. Ohio Nov. 6, 2012) (reviewing under abuse of discretion standard). Moreover, this burden extends to the question of causation; that is, the insurer "must demonstrate by a preponderance of the evidence not only that a condition enumerated within one of its exclusions existed, but that the condition" contributed to the death. *Id.*

More specifically:

> With respect to the burden of proof, Plaintiffs bear the burden of establishing that Bradley's death was an accident within the meaning of the Plan. Cooper v. Unum Life Ins. Co. of America, 2010 U.S. Dist. LEXIS 141525, 2010 WL 5859544 (E.D.Tenn. Nov. 16, 2010), citing Rose v. Hartford Fin. Servs. Group, Inc., 268 Fed. Appx. 444, 452 (6th Cir.2008), and Tracy v. Pharmacia & Upjohn Absence Payment Plan, 195 Fed. Appx. 511, 516 n. 4 (6th Cir.2006). The BAC, however, relies on Plan exclusions as a basis for the denial of benefits, therefore the BAC bears the burden of proving, by a preponderance of the evidence, that the exclusions

apply. See Cooper, 2010 U.S. Dist. LEXIS 141525, 2010 WL 5859544 citing Caffey v. Unum Life Ins. Co., 302 F.3d 576, 580 (6th Cir.2002); Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658 (8th Cir.1992); and Miller v. United Welfare Fund, 72 F.3d 1066, 1074 (2d Cir.1995). **Moreover, the BAC's burden of proof extends to the question of causation-it must demonstrate by a preponderance of the evidence not only that a condition enumerated within one of its exclusions existed, but that the condition was the proximate cause of Bradley's death.** See Cornish v. U.S. Life Ins. Co. of City of New York, 2009 U.S. Dist. LEXIS 92326, 2009 WL 3231351 (W.D.Ky. Sept. 30, 2009) (under applicable policy language, "Defendant insurance companies bear the burden to establish a causal relationship between the intoxication of the [decedent] and her resulting death by drowning"); see also Loan v. Prudential Ins. Co. of America, 370 Fed. Appx. 592, 596 (6th Cir.2010) ("After all, if a claimant is intoxicated while standing on a porch, the porch collapses, and he falls to his death, it cannot be said that his death has resulted from being legally intoxicated.").

*Id.,* (emphasis added).

See also, Couch on Insurance, Principles Applicable to Group Insurance; ERISA Actions §254:16 (3rd Ed.) (in ERISA actions, "if the insurer claims that a specific exclusion applies, the insurer has the burden to prove its applicability"); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (same).

Additionally, it would make no sense to impose the burden on Plaintiff to prove a negative, that the loss was **not** "**contributed to or caused by**…" (D.E. 30, p.12) a given blood alcohol level. Insurers wishing to avoid the burden of proving a causation element between intoxication and loss can simply write their exclusions to apply to any loss an insured suffers "while" intoxicated regardless of causation as discussed further below. Many do, as detailed below, but Lincoln did not.

Further, the Fifth Circuit embraces the concept of excluding all other hypotheses in the context of analogous ERISA exclusions. In a matter of first impression, the Fifth Circuit in *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349 (5th Cir. 2015), interpreted the "caused by or contributed to by" language in an exclusionary clause to mean "but-for cause" it defined as a

"cause without which the event could not have occurred." *Id*., at 355-356 (emphasis added). *George* involved an exclusionary provision limiting disability benefits to twenty-four months if "caused by or contributed to by mental or nervous disorders..." *Id.*, at 351. Since the George plaintiff had both physical and mental disabilities, the court reasoned that the limitation applied only if in the absence of his mental issues, his disability <u>could not have occurred.</u>

     *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189 (11th Cir. 2010) is on point. Although finding that Capone was intoxicated when he died in an accident diving from a pier, the *Capone* Court reasoned that the record simply could not factually support Aetna's conclusion that intoxication "caused or contributed" to his loss. The *Capone* Court rejected Aetna's idea, like Lincoln's here, that "since the decision to dive required a degree of judgment, alcohol necessarily caused or contributed to his injury." *Id*., at 1200. The *Capone* Court stated:

> Aetna cites the policy's alcohol exclusion as an independent ground for denial of Capone's claim. The policy provides, in relevant part:
>
> No benefits are payable for a loss **caused or contributed to by**:… Use of alcohol, intoxicants, or drugs, except as prescribed by a physician….
> Aetna relied on the toxicology tests over the contradictory affidavit of Kevin Zeh and the statements of Capone himself…. While we agree that it is reasonable to draw the conclusion that Capone was under the influence of alcohol, it is unreasonable to conclude that his intoxication caused his injury…. Capone has the burden of proving a *prima facie* case of entitlement to contractual benefits under the policy. *See Con't Assurance Co. v. Rothell,* 227 Ga. 258, 181 S.E.2d 283, 285 (1971). We hold that Capone has met this burden. Capone established that several other individuals were diving from the dock in a contemporaneous fashion. Capone claims they dove irrespective of their consumption of alcohol, and Aetna offers no evidence to refute this claim.
>
> **The burden then shifts to Aetna to prove that Capone is not entitled to benefits.** ***See id.*** **… Aetna claims that because Capone was intoxicated, his judgment was necessarily impaired. Aetna reasons that since the decision to dive required a degree of judgment, alcohol necessarily caused or contributed to his injury. This assertion, without more, cannot meet Aetna's burden of proving the exclusion applies.**

*Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1200–01 (11th Cir. 2010)(emphasis added).

Our facts warrant the same conclusion. Our record contains no facts to reasonably support the idea that Mr. Sewell's loss was "contributed to or caused by" a presence of alcohol; *i.e.*, that his decision to make a shallow water dive would not have occurred "but for" an alcohol level in Mr. Sewell. All indications were that it was safe to do so, that the water was 4.5 to 5 ft. deep, that others were doing so without issue, that Mr. Sewell exhibited no signs of impairment, and made a perfectly controlled. outward dive. Substantial evidence simply does not support Lincoln's denial.

**LINCOLN OBJECTION B:**

**LINCOLN OBJECTS TO THE M&R'S FINDINGS THAT LINCOLN DID NOT ENGAGE IN A FAIR, IMPARTIAL, OR THOROUGH REVIEW OF THE RECORD; RELIED SOLELY UPON THE BLOOD ALCOHOL LEVEL OF .222 CONTAINED IN THE MEDICAL RECORDS; AND DID NOT SUPPORT ITS DECISION WITH SUBSTANTIAL EVIDENCE.**

**LINCOLN FURTHER OBJECTS TO THE M&R'S FINDING THAT DR. MILLSTEIN'S, DR. GEIMER'S, AND DR. SWOTINSKY'S REPORTS AND OTHER EVIDENCE RELIED UPON BY LINCOLN WERE NOT SUBSTANTIAL EVIDENCE TO SUPPORT THE DENIAL OF SEWELL'S CLAIM.**

**LINCOLN FURTHER OBJECTS TO THE M&R'S FINDINGS THAT THE AFFIDAVITS CONSTITUTED SUBSTANTIAL EVIDENCE TO SUPPORT SEWELL'S CLAIM AND THAT LINCOLN REJECTED THE AFFIDAVITS WITHOUT REASON OR WITH WRONG CONCLUSIONS.**

**LINCOLN FURTHER OBJECTS TO THE M&R IGNORING THE VERY HIGH BLOOD ALCOHOL LEVEL AND EFFECTS THEREOF, AS WELL AS THE OTHER EVIDENCE IN THE ADMINISTRATIVE RECORD THAT SUPPORTS LINCOLN'S DECISION.**

Lincoln's multiple-part Objection B merely attacks the M&R as a whole (but inaccurately) with a rehashing of its briefing arguments. It is not a sufficient Objection under the above Rule 72 standards, and should not be considered as an Objection in the Rule 72 sense.

Regardless, Lincoln's arguments are baseless. Isolating each subpart of Lincoln's Objection B arguments, Plaintiff responds:

**LINCOLN OBJECTS TO THE M&R'S FINDINGS THAT LINCOLN DID NOT ENGAGE IN A FAIR, IMPARTIAL, OR THOROUGH REVIEW OF THE RECORD; RELIED**

**SOLELY UPON THE BLOOD ALCOHOL LEVEL OF .222 CONTAINED IN THE MEDICAL RECORDS; AND DID NOT SUPPORT ITS DECISION WITH SUBSTANTIAL EVIDENCE.**

This argument is baseless. Lincoln leaped from a questionable blood alcohol result to a finding of causation, ignoring undisputed facts overwhelmingly demonstrating that no alcohol effects contributed to Mr. Sewell's tragic accident. Caselaw from around the country, including the Fifth Circuit, hold that a blood alcohol level (even if accurate), plus risk factor statistics, standing alone, cannot qualify as substantial evidence to support the causation element of Lincoln's exclusion. Lincoln's claims process demonstrated gamesmanship and conflict of interest, not fairness or impartiality, as discussed below.

**LINCOLN FURTHER OBJECTS TO THE M&R'S FINDING THAT DR. MILLSTEIN'S, DR. GEIMER'S, AND DR. SWOTINSKY'S REPORTS AND OTHER EVIDENCE RELIED UPON BY LINCOLN WERE NOT SUBSTANTIAL EVIDENCE TO SUPPORT THE DENIAL OF SEWELL'S CLAIM.**

This argument is likewise baseless. Each expert's report makes the same leap from blood level plus risk factor statistics to a finding of causation that Fifth Circuit finds inadequate to support causation. The reports demonstrate bias, inaccurately presented critical facts, and false claims about statistics they cite as bases for their opinions as described below.

**LINCOLN FURTHER OBJECTS TO THE M&R'S FINDINGS THAT THE AFFIDAVITS CONSTITUTED SUBSTANTIAL EVIDENCE TO SUPPORT SEWELL'S CLAIM AND THAT LINCOLN REJECTED THE AFFIDAVITS WITHOUT REASON OR WITH WRONG CONCLUSIONS.**

Lincoln has this backwards. Mr. Sewell proved his claim; that is, he was rendered quadriplegic in a tragic accident. Lincoln denied based on an intoxication exclusion for which Lincoln bore the burden of proof. Regardless, even if Mr. Sewell were required to prove a negative, that alcohol did not contribute to his accident, the sworn testimony from the affidavits is consistent, undisputed, and indeed proves that.

As the M&R thoroughly and accurately explained, those affidavits established:

> On August 28, 2021, Plaintiff Timothy Sewell went on a fishing trip with three friends to the coastal waters surrounding Port Aransas, Texas. The fishing excursion began at around 6:30 a.m. At the time of the trip, Mr. Sewell was 56 years old and was employed as an insurance professional. He is a husband, father and veteran of the United States Navy. Mr. Sewell and his friends fished at different locations throughout the day. After lunch at around 4:00 p.m., they stopped in a large bay area to take a break and swim. They anchored in an area where there were other boats whose occupants were swimming in chest deep to neck deep water. Mr. Sewell's friends were avid saltwater fishermen familiar with the area. Mr. Sewell was unfamiliar with the area. He observed other persons jumping and diving from their boats. Mr. Sewell assumed the water in his vicinity would be the same depth as the other boats as they were 30 to 50 feet from his location. There were no shallow water signs, no visible sandbars, or other indications the water was shallow. The bottom was not visible from the boat. Mr. Sewell dove into the water from the boat in what he characterizes as a shallow water dive. The depth of the water was significantly shallower than anticipated, approximately two and a half feet deep, and there was an abrupt drop off. (D.E. 21-3, pp. 127-129). Mr. Sewell broke his neck when his head hit the bottom.

(M&R, D.E 30, p. 2)

> Mr. Sewell's own affidavit indicates he ate breakfast, lunch and snacks throughout the day. Mr. Sewell states he drank six beers over the course of the entire day from about 9:00 a.m. to 4:00 p.m. Mr. Sewell also consumed water and Gatorade. Mr. Sewell knows he only drank six beers from a 12 pack of Yuengling light beer and he did not drink any other alcohol that day. Witnesses later verified that six unopened cans of Yuegling light beer remained from Mr. Sewell's twelve pack. The other fisherman drank a different brand. Mr. Sewell did not feel drunk or unsteady at any time during the day nor at the time of the accident. He has a clear memory of the events and was shocked when he learned of the hospital blood test results. (D.E. 21-3, pp 127-129). Mr. Sewell's wife states in her affidavit that her husband's affidavit recounts the same information she learned about the events from Mr. Sewell and witnesses. (D.E. 21-3, p. 130).

> Mr. Sewell's version of facts is supported by the other eyewitnesses. Affiant James Fenn, the Vice President of Claims for Griston Claims Services, was present and an eyewitness for the relevant events. (D.E. 21-3, pp. 131-132). Mr. Fenn's affidavit is consistent with Mr. Sewell's in the amount of alcohol Mr. Sewell consumed and that they also drank water and Gatorade and consumed food. Mr. Fenn states in his affidavit that, "[a]t no time during the day did Tim [Sewell] appear intoxicated or "drunk", unsteady, or impaired in his actions or speech." (D.E. 21-3, p. 132). Mr. Fenn watched Mr. Sewell dive into the water when Mr. Sewell broke his neck. Mr. Fenn reported that Mr. Sewell removed his wallet and cell phone and took off his shirt before entering the water. "[Mr. Sewell] stood on the rear deck of

9

the boat and did not fall or lose his balance, and had control of his movements." (D.E. 21-3, p. 132). Mr. Fenn also stated he and the other witnesses spoke with several Game Wardens about "exactly what happened. They boarded the boat, and counted our beer cans and fish. None of them even raised a question about alcohol consumption, as we were obviously showing zero effects of alcohol." (D.E. 21-3, p. 132).

Tiffany Weaver, an Account Services Manager for Griston Claim Services, was also present and provided an affidavit. (D.E. 21-3, pp. 133-134). Ms. Weaver fished from a separate boat from Mr. Sewell, but they fished in tandem throughout the day and her boat was close enough to the boat Mr. Sewell occupied to have conversations with him. She also sat with Mr. Sewell when they had lunch. Ms. Weaver reported interacting, conversing, and observing Mr. Sewell throughout the day. Ms. Weaver also personally observed the accident. She reports: "I saw Tim Sewell dive into the water. He stood on the rear deck of the boat, diving out from the boat, not down. He did not fall or lose his balance or anything like that, but was surefooted and had control of his movements." (D.E. 21-3, p. 133). "At no time on that day did Tim Sewell or anyone on either boat act, appear or show any signs of being intoxicated. Nobody, including Tim Sewell, appeared unsteady or lacking in judgment. Nobody, including Tim Sewell, spoke in a manner appearing intoxicated or affected at all by alcohol consumption at any time of that day. All were in complete control of their judgment and behavior." (D.E. 21-3, p. 134). "The idea that Tim Sewell's blood alcohol concentration was over .2 at the hospital strikes me as impossible, inaccurate, and contrary to everything I observed that day." (D.E. 21-3, p. 134). Further, Ms. Weaver provided character testimony stating that she is well acquainted with Mr. Sewell and the other fishermen. "They are not youngsters who go boating to drink excessively. They are all professionals and perfect gentlemen in their mid to late 50's in age. I have never witnessed any of them drink excessively or appear intoxicated. This was just a typical, very relaxed and pleasant day of fishing among mature, responsible, professional friends." (D.E. 21-3, p. 134).

Paul Boswell, Senior Vice President for Catalytic Claims, was also present and provided an affidavit. (D.E. 21-3, pp. 135-37) as did Chris Boswell, the Chief Commercial Officer for a Morgan Stanley portfolio company. (D.E. 21-3, pp. 137-138). Both witnesses sworn affidavits are entirely consistent with the summaries of the witnesses above.

Mr. Sewell subsequently submitted an affidavit that he did not consume any alcohol at lunch (D.E. 21-3, p. 405) which was corroborated by additional affidavits from Tiffany Weaver (D.E. 21-3, p. 406), James Fenn, (D.E. 21-3, p. 407) and Chris Boswell (D.E. 21-3, p. 400) his lunch companions.

(M&R, D.E 30, p. 12-16)

Lincoln's summary dismissal of the above undisputed testimony in its denial is without

adequate or meaningful explanation. Lincoln suggests: "For example, with regard to the affidavits, Lincoln's letter noted that the affidavits were redundant, suggesting that one person was their primary author." (D.E. 31, p. 4) But redundant just means consistent and by more than one witness. Better reason to doubt their undisputed testimony would be if they were inconsistent. Lincoln's feigned reasoning for doubting those facts is flawed. The eyewitness testimony is solid, consistent, and unrefuted. Lincoln further suggests: "It also noted that the affidavits were inconsistent with the very high blood alcohol level." (D.E. 31, p. 4) But since the sworn testimony is unrefuted, Lincoln's point only casts further doubt on the accuracy of the blood alcohol lab result. Regardless, a blood alcohol level and risk factor statistics are insufficient to support a finding of causation, and the record contains zero evidence to support a finding that alcohol played a causal role here even if the lab result were accurate.

Lincoln also suggests: "Furthermore, it [Lincoln's denial] found the medical records containing the .222 g/dL BAC and the ER physician's note that Sewell had presented with "alcohol intoxication" were more reliable because the medical records were contemporaneous, came from independent sources not subject to biased recall, and came from medical professionals who were better qualified than Sewell's friends at recognizing his level of intoxication." (D.E. 31, p. 4) The M&R correctly found that those medical record notations lack the significance that Lincoln claims, as no medical record "recogniz[ed] his level of intoxication" as Lincoln claims. The medical record specifies that this history came from the questionable hospital lab result alone, noting that Mr. Sewell was intubated with no family member present. (D.E. 21-3, Page 190) Regardless, even if the Court even were to find Lincoln "reasonable" in relying on the hospital lab result as accurate, that in no way refutes the undisputed testimony relevant to causation - the controlled manner in which Mr. Sewell dove and the circumstances surrounding his decision to dive. Those facts are

proven by the undisputed sworn testimony of four independent eyewitnesses. Neither a lab result nor notations of alcohol in the medical record, which speak only to alcohol presence and level, can contradict those undisputed facts. Therefore, there is no record evidence, much less "concrete" evidence, to "clearly support" the essential "contributed to or caused by" element of the exclusion.

**LINCOLN FURTHER OBJECTS TO THE M&R IGNORING THE VERY HIGH BLOOD ALCOHOL LEVEL AND EFFECTS THEREOF, AS WELL AS THE OTHER EVIDENCE IN THE ADMINISTRATIVE RECORD THAT SUPPORTS LINCOLN'S DECISION.**

The M&R did no such thing. It discussed all of the evidence thoroughly, including the questionable blood alcohol lab result, all of Lincoln's experts' reports, and all evidence that Lincoln offered and argued. The Court even halted an imminent merits briefing schedule to remand and allow Lincoln to hire its third expert, and fully considered his report as well.

**LINCOLN OBJECTION C:**

**LINCOLN OBJECTS TO THE FINDING IN THE M&R THAT LINCOLN DID NOT CONSIDER OR FOLLOW A PLAIN READING OF THE POLICY EXCLUSION**

Lincoln quotes its exclusion to read: "[T]he presence of alcohol in the Covered Person's blood, . . . raises a presumption that the Covered Person was under the influence of alcohol and contributed to the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred." (Lincoln Objection, p.4) But Lincoln omits critical words. As the M&R correctly points out, Lincoln's exclusion excludes losses "**contributed to or caused by:**… the presence of alcohol in the Covered Person's blood **which** raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred." (D.E. 30, p.12) (Bold underlining added to the critical words Lincoln omits.)

One thing clear about the exclusion is that it requires proof that the presence of alcohol, at a certain threshold level, contributed to or caused the accident. "Contributed to or caused" is an

essential element for exclusion. But what is the threshold "presence" level? The concluding sentence states: "The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred [Texas here]." But that sentence is without meaning standing alone. It tells us a jurisdiction only. The only way to make sense of the exclusion as a whole is to interpret the threshold "presence" level to be the <u>level</u> "<u>which</u> raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident" under Texas law. Most states impose a presumption of intoxication at .08 BAC for DUI purposes. Some states impose a presumption of causation to automobile accidents at that level for punitive damages purposes. But Lincoln has not identified any presumption of accident causation under Texas law.

The word "presumption" plainly does not act to "presume" the essential causal element of the exclusion in a diving accident. Perhaps Lincoln's argument would be stronger if the word "which" (replaced with an ellipsis in Lincoln's quote of it) were actually not in the exclusion. But it is. And even if there were a presumption operating as Lincoln suggests, our record not only rebuts it, but overwhelmingly negates the reasonableness of finding that alcohol contributed to Mr. Sewell's accident.

Insurers wishing to avoid the burden of proving a causation element between intoxication and loss can simply write their exclusions with conclusive presumptions, or to apply to any loss an insured suffers "while" intoxicated regardless of causation. Many do, as detailed in Plaintiff's underlying briefing, but Lincoln did not. For instance, the following example of a <u>conclusive</u> presumption was noted in *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1200–01 (11th Cir. 2010): "An accident in which the blood alcohol level of the operator of a motor vehicle meets or exceeds the level at which intoxication would be presumed under the law of the State where the accident occurred <u>shall be deemed</u> to be caused by the use of alcohol." *Capone*, *supra*, at 1200 (emphasis

13

added). Examples of status intoxication exclusions (<u>while</u> intoxicated) are found in *Nichols, supra,* 2014 WL 12537147, at \*1 ("does not cover any loss caused or contributed to by ... (7) Injury sustained <u>while</u> intoxicated…); and *Papotto v. Hartford Life & Acc. Ins. Co.*, 731 F.3d 265, 267– 68 (3d Cir. 2013) (losses caused or contributed to by an "Injury sustained <u>while</u> Intoxicated" are excluded.)

Allowing insurers with exclusions that require proof of causation to rely on a blood-alcohol result, statistics, and "studies" alone to support causation would effectively read the causation element out of their exclusions. For an intoxicated claimant killed by a stray bullet while pumping gas in a high-crime area, the insurer could argue that but for alcohol-induced poor judgment, the claimant would not have chosen to refuel in a dangerous neighborhood. For insurers wanting no causation requirement, the answer is simple. Write your policy like the conclusive presumption or status intoxication examples above. Lincoln's Objection C is without merit and should be overruled.

**LINCOLN OBJECTION D:**

**LINCOLN OBJECTS TO THE FINDINGS IN THE M&R THAT AFTER SEWELL SUBMITTED HIS APPEAL, THE CLAIMS PROCESS BECAME ADVERSARIAL AND THAT LINCOLN'S CONFLICT OF INTEREST IS APPARENT FROM THE ADMINISTRATIVE RECORD.**

Lincoln's Objection D is baseless. The record fully demonstrates an overly-adversarial claim process and evidence of Lincoln's apparent conflict of interest as the following timeline demonstrates:

**Before the lawsuit:**

1/27/23 Lincoln denies the claim, concluding that intoxication caused the accident. (D.E. 21-4, Page 165-167) Just one day before the denial, Lincoln had hired Dr. Millstein on January 10, 2023, to review the claim, and he completed his report the very next day, January 11, 2023. (D.E. 21-4, Page 168-170) The report leaps from alcohol risk factors to find causation with no knowledge of the facts surrounding the accident. Dr. Millstein's *Curriculum Vitae* (CV) demonstrates zero

experience in Toxicology Medicine, his clinical experience ending in 2009, and his last 21 years spent consulting for Lincoln and Liberty Mutual on claims. (D.E. 21-3, Page 28-30)

5/25/23 Lincoln confirms receipt of Plaintiff's original appeal, which included an expert physician's report of Toxicologist Dr. Thomas Arnold, various eyewitness affidavits, and medical records. (D.E. 21-4, Page 40) Dr. Arnold's CV demonstrates the following extensive experience in Toxicology Medicine:

Diplomat, American Board of Medical Specialties Certified in Medical Toxicology (Subspecialty Board Certification) #22119, February 5, 1999 (re-certified 2009 and 2019); 2003 Fellow, American College of Medical Toxicology; Current Professor of Emergency Medicine, Department of Emergency Medicine, Section of Clinical Toxicology, Louisiana State University Health Sciences Center; Current Reviewer – Annals of Emergency Medicine; Current Reviewer – Journal of Toxicology – Clinical Toxicology; Current Reviewer – Journal of Medical Toxicology; Current EM 400 - Clinical Toxicology- Director for 15 Hour Course for all Fourth-Year Medical Students.

(D.E. 21-4, Page 65)

Dr. Arnold further explained his qualifications and opinions as follows:

I have served as the Chairman of the Department of Emergency Medicine at LSU Health Sciences Center in Shreveport, Louisiana since 2001. I am currently board certified in Emergency Medicine with sub-specialty board certification in Medical Toxicology. As Department Chairman, I currently administer and actively participate in an Emergency Medicine Residency Training Program with a current complement of 34 Emergency Medicine Residents enrolled. As a practicing Emergency Physician and a teacher of future Emergency Physicians I consider myself qualified to render an opinion regarding matters of Emergency medicine, trauma and medical toxicology. Since 1994, I have served as the Medical Director of the Louisiana Poison Center. I presently maintain a consulting service for medical toxicology at LSU Health- Shreveport and am consulted routinely by physicians throughout the state of Louisiana regarding management of patients with drug, alcohol and toxin related problems. As a Medical Toxicologist, questions of drug, toxin, chemical exposures, substance abuse and addiction are commonly encountered….

(D.E. 21-3, Page 98-103)

7/14/23    Lincoln sends Plaintiff a 7/7/23 original clinical review report of its newly- retained physician Dr. Geimer, to allow Plaintiff to respond by a deadline of August 4, 2023. (D.E. 21-4, Page 7) Dr. Geimer's CV demonstrates zero experience in Toxicology Medicine, and zero clinical experience of any kind for the last 35 years. (D.E. 21-3, Page 31-35)

7/21/23    Plaintiff by email asks Lincoln for an extension until 8/18/23 to complete Plaintiff's response to Lincoln's expert report. (D.E. 21-3, Pages 392-393)

8/4/23     Lincoln sends letter to Plaintiff stating that if Plaintiff's complete response to Lincoln's expert report is not received by 8/18/23, Lincoln will issue the appeal

decision without it. (D.E. 21-3, Page 402)

8/8/23      Plaintiff sends Lincoln a letter attaching the affidavit of witness Chris Boswell. (D.E. 21-3, Page 65)

8/21/23      Plaintiff sends letter to Lincoln attaching affidavit of Paul Boswell stating that this concludes Plaintiff's submission on appeal at this time. (D.E. 21-3, Page 68)

9/7/23      Lincoln's expert Dr. Geimer issues an _updated_ addendum report for Lincoln, this time voicing disagreement with Dr. Arnold's initial opinion and report, but Lincoln does not share it with Mr. Sewell for response before denying the claim. (D.E. 21-3, Page 83)

9/27/23      Lincoln denies Plaintiff's appeal, quoting Dr. Geimer's new 9/7/23 addendum report, which Plaintiff had never before seen, nor had opportunity to respond to. (D.E. 21-2, Page 2)

10/3/23      Plaintiff promptly requests the claim file from Lincoln to see Dr. Geimer's new 9/7/23 addendum report so he can share it with Dr. Arnold for response. (D.E. 21-3, Page 39)

10/16/23      Lincoln sends Plaintiff a letter attaching its claim file. (D.E. 21-3, Page 37) Plaintiff immediately sends the file and Dr. Geimer's new 9/7/23 addendum report to Dr. Arnold for comment.

11/17/23      Dr. Arnold issues addendum report responding to Dr. Geimer's new 9/7/23 addendum report. (D.E. 21-3, Page 24)

11/17/23      Plaintiff immediately sends Dr. Arnold's addendum report to Lincoln, asking Lincoln to reconsider its appeal denial in light of Plaintiff's response to its new evidence. (D.E. 21-3, Page 13)

11/22/23      Lincoln sends letter to Plaintiff expressly refusing to consider it. (D.E. 21-3, Page 24)

11/30/23      Plaintiff files suit. (Doc. 1)

**After the lawsuit:**

2/1/24      Lincoln Answers. (Doc. 6)

3/5/24      Plaintiff and Lincoln _jointly_ move for entry of a Scheduling Order with opening briefs due on 6/16/24. (Doc. 8)

3/6/24      Court enters the Scheduling Order that Plaintiff and Lincoln _jointly_ requested. (Doc. 9)

<table>
<tr><td>5/15/24</td><td>Thirty days before the agreed opening brief deadline, Lincoln filed a Motion to Extend Briefing Deadline to conduct another review to consider and respond to Dr. Arnold's report that it had expressly refused to consider six months earlier before suit was filed. The Court granted Lincoln's motion over Plaintiff's opposition.</td></tr>
</table>

Lincoln then had a new physician, occupational medicine Dr. Robert Swotinsky, to review the case. (D.E. 21-5, Page 114-119) Dr. Swotinsky is not a toxicologist, and his practice has involved "medical evaluations for insurers" for the past eleven years. (D.E. 21-5, Page 93-103) Despite his lack of toxicology expertise, his June 3, 2024, report rejects Dr. Arnold's opinion regarding Mr. Sewell's heart attack and resulting lactic acid buildup causing inaccurate lab results by ignoring the EMS record. On the separate issue of causation, he summarily dismisses the undisputed testimony of all eyewitnesses, and leaps from risk factor statistics to a finding of causation unsupported by undisputed facts. He says:

[A]a BAC of 0.22 corresponds with diminished judgment, increased self-confidence, and decreased inhibitions. As Drs. Millstein and Geimer described in their 01/11/23 and 09/07/23 reports to the insurer, alcohol consumption is a risk factor for diving-related cervical spine injuries. **[Now the leap…]** The claimant's ethanol impairment corresponding to his BAC of 0.22 was a contributing factor to his injuries.

(D.E. 21-5, Page 119) (bold bracketed added)

**On June 24, 2024, Toxicologist Dr. Arnold Responded to Dr. Swotinsky's Report as Follows:**

Dr. Swotinsky states my exact point that the consumption of six beers over seven hours prior to the accident cannot explain the serum alcohol level reported by the hospital. He also states that people tend to underestimate their alcohol consumption, but he completely omits the sworn affidavits of five other individuals listed in my original report who corroborate Mr. Sewell's account of his alcohol consumption that day….

Dr. Swotinsky would like to change the facts that were documented by the EMS providers on the scene and state that Mr. Sewell never experienced a cardiac arrest. The record very clearly states that he was in cardiac arrest at the time of their arrival, and he was down 3 minutes before CPR was started. Compressions were begun at 16:50 and return of spontaneous circulation (ROSC) was obtained at 16:55. That

five minutes plus the three minutes before CPR was started equals 8 minutes in cardiac arrest. They also record the initial ECG rhythm as Pulseless Electrical Activity (PEA). This is verification that Mr. Sewell was pulseless at that time. No reasonable physician or informed layperson who reviews this EMS chart can conclude that Mr. Sewell did not suffer a cardiac arrest. To ignore the clear documentation of this EMS record is intellectually disingenuous….

Dr. Swotinsky states in his own report, "Benchtop studies have demonstrated that an enzymatic ethanol test is subject to spurious elevation in the measured concentration due to the presence of lactic acid and/or lactate dehydrogenase." In addition, several of the references he listed discuss the possibility of this phenomenon occurring.

The hospital test does NOT directly measure alcohol in the blood. The simple explanation is that the hospital enzymatic test for alcohol in the serum measures a co-factor that is produced when alcohol is metabolized to acetaldehyde. This co-factor is called NADH. It is universally accepted that there are other compounds, illnesses and situations that can produce NADH that have nothing to do with alcohol metabolism. One of these compounds is lactic acid which is produced in situations of tissue hypoxia as would occur during a cardiac arrest event. When lactate is converted to pyruvate by the enzyme lactate dehydrogenase, NADH is produced. The hospital test has no way to differentiate NADH produced from alcohol metabolism or from lactate metabolism. This is the basis for my contention that Mr. Sewell's test was erroneous…. [references supporting medical literature]

He also criticizes me for not quantifying the amount of alcohol elevation is attributable to the lactic acid. The fact is that there is no linear relationship for this interference so no estimations can be made. The result is spurious and therefore unreliable…

Dr. Swotinsky misinterprets a very clear medical record documented by medical professionals who were at the scene and documenting the events at the time they occurred. The EMS record clearly documents that Mr. Sewell had a "CARDIAC ARREST". This contention otherwise should be viewed as a Hail Mary Pass by Lincoln Financial to attempt to suggest that lactic acid could not have been present because they know and fully understand that there is a problem with this alcohol test when lactic acid is present….

The matter of the clear disclaimer in the medical record that "Results are for medical purposes only and not for legal or employment purposes." As I have already stated, this disclaimer is present because the labs and hospitals know that this type of testing is subject to error and misapplication. This statement is a clear pronouncement that they are aware of the significant issues related to this type of testing and cannot stand behind the results as being valid or accurate….

My point is that Mr. Sewell did not have these levels of alcohol in his system at the

time of the accident. It was the build-up of lactic acid from 8 minutes of low or no circulation that resulted in a spurious result on the hospital serum alcohol assay.

**Finally, I address the issue of whether alcohol was a "contributing cause" of Mr. Sewell's accident. Even if one were to assume that Mr. Sewell had a BAC of 0.22 at the time of the accident, the undisputed facts still could not support a finding that alcohol played any contributing role in causing the accident. Accepted scientific methodology is fact based, not speculation based. The undisputed facts, attested to by multiple witnesses, are that Mr. Sewell exhibited no signs of intoxication, and made a perfectly controlled, outward dive from a boat, which is exactly what others were observed doing in close proximity from other boats, then witnessed wading and swimming in chest-deep water. There were no visual indications that the water was dramatically shallower where Mr. Sewell dove. Thus, there is nothing fact-based in the record to support the idea that any diminished judgment or other alcohol effect played any part in the decision to dive or the tragic accident.**

**Dr. Swotinsky's leap from generalities regarding impaired judgment to his claimed "contributing factor" conclusion is based upon pure speculation that has no support in the undisputed evidence. His scientific methodology is flawed and not appropriately applied. Likewise, previous statements presented by insurance company experts noting the percent of water-recreation accidents that involve alcohol are inadequate to support an opinion that alcohol was a "contributing cause." The mere fact that a given percentage of cervical injuries or water-recreation accidents may involve alcohol cannot support the conclusion that alcohol contributed to Mr. Sewell's accident. All available evidence is to the contrary….**

It should also be noted that I do not advertise my services as an expert witness, nor am I affiliated with any organization that solicits cases for me. I took on this case because I saw a miscarriage of justice being attempted on a helpless individual and family.

(D.E. 21-5, Page 50-55) (Emphasis added.)

**July 22, 2024** - Dr. Swotinsky issues yet another report, addressing points raised by Dr. Arnold's June 24, 2024 report, and citing nine new sources of literature.  (D.E. 21-5, Pages 44-49) In this report, he claimed that "alcohol use results in a 4.31-fold risk of a spinal cord injury while diving, meaning that 78% of all such diving accidents are attributable to alcohol use." But a simple glance at the cited 2004 study, titled <u>Garrison A, Clifford K, Gleason S, et al. Alcohol use associated with cervical spinal cord injury. *J Spinal Cord Med*. 2004;27:111-5</u>, proves those

assertions to be fiction. The study he cites is attached as Exhibit 1 to Plaintiff's underlying opposition brief (D.E. 26) for the Court's convenience.

The study actually shows that out of the 33 total people with diving-related cervical spine injuries, only 13 (39%) answered "yes", and 20 (61%) answered "no" to the question: "At the time of your spinal cord injury, were you using alcohol?" (Exhibit 1 to Plaintiff's underlying opposition brief, pp. 7, 3) Therefore the cited study does not at all support the idea that alcohol use "results in a 4.31-fold risk" of spinal injury, or that "78% of all such diving accidents are <u>attributable</u> to alcohol use" as Dr. Swotinsky and Lincoln posit. Not by a long shot.

The 4.31-fold (or 78%) increase that Dr. Swotinsky mischaracterized, and Lincoln as well in it's final denial letter, was clearly <u>not</u> a comparison of alcohol-use spinal cord injuries from diving with non-alcohol use spinal cord injuries from diving at all. Rather, it was a comparison of alcohol-use diving accidents resulting in <u>cervical spine injuries</u> (13 of them in the study) with alcohol-use diving accidents resulting in <u>non-cervical spine injuries</u> (only one of them in the study). (Exhibit 1 to Plaintiff's underlying opposition brief, p.7, 3) This is crystal clear in the study, and obviously expected: In shallow-water diving injuries, people land on their heads. Dr. Swotinsky twisted the clear and simple data into his unsupported conclusion, that in diving accidents, alcohol use results in a 4.31-fold risk increase of spinal injury, or that "78% of all such diving accidents are <u>attributable</u> to alcohol use." (D.E. 21-5, Page 48) Lincoln carried the falsity forward into its final appeal denial letter (D.E. 21-5, Page 41). The M&R correctly calls Lincoln's actions evidence of bad faith.

In evaluating a record to determine if substantial evidence supports a denial of benefits in an ERISA case, a district court "may properly assess each case's individual circumstances and evaluate the witness's credibility." *Salley v. E.I. Dupont de Nemours & Co.*, 966 F.2d 1011, 1016

(5th Cir. 1992). Dr. Swotinsky's credibility is shot on the causation issue. Further, a claim administrator like Lincoln may not rely on an expert opinion without considering its basis. *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 250 (5th Cir. 2007); *Schully, III v. Continental Casualty Company and Hartford Life Group Insurance Company*, 680 Fed. Appx. 437, 439, 2010 WL 2332080 (5th Cir. 2010) ("Nor may an administrator rely on an expert opinion without considering its basis or whether, as was the case here, it is in plain conflict with the medical records." Affirming the district court's finding that Hartford "deliberately ignored" plaintiff's medical evidence in order to support its "preferential and predetermined conclusions," the Fifth Circuit also affirmed the award of attorney's fees. *Id*., at 439.) The claimed basis for Dr. Swotinsky's causation opinion was a falsified reading of a simple study. Lincoln, as fiduciary claim administrator, inappropriately carried the falsity forward to support its denial, failing to consider his basis.

**\*\*Lincoln did not bother to share Dr. Swotinsky's July 22, 2024 report with Mr. Sewell for consideration or response before issuing its final, post-remand claim denial on August 2, 2024, and purporting to include it in the administrative record it filed into the Court record on August 8, 2024.**

**August 2, 2024** – Lincoln issues its final denial of Mr. Sewell's appeal (D.E. 21-5, Page 30-43), claiming that the hospital lab result "demonstrated a significantly elevated blood alcohol level, which would have resulted in impairments, including but not limited to judgement and perception, that caused or contributed to the accident that resulted in his quadriplegia." (D.E. 21-5, Page 42) Again, not only is the "caused or contributed to" element completely conclusory, but critically, Lincoln expressly relies on the same false information referenced above from the unshared final Dr. Swotinsky report to support that element.

**August 8, 2024** – Lincoln files what it claims to be the administrative record into the Court

record, including the unshared July 22, 2024 final report of Dr. Swotinsky containing the false data.

**September 16, 2024** - Lincoln files its opening memorandum, asking the Court to consider not only all post-lawsuit evidence referenced above, but also more proposed new evidence, not included in the August 8, 2024 administrative record Court filing, and not even related to responding to Dr. Arnold's report, which was the only claimed basis for Lincoln's request for remand. This new evidence, created September 13, 2024, and attached to its memorandum as Exhibit A, is the self-serving Declaration of Lincoln employee Ms. Bick, who attempts to further expand the record on the substantive issue of what weight the Court should give to Lincoln's conflict of interest through her description of Lincoln's purported pious claim-handling practices, both in general, and for Mr. Sewell's claim in particular. (D.E. 24-2, page 1-4)

Lincoln indeed took an overly adversarial position against Mr. Sewell, first refusing to consider relevant evidence Plaintiff provided before filing suit, then halting Court review just days before the opening briefing deadline to consider the same evidence <u>after</u> first filing a Joint Scheduling Order agreeing to that deadline. Those actions demonstrate financially conflicted, self-interested behavior, along with mischaracterizing parts of the record, claiming that bystanders stated that Mr. Sewell showed signs of "severe intoxication" when the opposite is true, and ignoring or summarily dismissing undisputed testimony of four eyewitnesses who were with Mr. Sewell the entire day, all to reach a pre-determined goal of denial.

**LINCOLN OBJECTION E:**

**LINCOLN OBJECTS TO THE FINDINGS IN THE M&R THAT SEWELL'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AND THAT LINCOLN'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.**

Lincoln complains that "the M&R fails to focus on the evidence that supported Lincoln's

decision, as required by *Ellis v. Liberty Life Assur. Co*. of Boston, 394 F.3d 262, 273 (5th Cir. 2004), choosing to solely rely on the affidavits of Sewell's friends and family to find that Lincoln abused its discretion in denying Sewell's claim for benefits", that Lincoln was reasonable "to draw the inference that Sewell's intoxication resulted in his decision to dive (not jump) into murky water of an unknown depth", and that "[t]he evidence will always be circumstantial, and courts should consider the nature of the incident in making that determination." (Citing *Dutka v. AIG Life Ins. Co.*, 573 F.3d at 210, 214 5th Cir. 2009). (D.E. 31, p. 6)

Lincoln is mistaken. First, Lincoln's idea that the court "failed to focus on the evidence that supported Lincoln's decision" distorts the Fifth Circuit's clear pronouncement that focus on the entirety of the administrative record is essential to determine whether a denial is plainly contradicted by the record as a whole on any essential issue, such as causation here. Very recently, in *Dwyer v. United Healthcare Insurance Company*, 2024 WL 4230125 (5th Cir. Sept. 19, 2024), the Fifth Circuit expressly considered all evidence in the record, finding that the insurer there abused its discretion because the evidence favoring the claimant's position as a whole overwhelmed the insurer's contrary conclusions. See also *Glenn v. Metropolitan Life Ins. Co.*, 461 F.3d 660, 672-74 & n. 4 (6th Cir. 2006) (denial decision arbitrary where plan selectively considered evidence to reach decision unsupported by the record as a whole), aff'd 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 483-84 (7th Cir. 2009) (holding that denial decision was arbitrary where insurer selectively relied on pieces of evidence to support the denial, while that evidence in context did not support the denial); *Leger v. Tribune Co.*, 557 F.3d 823, 832-33 (7th Cir.2009) (denial decision was arbitrary where insurer "cherry picked the statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally

disabled"). Thus proper review absolutely requires the consideration of all evidence, including that supportive of Mr. Sewell's position, and including the <u>undisputed</u> testimony concerning the circumstances surrounding Mr. Sewell's dive, as well as its deliberate and controlled nature, after seeing others do the same without issue, thus rebutting and negating even any "presumption" of causation. Lincoln's causation conclusion is not rational under our facts, and certainly not supported by "substantial" and "concrete" evidence, which "clearly supports" it.

The 26-page M&R thoroughly addresses all of Lincoln's arguments and evidence, and explains exactly why they are insufficient to support its claim denial on this record as a whole. As cited in Plaintiff's underlying trial briefing, court's all over the country, including the Fifth Circuit, hold that a blood alcohol result and statistics are insufficient alone to support a finding that intoxication caused an accident as addressed fully in Plaintiffs merits briefing. Lincoln, not Magistrate Judge Libby, ignored all evidence in the case that flatly negated the reasonableness of any "inference" Lincoln drew from a questionable lab result that.

Besides, "inferences" can't serve as substantial evidence to support a claim denial. "An abuse of discretion occurs when 'the decision is not based on **evidence**, even if disputable, that **clearly** supports the basis for its denial.' *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir.2009) (internal quotation marks and citations omitted)." *Firman v. Life Ins. Co. of North America,* 684 F.3d 533, 539 (5th Cir. 2012) (emphasis added).

In *Napoli v. Johnson & Johnson, Inc.*, 624 F.Appx. 861, 863-864 (5th Cir.2015), the court explained:

> In the seminal case of *Vega v. National Life Insurance Services, Inc.*, we explained that **"we will not countenance a denial of a claim solely because an administrator suspects something may be awry."** 188 F.3d 287, 302 (5th Cir.1999) *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343 141 L.Ed.2d 299 (2008). Although we owe deference to an administrator's *reasoned* decision, **"we owe no deference to the administrator's**

> **unsupported suspicions. Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion."**

(Emphasis added.)

Thus, "[a]n administrator's factual determinations will be reviewed with "due deference [to the extent they] reflect a reasonable and impartial judgment."[1] Stated another way, "[d]eferential review is not no review; deference need not be abject."[2] "Innuendos and hints" supportive of a denial are not enough. *Vega*, at 302. (Emphasis added)

The record as a whole contains zero evidence to support the idea that alcohol played any role in Mr. Sewell's tragic accident.

Lincoln cites *Dutka v. AIG Life Ins. Co.*, 573 F.3d 210, 214 (5th Cir. June 24, 2009) for the sweeping proposition that, in Lincoln's words: "As the Fifth Circuit has stated, even if there is no direct proof that alcohol consumption caused or contributed to Sewell's incident, that does not mean the administrator erred in denying benefits because there rarely is such direct proof. The evidence will always be circumstantial, and courts should consider the nature of the incident in making that determination." (D.E. 31, p. 6) But the *Dutka* Court didn't say "[t]he evidence will always be circumstantial." The *Dutka* Court did note in *dicta* "that there was no <u>direct</u> proof that the drugs [in the decedent's system] caused the crash, however, in such a case [where there are no living eyewitnesses to the small private plane crash] there <u>rarely</u> is—the evidence is circumstantial." *Dutka*, 573 F.3d at 214 (emphasis added). This *dicta* was far from condoning a denial on less than "concrete" evidence "clearly supporting" a denial, and the *Dutka* record <u>did</u> have concrete evidence clearly supporting the denial. *Dutka's* facts are nothing like ours.

First, the *Dutka* plane crash was unwitnessed. In contrast, our record has undisputed

---

[1] *Pierre v. Connecticut General Life Insurance Co.,* 932 F.2d 1552, 1563 (5th Cir.1991).
[2] *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir.1996) (emphasis added).

eyewitness testimony of the circumstances surrounding Mr. Sewell's accident. Additionally, the *Dutka* FAA toxicology report disclosed "the presence of chemicals in the decedent's body consistent with the use of multiple drugs around the time of the accident." *Id*., at 214. The court reasoned: "With evidence that the decedent was under the influence of Propoxyphene at the time of the crash and that he had recently used alcohol and cocaine, we cannot find arbitrary and capricious the administrator's conclusion that the decedent was intoxicated at the time of the crash" *Id*., at 214 (emphasis added). Turning to causation, the court reasoned that because weather conditions were clear, there was no evidence of mechanical failure, and with expert testimony on piloting airplanes concluding that "the failure to maintain air speed at low altitude is a **fundamental piloting error"** the administrator's decision had a sufficient factual foundation to reasonably conclude that the accident resulted in part from being under the influence of drugs. *Dutka*, 573 F.3d at 214 (emphasis added).

Our case is far different. Failing to maintain air speed while flying at low altitude, in good weather with no mechanical failure, a fundamental piloting error, while intoxicated by drugs and alcohol, with the record containing no evidence of causes other than impairment for making such a fundamental piloting error, bears no resemblance to our facts. Our record shows Mr. Sewell's simple decision to make a controlled and calculated dive, a reasonable decision based on all surrounding circumstances, with four eyewitnesses agreeing that Mr. Sewell exhibited no signs of intoxication and dove in a controlled manner in a safe outward direction from 18 inches above the water, after watching others doing the same thing with no problem from boats anchored next to them the same distance from shore, landing and wading in water 4.5-5ft. deep. Those facts are undisputed, rendering Lincoln's finding of causation pure speculation without concrete evidence clearly supporting it, not even slightly supporting it. *Dutka* is inapplicable on our facts and does

not support Lincoln's position.

Post-*Dutka* cases from the Fifth Circuit and other circuits are instructive and consistent with the Fifth Circuit rule as stated in *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 544 (5th Cir. 2012) (declining to impose a blanket standard of allowing insurers to consider injuries resulting from a crash involving an intoxicated driver as non-accidental. Rather, insurance companies must consider the circumstances of the fatal event in question and adduce some other evidence in addition to toxicology results). Compare *Green v. Life Insurance Co. of North America*, 754 F.3d 324, 331 (5th Cir.2014), where the record did contain sufficient other evidence in addition to toxicology results. Green died of head injuries in an unwitnessed boat accident. Distinguishing *Firman*, the *Green* Court noted, "there is evidence in addition to Green's blood alcohol content [a BAC of .243, which was uncontested] that supports the denial of benefits." *Id.*, at 331. The additional evidence included Green's actions of operating a boat at night without lights, and running into the support legs of a landing light at Keesler Air Force base, and other supporting circumstances, including empty beer bottles and cans found in the boat, and his wife's statement that before making his boat run he sounded intoxicated. *Id*. See also *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 331 (6th Cir. 2009) (same) See *id*. (citing *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1990 U.S. App. LEXIS 12175, 28 Employee Benefits Cas. (BNA) 1071 (1st Cir. 1990); see also *Hastie v. J. C. Penney Life Ins. Co.*, 115 F.3d 895, 895-97 (11th Cir. 1997) (the "insurance company had the burden of showing some causal connection between the intoxication and the insured's death in order for the exclusion to be effective.")

Courts consistently reject Lincoln's approach of merely relying on studies showing the generic effects of alcohol and medication to conclude causation without factual support. See, e.g., *Horton v. Life Ins. Co. of N. Am., Civil Action No.* ELH-14-3, 2015 U.S. Dist. LEXIS 39980, at

*52 (D. Md. Mar. 30, 2015), conducting an extensive survey of ERISA intoxication exclusion cases from multiple federal circuits, concluding "notwithstanding a minimal burden of proof and a deferential standard of review, an insurer cannot merely rest upon blood alcohol level and a generic list of alcohol's effects to establish a causative link between intoxication and loss." Otherwise, "Defendant's position is tantamount to the argument that the presence of blood alcohol above a certain limit automatically establishes causation and precludes coverage as a matter of law." *Id*. at *72. Rather, "there must be some evidence of the role of alcohol [or medication] in the loss, beyond the insured's intoxicated state, to establish the applicability of the exclusion." *Id*., at *72. To establish the causal link, the courts generally relied on direct evidence of <u>unexplained</u> driver error and other corroborating factors such as the lack of adverse conditions. *Id*., at *46-65. (citing *James-Smith v. Total Affiliates Accidental Death & Dismemberment Ins. Plan*, No. 3:10 CV 2640, 2011 U.S. Dist. LEXIS 118474, 2011 WL 4899992, at *6 (N.D. Ohio Oct. 13, 2011) (noting that police observed the insured's conduct and the insured failed to brake prior to the collision); *Dipper v. Union Labor Life Ins. Co.*, 400 F. Supp. 2d 604, 611 (S.D.N.Y. 2005) (highlighting "no evidence about abnormal conditions on the trail prior to the accident" or "evidence that the [vehicle] was prone to low-speed rolling or tipping"); *Bickel v. Sunbelt Rentals, Inc.*, WMN-09-2735, 2010 U.S. Dist. LEXIS 106546, 2010 WL 3938348, at *5 (D. Md. Oct. 6, 2010) ("the road conditions on the night of the accident were dry and [the police report] identified no other adverse conditions."); *Cornish v. United States Life Ins. Co.*, No. 3:06CV-344-DW, 2009 U.S. Dist. LEXIS 92326, at *21 (W.D. Ky. Sep. 30, 2009) (the "insurance companies bear the burden to establish a causal relationship between the intoxication of the [insured] and her resulting death.") See also, *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189 (11th Cir. 2010) (requiring evidence beyond establishing intoxication and statistics to satisfy the role of alcohol as causing or

contributing to the accident when exclusion included a caused or contributed to component.)

Magistrate Judge Libby appropriately assessed the underlying bases of Lincoln's hired experts' opinions (parroted by Lincoln in its denial) and those of Toxicologist Dr. Arnold on the issue of causation. He found the bases of Lincoln's experts' opinions to be flawed, which they were, and correctly found Lincoln's denial unsupported by the record.

## CONCLUSION AND PRAYER

The findings by Magistrate Judge Libby in the M&R are correct and Lincoln's Objections are erroneous and/or improper. Mr. Sewell respectfully requests that the Court adopt the Magistrate's Memorandum and Recommendation in full.

Respectfully Submitted,

s/J. Price McNamara

**J. PRICE McNAMARA**
Bar Nos: LA 20291 & TX 24084626
10455 Jefferson Highway, Ste. 130
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313
price@jpricemcnamara.com
Attorney for Complainant

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2025, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

s/J. Price McNamara

**J. PRICE McNAMARA**